No. 19-2706

# In The United States Court Of Appeals For The Third Circuit

**DR. ORIEN L. TULP,**

*Plaintiff - Appellant,*

**v.**

**EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES et al.,**

*Defendants - Appellees.*

On Appeal from the Order and Judgment Entered by the
United States District Court for the Eastern District of
Pennsylvania, No. 2:18-cv-05540-WB

**SUPPLEMENTAL APPENDIX**
**(Volume III of III, pages SAppx0511-0983)**

Elisa P. McEnroe
Matthew D. Klayman
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103
T. 215.963.5917
F. 215.963.5001

*Attorneys for Appellees Educational Commission for Foreign Medical
Graduates and Dr. William Pinsky*

# TABLE OF CONTENTS FOR SUPPLEMENTAL APPENDIX

**Page**

Notice of Appeal, filed July 23, 2019 ...................................................... SAppx0001

Memorandum Opinion and Order, filed June 25, 2019 ........................... SAppx0005

Memorandum Opinion and Order, filed March 26, 2019 ....................... SAppx0022

District Court Docket Entries for 18-cv-05540-WB ............................. SAppx0040

Complaint, filed December 24, 2018 ..................................................... SAppx0045

Defendants' Motion to Dismiss, filed January 22, 2019 ........................ SAppx0080

    Defendants' Memorandum of Law and Proposed Order ............. SAppx0082

Plaintiff's Answer to Defendants' Motion to Dismiss and Proposed Order, filed February 14, 2019 ........................................................................ SAppx0110

Defendants' Reply in Support of Motion to Dismiss, filed February 21, 2019 ...................................................................................................... SAppx0130

Defendant's Answer to Complaint, filed April 9, 2019 .......................... SAppx0145

Defendant Educational Commission for Foreign Medical Graduates' Motion for Summary Judgment,  filed May 3, 2019 ................................. SAppx0166

    Defendant's Memorandum of Law and Proposed Order ............. SAppx0168

    Statement of Undisputed Material Facts ..................................... SAppx0198

    Joint Appendix ............................................................................ SAppx0226

Plaintiff's Answer to Motion for Summary Judgment and Proposed Order, filed June 3, 2019 ................................................................................. SAppx0780

    Statement of Disputed Material Facts ......................................... SAppx0797

    Plaintiff's Appendix .................................................................... SAppx0800

Defendant's Reply in Support of Motion for Summary Judgment, filed June 20, 2019 .................................................................................................. SAppx0954

    Reply Statement of Undisputed Material Facts ........................... SAppx0968

    Supplement to Joint Appendix .................................................... SAppx0975

Scheduling Order, filed January 25, 2019 ............................................. SAppx0982

```
 1              MR. SWATE:  Ask Dr. to --

 2              THE COURT:  To Dr. Tulp?

 3              MR. SWATE:  To Dr. Tulp.

 4              THE COURT:  Okay.  Go ahead.

 5              MR. SWATE:  Yeah.  Since --

 6              THE COURT:  No, Dr. Tulp, you have to go back on the

 7    stand because he wants to introduce some documents through you.

 8              MR. REIL:  Your Honor, before I understand the --

 9    maybe I'm at the wrong point of juncture, I just wanted to

10    before we rest indicate what documents we wanted to introduce

11    into evidence.

12              THE COURT:  Well, I can tell you the ones that you

13    have had had admitted.  You've had Exhibit B, which is the

14    World Directory note.

15              MR. REIL:  That's one of them, yes.

16              THE COURT:  You've had Exhibit C, which is the

17    Montserrat Agreement.

18              MR. REIL:  Okay.

19              THE COURT:  You have Exhibit D, which is the

20    affidavit.

21              MR. REIL:  Yes.  I thought there was also --

22              THE COURT:  Wait a minute, we can -- you can say you

23    thought that once live gone through everything.  Let me see.  I

24    do not have records on Exhibit E, which is the November 21st,

25    2018 letter.  Is that something that you wanted to have
```

1    admitted?

2           MR. REIL:  Yes, there was testimony by Ms. Corrado on

3    that.  I would move to admit it.

4           THE COURT:  Any objection?

5           MS. MCENROE:  No, Your Honor.

6           THE COURT:  That's admitted, too.

7        (Plaintiff's Exhibit E admitted into evidence)

8           MR. REIL:  And I have one more.

9           THE COURT:  Hold on.  Which is the other one?

10          MR. REIL:  The other one, I believe, that there was

11   testimony on was --

12          THE COURT:  Identify it, yeah.

13          MR. REIL:  Yes, Exhibit G.  It was the fifth letter

14   down, the letter of 11/14/18 to Dr. -- Attorney Swate at page

15   22.  I asked Ms. Corrado about that is my recollection about

16   the faculty.

17          THE COURT:  Exhibit G, did you say?

18          MR. REIL:  Exhibit G.  And I have six letters listed.

19   It would be at page 23.

20          THE COURT:  I have no indication that that was -- oh.

21          MR. REIL:  If I might.

22          THE COURT:  Okay, I don't an indication that that was

23   admitted.  That was the page 23, correct?

24          MR. REIL:  Yes, Your Honor.

25          THE COURT:  Any objection to page 23 being admitted?

1           MS. MCENROE:  No objection.

2           THE COURT:  That's admitted.

3        (Plaintiff's Exhibit G admitted into evidence)

4           MR. REIL:  That's all I have, Your Honor.

5           THE COURT:  Okay.

6           MS. MCENROE:  And Your Honor, while we're admitting

7    exhibits, if you wouldn't mind, we have a number of exhibits

8    attached to our opposition to our motion -- sorry, our

9    opposition to the motion for preliminary injunction.

10          If you -- with the Court's permission, I'd like to

11   recall Ms. Corrado, if I could, to authenticate and can I just

12   have the exhibits admitted?

13          THE COURT:  I have no -- you can leave the stand now.

14          THE WITNESS:  Okay.

15       (Witness excused)

16          THE COURT:  I have no problem with that, but it will

17   be better if you could just stipulate.  Which documents are

18   they?

19          MS. MCENROE:  I don't know if you have the --

20          THE COURT:  I do.

21          MS. MCENROE:  -- exhibits in question.  So I would

22   like to -- Exhibit 1 is a printout of the ECFMG website about

23   ECFMG.

24          THE COURT:  Any objection to Exhibit 1 being

25   admitted?

Case: 19-2706 Document: 45-3 Page: 6 Date Filed: 01/16/2020
Case 2:18-cv-05540-WB Document 31-49 Filed 05/03/19 Page 265 of 304

111

1      MR. REIL:  Your Honor, we weren't given any notice

2   that these exhibits were going to be put into --

3      THE COURT:  Well, you're getting notice now, okay,

4   that's what we're talking about.

5      MR. REIL:  Oh.

6      THE COURT:  So let's talk about it.

7      MR. REIL:  Okay.

8      THE COURT:  Let's talk turkey.  Exhibit 1 to the

9   Defendant's motion, you have any objection to that being

10  admitted?

11     MS. MCENROE:  Sure, I don't think the note's in here.

12     MR. REIL:  I have to --

13     Yeah, fine.

14     Yeah, no objection.

15     THE COURT:  Admitted.

16   (Defendant's Exhibit 1 admitted into evidence)

17     MS. MCENROE:  Exhibit 2, please, Your Honor?

18     THE COURT:  The ECFMG Medical School policy --

19  international medical school definition.  Any objection to

20  that?

21     MR. REIL:  I have to know what purpose it's being

22  admitted for here?

23     MS. MCENROE:  Your Honor, it's for the purposes as

24  used in our opposition for the motion for preliminary

25  injunction to help provide the factual background for the

Case: 19-2706 Document: 45-3 Page: 7 Date Filed: 01/16/2020
Case 2:18-cv-05540-WB Document 31-49 Filed 05/03/19 Page 296 of 340

112

1    Court, what we think is necessary to rebut the Plaintiff's

2    motion for preliminary injunction.

3             In particular, this helps to lay out the fact that

4    ECFMG defines international medical schools as an international

5    medical school as an educational facility located in a country

6    outside of the United States and Canada with its primary campus

7    and main operations located in that country.  And there's

8    additional information in here, too.

9             THE COURT:  Well, I'm going to tell you that I'm

10   going to allow either Ms. Corrado or Ms. Cover to come up and

11   talk about this document.

12            And I'm pretty sure it's admissible, given that it's

13   an ECFMG school policy.  So we can do the hard way or we can do

14   it the easy way.

15            MR. REIL:  Well, let's do it the easy way.

16            THE COURT:  Excellent, that's admitted.

17        (Defendant's Exhibit 2 admitted into evidence)

18            MS. MCENROE:  Thank you, Your Honor.  Exhibit 3 is

19   the 2009 information booklet for ECMG (sic).  This -- each

20   year, ECMG publishes an information booklet laying out a full

21   range of information for the applicants coming through its

22   processes.

23            This includes a copy of the irregular behavior

24   policy.  And I'd be prepared to introduce and have it

25   authenticated by either Ms. Corrado or Ms. Clover.

Case: 19-2706    Document: 45-3    Page: 8    Date Filed: 01/16/2020    JA0288
Case 2:18-cv-05540-WB    Document 31-4    Filed 05/03/19    Page 292 of 344

113

1        THE COURT:  Any objection?

2        MR. REIL:  No, Your Honor -- yes, Your Honor.  That

3    applies to 2019.  All right, that's what it says on there,

4    ECFMG certification.  I don't know how, if any, it is changed

5    from what we were concerned of primarily, the hearing note in

6    November of 2000.

7        THE COURT:  What's your response to that?

8        MS. MCENROE:  Understood, Your Honor.  At the bottom,

9    it has the September 13th, 2018.  I believe this is sort of a

10   school year 2019 document, but I'd be happy to get one of the

11   witnesses up and they could testify as to any changes if

12   necessary.

13       THE COURT:  Okay.

14       MR. REIL:  Would you be willing to stipulate -- oh,

15   is your witness going to say that there are no changes?

16       MS. MCENROE:  I think no relevant changes to the

17   irregular behavior policy for certain.

18       MR. REIL:  Yes, Your Honor.

19       THE COURT:  Okay, that's admitted.

20     (Defendant's Exhibit 3 admitted into evidence)

21       MS. MCENROE:  Thank you, Your Honor.  Exhibit 4, I

22   believe had already been admitted in the form of one of the D

23   exhibits.  So we can skip that one unless my co-counsel

24   corrects me.

25       MR. REIL:  That's correct.

1          MS. MCENROE:  Same with Exhibit 5 and Exhibit 6.

2          MR. REIL:  Just --

3          MS. MCENROE:  Sorry, I'm going fast.

4          MR. REIL:  My fingers don't work.  Okay, all right,

5   all right.  4, we have to --

6          MS. MCENROE:  So --

7          THE COURT:  4 and 5 previously admitted?

8          MS. MCENROE:  Correct, Your Honor.  I believe 6 and 7

9   have also previously been admitted.

10         MR. REIL:  Counsel's representation, I agree.

11         THE COURT:  Okay.

12         MS. MCENROE:  Yeah, so I think we're up to Exhibit 8,

13  Your Honor, which is another letter from Ms. Corrado to Dr.

14  Tulp that we would submit for admission into evidence.

15         THE COURT:  Any objection?

16         MR. REIL:  No, Your Honor.

17         I have that anyway, I think.

18      (Defendant's Exhibit 8 admitted into evidence)

19         MS. MCENROE:  Your Honor, Exhibit 9 is a declaration

20  from Ms. Corrado.  I submit for its admission into evidence

21  today.

22         THE COURT:  That will not be admitted.

23  That's -- I'll just deal with that as a declaration.

24         MS. MCENROE:  Sure.

25         THE COURT:  All right.

1    MS. MCENROE:  I'd like to move for admission of

2    Exhibit Number 10.  This is a letter from Mr. Swate counsel to

3    Ms. Corrado

4        THE COURT:  Any objection?

5        MR. REIL:  One moment, Your Honor.  I'd like to know

6    for what purpose this is being offered?

7        MS. MCENROE:  Again, this is another exhibit that's

8    been submitted in conjunction with our opposition to

9    preliminary injunction.  So I think it's on the face of our

10   opposition about the facts that we've relied on before.

11       THE COURT:  Yeah, but it's a statement by an attorney

12   containing his views on the litigation.  So I'm not going to

13   allow that to be admitted.

14       MS. MCENROE:  Understood, Your Honor.

15       THE COURT:  Go ahead.

16       MS. MCENROE:  Exhibit 11's already been admitted.

17   Sorry, Your Honor.  Just (indiscernible).  Again, Exhibit 12.

18   Exhibit 13, I would move for admission of ECFMG meeting --

19   message that I'd be prepared to bring either Ms. Cover or Ms.

20   Corrado up to authenticate.

21       MR. REIL:  One second, Your Honor or one moment, Your

22   Honor.

23       THE COURT:  Uh-huh.  What is MECC Support?

24       MS. MCENROE:  The Medical Education Credentials

25   Committee support.  So that committee that had the hearing in

 1    November, it's called internally at ECFMG the MECC.

 2              MR. REIL:  Yes, Your Honor.

 3              THE COURT:  Okay.

 4         (Defendant's Exhibit 13 admitted into evidence)

 5              MS. MCENROE:  Your Honor, I'd move for admission of

 6    Exhibit 14.  This is an email from Ms. Corrado to Dr. Swate

 7    from November 2000 -- oh, you know what?  Has this one already

 8    been admitted?  I'm sorry.  I think in a different form,

 9    Plaintiffs have this email admitted.

10              THE COURT:  Okay, what else?

11              MS. MCENROE:  Exhibit 1 -- Exhibit 15 is a hearing

12    transcript and I'd move for its admission.

13              THE COURT:  That I would just deal with as a

14    transcript rather than an admitted document.

15              MS. MCENROE:  Thank you, Your Honor.  That's it from

16    us, Your Honor.  Thank you.

17              THE COURT:  Okay, and argument?  Opportunity for

18    argument if you wish.

19              MR. REIL:  Sure.

20              THE COURT:  Would you like to take a brief break

21    before we started argument?

22              MS. MCENROE:  That would be appreciated.

23              MR. REIL:  Yes, Your Honor.

24              THE COURT:  Five minutes.

25              MS. MCENROE:  Thank you.

1                THE COURT RECORDER:  All rise.

2          (Recess at 4:38 p.m., until 4:47 p.m.)

3                THE COURT RECORDER:  All rise.

4                THE COURT:  Okay, let's hear argument.

5                MS. MCENROE:  Your Honor, it's my position that it's

6     their burden of proof, so --

7                THE COURT:  Yes, we already -- well, they would have

8     to go first.

9                MS. MCENROE:  Thank you, Your Honor.

10               MR. SWATE:  If it pleases the Court, ECFMG had agreed

11    on their own that all documents and applications from students

12    of USAT would be honored until January the 1st, 2019.

13               Nothing has -- nothing changed on that date.  This is

14    not an allegation that you're running a rogue school.  The

15    result of the students have been exemplary students who

16    normally wouldn't have the opportunity to go to medical school,

17    they would go to medical school.  They achieved great results

18    on the test.

19               If the ECFMG tests are valid indications of education

20    of the students, the students are getting a great education at

21    USAT.

22               The harm that would result to USAT and Dr. Tulp would

23    be it essentially closes the school down.  That's the practical

24    effect of not allowing the status quo to be maintained.

25               With its notations on the website, the student that

Case: 19-2706  Document: 45-3  Page: 13  Date Filed: 01/16/2020
Case 2:18-cv-05540-WB  Document 31-2  Filed 05/03/19  Page 296 of 476

118

1   reads that is certainly not going to enroll in a school or not

2   going to continue.

3           Now the damage to the students is the students are in

4   various stages of education.  Some are in their second year.

5   Some are in their third year.  Some are in their fourth year.

6           So by just wiping that out immediately, it would do a

7   great harm to them, but also, it'd be great harm to the docket,

8   too, because he has a property interest in the medical school.

9           Public policy, the students who have graduated in

10  USAT have been a benefit to the medical system in the United

11  States.  You're not unleashing incompetent students.  They go

12  forward, and they do a good job, and they take care of American

13  citizens that need medical care.

14          The damage to ECFMG by allowing the status quo to be

15  maintained till this issue is resolved is minimal, because the

16  issues we're going to be presenting is our position is that

17  ECFMG is a quasi-government agency.  They've been delegated by

18  every state and agency -- every state and medical board in this

19  country to qualify international medical students.

20          So if they can enter the system without opening a

21  schedule, then the students are blocked from entering the

22  system.

23          So there's no damage.  They can't claim well, you're

24  producing these horrible students, a locus on the United States

25  and harming people.  There's no harm to be done by allowing the

1    status quo to exist.

2             It also benefits the general public, because 25

3    percent of health care in the United States is rendered by

4    international medical graduates that go through this ECFMG

5    process.

6             And that -- our position is Dr. Tulp was obviously

7    denied due process.  Now whether he is entitled to it or not

8    entitled to it is a question to be resolved.  Whether ECFMG has

9    to give him some degree of due process is a question to be

10   answered later on.

11            And I think it will be answered in this case.  But

12   the question today is what harm or result of maintaining the

13   status quo?  And that's what we're asking to do, maintain the

14   status quo until this case is decided.

15            And I don't think they can demonstrate any great harm

16   to the students if they're allowed the next six months or eight

17   months, however long it takes to resolve the case, because they

18   will probably resolve very quick to continue with their

19   education.

20            And then at the end, if they need to transfer, like

21   they were -- they suggesting January the 1st, 2019, they can

22   and the damage has been done.

23            That's the -- the fact issue in this case is what I

24   believe is not the issue today.  The issue today is not the

25   facts, because they didn't -- they would not give us the facts

Case 19-2706 Document 45-3 Page 15 Date Filed 01/16/2020 A0295
Case 2:18-cv-05540-WB Document 31 Filed 05/03/19 Page 298 of 304

120

1    at the hearing.  Just refused to do so.

2            And again, there's all kinds of questions about the

3    process.  But with respect to that, I ask the Court to issue a

4    temporary injunction to allow the -- that would require that

5    ECFMG to process the students' paperwork.

6            It doesn't mean that they have to agree to every

7    piece of paper that comes along.  They do their normal

8    procedure, but they just process the paperwork in a normal

9    fashion instead of just totally blocking it.

10           And if they have problems with the paperwork, of

11   course, they could do whatever is reasonable to do.  And I

12   think that's our approach and we believe it's reasonable.

13   Thank you.

14           THE COURT:  Thank you.  Ms. McEnroe?

15           MS. MCENROE:  May I approach, Your Honor?

16           THE COURT:  You may.

17           MS. MCENROE:  Your Honor, I'm going to try to keep

18   this brief, because we briefed it extensively in our papers.

19   So I'm not going to hit every point, but there are a number of

20   things I want to just make sure I clarify.

21           Mr. Swate said a number of times that he was seeking

22   to maintain the status quo.  This motion for preliminary

23   injunction that's being cited today was filed on January 2nd,

24   2019.

25           The status quo as of that time is that the finding of

1    irregular behavior had already gone into effect and the sponsor

2    note had already gone into effect.

3            What changed January 1st, 2019 is the issue that

4    counsel brought up a number of times.  That date had been

5    noticed to the public and to USAT from October 2018.

6            Their public policy and student interest definitely

7    keeps raising, notably, USAT is not a party here.  The students

8    are not a party here.  ECFMG takes its role in trying to

9    protect the public and interfacing with the students and

10   graduates that it works with very seriously.

11           And what happened on January 1st, 2019 is that the

12   notice ECFMG had provided in advance about the change in status

13   of this school went into effect.

14           And why did it go into effect?  Because ECFMG was not

15   sure and hadn't been provided evidence that USAT is truly

16   international medical school.

17           ECFMG only tries to reach as far as its grasp.  It's

18   not trying to issue sponsor notes to the University of

19   Pennsylvania Medical School.

20           It's not trying to issue certificates to graduates of

21   medical schools that it does not deem to be within its -- and

22   within its definition of an international medical school.

23           University of Sciences, Arts, and Technology does not

24   fall within that definition as far as ECFMG is concerned.  And

25   that's become abundantly clear.

1          There's a -- you know, we can talk semantics on

2     campus, not campus, whatever.  We heard today, and it's been

3     admitted into evidence, Dr. Tulp has called it a Miami campus.

4     There were cadavers dissected in Miami.  There was education

5     happening in the United States.  But yet, he hasn't gotten his

6     school to be accredited as a medical school in the United

7     States.

8          At the same time, ECFMG has failed to declare that it

9     doesn't feel capable of certifying its graduates going forward,

10    because it's concerned that it's not an international medical

11    school to meet ECFMG's definition.

12         That puts it as sort of a loophole school, that's not

13    going to be getting its authorization from anybody, which is a

14    concern to ECFMG, which tries and its mission is to protect the

15    health of the public.

16         ECFMG is (indiscernible) to hear -- it's wonderful to

17    hear that the USAT students are great doctors in serving the

18    public in the United States because there are 13 years, or 15

19    years, sorry, 15 years of graduates from that school that are

20    eligible to become medical professionals in the United States

21    through residency programs and certification from the ECFMG.

22         We have not taken -- ECFMG has not taken action to

23    file allegations of irregular behavior or take other sort of

24    actions against students from USAT on this basis

25    retrospectively.

Case: 19-2706  Document: 45-3  Page: 18  Date Filed: 01/16/2020  A0298
Case 2:18-cv-05540-WB  Document 31-2  Filed 05/03/19  Page 30 of 31

123

1          Prospectively, ECFMG provided notice.  But it may be

2     I'm getting too much in the weeds, because the truth of it is

3     we're here for a preliminary injunction.

4          And one day, I may be here arguing the full merits of

5     the case.  And Plaintiff just has not met the very high

6     standard for a preliminary injunction.

7          The status quo issue, I think, is a big one.  I think

8     we're sitting here now where the status quo they're seeking to

9     have overturned is that ECFMG would have to start recognizing

10    USAT, when it already has stopped recognizing USAT, basically

11    putting us in a position that if we were to be ordered to

12    change the sponsor note now, ECFMG would be getting forced by

13    this Court to tell the public that ECFMG deems graduates from

14    USAT to be eligible to be certified by ECFMG when ECFMG does

15    not deem that to be true.

16         If this Court were to go one step further, it would

17    be on this Court's discretion to tell us that we must certify

18    those graduates if they meet our other requirements

19    substituting this Court's opinion for ECFMG's.

20         So that I'm just trying to make sure, practically

21    speaking, it's clear what it is that an injunction here would

22    be seeking to do.

23         We think that just proves too much and goes too far,

24    especially on the very thin record that Plaintiffs have

25    provided you.

 1          Plaintiff notably has not provided any evidence that

 2    the underlying basis for ECFMG to take the action that it has

 3    is incorrect, other than semantics.

 4          Trying to say an administrative location versus a

 5    campus, even though they admit that students were dissecting

 6    cadavers in the United States and taking other extensive

 7    lecture courses, which is in that lecture document we had

 8    admitted into evidence.

 9          This is troubling to us.  And they've had a lot of

10    opportunities to fix it.  They could have even handed us

11    something today, said hey, Florida or Colorado, and somewhere

12    in the United States where we're doing these things, authorizes

13    us to do so and they haven't done that.

14          And we posit it's because they can't.  And until they

15    can satisfy that they are truly an authorized school, operating

16    the way that they would need to, to qualify as an international

17    medical school for our purposes, we just don't think we have

18    the authority.  We're trying to be limited here in what we can

19    possibly do.

20          Now we communicated that publicly through our sponsor

21    note, saying the truth of it is, hey, student -- potential

22    students, hey, others in the medical world, so you know, if

23    someone comes to us who's a 2019 grad, a 2020 grad, they're not

24    going to be eligible for certification.

25          We're trying to -- we're not trying to besmirch

Case: 19-2706 Document: 45-3 Page: 20 Date Filed: 01/16/2020
Case 2:18-cv-05540-WB Document 31-3 Filed 05/03/19 Page 308 of 384

A0300

125

1    anyone.  We're trying to just be accurate, so that there's fair

2    warning out in the public, so that people know.

3           In terms of due process, I would encourage Your Honor

4    to look at the extensive jurisprudence we've provided to you on

5    ECFMG being a state actor or not.

6           The 3rd Circuit has held that ECFMG is not a state

7    actor.  Other courts in this district have similarly so held.

8    We would posit that there hasn't been evidence taken or

9    submitted to indicate otherwise.

10          Counsel argued that 25 percent of health care in the

11   United States comes through the ECFMG.  We take our obligation

12   very seriously.

13          And we are very concerned that if we were to

14   misrepresent USAT's role, if we were to abdicate on our

15   obligation to try and say, hey, we think this is a legitimate

16   school or we don't think this is a legitimate school, we worry

17   that we would lose the credibility of doing that in the market

18   place, which we find to be our goal.

19          That's what we do.  We're good at it.  We try and go

20   around and certify that students have done what they need to do

21   to enter residency programs in the United States.

22          We encourage Your Honor not to undermine that

23   authority that we have reasonably exercised.  Dr. Tulp got

24   extensive notice.  Dr. Tulp got extensive opportunities to

25   present his facts to us.

Case: 19-2706 Document: 45-3 Page: 21 Date Filed: 01/16/2020 0301
Case 2:18-cv-05540-WB Document 31 Filed 05/03/19 Page 30 of 30

126

1          I submit to Your Honor, when you read the transcript

2     from the hearing on November 28th, it's correct.  I shut down

3     the hearing, because counsel was completely and utterly

4     preventing the committee from asking any questions of Dr. Tulp,

5     to get any sort of clarification on the facts and to

6     understand.

7          We weren't trying to deny anyone due process.  We

8     were trying to provide an extra layer of due process above what

9     we, a nonstate actor, even would need to provide.

10          So at the risk of not going on and on, Your Honor, if

11     there's a particular thing you'd like to hear about, I'd be

12     happy to argue further, but otherwise, I can let us bring this

13     to a close.

14          THE COURT:  Okay, thank you.

15          MS. MCENROE:  Thank you.

16          THE COURT:  Present and before the Court is

17     Plaintiff's motion for a preliminary injunction against

18     Defendant's Education Commission for Foreign Medical Graduates,

19     known as ECFMG and Dr. William Pinsky, collectively Defendants.

20          Plaintiff is president of the University of Science,

21     Arts, and Technology, USAT, a medical school located on the

22     British overseas territory of Montserrat.

23          ECFMG is a private nonprofit organization based in

24     Philadelphia, but certifies foreign medical school graduates,

25     so that those students can pursue postgraduate medical training

1    in the United States.

2            With a certification from ECFMG, graduates of foreign

3    medical schools like USAT begin the process of practicing

4    medicine in the United States.  Pinsky is the president and CEO

5    of ECFMG.

6            Plaintiff's suit is in effect, a response to

7    disciplinary action taken by ECFMG against USAT and Tulp

8    specifically.

9            According to documents attached to the complaint and

10   admitted here at the hearing today, ECFMG investigated and

11   subsequently sanctioned USAT and Tulp for providing false

12   information to ECFMG regarding the school's activities.

13           Specifically, ECFMG found that, one, USAT was

14   operating unauthorized branch campuses within the United

15   States; and two, Tulp personally provided false information to

16   ECFMG regarding USAT's student attendance.

17           Following a hearing before ECFMG's board, at which

18   Pinsky presided, ECFMG concluded that Tulp had -- that Tulp and

19   -- Tulp had engaged in behavior that violated ECFMG's policies

20   and procedures.

21           As a result, ECFMG took the following action.  It

22   determined that it will not accept any documents signed and/or

23   certified by Tulp for a period of five years; two, it undertook

24   steps to verify that USAT graduates had in fact attended USAT's

25   Montserrat campus; and three, held that USAT graduates with a

128

1    graduation year of 2019 and beyond are no longer eligible to

2    apply for ECFMG certification.

3              Plaintiff's suit alleges that Defendants violated his

4    constitutional rights and committed various common law torts.

5    He moved for a preliminary injunction, asking this Court to

6    enjoin Defendants from taking any further adverse action

7    against Plaintiff, resume processing the medical examinations

8    of the students of USAT, and release their examination scores,

9    and remove the negative advisory from the sponsor notes on the

10   World Directory of Medical Schools listing for the USAT College

11   of Medicine.

12             A Plaintiff seeking a preliminary injunction must

13   establish that he is likely to succeed on the merits, that he

14   is likely to suffer irreparable harm in the absence of

15   preliminary relief, that the balance of equities tip in his

16   favor, and that an injunction is in the public interest, that

17   is Winter v.  Natural Resources Defense Council, Inc., 555 U.S.

18   7, page 20, 2008.

19             The failure to establish any element renders a

20   preliminary injunction inappropriate.  That is Nutrasweet

21   Company v. Vit-Mar Enterprises, Inc., 176 F.3d 151, page 153,

22   3rd Circuit, 1999.

23             The movant bears the burden of showing that these

24   four factors weigh in favor of granting the injunction.  See

25   Opticians Association of America v. Independent Opticians of

1    America, 920 F.2d 187, page 192, 3rd Circuit, 1990.

2              Plaintiff's complaint includes four causes of action

3    or four claims labeled as causes of actions.  At the beginning

4    of this hearing, I clarified with Plaintiff what those claims

5    were and also clarified which claims the Plaintiff was

6    proceeding on in this preliminary injunction hearing.

7    Plaintiff's lawyer informed me that he was proceeding on the

8    constitutional claims, the §1983 claims.

9              Turning to the likelihood of success on the merits,

10   and that is Counts II and IV, §1983 claims, I find that

11   Plaintiff is unlikely to prevail on his §1983 claims because

12   they require a showing of state action, which is not present

13   here.

14             To prevail on a §1983 claim, Plaintiff must allegedly

15   violation of a right secured by the constitutional laws of the

16   United States committed by a person acting undercover of state

17   law.  That's West v. Atkins, 487 U.S. 42, page 48, 1988.

18             The 3rd Circuit has held that as a private not-for-

19   profit organization, ECFMG is a private party and not a state

20   actor.

21             That's Opoku v. Education Commission for Foreign

22   Medical Graduates, 574 F.Appx. 197, page 201, 3rd Circuit of

23   2014.

24             As has the Southern District of New York in Stoninger

25   (phonetic) v. Educational Commission for Foreign Medical

1  Graduates, 1993 Westlaw 138954 at page 2, SDNY, April 28th,

2  1993, concluding ECFMG is not a state actor.

3       To the extent that Opoku is a nonprecedential

4  decision in that it is a nonpublished decision, I look to

5  possible exceptions to the state or instances where a private

6  actor can be found to engage in state action.

7       Those instances are limited and as set forth in

8  McKeesport Hospital v. Accreditation Counsel for Graduate

9  Medical Education, 24 F.3d 519, 524, 3rd Circuit, those

10  instances are if the private party acted with the help of or in

11  concert with state officials.  In this case, there is no

12  indication that that happened.

13       Two, when the private party has been delegated their

14  power, traditionally exclusively reserved to the state.  In

15  this case, there is no evidence that that is the case.

16       Or three, if there is a sufficiently close nexus

17  between the State and the challenge action of the private

18  entity, so that the action of the latter may be fairly treated

19  as the state itself.

20       In this case, the testimony was that ECFMG is a

21  nonprofit organization.  And although there was testimony that

22  licensing boards in the United States generally require

23  certification through -- of students through ECFMG, the

24  testimony was that that requirement is a discretionary

25  requirement.  Accordingly, I find that ECFMG has not shown at

Case: 19-2706    Document: 45-3    Page: 26    Date Filed: 01/16/2020
Case 2:18-cv-05540-WB    Document 31    Filed 05/03/19    Page 309 of 594

131

1    this juncture of the litigation that it is a state actor.

2              While the lack of state action ultimately dooms

3    Plaintiff's constitutional claims, it is far from the only

4    problem with the §1983 claiMs.

5              ECFMG's disciplinary hearing seemingly meet the --

6    meets the requirements of due process in that an essential

7    principle of due process is that a deprivation of life,

8    liberty, or property be preceded by notice and opportunity for

9    hearing appropriate to the nature of the case.  Cleveland Board

10   of Education v. Loudermill, 470 U.S. 532, 542, 1985.  In this

11   case, there was notice and an opportunity to be heard.

12             As for Plaintiff's substantive due process claims,

13   the complaint does not identify a protected property interest

14   that falls within the ambit of substantive of due process.

15   Nicholas v. Pennsylvania State University, 227 F.3d, 133, page

16   141, 3rd Circuit, 2000.

17             Thus, Plaintiff's constitutional claims are likely to

18   fail, such that a preliminary injunction should not issue on

19   those claims.

20             Turning, however, in an excess of caution to the

21   irreparable harm prong on the preliminary injunction standard,

22   in addition to establishing a likelihood of success on the

23   merit, Plaintiff must also establish that he stands to suffer

24   irreparable harm if no injunction is issued.

25             Establishing a risk of irreparable harm is not

1    enough.  A Plaintiff has the burden of proving a clear showing

2    of immediate irreparable harm.

3           The requisite feared injury or harm must be

4    irreparable, not merely serious or substantial and it must be

5    of a peculiar nature, so that compensation in money cannot

6    atone for it.  That is Campbell Soup Company v. Conagra, Inc.,

7    977 F.2d, 86, page 92, 93, 3rd Circuit, 1992.

8           Plaintiff has made several arguments with respect to

9    the alleged harm that will befall USAT and its students.  With

10   respect to USAT, the testimony was that there has been a fall-

11   off in applications and that tuition payments have ceased.

12          Nevertheless, the testimony was also that USAT may

13   continue as an institution, so long as Dr. Tulp is not a

14   signatory.  Someone else from USAT could become an authorized

15   signatory.  And USAT is not disqualified from substituting a

16   different person as the authorized signatory.

17          Similarly with students, the testimony is that as

18   yet, there is -- no harm has befallen any students in that

19   students who graduated in 2018, up and through 2018, can still

20   go through the ECFMG process.

21          While students are -- who graduate in 2019 cannot,

22   they can transfer for their credits and also the first

23   graduation will be this summer.  So is -- there is no immediate

24   harm.

25          I go through the alleged harm to the students and to

1    USAT merely to illustrate that if the students or USAT were to

2    bring this preliminary injunction at present on the evidence on

3    the record, they would not have been able to meet the

4    irreparable harm standard.

5         Turning now to the harm that Plaintiff, as in Dr.

6    Tulp, says that he has or will suffer, he says in effect that

7    his business will stand to suffer because of Defendant's

8    actions.

9         Generally monetary harm in the form of lost business

10    does not constitute irreparable harm, because damages would be

11    an immediate remedy.  And that is Franks GMC Truck Center v. --

12    Inc. v. General Motors, Corp., 847 F.2d 100, 102, 3rd Circuit,

13    1988.

14         However, some courts have recognized that the

15    recoverable monetary loss may constitute irreparable harm where

16    the loss threatens the very existence of the movant's business.

17    See Washington Metropolitan Area Transit Commission v. Holiday

18    Tours, Inc., 559 F.2d 849, 843, note 2, D.C. Circuit, 1977.

19         Here, Plaintiff has the burden of proving through a

20    clear showing of immediate irreparable injury that he will

21    suffer such harm absent an injunction.  That's ECRI, 809 F.2d

22    at 226.

23         But as already discussed, there is no reason to

24    believe that with a change of signatory, and that USAT will not

25    be able to continue and therefore, in fact, the business need

Case: 19-2706 Document: 45-3 Page: 29 Date Filed: 01/16/2020 A0309
Case 2:18-cv-05540-WB Document 31 Filed 05/03/19 Page 312 of 404

134

1      not fail.

2            Thus, Plaintiff has not shown immediate irreparable

3      injury resulting from ECFMG's action and thus I will deny the

4      motion for preliminary injunction.

5            Turning now to one other issue, there was Defendant's

6      motion to quash.  And I think that was wanting Mr. Pinsky at

7      the PI hearing.  I understand that that is now moot?

8            MS. MCENROE:  Correct.

9            THE COURT:  Okay, so I will moot that out.

10           MR. REIL:  Yes, Your Honor.

11           Now I'm going to turn to the Rule 16 conference.

12           MS. MCENROE:  Your Honor, if I may with permission,

13     some of my witnesses have child care obligations

14     (indiscernible) if that's okay?

15           THE COURT:  Go ahead.  Yeah.

16           MS. MCENROE:  Thank you.

17           THE COURT:  I don't need those on the record.  Okay,

18     so --

19         (Proceedings concluded at 5:14 p.m.)

20

21

22

23

24

25

1                              **CERTIFICATE**

2

3

4          I, Chris Hwang, court approved transcriber, certify

5    that the foregoing is a correct transcript from the official

6    electronic sound recording of the proceedings in the above-

7    entitled matter.

8

9

10

11

12

13    _____          February 14, 2019

14    Chris Hwang                  Date

15    Transcriber

16

17

18

19

20

21

22

23

24

25

```
 1              UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
                       NO. 2:18-cv-05540-WB
 3
 4    DR. ORIEN L. TULP     )   DEPOSITION UPON
                            )
 5         Plaintiff,       ) ORAL EXAMINATION
                            )
 6      - vs -              )            OF
                            )
 7    EDUCATIONAL           ) WILLIAM W.
      COMMISSION FOR        ) PINSKY, M.D.
 8    FOREIGN MEDICAL       )
      GRADUATES and DR.     )
 9    WILLIAM W. PINSKY     )
                            )
10         Defendants.      )
      - - - - - - - - - -
11
12
13
14         TRANSCRIPT OF DEPOSITION, taken
15    by and before DANA M. JONES, Professional
16    Reporter and Notary Public, at the
17    offices of MORGAN LEWIS, 1701 Market
18    Street, 18th Floor, Philadelphia,
19    Pennsylvania, on Wednesday, February 6,
20    2019, commencing at 10:00 a.m.
21
22
23         GOLKOW LITIGATION SERVICES
           877.370.3377 ph/917.591.5672 fax
24              Deps@golkow.com
```

SAppx0539

William W. Pinsky, M.D.

```
 1    A P P E A R A N C E S:
 2
 3         LAW OFFICES OF WILLIAM C.
           REIL
 4         BY:  WILLIAM C. REIL,
           ESQUIRE
 5           1515 Market Street
             Suite 1200
 6           Philadelphia, PA  19102
                Attorney for the
 7         Plaintiff
 8
           MORGAN LEWIS & BOCKIUS LLP
 9         BY:  ELISA P. MCENROE,
           ESQUIRE
10           1701 Market Street
             18th Floor
11           Philadelphia, PA  19103
                Attorney for the
12         Defendants
13
14         ECFMG/FAIMER
           BY:  FRANCINE HALUSHKA KATZ,
15         ESQUIRE
             3624 Market Street
16           Philadelphia, PA  19104
                Senior Vice President
17         and General Counsel
18
19
20
21    A L S O   P R E S E N T:
22    Dr. Orien Tulp
      Christina Beatrice - Paralegal to William
23    Reid, Esquire.
24
```

SAppx0540

William W. Pinsky, M.D.                        A0313

```
 1                    I N D E X

 2

        WITNESS                           PAGE

 3

        WILLIAM W. PINSKY, M.D.

 4

 5        By:  Mr. Reil                      6

 6        By:  Ms. McEnroe                   X

 7

 8

                       - - -

 9

10

                  E X H I B I T S

11

12

        NUMBER        DESCRIPTION        PAGE

13

14      Pinsky-1      Compilation of
                      Documents          6

15

16

17

18

19

20

21

22

23

24
```

SAppx0541

William W. Pinsky, M.D.

```
 1                    LITIGATION SUPPORT PAGE

 2

              INSTRUCTION  NOT  TO  ANSWER

 3

 4     PAGE      LINE

 5      (None)

 6

 7        REQUEST  FOR  PRODUCTION  OF  DOCUMENTS

 8

       PAGE   LINE

 9

        (None)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

SAppx0542

William W. Pinsky, M.D.

1           (By agreement of counsel,

2       the sealing, filing, and

3       certification of the transcript

4       has been waived; and all

5       objections, except as to the form

6       of the question, have been

7       reserved until the time of trial.)

8           DR. WILLIAM PINSKY, after

9       having been duly sworn, was

10      examined and testified as follows:

11          (At this time, Compilation

12      of documents was marked for

13      identification as Exhibit

14      Pinsky-1.)

15          COURT REPORTER:  Usual

16      stipulations?

17          MS. MCENROE:  We'll reserve

18      all objections --

19          MR. REIL:  Okay.

20          MS. MCENROE:  -- other than

21      as to form until the time of

22      trial.

23          I don't know if there are

24      other stipulations you were

SAppx0543

William W. Pinsky, M.D.

```
 1              looking for.
 2                    MR. REIL:  The -- let's go
 3              off the record.
 4                    (At this time, a discussion
 5              was held off the record.)
 6                    MS. MCENROE:  And we will
 7              read and sign.
 8                    MR. REIL:  Before we begin,
 9              I have this as Pinsky-1.  It's
10              identical to what I used at the
11              hearing.  I just put the moniker
12              Pinsky-1 on there.
13                    I have one for the witness
14              and does the court reporter need
15              one?
16                    COURT REPORTER:  Sure.
17                    (At this time, a packet of
18              exhibits was marked for
19              identification as Exhibit
20              Pinsky-1.)
21                          - - -
22                    EXAMINATION
23                          - - -
24         BY MR. REIL:
```

SAppx0544

William W. Pinsky, M.D.

1          Q.    Dr. Pinsky, I'm Bill Reil.

2    I'm the attorney, one of the attorneys,

3    along with Tommy Swate for Dr. Tulp.  I'm

4    not going to go through a lot of

5    instructions for depositions because I'm

6    sure your attorney has done that with

7    you.  I guess there's a couple that, you

8    know, that I should mention, that I'm

9    sure you've already heard.

10              Your answers have to be

11   verbal.  So shakes of the head and things

12   like that are hard to get down on the

13   record.  We don't want you to guess or I

14   don't want you to guess but, you know,

15   you can estimate things if you want to.

16              If you don't understand the

17   question, you're allowed to say you don't

18   understand, you know, the question.  And

19   then there's another litany of things,

20   which I'm sure you've heard that I'm not

21   going to -- that I'm not going to bother

22   to go over.

23              Oh, yeah, one I guess I

24   should, right -- is there any reason that

William W. Pinsky, M.D.

1   you can't give a deposition today:  Don't

2   feel well, medical problems, anything

3   like that?

4        A.    No.

5        Q.    All right.  I think I'm

6   going to begin by finding out a little

7   bit of your background if I might.

8             Let's see.  How long have

9   you been a medical doctor?

10        A.    I graduated from medical

11   school in 1973.

12        Q.    And where was that?

13        A.    Saint Louis University.

14        Q.    And can you give me a

15   thumbnail sketch of what your medical

16   practice has consisted of from 1973 to

17   the present?

18             MS. MCENROE:  Objection to

19        form.  You can answer.

20             THE WITNESS:  Yes.  So my

21        goals after graduating from

22        medical school was to be a

23        pediatric cardiologist and to be

24        an academic pediatric

SAppx0546

1            cardiologist.  And I, after doing

2            my residency and fellowship, was

3            on the faculty full time at

4            several different universities.

5   BY MR. REIL:

6            Q.    And how did you come to be

7   associated with the ECFMG?

8            A.    The prior CEO was retiring

9   and a search firm was engaged to find a

10  successor and they contacted me to see if

11  I had interest.

12           Q.    Okay.  And I am going to,

13  even though I know the board is not the

14  ECFMG, it's just part of it, right, maybe

15  sometime I'll say the board, it's a

16  little shorter than all the initials.

17                 When did you first join the

18  ECFMG?

19           A.    I came in this position in

20  July of 2016.

21           Q.    When you say you came in

22  this position, what position is that?

23           A.    As President and CEO.

24           Q.    Okay.  Were you a member of

1    the, if I'm phrasing it right, were you a

2    member of the ECFMG before that?

3              MS. MCENROE:  Objection to

4         form.

5              THE WITNESS:  I don't know

6         what member means.

7    BY MR. REIL:

8         Q.    Well, let's talk about -- I

9    don't know if we -- when was your first

10   association with the ECFMG?

11        A.    As an employee?

12        Q.    Yes.  In any capacity.

13        A.    Well, I became aware of

14   ECFMG when I was in medical school --

15        Q.    Okay.

16        A.    -- because I knew that there

17   were certain physicians that had to come

18   through the ECFMG to be able to practice.

19        Q.    Go ahead.  I'm sorry, I'm

20   interrupting.

21        A.    No.  That's when I first

22   heard of ECFMG.

23        Q.    Right.  And does one do --

24   did you -- how does it work?  Did you

SAppx0548

1  join the ECFMG as a member, as an

2  employee?  Did you -- did your

3  association become more formal at some

4  time?

5           MS. MCENROE:  Objection to

6       form.

7           THE WITNESS:  So July 1st I

8       was hired -- I began my employment

9       as President and CEO.

10 BY MR. REIL:

11      Q.    President and CEO.  Okay.

12           And before that, were you

13 employed at all by the ECFMG?

14      A.    No.

15      Q.    Can you give me a summary of

16 what your job duties are as President and

17 CEO?  I'll call it the board but I mean

18 ECFMG because I can say it easy.

19           MS. MCENROE:  Objection to

20       form.

21           THE WITNESS:  So I am

22       responsible and accountable to the

23       board.  I'm the single employee

24       that's accountable to them.  And I

SAppx0549

William W. Pinsky, M.D.

1          have the responsibility and

2          accountability for meeting the

3          expectations of the board in terms

4          of overall performance of the

5          organization.

6     BY MR. REIL:

7          Q.    When you say you're

8     accountable to the board, can you

9     elaborate on that?

10         A.    They do an annual review of

11    my performance.

12         Q.    And how many people are on

13    the board?

14         A.    I think that there are 17 at

15    the moment.  I could be off by one or two

16    because we've gone through some

17    transition of right sizing --

18         Q.    -- well, that's good enough.

19    And you're also the CEO of the board?

20         A.    No.

21         Q.    No.  Who is?

22         A.    There's a Chairman of the

23    board.

24         Q.    There's a Chairman of the

SAppx0550

1    board. And who would that person be?

2         A.    Currently the Chair of the

3    board is Dr. Andy Filak.

4         Q.    Could you spell that for me?

5         A.    F, like in Frank, I-L-A-K.

6         Q.    Okay. And does Dr. Filak

7    work out of the building where you work

8    at, 36th and Market?

9         A.    No.

10        Q.    Where does he work out of?

11        A.    In Cincinnati.

12        Q.    36th and Market is the

13   headquarters of the ECFMG; right?

14        A.    Yes.

15        Q.    What is in Cincinnati?

16        A.    That's where Dr. Filak is

17   employed. Our board members are

18   voluntary board members so they have all

19   have other positions.

20        Q.    Now, I believe, and correct

21   me if I'm wrong, that you said you're the

22   President and CEO.

23        A.    Yes.

24        Q.    Okay. What do you do in

William W. Pinsky, M.D.

1   your capacity as CEO?

2           MS. MCENROE:  Objection to

3       form.

4   BY MR. REIL:

5       Q.    You can answer.

6       A.    I oversee the operations of

7   the organization.

8       Q.    Is one of your functions to

9   carry out the policies of the

10  organization?

11          MS. MCENROE:  Objection to

12      form.

13          THE WITNESS:  It's my

14      responsibility to assure that the

15      leadership and employees follow

16      the policies of the organization.

17  BY MR. REIL:

18      Q.    I see.  And how do you

19  generally -- how do you do that?

20      A.    By trust and verify.

21      Q.    So is it fair to say that a

22  part of your job is to be familiar with

23  the policies of -- I like your word, the

24  organization?

SAppx0552

1          A.      Yes.

2          Q.      Now, when did you become

3    aware of my client, Dr. Tulp?

4          A.      Probably somewhere partway

5    through 2018.

6          Q.      And how did Dr. Tulp come to

7    your attention?

8          A.      Conversation was initiated

9    to inform me of a possible policy

10   violation.

11         Q.      And with whom did you have

12   that conversation?

13         A.      I have to assume it was with

14   the leadership of the Operations Group

15   and I think probably with counsel as

16   well.

17         Q.      Well, we don't want anything

18   you told counsel.

19              But you said you had that

20   conversation, do you remember the name of

21   the person you had the conversation with?

22         A.      I would assume it was with

23   Ms. Corrado and Cover.

24         Q.      And what were you told?

William W. Pinsky, M.D.

1           MS. MCENROE:  So I'll object
2       to the extent it calls for
3       privileged information.  I don't
4       know if that's why you're
5       hesitating.
6           THE WITNESS:  That's why I'm
7       hesitating, yes.
8           MS. MCENROE:  So
9       substantively not to divulge
10      anything that was communicated to
11      counsel for the purpose of getting
12      legal advice.  But facts
13      communicated to you unrelated to
14      seeking legal advice you can
15      testify about.
16          MR. REIL:  I agree with
17      that.
18          THE WITNESS:  So as I
19      recall, I was told that there was
20      an issue that a medical school was
21      operating in the United States and
22      not as an international school.
23  BY MR. REIL:
24      Q.   And you we're talking about

SAppx0554

William W. Pilisky, M.D.

```
 1   USAT?

 2           A.    Yes.

 3           Q.    And did Ms. Corrado or Ms.

 4   Cover give any sort of written report or

 5   memo about this illegal operation to you?

 6                 MS. MCENROE:  Objection to

 7           form.

 8                 THE WITNESS:  I don't recall

 9           receiving it.

10   BY MR. REIL:

11           Q.    Well, if you didn't receive

12   one, where would it be?

13                 MS. MCENROE:  Objection to

14           form.

15                 THE WITNESS:  I'm not sure

16           what you're asking me.

17   BY MR. REIL:

18           Q.    Well, I think you said you

19   didn't recall receiving one.  Okay?

20           A.    I recall this as a

21   conversation not as a written report.

22           Q.    Did you ask either -- have

23   you received any memos from or -- from

24   Ms. Corrado about either Dr. Tulp or the
```

SAppx0555

William W. Pinsky, M.D.

```
 1    USAT?

 2              MS. MCENROE:  Objection to

 3         form.

 4              THE WITNESS:  Yeah, I don't

 5         recall receiving it.

 6    BY MR. REIL:

 7         Q.    Okay.  You don't recall.

 8              If you did receive them,

 9    where would they be?

10         A.    If they were electronic they

11    would be in an e-mail I assume.

12         Q.    I didn't hear you.

13         A.    I said if it was electronic

14    I assume it would be in an e-mail

15    somewhere, but I don't recall receiving

16    anything.

17         Q.    By the way, I have a

18    question, I don't want to go too far

19    afield.  I have a question about Ms.

20    Corrado.  We have several documents from

21    her where she has JD, Juris Doctor after

22    her name, is she an attorney?

23              MS. MCENROE:  Objection to

24         form.
```

William W. Pinsky, M.D.

1                    THE WITNESS:  Yes.  I

2          believe she graduated from law

3          school.

4    BY MR. REIL:

5          Q.    Do you know what law school

6    it was?

7          A.    No.

8          Q.    Now, I take it, did you in

9    your conversation with Ms. Corrado and

10   Ms. Cover, do you recall how they got the

11   information, alleged information, about

12   the illegal activities of USAT?

13                   MS. MCENROE:  Objection to

14          form.

15                   THE WITNESS:  So I recall in

16          the conversation that there was a

17          parent of a, I believe, a

18          prospective student, who had been

19          told that they -- if they enrolled

20          into school they would be going to

21          a campus in the United States.

22   BY MR. REIL:

23         Q.    Prior to that time, had USAT

24   come to your attention with regard to any

SAppx0557

William W. Pinsky, M.D.

```
1   alleged infractions?
2              MS. MCENROE:  Objection to
3       form.
4              THE WITNESS:  I don't
5       believe so.
6   BY MR. REIL:
7       Q.    Was there any prior
8   initiation of irregular behavior prior to
9   this particular, shall we say incident --
10             MS. MCENROE:  Objection --
11             MR. REIL:  -- against Dr.
12      Tulp.
13             MS. MCENROE:  Objection to
14      form.
15             THE WITNESS:  Not that I'm
16      aware of.
17  BY MR. REIL:
18      Q.    You say it came to your --
19  you mentioned a question or two ago about
20  a letter from a parent.  Okay?
21      A.    Well, I'm not sure if it was
22  a letter.  It was some sort of
23  communication, not to me, but to the
24  Operations Department.
```

SAppx0558

William W. Pinsky, M.D.

1          Q.    To the Operations

2    Department?

3          A.    To Ms. Corrado's department.

4          Q.    Ms. Corrado is the head of

5    the Operations Department?

6          A.    Ms. Cover is.

7          Q.    Ms. Corrado works in the

8    Operations Department?

9          A.    Yes.

10         Q.    Do you know if that

11   conversation was memorialized anywhere by

12   e-mail or writing?

13         A.    I don't know.

14         Q.    If it was, who would -- who

15   would have it, would it be Ms. Cover?

16               MS. MCENROE:  Objection to

17         form.

18               THE WITNESS:  I would assume

19         so.

20   BY MR. REIL:

21         Q.    Did the -- is there -- oh, I

22   should have asked you, I've been a little

23   remiss.  Let me back up.

24               Before you came to the

1    deposition today, did you review any

2    documents?

3          A.    Just a couple.

4          Q.    Can you remember what they

5    were?

6          A.    So one was the letter that

7    we sent to Dr. Tulp following the

8    appearance before the committee and the

9    other was the order for the deposition

10   today.

11         Q.    And you were actually

12   present at Dr. Tulp's hearing before the

13   committee on, I think it was 11/24?

14               MS. MCENROE:  Objection to

15        form.

16               THE WITNESS:  Yes.

17               DR. TULP:  11/28.

18   BY MR. REIL:

19         Q.    11/28.

20               MR. REIL:  Thank you,

21        Doctor.

22               THE WITNESS:  Whatever the

23        day was, yes.

24   BY MR. REIL:

SAppx0560

```
 1              Q.    And were you present for the
 2    whole hearing?
 3              A.    Yes.
 4              Q.    Now, at some point did you
 5    become aware that ECM launched a formal
 6    investigation of Dr. Tulp and USAT?
 7                    I'm talking other than what
 8    the parent communicated to you.
 9                    MS. MCENROE:  Objection to
10              form.
11                    THE WITNESS:  So I'm not
12              sure exactly what you mean by
13              formal investigation.
14    BY MR. REIL:
15              Q.    Well, at some point did the
16    organization hire people or use employees
17    to investigate these allegations of
18    campuses in the United States?
19                    MS. MCENROE:  Objection to
20              form.
21                    THE WITNESS:  So I'm aware
22              that we requested affidavits from
23              students to determine where they
24              were attending school.  And staff
```

SAppx0561

1          reviewed, I believe, other

2          information that was available.

3    BY MR. REIL:

4          Q.    In this investigation of

5    USAT and its alleged United States

6    campuses, were any outside people hired?

7    And by outside people, I mean, private

8    investigators or people who were not

9    working for the organization.

10              MS. MCENROE:  Objection to

11         form.

12              THE WITNESS:  So people not

13         working for the organization, you

14         mean, that are not full time

15         employees; is that what you're

16         asking?

17   BY MR. REIL:

18         Q.    Yes, like private

19   investigators.

20         A.    I believe I'm aware at some

21   point somebody was hired to visit the

22   campus.

23         Q.    And when you say somebody

24   was hired, was that somebody who worked

SAppx0562

1    for the organization or was that an

2    outside person?

3              MS. MCENROE:  Objection to

4         form.

5              THE WITNESS:  Outside person

6         that was hired to do that.

7    BY MR. REIL:

8         Q.   Okay.  Was it just one

9    person or do you know if it was more than

10   one person?

11        A.   I have no idea.

12        Q.   Who hired them?

13        A.   I don't know.

14        Q.   Who would know that?

15             MS. MCENROE:  Objection to

16        form.

17             THE WITNESS:  The person

18        that hired them.

19             Somebody in the Operations

20        Department would know.

21   BY MR. REIL:

22        Q.   Is it likely that Ms. Cover

23   would know that?

24             MS. MCENROE:  Objection to

SAppx0563

William W. Pinsky, M.D.

```
 1            form.

 2                 THE WITNESS:  Possibly.

 3  BY MR. REIL:

 4       Q.    And when this -- was --

 5  strike that.

 6                 When this person reviewed

 7  the alleged campuses, did they make a

 8  report back to the organization, if you

 9  know?

10       A.    I don't know.

11                 MS. MCENROE:  Objection to

12       form.

13                 THE WITNESS:  I never saw a

14       report.

15  BY MR. REIL:

16       Q.    Well, did you ever speak

17  with Ms. Cover or any other employee of

18  your organization and say, well, what's

19  happening with the investigation of Dr.

20  Tulp?

21       A.    I don't remember having a

22  direct conversation about that.

23       Q.    Well, how about what you

24  know?
```

SAppx0564

1              MS. MCENROE:  Objection to

2         form.

3              THE WITNESS:  I believe that

4         somebody visited the campus and

5         saw that there was -- there was --

6         they were building a building or

7         buildings.  But I don't know

8         anything more than that.

9    BY MR. REIL:

10        Q.    And did you see any -- did

11   you see any pictures?

12        A.    No.

13        Q.    Did you see any deeds for

14   property?

15        A.    No.

16             MS. MCENROE:  Objection to

17        form.

18             THE WITNESS:  No.

19   BY MR. REIL:

20        Q.    By the way, in any of its

21   documents or bulletins, does the

22   organization define the term campus?

23             MS. MCENROE:  Objection to

24        form.

SAppx0565

William W. Pinsky, M.D.

```
 1    BY MR. REIL:

 2         Q.    As far as you know?

 3         A.    I'm not sure.

 4         Q.    Does the organization have a

 5    file on Dr. Tulp?

 6         A.    I'm not sure what you mean

 7    by a file.

 8         Q.    Repository where

 9    investigative reports, things pertinent

10    to the investigation would be kept?

11         A.    I assume that records are

12    collated in reference to USAT.

13         Q.    And where would that

14    information be?

15         A.    It would be within the

16    Operations Group.

17         Q.    Within the Operations Group.

18              And Ms. Cover is the head of

19    the Operations Group?

20         A.    Yes.

21         Q.    And is it fair to say she's

22    also your second in command?

23              MS. MCENROE:  Objection to

24         form.
```

SAppx0566

William W. Pinsky, M.D.

```
 1                    THE WITNESS:  No.

 2                    MR. REIL:  No.  Okay.

 3    BY MR. REIL:

 4         Q.    Who is the second in command

 5    underneath you?

 6         A.    Mr. Donohue.  Dennis

 7    Donohue.

 8         Q.    Perhaps we can save some

 9    time, if you could enlighten me, starting

10    with yourself at the top of the pyramid

11    and give me a little idea of how the

12    chain of command works at the

13    organization?

14                    MS. MCENROE:  Objection to

15         form.

16                    THE WITNESS:  So my direct

17         reports are Mr. Donohue.  Mr.

18         Donohue has his direct reports

19         that include Ms. Cover, the Head

20         of HR, CFO, project management

21         person.  I believe that's his

22         direct reports.

23                    My other direct reports are

24         general counsel, the Director and
```

SAppx0567

1          Secretary of the Board and the
2          President of FAIMER.  Capital F,
3          A-I-M-E-R.  All capitalized.
4    BY MR. REIL:
5          Q.    Would you explain to me what
6    FAIMER is?
7          A.    It's the Foundation For the
8    Advancement of International Medical
9    Education and Research.  It's a separate
10   501 (c3) but basically a subsidiary 501
11   (c3) and they're involved in
12   international medical education.
13   Basically, to improve medical education
14   by mentoring and training medical
15   educators around the world.
16         Q.    To your knowledge, did
17   anyone from the organization ever visit
18   USAT in Montserrat?
19              MS. MCENROE:  Objection to
20         form.
21              THE WITNESS:  Not that I
22         know.
23   BY MR. REIL:
24         Q.    Why not?

1        A.    I don't know how to answer

2    that question.

3        Q.    Well, as president of USAT,

4    what was the relationship -- and we're

5    talking about 15 years, I believe the

6    university started around 2003.

7              Let me rephrase that

8    question.

9              What was the relationship

10    between the organization and Dr. Tulp?

11              MS. MCENROE:  Objection to

12         form.

13              THE WITNESS:  Well, I can't

14         speak prior to two-and-a-half

15         years ago.  I'm not sure there was

16         any relationship at all.

17    BY MR. REIL:

18        Q.    And two years ago you

19    received the -- you heard of a

20    conversation -- the organization heard of

21    a conversation or communication from a

22    parent that there were campuses in the

23    United States.  Do I have that right?

24              MS. MCENROE:  Objection to

SAppx0569

1           form.

2                   THE WITNESS:  Yes.

3       BY MR. REIL:

4           Q.    Are you aware if anyone from

5       the organization was able to attend a

6       lecture at any one of these campuses?

7                   MS. MCENROE:  Objection to

8           form.

9                   THE WITNESS:  No.

10      BY MR. REIL:

11          Q.    And where were these

12      campuses allegedly located?

13          A.    I'm not sure of all the

14      locations.  Florida, Texas, Colorado were

15      mentioned.

16          Q.    Was anyone from the

17      organization able to go down to Florida

18      and see a building that said USAT on it?

19                  MS. MCENROE:  Objection to

20          form.

21                  THE WITNESS:  What I am

22          aware of is that individuals from

23          the organization saw a YouTube

24          presentation by Dr. Tulp

SAppx0570

William W. Pinsky, M.D.

```
1              describing the opportunity to

2              attend a campus in Florida.  And I

3              have an understanding that many of

4              these activities occurred at

5              hotels.

6    BY MR. REIL:

7         Q.    Did anyone actually see a

8    building in Florida or anywhere else in

9    the United States that said USAT on it?

10             MS. MCENROE:  Objection to

11             form.

12             THE WITNESS:  No.  I don't

13             know.

14   BY MR. REIL:

15        Q.    So there was more than --

16   was more than one person assigned to go

17   down to Florida to check out if there

18   were campuses?

19             MS. MCENROE:  Objection to

20             form.

21             THE WITNESS:  I never said

22             anybody was assigned to go to

23             Florida.

24   BY MR. REIL:
```

SAppx0571

1        Q.    Okay.  Fair qualification.

2              Did anyone ever go to

3    Florida to physically check out if there

4    was --

5              MS. MCENROE:  -- objection

6         to form.  Asked and answered

7         repeatedly.

8              MR. REIL:  Okay.

9    BY MR. REIL:

10        Q.    You may answer.

11        A.    I'm not aware.

12        Q.    And why don't you tell me,

13   to your knowledge, what efforts were made

14   by the organization to determine if USAT

15   had a campus, had any campuses in the

16   United States?

17             MS. MCENROE:  Objection to

18        form.

19             THE WITNESS:  So I don't

20        know all the details, but what I'm

21        aware of, are that efforts were

22        made through, as I mentioned

23        before, looking through YouTube

24        and finding video presentations

SAppx0572

```
1            that talked about the campuses.

2            There may have been other social

3            media, you know, inspections as

4            well.  And affidavits were

5            requested from students asking

6            them where they attended classes.

7    BY MR. REIL:

8            Q.   Okay.  Did you authorize

9    those affidavits that we're talking

10   about?

11           A.   It wouldn't be my job --

12                MS. MCENROE:  --

13           objection to form.

14                THE WITNESS:  It wouldn't be

15           my job to do that.

16   BY MR. REIL:

17           Q.   Well, since we're talking

18   about -- since we're talking about

19   affidavits, maybe I want to look at what

20   I've designated as Pinsky-1 for the

21   purposes of this deposition.

22                And I'll represent on the

23   record, that this is the same material

24   which I presented at the Injunction
```

Case: 19-2706 Document: 45-3 Page: 66 Date Filed: 01/16/2020
Case: 18-cv-05540 Document: 1-93 Filed: 05/03/17 Page 349 of 514

William W. Pinsky, M.D.

1    Hearing before Judge Beetlestone, I think

2    was a couple Thursdays ago.

3                MS. MCENROE:  And for the

4         record, it's a compilation of

5         documents with an index appended

6         to the front.

7                MR. REIL:  Correct.

8    BY MR. REIL:

9         Q.    Okay.  I'm looking for the

10   affidavit.  Do you see the first page

11   where it has sort of like an index?

12   Maybe we should go to page 10.  Take a

13   look at page 10.

14        A.    (Witness complies.)

15        Q.    Page 10 says at the top,

16   it's a blank affidavit.  It says, ECFMG

17   at the top.  And it says, Affidavit

18   Attesting to Medical School Attendance.

19                Have you seen that before?

20        A.    No.

21        Q.    Haven't seen it before.

22   Okay.

23                Well, you spoke about an

24   affidavit in your testimony.  Is it that

SAppx0574

1   you were aware that there were affidavits

2   being used but you didn't actually see

3   them or am I missing what you're saying?

4        A.   Yes, that's what I said.

5        Q.   So you don't have any

6   personal knowledge as to how this

7   affidavit was used by the organization?

8             MS. MCENROE:  Objection to

9        form.

10            THE WITNESS:  I just know

11       that they were sent to the

12       students.

13  BY MR. REIL:

14       Q.   Who sent them?

15       A.   The Operations Group.

16       Q.   And that would be the one

17  that Mr. Cover heads?

18       A.   Yes.

19       Q.   Did you see any of the

20  affidavits that came back?

21       A.   No.

22       Q.   I want to direct your

23  attention to page 11 -- oh, before I do

24  that, let's stay with page 10.

```
 1              This affidavit would be

 2   directed, I think we said to students of

 3   USAT?

 4              MS. MCENROE:  Objection to

 5         form.

 6              THE WITNESS:  That's what I

 7         understand.

 8   BY MR. REIL:

 9         Q.    I see.  If you go about

10   two-thirds of the way down the document

11   on page 10, there's a part there

12   requesting documentation possibly

13   passport, airline tickets, so forth and

14   so on.

15              Do you see that?

16         A.    Yes.

17         Q.    So this is an affidavit

18   which also requests documents?

19              MS. MCENROE:  Objection to

20         form.

21              THE WITNESS:  Is that a

22         question?

23   BY MR. REIL:

24         Q.    Yes.
```

1    A.    I believe that's what it

2  says.

3    Q.    At the hearing of Dr. Tulp

4  back on November 28th, right, do you

5  recall that Dr. Tulp, through his

6  attorneys, were furnished with some of

7  these affidavits?

8          MS. MCENROE:  Objection to

9      form.

10  BY MR. REIL:

11    Q.    If you know?

12    A.    I don't remember.

13    Q.    Why don't we take a look at

14  page 11.  On page 11, let me read this

15  into the record.

16          Almost the next to the last

17  paragraph before the bottom it says:

18  ECFMG reserves the right.

19          Do you see that?

20    A.    Yes.

21    Q.    ECFMG reserves the right to

22  bring allegations of irregular behavior

23  against you, in accordance with its

24  policies and procedures, should ECFMG

SAppx0577

William W. Pinsky, M.D.

```
 1   obtain information that indicates that
 2   you have engaged in irregular behavior
 3   with respect to any documentation
 4   submitted as part of the process.
 5              Well, the you would refer to
 6   the students of USAT; right?
 7              MS. MCENROE:  Objection to
 8         form.
 9              THE WITNESS:  I believe so.
10   BY MR. REIL:
11         Q.    Is this -- is what I just
12   read, telling the students that they can
13   be charged with irregular behavior if
14   they haven't filled out this document
15   correctly?
16              MS. MCENROE:  Objection to
17         form.  The document speaks for
18         itself.  You may answer.
19              THE WITNESS:  I believe the
20         document speaks for itself.
21   BY MR. REIL:
22         Q.    Okay.  And does the document
23   say that students can be charged with
24   irregular behavior?
```

William W. Pinsky, M.D.

```
 1              MS. MCENROE:  Objection to
 2         form.
 3              THE WITNESS:  Same answer.
 4         I believe the document speaks for
 5         itself.
 6              It states that ECFMG
 7         reserves -- I'm quoting.  "ECFMG
 8         reserves the right to bring
 9         allegations of irregular
10         behavior."
11    BY MR. REIL:
12         Q.    What's irregular behavior?
13         A.    It's a term that is used for
14    actions that are not in accordance with
15    the policy of ECFMG.
16         Q.    And who would it apply to
17    generally?  I mean, I couldn't be -- I'm
18    not a medical person, I couldn't be found
19    guilty of irregular behavior, maybe I
20    could.  Could you give me an idea who
21    it's directed to?
22              MS. MCENROE:  Objection to
23         form.
24              THE WITNESS:  It's directed
```

SAppx0579

William W. Pinsky, M.D.

```
 1            to individuals who are involved in

 2            the process of applications for

 3            ECFMG certification.

 4   BY MR. REIL:

 5       Q.    I see.  Is that -- I

 6   wouldn't want -- I didn't expect you to

 7   have an exact quote.  But is what you

 8   say, is that stated in some sort of

 9   document the ECFMG has?

10       A.    Probably.  It's probably on

11   a policy statement somewhere.

12       Q.    Where are the policy

13   statements kept?

14            MS. MCENROE:  Objection to

15       form.

16            THE WITNESS:  In the offices

17       at 36th and Market.

18   BY MR. REIL:

19       Q.    Is there a book or something

20   like that that has a -- that has the

21   various policy statements from ECFMG?

22       A.    I'm sure there's a

23   depository, maybe electronic, but I'm

24   sure there's a depository.
```

SAppx0580

1          Q.    I'm curious, does the

2    organization, I like your word, does the

3    organization have a charter?

4          A.    What do you mean by charter?

5          Q.    Well, some document when it

6    came into being that explains its form

7    and function and where it gets its power

8    I guess?

9          A.    I think, I'm assuming

10   there's a document from 60 plus years ago

11   when ECFMG was formed at the request of

12   several organizations, and we have our

13   mission statement that's available.

14         Q.    The mission statement was

15   composed by the organization; correct?

16         A.    Yes.

17         Q.    Are there any outside

18   documents that -- by outside, I mean

19   outside the organization, that deal with

20   the powers of the organization?

21              MS. MCENROE:  Objection to

22         form.

23              THE WITNESS:  I don't know.

24   BY MR. REIL:

William W. Pinsky, M.D.

1          Q.    Now, if ECFMG, and I'm

2   asking you hypothetically because you're

3   the head of the organization, if ECFMG

4   finds a person culpable of irregular

5   behavior, what does that mean in terms of

6   what does that sanction mean if you're

7   found culpable of irregular behavior?

8                MS. MCENROE:  Objection to

9          form.

10               THE WITNESS:  So there's not

11         a single answer to that because

12         there's different types of

13         irregular behavior.

14  BY MR. REIL:

15         Q.    Okay.

16         A.    So an individual who is

17  found of irregular behavior has a

18  notation of that put into their file.

19  And then there are different sanctions

20  that could occur depending on the type of

21  irregular behavior.

22         Q.    Well, are there, somewhere

23  specified in writing, the different types

24  of irregular behavior?

```
 1              MS. MCENROE:  Objection to

 2         form.

 3              THE WITNESS:  No.  Irregular

 4         behavior is just irregular

 5         behavior.  Then it's what -- what

 6         the individual did to be found to

 7         have irregular behavior and the

 8         sanctions are determined; if there

 9         are any sanctions, there's not

10         always sanctions.  If there are

11         any sanctions to be found.

12    BY MR. REIL:

13         Q.   Is it a fair statement that

14    irregular behavior could be applied to an

15    individual who runs afoul of the policies

16    of the organization?

17              MS. MCENROE:  Objection to

18         form.

19              THE WITNESS:  I believe

20         that's what I said before.

21    BY MR. REIL:

22         Q.   Can persons, other than

23    foreign medical students, be found

24    culpable of irregular behavior?
```

SAppx0583

Case: 19-2706   Document: 45-3   Page: 76   Date Filed: 01/16/2020
Case 2:18-cv-05540-WB   Document 31-49   Filed 05/03/19   Page 359 of 496

A0356
William W. Pinsky, M.D.

```
 1                 MS. MCENROE:  Objection to
 2        form.
 3                 THE WITNESS:  Medical school
 4        officials can be.
 5   BY MR. REIL:
 6        Q.    Medical school officials can
 7   be.
 8                 And where does the
 9   organization get that authority to find
10   medical school officials potentially
11   guilty of irregular behavior?
12                 MS. MCENROE:  Objection to
13        form.
14   BY MR. REIL:
15        Q.    Is it -- where does that
16   come from?
17                 MS. MCENROE:  Objection to
18        form.
19                 THE WITNESS:  Again, it has
20        to do with accuracy and legitimacy
21        of documents that are provided to
22        ECFMG.
23   BY MR. REIL:
24        Q.    Can you comment for me on
```

SAppx0584

William W. Pinsky, M.D.

```
1    the relationship between the organization

2    and the State Medical Boards, how does

3    that work?  I'm a lay person.

4              MS. MCENROE:  Objection to

5         form.

6              THE WITNESS:  We have no

7         direct relationship with any of

8         the State Medical Boards.  The

9         State Medical Boards develop

10        policy and regulations that

11        usually are through legislation;

12        and ECFMG is recognized by the

13        State Boards to be the agency that

14        verifies documents, primary source

15        verification.

16   BY MR. REIL:

17        Q.   Is it fair to say that if

18   ECFMG does not certify a foreign medical

19   student or foreign medical graduate, that

20   they can't practice medicine in the

21   United States?

22             MS. MCENROE:  Objection to

23        form.

24             THE WITNESS:  No, that's not
```

SAppx0585

William W. Pinsky, M.D.

```
 1              true.
 2    BY MR. REIL:
 3         Q.    What is true?
 4         A.    State board can make an
 5    independent decision on their own.
 6         Q.    So there's an appeal process
 7    to the State board?
 8              MS. MCENROE:  Objection to
 9         form.
10              THE WITNESS:  I don't
11         understand the question.
12    BY MR. REIL:
13         Q.    Well, you -- I asked you
14    about ECFMG and a foreign medical student
15    and I think you said the State board,
16    right --
17              MR. REIL:  Could you read
18         that response back?  The question
19         and the answer.
20              (At this time, the court
21         reporter read back from the record
22         as requested.)
23    BY MR. REIL:
24         Q.    And I'm asking you to expand
```

SAppx0586

William W. Pinsky, M.D.

1   on that answer.  What is the mechanism by

2   which that occurs?

3                   MS. MCENROE:  Objection to

4           form.

5                   THE WITNESS:  So those are

6           State board policies that I can't

7           give you details on.  I do know

8           that a State board can make an

9           exception when they wish to.

10  BY MR. REIL:

11      Q.    So the -- so I think what

12  you're saying is, the State board could

13  somehow examine a decision by ECFMG and

14  decide if they are going to override it

15  or not?

16                  MS. MCENROE:  Objection to

17          form.

18                  THE WITNESS:  I believe so.

19  BY MR. REIL:

20      Q.    Does that happen very often,

21  if you know?

22                  MS. MCENROE:  Objection to

23          form.

24                  THE WITNESS:  I would guess

SAppx0587

1        not.

2   BY MR. REIL:

3        Q.    When is the last time you

4   remember that happening?

5        A.    I can't remember.

6        Q.    Well, let's put it this way:

7   If a foreign medical student or graduate

8   does not obtain, I think certification by

9   ECFMG, it would be as a practical matter,

10  it would be difficult for that person to

11  practice medicine in the United States?

12       A.    Yes.

13            MS. MCENROE:  Objection to

14       form.

15            THE WITNESS:  Yes.

16  BY MR. REIL:

17       Q.    You were at the hearing of

18  Dr. Tulp on November 28, 2018.  I think

19  we already established that; right?

20       A.    Correct.

21       Q.    Did any witnesses testify at

22  that hearing?

23            MS. MCENROE:  Objection to

24       form.

SAppx0588

1                    THE WITNESS:  Dr. Tulp was

2          invited to be a witness.

3     BY MR. REIL:

4          Q.    But I'm talking actually at

5     the hearing, did any witnesses testify at

6     the hearing?

7          A.    Dr. Tulp was invited to be a

8     witness and testify at the hearing.

9          Q.    Did he testify?

10         A.    No.

11         Q.    Did any witnesses testify?

12         A.    His attorney did.

13         Q.    Well, his attorney wasn't a

14    witness; right?

15                    MS. MCENROE:  Objection to

16         form.

17                    MR. REIL:  I won't quibble

18         over that.

19    BY MR. REIL:

20         Q.    Were any -- were any

21    documents introduced at that hearing?

22                    MS. MCENROE:  Objection to

23         form.

24                    THE WITNESS:  Documents were

SAppx0589

1          sent to Dr. Tulp and his

2          representation prior to the

3          hearing.

4     BY MR. REIL:

5          Q.    Were any of those documents

6     introduced at the hearing?

7               MS. MCENROE:  Objection to

8          form.

9     BY MR. REIL:

10         Q.    That you recall.

11         A.    What does introduce mean?

12         Q.    Put into evidence, you know,

13    this paper was put into evidence like

14    we're doing here.

15              MS. MCENROE:  Objection to

16         form.

17              THE WITNESS:  That's not the

18         format for that committee.

19    BY MR. REIL:

20         Q.    What is the format?

21         A.    The documents are

22    distributed prior to the hearing and then

23    the hearing is to answer any questions

24    relative to them.

William W. Pinsky, M.D.

```
 1          Q.    I see.  So the -- how
 2   many -- was the full board, maybe 16 or
 3   17, doctors there at the hearing?
 4                MS. MCENROE:  Objection to
 5          form.
 6                THE WITNESS:  No.
 7   BY MR. REIL:
 8          Q.    How many were there roughly?
 9          A.    It was the Medical Education
10   Credentials Committee Membership, which
11   is made up of people from the board.
12          Q.    All doctors?
13          A.    I don't think so.  I'm just
14   trying to remember.  I think we -- I
15   think -- I don't have a list of the
16   committee in front of me.
17          Q.    Mostly doctors?
18          A.    Mostly doctors.
19          Q.    Let's leave it at that.
20          A.    We have nonphysicians on the
21   board, I just can't remember.
22          Q.    Are there any attorneys on
23   the board?
24          A.    Yes.
```

SAppx0591

William W. Pinsky, M.D.

1          Q.     There are?

2          A.     Yes.

3          Q.     Okay.  Now, was Dr. Tulp

4    allowed to bring witnesses to present at

5    that hearing?

6               MS. MCENROE:  Objection to

7          form.

8               THE WITNESS:  I don't

9          recall.

10   BY MR. REIL:

11         Q.     Well, would there be

12   somewhere in the rules and regulation of

13   the organization that would describe what

14   you're allowed to do at the hearing?

15              MS. MCENROE:  Objection to

16         form.

17              THE WITNESS:  I don't know.

18         I think there probably was in the

19         communications to Dr. Tulp about

20         the opportunity to appear at the

21         hearing.

22   BY MR. REIL:

23         Q.     Do you know if there's

24   anything about the opportunity to bring

SAppx0592

William W. Pinsky, M.D.

```
1   witnesses?

2             MS. MCENROE:  Objection to

3        form.

4             THE WITNESS:  I don't

5        remember.

6   BY MR. REIL:

7        Q.    Did the board present any

8   witnesses at Dr. Tulp's hearing?

9             MS. MCENROE:  Objection to

10       form.

11            THE WITNESS:  No.

12  BY MR. REIL:

13       Q.    What did the board present

14  at Dr. Tulp's hearing?

15            MS. MCENROE:  Objection to

16       form.

17            THE WITNESS:  The board

18       received the same documents that

19       had been sent to Dr. Tulp and his

20       attorneys.  The board had that

21       material and they reviewed that

22       prior to coming to the committee

23       meeting.

24  BY MR. REIL:
```

1          Q.    So that -- I think black

2     binder that we got.

3          A.    Yes.

4          Q.    The board received that

5     prior to the meeting?

6          A.    Yes.

7          Q.    Hearing?

8          A.    Yes.  The committee did.

9          Q.    Okay.  And for what purpose?

10               MS. MCENROE:  Objection to

11          form.

12               THE WITNESS:  To be informed

13          about the work that was going to

14          go on during the committee meeting

15          that day.

16     BY MR. REIL:

17          Q.    Was that black binder ever

18     submitted into evidence, if you know?

19               MS. MCENROE:  Objection to

20          form.

21     BY MR. REIL:

22          Q.    Do you know what that means?

23               MS. MCENROE:  Objection to

24          form.

1          THE WITNESS:  That's not the

2          format of the committee.

3   BY MR. REIL:

4          Q.    What is the format?

5          A.    It's not a committee where

6   things are submitted as evidence.

7          Q.    So it's basically a

8   proceeding where Dr. Tulp has an

9   opportunity to make a statement on his

10  behalf; is that a fair statement?

11          MS. MCENROE:  Objection to

12          form.

13          THE WITNESS:  Yes.

14  BY MR. REIL:

15          Q.    Now, is there any

16  procedure -- I'm sure you've been to a

17  lot of the these hearings; is that a fair

18  statement?

19          MS. MCENROE:  Objection to

20          form.

21          THE WITNESS:  Well, in the

22          two-and-a-half years I've been to

23          several.

24  BY MR. REIL:

SAppx0595

William W. Pinsky, M.D.

1           Q.    Okay.  That's good enough

2    for me.

3                 Is there -- and there's --

4    there was a black binder that I remember

5    that had a lot of material in it; right?

6           A.    Yes.

7           Q.    Who gathered that material?

8           A.    The operations people.

9           Q.    Was Dr. Tulp, through his

10   attorneys, given any ability to object to

11   any of that material in the binder?

12                MS. MCENROE:  Objection to

13          form.

14                THE WITNESS:  The purpose of

15          the hearing was for them to be

16          able to raise questions -- or

17          answer questions or raise

18          questions in terms of anything

19          that they wanted to talk about.

20   BY MR. REIL:

21          Q.    Well, let's put it this way:

22   Did Dr. Tulp have any input as to what

23   material went into that binder?

24                MS. MCENROE:  Objection to

SAppx0596

William W. Pinsky, M.D.

```
 1              form.
 2                   THE WITNESS:  This was the
 3              material that had been accrued,
 4              you know, through working through
 5              this by ECFMG.
 6      BY MR. REIL:
 7              Q.    Working through -- I didn't
 8      hear that part.
 9              A.    Working through this --
10      working through the issues.
11              Q.    It was accrued by the
12      organization?
13              A.    Yes.
14              Q.    Was there a section of the
15      binder that contained material that was
16      submitted by Dr. Tulp or his attorneys?
17                   MS. MCENROE:  Objection to
18              form.
19      BY MR. REIL:
20              Q.    You can answer.
21              A.    I'm guessing there might
22      have been some correspondence that was in
23      there, that had been submitted to Dr.
24      Tulp or his attorneys.
```

SAppx0597

1          Q.   Well, we don't want you to

2    guess.  Let's take a look at -- I may

3    have covered this already.

4               Did we establish that part

5    of your job as the President and the CEO,

6    is to carry out the policies of the

7    organization?

8               MS. MCENROE:  Objection to

9          form.

10              THE WITNESS:  Yes, it is.

11   BY MR. REIL:

12         Q.   Let's take a look at the

13   letter that you sent out to Dr. Tulp

14   after the hearing.  I believe in

15   Pinsky-1, that's page 2 actually.  Let me

16   know when you have that.

17         A.   Yes.

18         Q.   Why don't you just take a

19   moment to look it over and then I have

20   some questions.

21         A.   (Witness complies.)  Okay.

22         Q.   Would you describe for the

23   record, if this is a letter from you to

24   Dr. Tulp, dated December 14, 2018, would

SAppx0598

Case: 19-2706   Document: 45-3   Page: 91   Date Filed: 01/16/2020   A0371
Case: 18-cv-09540 Web Document 31-99 Filed 05/03/19 Page 3/4 of 394

William W. Pinsky, M.D.

1    you identify this for the record?  In

2    other words, explain what it is.

3                MS. MCENROE:  Objection to

4         form.

5                THE WITNESS:  This is a

6         letter that summarizes the

7         Credential Committee review of the

8         allegations.  And in some brief

9         way, a listing of what the process

10        was in terms of providing

11        documents to Dr. Tulp and his

12        attorneys.  And then the

13        consideration of the committee

14        following the review of the

15        documentation and the appearance

16        at the committee.

17   BY MR. REIL:

18        Q.   A few questions about that

19   letter.

20                By the way, were you a

21   member of the Credentials Committee?

22        A.   Yes.

23        Q.   Were you the head of the

24   Credentials Committee?

1          A.     No.

2          Q.     Who was?

3          A.     Dr. Gusic.

4                 COURT REPORTER:  Gusic?

5                 THE WITNESS:  I'm sorry.

6          G-U-S-I-C.

7                 COURT REPORTER:  Thank you.

8    BY MR. REIL:

9          Q.     And does Dr. Gusic work at

10   36th and Market?

11         A.     No.

12         Q.     Let's take a look at that

13   letter on page 2 from December 14, 2018.

14                In the first sentence there

15   you say that the Credentials Committee

16   has completed its review.

17                Do you see that?

18         A.     Yes.

19         Q.     What did it review?

20                MS. MCENROE:  Objection to

21         form.

22                THE WITNESS:  It reviewed

23         the documentation.  It

24         participated in -- the committee

SAppx0600

1          participated in the appearance

2          before the committee and then

3          discussion afterwards.

4    BY MR. REIL:

5          Q.    Is it fair to say that since

6    no witnesses testified at the hearing and

7    Dr. Tulp didn't make a statement, the

8    review that we're talking about

9    essentially were the documents that were

10   in that black book?

11              MS. MCENROE:  Objection to

12         form.

13              THE WITNESS:  Because Dr.

14         Tulp did not make a statement,

15         even though he was asked to, it

16         was primarily the documentation

17         that were in the book.

18   BY MR. REIL:

19         Q.    Was it ever explained as far

20   as you're aware, whether Dr. Tulp --

21   whether the organization had to prove its

22   case against Dr. Tulp or Dr. Tulp had to

23   prove his case?  Did you ever get into

24   that?

SAppx0601

1          MS. MCENROE:  Objection to

2     form.

3          THE WITNESS:  You know it's

4     not a trial situation.

5  BY MR. REIL:

6     Q.    I see.

7     A.    It's a situation of

8  reviewing all information.

9     Q.    Well, the ECFMG brought

10 charges, if you will, against Dr. Tulp

11 and you were on the Credentials

12 Committee, was there any discussion of

13 what's called the burden of proof?

14          MS. MCENROE:  Objection to

15     form.  Asked and answered.

16          THE WITNESS:  Again, it's

17     not a trial so that terminology is

18     not used.

19 BY MR. REIL:

20     Q.    Is that defined anywhere in

21 the ECFMG bulletins or documents as to

22 who has the burden of proof in one of

23 these hearings?

24          MS. MCENROE:  Objection to

SAppx0602

```
1              form.

2                   THE WITNESS:  I don't think

3              the terminology burden of proof is

4              used.

5                   MS. MCENROE:  Counsel, we've

6              been going for about an hour.  If

7              there's a good time to take a

8              break, let us know.

9                   MR. REIL:  I would say --

10             let's go off the record.

11                  (At this time, a discussion

12             was held off the record.)

13    BY MR. REIL:

14             Q.   Now, if you go down to line

15    three or four of the letter.  It says --

16    the letter that we're talking about on

17    December 14th.

18                  It says:  Specifically, you

19    provided -- you I think referring to Dr.

20    Tulp -- false information to ECFMG when

21    you (1) notified ECFMG that USAT does not

22    operate a branch campus in Miami,

23    Florida; right?

24                  Are you aware of what that
```

SAppx0603

1    alleged false information was?

2         A.    I believe the false

3    information is that USAT holds itself to

4    be a medical school located in

5    Montserrat.

6         Q.    And then if you go down

7    further it says:

8              In the first paragraph, it

9    talks about, it says:  ECFMG has

10   information that these students were not

11   attending USAT during the time periods to

12   which you certified.

13             What's that in reference to,

14   No. 2 there?

15        A.    I believe that is in

16   reference to the dates of students

17   matriculation at USAT.

18        Q.    How was that information

19   obtained?

20        A.    I believe that's from the

21   affidavits.

22        Q.    To your knowledge, was any

23   other source for the information other

24   than the affidavits used?

SAppx0604

1          MS. MCENROE:  Objection to

2     form.

3          THE WITNESS:  I don't know.

4  BY MR. REIL:

5     Q.   Did Dr. Tulp have an

6  opportunity to challenge the accuracy of

7  any of these affidavits which were in the

8  black book at the hearing?

9          MS. MCENROE:  Objection to

10     form.

11          THE WITNESS:  Yes.

12  BY MR. REIL:

13     Q.   Yes.  Okay.

14          Well, was he supplied those

15  affidavits prior to the hearing?

16     A.   I don't know.

17     Q.   Isn't it true that many of

18  the affidavits, the information about the

19  individuals was redacted?

20     A.   I don't know that.

21     Q.   Under your procedures was

22  Dr. Tulp allowed to bring any of these

23  individuals who filled out affidavits to

24  the hearing on November 28th?

SAppx0605

William W. Pinsky, M.D.

 1                MS. MCENROE:  Objection to
 2        form.
 3                THE WITNESS:  I'm not sure
 4        about that.
 5   BY MR. REIL:
 6        Q.    Now, if you look, I think
 7   it's the next to the last paragraph, the
 8   one that starts, ECFMG Committee.
 9                Do you see that one?
10        A.    The next to last paragraph
11   on the first page?
12        Q.    On the first page, on page
13   2.
14        A.    Yes.
15        Q.    The last sentence there I
16   have a question about that.
17                It says:  Your ECFMG Medical
18   School Web Portal, and then in
19   parenthesis it has, EMSWP, account will
20   remain deactivated.
21                Can you explain what that
22   means, Doctor?
23        A.    Yes.  I believe that's the
24   electronic interface between the school

SAppx0606

William W. Pinsky, M.D.

```
 1    and ECFMG.

 2            Q.    And it says, remains

 3    deactivated, so -- well, strike that.

 4                  What's the purpose of this,

 5    of deactivating this portal?

 6                  MS. MCENROE:  Objection to

 7            form.

 8                  THE WITNESS:  The purpose of

 9            deactivating it?

10    BY MR. REIL:

11            Q.    Yes.  I think it was, will

12    remain deactivated.

13                  What's the idea behind

14    deactivating it?

15            A.    Because of the finding of

16    irregular behavior.

17            Q.    And it says:  Will remain

18    deactivated.

19                  It was deactivated before

20    the hearing, wasn't it?

21                  MS. MCENROE:  Objection to

22            form.

23                  THE WITNESS:  I believe so

24            but I don't remember that exactly,
```

SAppx0607

 1          but I believe so.

 2     BY MR. REIL:

 3          Q.    And who made the decision to

 4     deactivate the web portal prior to the

 5     hearing?

 6          A.    If it was, it would have

 7     been from Operations.

 8          Q.    And who in Operations, if

 9     you know, would have made that decision?

10          A.    I think it could have been,

11     you know, one of a couple different

12     senior people within Operations.

13          Q.    For instance?

14               MS. MCENROE:   Objection to

15          form.

16               THE WITNESS:   Ms. Corrado,

17          Ms. Cover.

18     BY MR. REIL:

19          Q.    To your knowledge, was there

20     a particular person who was leading the

21     investigation into Dr. Tulp and USAT?

22          A.    Not to my knowledge.

23          Q.    Well, besides Ms. Corrado

24     and Ms. Cover, who else was prominent in

William W. Pilnsky, M.D.

1   the investigation?

2              MS. MCENROE:  Objection to

3         form.

4              THE WITNESS:  I really don't

5         know at that level.  There are

6         other people, you know, at a

7         variety of different levels in

8         that department.

9   BY MR. REIL:

10        Q.    Would you receive reports at

11   regular intervals about the investigation

12   into Dr. Tulp and USAT?

13        A.    I didn't receive reports.

14   We had conversations with counsel prior

15   to the hearing.

16        Q.    And I don't want anything

17   you told counsel.

18              Let's take a look at page 3

19   if we might.

20              At the top of page 3 it

21   says:  In 2018, and there's one sentence

22   there, I'd ask that you read that into

23   the record?

24        A.    The one that starts, in

SAppx0609

William W. Pinsky, M.D.

1   2018?

2        Q.    Yes.  In 2018, just that one

3   sentence.

4        A.    In 2018, ECFMG determined

5   that a certain official of the University

6   of Science Arts & Technology engaged in

7   irregular behavior in connection with

8   providing false information to ECFMG.

9        Q.    That certain official, was

10  Dr. Orien Tulp; correct?

11       A.    Yes.

12       Q.    And was this -- was what you

13  just read, was that placed on the WDOMS?

14            MS. MCENROE:  Objection to

15       form.

16            THE WITNESS:  Yes.  It's

17       what the prior sentence says at

18       the bottom of page 2.

19  BY MR. REIL:

20       Q.    Can you explain for the

21  record what the WDOMS is?

22       A.    So it's WDMS, the World

23  Directory of Medical Schools, is a

24  directory that we co-sponsor that, to the

SAppx0610

William W. Pinsky, M.D.

1   best of our knowledge, lists all

2   operating medical schools in the world.

3           Q.    And what's the, you know, in

4   general, I know your organization doesn't

5   own the WDMS.  In general, can you, as an

6   insider in the field, describe the

7   audience for the WDMS?

8                MS. MCENROE:  Objection to

9           form.

10               THE WITNESS:  So the

11          audience is varied.  It can be

12          anywhere from individuals who are

13          interested in going to medical

14          school, individuals who are in

15          medical school.  It can be

16          individuals that have

17          responsibility for post-graduate

18          training.  It can be individuals

19          who were being recruited to a job

20          that might look at that.

21   BY MR. REIL:

22           Q.    Now, that sentence that you

23   just read, I think you said it was posted

24   on the WDMS, the web, the internet,

SAppx0611

Case: 19-2706   Document: 45-3   Page: 104   Date Filed: 01/16/2020
Case 2:18-cv-05540-WB   Document 31-49   Filed 05/03/19   Page 389 of 384

William W. Pinsky, M.D.

1   right; am I right about that?

2          A.    In the World Directory.

3          Q.    Was it placed there before

4   the November 28th hearing?

5          A.    I don't know.  But I believe

6   probably not.

7          Q.    Who would know?

8          A.    Operations people.

9          Q.    And why do you say probably

10  not?

11         A.    I assume it was waiting for

12  the outcome of the hearing.

13         Q.    Because it discusses

14  irregular behavior.  So you would assume

15  it would -- strike that.

16              Well, let me ask you this

17  question:  That last sentence that you

18  read, should it have been placed by the

19  organization on the WDMS prior to the

20  hearing?

21              MS. MCENROE:  Objection to

22         form.

23              THE WITNESS:  I assume so.

24  BY MR. REIL:

SAppx0612

Case: 19-2706    Document: 45-3    Page: 105    Date Filed: 01/16/2020
Case 2:18-cv-05540-WB    Document 31-49    Filed 05/03/19    Page 388 of 384

William W. Pinsky, M.D.

1        Q.    Can you explain what you

2   mean when you say I assume so?

3        A.    I assume that could be the

4   way we would do it.

5        Q.    That it should not be placed

6   on the WDMS prior to the hearing?  I want

7   to make sure I understand what you're

8   saying.

9        A.    That that would be placed

10  after the committee has reviewed and made

11  a determination of irregular behavior.

12        Q.    Why not before?

13            MS. MCENROE:  Objection to

14        form.

15  BY MR. REIL:

16        Q.    You can answer.

17        A.    I think the hearing is a

18  step that gives Dr. Tulp the opportunity

19  to comment on the findings.

20        Q.    Within your organization,

21  who would be the person who would likely

22  know when that was placed, that sentence

23  we just talked about, when that was

24  placed on the WDMS?

SAppx0613

William W. Pinsky, M.D.

1              MS. MCENROE:  Objection to

2         form.

3              THE WITNESS:  I think you

4         asked that before, but that's the

5         Operations Group.

6    BY MR. REIL:

7         Q.    In your opinion, is it

8    likely that Ms. Cover would know or could

9    find out when that was placed?

10             MS. MCENROE:  Objection to

11        form.

12             THE WITNESS:  Yes.

13   BY MR. REIL:

14        Q.    Now, at the end, the last

15   paragraph, it says:  As noted in the

16   enclosed ECFMG Rules of Appellate

17   Procedure.

18             Do you see that?

19        A.    Yes.

20        Q.    ECFMG has written Rules of

21   Appellate Procedure; right?

22        A.    Yes.

23        Q.    Does the ECFMG have written

24   rules about procedure at a hearing?

SAppx0614

Case: 19-2706  Document: 45-3  Page: 107  Date Filed: 01/16/2020
Case 2:18-cv-05540-WB  Document 31-49  Filed 05/03/19  Page 399 of 584

SA0387

William W. Pinsky, M.D.

1              MS. MCENROE:  Objection to

2         form.

3              THE WITNESS:  I assume so.

4    BY MR. REIL:

5         Q.    And where would they be?

6         A.    They would be at the 36th

7    and Market office.

8         Q.    And who would have access to

9    it?  Would you be able to get them or

10   would it be somebody else?

11        A.    It would be more efficient

12   to have the Operations Group.

13        Q.    And again, that would be Ms.

14   Cover?

15        A.    Yes.

16             MR. REIL:  Can we -- I just

17        want to talk to my client briefly.

18             MS. MCENROE:  Sure.  Let's

19        take a break and go off the

20        record.

21             (At this time, a short break

22        was taken.)

23   BY MR. REIL:

24        Q.    Dr. Pinsky, that letter of

SAppx0615

William W. Pilosky, M.D.

1    December 14th of this year, a two-page

2    letter beginning on page 2 and ended on

3    page 3.

4          A.    Of 2018?

5          Q.    2018, not this year.  Thank

6    you.  I stand corrected.

7                It's signed by you?

8          A.    Yes.

9          Q.    Did you draft it?

10         A.    No.

11         Q.    Who did draft it?

12         A.    The Operations Group.

13         Q.    When you say the Operations

14   Group, who presented it to you?  Did you

15   have some sort of discussion with

16   somebody about the particulars before you

17   signed it?

18         A.    The discussion on the

19   particulars occurred at the committee and

20   so this is the outcome of the committee

21   discussion.

22         Q.    Did Ms. Cover ever present

23   this letter to you for your review?

24         A.    In draft form, is that what

1   you're asking?

2          Q.    Yes.  In draft form.

3          A.    I don't recall.

4          Q.    But if I understand

5   correctly, you didn't actually draft the

6   letter?

7          A.    Correct.

8          Q.    Before you signed it, what

9   efforts did you make to ensure that the

10  letter was accurate?

11              MS. MCENROE:  Objection to

12         form.

13              THE WITNESS:  I read the

14         letter, and to assure myself that

15         it accurately reflected the

16         discussion and the outcome of the

17         committee meeting.

18  BY MR. REIL:

19         Q.    Of the committee meeting?

20         A.    (Witness nods head.)

21              MS. MCENROE:  That was a yes

22         for the record.

23              THE WITNESS:  That was a

24         yes.  I'm sorry.

SAppx0617

1   BY MR. REIL:

2        Q.    And did you ever give an

3   address or a presentation regarding

4   Caribbean medical schools?

5             MS. MCENROE:  Objection to

6        form.

7             THE WITNESS:  No.

8   BY MR. REIL:

9        Q.    Did you ever draft a

10  document or a memo concerning Caribbean

11  medical schools?

12            MS. MCENROE:  Objection to

13       form.

14            THE WITNESS:  Not that I can

15       recall.

16  BY MR. REIL:

17       Q.    Now, let me just finish up

18  again by going on page 3 that sentence,

19  in 2018 ECFMG, down to ECFMG.  The one

20  sentence you read in italics in your

21  letter.

22            Isn't it a fact that that

23  was placed on the WDMS on or before

24  September 11, 2018?

SAppx0618

Case: 19-2706    Document: 45-3    Page: 111    Date Filed: 01/16/2020
Case 2:18-cv-05540-WB    Document 31-4    Filed 05/03/19    Page 393 of 384

William W. Pilhsky, M.D.

 1                MS. MCENROE:  Objection to

 2        form.

 3                THE WITNESS:  I'm very

 4        confident it was not.

 5   BY MR. REIL:

 6        Q.    When do you believe that it

 7   was placed on the WDMS?

 8        A.    I believe that the intention

 9   is to place this after a determination

10   has been made.  I'm not even sure that

11   this particular statement has been placed

12   on it yet.

13        Q.    So the -- do you know as a

14   fact when or if this sentence that we're

15   talking about, when it was placed or if

16   it was placed on the WDMS?

17                MS. MCENROE:  Objection to

18        form.

19                THE WITNESS:  I don't know

20        if it's been placed yet.

21   BY MR. REIL:

22        Q.    And you don't know if it was

23   placed before the hearing or you are

24   certain that it was not placed before --

SAppx0619

1   well --

2         A.    I'm certain it was not

3   placed before.  And I'm not certain

4   whether it's been placed yet.

5         Q.    Okay.  Where is the -- when

6   you communicate with the WDMS, if you

7   know that, where are they located?

8               MS. MCENROE:  Objection to

9         form.

10  BY MR. REIL:

11        Q.    If you know?

12        A.    So I don't communicate

13  directly with them.  WDMS is, you know, a

14  partnership, you know, it's among

15  organizations.

16        Q.    Do you know where they're

17  located?  And I'm interested in terms of

18  contacting them to verify when this was

19  placed.

20              MS. MCENROE:  Objection to

21        form.

22              THE WITNESS:  I think

23        there's individuals that work on

24        the WDMS that are situated in

SAppx0620

1          various cities, including France

2          and Philadelphia.

3   BY MR. REIL:

4          Q.     And Philadelphia?

5          A.     Right.

6          Q.     Do you know where they are

7   in Philadelphia?

8          A.     It would be in our building.

9          Q.     They are in your building.

10  Okay.

11                And are they under WDMS or

12  are they under another name?

13         A.     They are under FAIMER, it's

14  the FAIMER Partnership.

15                THE WITNESS:  You have that

16         from before; right?

17                COURT REPORTER:  Yes.  Thank

18         you.

19  BY MR. REIL:

20         Q.     F-A-I-M-E-R?

21         A.     Yes.

22         Q.     It's one of the few things I

23  do well, spell.

24                And that's in your building?

SAppx0621

1          A.    Yes.

2          Q.    And who is the head person,

3    if you know, at FAIMER Partnership?

4          A.    So the President is John

5    Norcini, N-O-R-C-I-N-I.

6          Q.    And does he work out of your

7    building?

8          A.    Yes.

9          Q.    Now, to your knowledge, has

10   any other university president ever been

11   charged with irregular behavior by the

12   ECFMG?

13              MS. MCENROE:   Objection to

14         form.

15              THE WITNESS:   I know of

16         another senior official, I'm not

17         sure what his title was.

18   BY MR. REIL:

19         Q.    How about a university

20   president are you sure, as you sit there,

21   other than Dr. Tulp, does it come to mind

22   that another university president has

23   been charged with irregular behavior?

24              MS. MCENROE:   Objection to

1           form.

2                   THE WITNESS:  I'll say yes

3           but I'm not exactly sure of the

4           individual's title.

5    BY MR. REIL:

6           Q.    Who would that individual

7    be?

8           A.    The official that was in

9    charge of Atlantic University School of

10   Medicine.

11          Q.    And his name is?

12          A.    I'm blanking on his name

13   right now.

14          Q.    He was in charge?

15          A.    Yes.

16          Q.    Now -- so there's Dr. Tulp

17   and there's one other official from

18   Atlantic?

19          A.    Yes.

20          Q.    And they are the only two

21   you can recall in the history of the

22   ECFMG?

23                  MS. MCENROE:  Objection to

24          form.

William W. Pinsky, M.D.

```
 1              THE WITNESS:  I believe

 2         there were two officials at

 3         Atlantic University that were

 4         charged.

 5    BY MR. REIL:

 6         Q.    Anybody else you can recall?

 7         A.    No.

 8         Q.    The ECFMG is not an

 9    accrediting agency; correct?

10              MS. MCENROE:  Objection to

11         form.

12              THE WITNESS:  Correct.

13    BY MR. REIL:

14         Q.    And one of the things Dr.

15    Tulp was charged with in connection with

16    the irregular behavior, dealt with having

17    campuses in the United States; right?

18              MS. MCENROE:  Objection to

19         form.

20              THE WITNESS:  Giving us

21         false information --

22              MR. REIL:  False

23         information.

24              THE WITNESS:  -- about the
```

SAppx0624

William W. Pinsky, M.D.

```
 1          campuses.
 2    BY MR. REIL:
 3          Q.    To your recollection, was
 4    any other university president ever
 5    charged with the same thing?
 6                MS. MCENROE:  Objection to
 7          form.
 8                THE WITNESS:  Not to my
 9          knowledge.
10    BY MR. REIL:
11          Q.    Did you ever ask, by you,
12    the ECFMG, did they ever ask for a
13    curriculum from the USAT?
14                MS. MCENROE:  Objection to
15          form.
16                THE WITNESS:  I don't know.
17    BY MR. REIL:
18          Q.    Did you or any of your
19    senior people ever visit the USAT?
20                MS. MCENROE:  Objection to
21          form.  Asked and answered.
22                THE WITNESS:  As I said
23          before, not that I know.
24    BY MR. REIL:
```

SAppx0625

1      Q.    And why not?

2      A.    As I said before, I'm not

3   sure how to answer that question.

4      Q.    Okay.  You did say that.

5   I'll withdraw that question.

6           MR. REIL:  I think that's

7           all I have.  Let me just confer

8           with my superiors here and I think

9           that will be it.

10          (At this time, a discussion

11          was held off the record.)

12   BY MR. REIL:

13      Q.    To your knowledge, are there

14   other international schools of medicine,

15   of course, that have campuses in the

16   United States besides the USAT, which is

17   something that you allege?

18          MS. MCENROE:  Objection to

19          form.

20          THE WITNESS:  Not that I'm

21          aware of yet.

22   BY MR. REIL:

23      Q.    So presently, the only one

24   that you're aware of that has campuses in

SAppx0626

William W. Pinsky, M.D.

1    the United States is the USAT?

2                    MS. MCENROE:  Objection to

3           form.

4                    THE WITNESS:  From our

5           current knowledge, yes.

6                    MR. REIL:  That's all I

7           have.

8                    MS. MCENROE:  No questions

9           from us.  Thank you very much.

10                   Thank you, Dr. Pinsky.

11                   (Deposition concluded at

12          11:50 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

```
 1              C E R T I F I C A T I O N

 2

 3         I, DANA M. JONES, Professional

 4    Court Reporter and Notary Public, certify

 5    that the foregoing is a true and accurate

 6    transcript of the deposition held before

 7    me at the time, place and on the date

 8    hereinbefore set forth.

 9         I further certify that I am

10    neither attorney nor counsel for, not

11    related to or employed by, any of the

12    parties to the action in which this

13    deposition was taken; further, that I am

14    not a relative or employee of any

15    attorney or counsel employed in this

16    case, nor am I financially interested in

17    this action.

18

19

20

21

22         _____

                   DANA M. JONES

23

24
```

SAppx0628

```
 1            INSTRUCTION TO WITNESS

 2

 3

 4        Please read your deposition over

 5   carefully and make any necessary

 6   corrections.  You should state the reason

 7   in the appropriate space on the errata

 8   sheet for any corrections that are made.

 9        After doing so, please sign the

10   errata sheet and date it.

11        You are signing same subject to the

12   changes you have noted on the errata

13   sheet, which will be attached to your

14   deposition.

15        It is imperative that you return

16   the original errata sheet to the deposing

17   attorney within thirty (30) days of

18   receipt of the deposition transcript by

19   you.  If you fail to do so, the

20   deposition transcript may be deemed to be

21   accurate and may be used in court.

22

23

24
```

SAppx0629

William W. Pinsky, M.D.

```
1            ACKNOWLEDGEMENT OF DEPONENT

2

3

4          I, WILLIAM W. PINSKY, M.D., do hereby

5    certify that I have read the foregoing pages,

6    and that the same is a correct transcription of

7    the answers given by me to the questions

8    therein propounded, except for the

9    corrections or changes in form or

10   substance, if any, noted in the attached

11   errata sheet.

12

13

14

15   Date                    _____

16

17

18

19

20   Subscribed and sworn to before me.

21   My commission expires _____.

22

23

24
```

SAppx0630

William W. Pinsky, M.D.

```
 1              - - - - - - - -

 2                 ERRATA SHEET

 3              - - - - - - - -

 4

 5    PAGE     LINE         CHANGE/ REASON

 6    _ _ _    _ _ _ _ _ _ _ _ _ _ _ _ _ _

 7    _

 8    _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _

 9    _ _ _

10    _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _

11    _ _ _

12    _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _

13    _ _ _

14    _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _

15    _ _ _

16    _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _

17    _ _ _

18    _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _

19    _ _ _

20    _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _

21    _ _ _

22    _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _

23    _ _ _

24    _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _
```

SAppx0631

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DR. ORIEN L. TULP, ) | |
| ) | |
| Plaintiff, ) | Case No. 2:18-cv-05540-WB |
| ) | |
| v. ) | Hon. Wendy Beetlestone |
| ) | |
| EDUCATIONAL COMMISSION FOR ) | |
| FOREIGN MEDICAL GRADUATES and ) | |
| DR. WILLIAM W. PINSKY, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## DEFENDANTS' FIRST SET OF INTERROGATORIES AND FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DR. ORIEN L. TULP

Pursuant to Federal Rules of Civil Procedure 26, 33, and 34, Defendants Educational Commission for Foreign Medical Graduates ("ECFMG") and Dr. William W. Pinsky, by and through their counsel, hereby propound this First Set of Interrogatories and First Set of Requests for Production of Documents on Plaintiff Orien L. Tulp and direct that he respond separately, in writing and under oath, to each of the following interrogatories, and produce and permit the inspection and copying of the documents and/or other tangible things requested herein within thirty (30) days of the date of service to the undersigned counsel.

## DEFINITIONS AND INSTRUCTIONS

1.     The term "ECFMG" refers to Defendant Educational Commission for Foreign Medical Graduates or any other person or entity acting or purporting to act on its behalf, including any employees, agents, or representatives.

1

2.      The term "Dr. Pinsky" refers to Dr. William W. Pinsky or any other person or entity acting or purporting to act on his behalf, including any employees, agents, or representatives.

3.      The terms "you," "your," or "Plaintiff" refer to Plaintiff Dr. Orien L. Tulp or any other person or entity acting or purporting to act on behalf of Plaintiff Dr. Orien L. Tulp, including any employees, agents, or representatives of Plaintiff Dr. Orien L. Tulp.

4.      The term "USAT" refers to the University of Science, Arts, and Technology or any other person or entity acting or purporting to act on his behalf, including any employees, agents, or representatives.

5.      The term "Sponsor Note" refers to ECFMG's sponsor note in the World Directory of Medical Schools.

6.      The term "document" has the same meaning and scope as in Federal Rule of Civil Procedure 34(a), including without limitation, electronic or computerized data compilations.  A draft or non-identical copy is a separate document within the meaning of this term.

7.      The term "communication" refers to any transmission of information whether face-to-face or by telephone, telecopy, letter, telex, cable, electronic mail, text message, electronic means or other means whereby thoughts, opinions, facts or other matters are transmitted between two or more persons.

8.      The term "person" means any individual, association, public or private organization, institution, partnership, corporation, or other entity.

9.      The term "Complaint" refers to the "Complaint – Civil Action" filed in this action on December 24, 2018, in the United States District Court of the Eastern District of Pennsylvania.

SAppx0633

10.  The term "including" means including but not limited to.

11.  The term "relating to" means constituting, comprising, discussing, covering, evidencing, supporting, reflecting, or referring to directly or indirectly, the subject matter identified in a particular Request.

12.  The term "describe in detail" means to describe fully by reference to underlying facts rather than by ultimate facts or conclusions of law, and to particularize as to time, place, and manner.

13.  The term "identify" when used with reference to an oral communication, discussion, conversation, meeting, conference, or any other oral statements means to describe in detail the substance of, to state the date and location of, and to identify the participants in each such communication, discussion, conversation, meeting, conference, or statement.

14.  The term "identify" when used with reference to an individual person means to state his or her full name (or if not known, provide sufficient description so that he or she will be identifiable to the recipients of your answer), job title, employer or business affiliation, last known business or home address, and telephone number.

15.  The term "identify" when used with reference to a document or written communication means to state the type of document or communication (e.g., memorandum, letter, handwritten notes, etc.), to state its date, to briefly describe its contents, to identify the author (and if different, the originator and signer), and to identify the person (or, if widely distributed, the group of persons) to whom the document or communication was sent.  You may produce the document or written communication in lieu of identifying it.

16.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside of its scope.

17.     The use of the singular form of any word includes the plural and vice versa.

18.     In answering the Interrogatories, furnish all information that is available to you, including information in the possession of your attorneys or investigators, and not merely such information known of your own personal knowledge.  If you cannot answer these Interrogatories in full after exercising due diligence to secure the information to do so, so state and answer to the extent possible.

19.     If any information requested in these Interrogatories is withheld pursuant to a claim of any privilege or that the information constitutes attorney work product or trial preparation material, expressly state the privilege or protection claimed for each item of information, and describe the nature of such information withheld in a manner that, without revealing the privileged or protected information, will enable other parties to assess the applicability of the privilege or protection.

20.     If you object to the production of any document on the grounds of privilege, you are required to provide a log of such privileged documents, which log shall, as to each withheld document, identify the nature of the document, its subject matter, the title, author, and date of the document, the addressee(s) of the document, if any, and the basis for the claim of privilege.

21.     In responding to the Requests, you shall produce all documents that are available to you, including documents in the possession of your attorneys, investigators or experts, and not merely documents in your own personal possession.  If you cannot produce a particular document after exercising due diligence to find or obtain the document, you should so state.

SAppx0635

22.    Unless otherwise indicated, all Interrogatories and Requests refer to the period January 1, 2003 through the present.

## INTERROGATORIES

1.    Describe in detail anything that USAT does or has done in the United States, including without limitation any administrative, informational, lecture, educational and testing operations.

2.    Describe in detail all facts supporting your contention that ECFMG engaged in "illegal actions," as alleged in paragraph 22 of the Complaint.

3.    Identify any students who you contend have been adversely affected by ECFMG's actions and describe in detail how they have been adversely affected.

4.    Identify any USAT graduates who have not gone to the United States for their post-graduate medical training and describe in detail where (if anywhere) these students completed their medical training and where (if anywhere) they are licensed to practice medicine.

5.    Describe in detail USAT's relationship with the Medical College of London (MCL), which is referenced in USAT's agreement with Montserrat (Compl. Ex. C), including without limitation all facts relating to USAT's and/or MCL's accreditation status with the General Medical Council or any other accrediting body in the United Kingdom.

6.    Describe in detail all facts supporting your contention that the information about USAT in the Sponsor Note was misleading, as alleged in paragraph 45 of the Complaint.

7.    Describe in detail all facts supporting your contention that the ECFMG affidavits are "misleading," as alleged in paragraphs 10 and 35 of the Complaint.

8.    Describe in detail all facts supporting your contention that ECFMG holds itself out as a governmental entity, as alleged in paragraph 28 of the Complaint.

SAppx0636

9.      Describe in detail all facts relating to the "break-in at the office of USAT in Colorado" referred to in Plaintiff's Self-Executing Discovery Statement dated January 23, 2019, including without limitation all efforts to investigate the break-in (including details about the reporting officers), which items and documents related to the allegations in this Complaint were taken, and whether the items and documents taken have been recovered and/or had back-up copies.

10.      Describe in detail any and all remedies that you seek in connection with this lawsuit, including each element of damages or other relief to which you claim you are entitled, the method of calculating each such element of damages or other relief, the amount of each element of damages or other relief, and the time period for which you are seeking damages or other relief.

11.      Identify each and every person who provided information used to answer these Interrogatories, and identify the Interrogatory or Interrogatories for which that person provided information.

12.      Identify all persons with knowledge relating to the allegations and claims in the Complaint, and for each person, describe the subject(s) about which they have knowledge.

13.      Identify any and all persons you may call as a fact witness relating to this lawsuit at the time of trial.

## DOCUMENT REQUESTS

1.      All documents identified in Plaintiff's Self-Executing Discovery Statement dated January 23, 2019.

2.      All documents identified in or relied upon in the course of answering the Interrogatories served contemporaneously with these Requests.

SAppx0637

3.    All documents relating to anything that USAT does or has done in the United States, including without limitation documents relating to any administrative, information, lecture, and testing activities.

4.    All documents relating to USAT's relationship with the Miami Anatomical Research Center, including without limitation service contracts.

5.    All documents relating to USAT's commencement ceremonies occurring in the United States.

6.    All documents relating to any permission or authorization sought by USAT from federal, state, or local authorities and/or accrediting bodies to conduct business or maintain any operations in the United States.

7.    All communications between USAT and federal, state or local authorities and/or accrediting bodies in the United States relating to anything that USAT does or has done in the United States.

8.    All communications between USAT and accrediting bodies relating to USAT's accreditations and/or efforts to obtain accreditations.

9.    All documents relating to accreditation activities completed for or by USAT, including without limitation applications for accreditation, assessments, and documents relating to site visits.

10.    All documents relating to USAT's relationship with the Medical College of London (MCL), which is referenced in USAT's agreement with Montserrat (Compl. Ex. C), including without limitation all documents relating to USAT's and/or MCL's accreditation status with the General Medical Council or any other accrediting body in the United Kingdom.

SAppx0638

11.     Documents sufficient to show the number of students who applied to USAT from January 2003 to present and indicating whether each was admitted, deferred, denied or placed into some other category.

12.     Documents sufficient to show USAT's revenue for calendar years 2003 through 2018.

13.     All documents forecasting or projecting USAT's revenues after January 1, 2003.

14.     Copies of and all documents relating to contracts between USAT and USAT students.

15.     Copies of and all documents relating to prospective contracts between USAT and prospective USAT students.

16.     Copies of and all documents relating to contracts between you and USAT students.

17.     Copies of and all documents relating to prospective contracts between you and prospective USAT students.

18.     All documents relating to volcanic activity that allegedly displaced USAT from Montserrat, including without limitation all correspondence with authorities in Montserrat discussing such displacement and requesting to relocate back to Montserrat.

19.     Copies of and all documents relating to USAT's small platform online courses ("SPOC").

20.     Documents sufficient to show current enrollment at USAT.

21.     Documents sufficient to show all your past, current, and anticipated compensation from USAT.

SAppx0639

22.     Documents sufficient to show all past, current, and anticipated compensation you receive from USAT students.

23.     All documents relating to your ownership interest in USAT, as alleged in paragraphs 1 and 10 of the Complaint.

24.     All communications between you and ECFMG relating to the claims or facts underlying the claims you are asserting in the Complaint.

25.     All communications between you and USAT administrators relating to ECFMG or ECFMG affidavits.

26.     All communications between you and USAT faculty members relating to ECFMG or ECFMG affidavits.

27.     All communications between you and USAT students or graduates relating to ECFMG or ECFMG affidavits.

28.     All documents relating to plans by you or USAT to open or operate a medical school in the British Virgin Islands.

29.     All documents relating to your contention that ECFMG is attempting to close down USAT, as alleged in paragraph 10 of the Complaint.

30.     All documents relating to your contention that doctors who graduated from USAT have been unable to commence their residency due to ECFMG's actions, as alleged in paragraph 10 of the Complaint.

31.     All documents relating to your contention that ECFMG wants to remove you as President of USAT, as alleged in paragraph 26 of the Complaint.

32.     All documents relating to your contention that ECFMG represented itself to be a government agency, as alleged in paragraph 46 of the Complaint.

SAppx0640

33.     All documents relating to Dr. Pinsky and USAT, including without limitation documents relating to your contention that Dr. Pinsky "authorized the illegal actions of the ECFMG," as alleged in paragraph 50 of the Complaint.

34.     All documents relating to the closure of administrative conference venues in the United States, as alleged in paragraph 57 of the Complaint.

35.     All documents relating to the "break-in at the office of USAT in Colorado" referred to in Plaintiff's Self-Executing Discovery Statement dated January 23, 2019, including all police reports, summaries, text messages and e-mails pertaining to same.

36.     All statements you or your attorneys have obtained from individuals concerning the allegations in the Complaint or any alleged unlawful conduct by ECFMG.

37.     All documents and communications relating to the remedies you seek, including each element of damages or other relief to which you allegedly are entitled, as alleged in paragraph 30 of the Complaint.

38.     All documents and communications referenced in or used, reviewed, or relied upon in preparing the Complaint.

39.     All documents and communications relating to the claims asserted in the Complaint.

40.     All documents you may introduce as exhibits at trial in this lawsuit.


DATED:  February 19, 2019             */s/ Elisa P. McEnroe*
                                      Elisa P. McEnroe, PA Bar No. 206143
                                      Matthew D. Klayman, PA Bar No. 319105
                                      MORGAN, LEWIS & BOCKIUS, LLP
                                      1701 Market Street
                                      Philadelphia, PA  19103-2921
                                      Telephone:     +1.215.963.5917
                                      Facsimile:     +1.215.963.5001

elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for
Foreign Medical Graduates and Dr. William W.
Pinsky*

11

## CERTIFICATE OF SERVICE

I do hereby certify that on this date, I caused true and correct copies of the foregoing document to be served upon the following counsel of record via electronic and regular mail:

TOMMY SWATE
403 WILD PLUM
HOUSTON, TX 77013

WILLIAM C. REIL
1515 MARKET ST SUITE 1200
PHILADELPHIA, PA 19102
215-564-1635
Fax: 215-564-4292
Email: billreillaw@gmail.com

*Attorneys for Plaintiff*

<div align="right">

*/s/ Elisa P. McEnroe*_____
Elisa P. McEnroe

</div>

SAppx0643

**William C. Reil, Esquire**
**1515 Market Street, Suite 1200, Philadelphia, PA 19102**
**Tel: 215-564-1635 Fax: 215-564-4292**
**BillReilLaw@gmail.com**

March 27, 2019                          **BY EMAIL ONLY**
                                        elisa.mcenroe@morganlewis.com

Elisa P. McEnroe, Esquire
Morgan, Lewis, and Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921

   Re: Dr. Tulp v. ECFMG and Dr. Pinsky
     Docket No: 2:18-cv-05540-WB
     **Plaintiff's Answers to Defendants' Initial Discovery;**
     **Outstanding Depositions**

Dear Ms. McEnroe:

Enclosed please find a true and correct copy of plaintiff's answers to defendants' initial interrogatories and request for production of documents. In light of Judge Bettlestone's recent Order on defendants' motion to dismiss, I would like to discuss the outstanding deposition situation with you, as soon as possible.

Sincerely yours,

*William C. Reil*

William C. Reil

cc: Tommy Swate, Esq.
  Dr. Orien L. Tulp

enc: Plaintiff's Answers to Defendants' Initial Discovery with:
    **-** Judge Bettlestone's Order of 03/26/19
    **-** Plaintiff's Proposed Exhibits
    **-** Plaintiff's Self-Executing Discovery

LAW OFFICES OF WILLIAM C. REIL
BY: William C. Reil, Esquire
Identification No. 26833
1515 Market Street, Suite 1200
Philadelphia, PA 19102
215-564-1635

| | | |
|---|---|---|
| | | ATTORNEY FOR PLAINTIFF |
| Dr. Orien L. Tulp | : | UNITED STATES DISTRICT |
| President of the | : | COURT FOR THE EASTERN |
| University of Science, Arts, and Technology | : | DISTRICT OF PENNSYLVANIA |
| 4288 Youngfield Street | : | |
| Wheat Ridge, CO 80033 | : | Case No. 2:18-cv-05540-WB |
| vs. | : | |
| Educational Commission for | : | |
| Foreign Medical Graduates | : | |
| 3624 Market Street | : | |
| Philadelphia, PA 19104 | : | |
| and | : | |
| Dr. William W. Pinsky | : | |
| President and CEO | : | |
| Educational Commission for | : | |
| Foreign Medical Graduates | : | |
| 3624 Market Street | : | |
| Philadelphia, PA 19104 | : | JURY TRIAL DEMANDED |

## **PLAINTIFF'S ANSWERS TO DEFENDANTS' INTERROGATORIES**

Plaintiff, through his undersigned counsel, submits the following answers to defendants' initial interrogatories and request for production of documents, and in support thereof, it is averred as follows:

**Preliminary Statement:**

These interrogatories were dictated before the Court's recent Order attached hereto, which limits Plaintiff's Lawsuit to Violation of Due Process by the Defendants. Accordingly, Plaintiff objects to any discovery which is inadmissible discovery under the Court's Order.

1. The entire interrogatory is objected to as vague; notwithstanding, students in the United States have access to Internet courses. See transcript of Tulp court testimony.

2. Inter alia, the Complaint explicates illegal actions of ECFMG. See also the exhibits to the Complaint, the Court testimony of Dr. Tulp, and the deposition testimony of Dr. Pinsky. ECFMG has the primary evidence in their redacted affidavits, which plaintiff herein requests. Essentially, ECFMG has erected a number of illegal barriers which make it difficult, if not impossible, for many of USAT's students to complete the process for which ECFMG is the gatekeeper. This effectively means that the defendants have the ability to foreclose foreign medical students from obtaining medical licensure in the United States, even where such licensure is merited.

3. ECFMG would have the information in their possession about the particular students from USAT who have paid to take examinations, have been denied by ECFMG their right to take these examinations, and have not had their money refunded.

4. Objection that this interrogatory does not lead to admissible evidence on any material issue in this case. By way of further response, Plaintiff objects based on the privacy of these individuals, as defendant did when they redacted names of individuals from their so called subpoenas. In addition, plaintiff is unable to answer this question as stated.

5. Objected to as not leading to relevant, discoverable evidence. By way of further response, USAT at present has no relationship with the Medical College of London except what is indicated in the document therein.

6. Inter alia, the sponsor note by the ECFMG, which was put on the WDOMS website, implied that misconduct by Dr. Tulp and/or USAT was committed before the Hearing by the ECFMG for Dr. Tulp.

7. Inter alia, the affidavits referred to in this interrogatory are not affidavits. Among other reasons, they request documents. There are more akin to illegal subpoenas. It should be noted that plaintiff has not been supplied all the redacted affidavits by ECFMG. The trial testimony of Dr. Tulp is incorporated herein, as though fully set forth.

8. Paragraph 20 of the Complaint as well as 29 and 30 speak for themselves. It is noted that ECFMG never indicated in its affidavits to any USAT students that it was not a governmental entity, and that is the impression that ECFMG was trying to convey. Also, ECFMG is the sole gatekeeper for the admission of foreign medical students to practice medicine in the United States.

9. The break-in at the USAT offices in Colorado was reported by the building manager, who has not yet reported the outcome to USAT. To date, no items were recovered. The primary location targeted was a former registrar's desk and the computers used by her.

10. The elements of damages are included in the Complaint and supplemented by the trial testimony of Dr. Tulp. Essentially, ECFMG has destroyed the reputation of Dr. Tulp and the act of functioning of USAT. Many of the damages indicated herein are intangible in nature.

11. The plaintiff, Orien Tulp.

12. The interrogatory is objected to as overbroad. For example, there are probably dozens, if not hundreds, of students who have information relevant to the Complaint, including those students who were illegally sent so called "affidavits" by ECFMG. Dr. Orien Tulp was the source for the information used in the Complaint, and the exhibits attached thereto.

13. This is a litigation decision which has not yet been made, and is contingent upon further discovery and any rulings by the Court. Without waiving any objection hereto, it is anticipated that the parties, Kara Corrado and Lisa L. Cover, may be called as witnesses. While plaintiff has not made a final determination as to witnesses, it is anticipated that witnesses involved with the WDOMS and administrative personnel used in the investigation of Dr. Tulp and ECFMG may also be called as witnesses.

Respectfully submitted,

William C. Reil, Esquire
Attorney for Plaintiff
03/27/19

LAW OFFICES OF WILLIAM C. REIL
BY: William C. Reil, Esquire
Identification No. 26833
1515 Market Street, Suite 1200
Philadelphia, PA 19102
215-564-1636

| | | |
|---|---|---|
| | | ATTORNEY FOR PLAINTIFF |
| Dr. Orien L. Tulp | : | UNITED STATES DISTRICT |
| President of the | : | COURT FOR THE EASTERN |
| University of Science, Arts, and Technology | : | DISTRICT OF PENNSYLVANIA |
| 4288 Youngfield Street | : | |
| Wheat Ridge, CO 80033 | : | Case No. 2:18-cv-05540-WB |
| vs. | : | |
| Educational Commission for | : | |
| Foreign Medical Graduates | : | |
| 3624 Market Street | : | |
| Philadelphia, PA 19104 | : | |
| and | : | |
| Dr. William W. Pinsky | : | |
| President and CEO | : | |
| Educational Commission for | : | |
| Foreign Medical Graduates | : | |
| 3624 Market Street | : | |
| Philadelphia, PA 19104 | : | JURY TRIAL DEMANDED |

## PLAINTIFF'S ANSWER TO THE FIRST SET OF DOCUMENTS

**Preliminary Statement**:

Plaintiff herein incorporates the Preliminary Statement to his interrogatory answers, as fully set forth herein.

1. Plaintiff has no documentary evidence with the exception of the exhibits used at the preliminary injunction hearing at this time. Plaintiff would also identify the "black binder" given to counsel at the "irregular behavior" hearing on 11/28/18. This binder appears to contain at several hundred pages of information. Plaintiff would request any documents in the possession of defendants involving allegations of "irregular behavior" which have not been provided. Plaintiff would request rules and regulations pertinent to the ECFMG and the state medical boards in the possession of ECFMG.

2. ECFMG brought charges and has all documents in its possession upon which plaintiff was found guilty of "irregular behavior":

a)  A black binder handed out by defendants consisting of several hundred pages, which was made available to the committee prior to the Hearing, but to the plaintiff Dr. Tulp on the date of the Hearing.

b)  Transcripts from the Injunction Hearing involving Dr. Tulp, including testimony by Dr. Tulp and Kara Corrado.

c)  The transcripts of Dr. Pinsky's deposition.

d)  Exhibits used at the Injunction Hearing.(see cover page attached).

e)  Transcript of the ECFMG Administrative Hearing of Dr. Tulp.

3. Objected to as inadmissible discovery evidence in light of the Court's ruling confining issues to the Due Process claims of defendant.

4. Objected to as inadmissible in Discovery because these documents do not relate to the Hearing of Dr. Tulp before the ECFMG and the denial of due process prior to the Hearing.

5-40. Plaintiff incorporates his answers to paragraphs 1, 2, 3, and 4, as though fully set forth herein.

Respectfully submitted,

*William C. Reil*

William C. Reil, Esquire
Attorney for Plaintiff
03/27/19

## <u>CERTIFICATE OF SERVICE</u>

I certify that I will serve in accordance with P.A.R.C.P. 440 all parties not served

electronically. I further certify that a true and correct copy of the attached document (s)

was served upon all other parties or their counsel of record by:

| | |
|---|---|
| _____ | Regular First Class Mail |
| _____ | Facsimile |
| _____ | Certified Mail |
| _____ | Hand-Delivered |
| _____ | Electronic Filing |
| \_\_\_\_X\_\_\_\_ | Email |

Respectfully submitted,

*William C. Reil*

William C. Reil, Esquire
Attorney for Plaintiff
03/27/19

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DR. ORIEN L. TULP,                              CIVIL ACTION
        Plaintiff,

     v.

EDUCATIONAL COMMISSION FOR                      NO.  18-5540
FOREIGN MEDICAL GRADUATES AND
DR. WILLIAM W. PINSKY,
        Defendants.

## ORDER

    **AND NOW**, this 26th day of March, 2019, upon consideration of Defendants' Motion to Dismiss and support thereof (ECF Nos. 20 & 25), and Plaintiff's Response in Opposition thereto (ECF No. 24), it is hereby **ORDERED** that Defendants' Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART**, as follows:

1. Defendants' Motion to Dismiss Plaintiff's common law due process claim against ECFMG is **DENIED**;

2. Defendants' Motion to Dismiss the remainder of Plaintiff's claims against Defendants is **GRANTED**.  Such claims are **DISMISSED WITHOUT PREJUDICE**.


                **BY THE COURT:**


                /s/ Wendy Beetlestone

                _____
                **WENDY BEETLESTONE, J.**

Dr. Tulp v. ECFMG and Dr. Pinsky
Docket No: 2:18-cv-05540-WB

## PLAINTIFF'S PROPOSED EXHIBITS

|  | PAGE |
|---|---|
| Acronym Sheet | 1 |
| (Exhibits A-F from Complaint) | |
| Exhibit A: Letter of 12/14/18 from Dr. Pinsky To Dr. Orien L. Tulp | 2 |
| Exhibit B: World Directory of Medical Schools Printout on USAT | 4 |
| Exhibit C: Agreement between USAT and the Government of Montserrat | 5 |
| Exhibit D: ECFMG Affidavit Attesting to Medical School Attendance | 10 |
| Exhibit E: Letter of 11/21/18 from Ms. Kara Corrado to Dr. Tommy Swate | 12 |
| Exhibit F: Letter of 10/18/18 from Lisa L. Cover to Dr. Orien L. Tulp | 14 |
| Exhibit G: (Letters from Kara Corrado, Esq.) | |
| Letter of 11/27/18 to Dr. Tommy Swate | 18 |
| Letter of 11/25/18 to Dr. Tommy Swate | 19 |
| Letter of 10/18/18 to Dr. Orien L. Tulp | 21 |
| Letter of 11/14/18 to Dr. Tommy Swate | 23 |
| Letter of 10/26/18 to Dr. Tommy Swate | 28 |
| Letter of 9/14/18 to Dr. Orien L. Tulp | 31 |

<div align="center">

**William C. Reil, Esquire**
**1515 Market Street, Suite 1200, Philadelphia, PA 19102**
**Tel: 215-564-1635 Fax: 215-564-4292**
**BillReilLaw@gmail.com**

</div>

January 23, 2019                                   **BY EMAIL AND REGULAR MAIL**
                                                   elisa.mcenroe@morganlewis.com

Elisa P. McEnroe, Esquire
Morgan, Lewis, and Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921

> Re: Dr. Tulp v. ECFMG and Dr. Pinsky
> Docket No: 2:18-cv-05540-WB
> **Plaintiff's Self-Executing Discovery Statement**

Dear Ms. McEnroe:

I submit the following as plaintiff's self-executing discovery statement pursuant to Rule 26. Plaintiff reserves the right to amend or supplement these responses through the discovery process.

a)   **Witnesses**: Plaintiff, all defendants, and Lisa Cover. Plaintiff particularly wishes to take the deposition of Dr. William Pinsky. All of these witnesses, with the exception of Dr. Pinsky, should have been present at the hearing on the preliminary injunction on 1/24/19. In addition, plaintiff will want to take the deposition of any person from ECFMG or hired by ECFMG to investigate the issue of "irregular behavior." Plaintiff may want to take the deposition of any person who has information concerning the allegation of a false statement by Dr. Tulp. Plaintiff may also want to take the deposition of any person who has any information that Dr. Tulp allegedly committed "irregular behavior." Plaintiff has not retained an expert witness at this time.

b)   **Documents and Evidence**: Plaintiff has no documentary evidence with the exception of the exhibits used at the preliminary injunction hearing at this time. Plaintiff would also the identify the "black binder" given to counsel at the "irregular behavior" hearing on 11/28/18. This binder appears to contain at least 200 pages of information. Plaintiff would request any documents in the possession of defendants involving allegations of "irregular behavior" which have not been provided, as well as any information in the possession of defendant concerning alleged improper campuses" by the USAT including photographs. Plaintiff would request rules and regulations pertinent to the ECFMG and the state medical boards in the possession of ECFMG.

    c)    **Damages**: Essentially, the decision of the ECFMG board has destroyed the career of Dr. Tulp, the existence of USAT, and the possibly the careers of a number of students and graduates of USAT. There are significant lost tuition payments, as well as the destruction of Dr. Tulp's reputation.

    d)    **Insurance**: Not Applicable to Plaintiff.

Sincerely yours,

William C. Reil
WCR/cmb

cc:  Dr. Orien L. Tulp
      Tommy Swate, Esquire

**P.S. I first became aware yesterday  that there was a break-in at the office of USAT in Colorado on Friday evening. The police were called. Computers and other items were taken. No one has been arrested at this time.**

1           UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2
                    NO. 2:18-cv-05540-WB
3
4    DR. ORIEN L. TULP      ) VIDEO DEPOSITION
                            )
5          Plaintiff,       ) OF
                            )
6      - vs -               ) ORIEN L. TULP,
                            ) Ph.D., M.D.
7    EDUCATIONAL            )
     COMMISSION FOR         )
8    FOREIGN MEDICAL        )
     GRADUATES and DR.      )
9    WILLIAM W. PINSKY      )
                            )
10         Defendants.      )
     _ _ _ _ _ _ _ _ _ _
11
12
13
14           TRANSCRIPT OF VIDEO DEPOSITION,
15   taken by and before DANA M. JONES,
16   Professional Reporter and Notary Public,
17   at the offices of MORGAN LEWIS, 1701
18   Market Street, 18th Floor, Philadelphia,
19   Pennsylvania, on Wednesday, April 17,
20   2019, commencing at 9:20 a.m.
21
22
23           GOLKOW LITIGATION SERVICES
          877.370.3377 ph/917.591.5672 fax
24             Deps@golkow.com

SAppx0656

```
1    A P P E A R A N C E S:
2
3

          LAW OFFICES OF WILLIAM C. REIL
4         BY:  WILLIAM C. REIL, ESQUIRE
            1515 Market Street
5           Suite 1200
            Philadelphia, PA  19102
6              Attorney for the
          Plaintiff
7
8         T. E. SWATE, LAW OFFICE
          BY:  TOMMY SWATE, ESQUIRE
9           403 Wild Plum Street
            Houston, Texas 77013
10             Attorney for Plaintiff
11
12
          MORGAN LEWIS
13           BY:  ELISA P. MCENROE, ESQUIRE
             MATTHEW KLAYMAN,ESQUIRE
14           1701 Market Street
             18th Floor
15           Philadelphia, PA  19103
               Attorneys for the
16        Defendants
17
18        ECFMG/FAIMER
          BY:  FRANCINE HALUSHKA KATZ,ESQUIRE
19           3624 Market Street
             Philadelphia, PA  19104
20             Senior Vice President
          and General Counsel
21
     A L S O   P R E S E N T:
22
     Devyn Mulholland - Videographer
23   Christina Beatrice - Paralegal to William
     Reid, Esquire.
24   Christopher Blinn
```

SAppx0657

```
 1                     I N D E X

 2

     WITNESS                              PAGE

 3

     ORIEN L. TULP, Ph.D., M.D.

 4

 5       By:  Ms. McEnroe                  5, 114

 6       By:  Mr. Swate                    96

 7

                       - - -

 8

 9

                 E X H I B I T S

10

11

     NUMBER          DESCRIPTION        PAGE

12

13   Exhibit-1    Resume                  32

14

15

16

17

18

19

20

21

22

23

24
```

SAppx0658

1                    LITIGATION SUPPORT PAGE

2

                   INSTRUCTION NOT TO ANSWER

3

4        PAGE      LINE

5        (None)

6

7            REQUEST FOR PRODUCTION OF DOCUMENTS

8

         PAGE   LINE

9

         77          7

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

SAppx0659

```
1                    P R O C E E D I N G,

2             VIDEOGRAPHER:  We are now on

3        the record.  My name is Devyn

4        Mulholland.  I'm a videographer

5        with Golkow Litigation Services.

6                    Today's date is April 17,

7        2019.  The time is 9:20 a.m. This

8        video deposition is being held in

9        Philadelphia, Pennsylvania in the

10       matter of Tulp, Ph.D. versus

11       ECFMG, et al. The defendant is

12       Orien L.  Tulp, Ph.D., M.D.

13                    Counsel will be noted on the

14       stenographic record.  The court

15       reporter is Dana Jones and will

16       now swear in the witness.

17                    ORIEN L. TULP, Ph.D.,

18       M.D., after having been duly

19       sworn, was examined and testified

20       as follows:

21                         - - -

22             EXAMINATION

23                         - - -

24   BY MS. MCENROE:
```

SAppx0660

1        Q.    Good morning, Dr. Tulp.  My
2    is Elisa McEnroe, counsel for the
3    Educational Commission for Foreign
4    Medical Graduates, which we'll call it
5    ECFMG today.
6        A.    Okay.
7        Q.    Is that okay?
8        A.    All right.
9        Q.    Have you been deposed
10   before?
11       A.    Not very often.
12       Q.    Not very often but ever
13   before?
14       A.    Only once.
15       Q.    Only once.  Okay.  So you
16   understand that you're under oath today?
17       A.    I understand.
18       Q.    Just as if you were in a
19   court room before Judge Beetlestone?
20       A.    Yes.
21       Q.    And we will expect that
22   you'll tell the true?
23       A.    I don't know any other way.
24       Q.    Great.  And if you could

SAppx0661

1    speak up a little bit louder that will be

2    helpful for all of us.

3           A.    I will try.

4           Q.    Thank you so much.

5                 Do you know where you were

6    on January 18, 2019?

7           A.    January 18, 2019?

8           Q.    Correct.

9           A.    Wasn't I here?

10          Q.    I don't know.  That's the

11   date of the alleged break in for the --

12          A.    -- oh, that break in.

13          Q.    Yeah.  Do you know where you

14   were the day of the break in?

15          A.    I was not in Colorado that

16   day.

17          Q.    And was the break in in

18   Colorado?

19          A.    It was in Colorado, yes.

20          Q.    What kind of facility was it

21   a break in into?

22          A.    It was an office complex.

23          Q.    And what office is in that

24   complex?

SAppx0662

1          A.     USAT had their

2    administrative admission's office there

3    and an office for the registrar.

4    Administrative offices.

5          Q.     Does it still have offices

6    there?

7          A.     No.

8          Q.     When did it cease having

9    offices there?

10          A.     March 1st.

11          Q.     And where did the documents

12    or other possessions from USAT move to?

13          A.     5400 Ward Road, Aspen

14    Business Complex.

15          Q.     Also in Colorado?

16          A.     Aspen Park Business.

17          Q.     Also in Colorado?

18          A.     Also in Colorado, yes.

19          Q.     What's the reason for the

20    move?

21          A.     The lease was up and they

22    put the building up for sale.

23          Q.     Do you know what was stolen

24    during the theft on January 18, 2019?

SAppx0663

1          A.     What was missing?  They

2    appeared to have targeted the former

3    registrar's desk.  They took the two

4    computers that she had been using during

5    her employ.  And some files that had been

6    in her desk and little else.

7               COURT REPORTER:  I'm sorry?

8               THE WITNESS:  A few minor

9          other items but they only targeted

10         her desk and that was about it.

11   BY MS. MCENROE:

12         Q.     And who was that former

13   registrar?

14         A.     That was Nadine Cruz.

15         Q.     When did she cease being a

16   registrar for USAT?

17         A.     About one month before that.

18   I don't recall the exact date.

19         Q.     When you say two computers,

20   were they desktop computers or laptops?

21         A.     They were laptops, desktops,

22   yes.

23         Q.     Desktops or laptops?

24         A.     You know, laptops.

SAppx0664

Case: 18-2706   Document: 45-3   Page: 157   Date Filed: 01/16/2020
Case 2:18-cv-05540-WB   Document 21-35   Filed 05/03/19   Page 449 of 584

Orlen L. Tulp, Ph.D., M.D.

1        Q.      And when you say some files

2   in her desk were stolen, were those hard

3   copy or electronic files?

4        A.      They were paper files.  It

5   was actually the application for her

6   replacement.

7        Q.      And who was her replacement?

8        A.      A trainee, Nicole Perez.

9        Q.      You said a couple of other

10  small things were taken as well.

11       A.      Speakers.

12       Q.      Speakers, computer speakers?

13       A.      Laptop speakers.

14       Q.      Anything else?

15       A.      A couple of flash drives.

16       Q.      Do you remember the contents

17  of those flash drives?

18       A.      I do not know the content of

19  the flash drives, no.

20       Q.      Anything else?

21       A.      I think they took a water

22  bottle that belonged to Ms. Cruz, I

23  believe.

24       Q.      Anything else?

SAppx0665

1         A.    I don't know of any other
2    items.
3         Q.    Do you if a police report
4    was made?
5         A.    Yes.
6         Q.    Have you ever seen that?
7         A.    No.
8         Q.    Who made the police report?
9         A.    The building owner made the
10   report -- or the building manager made
11   the report.
12        Q.    Who was that?
13        A.    The building manager, I
14   don't know her name.
15        Q.    A lady?
16        A.    A lady.  I don't know her
17   name.
18        Q.    Has anything been recovered?
19        A.    No.
20        Q.    Do you know if it's an open
21   investigation?
22        A.    I believe it's still open.
23        Q.    Do you have a suspicion or
24   understanding about why those things may

SAppx0666

1   have been stolen from the USAT building?

2        A.    A very strong suspension.

3        Q.    And what is your suspension?

4        A.    The suspension would be that

5   it would have been linked to Ms. Cruz

6   because it specifically targeted her desk

7   and her previous -- her former computers.

8   And because the nature of the break in

9   where it occurred, how it occurred, one

10  would have to be very familiar with the

11  building to know how to gain entrance.

12       Q.    Was there any, as far as you

13  know, evidence of a break in, broken

14  locks, broken windows?

15       A.    Broken window.

16       Q.    A broken window?

17       A.    A broken window in the

18  conference room.

19       Q.    Glass broken or broken like

20  the lock --

21       A.    -- glass broken.

22       Q.    So if you could just let me

23  finish my questions --

24       A.    Okay.

SAppx0667

1        Q.      -- and I'll let you finish

2   your answer, so we don't talk on top of

3   each other.  But we're doing great so

4   far.

5        A.      That's fine.

6        Q.      Okay.  Thank you.

7                So there was broken glass

8   you said?

9        A.      Yes.

10        Q.      And what are the

11   circumstances of Ms. Cruz leaving USAT?

12        A.      There were work performance

13   issues.

14        Q.      What do you mean by that?

15        A.      Repeated errors on

16   transcripts.

17        Q.      What do you mean by repeated

18   errors on transcripts?

19        A.      Misspelling of names,

20   misspelling of course selections,

21   miscalculation of grade point averages,

22   things that a registrar has to be very

23   accurate about.

24        Q.      Who communicated to Ms. Cruz

SAppx0668

Case: 19-2706   Document: 45-3   Page: 161   Date Filed: 01/16/2020
Case 2:18-cv-05540-WB   Document 21-21   Filed 05/03/19   Page 445 of 584

Orlen L. Tulp, Ph.D., M.D.

1    that she was no longer going to be

2    employed by USAT?

3          A.    The vice president.

4          Q.    And who is that?

5          A.    Carla Konyk, Director Konyk.

6          Q.    And could you spell Carla's

7    last name for us?

8          A.    K-O-N-Y-K.

9          Q.    And you say that Konyk?

10         A.    Konyk.

11         Q.    Great.  Thank you.

12               Was that communication in

13   writing or oral, do you know?

14         A.    Both.  And it was a

15   longstanding communication over a number

16   of months.

17         Q.    Prior to January 2019?

18         A.    Prior to her dismissal.

19         Q.    And which was in December

20   2018, does that sound right?

21         A.    I don't remember the exact

22   date.  I don't know.

23         Q.    But towards the end of 2018

24   would you say?

SAppx0669

1          A.      Probably, yes.

2          Q.      Do you know if any valuables

3    were taken in the theft?

4          A.      Any?

5          Q.      Valuables.

6          A.      Valuables.  Well, laptops in

7    this case would be considered valuables.

8          Q.      Aside from the laptops.

9          A.      I don't -- I'm not aware of

10   any other significant valuables.  There's

11   no money stored on campus, for example,

12   in the office.

13         Q.      Have you been in touch with

14   the police to tell them your suspicion

15   about the cause of the theft?

16         A.      I have requested through the

17   vice president who communicates with the

18   former manager who has been unresponsive.

19         Q.      The former building manager?

20         A.      Building manager is

21   unresponsive.

22         Q.      But you have not gone

23   directly to the police yourself?

24         A.      No, I haven't gone directly

SAppx0670

1    to the police myself.

2              Q.    I'd like to talk about USAT

3    a little bit.

4              Do you understand what I'm

5    talking about by saying USAT?

6              A.    Uh-huh.  I'm familiar with

7    the term.

8              MR. REIL:  Counsel, before

9         we get into your next issue, could

10        we go off the record?

11             MS. MCENROE:  Sure.

12             MR. REIL:  Okay.

13             VIDEOGRAPHER:  Off the

14        record at 9:29 a.m.

15             (At this time, a discussion

16        was held off the video and

17        stenographic record.)

18             VIDEOGRAPHER:  Back on the

19        record at 9:30 a.m.

20             MS. MCENROE:  Counsel can

21        correct me if I'm wrong but we've

22        agreed that for the purposes of

23        this deposition, that all

24        objection -- all objections aside

SAppx0671

1          to those to form are reserved

2          until the time of trail.

3                    MR. SWATE:  Yes, that's the

4          agreement.

5                    MR. REIL:  So agreed.

6                    MS. MCENROE:  Thank you.

7     BY MS. MCENROE:

8          Q.    So what does USAT stand for?

9          A.    University of Science, Arts

10    and Technology.

11         Q.    Do you know when USAT came

12    into existence?

13         A.    I didn't hear that.

14         Q.    Do you know when USAT came

15    into existence?

16         A.    September 26, 2003.

17         Q.    And how do you know that

18    date?

19         A.    Because I was there.

20         Q.    Tell me a little bit about

21    your involvement in the starting of USAT?

22         A.    We -- while I was residing

23    in the UK I'm often, as a professor,

24    often asked to write letters of

SAppx0672

Orien L. Tulp, Ph.D., M.D.

```
 1   recommendation for students to go to
 2   other schools, and I became aware while I
 3   was on a leave in Cambridge that there
 4   were a number of offshore schools based,
 5   you know, satellite programs running in
 6   the UK, and while I was there one of them
 7   invited me to be a dean of his school.  I
 8   went down and looked at it and I began to
 9   investigate and discovered that, number
10   one, his school was never licensed.  And
11   I used the credential for the Pentagon
12   for medical professionals, so I did a
13   little background research to find out
14   that this whole school was bogus at the
15   time.
16        Q.    And what school was that?
17        A.    Saint Christopher's School
18   of Medicine -- or St. Christopher's
19   College of Medicine it became, and I'm
20   not when that transition occurred.
21             I declined the invitation on
22   the grounds that I've -- I was attending
23   professor at Drexel and it would have
24   been a conflict of my contract and I
```

SAppx0673

1    didn't want to do it anyway.  And so --

2    but it gave me a reason to look into the

3    business of offshore schools, being many

4    of them.  I think they're right now 78

5    offshore schools in the Caribbean region

6    alone, in the Caricom.

7             COURT REPORTER:  In where?

8             THE WITNESS:  In the

9         Caricom.

10            And so I looked into that

11        and I realized that they're all

12        entrepreneurial, all of them.  And

13        we got the idea that if one were

14        to form a university based on an

15        academic platform, it should go

16        far because there's a real need

17        and that's when we created USAT.

18   BY MS. MCENROE:

19        Q.    You say when we created

20   USAT, who else worked with you to help

21   create USAT?

22        A.    Several other individuals.

23   We got together in a pub in Cambridge,

24   the Eagle Pub.  Very famous.  I'm sure

1    you know about it.

2          Q.    I studied at Oxford not at

3    Cambridge so I apologize, I don't know

4    that one.

5          A.    I see.  That's where they

6    first outlined DNA on a napkin.  Anyway.

7    So we decided that we would form this

8    school, form a university based on an

9    academic platform because we're all

10   academics.

11         Q.    And who is the we?

12         A.    We -- my other primary

13   contributor at that time was Dr. Jeffrey

14   Mvenge.

15         Q.    How do you spell the last

16   name?

17         A.    M-V-E-N-G-E.

18         Q.    And anybody else?

19         A.    And he and I were the two

20   principles.

21         Q.    You said offshore schools a

22   number of times, what do you mean by that

23   in this setting?

24         A.    Offshore schools that are

SAppx0675

1    schools that are located off the shores

2    of the US or major continents.  They're

3    offshore schools I believe where

4    virtually every major land to me.

5         Q.    So are you and Jeffrey

6    Mvenge the two founders of USAT?

7         A.    He went back to Zimbabwe.

8         Q.    Did he found USAT with you?

9         A.    He was on the organizing

10   committee.

11        Q.    Did he found USAT with you?

12        A.    He was a contributor, I will

13   say that.

14        Q.    Does he have any ownership

15   interest in USAT today?

16        A.    No.

17        Q.    Do you?

18        A.    Yes.

19        Q.    What's your ownership

20   interest in USAT?

21        A.    50 percent.

22        Q.    Who owns the other 50

23   percent?

24        A.    Carla Konyk.

SAppx0676

1                    Why is that relevant?

2                    MR. REIL:  Let counsel ask

3          her questions.

4                    THE WITNESS:  All right.

5                    MR. REIL:  We'll object if

6          we think it's necessary.

7                    THE WITNESS:  Okay.

8                    MS. MCENROE:  Thank you.

9     BY MS. MCENROE:

10          Q.    And what's your relationship

11    to Ms. Konyk?

12          A.    She's the vice president.

13          Q.    Do you have a personal

14    relationship?

15          A.    I've known her for many

16    years.

17          Q.    Is she your wife?

18                    MR. REIL:  You can answer.

19                    THE WITNESS:  She is.

20    BY MS. MCENROE:

21          Q.    Is she a medical doctor?

22          A.    Yes.

23          Q.    Where did she get her

24    medical degree?

SAppx0677

1          A.     In the UK.

2          Q.     At what school?

3          A.     I think it was called London

4    Medical College or something like that.

5          Q.     Is that before or after you

6    guys had met?

7          A.     Probably after.  I met her

8    many years ago on a humanitarian medical

9    mission.

10         Q.     And pardon me for not

11   nothing but does she have an M.D. or is

12   there a different medical degree from the

13   UK?

14         A.     They're MBBS.

15         Q.     MBBS.  And is that what she

16   has?

17         A.     Yes.

18         Q.     Since the founding of USAT

19   has the ownership split been 50 percent

20   you and 50 percent Ms. Konyk?

21         A.     Yes.

22         Q.     From the beginning?

23         A.     From the beginning.

24         Q.     Still today?

SAppx0678

1          A.      Until today.

2          Q.      And what is your title aside

3     from owner at USAT?

4          A.      Professor.

5          Q.      Are you also the president?

6          A.      Yes.

7          Q.      Do you have any other titles

8     at USAT?

9          A.      No.

10         Q.      Have you had any other

11    titles at USAT?

12         A.      No.

13         Q.      Speaking first about your

14    role as president, what specifically do

15    you do at USAT as president?

16         A.      I provide overall direction

17    of the University, administrative

18    professor -- I tend to spend more of my

19    time working on the professional side, on

20    the academic side, curriculum,

21    corporation, guiding the curriculum

22    development, that sort of thing.

23         Q.      Anything else?

24         A.      That's about it.

1    Q.    For professor, what do you

2    teach or have you taught at USAT?

3    A.    Nutritional medicine mostly.

4    And that would include things like

5    pharmacology.

6         COURT REPORTER:  I'm sorry?

7         THE WITNESS:  That would

8         include pharmacology.

9         MR. REIL:  Wait until

10        there's a question.

11        MS. MCENROE:  I think he was

12        just clarifying for the court

13        reporter.

14        MR. REIL:  Oh, okay.  Fine.

15   BY MS. MCENROE:

16        Q.    And have you been both the

17   professor and the president of USAT since

18   its founding?

19        A.    Yes.

20        Q.    And you mentioned that Ms.

21   Konyk is the vice president?

22        A.    Yes.

23        Q.    Is she a professor as well?

24        A.    No, she's administrator.

SAppx0680

1    Q.    Just very briefly, what her

2    role is at USAT?

3    A.    She's vice president and --

4    administration.

5    Q.    So what does that mean?

6    A.    Well, she takes care of all

7    the administrative details, makes sure

8    the bills get paid and that sort of

9    thing.  Faculty get paid, making sure the

10   administrative policies, managing the

11   office and that sort of thing.

12   Q.    Where is she based?

13   A.    Colorado.

14   Q.    And where are you based?

15   A.    Colorado and Montserrat.  I

16   split my time.

17   Q.    How would you estimate your

18   split of time percentage-wise?

19   A.    Recently, probably if I go

20   back, in the average over the last 15

21   years about 50/50.

22   Q.    About 50/50.

23   You have a home there in

24   Montserrat?

SAppx0681

1          A.     Yes.

2          Q.     Is there any other USAT

3    faculty or employees who are located in

4    Montserrat?

5          A.     Yes.

6          Q.     And who is that?

7          A.     Dr. Lewis.   Consultant

8    surgeon.

9          Q.     What's Dr. Lewis' first

10   name?

11         A.     Lowell.

12         Q.     And is he a professor?

13         A.     He's a professor.   He's a

14   very senior surgeon.

15         Q.     Anybody else?

16         A.     Tracy Scipio, who is the

17   office manager.

18         Q.     Yup.

19         A.     Roy Abrams who is the

20   building engineer of the campus.

21         Q.     Yup.

22         A.     Another fellow who is --

23   Charles Rooney, who is the grounds

24   keeper.

1    Q.    Yup.

2    A.    We have a housekeeper whose

3    name I don't recall, it just changed.

4    Q.    Yup.

5    A.    We have some other staff

6    that worked there on a regular basis to

7    make sure that, you know, the buildings

8    are maintained in good condition and the

9    administrative stuff gets managed.

10    Q.    Any other professors located

11    in Montserrat?

12    A.    They travel in as are

13    needed.

14    Q.    Are you currently employed

15    at the University of Health and

16    Humanities in the British Virgin Islands?

17    A.    No.

18    Q.    Has that school been

19    founded?

20    A.    I believe so.

21    Q.    Were you involved in it

22    getting founded?

23    A.    Yes and no.  I provided some

24    guidance.

SAppx0683

1          Q.     Is Ms. Konyk involved in its

2     founding?

3          A.     I believe so.

4          Q.     Is she an owner, in part or

5     in whole, of the University of Health and

6     Humanities BVI?

7          A.     I believe so.

8          Q.     What percentage owner is

9     she?

10         A.     I'm not sure.

11         Q.     Do you know any of the other

12     owners at the University of Health and

13     Humanities BVI?

14         A.     Not really.

15         Q.     So is that a no?

16         A.     That's a no.

17         Q.     Do you know what the status

18     is of that school, is it open and

19     operating?

20         A.     It's been operating, yes.

21         Q.     Since when?

22         A.     Since January.

23         Q.     Does it have students

24     enrolled?

SAppx0684

1    A.    I believe so.  I believe

2  they do have.

3    Q.    Are you a professor at the

4  University of Health and Humanities BVI?

5    A.    No.

6    Q.    Do you plan to be?

7    A.    Not sure.

8    Q.    Is there any relationship

9  between USAT and the University of Health

10  and Humanities in BVI?

11    A.    No direct relationship that

12  I'm aware of.

13    Q.    Is there an indirect

14  relationship?

15         MR. REIL:  Objection to the

16    form of the question.  Can we go

17    off the record?

18         VIDEOGRAPHER:  Off the

19    record at 9:43 a.m.

20         (At this time, a discussion

21    was held off the video and

22    stenographic record.)

23         MR. REIL:  I object to that

24    question because -- the form of

SAppx0685

```
 1            the question because I think the
 2            term indirect relationship is very
 3            vague.  I'd appreciate it if you
 4            can clarify that.
 5                 MS. MCENROE:  Are you
 6            directing him not to answer?
 7                 MR. REIL:  Absolutely not.
 8                 MS. MCENROE:  Then let's go
 9            back on the record.
10                 VIDEOGRAPHER:  Back on the
11            video record at 9:44 a.m.
12      BY MS. MCENROE:
13            Q.    Is there an indirect
14      relationship between USAT and the
15      University of Health and Humanities BVI?
16            A.    I would say probably yes.  I
17      don't -- I can't clarify that.  I'm not
18      privy to that information.
19            Q.    So Dr. Tulp, I am not going
20      to try to go through your whole
21      employment history and education history
22      because it's quite impressive and long.
23      I'm not going to belabor the point here
24      today but I do want to talk through a
```

SAppx0686

1    couple of things in particular.  And we

2    have what we believe is a copy of your

3    resume.

4              MS. MCENROE:  I'd like to

5         mark Exhibit-1.

6              (At this time, a Resume was

7         marked for identification as

8         Exhibit-1.)

9    BY MS. MCENROE:

10        Q.    So Dr. Tulp, I'm handing you

11   what's been marked as Exhibit-1.  Is that

12   your name at the top?

13        A.    It is indeed, yes.

14        Q.    And are those your titles

15   listed out, Ph.D., M.D., F.A.C.N.,

16   C.N.S.?

17        A.    Yes.

18        Q.    Is this your resume?

19        A.    It does appear to be, yes.

20        Q.    Is this a familiar document

21   to you?

22        A.    It is familiar, yes.

23        Q.    Did you prepare it?

24        A.    I most likely did some time

SAppx0687

1   ago.

2        Q.    Do you have any reason to

3   believe you did not prepare it?

4        A.    No.

5        Q.    So I know what a Ph.D. and

6   an M.D. is.  What is an F.A.C.N.?

7        A.    Fellow of the American

8   College of Nutrition.

9        Q.    And what is C.N.S.?

10       A.    Certified Nutritional

11  Specialist.

12       Q.    I'd like to take a look at

13  the second page of that document and I'd

14  like to go through a couple things in

15  your education briefly.

16            So as I see it you have a

17  number of different degrees listed here

18  but I want to start from the top and work

19  my way down for the M.D. related degrees.

20  So the first that I see is a Ph.D., M.D.,

21  from the University of Vermont in 1968 to

22  1974; is that correct?

23       A.    Correct, uh-huh.

24       Q.    So am I understanding that

SAppx0688

1    correct to say that you did both a

2    Medical Doctor degree and a Doctor of

3    philosophy at the University of Vermont?

4         A.    Yes, I did the Ph.D.

5         Q.    The M.D., Ph.D. program?

6         A.    That's right.

7         Q.    And so if I called the

8    University of Vermont would they tell me

9    that you graduated with an M.D.?

10             MR. REIL:  Objection as to

11        what the University of Vermont

12        would say.  You can answer.

13             THE WITNESS:  I have no

14        idea.

15   BY MS. MCENROE:

16        Q.    Do you have an diploma from

17   the University of Vermont with an M.D.

18   degree on it?

19        A.    I have a diploma.  I had

20   one.

21        Q.    Have you ever seen one for

22   yourself?

23        A.    Yes, I have.  I've had one.

24   When I went to Montserrat they wanted my

SAppx0689

Orlen L. Yulp, Ph.D., M.D.

1   original diploma so I took it out of the

2   frame and it has yet to be returned.

3        Q.    And when I asked you if I

4   called the University of Vermont if they

5   would tell me that you had an M.D. degree

6   or not, you didn't say emphatically yes.

7   Why not?

8        A.    Because I don't have a copy

9   of that certificate anymore, it's gone.

10       Q.    Do you have a transcript

11   from when you attended the University of

12   Vermont and got your medical doctorate

13   degree?

14       A.    I'm sure I do.  It's been

15   many years.

16       Q.    Moving a little bit further

17   down there's listed as a medical degree

18   from St. Petersburg Medical Academy/IUFS

19   in St.  Petersburg, Russia in 2005.  What

20   is IUFS?

21       A.    I think that's the

22   International University for Fundamental

23   Studies.  And I'm not sure what the

24   relationship of that is with St.

1   Petersburg Medical Academy.  Medical

2   Academy is the medical school.

3        Q.    Was that education in

4   Russian or in English?

5        A.    It was in English.

6        Q.    Have you ever tried to come

7   through the Educational Commission for

8   Foreign Medical Graduates with your

9   foreign medical diploma to enter graduate

10  medical education in the United States?

11       A.    No.

12       Q.    That diploma is listed as

13  2005?

14       A.    Correct.

15       Q.    Why did you attend St.

16  Petersburg Medical Academy for a medical

17  doctor degree in 2005?

18       A.    They wanted me to be -- they

19  offered me a seated faculty position and

20  that was an enticement to get me to

21  accept it.

22       Q.    Did you do course work for

23  that M.D. degree?

24       A.    It was transfer credit.

SAppx0691

1    Q.    From where?

2    A.    From University of Vermont.

3    Q.    Did you do any course work

4  at St.  Petersburg Medical Academy?

5    A.    No.  It was all transfer

6  credit.

7    Q.    And I'd like to look at your

8  M.D. degree next, it's from California

9  University, Los Angeles?

10    A.    That's a foreign degree

11  equivalence.

12    Q.    So can you explain what that

13  means?

14    A.    They reviewed everything,

15  they did a -- just like when similar to I

16  assume with the ECFMG does when you

17  submit your credentials, they do an

18  evaluation of that credential through

19  some agency and then they issue the

20  certificate accordingly.

21    Q.    And was that a degree

22  awarded for course work done there?

23    A.    No, that's an equivalency.

24    Q.    Is that school, the

SAppx0692

1   California University, Los Angeles

2   located in the United States?

3          A.     Yes.

4          Q.     In California?

5          A.     In California.

6          Q.     In Los Angeles?

7          A.     In Los Angeles.

8          Q.     Did you go to Los Angeles in

9   connection with receiving this degree?

10         A.     I've been to Los Angeles

11  many times.

12         Q.     In connection with receiving

13  this degree?

14         A.     I didn't -- no, I didn't

15  have to go in connection with that

16  because it's an equivalency certificate,

17  not, you know, not in a classroom base.

18         Q.     And what served as the basis

19  for that equivalency?

20         A.     They evaluate your course

21  work and compare it to the US standard.

22         Q.     And what course work was

23  that for you?

24         A.     That was course work taken

SAppx0693

¹ at the University of Vermont and I

² presume -- it's a collection of

³ everything.

⁴        Q.    And why did you pursue

⁵ getting the M.D. degree at California

⁶ University, Los Angeles?

⁷        A.    I guess for the same reason

⁸ we had to do it for NARIC in the UK.

⁹ When I was residing there, they evaluate

¹⁰ your credentials to see if they're

¹¹ equivalent to their credentials.  Even

¹² though I never actually took a position

¹³ in the UK.  We did do -- I did to the

¹⁴ NARIC evaluation and they considered

¹⁵ everything equivalent up to and including

¹⁶ the Ph.D., which is pretty good because

¹⁷ I'm aware that they don't accept a lot of

¹⁸ US credentials.

¹⁹        Q.    So I want to make sure I

²⁰ understand.  So the Doctor of Medicine,

²¹ California University, Los Angeles, were

²² they evaluating to see if you had the

²³ equivalent of a US degree?

²⁴        A.    US and UK.

1          Q.     US and UK.

2          A.     Yes.

3          Q.     Okay.  And so -- but you

4     already had a US degree from the

5     University of Vermont; correct?

6          A.     Right.

7          Q.     So you were doing that for

8     the purposes of having the equivalency of

9     a UK degree?

10          A.     Yes, because I was

11     considering an appointment at Cambridge.

12          Q.     So did you take an

13     appointment at Cambridge?

14          A.     No, I did not.

15          Q.     But you mentioned having

16     been at Cambridge when you had the idea

17     for USAT?

18          A.     Yes, right.

19          Q.     So were you a ever

20     affiliated with a college in Cambridge?

21          A.     I was invited to give a few

22     lectures at different colleges while I

23     was there.

24          Q.     What colleges?

SAppx0695

1        A.    I don't remember the names

2   of the colleges.  It's many years ago.

3        Q.    Would that have been in the

4   2004 timeframe?

5        A.    It would have been 2001,

6   '02, '03, '04 because I resided in the UK

7   for about six years.

8        Q.    And what were you doing

9   professionally when you lived in

10  Cambridge for six years?

11       A.    I was on leave from Drexel

12  University.

13       Q.    Doing what?

14       A.    I was on a medical leave.

15       Q.    Why did you take your

16  medical leave from Drexel University in

17  the United Kingdom?

18       A.    I had a serious back injury

19  from a car accident and I needed to have

20  a year away when Drexel would stop

21  ringing up my phone every day.

22       Q.    So did you work while you

23  were there?

24       A.    I gave guest lectures,

SAppx0696

1    occasional guest lectures there and on

2    the continent.

3          Q.    The next degree is an M.D.

4    (AM.) What does that mean?

5          A.    Yes.

6          Q.    What does that mean, the AM?

7          A.    Alternative medicine.

8          Q.    So is that different than a

9    Doctor of Medicine degree?

10          A.    Yes.  That's natural

11    medicine.

12          Q.    And you received that degree

13    in 2004 from Open International

14    University, Columbo, Sri Lanka India?

15          A.    Correct.

16          Q.    Did you actually physically

17    go to India to receive that degree?

18          A.    No, I did not.

19          Q.    Did you take any course work

20    to receive that degree?

21          A.    They used my course work

22    from the University of Vermont and other

23    institutions because I have a strong

24    interest in complementary medicine.

SAppx0697

1          Q.    You also have another M.D.
2    (AM) received in 2004, this time labeled
3    as Doctor of Medicine in Alternative,
4    slash, Integrated Medicine, Medicina
5    Alternativa?
6          A.    Yes.
7          Q.    If I didn't butcher that.
8    Okay.
9                From the Indian Board of
10   Alternative Medicine Calcutta?
11         A.    That's correct.
12         Q.    And did you go to Calcutta
13   in connection with that degree?
14         A.    No, I did not have to.  I
15   didn't go to.
16         Q.    What did they accept in
17   order to award you that degree?
18         A.    They reviewed my transcripts
19   and my entire profile to do that.
20         Q.    So was that again the
21   University of Vermont course work?
22         A.    It included University of
23   Vermont, yes.
24         Q.    Did it return -- sorry.

SAppx0698

1    Strike that.

2            Did it include anything

3    else?

4        A.    They probably did but I

5    don't recall.

6        Q.    Do you have any other M.D.

7    or medical degree or equivalent?  Or did

8    we review all of them?

9        A.    No, I think you've got it

10    covered.

11        Q.    Are you a practicing doctor

12    in the United States?

13        A.    No.

14        Q.    Are you licensed to practice

15    medicine in United States?

16        A.    I was at one time.

17        Q.    In what state?

18        A.    West Virginia.

19        Q.    When was that?

20        A.    A long time ago.

21        Q.    If it refreshes your

22    recollection at all, take a look at page

23    4, if it would be helpful.  And of

24    course, I want your current answer.  But

SAppx0699

1   just there's a section at the top, it

2   says, Medical Licensure, West Virginia,

3   USA.

4        A.    Right.

5        Q.    And it says that it expired

6   in July of 2010.  Do you see that?

7        A.    Right.

8        Q.    Does that sound right to

9   you?

10       A.    That seems right.  I just

11  didn't bother renewing it.

12       Q.    Have you ever treated

13  patients in the United States as a

14  medical doctor?

15       A.    No.  I've been an academic

16  and a researcher.

17       Q.    Do you know when you

18  received your medical degree in West

19  Virginia?  I'm sorry, strike that.

20            Do you know when you

21  received your medical license from West

22  Virginia?

23       A.    I don't recall the year.

24       Q.    It also says here that you

1    are an Allied Health Professional in

2    California.  Is that a medical doctor?

3         A.    That was Allied Health.  It

4    was when I first -- I did a sabbatical in

5    California at a pharmaceutical firm.

6         Q.    But is that the same as a

7    medical license in California?

8         A.    No, that's more pathology.

9         Q.    In the District of Columbia

10   you have listed Naturopathic Medicine?

11        A.    Yes.  I was registered their

12   Naturopathic Medicine.

13        Q.    Is that the same as a

14   license to practice medicine?

15        A.    It was in that domain, yes.

16        Q.    So you are able to practice

17   medicine in the District of Columbia?

18        A.    Natural medicine.

19        Q.    Just natural medicine?

20        A.    Natural medicine.  Yes.

21        Q.    But it was an

22   unrestricted -- it was not an

23   unrestricted license to practice

24   medicine?

SAppx0701

1              A.    No.  No.

2                    THE WITNESS:  I don't think

3              they issue those anymore, I don't

4              know.  I haven't kept up with it.

5                    MS. MCENROE:  Well, it's

6              almost 10 o'clock and we're about

7              to have a fire alarm so we're

8              going to take a quick break.

9                    VIDEOGRAPHER:  Off the

10             record at 9:57 a.m.

11                   (At this time, a short break

12             was taken.)

13                   VIDEOGRAPHER:  We're back on

14             the record at 10:08 a.m.

15     BY MS. MCENROE:

16             Q.    Dr. Tulp, I'd like to talk a

17     little bit about your work at USAT.  And

18     in particular, your role as an authorized

19     signatory on behalf of USAT for purposes

20     of the Educational Commission for Foreign

21     Medical Graduates?

22             A.    Sure.

23             Q.    When I say an authorized

24     signatory, do you know what I'm talking

SAppx0702

1    about?

2          A.    I think I do.

3          Q.    What does that mean to you?

4          A.    It means I get to sign

5    things.

6          Q.    You get to sign things for

7    what purpose?

8          A.    Diplomas and I suppose also

9    it would include anything that requires

10   an official signature.

11         Q.    In order to communicate to

12   the Educational Commission for Foreign

13   Medical Graduates, that the information

14   is correct?

15         A.    Presuming it's correct as

16   presented to me.

17         Q.    To the best of your

18   knowledge?

19         A.    To the best of my knowledge.

20         Q.    Do you understand that you

21   are not presently permitted by the ECFMG

22   to be an authorized signatory?

23         A.    I understand that.

24         Q.    Do you know if USAT has

Orien L. Tulp, Ph.D., M.D.

1    different authorized signatories at

2    present aside from yourself?

3          A.    Yes, it does.

4          Q.    And who is that?

5          A.    Carla Konyk is the

6    authorized signature now.

7          Q.    Anybody else?

8          A.    The registrar which would

9    be --

10         Q.    Mary Hickling?

11         A.    Mary Hickling, yes.

12         Q.    And they are both presently

13   employees of USAT?

14         A.    Yes.

15         Q.    Do you know whether they

16   were both authorized signatories

17   previously when you were also an

18   authorized signatory?

19         A.    I was not aware that they

20   were.

21         Q.    Do you know one way or the

22   other?

23         A.    I did not know that they

24   were authorized signatories at that time.

1    I only knew that the registrar, because

2    her signature has to be recorded with an

3    official ECFMG form of some sort.  And I

4    knew that she was but I didn't know any

5    of the others were.

6         Q.    And when you say the

7    registrar, you're talking about Ms.

8    Hinkling?

9         A.    Ms. Hinkling, yes.

10        Q.    And how long has she been

11   the registrar at USAT?

12        A.    About five years I think.

13   I'm guessing.

14        Q.    Previously when you were an

15   authorized signatory to ECFMG, when

16   documents were signed with your name,

17   were you the actually the one signing

18   them?

19        A.    I hope I was but I can't

20   attest that I always was.

21        Q.    And why do you say that?

22        A.    Well, some of the forms are

23   already signed when I get them.

24        Q.    By you?

SAppx0705

1        A.      Some by the ECFMG.

2        Q.      Right.  But if you sign a

3   document as the authorized signatory on

4   behalf of USAT previously and submitted

5   it to ECFMG, did it have your signature

6   on it before you received it?  Is that

7   what you're saying?

8        A.      I can't say yes or no.  That

9   it was always that way.

10       Q.      So you said you hoped that

11  you were the person who actually signed

12  the documents, was anybody else at USAT

13  authorized to sign on your behalf?

14       A.      No.

15       Q.      Was anybody authorized to

16  send e-mails on your behalf?

17       A.      I believe that the -- they

18  sent everything out over my signature

19  block.  When they send correspondence to

20  students, for example, they send it over

21  my signature block, and I never really

22  thought very much about that one way or

23  the other.

24       Q.      But you may not have

1    necessarily been the author of the

2    e-mails, is that what you're saying?

3         A.    I would not have been the

4    author.

5         Q.    Sometimes you were and

6    sometimes you weren't?

7         A.    More often than not on the

8    usual correspondence then I'm not author.

9         Q.    I just want to confirm the

10   e-mail addresses that you use.

11        A.    I (indicating.)

12        Q.    I just want to confirm the

13   e-mail addresses that you use.  One I

14   have is O.tulp, which is T-U-L-P,

15   @USAT.edu?

16        A.    That is correct.

17        Q.    And another I've seen is

18   USAT.edu@gmail.com.

19        A.    Yes.  That preceded the edu,

20   the Educause domain.

21        Q.    And those are both e-mails

22   addresses you have used?

23        A.    Yes.

24        Q.    And you receive e-mails at

SAppx0707

1    those e-mail addresses?

2          A.    Yes.

3          Q.    Since it sounds like you

4    have some uncertainty about whether

5    documents that went to ECFMG with your

6    signature on them weren't necessarily

7    signed by, did you ever raise that

8    concern to ECFMG?

9          A.    I haven't because as a

10   result of this I became aware of it.

11         Q.    What do you mean by that?

12         A.    I was not aware that there

13   were questions before.  15 years we had

14   no glitches.  Not a single glitch.

15         Q.    I just want to make sure I

16   break that down and understand what

17   you're talking about.

18               So when you say before this

19   are you talking about before the

20   circumstances that bring us to this

21   deposition today?

22         A.    Yes.

23         Q.    And when you say you weren't

24   aware of there being glitches, what do

SAppx0708

1   you mean by a glitch?

2        A.    The ECFMG is claiming that

3   documents were inaccurate.  I'm unaware

4   of any that were inaccurate when they

5   were sent by me.

6        Q.    Are you now aware that they

7   were inaccurate at the time?

8        A.    No.  Because I have not seen

9   proof.

10       Q.    What steps, if any, is USAT

11  currently taking to make sure that

12  documents that are signed by an

13  authorized signatory sent to ECFMG are

14  accurate?

15       A.    When Dr. Konyk reviews them

16  she has access to administrative files

17  that I do not.  So she's able to go back

18  and verify names, dates and places that I

19  could not.

20       Q.    And is that a process that's

21  in place now?

22       A.    It is.  Yes, it's in place

23  now.

24       Q.    Was it in place previously

SAppx0709

1    when you were the authorized signatory or

2    a authorized signatory I should say?

3              A.    We follow FERPA.  And

4    therefore, if you have no need, there's

5    no requirement to see if this particular

6    document, you cannot access that.  So

7    during the process of leading up to this,

8    I can't go in and look at a person's

9    transcript and make a comment on it or

10   edit it or verify things.  Occasionally,

11   I can get them but I'm not authorized to

12   be in that system because I have no need

13   to enter data.  If you can't enter data

14   there's no need to be in there.

15             Q.    So when you were the

16   authorized signatory, you were also

17   President of USAT signing documents to

18   attest to the veracity of transcripts and

19   diplomas to the ECFMG, but you say that

20   you had no reason to check that they were

21   actually accurate?

22             A.    I had to reason to doubt

23   that they were correct.  I had no reason

24   to doubt that they were correct or

1   incorrect because as they were presented

2   to me they've already been through the

3   registrar for verification.

4        Q.   What was the process there?

5   Because my understanding is is that ECFMG

6   would send documents to USAT asking if

7   these are correct, and then they would

8   come back with your signature saying they

9   were.

10        So at what point was the

11   registrar verifying that they were

12   correct and how do we know that that's

13   true based on the document?

14        A.   At that point I would take

15   the data from the transcript.

16        Q.   Which transcript?

17        A.   The USAT transcript.

18        Q.   Provided from ECFMG?

19        A.   Provided by the registrar.

20        Q.   So you would get a

21   comparison?

22        A.   I'd get it and if they

23   matched they matched.  They almost all

24   exclusively did.  I don't recall any

SAppx0711

1    times when they did not match.

2         Q.    So how does that play in

3    with FERPA, if you were verifying that

4    the transcripts matched or that the

5    diplomas matched, what is it that you're

6    talking about that you were not

7    accessing?

8         A.    I can't access -- if you

9    come to me as a student and you want me

10   to do a grade, review your file, I can

11   only review what the student brings to me

12   to look at and what their study plan is.

13   I can't review their -- I can't -- I

14   can't calculate on whether they got an A,

15   B, C or a D on a grade because I can't

16   read that part of the -- I can't read

17   that part of the file.

18        Q.    So you as president were not

19   authorized to read those files to make

20   sure that they were accurate?

21        A.    I never asked to be

22   authorized to read that because that's --

23   I delegate that to the registrars.  Those

24   that have a need to be in those files.

1          Q.     So in fulfilling your role

2     when you were an authorized signatory for

3     ECFMG, when a transcript or a diploma was

4     sent to USAT for primary source of

5     verification you did not access the

6     underlining information --

7          A.     -- then I would get --

8          Q.     Hold on.  Let me finish my

9     question.

10              -- you did not access the

11    underlining information in USAT's system

12    to verify that it was accurate?

13         A.     I would access it through

14    the registrar.

15         Q.     What do you mean by that?

16    Physically, how did it work?

17         A.     I would ask her now to send

18    me a copy of that transcript so that I

19    could verify the accuracy.

20         Q.     Okay.  So you would.  You

21    would just have a middle person, who

22    would go into the system and get it for

23    you and then you can hold the two next to

24    each other and say, yes, that matches?

1          A.     Right.  I can look at it

2     side-by-side and say, yes, they match

3     that's correct.

4          Q.     And do you believe you did

5     that each time that your signature was on

6     a document, to ECFMG as the authorized

7     signatory for either a diploma or a

8     transcript?

9          A.     I believe I did, yes.

10          Q.     If you were permitted by

11     ECFMG now would you continue to serve as

12     an authorized signatory for USAT to

13     ECFMG?

14          A.     I would.

15          Q.     And would you change the

16     process involved to make sure that there

17     were no "glitches?"

18          A.     I would tighten it up.

19          Q.     And how would you tighten it

20     up?

21          A.     I would tighten it up by,

22     you know, request the access to the files

23     at that time so that I can look not just

24     at the transcript but the entire academic

SAppx0714

1    record.

2              THE WITNESS:  There's one

3         point that you didn't finish with.

4              MR. REIL:  Wait for a

5         question.

6              THE WITNESS:  Okay.  All

7         right.

8    BY MS. MCENROE:

9         Q.    You testified earlier that

10   Ms. Cruz was dismissed from USAT because

11   of some issues with her performance; is

12   that correct?

13        A.    She wasn't dismissed she

14   walked off the job.

15        Q.    Ah, so she quit?

16        A.    She quit.

17        Q.    But in any event, you

18   mentioned that she had had some

19   performance issues; is that correct?

20        A.    Yes.  She had been counseled

21   repeatedly.

22        Q.    Do you know if any of those

23   errors coming from Ms. Cruz made their

24   way to ECFMG?

SAppx0715

1          A.     I believe they probably did.

2          Q.     And what role was she

3   playing?

4          A.     She was the registrar.

5          Q.     So you would have been

6   relying on --

7          A.     -- she was the registrar

8   before Mary Hickling.

9          Q.     So you would have been

10  relying on information from Ms. Cruz --

11         A.     Yes.

12         Q.     -- in serving as the

13  authorized --

14         A.     Right.

15         Q.     -- signatory to ECFMG?

16         A.     Right.  We became aware of

17  the errors maybe a year prior to her

18  departure.

19         Q.     What steps, if any, did you

20  take to rectify those errors with ECFMG?

21         A.     She was counseled, she was

22  put on probation.

23         Q.     Did the actual errors that

24  made their way to ECFMG get corrected?

SAppx0716

1        A.    When we found them we would
2    correct them, yes.
3        Q.    You corrected them with
4    ECFMG directly?
5        A.    Some, yes.  Some, yes.  I
6    think some probably did get corrected,
7    you know, that way.
8        Q.    But potential that some of
9    them did not?
10       A.    But until I became aware of
11   these because -- I became aware of it
12   when I was reviewing some of the
13   transcripts to certify individuals, that
14   there were errors on those transcripts
15   that had slipped through.  Typos,
16   misspellings.  I looked mostly at the
17   signature, the heading of the transcript.
18   The name, make sure the name is correct.
19   And that it matched the application, that
20   it matched all the other parts of the
21   file.  And that's when we discovered that
22   not only was the -- were names being
23   misspelled, careless typing.  Failing to
24   check her work.

SAppx0717

1    Q.    Could there have been

2    substantive errors as well?

3    A.    There could have been.

4    There could have been.

5    Q.    And they would have gone to

6    ECFMG under your signature?

7    A.    They could have before I

8    detected it.

9    Q.    Is USAT currently operating

10    as a medical school?

11    A.    It's currently operating,

12    yes, because we have files that we have

13    to attend to and maintain for a number of

14    years.

15    Q.    Does USAT currently have

16    students enrolled?

17    A.    I don't believe so.

18    Q.    When was the last student

19    enrolled attending USAT?

20    A.    Probably December 31st.

21    Q.    2018?

22    A.    Yes.

23    Q.    Do you know if any students

24    were set to graduate after January 1,

SAppx0718

1    2019?

2          A.    There were some that would

3    have been eligible in the coming year,

4    yes.

5          Q.    Do you know what happened to

6    those students?

7          A.    I believe they've all

8    transferred to other schools.

9          Q.    Did anyone, in fact,

10   graduate after January 1, 2019?

11         A.    No.

12         Q.    Going back to the previous

13   years, 2014, '15, '16.  Prior to the

14   circumstances that bring us here today,

15   when would you USAT hold graduation?

16         A.    Twice a year.

17         Q.    When is that?

18         A.    Mid June and mid December.

19         Q.    Mid June and mid December.

20               And typically, how many

21   students would graduate at each of those

22   graduation ceremonies, ballpark?

23         A.    It would vary depending on

24   how many were -- had completed the

1    requirements at that point.

2         Q.    And was one was graduation

3    ceremony more common than the other?  So

4    would most people graduate in the summer

5    and a couple in December or would

6    it be in --

7         A.    About half and half.

8         Q.    About half and half.

9         A.    It changed over time.

10        Q.    And what do you mean by

11   that?

12        A.    The December graduation

13   became more popular.

14        Q.    Why do you think that?

15        A.    Because that would graduate

16   them in time to go to residency without

17   skipping a year.

18        Q.    And explain to me how that

19   timeframe works, that sort of life cycle?

20        A.    During their fourth, you

21   know, their last year, their fourth year,

22   they would be taking all of the remainder

23   of the USMLE, you know, requirements, and

24   we would like to have them complete those

1    before they graduate.

2          Q.    Do they have to complete

3    those before they graduate?

4          A.    No.

5          Q.    And what do you mean by

6    that?  So they can still have course work

7    ongoing even if they graduated?

8          A.    If they're an international

9    student there's no need to take the

10   USMLE.

11         Q.    Ah, I see.  So you're saying

12   because they may not come to the United

13   States to practice medicine; correct?

14         A.    They do not all want to come

15   here to practice.

16         Q.    When USAT had students

17   enrolled, was it possible for a student

18   to graduate before they finished their

19   course work for USAT?

20         A.    No.

21         Q.    Typically, how many years

22   would it take a student at USAT to get

23   through the medical curriculum at USAT?

24         A.    Typically about

SAppx0721

1   three-and-a-half years.

2           Q.    And you say typically, is

3   that the most common or do you view there

4   as being some other general range?

5           A.    Some take longer than

6   others.

7           Q.    And when you say that, would

8   3.5 years generally be the minimum that

9   it would take for someone to get

10  through --

11          A.    -- probably the average.

12          Q.    The average?

13          A.    Yeah.

14          Q.    And how quickly could

15  someone get through it if they were doing

16  the course work?

17          A.    Probably as little as three

18  years because there are no breaks.

19          Q.    When you say that, you mean

20  that they have accelerated their course

21  work so it would be a little bit more

22  condensed?

23          A.    There no -- there's no term

24  off.  There's no, you know, in my day we

SAppx0722

1    had the summers off.  Our students don't

2    have the summers off.  Once they start

3    the program it is nonstop until they

4    finish.  So they can complete that four

5    years of, you know, academic work in

6    about three academic -- three calender

7    years.

8         Q.    Would it be possible for

9    them to do it faster than three calender

10   years?

11        A.    It would be possible but not

12   very -- not very often.  We don't like to

13   graduate them too soon.

14        Q.    When you say it would be

15   possible, I'm just trying to understand

16   that -- in my experience, tell me if I'm

17   wrong, there's a certain number of course

18   hours one would need to complete --

19        A.    Right.

20        Q.    -- usually to get through a

21   curriculum, is that how it was at USAT?

22        A.    Yeah, they can.

23        Q.    So if you took no terms off

24   would it be possible to condense the

SAppx0723

1    education faster than three calender

2    years?

3         A.    It would be a challenge.

4         Q.    Do you know of students

5    having done that?

6         A.    I believe a few may have but

7    we usually would not encourage them to

8    graduate until after they take that

9    remaining time to finish the USMLE

10   requirements.  If they put those off

11   until the end they might be able to

12   finish the academic part a little bit

13   quicker but we want them to do those all

14   before they graduate whenever possible.

15        Q.    And when you say the USMLE

16   requirements, are you talking about

17   examinations?

18        A.    Step one, step two CS at

19   2CK.

20        Q.    Did USAT have a requirement,

21   a graduation requirement, for its

22   students who were intending to go to the

23   United States to pass any of the steps?

24        A.    They do not have to pass the

1    USMLE to graduate because the USMLE is

2    not an academic requirement.

3          Q.    Does USAT require it or no?

4          A.    We do not require them to,

5    no.

6          Q.    Do you know how many

7    students graduated from USAT in 2015?

8          A.    I don't recall exactly.

9    Probably about a hundred.

10         Q.    And in 2016?

11         A.    Probably about a hundred.

12         Q.    And 2017?

13         A.    Probably about a hundred.

14         Q.    And 2018?

15         A.    Two hundred and eight --

16   2018 was a banner year because of the

17   ECFMG actions.

18         Q.    So how many in 2018?

19         A.    400.

20         Q.    400?

21         A.    Yes.  Approximately.  I

22   don't know the exact number.

23         Q.    And when you say it was a

24   banner year because of the ECFMG actions,

SAppx0725

1  what do you mean?

2      A.    Students who were in that

3  final transitional year, the pressure on

4  them then was to graduate, in some cases,

5  before they had taken the USMLE.

6  Normally, they would have delayed until

7  2019.

8      Q.    So were all 400 who

9  graduated in 2018 in their final year at

10 USAT?

11     A.    Obviously.

12         (Brief interpretation.)

13         THE WITNESS:  Sorry.  Sorry.

14         MS. MCENROE:  No problem.

15 You can --

16         THE WITNESS:  I thought I

17     put the power off before.

18 BY MS. MCENROE:

19     Q.    And when -- in 2018, do you

20 know what happened to the non-final year

21 students at USAT, the lower-graded

22 students?

23     A.    They transferred to other

24 schools.

1          Q.     And how many students

2     transferred?

3          A.     About a thousand.

4          Q.     Do you know if any of them

5     transferred to the University of Health

6     and Humanities BVI?

7          A.     No.  I do not know.

8          Q.     You don't know one way or

9     the other?

10         A.     I don't know one way or the

11    other.

12         Q.     Do you know where the

13    majority of them transferred to?

14         A.     No, I do not.  I know some

15    of the schools they transferred to but I

16    don't know all of them.

17         Q.     Was there a primary school

18    or two that they transferred to or was it

19    a mix?

20         A.     It was a mix.

21         Q.     Just trying to get an

22    understanding for USAT's operations in

23    terms of tuition from its students.

24                Did USAT get paid tuition

SAppx0727

1   annually, semiannually, quarterly, how

2   did that work from students?

3          A.     They had a payment plan.

4   Every student has to sign a payment plan.

5          Q.     So explain what that means.

6          A.     They make an agreement when

7   they matriculate of how they're going to

8   pay their tuition.

9          Q.     Is there a standardized

10  payment plan?

11         A.     It's tailored to the

12  individual.

13         Q.     I understand it may be

14  tailored to the individual.  But is there

15  a standard form --

16         A.     Yes.

17         Q.     -- of agreement?

18         A.     Yes.

19         Q.     And so on the standard form

20  was there a schedule for payment?

21         A.     Yes.

22         Q.     Can you explain that

23  schedule, please?

24         A.     The schedule would be how

1    much they plan to pay each month and how

2    they plan to pay it.

3          Q.    So they paid monthly?

4          A.    Some paid monthly.

5          Q.    And some paid otherwise?

6          A.    Some paid on whatever

7    schedule they could agree on.

8          Q.    How many, percentage-wise,

9    paid monthly?

10         A.    I do not know.

11         Q.    Who would know that?

12         A.    The administrative office in

13   Colorado would know that.

14         Q.    So is that Ms. Konyk?

15         A.    That would be Dr. Konyk.

16   Dr. Konyk, yes.

17         Q.    Oh, it's Dr. Konyk, I'm

18   sorry.

19               So it sounds to me, and

20   correct me if I'm wrong, that the -- in

21   the usual course for a USAT student

22   before 2018 a student would attend course

23   work?

24         A.    Right.

SAppx0729

1      Q.      Between three-and-a-half,

2  four years kind of timing?

3      A.      Typically.

4      Q.      And they'd remain a USAT

5  student until they got through certain of

6  the USMLE exams?  Certain of the steps?

7      A.      That was -- that was the

8  plan.

9      Q.      Did those students continue

10  to pay tuition between when they finished

11  course work and when they finished their

12  USMLE exams?

13      A.      Some did.

14      Q.      But some did not?

15      A.      It was an individual basis.

16      Q.      But they yet remained

17  enrolled at USAT?

18      A.      It's an individual basis

19  that they would work out with the vice

20  president.

21      Q.      Do students pay any

22  additional amount of money upon

23  graduation for the termination of their

24  time at USAT?

1        A.    No, no.  A graduation fee

2   and that's all they would pay.

3        Q.    Would USAT graduate students

4   who still had amounts due and owing of

5   USAT?

6        A.    They could walk for

7   graduation.

8        Q.    Would you issue a diploma?

9        A.    No.

10        Q.    Do you know in 2018 if USAT

11   issued diplomas before students finished

12   paying their tuition?

13        A.    USAT did not issue diplomas

14   until tuition is paid.  They have to

15   clear all the academic and administrative

16   elements before they receive their

17   certificates.

18        Q.    Is it fair to say that USAT

19   got paid on a time basis, so monthly or

20   quarterly, whenever the student could, as

21   opposed to an X amount for a medical

22   degree?  So if took a student five years

23   it would cost more than someone who took

24   three years?

1      A.      No.

2      Q.      So explain that to me.

3      A.      The fees are explained in

4   their admission document exactly how much

5   they're going to be and they're locked in

6   at the time of matriculation.

7              MS. MCENROE:  For purposes

8         of the record, and we can follow

9         up after the deposition, we're

10        going to put in a request for

11        production of at least the

12        standard form tuition agreement

13        with the students.  It's

14        responsive to a number of our

15        document requests in particular,

16        for example, number 12 documents

17        sufficient to show USAT's revenue

18        for calendar years 2003 through

19        2018.  Copies of and all documents

20        relating to contracts between USAT

21        and USAT students, etcetera.

22             MR. SWATE:  Send us a formal

23        request.

24             MS. MCENROE:  Yeah, we'll

1    send you a letter in writing but I

2    just wanted to put you on notice

3    now.

4         MR. SWATE:  Send us a formal

5    request.

6         MS. MCENROE:  Oh, we did

7    already.

8         MR. SWATE:  Oh, you have?

9         MS. MCENROE:  Yes, we

10   already sent you a formal request,

11   that's what I'm looking at from

12   February 19, 2019.

13        MR. SWATE:  Okay.

14        MR. REIL:  Is that different

15   than what we've answered so far?

16   That's a request that has not been

17   answered?

18        MS. MCENROE:  It's a request

19   that's been answered like all the

20   rest of your answers that you're

21   not providing us with documents.

22   And I'm specifically telling you,

23   we found out now that there are

24   documents responsive that we

Orien L. Tulp, Ph.D., M.D.

1              should be able to at least see a

2              copy of the form tuition

3              agreement.

4                    MR. REIL:  I'm certainly not

5              going to agree to that.  But as my

6              cocounsel said, send us the

7              request.

8                    MS. MCENROE:  Well, we

9              already made the request.  But

10             we'll send you a letter clarifying

11             the request.

12                   MR. REIL:  Thank you.

13    BY MS. MCENROE:

14             Q.    Do you know when USAT last

15    admitted a student, most recently?

16             A.    Mid September.

17             Q.    2018?

18             A.    2018.

19             Q.    Do you know what happened to

20    that last admitted student, did they

21    graduate?

22             A.    Not if they applied in

23    September they wouldn't have graduated,

24    no.

1          Q.     So I had asked you a

2    question before, if a student took five

3    years to graduate did they pay more than

4    a student who graduated in three years.

5          A.     No.

6          Q.     So can you explain that to

7    me?

8          A.     There are fees, expected

9    fees, that are set when they are

10   admitted.  Those fees are locked in, as

11   University policy, and they will not

12   change for that student.  If the tuition

13   rate changes they got locked in at the

14   original rate quoted to them originally.

15   They need to plan their budgets just like

16   we need to plan ours.

17         Q.     Right.  But it sounded like

18   the students got charged on a monthly

19   basis.  And so I'm just trying to

20   understand when you say that they're

21   charged a fee or quoted a fee, is that a

22   lump sum price, it will cost you X amount

23   of dollars to get your medical degree

24   here?

1      A.    It depends on the student

2  and how many semesters they must complete

3  and what the total cost is predicted to

4  be.  If it goes over that we don't charge

5  them extra.

6      Q.    If they take longer you

7  don't charge them extra?

8      A.    Well, some people have to

9  take a leave for a month or a week or a

10 semester for family reasons, for personal

11 reasons, and we don't charge them more

12 money because they had to take a leave,

13 that would be silly.

14     Q.    So if a student graduated in

15 fewer years, so let's say in four years,

16 did that student pay less tuition than

17 somebody who took longer?

18     A.    They pay what would be

19 quoted in their admission letter.

20     Q.    Right.  But I'm still trying

21 to understand.  You had said they would

22 pay on some periodic basis, be it monthly

23 or whatnot.  And I was trying to

24 understand if they were quoted overall

1  amounts that they're charged?

2       A.    It's based on a predicted

3  enrollment of four years.

4       Q.    Okay.  And if they finish in

5  three-and-a-half years would they be

6  charged less?

7       A.    No.  Because that would mean

8  they've completed their work faster than

9  prediction.  We always try to predict an

10  extra six months or so for each student

11  to be on the safe side.  But their

12  tuition is set as the number of semesters

13  they must complete and the amount of

14  course work they must complete, whether

15  it takes them three years or ten years.

16  It's the same.

17            No one has ever taken ten

18  years thankfully.  We'd have a talk

19  before that happens.

20       Q.    I'm sure you would.

21       A.    That's where I come in.

22       Q.    Yes.  Okay.  So we've been

23  talking a little bit about the money

24  inflowing, so coming into USAT.  I just

<sub>1</sub> want to understand, obviously, we're here

<sub>2</sub> today because you filed a lawsuit against

<sub>3</sub> ECFMG.  What is it that you're hoping to

<sub>4</sub> get out of this lawsuit?

<sub>5</sub>         A.    Good resolution.

<sub>6</sub>         Q.    What do you mean by that?

<sub>7</sub>         A.    A good resolution.  Number

<sub>8</sub> one, you've attached me personally.

<sub>9</sub> ECFMG has attached me personally without

<sub>10</sub> justifying that.

<sub>11</sub>         Q.    So I'm sorry --

<sub>12</sub>         A.    -- without proof.

<sub>13</sub>         Q.    I'm not trying to get at

<sub>14</sub> what your allegations are.  I think I

<sub>15</sub> have a pretty good understanding of your

<sub>16</sub> allegations.  I'm trying to understand

<sub>17</sub> the damages, the outcome, what you're

<sub>18</sub> trying to get from ECFMG.

<sub>19</sub>         MR. REIL:  I'm going to

<sub>20</sub>         object, that the witness should be

<sub>21</sub>         allowed to finish his answer.

<sub>22</sub>         It's a wide-ranging question.  But

<sub>23</sub>         you can answer.

<sub>24</sub>         MS. MCENROE:  You can

```
 1              answer.

 2                   THE WITNESS:  It's a

 3          wide-ranging question.  When the

 4          ECFMG posted that warning on the

 5          World Directory of Medical Schools

 6          on or before September 11, 2018,

 7          when it was first reported to me,

 8          not by ECFMG but by a student.  At

 9          that point, all payments to the

10          University stopped and there was a

11          mass exitus.  You cost us over a

12          thousand students and you cost

13          over a thousand students their

14          medical careers.

15     BY MS. MCENROE:

16          Q.   All right.  So I'm just

17     trying to make sure I understand what

18     you're seeking to get out of this

19     lawsuit.  So you said you're not thousand

20     students, right, so you're not here on

21     behalf of their medical careers.  You're

22     here on behalf of yourself; right?

23          A.   The losses to the

24     University --
```

SAppx0739

Orlen L. Tulp, Ph.D., M.D.

 1          Q.    Wait.  Wait.

 2          A.    -- are extraordinary.

 3          Q.    So I'm trying to understand

 4    through your lawsuit, Dr. Tulp, what is

 5    it you're trying to get from ECFMG?

 6               MR. REIL:  I would request

 7          that the witness be allowed to

 8          finish his answer without

 9          interruption.

10               MS. MCENROE:  I'm trying to

11          make sure he actually answers my

12          question.

13               THE WITNESS:  We want a

14          resolution.  I'm not an

15          argumentative person.  We want a

16          resolution.  You gave the

17          University no opportunity to

18          correct whatever deficiencies you

19          found after 15 years of having

20          found none.

21               MS. MCENROE:  I'm going to

22          move --

23               THE WITNESS:  That makes no

24          sense to me.

SAppx0740

 1                    MS. MCENROE:  I'm going to

 2          move strike as nonresponsive.

 3     BY MS. MCENROE:

 4          Q.     So what dollar figure are

 5     you looking to get from ECFMG?

 6          A.     The uncollectible --

 7          Q.     -- specific dollar --

 8          A.     -- do you want to have a

 9     dollar figure?

10          Q.     Yes, I would like a dollar

11     figure.

12          A.     The uncollectible tuitions

13     as of October 1st up to, you know, from

14     at that point over $41.2 million.  These

15     are students that are paying a little bit

16     each month as they could, waiting to get

17     their documents.

18          Q.     Anything else?

19          A.     Personal damages.

20          Q.     How much?

21          A.     It's up to the judge.

22          Q.     How much would you be

23     seeking?

24          A.     You destroyed my career.

SAppx0741
ECFMG0513

1        Q.      I'm not --

2        A.      -- I had spotless career for

3    50 years.

4        Q.      Sir, I appreciate that.  I'm

5    asking for a dollar figure.  How much

6    would you be seeking from the court?

7            MR. REIL:  Objection.  There

8            are intangible damages in the

9            Complaint, that's for the

10           factfinder.  You may answer.

11   BY MS. MCENROE:

12       Q.      How much would you be

13   seeking from the court?

14       A.      We haven't decided.

15       Q.      Anything else?

16       A.      We want a resolution.

17       Q.      What do you mean by

18   resolution?  You've used that multiple

19   times.

20       A.      We have tried to work with

21   the ECFMG from the first e-mail and they

22   were very dishonest with me.  They said I

23   lied and I did not.  I don't lie.  If

24   there was an error in a form somewhere

1   along the line that they discovered

2   retrospectively, let's fix the error,

3   let's not destroy the school.  We had the

4   strongest academic record of any school

5   in the Caribbean, that we built.  Because

6   we built it on an academic platform.  You

7   destroyed that.

8             MS. MCENROE:  Move to strike

9        as nonresponsive.

10  BY MS. MCENROE:

11       Q.    So what do you mean by

12  resolution?  You've used that word a

13  couple times.

14       A.    We want to restore USAT

15  preferentially.

16       Q.    What do you mean by

17  preferentially?

18       A.    That would be our first

19  choice to restore USAT.

20       Q.    Okay.

21       A.    So they continue to function

22  and continue to provide the diversity of

23  medical education that other schools are

24  not doing.

Orien L. Tulp, Ph.D., M.D.

1          Q.     So that means through a
2     modification of ECFMG sponsor note?
3          A.     Through removing the sponsor
4     note that's there that was placed well
5     before we knew, and well before any
6     correspondence from ECFMG.
7          Q.     Anything else?
8          A.     I think that's what's called
9     due process.
10               MS. MCENROE:  Move to strike
11          as nonresponsive.
12    BY MS. MCENROE:
13          Q.     Anything else?
14          A.     What else do you need to
15    know?
16          Q.     I'm just trying to get a
17    sense of what it is you're seeking
18    through this lawsuit.  I've asked that
19    question a number of times.  We've talked
20    through a number of things.  I'm asking
21    if there's anything else?
22          A.     We haven't decided the
23    damages.
24          Q.     You haven't yet decided the

SAppx0744

1   damages?

2         A.    We have not decided the

3   damages.

4         Q.    Okay.  Well, we're in

5   discovery --

6         A.    -- but we must collect the

7   uncollectible tuitions that became

8   uncollectible when that sponsor note went

9   on the World Directory of Medical Schools

10  without warning.

11        Q.    As of October 1st?

12        A.    It was there on September

13  11th.

14        Q.    And when did you -- no, no,

15  I understand.  But you said that there

16  was a mass exitus but you graduated a

17  whole lot of students in 2018; right?

18        A.    Those were the ones that

19  completed the requirements or where in

20  their final semester.

21        Q.    So you graduated a whole lot

22  of students at the end of 2018.  Do you

23  have a sense of how much money USAT took

24  in from the finishing of the medical

SAppx0745

1   education for all those 400 students at

2   the end of 2018?

3          A.    No, I do not.

4          Q.    How would we figure that

5   out?  Does USAT keep financial

6   statements?

7          A.    Yes, but I don't -- I don't

8   keep them.

9          Q.    Does USAT get audited

10  financial statements?

11         A.    I believe so.

12         Q.    Do you know where USAT pays

13  taxes?

14         A.    Yes, we do pay taxes.

15         Q.    In which jurisdiction?

16         A.    The United States.

17         Q.    USAT pays taxes in the

18  United States --

19         A.    -- in the United States and

20  in Montserrat.

21         Q.    Where do you personally pay

22  taxes?

23         A.    I personally pay taxes?

24         Q.    Yes, where?

 1          A.      In the US.

 2          Q.      In which state?

 3          A.      Colorado.

 4          Q.      And do you file in any

 5    foreign jurisdictions?

 6          A.      I earn no foreign income.

 7          Q.      And do you get paid a salary

 8    from USAT?

 9          A.      No.

10          Q.      How do you get paid from

11    USAT?

12          A.      I don't get paid by USAT.

13          Q.      Previously, did you get paid

14    by USAT?

15          A.      No.

16          Q.      So how do you earn a living?

17          A.      I'm retired.  I have a

18    pension.

19          Q.      When did you retire?

20          A.      20 years ago.

21          Q.      Have you ever earned money

22    from USAT?

23          A.      No.

24          Q.      So you said you get a

SAppx0747

1  pension, is that from the US Army?

2        A.    I get a military pension and

3  Social Security and a teacher's

4  retirement pension.

5        Q.    And from teaching where?

6        A.    From Drexel.  And other

7  institutions.

8        Q.    How long did you teach at

9  Drexel?

10        A.    Over 20 years.

11        Q.    And at what school at

12  Drexel?  If I'm saying that the right

13  way.  At the medical school,

14  undergraduate?

15        A.    They did not have the

16  medical school then.

17        Q.    Oh, I didn't realize that.

18  Okay.  So where were you teaching within

19  Drexel?

20        A.    I was Professor of

21  Nutrition.

22        Q.    From when to when?

23        A.    1983 until 2004.

24        Q.    And you get a pension from

1    them as well?

2          A.    I have teacher's -- from the

3    TIAA.

4          Q.    Anything else?

5          A.    No.

6          Q.    Any other sources of income?

7          A.    No.

8          Q.    And you said Social Security

9    as well?

10         A.    Yes.

11         Q.    I little bit of housekeeping

12   and then we can take a quick break.  I

13   just want to make sure I have this right.

14               You have two counsel here

15   representing you today?

16         A.    Yes, I do.

17         Q.    You have Tommy Swate --

18         A.    Yes.

19         Q.    -- and Bill Reil?

20         A.    Yes.

21         Q.    And they're both your

22   lawyers?

23         A.    Yes.

24         Q.    And they're lawyers in this

```
 1   case for you?

 2           A.     Yes.

 3           Q.     And they were lawyers for

 4   you before the ECFMG hearing on November

 5   28, 2018?

 6           A.     No.

 7           Q.     They were not?

 8           A.     Oh, yeah.  They were here

 9   then.  Yes, yes, yes.

10           Q.     Okay.  So just to make sure

11   that the record is clear.  For the

12   hearing you attended at ECFMG in November

13   2018 --

14           A.     November 28th.

15           Q.     -- both Tommy Swate and Bill

16   Reil came with you as your counsel?

17           A.     That is correct.

18           Q.     And you had engaged them

19   prior to that time; correct?

20           A.     Yes.

21                  MS. MCENROE:  I'd like to

22           take a quick break.

23                  THE WITNESS:  Sure.

24                  VIDEOGRAPHER:  Off the
```

1          record at 10:48 a.m.

2                  (At this time, a short break

3          was taken.)

4                  VIDEOGRAPHER:  We're back on

5          the record at 11:08 a.m.

6                  MS. MCENROE:  Subject to

7          question from counsel, I have

8          nothing further at this time.

9          Thank you very much.

10                 THE WITNESS:  Okay.

11                     - - -

12                 EXAMINATION

13                     - - -

14    BY MR. SWATE:

15         Q.    Coronal, I just have a few

16    questions.  I'm calling you Coronal, is

17    that insulting to you?

18         A.    Not at all.

19         Q.    Why?

20         A.    Because I earned the rank of

21    Coronal, professionally approved.

22         Q.    In the --

23         A.    -- in the United States

24    Army.

1        Q.     It wasn't Iraqui Army, it

2   was the United States Army?

3        A.     United States Army.

4        Q.     And you didn't get that by

5   filing a few papers?

6        A.     No, I did not.

7        Q.     How long did you serve in

8   the United States Army?

9        A.     Over 40 years.

10        Q.     40 years.  Now, did you have

11   lawyers hired when you found out about

12   the posting by the ECFMG on this internet

13   site for medical schools?

14        A.     No.

15        Q.     Did you have notice it was

16   going to be posted?

17        A.     No.

18             MS. MCENROE:  Objection to

19        form.

20   BY MR. SWATE:

21        Q.     How did you -- how did you

22   find out it was posted?

23        A.     A student called me and -- I

24   believe on the 13th of September and

SAppx0752

1      alerted me that it was there.

2              Q.     You didn't get a certified

3      letter from the ECFMG?

4              A.     No.

5                     MS. MCENROE:  Objection to

6              form.

7                     THE WITNESS:  No, I did not.

8                     MR. SWATE:  Just to make

9              sure I answer your objection.

10     BY MR. SWATE:

11             Q.     Did you get any notice from

12     any party that they were posting this

13     information on the internet?

14             A.     No.

15                    MS. MCENROE:  Objection to

16             form.

17     BY MR. SWATE:

18             Q.     Who posted this information?

19                    MS. MCENROE:  Objection to

20             form.

21                    THE WITNESS:  As I

22             understand it, the posting was

23             from the ECFMG to the World

24             Directory of Medical Schools.

SAppx0753

1          They take their instructions from

2          their sponsors, of which the ECFMG

3          is one.

4    BY MR. SWATE:

5          Q.    Did you have a hearing prior

6    to this post?

7          A.    No.

8          Q.    So what -- what was the

9    affect of this posting on the USAT?

10         A.    It was dramatic.

11         Q.    Well, dramatic, what do you

12   mean by --

13         A.    -- Dramatic in the sense

14   that up until mid September, I think

15   September 11th was the date that it was

16   actually posted, on or before, up until

17   mid December.  Mid September we were

18   getting between 2- and 300 applications

19   per month and admitting maybe 50 of

20   those.  They stopped.  We haven't had an

21   admission since mid September.  And since

22   that posting was on the World Directory

23   of Medical Schools our admissions group

24   tells us that there had only been 12

1   applicants in all that time, that's eight

2   months.

3          Q.    Did it -- did any, have any

4   affect on your current students?

5          A.    Yes.

6          Q.    What affect did it have?

7          A.    It was devastating because

8   they saw their medical degree going out

9   the window.

10          Q.    Did any students leave the

11   school?

12          A.    About a thousand.  At least

13   a thousand.  I don't have an exact count.

14          Q.    Now, tell us a little bit

15   about your student population, is it

16   basically 22-year-olds from prominent

17   schools that get admitted or --

18          A.    -- no.

19          MS. MCENROE:  Objection to

20          form.

21   BY MR. SWATE:

22          Q.    What's your student

23   population?

24          A.    Student population are --

1          MS. MCENROE:  Objection to

2     form.

3          THE WITNESS:  -- adult

4     learners.  The average age coming

5     in is mid 30s.  They range in age

6     from early 20s to over 60.  We do

7     not use any age criteria.  They

8     represent a very diverse group of

9     students culturally and -- as they

10    come from all -- all walks of life

11    literally and all cultures.

12         About 50 percent or more are

13    minorities that do not have access

14    to medical school in the United

15    States' system for the most part.

16    And that gives them an opportunity

17    to earn a medical degree and

18    become a physician, which for many

19    of them it's their life dream.

20 BY MR. SWATE:

21         Q.    How -- now, one of the

22 criteria of a successful medical schools

23 is how their students perform the test

24 that are administered by the USMLE, which

SAppx0756

1   you can't take the test unless the ECFMG

2   gives you a certificate.  How do your --

3   how do your students do on this test,

4   these tests, these series of tests?

5                MS. MCENROE:  Objection to

6        form.

7                THE WITNESS:  Generally they

8        do quite well.

9   BY MR. SWATE:

10        Q.    Well, specifically, can you

11   tell me specifically how they do?

12                MS. MCENROE:  Objection to

13        form.

14                THE WITNESS:  About 90

15        percent pass, which is a very high

16        percentage for an international

17        school.  The highest score that I

18        have seen several years ago was

19        290 on an exam out of 292 and 288.

20        They do very well.

21   BY MR. SWATE:

22        Q.    Well, how does it compare

23   with the past rate of American medical

24   schools?

SAppx0757

1                   MS. MCENROE:  Objection to

2          form.

3                   THE WITNESS:  Comparable.

4          Very comparable.

5     BY MR. SWATE:

6          Q.    Now, once the students pass

7     the exams, arduous exams, how do they do

8     on their residency programs?

9          A.    Very well.

10                  MS. MCENROE:  Objection to

11         form.

12    BY MR. SWATE:

13         Q.    What's the acceptance rate

14    for residency?

15         A.    This year --

16                  MS. MCENROE:  Objection to

17         form.

18                  THE WITNESS:  This year our

19         selection rate was 90 percent for

20         residency in spite of that

21         warning.  It would have been

22         higher but many of them could not

23         get their results released in time

24         to be placed into residency.

SAppx0758

1    BY MR. SWATE:

2         Q.    Well, this lack of notice

3    and lack of hearing that ECFMG

4    participated in, what affect did it have

5    on your students?

6              MS. MCENROE:  Objection to

7         form.

8              THE WITNESS:  It was

9         devastating.

10   BY MR. SWATE:

11        Q.    By devastating, what do you

12   mean?

13        A.    Devastating because they

14   want information and they have not been

15   able to get accurate information from the

16   case workers.

17        Q.    Well, what affect did it

18   have on applying for residency?

19             MS. MCENROE:  Objection to

20        form.

21             THE WITNESS:  We have --

22   BY MR. SWATE:

23        Q.    -- if you know?

24        A.    We have 51 signed up for

1    ERAS only about 20 were approved in time

2    by ECFMG.  And of those 20 I believe 18

3    have now been placed.

4            Q.    We talked about the ECFMG.

5    What is the role of the ECFMG in foreign

6    medical graduate education?  Can you tell

7    the jury --

8               MS. MCENROE:  Objection to

9          form.

10   BY MR. SWATE:

11           Q.    -- what the role is?

12           A.    They have exclusive control

13   over access to the US Medical Licensing

14   Examination.  There's no other way to

15   take that exam except going through the

16   ECFMG.  They're delegated that authority,

17   as I understand it, from various states.

18   And that would seem to make them, cause

19   they're governmental, because the states

20   are governmental.

21           Q.    Well, Coronal, if I

22   understand what you're telling me, if

23   they don't get a certificate from the

24   ECFMG you cannot enter the United States

SAppx0760

1    medical training?

2             A.    They cannot.

3                   MS. MCENROE:  Objection to

4             form.

5                   THE WITNESS:  They cannot.

6             Because they also control the

7             residency ERAS, Electronic

8             Residency Application Service,

9             which gates them into applying for

10            specific programs for residency.

11   BY MR. SWATE:

12            Q.    The -- what action did the

13   ECFMG take, understand it was a hearing

14   on the 28th, of November the 28th.  Prior

15   to that hearing, what action did the

16   ECFMG take regarding documents they would

17   accept from your medical school, USAT?

18                 MS. MCENROE:  Objection to

19            form.

20                 THE WITNESS:  They, in their

21            statement, they said they would

22            not accept any documents that were

23            after December 31st.  They

24            canceled the exam permits for many

1          students even though they had been

2          previously approved to take the

3          exam.  When they go report in to

4          take the exam they would discover

5          that their exams had been canceled

6          by the ECFMG.

7     BY MR. SWATE:

8          Q.    This December 31st date,

9     that's December 31, 2018?

10         A.    No, this is in October --

11    November.

12         Q.    No, I'm talking about the

13    date they wouldn't accept any documents

14    from USAT?

15         A.    No, they would --

16         Q.    -- at what date?

17              MS. MCENROE:  Objection to

18         form.

19              THE WITNESS:  The last date

20         they would accept documents they

21         had to have everything completed

22         by December 31st.

23    BY MR. SWATE:

24         Q.    Of what year?

SAppx0762

1      A.      Of 2018.

2      Q.      So on January 1, 2019, after

3  New Year's, it's like Cinderella that

4  turned into a pumpkin.

5              MS. MCENROE:  Objection to

6         form.

7              THE WITNESS:  Yeah, it turns

8         into now they can no longer --

9         after that they can't become

10        certified unless they have

11        completed all the requirements and

12        have the diploma in hand by the

13        end of 2018.

14  BY MR. SWATE:

15      Q.      When was this December the

16  31st deadline imposed?

17              MS. MCENROE:  Objection to

18         form.

19              THE WITNESS:  I believe it

20         was in October.

21  BY MR. SWATE:

22      Q.      Prior to the November 28th

23  hearing?

24      A.      Yes.

1        Q.    So the committee that heard

2    your case didn't make that decision?

3              MS. MCENROE:  Objection to

4        form.

5              THE WITNESS:  No, it was

6        already made.

7              MR. SWATE:  And --

8              THE WITNESS:  -- the actual

9        date was September 11th as far as

10       I can figure out from looking at

11       the date stamped on the World

12       Directory site.

13   BY MR. SWATE:

14       Q.    So you weren't given an

15   opportunity for a hearing and notice of

16   the December 31st --

17       A.    -- no.

18             MS. MCENROE:  Objection to

19       form.

20             THE WITNESS:  Not at all.

21   BY MR. SWATE:

22       Q.    Now, you had a hearing on

23   December -- November the 28th; correct?

24       A.    Correct.

SAppx0764

1       Q.    And who conducted that

2  hearing?

3             MS. MCENROE:  Objection to

4       form.

5             THE WITNESS:  Ms. McEnroe.

6  BY MR. SWATE:

7       Q.    Ms. McEnroe.  Did any

8  committee member speak?

9       A.    No, not that I recall.

10      Q.    Did any committee members

11  talk about any evidence that was being

12  presented against you?

13      A.    No, not that I recall.

14            MS. MCENROE:  Objection to

15      form.

16  BY MR. SWATE:

17      Q.    Was evidence presented at

18  the hearing that you've never seen

19  before?

20            MS. MCENROE:  Objection to

21      form.

22            THE WITNESS:  There was a

23      book placed on the table that I've

24      never seen before.  It was a black

SAppx0765

1          book on a black table, almost

2          didn't see it when I walked by.

3    BY MR. SWATE:

4          Q.    Was the committee -- was the

5    hearing adjourned?

6          A.    Yes.

7          Q.    Prior to you giving any

8    testimony?

9          A.    Yes.

10         Q.    Was your lawyer in the

11   process of going through the book when

12   the hearing was adjourned?

13         A.    Yes, he was.

14         Q.    Who was your lawyer?

15         A.    Tommy Swate.

16         Q.    Was Tommy Swate being

17   hostile or aggressive or frightening in

18   his representation of you during that --

19         A.    -- no.

20               MS. MCENROE:  Objection to

21         form.

22               Wait for him to finish the

23         question.

24               THE WITNESS:  Not at all.

1    BY MR. SWATE:

2         Q.    Now, Ms. McEnroe is a

3    witness; correct?

4              MS. MCENROE:  Objection to

5         form.

6              THE WITNESS:  She is a

7         witness, yes.

8              MR. SWATE:  Can I just

9         consult with my counsel a minute?

10        We may be close.

11             MS. MCENROE:  Sure.  Do you

12        want to take a quick?

13             MR. SWATE:  Yeah.

14             VIDEOGRAPHER:  Off the

15        record at 11:20 a.m.

16             (At this time, a short break

17        was taken.)

18             VIDEOGRAPHER:  Back on the

19        record at 11:26 a.m.

20   BY MR. SWATE:

21        Q.    Just a couple quick

22   questions, Coronal.

23             In this hearing of the 28th

24   I just want to make it clear that the

SAppx0767

1  committee presented no evidence against

2  you?

3         A.    No, they did not.

4             MS. MCENROE:  Objection to

5      form.

6  BY MR. SWATE:

7         Q.    And you understand by their

8  agreement that they are required to make

9  a decision based on the preponderance of

10  the evidence?

11             MS. MCENROE:  Objection to

12      form.

13             THE WITNESS:  That's what I

14      understand.

15  BY MR. SWATE:

16         Q.    Did -- by preponderance of

17  the evidence, could they have made some

18  kind of decision based on the evidence

19  heard in the committee meeting?

20         A.    No.

21             MS. MCENROE:  Objection to

22      form.  Calls for a legal

23      conclusion.

24  BY MR. SWATE:

SAppx0768

1      Q.     Was there any evidence

2    presented in the committee meeting?

3             MS. MCENROE:  Objection to

4        form.

5             THE WITNESS:  In the

6        committee meeting that followed

7        the hearing?

8    BY MR. SWATE:

9      Q.     No.  The hearing, your --

10     A.     -- no, there was no evidence

11   presented.

12            MR. SWATE:  Okay.  I'll pass

13       the witness.

14            MS. MCENROE:  Thank you.

15                  - - -

16                EXAMINATION

17                  - - -

18   BY MS. MCENROE:

19     Q.     I just have a couple of

20   quick questions.

21     A.     Okay.

22     Q.     You were just being

23   questioned by your counsel, Tommy Swate;

24   correct?

SAppx0769

1      A.    Right.  Correct.

2      Q.    You testified earlier that

3   I'm a witness, meaning Elisa McEnroe, is

4   a witness to the November 28th hearing --

5      A.    Right.

6      Q.    -- is that correct?

7      A.    That's correct.

8      Q.    So the same would be true

9   for your counsel, Tommy Swate; correct?

10      A.    No --

11      Q.    -- he was present?

12      A.    Yeah, he was present.

13      Q.    Yup.  And he would be a

14   witness as well?

15      A.    He would be the witness of

16   the events, yes.

17      Q.    And Mr. Bill Reil as well

18   was a present at the hearing?

19      A.    Yes.

20      Q.    And he would be a witness as

21   well?

22      A.    That's correct.

23      Q.    When did you hire your

24   counsel Tommy Swate and Bill Reil?

SAppx0770

1          A.    October.  I don't know

2    when -- it was after this, you know,

3    after this happened because we weren't --

4          Q.    After what happened?

5          A.    After we received the

6    September 14th, I think was -- the close

7    of business of September 14th, when I

8    received the e-mail from the ECFMG

9    notifying us.  So that's at least three

10   days after it was posted.

11         Q.    So you hired counsel in mid

12   September 2018?

13         A.    Sometime around October 1st

14   or thereabouts.  It took us a little

15   while to find an attorney who understood

16   the merits of the case.

17               But I have one question for

18   you.

19               MR. SWATE:  No.

20               MR. REIL:  No.

21               THE WITNESS:  Because you

22         haven't introduced your friends

23         here.  And I don't know who they

24         are.

SAppx0771

1            MR. REIL:  Don't worry about
2       that now.  Just answer her
3       questions.
4            THE WITNESS:  Okay.
5  BY MS. MCENROE:
6       Q.    And when you say you hired
7  counsel that was Mr. Tommy Swate and Bill
8  Reil?
9       A.    Correct.
10       Q.    So that was sometime maybe
11  early October?
12       A.    Something like that.  I
13  don't recall the exact date.
14       Q.    Got it.  And have you
15  personally been sued by any USAT student
16  in connection with the ECFMG sponsor
17  note?
18       A.    Not yet.
19       Q.    Have you personally been
20  sued by any USAT student in connection
21  with the finding of irregular behavior
22  against you by ECFMG?
23       A.    No, not yet.
24       Q.    And when you say not yet, do

SAppx0772

1   you know of any impending lawsuits at

2   present?

3           A.      I've heard rumors.

4           Q.      You've heard rumors.  Do you

5   know about who was going to sue you?

6           A.      I wouldn't care to disclose

7   that.

8           Q.      Do you know if USAT has been

9   sued by any student in connection with

10  the sponsor note change for USAT from

11  ECFMG?

12          A.      I'm not aware of it yet.

13          Q.      You say you're not aware of

14  it yet, are you aware that USAT has been

15  sued or you don't, or no?

16          A.      I'm not aware.  I think I

17  would have known if they had been served

18  a suit.  I have not been served a suit.

19          Q.      Do you know if a suit

20  against USAT has been filed?

21          A.      I do not know.

22                  MS. MCENROE:  I have no

23          further questions.  Pending

24          counsel's questions.

SAppx0773

1            MR. SWATE:  No, we have --

2            MR. REIL:  Nor do I.

3            MS. MCENROE:  Great.  Well,

4      thank you everybody.  Thank your

5      for your time, Doctor.

6            VIDEOGRAPHER:  This

7      concludes this deposition.  The

8      time is 11:30 a.m., we're off the

9      record.

10            (Video deposition concluded

11      at 11:30 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

1          C E R T I F I C A T I O N

2

3          I, DANA M. JONES, Professional

4    Court Reporter and Notary Public, certify

5    that the foregoing is a true and accurate

6    transcript of the deposition held before

7    me at the time, place and on the date

8    hereinbefore set forth.

9          I further certify that I am

10   neither attorney nor counsel for, not

11   related to or employed by, any of the

12   parties to the action in which this

13   deposition was taken; further, that I am

14   not a relative or employee of any

15   attorney or counsel employed in this

16   case, nor am I financially interested in

17   this action.

18

19

20

21

22          _____

                    DANA M. JONES

23

24

SAppx0775



https://search.wdoms.org/home/SchoolDetail/F0000836 Foundation for Advancement of INT Medical E...

School Detail

File Edit View Favorites Tools Help

# World Directory of Medical Schools

Home About Sponsors Subscription Search

Home > Search > School Details New Search

## University of Science, Arts & Technology (USAT) Faculty of Medicine

**Montserrat**

School Details | Contact Information | Program Details | Sponsor Notes

The information below has been provided by the World Directory's sponsoring organizations.

**Educational Commission for Foreign Medical Graduates (ECFMG), United States of America**

- Students and graduates of this medical school are eligible to apply to ECFMG for ECFMG Certification and for examination, provided that:
  - For medical school students officially enrolled in this school, the graduation years are listed below as "current".
  - For graduates of this medical school, their graduation year is included in the graduation years listed below.
    Graduation Years:
    2003 - 2018
  - All other eligibility requirements are met. Refer to the ECFMG Information Booklet for detailed information.
- **Note: As of January 1, 2019, students and graduates of this medical school with a graduation year of 2019 and later are not eligible to apply to ECFMG for ECFMG Certification, which also renders them ineligible to apply to ECFMG for the United States Medical Licensing Examinations (USMLE) as a step toward ECFMG Certification.**
- **Currently, students and graduates of USAT are subject to enhanced procedures that must be met in order to be eligible to apply for ECFMG Certification related services, including but not limited to: ECFMG Certification, USMLE examinations that lead to ECFMG Certification, and Electronic Residency Application Service (ERAS®) Support Services. ECFMG will provide information and instructions to applicants upon receipt of application.**

FAIMER SCHOOL ID: F0000836

10:07 AM 4/19/2019

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DR. ORIEN L. TULP,                              ) | |
|                                                 ) | |
|       Plaintiff,   ) | Case No. 2:18-cv-05540-WB |
|                                                 ) | |
| v.                                              ) | Hon. Wendy Beetlestone |
|                                                 ) | |
| EDUCATIONAL COMMISSION FOR                      ) | |
| FOREIGN MEDICAL GRADUATES and DR.               ) | |
| WILLIAM W. PINSKY,                              ) | |
|                                                 ) | |
|       Defendants.  ) | |

## DECLARATION OF KARA CORRADO IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Kara Corrado, declare as follows:

1.      I am currently employed as the Vice President for Operations at the Educational Commission for Foreign Medical Graduates ("ECFMG").

2.      I make this Declaration in connection with the above-captioned action.  I have personal knowledge of the facts stated herein and if called as a witness could and would testify to those facts.

3.      Pursuant to Section B.7 of ECFMG's Policies and Procedures Regarding Irregular Behavior, Dr. Orien L. Tulp was permitted to appeal the decision of the Medical Education Credentials Committee concerning allegations of irregular behavior by Dr. Tulp.  Dr. Tulp never appealed that decision.

4.      Pursuant to Section B.8 of ECFMG's Policies and Procedures Regarding Irregular Behavior, Dr. Orien L. Tulp was permitted to petition for reconsideration of the Medical

Education Credentials Committee's decision concerning allegations of irregular behavior by Dr. Tulp.  Dr. Tulp never petitioned for reconsideration of that decision.

5.      On or around September 24, 2018, ECFMG updated its Sponsor Note for the University of Science, Arts, and Technology Montserrat ("USAT") in the World Directory of Medical Schools to add the following language:

> Currently students and graduates of USAT are subject to enhanced procedures that must be met in order to be eligible for ECFMG Certification related services, including but not limited to:  ECFMG Certification, USMLE examinations that lead to ECFMG certification, and Electronic Residency Application Service (ERAS) Support Services. ECFMG will provide information and instructions to applicants upon receipt of application.

6.      I sent a letter to USAT on or about September 14, 2018 notifying USAT of the "enhanced procedures" described in the updated Sponsor Note.  The document Bates numbered JA0102 is a true and correct copy of that letter.

7.      On or around October 18, 2018, ECFMG updated its Sponsor Note for USAT in the World Directory of Medical Schools to add the following language:

> Note: As of January 1, 2019, students and graduates of this medical school with a graduation year of 2019 and later are not eligible to apply to ECFMG for ECFMG Certification, which also renders them ineligible to apply to ECFMG for the United States medical Licensing Examinations (USMLE) as a step towards ECFMG Certification.

8.      I sent a letter to USAT on or about October 18, 2018 notifying USAT of this change to ECFMG's Sponsor Note for USAT in the World Directory of Medical Schools.  The document Bates numbered JA0113 through JA0114 is a true and correct copy of that letter.

9.      ECFMG has not updated its Sponsor Note for USAT in the World Directory of Medical Schools to reflect the finding of irregular behavior against Dr. Tulp.

SAppx0778

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge.

EXECUTED:  May 3, 2019

_____

Kara Corrado

3

| DR. ORIEN L. TULP | : | UNITED STATES DISTRICT |
| | : | COURT FOR THE EASTERN |
| vs. | : | DISTRICT OF PENNSYLVANIA |
| | : | |
| EDUCATION COMMISSION FOR | : | CASE NO: 2:18-cv-05540-WB |
| FOREIGN MEDICAL GRADUATES | : | |
| and DR. WILLIAM C. PINSKY | : | HONORABLE WENDY BEETLESTONE |

## PLAINTIFF'S ANSWER TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

For the reasons set forth in the attached memorandum of law and exhibits,

plaintiff Dr. Orien L. Tulp, by his undersigned counsel, moves to deny defendants'

motion for summary judgment.

Respectfully submitted,

*William C. Reil*

William C. Reil, Esquire
Attorney for Plaintiff
Attorney I.D. No. 26833
1515 Market Street, Suite 1200
Philadelphia, PA 19102
215-564-1635
06/03/19
For: Tommy Swate, Esquire

| DR. ORIEN L. TULP | : | UNITED STATES DISTRICT |
|---|---|---|
| | : | COURT FOR THE EASTERN |
| vs. | : | DISTRICT OF PENNSYLVANIA |
| | : | |
| EDUCATION COMMISSION FOR | : | CASE NO: 2:18-cv-05540-WB |
| FOREIGN MEDICAL GRADUATES | : | |
| and DR. WILLIAM C. PINSKY | : | HONORABLE WENDY BEETLESTONE |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Dr. Orien L. Tulp, through his undersigned counsel, submits this memorandum of law in opposition to defendants' motion for summary judgment, and in support thereof, it is averred as follows:

### INTRODUCTION: NOMENCLATURE DIFFICULTIES

There was no meeting or conference to develop a single joint appendix of exhibits as the Court directed in paragraph 2A of its Scheduling Order. (Document 21, filed 01/25/19 by Judge Beetlestone, PA0615). There is a serious disconnect between the parties with respect to defendants' alleged Joint Appendix and alleged Statement of Undisputed Facts. Neither of plaintiff's counsel ever agreed to any Statement of Undisputed Facts which is referenced as "SOF" in defendants' motion. It is undersigned counsel's recollection that he saw this Statement of Undisputed Facts for the first time on 05/03/19, the date on which the motion for summary judgment was filed. Plaintiff never agreed to defendants' Statement of Undisputed Facts or Joint Appendix.

There is no written indication, or otherwise, confirming that plaintiff agreed to these so-called undisputed facts of defendants, which would be tantamount to agreeing to defendants' motion for summary judgment. The same thing is true for the Joint Appendix. Plaintiff's counsel was sent a proposed Joint Appendix of over 500 pages only two days

1

before the 05/03/19 deadline. He indicated to defense counsel that he needed time to read

through these. For example, plaintiff would not agree to a joint appendix that omitted

both the complaint and the answer to the complaint, as in the instant case.

Plaintiff is attempting to keep the nomenclature for exhibits, etc., as specified by

the Court. Plaintiff's exhibits will start with Bates stamp PA0552 (Plaintiff's Appendix).

A true and correct copy of an email on defendants' "Undisputed Facts" between

plaintiff's co-counsel, Tommy Swate, Esquire, and defense co-counsel, Matthew D.

Klayman, Esquire, is attached and incorporated as a plaintiff's exhibit, as well as the

Reil-McEnroe letter. (PA0612-PA0614). The bottom line is that is is difficult to respond

to a so-called Joint Appendix, which is not joint, and alleged issues of undisputed facts,

which were never agreed to.

**CASE OVERVIEW**

An overview of the case can be found in paragraph 10 of the complaint, titled

"Summary". It reads as follows:

> 10. In an attempt to close down the USAT and sanction Dr. Tulp, defendant
> ECFMG has refused to allow students of USAT to take necessary medical
> examinations. Defendant ECFMG has effectively closed USAT, by refusing to
> release scores for students who paid for the examinations. Doctors who graduated
> from USAT have been unable to commence their residency due to the refusal of
> the Board to issue an appropriate certification. ECFMG has also sent misleading
> "affidavits" to many USAT students and threatened many students with "irregular
> behavior" in order to sanction Dr. Tulp and force closure of the University, which
> he founded. He is President, CEO, and an equal owner of the University. Thus,
> ECFMG tortiously interfered with the educational contract between the students
> of USAT, the University, and Dr. Tulp, denied due process to Dr. Tulp and the
> students of USAT, and improperly used an "affidavit" [See Exhibit D] to coerce
> information from students. [Pinsky letter, See Exhibit A.] In addition, the Board
> placed information in the World Directory of Medical Schools, prior to any
> hearing or legal process, advising that it would no longer recognize the test scores
> of USAT graduates after January 1, 2019. See Exhibit B.

2

Paragraphs 11 through 20 of the complaint give a factual background of the general allegations. They read as follows:

11. ECFMG sent to USAT a letter implying that the school would be closed on or about 01/01/19 because the Board would no longer recognize the scores of its students in taking the three-part United States Medical Licensing Examination. This action prohibits applicants from sitting for the USMLE, which is required for unrestricted medical licensure.

12. On 11/21/18, Kara Corrado, J.D., Vice President for Operations of the Board, sent a letter to counsel for USAT indicating two concerns: 1) that USAT's authority to conduct its medical education program amounted to "irregular behavior" because USAT had not been certified by a governmental entity in the United States, and 2) the allegation that USAT was operating medical school campuses in the United States. See Exhibit E. On October 18, 2018, Lisa Cover, a Senior Vice President with ECFMG, wrote a letter to Dr. Tulp advising him of the allegation that he engaged in "irregular behavior". See Exhibit F.

13. USAT has a certification from the government of Montserrat, allowing it to operate temporary venues due to an active volcano on the island. Such certification had been recognized by the Board without incident since 2003. USAT also operates online courses for the majority of its basic sciences course requirements via a specially developed SPOC [small platform online courses, developed by USAT]. A true and correct copy of the certification from Montserrat is attached and incorporated as Exhibit C.

14. Students from USAT have each paid well over $1,000 to the Board to take necessary medical exams, and the Board has refused to release their scores because of alleged misconduct by Dr. Tulp, and an assignment by the Board of "irregular behavior" arising out of an illegal affidavit issued to students of USAT. "Irregular behavior" may be a permanent admonition on a student or physician's official record, and make residency difficult, if not impossible.

15. The Board set up a hearing on 11/28/18 for Dr. Tulp, only, in Philadelphia, at the address in the caption to address so-called "irregular behavior". After a few minutes, with no witnesses called, Board counsel announced that the hearing was terminated. Prior to the hearing, the Board took the position that Dr. Tulp had the burden of proof on the issue of "irregular behavior" for which he had been charged by the Board. The Board set 20 minutes as the duration of the hearing. No testimony was taken or exhibits received in evidence, before Board counsel terminated the hearing. No Transcript of the proceedings has been received. The Board indicated that on 01/01/19 it will issue a finding of "irregular behavior" to Dr. Tulp effectively closing USAT.

SAppx0783

16. There was no jurisdiction over, or relationship with, Dr. Tulp to compel him to attend the hearing by the Board, and he made a special appearance while not agreeing to jurisdiction. ECFMG has no jurisdiction over Dr. Tulp, or legal relationship with Dr. Tulp, or the power to enter any sanction against him. The Board has no contractual or statutory authority over Dr. Tulp.

17. The Board would not give Dr. Tulp sufficient discovery to conduct an adequate defense. Also, the Board has never requested any curricula, student records, or any documentation from USAT.

18. The term "irregular behavior" is void for vagueness, since "irregular behavior" is so broad that it essentially amounts to any behavior which the Board does not approve. There is no intelligible standard to ascertain "irregular behavior" with the exception of the fiat by the ECFMG. There is no due process mechanism to effectively challenge a finding of "irregular behavior" which can amount to an indefinite suspension of United States medical licenses by the Board without formal notification of such assignment to the individual concerned.

19. There is no reasonable way to ascertain the standards for "irregular behavior" in the instant case, prior to any adjudication.

20. The Board has effectively closed USAT by not allowing its students and graduates to complete the necessary medical examinations beyond January 1, 2019, and has tortiously interfered with the relationship of the students of USAT and Dr. Tulp, the President of the University.

Instructive is paragraph 58 which reads:

    The actions of the ECFMG on Dr. Tulp and the students of USAT amount to a violation of procedural and substantive due process, as follows:
    (a) banning Dr. Tulp without a proper hearing;
    (b) banning Dr. Tulp without an evidentiary basis;
    (c) forcing closure of USAT and causing its students to be dismissed in an arbitrary and capricious manner;
    (d) requiring, at a hearing on 11/28/18, that USAT assume the burden of proof and allotting 20 minutes for the hearing;
    (e) terminating the hearing on 11/28/18 without receiving any evidence from Dr. Tulp;
    (f) finding Dr. Tulp guilty of "irregular behavior" without jurisdiction and due process, and effectively forcing closure of USAT College of Medicine without legal process, and constructively dismissing the students of USAT in violation of the law.

4

Plaintiff references the phrase "due process" several times in the complaint (PA0559) and such due process is not restricted to constitutional due process under Section 1983. The Court, in its Opinion on the defendants' motion to dismiss, found that the only issue for summary judgment was whether there were material issues of fact concerning common law due process. Defendants mention, several times in their brief, that the Court has already found that there was due process and opportunity to be heard.

This is misleading. Where defendants get this notion is from the Court's directions after the injunction hearing in January. While there may have been, at the time, sufficient notice and opportunity to be heard as part of the reason for denying the injunction, this is not dispositive for the motion for summary judgment. Not only is there a heightened standard of proof for a preliminary injunction, but the elements for a preliminary injunction are different than those for a motion for summary judgment. The Court indicates that "common law due process is the only issue remaining" in the Opinion on the motion to dismiss. If the Court had already found that there was notice and opportunity to be heard, which is tantamount to common law due process, there would not be a motion for summary judgment.

It should also be mentioned that plaintiff pled jurisdiction both under federal question and under diversity of citizenship. The parties in this case reside in different states. (Complaint at paragraph 8, PA0560).

An administrative hearing was held by the ECFMG on 11/28/18 in Philadelphia. Only Dr. Tulp was present as a witness. (PA0670-PA0702). Procedurally, a complaint was filed on 12/24/18. Plaintiff then filed a motion for a preliminary and/or permanent injunction, which was answered by a memorandum of law by defendants. A hearing was

SAppx0785

held before the Court on 01/24/19 at which plaintiff Tulp, defendant Pinsky, and Kara Corrado, an administrator and attorney for defendant, testified. The Court denied plaintiff's motion for injunction, and then conducted a scheduling conference in Court.

Defendants filed a motion to dismiss, which was timely answered by plaintiffs, and the Court ruled on the motion to dismiss on 03/26/19. In summary, the Court found that the only claim which survived was plaintiff's cause of action for common law due process against ECFMG, only. Dr. Pinsky was dismissed as a plaintiff. ECFMG then answered plaintiff's complaint.

Discovery was conducted by the parties, including a videotaped deposition of Dr. Tulp and a deposition of Dr. Pinsky. Plaintiff served two sets of discovery, including interrogatories, requests for production of documents and admissions. Defendants served written discovery in the form of interrogatories and requests for production of documents. Very little, if any, new light was shed on the hearing of Dr. Tulp before the ECFMG, which is preserved in the attached transcript. (PA0670-PA0702).

Defendants filed a motion for summary judgment of over 500 pages, most of which consisted of attachments or exhibits in the form of a Joint Appendix, as well as a Statement of Undisputed Material Facts. Plaintiff vigorously denies that the Appendix was joint or that the statements were undisputed, but rather these documents were sent by defendant to plaintiff shortly before their time for summary judgment was up.

## STANDARD FOR SUMMARY JUDGMENT

In order to prevail on a motion for summary judgment, defendants must show, taking facts and inferences in the light most favorable to plaintiff, that no reasonable fact finder could find for the plaintiff on an issue which is case determinative. *Thomas v.*

SAppx0786

*Transamerica Accidental Life Insurance Company*, 761 F. Supp. (D.Or. 1991). Summary

judgment is inappropriate when credibility is at issue or different ultimate inferences can

be reached. FRCP 56(c). In addition to the evidence cited in Rule 56(c), a court may take

into account any material that would be admissible or usable at trial. *Wright and Miller,*

*Federal Practice and Procedure*, Section 2721 at 40 (2d. Ed. 1983). In evaluating a

summary judgment motion, the record will be viewed in the light most favorable to the

opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505 (1986).

Summary judgment is appropriate only if there is no genuine issue of material fact such

that a reasonable fact finder could find for the non-moving party, *Celotex Corp. v.*

*Cartarett*, 477 U.S. 317, 106 S.Ct. 2548 (1986).

It is argued that there are several issues of material fact which would mitigate

against summary judgment, and would require resolution by the trial court and or jury,

depending upon whether the relief sought by plaintiff requires a Court Order. For

example, it would be expected that the factual issues involving whether the ECFMG

hearing comported with common law due process, would be decided by a jury.

Summary judgment is governed by Federal Rule of Civil Procedure 56. Summary

judgment is appropriate when "there is no genuine dispute as to material fact and the

movant is entitled to judgment as a matter of law". A genuine issue of material fact exists

"if the evidence is such that a reasonable jury could return a verdict for the non-moving

party". *See Anderson v. Liberty Lobby, supra.*

It should be mentioned that defendants have included in their so-called joint

memorandum, letters from ECFMG, not in the record or exhibits. Such material should

not be considered.

Case 2:18-cv-05540-WB    Document 391    Filed 06/03/19    Page 6 of 45

In 15 years, the ECFMG had found no violations by USAT or Dr. Tulp. There were no allegations that students at USAT were not passing the ECFMG gatekeeping test at an unacceptable level. There were no requests by ECFMG to visit the USAT campus in Montserrat. The allegations about the branch campuses in Florida are anonymous allegations and should be entitled no weight, as such. The term "campus", let alone "branch campus", is never defined in ECFMG's rules and regulations. This is particularly important when there are commonly online courses offered by colleges and universities. ECFMG states that it wrote to the Florida Department of Education about accreditation for USAT in Florida. There is no indication that the Florida Department of Education ever did anything or made any findings as a result of this inquiry.

It should be underscored that the alleged, "false statements" concerning backdating of students' time spent at USAT are based on the student affidavits sent to ECFMG. The affidavits that plaintiff received were redacted, and plaintiff never received all of them. The students filled these out and there is no indication that it was in variance with the records from USAT, because the ECFMG never got the complete, unredacted records from USAT.

**COMMON LAW DUE PROCESS**

It is difficult to exercise the common law due process rights that require notice and an opportunity to be heard, if no witnesses or evidence are allowed to be presented at the hearing. Notice of a hearing is not meaningful if the hearing is a sham. The opportunity to be heard rings hollow when it is limited to 20 minutes and then the hearing is prematurely adjourned. This is precisely what the hearing with the ECFMG consisted of. Instructive is the Court's inquiry in this area of Kara Corrado. Ms. Corrado testified at

SAppx0788

the "Injunction Hearing" on 01/24/19 before the Court. She is an attorney and an administrator for the ECFMG, who was present at the hearing for Dr. Tulp on 11/28/18. She was also involved in the correspondence in the case. The testimony of Ms. Corrado, at the injunction hearing on 01/24/19, beginning at page 22, line 5, in response to the questions of clarification by the **Court,** speak for themselves:

> **Q      Did the ECFMG Board of Physicians present any witnesses at the hearing?**
>
> **A      No, that -- we don't normally present witnesses at our hearings.**
>
> **Q      I see, did the ECFMG board present any documents at the hearing?**
>
> **A      No, the documents are always produced before the hearing.**

**(emphasis supplied).**

(Corrado testimony, lines 5-12 inclusive, JA0197).

The unblemished record of Dr. Tulp and the USAT for the 15 years of its existence, in addition to the societal interests involving competent doctors indicates that there is an issue of material fact for a jury, as to whether the hearing afforded Dr. Tulp crosses the threshold for common law due process.

The Court in its Opinion on the Motion to Dismiss references several cases which are instructive on the parameters of the common law right of due process. Perhaps, the case most like the instant case, is *Thomas M. Cooley Law Sch. v. Am. Bar Ass'n*, 459 F.3D 705, 712 (6th Cir. 2006). This is a 6th circuit case which dealt with a law school which sued the ABA arising out of allegations, inter alia, that Cooley was denied due process for failing to accredit two proposed satellite campuses and imposing sanctions on Cooley for operating without ABA approval. Although Cooley lost the case, this was

9

largely because the ABA provided substantial due process in the form of cross-examination, presentation of witnesses and documents, and the ABA assumed the burden to prove that Cooley had violated written ABA procedures. The point here is that the law school was given full notice and opportunity to be heard, in stark contrast to the sham hearing provided by the ECFMG.

Another case cited by the Court, which plaintiff believes is useful, is *Psi Upsilon of Philadelphia v. University of Pennsylvania*, 591 A.2d 755 (Pa. Super. 1991). This is a case that deals with the common law right of due process for a college fraternity whose members were involved in assaulting a non-fraternity member. The *Psi Upsilon* Court noted that where there is a matter of public interest, even though we have a private entity such as the University of Pennsylvania, that the basic principles of due process and fundamental fairness were required. Again, a hearing, in this case by faculty, where the fraternity was allowed to call their own witnesses and cross-examine witnesses against them, was allowed. Not only is this in stark contrast to the hearing provided by the ECFMG, but in terms of the public interest component of common law due process, it is asserted that the public interest involving USAT and the gate-keeping function involving certification of future doctors, far outweighs the situation involving the continuation of a fraternity.

Another case cited by the Court is *Prof'l Massage Training Ctr., Inc. v. Accreditation All. Of Career Sch. & Colleges*, 781 F.3d 161, 169 (4th Cir 2015). This case comes out of the Fourth Circuit Court of Appeals is relevant as a recent case in which a private accrediting agency denies reaccreditation for a massage training center.

10

The case has some similarities to the instant case. While this case is persuasive only, excerpts from the case are particularly relevant:

"This is not to say however that accreditation agencies are wholly free of judicial oversight. They, like all bureaucratic entities, can run off the rails. We thus recognize, along with our sister circuits, that there exists a "common law duty on the part of 'quasi-public' private professional organizations or accreditation associations to employ fair procedures when making decisions affecting their members." *McKeesport Hosp. V. Accreditation Council for Graduate Medical Education*, 24 F.3d 519., 534-35 (3d Cir. 1994); *see also Cooley*, 459 F. 3d at 711-12; *Wilfred*, 957 F. 2d at 214; *Med. Inst. Of Minn.*, 817 F.2d at 1314 (finding that accreditation agencies "nevertheless must conform [their] actions to fundamental principles of fairness'); *Marjorie Webster Jr, Coll., Inc. V. Middle States Ass'n of Colls. & Secondary Schools., Inc.*, 432 F.2d 650, 655-58 (D.C.Cir.1970).

That the Courts will not uphold accreditation decisions if "arrived at arbitrarily and without sufficient evidence" The duty was meant to operate as a "check on organizations that exercise significant authority in areas of public concern such as accreditation and professional licensing." *Cooley*, 459 F. 3d at 712. In may ways, the ECFMG used its sweeping "irregular behavior" power and control of the World Directory of Medical Schools (WDMS) website to act like a monopolistic accrediting agency.

In the case of *Falcone v. Middlesex Cnty. Med. Soc.*, 170 A.2d 791, 800 (N.J. 1961), the Supreme Court of New Jersey in 1961, found in favor of plaintiff who was an osteopathic physician who sought to be admitted to a County Medical Society. The

11

County Medical Society denied plaintiff admission because he did not have a traditional M.D. degree. The Court found that plaintiff made out a case requiring that he be admitted, otherwise it would be difficult for him to practice medicine. The Court makes a point here that the Medical Society had monopolistic power to destroy a medical career and that there are substantial public interests involved here.

None of the above-cited cases involve a hearing like the instant case. It is undisputed that Dr. Tulp had a longstanding and significant interest at stake in the ECFMG administrative hearing; yet the ECFMG placed the burden of proof on Dr. Tulp, the non-charging party. (ECFMG transcript at page 6, PA0675). In all of the above cases, the burden was placed on the charging party.

**DAMAGES**

In terms of damages, paragraphs 29 and 30, together with the prayer of the complaint, set forth not only injunctive and equitable relief, but also the tangible and intangible effects of the ECFMG on Dr. Tulp. Plaintiff requests that the finding of "irregular behavior" be reversed. It is too late now to have another hearing, since USAT has basically been destroyed by the actions of the ECFMG. Dr. Tulp indicated in his deposition with regards to damages the following: when the ECFMG posted a warning on the WDOMS before the hearing with ECFMG. At that time, virtually all payments to USAT stopped and there was a mass exodus of students. Dr. Tulp indicated that ECFMG cost USAT over a thousand students and their medical careers. (Tulp deposition at JA0511). Dr. Tulp also indicated "The uncollectible tuitions as of October 1st up to, you know, from at that point over $41.2 million. These are students that are paying a little bit each month as they could, waiting to get their documents." (Tulp deposition at JA0513).

12

Plaintiff is requesting not only Court-ordered relief in the form of an injunction or equitable relief, but damages from a jury, as well. Dr. Tulp testified that he was a 50% owner of the ECFMG, based in Montserrat. As a result of the actions of the ECFMG, put on its website on two occasions before Dr. Tulp's hearing, and the subsequent finding of irregular behavior, plaintiff's interests in USAT has been vastly diminished. That plaintiff did not choose to draw a salary for his past tenure as president of USAT, does not abrogate the fact that he has lost the present and future right to draw a salary. In addition, it is argued that violation of due process rights particularly when intentional, give rise to nominal damages and attorney fees.

**ECFMG FUNCTION**

Ecfmg is an organization sponsored by state medical organizations, including the federation of state medical boards. Through its process, it gives students what is a license to apply for a residency program. A residency program is a certified program that trains students who have graduated from medical school and who have taken a series of tests known as the United States Medical Licensing Examination. The various state boards have given the power to test and certify international medical graduates as competent to undertake residency training. New Jersey requires a foreign

medical graduate to demonstrate to the New Jersey State Board of Medical Examiners that he or she holds a certificate issued by the ecfmg which was granted following the attainment of a passing score on an acceptable examination and verification of his or her credentials by the ecfmg.

ECfmg issues a de facto license (certification) which renders a foreign medical graduate eligible to apply for admission to a residence program in the United States.

13

Without this license, a foreign medical graduate can not apply for a residency program. Without training in a residency program, the foreign medical graduate can not obtain a state medical license.

## CONCLUSION

Defendants have submitted a motion of over 500 pages with attachments, in an effort to obfuscate the main issue in this case, as set forth in the Court's Opinion on the motion to dismiss: Did defendant ECFMG deny plaintiff Dr. Orien Tulp his right of common law due process, in finding plaintiff culpable of "irregular behavior" and imposing sanctions on Dr. Tulp, USAT and its students? These sanctions essentially destroyed the 15-year career of plaintiff as a medical school administrator, as well as USAT as a viable institution. Dr. Pinsky, in his letter of 12/14/18 (PA0552) also imposed onerous sanctions on the students of USAT. Neither USAT the institution, nor its students, were allowed to testify at the hearing of Dr. Tulp on 11/28/18.

The transcript of the hearing for Dr. Tulp (PA0670-PA0702), before the ECFMG, indicates that it does not comport with fundamental fairness, including notice and opportunity to be heard. Nothing has changed, in terms of the summary judgment record on this issue, since the Court concluded in its Opinion that there was a plausible claim for deprivation of common law due process. Notice and opportunity to be heard are hollow if the committee members for the ECFMG received the defendants' evidence **before** the hearing.

1. The hearing before the ECFMG was a sham, without any evidence in the administrative record, or witnesses and cross-examination allowed.

2. The 20-minute hearing for Dr. Tulp was terminated prematurely by counsel for the ECFMG without plaintiff making any statement.

14

3. The ECFMG put notices on the WDOMS, an Internet site which appears to be controlled by the ECFMG, in each of the two months before the hearing for Dr. Tulp, which implied that plaintiff had already been found culpable.

4. Anonymous charges about a branch campus were leveled against USAT, but no site visit by the ECFMG was ever documented.

5. Allegations based on redacted affidavits, allegedly filled-out by USAT students under the threat of punishment by the ECFMG, were used against Dr. Tulp to suggest backdating of attendance by students, but the ECFMG never attempted to compare these records to the original records at USAT.

All of these allegations appear to be contested by the ECFMG and they constitute issues of material fact, which should be determined by a jury. The hearing by ECFMG for Dr. Tulp resembled not so much an adversary process, but a preordained result in which Dr. Tulp had basically a right of "allocution" only. The core purpose of the hearing appeared to be that Dr. Tulp would be given a maximum of 20 minutes to address the committee in an attempt to persuade them that he was innocent, in light of the investigation that the ECFMG had conducted before the hearing.

Respectfully submitted,

William C. Reil

William C. Reil, Esquire
Attorney for Plaintiff
Attorney I.D. No. 26833
1515 Market Street, Suite 1200
Philadelphia, PA 19102
215-564-1635
06/03/19
For: Tommy Swate, Esquire

SAppx0795

| DR. ORIEN L. TULP | : | UNITED STATES DISTRICT |
|---|---|---|
| | : | COURT FOR THE EASTERN |
| vs. | : | DISTRICT OF PENNSYLVANIA |
| | : | |
| EDUCATION COMMISSION FOR | : | CASE NO: 2:18-cv-05540-WB |
| FOREIGN MEDICAL GRADUATES | : | |
| and DR. WILLIAM C. PINSKY | : | HONORABLE WENDY BEETLESTONE |

## ORDER

AND NOW, this _____ day of _____, 2019, upon consideration of

Defendants' Motion for Summary Judgment and Plaintiff's Answer thereto, it is hereby

ORDERED that Defendants' Motion is DENIED.


By the Court:


_____
Honorable Wendy Beetlestone
United States District Court Judge

| DR. ORIEN L. TULP | : | UNITED STATES DISTRICT |
| | : | COURT FOR THE EASTERN |
| vs. | : | DISTRICT OF PENNSYLVANIA |
| | : | |
| EDUCATION COMMISSION FOR | : | CASE NO: 2:18-cv-05540-WB |
| FOREIGN MEDICAL GRADUATES | : | |
| and DR. WILLIAM C. PINSKY | : | HONORABLE WENDY BEETLESTONE |

### STATEMENT OF DISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S ANSWER TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1. The administrative hearing by he ECFMG on 11/28/18 for Dr. Tulp was fundamentally unfair and violated common law due process. (Number 14 on Plaintiff's Appendix, Transcript of ECFMG Hearing for Dr. Tulp (11-28-18), PA0670-PA0702).

2. Defendants' violated Dr. Tulp's right to common law due process by publishing on the WDOMS before his hearing. This impacted the hearing because it implied that Dr. Tulp was guilty of irregular behavior or misconduct before he had his hearing. (PA0556-PA0558, PA0573).

3. There is no evidence, in the record of the administrative hearing of Dr. Tulp, from which the ECFMG could have found him guilty of irregular behavior. (Number 14 on Plaintiff's Appendix, Transcript of ECFMG Hearing for Dr. Tulp (11-28-18), PA0670-PA0702).

4. ECFMG limited Dr. Tulp to 20 minutes for presentation and the hearing was unilaterally terminated by Elisa P. McEnroe, Esquire, without any evidence put in to the record. (PA0701, ECFMG Hearing; Complaint paragraph 15, PA0562).

5. Dr. Tulp never received any indication from ECFMG, nor did their rules indicate, who had the burden of proof at the administrative hearing. Accordingly, Dr.

Tulp did not know whether ECFMG intended to present witness and evidence that he could cross-examine. At the hearing, Dr. Tulp was informed that he had the burden of proof. (PA0675). See also spreadsheet of student losses at USAT. (PA0663-PA-0665).

6. ECFMG serves a public function by certifying International Medical Graduates. Not reasonably disputed.

7. The policy of the ECFMG is not to present witnesses or documents at hearings. (Injunction Hearing, testimony of Corrado, lines 5-12, JA0197).

8. In terms of damages, paragraphs 29 and 30, together with the prayer of the complaint, set forth not only injunctive and equitable relief, but also the tangible and intangible effects of the ECFMG on Dr. Tulp. Plaintiff requests that the finding of "irregular behavior" be reversed. It is too late now to have another hearing, since USAT has basically been destroyed by the actions of the ECFMG. Dr. Tulp indicated in his deposition with regards to damages the following: when the ECFMG posted a warning on the WDOMS before the hearing with ECFMG. At that time, virtually all payments to USAT stopped and there was a mass exodus of students. Dr. Tulp indicated that ECFMG cost USAT over a thousand students and their medical careers. (Tulp deposition at JA0511). Dr. Tulp also indicated "The uncollectible tuitions as of October 1st up to, you know, from at that point over $41.2 million. These are students that are paying a little bit each month as they could, waiting to get their documents." (Tulp deposition at JA0513).

9. According to ECFMG procedure, no witnesses or evidence were presented at the administrative hearing of Dr. Tulp. (Number 14 on Plaintiff's Appendix, Transcript of ECFMG Hearing for Dr. Tulp (11-28-18), PA0670-PA0702).

10. The ECFMG refused to define "campus" when asked prior to the 11/28/19 hearing, but insisted that Dr. Tulp define it for the ECFMG. (PA0668).

11. Nowhere in the rules or regulations of the ECFMG, is it stated who has the burden of proof at the hearing. Not reasonably disputed.

12. The ECFMG conducted the administrative hearing as if Dr. Tulp had the burden to prove his innocence without any evidence introduced against him. (Number 14 on Plaintiff's Appendix, Transcript of ECFMG Hearing for Dr. Tulp (11-28-18), PA0670-PA0702).

Respectfully submitted,

*William C. Reil*

William C. Reil, Esquire
Attorney for Plaintiff
Attorney I.D. No. 26833
1515 Market Street, Suite 1200
Philadelphia, PA 19102
215-564-1635
06/03/19
For: Tommy Swate, Esquire

| | | |
|---|---|---|
| DR. ORIEN L. TULP | : | UNITED STATES DISTRICT |
| | : | COURT FOR THE EASTERN |
| vs. | : | DISTRICT OF PENNSYLVANIA |
| | : | |
| EDUCATION COMMISSION FOR | : | CASE NO: 2:18-cv-05540-WB |
| FOREIGN MEDICAL GRADUATES | : | |
| and DR. WILLIAM C. PINSKY | : | HONORABLE WENDY BEETLESTONE |

## **PLAINTIFF'S APPENDIX – TABLE OF CONTENTS**

| Tab | Document | Page(s) |
|---|---|---|
| 1. | Email from Dr. Pinsky to Dr. Tulp (12-14-18) | PA0552-PA0553 |
| 2. | Email from K. Corrado, J.D. to Dr. Tulp (10-18-18) | PA0554-PA0555 |
| 3. | Sponsor Note from ECFMG on WDOMS (11-27-18) | PA0556-PA0557 |
| 4. | Email of Sponsor Note, as above from Dr. Tulp (02-10-19) | PA0558 |
| 5. | Plaintiff's Complaint with Exhibits | PA0559-PA0590 |
| 6. | Defendant's Answer to Complaint and Affirmative Defenses | PA0591-PA0611 |
| 7. | Swate-Klayman Email Chain on "Undisputed Facts" (05-03-19 and 05-06-19) | PA0612-PA0613 |
| 8. | Email to McEnroe from Reil on (Joint) Appendix and Stipulations (05-02-19) | PA0614 |
| 9. | Scheduling Order of Court (01-25-19) | PA0615-PA0616 |

| 10. | Defendants' Responses to Plaintiff's Discovery Requests | PA0617-PA0662 |
|-----|-----|-----|
| 11. | Spreadsheet of Student Loss at USAT (06-03-19) | PA0663-PA0665 |
| 12. | Affidavit of Dr. Tulp (06-03-19) | PA0666-PA0668 |
| 13. | ECFMG Sponsor Note from Dr. Tulp (05-26-19) | PA0669 |
| 14. | Transcript of ECFMG Hearing for Dr. Tulp (11-28-18) | PA0670-PA0702 |

Respectfully submitted,

*William C. Reil*

William C. Reil, Esquire
Attorney for Plaintiff
Attorney I.D. No. 26833
1515 Market Street, Suite 1200
Philadelphia, PA 19102
215-564-1635
06/03/19
For: Tommy Swate, Esquire



| | EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES | 3624 Market Street<br>Philadelphia PA 19104-2685 USA<br>215-386-5900  |  215-386-9767 Fax<br>www.ecfmg.org |

PERSONAL AND CONFIDENTIAL
VIA EMAIL: o.tulp@usat.edu

December 14, 2018

Dr. Orien L. Tulp
Professor and President
University of Science, Arts & Technology (USAT) Faculty of Medicine
Main Campus
S. Mayfield Estate Drive
Olveston
MONTSERRAT

Dear Dr. Tulp:

I am writing to inform you that the ECFMG Medical Education Credentials Committee ("ECFMG Committee") has completed its review of the allegation that you, individually and in your capacity as an official of University of Science, Arts & Technology (USAT) Faculty of Medicine, Montserrat, engaged in irregular behavior in connection with providing false information to ECFMG.  Specifically, you provided false information to ECFMG when you (1) notified ECFMG that USAT does not operate a branch campus in Miami, FL and (2) certified to the attendance dates of several USAT students and graduates when ECFMG has information that these students were not attending USAT during some of the time periods to which you certified.

In advance of the review, the members of the ECFMG Committee were provided with the documents listed in ECFMG's October 18, 2018 letter and ECFMG's November 14, 2018 emails.  A hardcopy of the complete file was also sent to your attorney, Mr. Tommy Swate, on November 16, 2018 via Federal Express.  On November 16, 2018, Mr. Swate acknowledged receipt of this complete file.  You made a personal appearance before the ECFMG Committee accompanied by your legal counsel, Mr. Swate.  A copy of the transcript of the proceedings will be sent to you as soon as it is available.

The ECFMG Committee considered the documentation presented to it and Mr. Swate's statements. Following careful review, the ECFMG Committee determined that you engaged in irregular behavior in connection with providing false information to ECFMG.

The ECFMG Committee has determined that ECFMG will not accept any documents signed / certified by you for ECFMG on behalf of USAT, or any other medical school, for a minimum of five years from today; thereafter, the prohibition shall end only upon a petition to ECFMG conclusively demonstrating to the satisfaction of the ECFMG Committee a familiarity with, and willingness to adhere to, ECFMG polices. Your ECFMG Medical School Web Portal (EMSWP) account will remain deactivated.

In light of the ECFMG Committee's findings, the ECFMG Sponsor Note for USAT in the *World Directory of Medical Schools (World Directory)* will be updated as follows:

ECFMG® is an organization committed to promoting excellence in international medical education.

PA 0552

Case 2:18-cv-05540-WB Document 33-5 Filed 06/03/19 Page 2 of 151
Case: 19-2708 Document: 45-3 Page: 295 Date Filed: 01/16/2020
Case 2:18-cv-05540-WB Document 1 Filed 12/24/18 Page 13 of 32

Dr. Orien L. Tulp
December 14, 2018
Page 2 of 2

> *In 2018, ECFMG determined that a certain official of the University of Science Arts & Technology engaged in irregular behavior in connection with providing false information to ECFMG.*

This note will remain in USAT's ECFMG Sponsor Note in the *World Directory* for five years, regardless of whether USAT changes its name, ownership, and/or location.

Additionally, in accordance with the ECFMG *Policies and Procedures Regarding Irregular Behavior*, a permanent annotation that you engaged in irregular behavior will be included in your ECFMG record. ECFMG may report the ECFMG Committee's determination of irregular behavior to the Federation of State Medical Boards of the United States, U.S. state and international medical licensing authorities, directors of graduate medical education programs, and to any other organization or individual who, in the judgment of ECFMG, has a legitimate interest in such information.

As noted in the enclosed ECFMG *Rules of Appellate Procedure*, decisions of the ECFMG Medical Education Credentials Committee may be appealed within the 30-day time period specified.

Sincerely,

William W. Pinsky, MD FAAP FACC
President and CEO

CC: Tommy Swate, Esq. swatemd@aol.com
William Reil, Esq. billreillaw@gmail.com

Encl: As noted.

SAppx0803

PA 0553



EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

3624 Market Street
Philadelphia, PA 19104-2685 USA
215-386-5900 | 215-386-9767 Fax
www.ecfmg.org

October 18, 2018

VIA EMAIL: usat.edu@gmail.com

Orien Tulp, President
University of Science, Arts & Technology (USAT) Faculty of Medicine
Main Campus
S. Mayfield Estate Drive
Olveston, MONTSERRAT

Dear Dr. Tulp,

This is a follow-up to my August 21 and September 14, 2018 letters to you. As you know, it has recently come to the attention of the Educational Commission for Foreign Medical Graduates (ECFMG) that USAT in Montserrat is operating a satellite (or branch) campus in Miami, Florida. ECFMG also understands that USAT is operating satellite campuses in Texas and Puerto Rico.

As I previously advised you, in order for students and graduates of an international medical school, such as USAT, to have eligibility to apply for ECFMG Certification, ECFMG policy requires confirmation from the appropriate government authority in the branch campus country that the branch campus is authorized to operate as a medical school in such branch campus country, among other requirements.

In light of this policy, ECFMG requested that USAT provide documentation from the United States Department of Education and/or the Florida Department of Education confirming that USAT's Miami branch campus is authorized to operate as a medical school in the United States. This documentation should cover the entire time period during which the USAT Miami branch campus has been in operation. To date, ECFMG has no record of receipt of such documentation from you or USAT.

**Therefore, effective today, ECFMG's Sponsor Note in the *World Directory of Medical Schools* (*World Directory*) for USAT has been updated to reflect that 2019 and later graduates of USAT are no longer eligible to apply for ECFMG Certification or USMLE examinations as a step toward ECFMG Certification.**

ECFMG is also writing to your current students to advise them that, if they graduate from USAT in 2019 or later, they will be ineligible for ECFMG Certification and ineligible to register for USMLE examinations as a step toward ECFMG Certification after December 31, 2018. We are also letting them know that in order to become eligible for ECFMG Certification (or to register for USMLE examinations as a step toward ECFMG Certification) on or after January 1, 2019, the United States Department of Education and/or the Departments of Education for Florida, Texas, and Puerto Rico

ECFMG® is an organization committed to promoting excellence in international medical education.

PA 0554

Dr. Orien L. Tulp
October 18, 2018
Page 2 of 2

must provide ECFMG with documentation that USAT is authorized to operate as a medical school in the United States. Otherwise, the students must transfer to and/or be officially enrolled in a medical school that is listed in the *World Directory* as meeting eligibility requirements for ECFMG Certification. In addition, the "Graduation Years" in the ECFMG note on the Sponsor Notes tab of the *World Directory* listing for the student's medical school must be listed as "Current" at the time he/she applies and on his/her test day.

USAT's 2018 and earlier graduates will continue to remain eligible to apply to ECFMG for ECFMG Certification.

Should the United States Department of Education and/or the Departments of Education for Florida, Texas, and Puerto Rico provide ECFMG with documentation that USAT is authorized to operate as a medical school in the United States, ECFMG will be happy to review USAT's eligibility for an ECFMG Sponsor Note in the *World Directory.*

Sincerely,

Ms. Kara Corrado, JD
Vice President for Operations

ECFMG® is an organization committed to promoting excellence in international medical education.

SAppx0805

PA 0555



**Bill Reil** <billreillaw@gmail.com>

---

### sponsor notes from WDOMS listing of USAT input by ECFMG: SEE NOTES IN RED/
1 message

---

**Orien Tulp** <o.tulp@usat.edu>
To: swatemd@aol.com, billreillaw@gmail.com, Carla Konyk - Director/Student Accounts <c.konyk@usat.edu>

Tue, Nov 27, 2018 at 12:08 PM

| School Details | Contact Information | Program Details | Sponsor Notes |
| --- | --- | --- | --- |

The information below has been provided by the World Directory's sponsoring organizations.

**Canada**

- Unless indicated otherwise, Medical provincial/territorial medical regulator Canada. For more information about Registration in Canada click here.

  Medical degrees obtained from this n FROM 2003 - 2018

- À moins d'avis contraire, les diplôme médecins dans les provinces et territ Canada qui œuvre dans le domaine telles que définies dans les normes r

  Les diplômes de médecine de cette f DE 2003 - 2018

**Educational Commission for Foreign Me**

Students and graduates of this medic

---

- Unless indicated otherwise, Medical degrees obtained from this medical school are acceptable to the provincial/territorial medical regulatory authorities in Canada, and therefore acceptable to all medical organizations in Canada. For more information about the acceptable medical schools as defined in the Model Standards for Medical Registration in Canada click here.

  Medical degrees obtained from this medical school are acceptable to Canada between the following period: FROM 2003 - 2018

- À moins d'avis contraire, les diplômes de médecine de cette faculté de médecine sont acceptables aux ordres des médecins dans les provinces et territoires du Canada, et par conséquent acceptables à toute autre organisation au Canada qui œuvre dans le domaine médical. Pour plus d'information au sujet des facultés de médecine acceptables, telles que définies dans les normes modèles pour l'inscription médicale au Canada, cliquez ici.

  Les diplômes de médecine de cette faculté de médecine sont acceptables pour le Canada entre la période suivante: DE 2003 - 2018

---

### Educational Commission for Foreign Medical Graduates (ECFMG), United States of America

- Students and graduates of this medical school are eligible to apply to ECFMG for ECFMG Certification and for examination, provided that:
  - For medical school students officially enrolled in this school, the graduation years are listed below as "current".
  - For graduates of this medical school, their graduation year is included in the graduation years listed below.

PA 0556

Graduation Years:
2003 - 2018

- ○ All other eligibility requirements are met. Refer to the ECFMG Information Booklet for detailed information.

- **Note: As of January 1, 2019, students and graduates of this medical school with a graduation year of 2019 and later are not eligible to apply to ECFMG for ECFMG Certification, which also renders them ineligible to apply to ECFMG for the United States Medical Licensing Examinations (USMLE) as a step toward ECFMG Certification.**

- **Currently, students and graduates of USAT are subject to enhanced procedures that must be met in order to be eligible to apply for ECFMG Certification related services, including but not limited to: ECFMG Certification, USMLE examinations that lead to ECFMG Certification, and Electronic Residency Application Service (ERAS®) Support Services. ECFMG will provide information and instructions to applicants upon receipt of application.**

Orien L Tulp, PhD, MD, FACN, CNS
Professor and President
USAT Montserrat
*www.usat.edu*
Cell: 727-252-6210

PA 0557

 Gmail

**Bill Reil <billreillaw@gmail.com>**

___

## sponsor note as it appeared until early January 2019
1 message

___

**Orien Tulp <o.tulp@usat.edu>**                                    Sun, Feb 10, 2019 at 7:46 PM
To: Bill Reil <billreillaw@gmail.com>, swatemd <swatemd@aol.com>, Carla Konyk - Director/Student Accounts
<c.konyk@usat.edu>

- **Note: As of January 1, 2019, students and graduates of this medical school with a graduation year of 2019 and later are not eligible to apply to ECFMG for ECFMG Certification, which also renders them ineligible to apply to ECFMG for the United States Medical Licensing Examinations (USMLE) as a step toward ECFMG Certification.**

- **Currently, students and graduates of USAT are subject to enhanced procedures that must be met in order to be eligible to apply for ECFMG Certification related services, including but not limited to: ECFMG Certification, USMLE examinations that lead to ECFMG Certification, and Electronic Residency Application Service (ERAS®) Support Services. ECFMG will provide information and instructions to applicants upon receipt of application.**

- **Note: In 2018, ECFMG determined that certain staff / officials of the University of Science, Arts and echnology (USAT) engaged in irregular behavior in connection with providing false information and documents to ECFMG.**

Orien L Tulp, PhD, MD, FACN, CNS
Professor and President
USAT Montserrat
*www.usat.edu*
Cell: 727-252-6210

LAW OFFICES OF WILLIAM C. REIL
BY: William C. Reil, Esquire
Identification No. 26833
1515 Market Street, Suite 1200
Philadelphia, PA 19102

| | | |
|---|---|---|
| 215-564-1635 | | ATTORNEY FOR PLAINTIFF |
| Dr. Orien L. Tulp | : | UNITED STATES DISTRICT |
| President of the | : | COURT FOR THE EASTERN |
| University of Science, Arts, and Technology | : | DISTRICT OF PENNSYLVANIA |
| 4288 Youngfield Street | : | |
| Wheat Ridge, CO 80033 | : | CIVIL ACTION NO. |
| vs. | : | |
| Educational Commission for | : | |
| Foreign Medical Graduates | : | |
| 3624 Market Street | : | |
| Philadelphia, PA 19104 | : | |
| and | : | |
| Dr. William W. Pinsky | : | |
| President and CEO | : | |
| Educational Commission for | : | |
| Foreign Medical Graduates | : | |
| 3624 Market Street | : | |
| Philadelphia, PA 19104 | : | JURY TRIAL DEMANDED |

## COMPLAINT – CIVIL ACTION

### PARTIES

1. The plaintiff is Dr. Orien L. Tulp, hereafter referred to as "Dr. Tulp", an adult individual whose address for service of process is at 4288 Youngfield Street, Wheat Ridge, CO 80033. At all times material herein, plaintiff was President of the University of Science, Arts, and Technology ("USAT"), and had an ownership interest in the University. USAT is located in Montserrat, but its US administrative office is located at the address in the caption, and students take classes in Montserrat and the US via a distance education format.

2. A defendant is the Educational Commission for Foreign Medical Graduates, hereafter referred to as "ECFMG" or "the Board", which is an unincorporated association, whose address for service of process is 3624 Market Street, Philadelphia, PA 19104. According to their mission statement, the ECFMG is an organization which purports to certify medical school students and graduates to practice medicine in the United States.

PA 0559

3. A defendant is Dr. William W. Pinsky, the President and CEO of the ECFMG, whose address for service of process is indicated in the caption. *See* Exhibit A, attached and incorporated herein.

4. ECFMG is an organization sponsored by various medical organizations, including the Federation of State Medical Boards. Through the ECFMG's certification process, it gives medical students and medical graduates a certification of eligibility (essentially a license) to apply for a ACGME [Accreditation Council for Graduate Medical Education] certified residency program of postgraduate specialty training that can lead to medical licensure of the applicant. A residency program is a certified program that trains students who have graduated from a medical school and taken a series of examinations or tests administered by way of the United States Medical Licensing Examination [the USMLE]. The state medical boards have given ECFMG the power to examine and certify international medical graduates [IMGs] as competent to undertake residency training in the USA. Without the certification (license) from the ECFMG, a foreign medical graduate cannot start the process of being licensed as a physician in the United States.

5. The action of the ECFMG is in granting authority to apply for a residency program is state action. The ECFMG's authority, which is in essence a license to apply for a residency program, has a close nexus to the various state medical boards. Without the ECFMG certificate, the ACGME postgraduate programs will not permit the applicant to start the training that will in essence allow the gate to be closed to obtaining a medical residency and eventual license to practice medicine in the USA. Without the residency training, the medical graduate cannot obtain a full unrestricted medical license. The state medical boards have granted the power to the ECFMG to screen foreign medical students for licensure. State action is established because of this delegation of screening power. *Jackson v. Metro Edison Co.*, 419 U.S. 345, 351.

6. The ECFMG has placed itself in a position of interdependence with the state medical boards. The ECFMG cannot be considered to be a private entity because the ECFMG reports to the state medical boards but also reports to the National Practitioner Data Bank. The ECFMG would not exist without the powers delegated by the state medical boards. *Burton v. Wilmington Parkway Authority*, 365 U.S. 715, 725 (1961).

7. Because the ECFMG's actions are delegated state actions, the ECFMG is required to give both procedural and substantive Fourteenth Amendment due process rights.

## JURISDICTION AND VENUE

8. The Court has jurisdiction under Diversity of Citizenship, the Civil Rights Act (42 U.S.C.A. 1983) and the Due Process clause of the United States Constitution, with pendent jurisdiction to consider any claims arising under state law.

9. Venue is properly before the Court, since all defendants are located and conduct business in the Eastern District of Pennsylvania.

## SUMMARY

10. In an attempt to close down the USAT and sanction Dr. Tulp, defendant ECFMG has refused to allow students of USAT to take necessary medical examinations. Defendant ECFMG has effectively closed USAT, by refusing to release scores for students who paid for the examinations. Doctors who graduated from USAT have been unable to commence their residency due to the refusal of the Board to issue an appropriate certification. ECFMG has also sent misleading "affidavits" to many USAT students and threatened many students with "irregular behavior" in order to sanction Dr. Tulp and force closure of the University, which he founded. He is President, CEO, and an equal owner of the University. Thus, ECFMG tortiously interfered with the educational contract between the students of USAT, the University, and Dr. Tulp, denied due process to Dr. Tulp and the students of USAT, and improperly used an "affidavit" [*See* Exhibit D] to coerce information from students. [Pinsky letter, *See* Exhibit A.] In addition, the Board placed information in the World Directory of Medical Schools, prior to any hearing or legal process, advising that it would no longer recognize the test scores of USAT graduates after January 1, 2019. *See* Exhibit B.

## GENERAL ALLEGATIONS

11. ECFMG sent to USAT a letter implying that the school would be closed on or about 01/01/19 because the Board would no longer recognize the scores of its students in taking the three-part United States Medical Licensing Examination. This action prohibits applicants from sitting for the USMLE, which is required for unrestricted medical licensure.

12. On 11/21/18, Kara Corrado, J.D., Vice President for Operations of the Board, sent a letter to counsel for USAT indicating two concerns: 1) that USAT's authority to conduct its medical education program amounted to "irregular behavior" because USAT had not been certified by a governmental entity in the United States, and 2) the allegation that USAT was operating medical school campuses in the United States. *See* Exhibit E. On October 18, 2018, Lisa Cover, a Senior Vice President with ECFMG, wrote a letter to Dr. Tulp advising him of the allegation that he engaged in "irregular behavior". *See* Exhibit F.

13. USAT has a certification from the government of Montserrat, allowing it to operate temporary venues due to an active volcano on the island. Such certification had been recognized by the Board without incident since 2003. USAT also operates online courses for the majority of its basic sciences course requirements via a specially developed SPOC [small platform online courses, developed by USAT]. A true and correct copy of the certification from Montserrat is attached and incorporated as Exhibit C.

14. Students from USAT have each paid well over $1,000 to the Board to take necessary medical exams, and the Board has refused to release their scores because of

PA 0561

Case 2:19-cv-00655-DMG Document 45-3 Filed 06/11/21 Page 304 of 476 Page ID #:...

Case 2:18-cv-05540-WB   Document 1   Filed 12/24/18   Page 4 of 32

alleged misconduct by Dr. Tulp, and an assignment by the Board of "irregular behavior" arising out of an illegal affidavit issued to students of USAT. "Irregular behavior" may be a permanent admonition on a student or physician's official record, and make residency difficult, if not impossible.

15. The Board set up a hearing on 11/28/18 for Dr. Tulp, only, in Philadelphia, at the address in the caption to address so-called "irregular behavior". After a few minutes, with no witnesses called, Board counsel announced that the hearing was terminated. Prior to the hearing, the Board took the position that Dr. Tulp had the burden of proof on the issue of "irregular behavior" for which he had been charged by the Board. The Board set 20 minutes as the duration of the hearing. No testimony was taken or exhibits received in evidence, before Board counsel terminated the hearing. No Transcript of the proceedings has been received. The Board indicated that on 01/01/19 it will issue a finding of "irregular behavior" to Dr. Tulp effectively closing USAT.

16. There was no jurisdiction over, or relationship with, Dr. Tulp to compel him to attend the hearing by the Board, and he made a special appearance while not agreeing to jurisdiction. ECFMG has no jurisdiction over Dr. Tulp, or legal relationship with Dr. Tulp, or the power to enter any sanction against him. The Board has no contractual or statutory authority over Dr. Tulp.

17. The Board would not give Dr. Tulp sufficient discovery to conduct an adequate defense. Also, the Board has never requested any curricula, student records, or any documentation from USAT.

18. The term "irregular behavior" is void for vagueness, since "irregular behavior" is so broad that it essentially amounts to any behavior which the Board does not approve. There is no intelligible standard to ascertain "irregular behavior" with the exception of the fiat by the ECFMG. There is no due process mechanism to effectively challenge a finding of "irregular behavior" which can amount to an indefinite suspension of United States medical licenses by the Board without formal notification of such assignment to the individual concerned. .

19. There is no reasonable way to ascertain the standards for "irregular behavior" in the instant case, prior to any adjudication.

20. The Board has effectively closed USAT by not allowing its students and graduates to complete the necessary medical examinations beyond January 1, 2019, and has tortiously interfered with the relationship of the students of USAT and Dr. Tulp, the President of the University.

## FIRST CAUSE OF ACTION
### Plaintiff v. ECFMG

21. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

22. This cause of action is for the illegal actions of the ECFMG (the Board) in tortiously interfering with the contract between the students of USAT and plaintiff Dr. Orien Tulp, the University President and co-owner.

23. The Board allegedly refused to release scores of necessary medical exams to students and graduates of USAT, de facto, closing the University.

24. The Board published, in the World Directory of Medical Schools, a warning to students that it would not recognize USAT with respect to necessary medical qualifying examinations after January 1, 2019. *See* Exhibit B.

25. The Board sent illegal "affidavits" to students in an attempt to intimidate them from continuing as students at USAT. These alleged affidavits threatened medical students with perjury, as well as "irregular behavior", and also directed the students to provide certain documentary evidence, such as a copy of their passport. This "affidavit" by the Board was an abuse of process, and constituted fraudulent or negligent representation, since it was tantamount to a "subpoena duces tecum" without first having a legal proceeding. The Board had no power to issue these so-called affidavits. These affidavits are also a violation of Federal Education Records Protection Act (FERPA). Students are predominantly US citizens and are entitled to such protection under FERPA.

26. The purpose of the ECFMG doing this was to effectively remove Dr. Tulp as President of the University by discouraging students from registering or continuing their education at USAT, including verbal recommendations from ECFMG case workers. The Board issued "affidavits" and threatened to find students of USAT guilty of "irregular behavior".

27. There was no hearing before the students of USAT were sent emails by the ECFMG telling them that they may have been assigned "irregular behavior" and that their scores would not be released to medical institutions to be accepted for residency applications or other ECFMG services.

28. ECFMG alleges to be a private organization which permits the administration of qualifying examinations for foreign medical students and international medical graduates and passes information to the state licensing agencies in the United States. De facto, the ECFMG is a quasi-governmental agency that issues certificates, that are essentially licenses, to foreign medical students and physicians upon completion of their certification process, and it holds itself out to medical students and others as a governmental entity

29. As a result of the illegal actions of the Board in refusing to release the scores of the students of the plaintiff, the plaintiff has suffered, and will continue to suffer, irreparable harm including, but not limited to, the immediate closing of USAT College of Medicine and the removal of Dr. Tulp as a medical educator under the cloud of an indefinite sentence of "irregular behavior" for a duration of not less than 5 years.

30. Dr. Tulp will also suffer loss of his position as President of the University, as well as direct monetary damages resulting from the closing of USAT, arising out of the actions of ECFMG to close USAT, and to preclude its students from practicing medicine or engaging in postgraduate training in the USA, and the discouraging of any students from attending an institution where they cannot receive required certification from the ECFMG Board to qualify for licensure or registration to practice medicine in the USA.

WHEREFORE, the Court is requested to order ECFMG to immediately resume processing the medical examinations of students of USAT, and release their examination scores, and remove the negative advisory from the sponsor notes on the World Directory of Medical Schools listing for the USAT College of Medicine, and to award such other injunctive and equitable relief as appropriate, plus damages, interest, and attorney fees.

## SECOND CAUSE OF ACTION
### Plaintiff v. ECFMG

31. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

32. This cause of action is for violation of due process by the ECFMG (the Board).

33. The Board violated the due process rights of Dr. Tulp by finding him guilty of "irregular behavior" when it had no jurisdiction over Dr. Tulp, or any direct contact with him prior to a finding of "irregular behavior".

34. The Board violated the due process rights of Dr. Tulp by illegally withholding necessary medical examination  for USAT students and graduates in an attempt to sanction plaintiff and to force closure of USAT.

35. The Board violated the due process rights of Dr. Tulp by sending misleading affidavits to students of USAT, which affidavits were illegal and designed to intimidate the students from attending USAT. The Board stated that as January 1, 2019, students of USAT may not apply to ECFMG for certification. Essentially, the Board engaged in an illegal scheme to destroy USAT and Dr. Tulp by publishing the demise of the University in the World Directory of Medical Schools before any notification of such intent by the ECFMG.

36. The Board violated the due process rights of Dr. Tulp by failing to award him or the students of his college a legitimate hearing before taking adverse action. The Board commingled the adjudicatory and investigative functions, particularly through the use of

affidavits sent to students to secure documentary evidence under the threat of "irregular behavior". *See Lyness v. Com., State Bd. Of Medicine* 529 Pa. 535 (1992).

37. ECFMG is estopped from denying that it is a governmental or quasi-governmental entity, *inter alia*, because no disclaimer that it was a private entity to that effect was placed on the affidavits sent to thousands of USAT students. In point of fact, the opposite was implied.

38. The Board has acted as a governmental entity, and is estopped from denying the same.

39. When the Board corresponded with USAT and with its students, there was no disclaimer that the Board was not acting on behalf of any governmental authorization, or that it was allegedly a private entity, and the students were not required by law to respond to the affidavit or provide any documents. Students were required to complete "affidavits" under penalty of a finding of "irregular behavior" and denial of ECFMG services.

40. Under the doctrine of state action, the Board has failed to exercise due process in its dealings with USAT and its students as is required by the Due Process Clause of the Pennsylvania and US Constitutions.

41. The Board has failed to show due process to USAT students, as heretofore mentioned. The affidavits indicated that the Board has illegally commingled the adjudicatory and prosecutorial functions, in violation of due process.

42. As a result of the Board acting as a quasi-governmental entity, Dr. Tulp and his University suffered the damages as previously enumerated.

WHEREFORE, the Court is requested to order ECFMG to immediately resume processing the medical examinations of students of USAT, and release their examination scores, and remove the negative advisory from the sponsor notes on the World Directory of Medical Schools listing for the USAT College of Medicine, and to award such other injunctive and equitable relief as appropriate, plus damages, interest, and attorney fees.

### THIRD CAUSE OF ACTION
#### Plaintiff v. ECFMG

43. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

44. This is a cause of action for fraudulent misrepresentation, abuse of process, and negligent representation against the ECFMG (the Board).

45. As heretofore indicated, the Board committed the aforementioned torts through the following acts and omissions:

(a) representing itself as an official governmental agency;
(b) distributing affidavits to intimidate USAT students, which affidavits did not have a disclaimer or conform to law;
(c) placing misleading information about USAT into the World Directory of Medical Schools without notice, and which was designed to intimidate students and to effectively force closure of USAT;
(d) using illegal affidavits whose purpose was to gather documents and evidence of alleged culpable behavior by USAT and Dr. Tulp, all of which was in violation of FERPA, the Family Educational Rights and Privacy Act;
(e) violating FERPA by not receiving the requisite consent of students to their educational records.

46. As indicated in the prior counts, the Board has held itself out as a governmental agency. The Board has never indicated to those that it dealt with, in particular the students, that it is not an official governmental agency.

47. Accordingly, the Board is estopped by its conduct to deny that it is required to show due process, as if it were a governmental entity.

WHEREFORE, the Court is requested to order ECFMG to immediately resume processing the medical examinations of students of USAT, and release their examination scores, and remove the negative advisory from the sponsor notes on the World Directory of Medical Schools listing for the USAT College of Medicine, and to award such other injunctive and equitable relief as appropriate, plus damages, interest, and attorney fees.

## FOURTH CAUSE OF ACTION
### Plaintiff v. All Defendants

48. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

49. This cause of action arises out of the 12/14/18 letter by Dr. William W. Pinsky, which is attached and incorporated as Exhibit A.

50. Dr. Pinsky is the President and CEO of the ECFMG, and in that capacity, he authorized the illegal actions of the ECFMG, heretofore described.

51. On 12/14/18, Dr. Pinsky sent a letter [Exhibit A] to Dr. Orien L. Tulp, addressing him as Professor and President of USAT at its main location in Montserrat.

52. In this letter, Dr. Pinsky indicated, *inter alia*, essentially, that the ECFMG Committee had determined that, for a minimum period of five years, from the date of the letter, that Dr. Tulp was banned from submitting any documents or having any dealings with the ECFMG on behalf of USAT or otherwise.

53. This indefinite ban of Dr. Tulp for allegedly engaging in "irregular behavior" was arbitrarily imposed by the ECFMG Committee for alleged unproven false statements, none of which allegations were actually documented.

54. This ban effectively precludes Dr. Tulp from operating, or being involved with, any medical school, in any capacity, for an indefinite period of time, subject to the unfettered discretion of ECFMG.

55. This ban effectively closes USAT, as an institution for medical students, for an indefinite period of time, if not permanently.

56. Actions which allegedly are announced in Dr. Pinsky's letter have already been instituted by the ECFMG such as the ban on the World Directory of Medical Schools website and the shutdown of the portal and the blocking of student scores and the affidavits.

57. The ban by the ECFMG, as set forth in the letter of Dr. Pinsky, also means that the operations of the USAT in the United States must be shut down, and the students from the United States will be separated from USAT, which will have to be closed if the actions of the ECFMG are not reversed. Two of the three administrative conference venues have been closed due to the actions of the ECFMG. Students have been forced to transfer to other medical schools to continue their education past January 1, 2019. As previously mentioned, the bulk of the USAT Basic Sciences Program is delivered via an advanced SPOC [Small Program Online Course program developed by USAT and delivered worldwide, thereby negating any requirement for a fixed US Campus]. The ECFMG or Dr. Pinsky has never asked for any information about the structure or content of the Basic Sciences Program.

58. The actions of the ECFMG on Dr. Tulp and the students of USAT amount to a violation of procedural and substantive due process, as follows:

(a) banning Dr. Tulp without a proper hearing;
(b) banning Dr. Tulp without an evidentiary basis;
(c) forcing closure of USAT and causing its students to be dismissed in an arbitrary and capricious manner;
(d) requiring, at a hearing on 11/28/18, that USAT assume the burden of proof and allotting 20 minutes for the hearing;
(e) terminating the hearing on 11/28/18 without receiving any evidence from Dr. Tulp;
(f) finding Dr. Tulp guilty of "irregular behavior" without jurisdiction and due process, and effectively forcing closure of USAT College of Medicine without legal process, and constructively dismissing the students of USAT in violation of the law.

WHEREFORE, the Court is requested to order ECFMG to immediately resume processing the medical examinations of students of USAT, and release their examination scores, and remove the negative advisory from the sponsor notes on the World Directory of Medical Schools listing for the USAT College of Medicine, and to award such other injunctive and equitable relief as appropriate, plus damages, interest, and attorney fees.

Respectfully submitted,

William C. Reil

William C. Reil, Esquire
FOR: Tommy Swate, Esquire
Attorneys for Plaintiff
File I.D. No. WCR1962
Attorney I.D. No. 26833
1515 Market Street, Suite 1200
Philadelphia, PA 19102
215-564-1635

December 24, 2018

# EXHIBIT A

SAppx0819



EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

3624 Market Street
Philadelphia PA 19104-2685 USA
215-386-5900 | 215-386-9767 Fax
www.ecfmg.org

PERSONAL AND CONFIDENTIAL
VIA EMAIL: o.tulp@usat.edu

December 14, 2018

Dr. Orien L. Tulp
Professor and President
University of Science, Arts & Technology (USAT) Faculty of Medicine
Main Campus
S. Mayfield Estate Drive
Olveston
MONTSERRAT

Dear Dr. Tulp:

I am writing to inform you that the ECFMG Medical Education Credentials Committee ("ECFMG Committee") has completed its review of the allegation that you, individually and in your capacity as an official of University of Science, Arts & Technology (USAT) Faculty of Medicine, Montserrat, engaged in irregular behavior in connection with providing false information to ECFMG. Specifically, you provided false information to ECFMG when you (1) notified ECFMG that USAT does not operate a branch campus in Miami, FL and (2) certified to the attendance dates of several USAT students and graduates when ECFMG has information that these students were not attending USAT during some of the time periods to which you certified.

In advance of the review, the members of the ECFMG Committee were provided with the documents listed in ECFMG's October 18, 2018 letter and ECFMG's November 14, 2018 emails. A hardcopy of the complete file was also sent to your attorney, Mr. Tommy Swate, on November 16, 2018 via Federal Express. On November 16, 2018, Mr. Swate acknowledged receipt of this complete file. You made a personal appearance before the ECFMG Committee accompanied by your legal counsel, Mr. Swate. A copy of the transcript of the proceedings will be sent to you as soon as it is available.

The ECFMG Committee considered the documentation presented to it and Mr. Swate's statements. Following careful review, the ECFMG Committee determined that you engaged in irregular behavior in connection with providing false information to ECFMG.

The ECFMG Committee has determined that ECFMG will not accept any documents signed / certified by you for ECFMG on behalf of USAT, or any other medical school, for a minimum of five years from today; thereafter, the prohibition shall end only upon a petition to ECFMG conclusively demonstrating to the satisfaction of the ECFMG Committee a familiarity with, and willingness to adhere to, ECFMG polices. Your ECFMG Medical School Web Portal (EMSWP) account will remain deactivated.

In light of the ECFMG Committee's findings, the ECFMG Sponsor Note for USAT in the *World Directory of Medical Schools (World Directory)* will be updated as follows:

ECFMG® is an organization committed to promoting excellence in international medical education.

Dr. Orien L. Tulp
December 14, 2018
Page 2 of 2

> In 2018, ECFMG determined that a certain official of the University of Science
> Arts & Technology engaged in irregular behavior in connection with providing
> false information to ECFMG.

This note will remain in USAT's ECFMG Sponsor Note in the *World Directory* for five years,
regardless of whether USAT changes its name, ownership, and/or location.

Additionally, in accordance with the ECFMG *Policies and Procedures Regarding
Irregular Behavior*, a permanent annotation that you engaged in irregular behavior will be
included in your ECFMG record. ECFMG may report the ECFMG Committee's determination of
irregular behavior to the Federation of State Medical Boards of the United States, U.S. state and
international medical licensing authorities, directors of graduate medical education programs,
and to any other organization or individual who, in the judgment of ECFMG, has a legitimate
interest in such information.

As noted in the enclosed ECFMG *Rules of Appellate Procedure*, decisions of the
ECFMG Medical Education Credentials Committee may be appealed within the 30-day time
period specified.

Sincerely,

William W. Pinsky, MD FAAP FACC
President and CEO

CC: Tommy Swate, Esq. swatemd@aol.com
    William Reil, Esq. billreillaw@gmail.com

Encl: As noted.

PA 0571

# EXHIBIT B

# University of Science, Arts & Technology (USAT) Faculty of Medicine

Montserrat

School Details    Contact Information    Program Details    **Sponsor Notes**

The information below has been provided by the World Directory's sponsoring organizations.

- Students and graduates of this medical school are eligible to apply to ECFMG for ECFMG Certification and for examination, provided that:
  - For medical school students officially enrolled in this school, the graduation years are listed below as "current".
  - For graduates of this medical school, their graduation year is included in the graduation years listed below.
    Graduation Years:
    2003 - 2018
  - All other eligibility requirements are met. Refer to the ECFMG Information Booklet for detailed information.

- **Note: As of January 1, 2019, students and graduates of this medical school with a graduation year of 2019 and later are not eligible to apply to ECFMG for ECFMG Certification, which also renders them ineligible to apply to ECFMG for the United States Medical Licensing Examinations (USMLE) as a step toward ECFMG Certification.**

- **Currently, students and graduates of USAT are subject to enhanced procedures that must be met in order to be eligible to apply for ECFMG Certification related services, including but not limited to: ECFMG Certification, USMLE examinations that lead to ECFMG Certification, and Electronic Residency Application Service (ERAS®) Support Services. ECFMG will provide information and instructions to applicants upon receipt of application.**

# EXHIBIT C



AN AGREEMENT

BETWEEN

THE GOVERNMENT OF MONTSERRAT

AND

MEDICAL COLLEGE OF

LONDON (MCL),

UNIVERSITY OF SCIENCE, ARTS

AND

TECHNOLOGY

(MONTSERRAT) LTD. (USAT)

Case 2:19-2706 Document 45-3 Page: 318 Date Filed: 01/16/2020
Case 2:18-cv-05540-WB Document 33 Page: Filed 06/23/19 Page 25 of 451
Case 2:18-cv-05540-WB   Document 1   Filed 12/24/18   Page 18 of 32

MONTSERRAT

A.D. 2003

**A G R E E M E N T**

THIS AGREEMENT made the 2nd day of September 2003 between:

THE GOVERNMENT OF MONTSERRAT (hereinafter referred to as "the Government" which expression shall where the context so admits include its assigns and successors) whose address for service is THE CHIEF MINISTER'S OFFICE, BRADES, MONTSERRAT and MEDICAL COLLEGE OF LONDON (MCL), UNIVERSITY OF SCIENCE, ARTS AND TECHNOLOGY (Montserrat) LTD (USAT), a duly incorporated company (hereinafter referred to as 'the MCL-USAT' which expression shall where the context so admits include its assigns and successors) whose address is BRADES, Montserrat.

WITNESSETH AS FOLLOWS: -

1.    DEFINITIONS

In this agreement the following expressions shall have the meaning herein ascribed to them.

"Agreement Period" means a period of 20 years commencing with the date on which this agreement is executed. The MCL-USAT will have the option to review and renew the Agreement.

"Contributions" means a contribution payable to the Social Security Fund.

"Expatriate Staff" means staff recruited from overseas who are not citizens of Montserrat or are not ordinarily resident in Montserrat for tax purposes.

"USAT" means UNIVERSITY OF SCIENCE, ART AND TECHNOLOGY (MONTSERRAT) LTD.

2.    TAX EXEMPTIONS

(1)

6.    WORK PERMIT FOR EXPATRIATE EMPLOYEES

6.1    MCL-USAT will at the beginning of each year of the agreement period provide a list of names of its academic and administrative staff requiring work permits and in addition shall supply all relevant information needed for the processing of the work permits.

6.2    Government of Montserrat shall issue the necessary work permits and visas to enable MCL-USAT staff, students and families to remain on island for the period of their employment or study subject to the significance of any information provided on Police Records.

3

Case: 2:18-cv-05540-WB Document 33-5 Filed 06/03/19 Page 26 of 151
Case: 19-2706 Document: 45-3 Page: 319 Date Filed: 01/16/2020
Case 2:18-cv-05540-WB Document 1 Filed 12/24/18 Page 19 of 32

7.2 MCL-USAT will ensure that income tax is paid in respect of each of its employees.

8. GENERAL

8.1 The Government undertakes to establish a registry to record certification obtained by medical graduates of MCL-USAT.

8.2 The Government of Montserrat will at the request of MCL-USAT request the listing of MCL-USAT with the World Directory of Medical Schools published by WHO, Geneva, Switzerland.

8.13 MCL-USAT agrees to maintain operations in Montserrat with regard to its Medical and other Programmes for the duration of the agreement unless unforeseen circumstances and/or natural disaster arise that the MCL-USAT may choose to relocate to an area of convenience for the MCL-USAT for a time period to be determined by MCL-USAT. This would not affect any permission granted to the MCL-USAT by the Government of Montserrat.

8.14 The MCL-USAT may grant academic and professional degrees to duly qualified students of the institution and commensurate with an institution of higher education who have completed the academic and professional requirements of the degree for which they have been considered, and who have been recommended for such by the faculty and directors of MCL-USAT. The specific degrees authorized shall include Doctor of Philosophy (PH.D.), the Doctor of Medicine (M.D.) or Bachelor of Surgery (M.B.B.S), Bachelor of Dental Surgery (B.D.S.), the Master of Pubic Health (M.P.H.), the Master of Science (M.Sc.), the Master of Arts (M.A.), the Bachelor of Science (B.Sc.) and the Bachelor of Arts (B.A.).

IN WITNESS whereof the parties or the duly authorised representative of the parties have signed this Deed on the day first above written.

Signed by Mr. John A. Osborne
Minister for Finance and
Economic Development on behalf
of the Government of Montserrat

Dr. Chen L. Tulp
President, USAT, and Director
Medical College of London

Before and in the presence of:

Esco Henry-Greer
Attorney General

Before and in the presence of:

Esco Henry-Greer
Attorney General


9.5   At the end of the agreement period MCL-USAT shall have the option to extend the agreement for a further period to be determined by MCL-USAT and GOM.

9.6   Notwithstanding the above, the offer included in this agreement shall be valid for a period of one (1) year from the date of this agreement after which the terms and conditions may be subject to re-negotiation however, if MCL-USAT makes any substantial property investment or undertakes any major contractual obligation referable to and in reliance on this Agreement, then the terms set out shall become final and binding on the Government.

IN WITNESS whereof the parties or the duly authorised representative of the parties have signed this Deed on the day first above written.

Signed by Mr. John A. Osborne
Minister for Finance and
Economic Development on behalf
of the Government of Montserrat

Before and in the presence of:

Esco Henry-Greer
Attorney General

Dr. Orien L. Tulp
President, USAT, and Director
Medical College of London

Before and in the presence of:

Esco Henry-Greer
Attorney General

7

SAppx0828

PA 0578

17080
COMPANY NO.

# COMPANIES ACT OF MONTSERRAT

## CERTIFICATE OF INCORPORATION

### UNIVERSITY OF SCIENCE, ARTS AND TECHNOLOGY (MONTSERRAT) LTD.
### NAME OF COMPANY

I hereby certify that the above-mentioned Company, the Articles of Incorporation of which are attached, was incorporated under the Montserrat Companies Act 1998.

Registrar of Companies

18ᵗʰ September, 2003
Date of Incorporation

SAppx0829

PA 0579

# EXHIBIT D

Case 2:18-cv-05540-WB   Document 33-5   Filed 06/03/19   Page 30 of 151
Case: 19-2706    Document: 45-3    Page: 323    Date Filed: 01/16/2020
Case 2:18-cv-05540-WB   Document 1   Filed 12/24/18   Page 23 of 32

**ECFMG®** EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

3624 Market Street
Philadelphia, PA 19104-2685 USA
215-386-5900 | 215-386-9767 Fax
www.ecfmg.org

# AFFIDAVIT ATTESTING TO MEDICAL SCHOOL ATTENDANCE

I,
_____

ECFMG Applicant Name                                                    ECFMG ID Number

hereby declare, under penalty of perjury under the laws of all applicable jurisdictions, including the United States of America, and under penalty of a finding of irregular behavior under applicable ECFMG rules and regulations, that:

## Section 1: Attendance Dates at University of Science, Arts & Technology (USAT) Faculty of Medicine

I attended University of Science, Arts & Technology (USAT) Faculty of Medicine located in Montserrat during the following dates:

| From (Month/Year) | To (Month/Year) |
|---|---|
|  |  |

## Section 2: Dates and Location of Basic Sciences Courses Taken in Montserrat

I was physically present and took basic sciences courses in Montserrat, during the following dates and at the following location (If you did not complete your basic sciences course work at a facility located in Montserrat, complete Section 3):

| Dates of Basic Sciences Courses Taken while Physically Located in Montserrat | | |
|---|---|---|
| (Do not include dates if you were not physically present in Montserrat. Do not include breaks in time where you were not physically located in Montserrat. Only list the beginning and end date for when you were physically present in Montserrat attending basic sciences courses.) | | |
| From (Month/Year) | To (Month/Year) | Address of Facility Where Basic Sciences Classes Were Held |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

While I took my basic sciences classes in Montserrat, I resided at the following location(s):

| Residence Address in Montserrat | Residence Dates in Montserrat | |
|---|---|---|
|  | From (Month/Year) | To (Month/Year) |
|  |  |  |
|  |  |  |

I am attaching the following documentation to demonstrate my physical presence in Montserrat during the time I was taking basic sciences classes at University of Science, Arts & Technology (USAT) Faculty of Medicine. (check all that apply):

☐ My passport, showing travel to Montserrat and visas for Montserrat       ☐ My lease, utility bills, etc. for my housing

☐ My airline tickets/boarding passes documenting travel to Montserrat      ☐ Other (please specify)

## Section 3: TO BE COMPLETED ONLY IF YOU CANNOT COMPLETE SECTION 2

I did not take basic sciences courses at a facility located in Montserrat because:

I also declare that this information is comprehensive, complete and accurate as of the date of my signature.

_____          _____  _____  _____

Signature of Applicant                                                        (day)    (month)    (year)

### Certification by Official

I certify that on the date set forth below the individual named above did appear personally before me and that the statements in this document are subscribed and sworn to before me by the individual on this _____ day, of the month of _____ in the year _____ .

_____

Signature of Notary Public

_____

Printed Name of Official

| Official Seal |
|---|

Case 2:18-cv-05540-WB   Document 33-5   Filed 06/03/19   Page 31 of 151
Case: 19-2706   Document: 45-3   Page: 324   Date Filed: 01/16/2020
Case 2:18-cv-05540-WB   Document 1   Filed 12/24/18   Page 24 of 32

WHAT YOU NEED TO DO

Effective immediately, as a USAT student or graduate seeking a service or services related to ECFMG Certification, including registration for the United States Medical Licensing Examination (USMLE), release of USMLE scores, issuance of an ECFMG Certificate, or issuance of ECFMG Certification Status Reports to residency programs, you must complete the attached affidavit, attesting to the accuracy of your medical school attendance information to ECFMG's satisfaction. Completion of the affidavit is required and will facilitate ECFMG's review.

The affidavit must also be notarized by NotaryCam, which provides secure on-line notarization of documents. To use NotaryCam, go to https://www.notarycam.com/ecfmg-affidavit/ and follow NotaryCam's instructions. NotaryCam will e-mail your affidavit to ECFMG directly.

YOU MUST COMPLETE AND SUBMIT THIS AFFIDAVIT NO LATER THAN NOVEMBER 1, 2018.

Please allow two to four weeks processing time after the above-described affidavit has been submitted to ECFMG. ECFMG will notify you in writing after your affidavit has been processed.

ECFMG reserves the right to bring allegations of irregular behavior against you, in accordance with its policies and procedures, should ECFMG obtain information that indicates that you have engaged in irregular behavior with respect to any documentation submitted as part of this process.

If you have any questions, please contact MECCsupport@ecfmg.org and you will be assigned a Case Manager. If you prefer, you may call 215-386-5900 and ask to be transferred to a Case Manager for USAT.

Sincerely,

ECFMG

PA 0582

# EXHIBIT E



EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

3624 Market Street
Philadelphia PA 19104-2685 USA
215-386-5900 | 215-386-9767 Fax
www.ecfmg.org

VIA EMAIL: swatemd@aol.com

November 21, 2018

Mr. Tommy Swate
Attorney at Law
403 Wild Plum
Houston, Texas 77013

Dear Mr. Swate:

Thank you for the email confirmation on November 16, 2018 that you received the complete file that will be reviewed by the ECFMG Medical Education Credentials Committee ("ECFMG Committee") in the matter related to Dr. Orien Tulp. As previously communicated, Dr. Tulp is scheduled to make a personal appearance (accompanied by you and Mr. Reil, his attorneys) before the ECFMG Committee on Wednesday, November 28, 2018 at 9:00 AM at the Rittenhouse Hotel, 210 West Rittenhouse Square, Philadelphia, PA 19103. Please arrive with Dr. Tulp at 8:45 AM.

I am writing in response to your letter dated November 13, 2018, which is rife with misstatements. There are two important issues of concern which require clarification at this time: (1) ECFMG's authority to conduct its activities, including the ECFMG Certification program and making allegations of irregular behavior pertaining to Dr. Tulp; and (2) the "activity of the ECFMG in regards to the USAT" related to ECFMG's update of USAT's *World Directory of Medical Schools* ECFMG Sponsor Note.

### Concern (1):   ECFMG's Authority to Conduct the ECFMG Certification Program & *Irregular Behavior*

In your letter, you request ECFMG to "identify by what legal authority [ECFMG] has to claim and report that Dr. Tulp - engaged in 'irregular behavior'." For some additional context regarding ECFMG's responsibility and its mission to protect the public, ECFMG (formally the Evaluation Service for Foreign Medical Graduates) was established as a private, non-profit organization in 1956 by the Federation of State Medical Boards (FSMB), the American Hospital Association (AHA), the Association of American Medical Colleges (AAMC), and the American Medical Association (AMA). It was established to validate medical credentials, assess basic medical knowledge and determine English language proficiency for graduates of international medical schools. As you may already know, medical licensing authorities in the United States require that international medical graduates (IMGs) be certified by ECFMG, among other requirements, to obtain an unrestricted license to practice medicine.

In support of its mission to protect the public, individuals that have or have attempted to subvert ECFMG's policies and procedures are subject to ECFMG's Policies and Procedures on Irregular Behavior. These were previously shared with you and are also available on ECFMG's web-site at https://www.ecfmg.org/programs/irregular-behavior.html. As communicated in our prior correspondence, it is under these policies that Dr. Tulp is charged with irregular behavior for providing false information to ECFMG. I trust that the files you received on November 16 help clarify the charges and evidence of irregular behavior.

ECFMG® is an organization committed to promoting excellence in international medical education.

Mr. Tommy Swate
November 21, 2018
Page 2 of 2

***Concern (2): ECFMG's Update to USAT's World Directory ECFMG Sponsor Note***

As previously communicated to you, ECFMG's update to USAT's World Directory Sponsor note is ***not*** related to a charge of irregular behavior for Dr. Tulp.

ECFMG updated its sponsor note on October 18, 2018 because ECFMG learned that USAT was operating a medical school campus located in the United States. Before taking this action, ECFMG had requested USAT to provide documentation from the appropriate United States authorities that USAT is authorized to operate its medical school campuses and educational programs in the United States. To date, USAT has failed to deliver such documentation.

It appears from the information gathered from you (e.g. your statement that USAT has conducted classes "in locations other than Montserrat *for 15 years* without incident...") and corroborated by USAT students that USAT has primarily operated and conducted its educational activities in the United States. Based on this information, USAT may not even be an international medical school. However, as previously communicated, if you are able to provide documentation from the appropriate United States authorities that USAT is authorized to operate its medical school branch campuses in the United States, ECFMG will consider this information.

Also, in your letter dated November 13, 2018 you state "ECFMG has taken the position that ECFMG has the right to accredit a medical school." We must clarify for you that ECFMG is not an accrediting agency and does not purport to accredit international medical schools.

Please contact me if you have any additional questions regarding our ECFMG Committee meeting scheduled next week.

Sincerely,

*Kcorrado*

Ms. Kara Corrado, JD
Vice President for Operations

Case: 19-2706   Document: 45-3   Page: 328   Date Filed: 01/16/2020
Case 2:18-cv-05540-WB   Document 33-9   Filed 06/03/19   Page 35 of 151
Case 2:18-cv-05540-WB   Document 1   Filed 12/24/18   Page 28 of 32

# EXHIBIT F



EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

3624 Market Street
Philadelphia PA 19104-2685 USA
215-386-5900
www.ecfmg.org

PERSONAL AND CONFIDENTIAL
VIA EMAIL: o.tulp@usat.edu

October 18, 2018

Dr. Orien L. Tulp
Professor and President
University of Science, Arts & Technology (USAT) Faculty of Medicine
Main Campus
S. Mayfield Estate Drive
Olveston
MONTSERRAT

Dear Dr. Tulp:

I am writing to advise you of the allegation that you, individually and in your capacity as an official of the University of Science, Arts & Technology (USAT) Faculty of Medicine, Montserrat, engaged in irregular behavior in connection with providing false information to ECFMG. Specifically, you provided false information to ECFMG when you (1) notified ECFMG that USAT does not operate a branch campus in Miami, Florida and (2) certified to the attendance dates of several USAT students and graduates when ECFMG has information that these students were not attending USAT during some of the time periods to which you certified. The details of ECFMG's allegation are set forth below.

### Details of Allegation
#### *False Information Regarding U.S. Branch Campuses*
On August 21, 2018, ECFMG advised you that we had become aware that USAT was operating a "branch" campus in Miami, Florida. We advised you that in order for students and graduates of an international medical school, such as USAT, to have eligibility to apply for ECFMG Certification, ECFMG policy requires confirmation from the appropriate government authority in the branch campus country that the branch campus is authorized to operate as a medical school in such branch campus country. Therefore, we requested that USAT provide documentation from the United States Department of Education and/or the Florida Department of Education confirming that USAT's Miami branch campus is authorized to operate as a medical school in the United States. We indicated that this documentation should cover the whole time period that the USAT Miami branch campus has been in operation.

In response to ECFMG's August 21, 2018 letter, you replied:

"This is incorrect information. The Miami location is an information and testing site only, where a pre-usmle examination [an NBME] may administered, and an Orientation for new students is conducted prior to their traveling to the

ECFMG® is an organization committed to promoting excellence in medical education.

PA 0587

Dr. Orien L. Tulp
October 18, 2018
Page 2 of 4

Caribbean.. It is NOT a campus. Our ONLY Campus is located in Olveston, Montserrat, British West Indies.

Actually, recall that Montserrat is a volcanic Island, and the license issued to USAT in September, 2003 DOES actually permit the establishment of off-campus lecture and administrative sites as needed. USAT has students on island on a year round basis since its origination." [emphasis in original]

After receiving your reply, ECFMG received information that USAT was also providing medical education lectures not only at its Miami site, but also at sites in Tampa, Florida, Dallas, Texas, and Puerto Rico. As a result and to ensure that information regarding international medical schools and their students provided to ECFMG complies with ECFMG policies and requirements, ECFMG notified you that ECFMG would require USAT students and graduates to complete an affidavit, attesting to the accuracy of the medical school information provided to ECFMG.

In response to ECFMG's affidavit request, many USAT students and graduates have certified that they have not completed any courses on Montserrat, but instead completed courses on site in the United States at the direction of USAT officials due to volcanic and hurricane activity on Montserrat. ECFMG also received a copy of the "2018 University of Science, Arts and Technology Lecture Conference Schedule" which shows lectures occurring in Florida and Texas. We note that there are no lectures scheduled for Montserrat. We also note that graduation occurs in Miami, Florida.

This directly conflicts with the information that you provided, i.e. that "the Miami location is an information and testing site only, where a pre-usmle examination [an NBME] may administered, and an Orientation for new students is conducted prior to their traveling to the Caribbean.. It is NOT a campus. Our ONLY Campus is located in Olveston, Montserrat, British West Indies." [emphasis in original]. Further, though USAT's agreement with the Montserrat government indicates that USAT "agrees to maintain operations in Monserrat with regard to its Medical and other programmes for the duration of the agreement unless unforeseen circumstances and/or natural disaster arise that the MCL-USAT may choose to relocate to an area of convenience for the MCL-USAT for a time period to be determined by MCL-USAT. This would not effect any permission granted to MCL-USAT by the government of Montserrat," ECFMG has no record of receipt of any official communication from you or any other USAT official indicating that USAT relocated due to volcanic activity, from 2003 until present.

In ECFMG's September 15, 2017 announcement "Relocation of Caribbean Medical Schools Impacted by Hurricane Irma" ECFMG advised: "Schools that have relocated or plan to relocate their operations to the United States or elsewhere as a result of Hurricane Irma should provide ECFMG with: a) a formal notice to ECFMG that includes the address of where the school is temporarily located and the expected date of when the school will return to its home country, b) copies of approvals from the home country governmental authorities, and c) copies of approvals from the accrediting

Dr. Orien L. Tulp
October 18, 2018
Page 3 of 4

agency, if any. This information should be e-mailed to Medical Education Resources at medschoolreview@ecfmg.org, along with any questions or comments." ECFMG has no record of receipt of any correspondence from you or any other USAT official that USAT was relocating to the United States due to Hurricane Irma, or any other hurricane.

### Certification of False Information Regarding Students Attendance Dates

During the course of the investigation into USAT's branch campuses, ECFMG has discovered information that indicates that you provided false information to ECFMG regarding the attendance dates of some of your students on some of their applications for United States Medical Licensing Examinations (USMLE). Specifically, you certified that students were attending USAT during time periods which they were not actually attending USAT.

It is ECFMG's usual practice to consider any action or attempted actions by any person that would or could subvert the processes, programs or services of ECFMG to be *irregular behavior*. See Section A.1. of the enclosed *ECFMG Medical Education Credentials Committee Policies and Procedures*. Examples of irregular behavior include the provision of false information or falsified credentials to ECFMG. ECFMG investigates and considers allegations of irregular behavior in order to protect the integrity of its processes, programs, and services. The ECFMG Committee can impose serious sanctions if it finds irregular behavior has been committed.

The review into the matters described in this letter are ongoing. ECFMG reserves the right to amend or make additional allegations of irregular behavior, in accordance with its policies and procedures, should ECFMG obtain information that supports such amendment or additional allegations.

### ECFMG Medical Education Credentials Committee Review of this Allegation

This matter will be referred to the ECFMG Committee for review at its next scheduled meeting on November 28, 2018 in Philadelphia. The ECFMG Committee will consider the information presented and take action in accordance with the enclosed *ECFMG Medical Education Credentials Committee Policies and Procedures*.

You will have the opportunity to appear personally before the ECFMG Committee, accompanied by legal counsel, if you so wish. Please indicate in your response if you wish to appear personally before the ECFMG Committee in your individual and/or official capacities. If you do wish to make a personal appearance, I will notify you of the particular time and location of the meeting.

The following documents will be included in the Agenda for the ECFMG Committee's review:

- ECFMG's August 21, 2018 letter to you and your August 21, 2018 e-mail reply;

Dr. Orien L. Tulp
October 18, 2018
Page 4 of 4

- ECFMG's September 14, 2018 letter to you, including a copy of the affidavit sent to USAT students on September 14, 2018;
- Copy of "2018 University of Science, Arts and Technology Lecture Conference Schedule"
- September 15, 2017 ECFMG Announcement "Relocation of Caribbean Medical Schools Impacted by Hurricane Irma";
- Copy of "An Agreement Between the Government of Montserrat and Medical College of London (MCL) University of Science, Arts, and Technology (Montserrat) LTD. (USAT)"
- Affidavits completed by USAT students; and
- This letter.

Copies of these documents, with the exception of the completed affidavits by students, are enclosed.

**Please provide a response to ECFMG by November 1, 2018.** In your response, please note whether you wish to make a personal appearance before the ECFMG Committee. All documents should be submitted to Ms. Kara Corrado, Vice President for Operations, at the address above or via e-mail at kcorrado@ecfmg.org. If you have any questions, please do not hesitate to call me at (215) 883-7318.

Sincerely,

*Lisa L. Cover*

Lisa L. Cover
Senior Vice President for Business
Development and Operations

Encl: As noted.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DR. ORIEN L. TULP,    ) | |
| )  | |
| *Plaintiff*,    ) | Case No. 2:18-cv-05540-WB |
| )  | |
| v.    ) | Hon. Wendy Beetlestone |
| )  | |
| EDUCATIONAL COMMISSION FOR    ) | |
| FOREIGN MEDICAL GRADUATES and    ) | |
| DR. WILLIAM W. PINSKY,    ) | |
| )  | |
| *Defendants*.    ) | |
| )  | |

## DEFENDANT EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES' ANSWER TO COMPLAINT AND AFFIRMATIVE DEFENSES

Defendant Educational Commission for Foreign Medical Graduates ("ECFMG"),[1] by and

through its undersigned counsel, hereby answers the Complaint filed by Dr. Orien L. Tulp in

accordance with the numbered paragraphs thereof as follows:

### PARTIES

1.     The plaintiff is Dr. Orien L. Tulp, hereafter referred to as "Dr. Tulp", an adult
individual whose address for service of process is at 4288 Youngfield Street, Wheat Ridge, CO
80033. At all times material herein, plaintiff was President of the University of Science, Arts, and
Technology ("USAT"), and had an ownership interest in the University. USAT is located in
Montserrat, but its US administrative office is located at the address in the caption, and students
take classes in Montserrat and the US via a distance education format.

**ANSWER:**     ECFMG admits in part and denies in part the allegations of this paragraph.

ECFMG admits that Dr. Orien L. Tulp is the plaintiff in this lawsuit.  ECFMG denies that USAT

students "take classes in Montserrat and the US via a distance education format."  ECFMG lacks

---

[1] On March 26, 2019, the Court dismissed all claims against Dr. William W. Pinsky.  As a result,
this filing is made by and on behalf of ECFMG only, the sole remaining defendant.

knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph and they are, therefore, denied.

2.     A defendant is the Educational Commission for Foreign Medical Graduates, hereafter referred to as "ECFMG" or "the Board", which is an unincorporated association, whose address for service of process is 3624 Market Street, Philadelphia, PA 19104. According to their mission statement, the ECFMG is an organization which purports to certify medical school students and graduates to practice medicine in the United States.

**ANSWER:**     ECFMG admits in part and denies in part the allegations of this paragraph.

ECFMG admits that is headquartered at 3624 Market Street, Philadelphia, PA 19104.  ECFMG

further admits that, among other things, it certifies that foreign medical graduates have met certain

minimum criteria for entry into graduate medical education in the United States.  ECFMG denies

that it is an unincorporated association and that it "certif[ies] medical school students and graduates

to practice medicine in the United States."  ECFMG denies the remaining allegations of this

paragraph.

3.     A defendant is Dr. William W. Pinsky, the President and CEO of the ECFMG, whose address for service of process is indicated in the caption. *See* Exhibit A, attached and incorporated herein.

**ANSWER:**     ECFMG admits in part and denies in part the allegations of this paragraph.

ECFMG admits that Dr. William W. Pinsky is the President and CEO of ECFMG and that ECFMG

is headquartered at 3624 Market Street, Philadelphia, PA 19104.  ECFMG denies that Dr. Pinsky

is a defendant in this lawsuit because the Court has dismissed all claims against Dr. Pinsky.

ECFMG denies the remaining allegations of this paragraph.

4.     ECFMG is an organization sponsored by various medical organizations, including the Federation of State Medical Boards. Through the ECFMG's certification process, it gives medical students and medical graduates a certification of eligibility (essentially a license) to apply for a ACGME [Accreditation Council for Graduate Medical Education] certified residency program of postgraduate specialty training that can lead to medical licensure of the applicant. A residency program is a certified program that trains students who have graduated from a medical school and taken a series of examinations or tests administered by way of the United States Medical Licensing Examination [the USMLE]. The state medical boards have given ECFMG the power to examine and certify international medical graduates [IMGs] as competent to undertake residency

2

PA 0592

training in the USA. Without the certification (license) from the ECFMG, a foreign medical graduate cannot start the process of being licensed as a physician in the United States.

    **ANSWER:**  ECFMG admits in part and denies in part the allegations of this paragraph. ECFMG admits that, among other things, it certifies that foreign medical graduates have met certain minimum criteria for entry into graduate medical education in the United States. ECFMG further admits that ACGME has elected to require foreign medical graduates who enter ACGME-accredited programs to be certified by ECFMG. ECFMG specifically denies that "[t]he state medical boards have given ECFMG the power to examine and certify international medical graduates [IMGs] as competent to undertake residency training in the USA." ECFMG denies the remaining allegations of this paragraph.

    5.    The action of the ECFMG is in granting authority to apply for a residency program is state action. The ECFMG's authority, which is in essence a license to apply for a residency program, has a close nexus to the various state medical boards. Without the ECFMG certificate, the ACGME postgraduate programs will not permit the applicant to start the training that will in essence allow the gate to be closed to obtaining a medical residency and eventual license to practice medicine in the USA. Without the residency training, the medical graduate cannot obtain a full unrestricted medical license. The state medical boards have granted the power to the ECFMG to screen foreign medical students for licensure. State action is established because of this delegation of screening power. *Jackson v. Metro Edison Co.*, 419 U.S. 345, 351.

    **ANSWER:**  The allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied. To the extent that a response is required, ECFMG admits in part and denies in part the allegations of this paragraph. ECFMG admits that ACGME has elected to require foreign medical graduates who enter ACGME-accredited programs to be certified by ECFMG. ECFMG specifically denies that "[t]he state medical boards have granted the power to the ECFMG to screen foreign medical students for licensure." ECFMG denies the remaining allegations of this paragraph.

    6.    The ECFMG has placed itself in a position of interdependence with the state medical boards. The ECFMG cannot be considered to be a private entity because the ECFMG reports to the state medical boards but also reports to the National Practitioner Data Bank. The

SAppx0843

PA 0593

ECFMG would not exist without the powers delegated by the state medical boards. *Burton v. Wilmington Parkway Authority,* 365 U.S. 715, 725 (1961).

**ANSWER:**   The allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.  To the extent that a response is required, ECFMG denies the allegations of this paragraph.

7.   Because the ECFMG's actions are delegated state actions, the ECFMG is required to give both procedural and substantive Fourteenth Amendment due process rights.

**ANSWER:**   The allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.  To the extent that a response is required, ECFMG denies the allegations of this paragraph.

### JURISDICTION AND VENUE

8.   The Court has jurisdiction under Diversity of Citizenship, the Civil Rights Act (42 U.S.C.A. 1983) and the Due Process clause of the United States Constitution, with pendent jurisdiction to consider any claims arising under state law.

**ANSWER:**   The allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.

9.   Venue is properly before the Court, since all defendants are located and conduct business in the Eastern District of Pennsylvania.

**ANSWER:**   The allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.  To the extent that a response is required, ECFMG admits that it is headquartered and conducts business in the Eastern District of Pennsylvania.

### SUMMARY

10.   In an attempt to close down the USAT and sanction Dr. Tulp, defendant ECFMG has refused to allow students of USAT to take necessary medical examinations. Defendant ECFMG has effectively closed USAT, by refusing to release scores for students who paid for the examinations. Doctors who graduated from USAT have been unable to commence their residency due to the refusal of the Board to issue an appropriate certification. ECFMG has also sent misleading "affidavits" to many USAT students and threatened many students with "irregular

4

behavior" in order to sanction Dr. Tulp and force closure of the University, which he founded. He is President, CEO, and an equal owner of the University. Thus, ECFMG tortiously interfered with the educational contract between the students of USAT, the University, and Dr. Tulp, denied due process to Dr. Tulp and the students of USAT, and improperly used an "affidavit" [*See* Exhibit DI to coerce information from students. [Pinsky letter, *See* Exhibit A.] In addition, the Board placed information in the World Directory of Medical Schools, prior to any hearing or legal process, advising that it would no longer recognize the test scores of USAT graduates after January 1, 2019. *See* Exhibit B.

**ANSWER:** The allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied. Moreover, the allegations of this paragraph refer to written documents that speak for themselves, and Plaintiff's characterization of them is, therefore, denied. To the extent that a response is required, ECFMG admits in part and denies in part the allegations of this paragraph. ECFMG admits that it imposed a limited sanction on Plaintiff after finding that he engaged in "irregular behavior" (as defined by and consistent with ECFMG's Policies and Procedures Regarding Irregular Behavior), which finding was made after Plaintiff was given notice of the allegations of "irregular behavior," copies of ECFMG's Policies and Procedures Regarding Irregular Behavior and documentary evidence considered making the finding of "irregular behavior," and an opportunity to be heard at an in-person hearing before ECFMG's Medical Education Credentials Committee. ECFMG further admits that it sent blank affidavit forms to USAT students applying to ECFMG for services to gather information about their medical school coursework. ECFMG denies that it "has refused to allow students of USAT to take necessary medical examinations." ECFMG denies that it "has effectively closed USAT, by refusing to release scores for students who paid for the examinations." ECFMG denies that "[d]octors who graduated from USAT have been unable to commence their residency due to the refusal of the Board to issue an appropriate certification." ECFMG denies that the blank affidavits sent to USAT students were "misleading," "threatened" students with "irregular behavior," were sent "to sanction Dr. Tulp and force closure of" USAT. ECFMG lacks knowledge or information

5

SAppx0845

sufficient to form a belief about the truth of the allegation that Plaintiff "is President, CEO, and an

equal owner of" USAT. ECFMG specifically denies that Plaintiff was denied due process.

ECFMG denies the remaining allegations of this paragraph.

## GENERAL ALLEGATIONS

11.     ECFMG sent to USAT a letter implying that the school would be closed on or about 01/01/19 because the Board would no longer recognize the scores of its students in taking the three-part United States Medical Licensing Examination. This action prohibits applicants from sitting for the USMLE, which is required for unrestricted medical licensure.

**ANSWER:**     The allegations of this paragraph refer to a letter that is a written document

that speaks for itself, and Plaintiff's characterization of it is, therefore, denied. To the extent that

a response is required, ECFMG denies the allegations of this paragraph.

12.     On 11/21/18, Kara Corrado, J.D., Vice President for Operations of the Board, sent a letter to counsel for USAT indicating two concerns: 1) that USAT's authority to conduct its medical education program amounted to "irregular behavior" because USAT had not been certified by a governmental entity in the United States, and 2) the allegation that USAT was operating medical school campuses in the United States. *See* Exhibit E. On October 18, 2018, Lisa Cover, a Senior Vice President with ECFMG, wrote a letter to Dr. Tulp advising him of the allegation that he engaged in "irregular behavior". *See* Exhibit F.

**ANSWER:**     The allegations of this paragraph refer to letters that are written documents

that speaks for themselves, and Plaintiff's characterization of them is, therefore, denied. To the

extent that a response is required, ECFMG admits in part and denies in part the allegations of this

paragraph. ECFMG admits that Kara Corrado, the ECFMG Vice President of Operations, sent a

letter to counsel for Plaintiff on November 21, 2018 that, *inter alia*, (i) confirmed Plaintiff would

make personal appearance with his attorneys at a hearing before the ECFMG Medical Education

Credentials Committee on November 28, 2018 in connection with allegations of "irregular

behavior" against Plaintiff, (ii) corrected numerous misstatements set forth in a letter from counsel

for Plaintiff dated November 13, 2018, and (iii) as ECFMG had already done multiple times,

invited Plaintiff and USAT to provide evidence to ECFMG that USAT's operations in the United

6

States were authorized.  ECFMG further admits that Lisa Cover, the ECFMG Senior Vice President for Business Development and Operations, sent a letter to Plaintiff on October 18, 2018, which (i) gave Plaintiff notice of the allegations of "irregular behavior" against Plaintiff, (ii) enclosed numerous documents supporting the allegations of "irregular behavior" against Plaintiff, and (iii) invited Plaintiff to make a personal appearance before the ECFMG Medical Education Credentials Committee at a hearing regarding the allegations of "irregular behavior" against Plaintiff, pursuant to the Committee's policies and procedures.  ECFMG denies the remaining allegations of this paragraph.

13.     USAT has a certification from the government of Montserrat, allowing it to operate temporary venues due to an active volcano on the island. Such certification had been recognized by the Board without incident since 2003. USAT also operates online courses for the majority of its basic sciences course requirements via a specially developed SPOC [small platform online courses, developed by USAT]. A true and correct copy of the certification from Montserrat is attached and incorporated as Exhibit C.

**ANSWER:**     The allegations of this paragraph refer to a written document that speaks for itself, and Plaintiff's characterization of it is, therefore, denied.  To the extent that a response is required, ECFMG admits in part and denies in part the allegations of this paragraph.  ECFMG admits that before ECFMG learned of USAT's unauthorized operations in the United States, ECFMG treated USAT as a foreign medical school located in Montserrat based on authorization by Montserrat to operate there.  ECFMG lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph and they are, therefore, denied.

14.     Students from USAT have each paid well over $1,000 to the Board to take necessary medical exams, and the Board has refused to release their scores because of alleged misconduct by Dr. Tulp, and an assignment by the Board of "irregular behavior" arising out of an illegal affidavit issued to students of USAT. "Irregular behavior" may be a permanent admonition on a student or physician's official record, and make residency difficult, if not impossible.

7

**ANSWER:** ECFMG admits in part and denies in part the allegations of this paragraph. ECFMG admits that a finding of "irregular behavior" results in a permanent annotation of that finding in ECFMG's records. ECFMG denies the remaining allegations of this paragraph.

15.    The Board set up a hearing on 11/28/18 for Dr. Tulp, only, in Philadelphia, at the address in the caption to address so-called "irregular behavior". After a few minutes, with no witnesses called, Board counsel announced that the hearing was terminated. Prior to the hearing, the Board took the position that Dr. Tulp had the burden of proof on the issue of "irregular behavior" for which he had been charged by the Board. The Board set 20 minutes as the duration of the hearing. No testimony was taken or exhibits received in evidence, before Board counsel terminated the hearing. No Transcript of the proceedings has been received. The Board indicated that on 01/01/19 it will issue a finding of "irregular behavior" to Dr. Tulp effectively closing USAT.

**ANSWER:**    ECFMG admits in part and denies in part the allegations of this paragraph. ECFMG admits that a hearing about the allegations of "irregular behavior" against Plaintiff was held on November 28, 2018 before ECFMG's Medical Education Credentials Committee pursuant to the Committee's policies and procedures.  ECFMG admits that it allotted 20 minutes for the hearing (consistent with ECFMG's ordinary practice) and that the hearing concluded sooner because Plaintiff (through his counsel) refused to engage and became argumentative.  ECFMG denies the remaining allegations of this paragraph.

16.    There was no jurisdiction over, or relationship with, Dr. Tulp to compel him to attend the hearing by the Board, and he made a special appearance while not agreeing to jurisdiction. ECFMG has no jurisdiction over Dr. Tulp, or legal relationship with Dr. Tulp, or the power to enter any sanction against him. The Board has no contractual or statutory authority over Dr. Tulp.

**ANSWER:**    The allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.  To the extent that a response is required, ECFMG denies the allegations of this paragraph.

17.    The Board would not give Dr. Tulp sufficient discovery to conduct an adequate defense. Also, the Board has never requested any curricula, student records, or any documentation from USAT.

**ANSWER:**    ECFMG denies the allegations of this paragraph.

SAppx0848

18.     The term "irregular behavior" is void for vagueness, since "irregular behavior" is so broad that it essentially amounts to any behavior which the Board does not approve. There is no intelligible standard to ascertain "irregular behavior" with the exception of the fiat by the ECFMG. There is no due process mechanism to effectively challenge a finding of "irregular behavior" which can amount to an indefinite suspension of United States medical licenses by the Board without formal notification of such assignment to the individual concerned.

**ANSWER:**     The allegations of this paragraph contain conclusions of law to which no

response is required and they are, therefore, denied.  To the extent that a response is required,

ECFMG denies the allegations of this paragraph.

19.     There is no reasonable way to ascertain the standards for "irregular behavior" in the instant case, prior to any adjudication.

**ANSWER:**     The allegations of this paragraph contain conclusions of law to which no

response is required and they are, therefore, denied.  To the extent that a response is required,

ECFMG denies the allegations of this paragraph.

20.     The Board has effectively closed USAT by not allowing its students and graduates to complete the necessary medical examinations beyond January 1, 2019, and has tortiously interfered with the relationship of the students of USAT and Dr. Tulp, the President of the University.

**ANSWER:**     The allegations of this paragraph contain conclusions of law to which no

response is required and they are, therefore, denied.  To the extent that a response is required,

ECFMG denies the allegations of this paragraph.

### FIRST CAUSE OF ACTION
### Plaintiff v. ECFMG

21.     Plaintiff incorporates all prior paragraphs as though fully set forth herein.

**ANSWER:**     ECFMG incorporates its responses to the previous paragraphs as though

fully set forth herein.

22.     This cause of action is for the illegal actions of the ECFMG (the Board) in tortiously interfering with the contract between the students of USAT and plaintiff Dr. Orien Tulp, the University President and co-owner.

SAppx0849

**ANSWER:**   The Court dismissed Plaintiff's First Cause of Action, and thus no response

to this paragraph is required.

23.   The Board allegedly refused to release scores of necessary medical exams to students and graduates of USAT, de facto, closing the University.

**ANSWER:**   The Court dismissed Plaintiff's First Cause of Action, and thus no response

to this paragraph is required.

24.   The Board published, in the World Directory of Medical Schools, a warning to students that it would not recognize USAT with respect to necessary medical qualifying examinations after January 1, 2019. *See* Exhibit B.

**ANSWER:**   The Court dismissed Plaintiff's First Cause of Action, and thus no response

to this paragraph is required.

25.   The Board sent illegal "affidavits" to students in an attempt to intimidate them from continuing as students at USAT. These alleged affidavits threatened medical students with perjury, as well as "irregular behavior", and also directed the students to provide certain documentary evidence, such as a copy of their passport. This "affidavit" by the Board was an abuse of process, and constituted fraudulent or negligent representation, since it was tantamount to a "subpoena duces tecum" without first having a legal proceeding. The Board had no power to issue these so-called affidavits. These affidavits are also a violation of Federal Education Records Protection Act (FERPA). Students are predominantly US citizens and are entitled to such protection under FERPA.

**ANSWER:**   The Court dismissed Plaintiff's First Cause of Action, and thus no response

to this paragraph is required.

26.   The purpose of the ECFMG doing this was to effectively remove Dr. Tulp as President of the University by discouraging students from registering or continuing their education at USAT, including verbal recommendations from ECFMG case workers. The Board issued "affidavits" and threatened to find students of USAT guilty of "irregular behavior".

**ANSWER:**   The Court dismissed Plaintiff's First Cause of Action, and thus no response

to this paragraph is required.

27.   There was no hearing before the students of USAT were sent emails by the ECFMG telling them that they may have been assigned "irregular behavior" and that their scores would not be released to medical institutions to be accepted for residency applications or other ECFMG services.

**ANSWER:**   The Court dismissed Plaintiff's First Cause of Action, and thus no response

to this paragraph is required.

28.   ECFMG alleges to be a private organization which permits the administration of qualifying examinations for foreign medical students and international medical graduates and passes information to the state licensing agencies in the United States. De facto, the ECFMG is a quasi-governmental agency that issues certificates, that are essentially licenses, to foreign medical students and physicians upon completion of their certification process, and it holds itself out to medical students and others as a governmental entity.

**ANSWER:**   The Court dismissed Plaintiff's First Cause of Action, and thus no response

to this paragraph is required.

29.   As a result of the illegal actions of the Board in refusing to release the scores of the students of the plaintiff, the plaintiff has suffered, and will continue to suffer, irreparable harm including, but not limited to, the immediate closing of USAT College of Medicine and the removal of Dr. Tulp as a medical educator under the cloud of an indefinite sentence of "irregular behavior" for a duration of not less than 5 years.

**ANSWER:**   The Court dismissed Plaintiff's First Cause of Action, and thus no

response to this paragraph is required.

30.   Dr. Tulp will also suffer loss of his position as President of the University, as well as direct monetary damages resulting from the closing of USAT, arising out of the actions of ECFMG to close USAT, and to preclude its students from practicing medicine or engaging in postgraduate training in the USA, and the discouraging of any students from attending an institution where they cannot receive required certification from the ECFMG Board to qualify for licensure or registration to practice medicine in the USA.

**ANSWER:**   The Court dismissed Plaintiff's First Cause of Action, and thus no response

to this paragraph is required.

WHEREFORE, the Court is requested to order ECFMG to immediately resume processing the medical examinations of students of USAT, and release their examination scores, and remove the negative advisory from the sponsor notes on the World Directory of Medical Schools listing for the USAT College of Medicine, and to award such other injunctive and equitable relief as appropriate, plus damages, interest, and attorneys fees.

**ANSWER:**   The Court dismissed Plaintiff's First Cause of Action, and thus no response

to this WHEREFORE clause is required.

11

PA 0601

## SECOND CAUSE OF ACTION
### Plaintiff v. ECFMG

31.     Plaintiff incorporates all prior paragraphs as though fully set forth herein.

**ANSWER:**   ECFMG incorporates its responses to the previous paragraphs as though fully set forth herein.

32.     This cause of action is for violation of due process by the ECFMG (the Board).

**ANSWER:**   The allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.

33.     The Board violated the due process rights of Dr. Tulp by finding him guilty of "irregular behavior" when it had no jurisdiction over Dr. Tulp, or any direct contact with him prior to a finding of "irregular behavior".

**ANSWER:**   The allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.  To the extent that a response is required, ECFMG denies the allegations of this paragraph.

34.     The Board violated the due process rights of Dr. Tulp by illegally withholding necessary medical examination for USAT students and graduates in an attempt to sanction plaintiff and to force closure of USAT.

**ANSWER:**   The allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.  To the extent that a response is required, ECFMG denies the allegations of this paragraph.

35.     The Board violated the due process rights of Dr. Tulp by sending misleading affidavits to students of USAT, which affidavits were illegal and designed to intimidate the students from attending USAT. The Board stated that as January 1, 2019, students of USAT may not apply to ECFMG for certification. Essentially, the Board engaged in an illegal scheme to destroy USAT and Dr. Tulp by publishing the demise of the University in the World Directory of Medical Schools before any notification of such intent by the ECFMG.

**ANSWER:**   The allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.  To the extent that a response is required, ECFMG denies the allegations of this paragraph.

12

PA 0602

36.     The Board violated the due process rights of Dr. Tulp by failing to award him or the students of his college a legitimate hearing before taking adverse action. The Board commingled the adjudicatory and investigative functions, particularly through the use of affidavits sent to students to secure documentary evidence under the threat of "irregular behavior". *See Lyness v. Corn., State Bd. of Medicine* 529 Pa. 535 (1992).

**ANSWER:**   The allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.  To the extent that a response is required, ECFMG denies the allegations of this paragraph.

37.     ECFMG is estopped from denying that it is a governmental or quasi-governmental entity, *inter alia,* because no disclaimer that it was a private entity to that effect was placed on the affidavits sent to thousands of USAT students. In point of fact, the opposite was implied.

**ANSWER:**   The allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.  To the extent that a response is required, ECFMG denies the allegations of this paragraph.

38.     The Board has acted as a governmental entity, and is estopped from denying the same.

**ANSWER:**   The allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.  To the extent that a response is required, ECFMG denies the allegations of this paragraph.

39.     When the Board corresponded with USAT and with its students, there was no disclaimer that the Board was not acting on behalf of any governmental authorization, or that it was allegedly a private entity, and the students were not required by law to respond to the affidavit or provide any documents. Students were required to complete "affidavits" under penalty of a finding of "irregular behavior" and denial of ECFMG services.

**ANSWER:**   The allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied.  To the extent that a response is required, ECFMG denies the allegations of this paragraph.

40.     Under the doctrine of state action, the Board has failed to exercise due process in its dealings with USAT and its students as is required by the Due Process Clause of the Pennsylvania and US Constitutions.

13

PA 0603

**ANSWER:** The allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied. To the extent that a response is required, ECFMG denies the allegations of this paragraph.

41. The Board has failed to show due process to USAT students, as heretofore mentioned. The affidavits indicated that the Board has illegally commingled the adjudicatory and prosecutorial functions, in violation of due process.

**ANSWER:** The allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied. To the extent that a response is required, ECFMG denies the allegations of this paragraph.

42. As a result of the Board acting as a quasi-governmental entity, Dr. Tulp and his University suffered the damages as previously enumerated.

**ANSWER:** The allegations of this paragraph contain conclusions of law to which no response is required and they are, therefore, denied. To the extent that a response is required, ECFMG denies the allegations of this paragraph.

WHEREFORE, the Court is requested to order ECFMG to immediately resume processing the medical examinations of students of USAT, and release their examination scores, and remove the negative advisory from the sponsor notes on the World Directory of Medical Schools listing for the USAT College of Medicine, and to award such other injunctive and equitable relief as appropriate, plus damages, interest, and attorneys fees.

**ANSWER:** In response to this WHEREFORE clause, ECFMG denies that Plaintiff is entitled to any type of remedy, relief, or damages whatsoever, including the relief requested in this WHEREFORE clause. ECFMG denies the remaining allegations of this paragraph.

### THIRD CAUSE OF ACTION
### Plaintiff v. ECFMG

43. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

**ANSWER:** ECFMG incorporates its responses to the previous paragraphs as though fully set forth herein.

14

PA 0604

44.     This is a cause of action for fraudulent misrepresentation, abuse of process, and negligent representation against the ECFMG (the Board).

**ANSWER:**     The Court dismissed Plaintiff's Third Cause of Action, and thus no response to this paragraph is required.

45.     As heretofore indicated, the Board committed the aforementioned torts through the following acts and omissions:

        (a)     representing itself as an official governmental agency;

        (b)     distributing affidavits to intimidate USAT students, which affidavits did not have a disclaimer or conform to law;

        (c)     placing misleading information about USAT into the World Directory of Medical Schools without notice, and which was designed to intimidate students and to effectively force closure of USAT;

        (d)     using illegal affidavits whose purpose was to gather documents and evidence of alleged culpable behavior by USAT and Dr. Tulp, all of which was in violation of FERPA, the Family Educational Rights and Privacy Act;

        (e)     violating FERPA by not receiving the requisite consent of students to their educational records.

**ANSWER:**     The Court dismissed Plaintiff's Third Cause of Action, and thus no response to this paragraph and its subparts is required.

46.     As indicated in the prior counts, the Board has held itself out as a governmental agency. The Board has never indicated to those that it dealt with, in particular the students, that it is not an official governmental agency.

**ANSWER:**     The Court dismissed Plaintiff's Third Cause of Action, and thus no response to this paragraph is required.

47.     Accordingly, the Board is estopped by its conduct to deny that it is required to show due process, as if it were a governmental entity.

**ANSWER:**     The Court dismissed Plaintiff's Third Cause of Action, and thus no response to this paragraph is required.

WHEREFORE, the Court is requested to order ECFMG to immediately resume processing the medical examinations of students of USAT, and release their examination scores, and remove the negative advisory from the sponsor notes on the World Directory of Medical Schools listing

SAppx0855

PA 0605

for the USAT College of Medicine, and to award such other injunctive and equitable relief as appropriate, plus damages, interest, and attorneys fees.

**ANSWER:**   The Court dismissed Plaintiff's Third Cause of Action, and thus no response to this WHEREFORE clause is required.

<div align="center">

### FOURTH CAUSE OF ACTION
**Plaintiff v. All Defendants**

</div>

48.     Plaintiff incorporates all prior paragraphs as though fully set forth herein.

**ANSWER:**   ECFMG incorporates its responses to the previous paragraphs as though fully set forth herein.

49.     This cause of action arises out of the 12/14/18 letter by Dr. William W. Pinsky, which is attached and incorporated as Exhibit A.

**ANSWER:**   The Court dismissed Plaintiff's Fourth Cause of Action, and thus no response to this paragraph is required.  To the extent that a response is required, ECFMG denies the allegations of this paragraph.

50.     Dr. Pinsky is the President and CEO of the ECFMG, and in that capacity, he authorized the illegal actions of the ECFMG, heretofore described.

**ANSWER:**   The Court dismissed Plaintiff's Fourth Cause of Action, and thus no response to this paragraph is required.  To the extent that a response is required, ECFMG denies the allegations of this paragraph.

51.     On 12/14/18, Dr. Pinsky sent a letter [Exhibit A] to Dr. Orien L. Tulp, addressing him as Professor and President of USAT at its main location in Montserrat.

**ANSWER:**   The Court dismissed Plaintiff's Fourth Cause of Action, and thus no response to this paragraph is required.  To the extent that a response is required, ECFMG denies the allegations of this paragraph.

52.     In this letter, Dr. Pinsky indicated, *inter alia,* essentially, that the ECFMG Committee had determined that, for a minimum period of five years, from the date of the letter, that Dr. Tulp was banned from submitting any documents or having any dealings with the ECFMG on behalf of USAT or otherwise.

<div align="center">16</div>

PA 0606

**ANSWER:** The Court dismissed Plaintiff's Fourth Cause of Action, and thus no response to this paragraph is required.

53. This indefinite ban of Dr. Tulp for allegedly engaging in "irregular behavior" was arbitrarily imposed by the ECFMG Committee for alleged unproven false statements, none of which allegations were actually documented.

**ANSWER:** The Court dismissed Plaintiff's Fourth Cause of Action, and thus no response to this paragraph is required. To the extent that a response is required, ECFMG denies the allegations of this paragraph.

54. This ban effectively precludes Dr. Tulp from operating, or being involved with, any medical school, in any capacity, for an indefinite period of time, subject to the unfettered discretion of ECFMG.

**ANSWER:** The Court dismissed Plaintiff's Fourth Cause of Action, and thus no response to this paragraph is required. To the extent that a response is required, ECFMG denies the allegations of this paragraph.

55. This ban effectively closes USAT, as an institution for medical students, for an indefinite period of time, if not permanently.

**ANSWER:** The Court dismissed Plaintiff's Fourth Cause of Action, and thus no response to this paragraph is required. To the extent that a response is required, ECFMG denies the allegations of this paragraph.

56. Actions which allegedly are announced in Dr. Pinsky's letter have already been instituted by the ECFMG such as the ban on the World Directory of Medical Schools website and the shutdown of the portal and the blocking of student scores and the affidavits.

**ANSWER:** The Court dismissed Plaintiff's Fourth Cause of Action, and thus no response to this paragraph is required. To the extent that a response is required, ECFMG denies the allegations of this paragraph.

57. The ban by the ECFMG, as set forth in the letter of Dr. Pinsky, also means that the operations of the USAT in the United States must be shut down, and the students from the United States will be separated from USAT, which will have to be closed if the actions of the ECFMG are not reversed. Two of the three administrative conference venues have been closed due to the

17

PA 0607

actions of the ECFMG. Students have been forced to transfer to other medical schools to continue their education past January 1, 2019. As previously mentioned, the bulk of the USAT Basic Sciences Program is delivered via an advanced SPOC [Small Program Online Course program developed by USAT and delivered worldwide, thereby negating any requirement for a fixed US Campus]. The ECFMG or Dr. Pinsky has never asked for any information about the structure or content of the Basic Sciences Program.

**ANSWER:** The Court dismissed Plaintiff's Fourth Cause of Action, and thus no response to this paragraph is required. To the extent that a response is required, ECFMG denies the allegations of this paragraph.

58.   The actions of the ECFMG on Dr. Tulp and the students of USAT amount to a violation of procedural and substantive due process, as follows:

(a)   banning Dr. Tulp without a proper hearing;

(b)   banning Dr. Tulp without an evidentiary basis;

(c)   forcing closure of USAT and causing its students to be dismissed in an arbitrary and capricious manner;

(d)   requiring, at a hearing on 11/28/18, that USAT assume the burden of proof and allotting 20 minutes for the hearing;

(e)   terminating the hearing on 11/28/18 without receiving any evidence from Dr. Tulp;

(f)   finding Dr. Tulp guilty of "irregular behavior" without jurisdiction and due process, and effectively forcing closure of USAT College of Medicine without legal process, and constructively dismissing the students of USAT in violation of the law.

**ANSWER:** The Court dismissed Plaintiff's Fourth Cause of Action, and thus no response to this paragraph and its subparts is required. To the extent that a response is required, ECFMG denies the allegations of this paragraph and its subparts.

WHEREFORE, the Court is requested to order ECFMG to immediately resume processing the medical examinations of students of USAT, and release their examination scores, and remove the negative advisory from the sponsor notes on the World Directory of Medical Schools listing for the USAT College of Medicine, and to award such other injunctive and equitable relief as appropriate, plus damages, interest, and attorneys fees.

SAppx0858

**ANSWER:**   The Court dismissed Plaintiff's Fourth Cause of Action, and thus no response to this WHEREFORE clause is required.   To the extent that a response is required, ECFMG denies the allegations of this paragraph.

## AFFIRMATIVE DEFENSES

Without assuming the burden of proof on any matters that would otherwise rest with Plaintiff, and expressly denying any and all wrongdoing, ECFMG alleges the following affirmative defenses.   ECFMG presently has insufficient knowledge or information to form a belief as to whether there are additional defenses than those stated below.   Therefore, ECFMG expressly reserves the right to assert additional defenses.

1.      The Complaint fails to state a due process claim upon which relief may be granted.

2.      Plaintiff's due process claim fails because ECFMG afforded Plaintiff due process.

3.      Plaintiff's due process claim fails because Plaintiff had notice and an opportunity to be heard.

4.      Plaintiff's due process claim is barred because Plaintiff has not suffered any actual injury or damage.

5.      Plaintiff is not entitled to relief under the doctrine of unclean hands.

6.      Plaintiff failed to mitigate his purported damages.

19

PA 0609

Respectfully submitted,

DATED:  April 9, 2019

/s/ Elisa P. McEnroe
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA  19103-2921
Telephone:     +1.215.963.5917
Facsimile:      +1.215.963.5001
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for Foreign Medical Graduates*

SAppx0860

PA 0610

## CERTIFICATE OF SERVICE

I do hereby certify that on this date, I caused true and correct copies of the foregoing

document to be served via electronic filing upon the following counsel of record via the ECF

system and/or e-mail:

TOMMY SWATE
403 WILD PLUM
HOUSTON, TX 77013

WILLIAM C. REIL
1515 MARKET ST SUITE 1200
PHILADELPHIA, PA 19102
215-564-1635
Fax: 215-564-4292
Email: billreillaw@gmail.com

*Attorneys for Plaintiffs*

DATED:  April 9, 2019              */s/ Elisa P. McEnroe*
                                   Elisa P. McEnroe

 **Gmail**

Bill Reil <billreillaw@gmail.com>

---

## RE: Tulp v. ECFMG - Filing
1 message

---

**Klayman, Matthew D.** <matthew.klayman@morganlewis.com>          Mon, May 6, 2019 at 10:56 AM
To: "swatemd@aol.com" <swatemd@aol.com>
Cc: "McEnroe, Elisa P." <elisa.mcenroe@morganlewis.com>, Bill Reil <billreillaw@gmail.com>

Mr. Swate,

We complied with Judge Beetlestone's Policies and Procedures (available online at http://www.paed.uscourts.gov/ documents/procedures/beepol.pdf) and will not withdraw our filing.

Per Section V.A-B of the Civil Cases section in Judge Beetlestone's Policies and Procedures, we sent you and Mr. Reil our proposed "single, joint appendix of all exhibits that may be referenced" in the summary judgment briefing. We then spoke to Mr. Reil about how this is for the Court's convenience, per her procedures, so that we can all reference the same universe of documents. We have not represented that you stipulated to anything in that regard. Section V.B explains how you may submit additional exhibits, if you believe it is necessary to do so.

Per Section V.C.1 of the Civil Cases section in Judge Beetlestone's Policies & Procedures, we submitted "a separate **Statement of Undisputed Material Facts** containing a numbered, paragraph-by-paragraph recitation of facts with specific citations to the joint appendix in support of all of those facts **as to which the moving party [(in this case, ECFMG)] contends no genuine issue exists**." (Emphases added.) Section V.C.2 explains how Dr. Tulp may submit "a separate Statement of Disputed Material Facts, stating in similar paragraph form whether [Dr. Tulp] accepts or rejects that each fact as stated by the moving party is undisputed." The Court did not instruct us to share with you a copy of our statement of facts in advance of filing and we followed the proper procedures.

A courtesy copy of Defendant's filing was sent to the Court today, along with the enclosed correspondence.

Regards,

Matt

**Matthew D. Klayman**

**Morgan, Lewis & Bockius LLP**

1701 Market Street | Philadelphia, PA 19103-2921

Direct: +1.215.963.5609 | Main: +1.215.963.5000 | Fax: +1.215.963.5001

matthew.klayman@morganlewis.com | www.morganlewis.com

Assistant: Angela P. Garden | +1.215.963.5463 | angela.garden@morganlewis.com

**From:** swatemd@aol.com <swatemd@aol.com>
**Sent:** Friday, May 03, 2019 10:49 PM
**To:** Klayman, Matthew D. <matthew.klayman@morganlewis.com>
**Subject:** Re: Tulp v. ECFMG - Filing


[EXTERNAL EMAIL]

The motion you filed indicated that certain facts were agreed to by Dr. Tulp or his attorneys is false. Please withdraw this documents. The various documents e mailed to me on May 3, are the first time either Mr Riel or I have seen the "so called agreed facts". We certainly have agreed to no facts at this time. We will review your claims of facts. A decision will be made as to which facts we can agree and which facts we disagree. I point out to you the court instructed you to submit your version of the facts to Mr. Riel and I.  Tommy Swate


-----Original Message-----
From: Klayman, Matthew D. <matthew.klayman@morganlewis.com>
To: swatemd <swatemd@aol.com>; Bill Reil <billreillaw@gmail.com>
Cc: McEnroe, Elisa P. <elisa.mcenroe@morganlewis.com>
Sent: Fri, May 3, 2019 5:21 pm
Subject: Tulp v. ECFMG - Filing

Counsel,


Please see attached.


Regards,

Matt


**Matthew D. Klayman**

**Morgan, Lewis & Bockius LLP**

1701 Market Street | Philadelphia, PA 19103-2921

Direct: +1.215.963.5609 | Main: +1.215.963.5000 | Fax: +1.215.963.5001

matthew.klayman@morganlewis.com | www.morganlewis.com

Assistant: Angela P. Garden | +1.215.963.5463 | angela.garden@morganlewis.com


DISCLAIMER
This e-mail message is intended only for the personal use
of the recipient(s) named above. This message may be an
attorney-client communication and as such privileged and
confidential and/or it may include attorney work product.
If you are not an intended recipient, you may not review,
copy or distribute this message. If you have received this
communication in error, please notify us immediately by
e-mail and delete the original message.


📄 **Tulp v. ECFMG - McEnroe Letter re Courtesy Copy [5.6.2019].pdf**
42K

**William C. Reil, Esquire**
**1515 Market Street, Suite 1200, Philadelphia, PA 19102**
**Tel: 215-564-1635 Fax: 215-564-4292**
**BillReilLaw@gmail.com**

May 2, 2019

<u>**BY EMAIL ONLY**</u>
elisa.mcenroe@morganlewis.com

Elisa P. McEnroe, Esquire
Morgan, Lewis, and Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921

> Re:  Dr. Tulp v. ECFMG and Dr. Pinsky
> Docket No: 2:18-cv-05540-WB
> <u>**Joint Appendix and Stipulations**</u>

Dear Ms. McEnroe:

I received your email captioned "Joint Appendix." There has been insufficient time to look over 500 pages of documents which you sent to us. It would be useful if you could send a list of proposed stipulations, which you wish Mr. Swate and myself to consider.

Generally, I will stipulate to the authenticity of any reasonable exhibit, but not necessarily to the truth of the entire document. Accordingly, it would be preferable to see the document to which the appendix refers. I would recommend to my client that we reserve the right to object to a stipulation, contingent upon how it is used.

Sincerely yours,

William C. Reil

cc:  Tommy Swate, Esquire
     Dr. Orien L. Tulp

Case 2:18-cv-05540-WB   Document 33-5   Filed 06/03/19   Page 64 of 151
Case: 19-2706   Document: 45-3   Page: 357   Date Filed: 01/16/2020
Case 2:18-cv-05540-WB   Document 21   Filed 01/25/19   Page 1 of 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DR. ORIEN L. TULP,
**Plaintiff,**

**CIVIL ACTION**

v.

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES AND
DR. WILLIAM W. PINSKY,
**Defendants.**

NO. 18-5540

**FILED**

JAN 25 2019

KATE BARKMAN, Clerk
By_____Dep. Clerk

### SCHEDULING ORDER

**AND NOW**, this 24th day of January, 2019, following a Preliminary Pretrial Conference,

**IT IS ORDERED** as follows:

1.      All fact discovery shall be completed by April 19, 2019.

2.      Any motions for summary judgment motions shall be filed and served on or before May 3, 2019. If the parties do not plan on filing summary judgment motions, they shall so report to the Court (Chambers, Room 3809) on or before May 3, 2019. In all summary judgment filings, the parties shall comply with the provisions of this Court's Policies and Procedures regarding the submission of a joint appendix and of statements of undisputed and disputed material facts.

         A.      When one party intends to move for summary judgment, that party shall initiate a process whereby the parties shall meet, confer and develop a single, joint appendix of all exhibits, including any and all exhibits that may be referenced in their respective briefs.

         B.      The joint appendix shall be filed by the movant no later than the date the initial motion for summary judgment is docketed. All pages of the joint appendix shall be consecutively "Bates stamped" and referenced in the motions and briefs by the Bates number assigned each page. The joint appendix shall include a table of contents. The parties shall make every effort to include all necessary exhibits in the initial joint appendix. Should it become necessary for the non-moving party to submit additional exhibits, however, it may do so at the time it files its opposition brief. Any addendum to the joint appendix shall

PA 0615

be consecutively Bates stamped, beginning at the page number where the joint appendix left off, and shall include a table of contents. Judge Beetlestone will not consider material not included in the appendix.

C.    Statements of Facts

1.   Upon motion for summary judgment, counsel shall also submit a separate Statement of Undisputed Material Facts containing a numbered, paragraph-by-paragraph recitation of facts with specific citations to the joint appendix in support of all of those facts as to which the moving party contends no genuine issue exists.

2.   Counsel opposing a motion for summary judgment shall also submit a separate Statement of Disputed Material Facts, stating in similar paragraph form whether that party accepts or rejects that each fact as stated by the moving party is undisputed. If a party contends that a fact is in dispute, citation must be made to the joint appendix that supports the party's view that that particular fact is in dispute. The party should then list its own additional disputed facts in the same format with specific citations to the joint appendix.

3.   Counsel for the moving party shall then submit—even if not filing a reply brief—a separate Reply Statement of Undisputed Material Facts stating in similar paragraph form whether that party accepts or rejects that each additional fact as stated by the opposing party is disputed. If a party contends that a fact is undisputed, citation must be made to the joint appendix that supports that party's view that the particular fact is undisputed.

3.   For all filings submitted and conferences held pursuant to this scheduling order, and for all pretrial and trial proceedings referred to herein, counsel shall follow Judge Beetlestone's Policies and Procedures, a copy of which can be found online at www.paed.uscourts.gov.

BY THE COURT:

WENDY BEETLESTONE, J.

ENT'D JAN 25 2019

2

SAppx0866

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DR. ORIEN L. TULP, | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. 2:18-cv-05540-WB |
| | ) | |
| v. | ) | Hon. Wendy Beetlestone |
| | ) | |
| EDUCATIONAL COMMISSION FOR | ) | |
| FOREIGN MEDICAL GRADUATES and | ) | |
| DR. WILLIAM W. PINSKY, | ) | |
| | ) | |
| *Defendants.* | ) | |

## DEFENDANT EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES' OBJECTIONS AND RESPONSES TO PLAINTIFF'S DISCOVERY REQUESTS

Pursuant to Federal Rules of Civil Procedure 26, 33, and 34, Defendant Educational Commission for Foreign Medical Graduates ("ECFMG"),[1] by and through its counsel, serves the following responses and objections to Plaintiff Dr. Orien L. Tulp's Interrogatories, Requests for Production of Documents, and Requests for Admissions ("Interrogatories and Requests").

### GENERAL RESPONSES AND OBJECTIONS

1. All of these General Responses and Objections are incorporated into each of the Specific Responses and Objections set forth below. These General Responses and Objections, which form a part of ECFMG's Specific Responses and Objections to each individual Interrogatory and Request, are set forth here to avoid the duplication of restating them in response to each individual Interrogatory. The General Responses and Objections may also be specifically

---

[1] On March 26, 2019, the Court dismissed all claims against Dr. William W. Pinsky. As a result, these Responses and Objections are made by and on behalf of ECFMG only, the sole remaining defendant.

1

SAppx0867

PA 0617

Case 2:18-cv-05540-WB    Document 33-5    Filed 06/03/19    Page 67 of 151

referred to in ECFMG's Specific Responses and Objections to certain of the individual Interrogatories and Requests for purposes of emphasis and clarity. Omission from any Specific Response or Objection, however, should not be construed as a waiver of any General Response or Objection.

2.    ECFMG objects to the Interrogatories and Requests to the extent they seek to impose obligations that are inconsistent with or greater than those imposed by the Federal Rules of Civil Procedure, the Local Rules of the Eastern District of Pennsylvania, and/or the Court's rules and procedures.

3.    Unless ECFMG expressly states otherwise, neither the Requests and Interrogatories nor ECFMG's Responses and Objections to them shall be construed as admissions by ECFMG that any fact or circumstance alleged in any Request or Interrogatory occurred or existed or that Plaintiff's characterization of any facts or circumstances is correct.

4.    ECFMG objects to the Requests and Interrogatories to the extent that they seek information that is immune from disclosure, including information protected by the attorney-client privilege, the attorney work product doctrine, or any other legally cognizable privilege, protection, or immunity. Accordingly, ECFMG will not produce such information. The provision of any information that is privileged, protected, or immune from disclosure would be inadvertent and is not a waiver of any privilege, protection, or immunity.

5.    ECFMG objects to the Interrogatories and Requests as overbroad and unduly burdensome in the instances that Plaintiff has not identified an applicable time period. Where Plaintiff has not identified a time period applicable to a particular Interrogatory and Request, ECFMG will interpret the Interrogatory and Request as requesting information from August 1,

SAppx0868

2018 to December 24, 2018, the date when the Complaint in the Action was filed, unless otherwise stated in a Response or Objection to a particular Request or Interrogatory.

6.     ECFMG objects to the Interrogatories and Requests to the extent that they seek documents and information that are not relevant to the claims or defenses of a party, and/or not proportional to the needs of this case.

7.     ECFMG objects to the Interrogatories and Requests to the extent they seek documents and information not within its possession, custody, or control, or seek documents and information that are already in the possession of Plaintiff or that are equally available to Plaintiff from other sources.

8.     These Responses and Objections reflect ECFMG's present knowledge, information, and belief.  These Responses and Objections are therefore without prejudice to ECFMG's right to supplement, revise, modify, correct, add to, or clarify the Responses and Objections set forth herein and the information provided, should it discover additional documents, information, or grounds for objection.  ECFMG reserves the right to rely on any facts, documents, evidence, or other contentions that may develop or come to its attention at a later time, and to supplement or amend the information contained in these Responses and Objections, including objections, at any time before trial in this Action should additional or different information become available.  Moreover, if ECFMG at any time supplements or amends its Responses and Objections to these Interrogatories and Requests, by agreement or otherwise, ECFMG expressly reserves the right to assert any applicable objection, privilege, or other protection in connection with such supplementation or amendment.

9.     ECFMG objects to the Interrogatories and Requests to the extent that they purport to require ECFMG to undertake more than a reasonable good-faith search for information within

3

its possession, custody, or control responsive to the Interrogatories. ECFMG expressly disclaims any obligation or ability to respond to Requests and Interrogatories with information that is in the possession, custody, or control of Plaintiffs, third-parties, or former employees, except for the period of their employment at ECFMG.

10. ECFMG objects to the Interrogatories and Requests to the extent they seek "all documents," "all written statements," or "all" of any type of material because the burden or expense of such discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues. Representing that "all documents," or "all" of any type of material, falling within a description have been located or identified, rather than documents that have been located or identified after a reasonably diligent search, is not proportional to the needs of the case.

11. ECFMG objects to the Requests to the extent they purport to require ECFMG to engage in the collection or review of electronically stored information ("ESI"). Consistent with the Parties' agreement in the Joint Report of Rule 26(f) Meeting (Dkt. No. 19), ECFMG will not collect or review ESI in order to respond to the Requests.

12. ECFMG further objects to the Interrogatories and Requests as vague and ambiguous to the extent Plaintiff does not identify with any specificity the information and material he seeks. As worded, many of the Interrogatories and Requests are so vague and ambiguous that ECFMG cannot reasonably formulate a response.

13. In making its Objections, ECFMG does not waive, or intend to waive, but rather intends to preserve and is preserving:

    a. All objections as to competency, relevance, materiality, or admissibility;

<div align="center">4</div>

b. All rights to object on any ground to the use of any objections, responses, or answers;

c. All rights to object on any ground to any request for further responses to the Interrogatories or any other Interrogatories; and

d. The right at any time to amend, correct, add to, or clarify any of the responses, objections, or answers found herein.

## SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES

**Interrogatory No. 1:** WITNESSES: State the name and address of any person whom defendant believes may have any knowledge concerning the allegations made in the Complaint of the plaintiff or the defenses made by defendant.

**Response:**

ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or other applicable privileges.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows:

| Name | Address/Contact Information |
|------|----------------------------|
| Kara Corrado | Through ECFMG's Counsel. |
| Lisa Cover | Through ECFMG's Counsel. |
| Dr. Orien L. Tulp | Through Plaintiff's Counsel. |
| USAT Faculty / Employees (current / former) | Through Plaintiff's Counsel. |
| USAT Students (current / former) | Through Plaintiff's Counsel. |

**Interrogatory No. 2:** EVIDENCE: Identify any document, report, writing, statement, item, physical or tangible evidence which is in the possession of defendant or known to defendant, which

5

PA 0621

may be relevant to the allegations made in the Complaint of plaintiff or the defenses made by defendant.

**Response**:

ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG objects to this Interrogatory as overly broad, unduly burdensome, and/or not proportional to the needs of the case because it seeks the identity of "any" evidence "which may be relevant to the allegations made in the Complaint . . . or the defenses made by defendant," without regard for whether such materials are in any way related to the sole remaining due process claim in the Action. ECFMG further objects to this Interrogatory in that Plaintiff does not identify with any specificity the information he seeks. As worded, the Interrogatory is so vague and ambiguous that ECFMG cannot reasonably formulate a response. ECFMG further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or other applicable privileges.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows: ECFMG has already produced (1) the materials ECFMG provided to the Medical Education Credentials Committee in connection with Plaintiff's irregular behavior hearing, (2) the materials ECFMG provided to the Medical Education Credentials Committee in connection with its review of USAT, (3) other documents relating to Plaintiff's irregular behavior hearing, and (4) certain documents pertaining to USAT's sponsor note in the World Directory of Medical Schools. ECFMG also refers to all of the exhibits used or cited in opposition to Plaintiff's Motion for a Preliminary and/or Permanent Injunction and to any YouTube videos posted by USAT and/or in which Plaintiff appears.

SAppx0872

**Interrogatory No. 3:** PHOTOGRAPHS AND DIAGRAMS: Identify any photographs, videotapes, audiotapes, slides, movies, charts or diagrams, which are in the possession of defendants or which are known to defendants.

**Response**:

ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG objects to this Interrogatory as overly broad, unduly burdensome, and/or not proportional to the needs of the case because it seeks the identity of "any" photographs and diagrams "which are in the possession of defendants or which are known to defendants," without regard for whether such materials are in any way related to the sole remaining due process claim in the Action. ECFMG further objects to this Interrogatory to the extent it asks ECFMG to identify documents and information in the possession of Plaintiff or that are equally available to Plaintiff from other sources, including public sources. ECFMG further objects to this Interrogatory in that Plaintiff does not identify with any specificity the information he seeks. As worded, the Interrogatory is so vague and ambiguous that ECFMG cannot reasonably formulate a response. ECFMG further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or other applicable privileges.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows: ECFMG has already produced (1) the materials ECFMG provided to the Medical Education Credentials Committee in connection with Plaintiff's irregular behavior hearing, (2) the materials ECFMG provided to the Medical Education Credentials Committee in connection with its review of USAT, (3) other documents relating to Plaintiff's irregular behavior hearing, and (4) certain documents pertaining to USAT's sponsor note in the World Directory of Medical Schools. ECFMG also refers to all of the exhibits used or cited in opposition to Plaintiff's Motion for a Preliminary and/or Permanent Injunction and to any YouTube videos posted by USAT and/or in which Plaintiff appears.

SAppx0873

**Interrogatory No. 4:** STATEMENTS: Have you or any person acting on your behalf obtained from any person any statement (as defined by the Rules of Civil Procedure) or had any conversation with anyone concerning this action or its subject matter? If so, identify:

      (a)     each such person;

      (b)     when, where, by whom, and to whom each statement was made and whether it was reduced to writing or recorded;

      (c)     any person who has custody of any such statements which was reduced to writing or recorded;

      (d)     attach a copy of the statement.

**Response**:

      ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG objects to this Interrogatory as overly broad, unduly burdensome, and/or not proportional to the needs of the case because it seeks the identity of "any" statement or conversation with unspecified parties "concerning this action or its subject matter," without regard for whether such materials are in any way related to the sole remaining due process claim in the Action. ECFMG further objects to this Interrogatory in that Plaintiff does not identify with any specificity the information he seeks. As worded, the Interrogatory is so vague and ambiguous that ECFMG cannot reasonably formulate a response. ECFMG further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or other applicable privileges.

      Subject to and without waiver of the foregoing objections, ECFMG responds as follows: ECFMG has already produced (1) the materials ECFMG provided to the Medical Education Credentials Committee in connection with Plaintiff's irregular behavior hearing, (2) the materials ECFMG provided to the Medical Education Credentials Committee in connection with its review of USAT, (3) other documents relating to Plaintiff's irregular behavior hearing, and (4) certain documents pertaining to USAT's sponsor note in the World Directory of Medical Schools.

8

PA 0624

ECFMG also refers to all of the exhibits used or cited in opposition to Plaintiff's Motion for a

Preliminary and/or Permanent Injunction and to any YouTube videos posted by USAT and/or in

which Plaintiff appears. .

**Interrogatory No. 5:** <u>EXPERTS</u>: State the name, address and field of expertise of each expert whose testimony you intend to present at the trial of this case. State the subject matter about which the expert is expected to testify, the facts and opinions to which he or she is expected to testify, and a summary of the grounds for each opinion. Identify the expert's publications and previous cases in which the expert has appeared. Attach a copy of any report by the expert and a curriculum vitae.

**Response**:

      ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG

further objects to this Interrogatory to the extent that it seeks information protected by the attorney-

client privilege, the attorney work-product doctrine, or other applicable privileges.

      Subject to and without waiver of the foregoing objections, ECFMG responds as follows:

Plaintiff has not disclosed any expert witnesses, and Plaintiff's counsel represented at the Rule 16

conference that they did not anticipate presenting any expert witnesses. ECFMG reserves the right

to revisit its expert disclosures if something changes.

**Interrogatory No. 6:** <u>INSURANCE</u>: State the policy numbers, insurance company, and amount of coverage of any insurance policy naming a defendant as an insured, or in which a defendant has an insurable interest, or the existence of any insurance policy, which could apply to the claims of the plaintiff, including umbrella, excess, automobile, commercial and homeowner's policies. Attach a "Face Sheet" or equivalent documentation indicating the policy limits of each such insurance coverage. Indicate whether there has been a disclaimer or a reservation of rights by an insurance carrier of defendant.

**Response**:

      ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG

objects to this Interrogatory as vague and ambiguous with respect to the undefined term "Face

Sheet." ECFMG further objects to this Interrogatory to the extent that it seeks information

SAppx0875

PA 0625

protected by the attorney-client privilege, the attorney work-product doctrine, or other applicable privileges.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows: ECFMG is investigating whether any insurance agreements exist under which an insurance business may be liable to satisfy all or part of a possible judgment in the Action or to indemnify or reimburse for payments made to satisfy a possible judgment in the Action. Given the ongoing and continuing nature of this investigation, ECFMG specifically reserves its right to supplement its response to this Interrogatory to reflect additional facts and documents.

**Interrogatory No. 7:** TRIAL WITNESSES: Identify each witness by name and address that defendant intends to call or subpoena at the trial or arbitration of this case.

**Response**:

ECFMG reasserts and incorporates each of the General Objections and Objections to Definitions and Instructions above. ECFMG further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or other applicable privileges. ECFMG further objects to this Interrogatory as it is premature.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows: ECFMG will identify persons who it may call as fact witnesses at trial pursuant to the applicable deadlines scheduled by the Court for such disclosure at the appropriate time.

**Interrogatory No. 8:** TRIAL EVIDENCE: Identify each document, item or exhibit, which defendant intends to use, refer to, mark or introduce into evidence at deposition, trial or arbitration of this case. Attach copies of any documents, photographs or other items which will be used, referred to, or introduced.

**Response**:

ECFMG reasserts and incorporates each of the General Objections above. ECFMG further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client

SAppx0876

PA 0626

privilege, the attorney work-product doctrine, or other applicable privileges. ECFMG further objects to this Interrogatory as it is premature.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows: ECFMG will identify its trial evidence pursuant to the applicable deadlines scheduled by the Court for such disclosure at the appropriate time.

**Interrogatory No. 9:** <u>SOURCES</u>: Identify all persons, documents, and sources of information that were used or consulted in answering this document, other than defendant's counsel.

**<u>Response</u>**:

ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or other applicable privileges.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows: ECFMG used the following sources of information to respond to the Interrogatories:

- Documents already produced by ECFMG, including (1) the materials ECFMG provided to the Medical Education Credentials Committee in connection with Plaintiff's irregular behavior hearing, (2) the materials ECFMG provided to the Medical Education Credentials Committee in connection with its review of USAT, (3) other documents relating to Plaintiff's irregular behavior hearing, and (4) certain documents pertaining to USAT's sponsor note in the World Directory of Medical Schools.
- Exhibits used or cited in connection with Plaintiff's Motion for a Preliminary and/or Permanent Injunction, including YouTube videos posted by USAT and/or in which Plaintiff appears.
- Documents filed in the action.

**Interrogatory No. 10:** <u>DEFENSES</u>: State the factual basis of any defense which defendant has asserted in a pleading, or which defendant intends to assert at trial.

11

**Response**:

ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or other applicable privileges. ECFMG further objects to this Interrogatory to the extent it purports to compel ECFMG to draw legal conclusions in order to respond.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows: The factual basis of ECFMG's defenses may be determined by examining the Background section of ECFMG's Opposition to Plaintiff's Motion for a Preliminary and/or Permanent Injunction, the transcript of the January 24, 2019 injunction hearing before Judge Beetlestone, and the materials that ECFMG has already produced. *See* Dkt. No. 12, Section II.

**Interrogatory No. 11:** CONTRIBUTORY NEGLIGENCE: If defendant alleges contributory negligence by the plaintiff, then state the factual basis for this contention.

**Response**:

ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or other applicable privileges. ECFMG further objects to this Interrogatory to the extent it purports to compel ECFMG to draw legal conclusions in order to respond.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows: ECFMG has not alleged contributory negligence by the Plaintiff and thus will not provide the factual basis for this inapplicable defense.

**Interrogatory No. 12:** DEFENDANT'S VERSION: State briefly defendant's version of the incident described in plaintiff's Complaint, it materially differs from what plaintiff has alleged.

12

**Response**:

ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG objects to this Interrogatory as overly broad, unduly burdensome, and/or not proportional to the needs of the case because it seeks Defendant's version of the incident described in Plaintiff's Complaint, without regard for whether such materials are in any way related to the sole remaining due process claim in the Action. ECFMG further objects to this Interrogatory in that Plaintiff does not identify with any specificity the information he seeks. As worded, the Interrogatory is so vague and ambiguous that ECFMG cannot reasonably formulate a response. ECFMG further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or other applicable privileges.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows: The answer to this Interrogatory may be determined by examining the Background section of ECFMG's Opposition to Plaintiff's Motion for a Preliminary and/or Permanent Injunction, the transcript of the January 24, 2019 injunction hearing before Judge Beetlestone, and the materials that ECFMG has already produced. *See* Dkt. No. 12, Section II.

**Interrogatory No. 13:** DEFENDANT'S FILE: Identify any document, writing or evidence, that is not privileged, which has been obtained by defendant in connection with this lawsuit and has not been previously supplied to plaintiff or by plaintiff, including any document which mentions or refers to the parties, witnesses or the subject matter of this lawsuit, or a defense asserted thereto.

**Response**:

ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG objects to this Interrogatory as overly broad, unduly burdensome, and/or not proportional to the needs of the case because it seeks the identity of "any document, writing or evidence" "which has been obtained by defendant in connection with this lawsuit," without regard for whether such materials are in any way related to the sole remaining due process claim in the Action. ECFMG

13

further objects to this Interrogatory in that Plaintiff does not identify with any specificity the information he seeks. As worded, the Interrogatory is so vague and ambiguous that ECFMG cannot reasonably formulate a response. ECFMG further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or other applicable privileges.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows: To the extent that this Interrogatory calls for properly discoverable information, such information would be subsumed within Plaintiff's other, more specific discovery requests.

**Interrogatory No. 14:** LIABILITY BY ANOTHER: If defendant maintains that someone or some entity, who is not a party to this lawsuit, may be liable to plaintiff, then fully identify that person or entity, and state the factual basis for the alleged liability.

**Response:**

ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or other applicable privileges. ECFMG further objects to this Interrogatory to the extent it purports to compel ECFMG to draw legal conclusions in order to respond.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows: Plaintiff is responsible for the consequences of his own actions, including providing false information to ECFMG.

**Interrogatory No. 15:** DESIGNATION OF DEFENDANT: If it is maintained that defendant has been improperly named or designated in this lawsuit, state the correct name of defendant and indicate whether defendant will stipulate to amend the Complaint to reflect the correct name. Has defendant's insurance carrier indicated that insurance coverage is not applicable based on an improper designation of defendant in this lawsuit?

14

**Response**:

ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or other applicable privileges.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows: ECFMG previously moved for the dismissal of Dr. William W. Pinsky as a defendant in this Action. The Court granted ECFMG's motion in part and dismissed the sole claim against Dr. Pinsky on March 26, 2019. Dkt. No. 29. Moreover, ECFMG is not properly a defendant in this lawsuit, and all claims against ECFMG fail as a matter of law.

**Interrogatory No. 16:** PRIVILEGED MATERIAL: Identify any terms or material relevant to this lawsuit which defendant has not supplied, because defendant believes that such material is privileged, confidential or not subject to discovery, except material generated by counsel, and the legal basis for withholding the material.

**Response**:

ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG objects to this Interrogatory as overly broad, unduly burdensome, and/or not proportional to the needs of the case because it seeks the identity of "any" material relevant to this lawsuit, without regard for whether such materials are in any way related to the sole remaining due process claim in the Action. ECFMG further objects to this Interrogatory in that Plaintiff does not identify with any specificity the information he seeks. As worded, the Interrogatory is so vague and ambiguous that ECFMG cannot reasonably formulate a response. ECFMG further objects to this Interrogatory to the extent it seeks to impose obligations that are inconsistent with or greater than those imposed by the Federal Rules of Civil Procedure, the Local Rules of the Eastern District of Pennsylvania, and/or the Court's rules and procedures. ECFMG further objects to this Interrogatory to the extent

15

that it seeks information protected by the attorney-client privilege, the attorney work-product

doctrine, or other applicable privileges.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows:

ECFMG is open to meeting and conferring with Plaintiff regarding a mutual exchange of privilege

logs, if any.

## SPECIFIC RESPONSES AND OBJECTIONS TO
## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.      TRIAL, DEPOSITION OR ARBITRATION EVIDENCE. All documents, exhibits, items
or evidence of any type which defendant intends to use, refer to, mark or introduce at deposition,
arbitration, or trial of this case. Please list any evidentiary material which defendant has or is
supplying to plaintiffs. **Plaintiffs will object to any evidence, which defense counsel has not
sent directly to plaintiffs' counsel in discovery in a timely manner, including documents
obtained from third parties by subpoena or request to produce. This request for production
is a continuing request, which requires defendant through defense counsel, to supplement
their answers and produce directly to plaintiffs' counsel in a timely manner, any evidence
received after defendant's response herein.**

**Response**:

ECFMG reasserts and incorporates the General Objections as set forth above.  ECFMG

objects to this Request to the extent it seeks information that is in the possession, custody, or

control of Plaintiff.  ECFMG further objects to this Request to the extent that it seeks information

or documents that are protected from disclosure by the attorney-client privilege and/or the work-

product doctrine.  ECFMG further objections to this Request to the extent it seeks to impose

obligations that are inconsistent with or greater than those imposed by the Federal Rules of Civil

Procedure, the Local Rules of the Eastern District of Pennsylvania, and/or the Court's rules and

procedures.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows:

ECFMG has already produced (1) the materials ECFMG provided to the Medical Education

Credentials Committee in connection with Plaintiff's irregular behavior hearing, (2) the materials

16

ECFMG provided to the Medical Education Credentials Committee in connection with its review of USAT, (3) other documents relating to Plaintiff's irregular behavior hearing, and (4) certain documents pertaining to USAT's sponsor note in the World Directory of Medical Schools. ECFMG specifically reserves the right to use any materials that are in the public domain or that are in the possession, custody, or control of Plaintiff, have been used at any hearing or in connection with any briefing in this Action, or that have otherwise been produced in connection with the Action. ECFMG will provide its trial exhibit list pursuant to the applicable deadlines scheduled by the Court for such disclosure at the appropriate time.

2.      PHOTOGRAPHS: All photographs and diagrams of any person, place or thing which is directly or indirectly related to the incident set forth in the plaintiff's Complaint, or in defendant's response.

**Response**:

ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG objects to this Request as overly broad, unduly burdensome, and/or not proportional to the needs of the case because it seeks the production of "all" photographs and diagrams "directly or indirectly related to the incident set forth in the plaintiff's Complaint," without regard for whether such materials are in any way related to the sole remaining due process claim in the Action. ECFMG further objects to this Request in that Plaintiff does not identify with any specificity the materials he seeks. As worded, the Request is so vague and ambiguous that ECFMG cannot reasonably formulate a response. ECFMG further objects to this Request to the extent it seeks information that is in the possession, custody, or control of Plaintiff. ECFMG further objects to this Request to the extent that it seeks information or documents that are protected from disclosure by the attorney-client privilege and/or the work-product doctrine.

17

Subject to and without waiver of the foregoing objections, ECFMG responds as follows: To the extent that this Request calls for properly discoverable documents, such documents would be subsumed within Plaintiff's other, more specific discovery requests.

3.    <u>STATEMENTS</u>: All written statements (signed or unsigned), descriptions of statements, records and written accounts of investigations relating to this lawsuit.

**Response:**

ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG objects to this Request as overly broad, unduly burdensome, and/or not proportional to the needs of the case because it seeks the production of "all" written statements, descriptions of statements, records, and written accounts "relating to this lawsuit," without regard for whether such materials are in any way related to the sole remaining due process claim in the Action. ECFMG further objects to this Request in that Plaintiff does not identify with any specificity the materials he seeks. As worded, the Request is so vague and ambiguous that ECFMG cannot reasonably formulate a response. ECFMG further objects to this Request to the extent it seeks information that is in the possession, custody, or control of Plaintiff. ECFMG further objects to this Request to the extent that it seeks information or documents that are protected from disclosure by the attorney-client privilege and/or the work-product doctrine.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows: ECFMG has already produced (1) the materials ECFMG provided to the Medical Education Credentials Committee in connection with Plaintiff's irregular behavior hearing, (2) the materials ECFMG provided to the Medical Education Credentials Committee in connection with its review of USAT, (3) other documents relating to Plaintiff's irregular behavior hearing, and (4) certain documents pertaining to USAT's sponsor note in the World Directory of Medical Schools. ECFMG specifically reserves the right to use any materials that are in the public domain or that

18

are in the possession, custody, or control of Plaintiff, have been used at any hearing or in connection with any briefing in this Action, or that have otherwise been produced in connection with the Action.

4.    WITNESS DOCUMENTS: Any documents or writings, which mention or refer to the parties in this lawsuit or any witness in this lawsuit, including **all medical records obtained by the defendant,** which refer to plaintiffs or the incident involving plaintiffs, or to defendant or the incident involving defendant.

**Response:**

ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG objects to this Request as overly broad, unduly burdensome, and/or not proportional to the needs of the case because it seeks the production of any materials "which mention or refer to the parties in this lawsuit or any witness in this lawsuit," "plaintiffs or the incident involving plaintiffs, or to defendant or the incident involving defendant," without regard for whether such materials are in any way related to the sole remaining due process claim in the Action. ECFMG further objects to this Request in that Plaintiff does not identify with any specificity the materials he seeks. As worded, the Request is so vague and ambiguous that ECFMG cannot reasonably formulate a response. ECFMG further objects to this Request to the extent it seeks information that is in the possession, custody, or control of Plaintiff. ECFMG further objects to this Request to the extent that it seeks information or documents that are protected from disclosure by the attorney-client privilege and/or the work-product doctrine. ECFMG further objects to this Request to the extent that it is not tailored to the facts or circumstances of the Action.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows: ECFMG has already produced (1) the materials ECFMG provided to the Medical Education Credentials Committee in connection with Plaintiff's irregular behavior hearing, (2) the materials ECFMG provided to the Medical Education Credentials Committee in connection with its review

19

PA 0635

of USAT, (3) other documents relating to Plaintiff's irregular behavior hearing, and (4) certain

documents pertaining to USAT's sponsor note in the World Directory of Medical Schools.

ECFMG specifically reserves the right to use any materials that are in the public domain or that

are in the possession, custody, or control of Plaintiff, have been used at any hearing or in

connection with any briefing in this Action, or that have otherwise been produced in connection

with the Action.

5.    INSURANCE: The "face-sheet" of any insurance policies, including excess or umbrella
policies, under which the defendant was an insured or had an insurable interest on or about the
time of the incident described in the Complaint by the plaintiffs, including the policy limits of all
insurance policies, and any supporting documentation if there is a reservation of rights or
disclaimer by an insurance carrier.

**Response:**

ECFMG reasserts and incorporates the General Objections as set forth above.  ECFMG

objects to this Request as vague and ambiguous with respect to the undefined term "face-sheet."

ECFMG further objects to this Request to the extent that it seeks information protected by the

attorney-client privilege, the attorney work-product doctrine, or other applicable privileges.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows:

ECFMG is investigating whether any insurance agreements exist under which an insurance

business may be liable to satisfy all or part of a possible judgment in the Action or to indemnify

or reimburse for payments made to satisfy a possible judgment in the Action.  Given the ongoing

and continuing nature of this investigation, ECFMG specifically reserves its right to supplement

its response to this Request to reflect additional facts and documents.

6.    DOCUMENTS AND TANGIBLE EVIDENCE: All writings, items, memoranda, data and
tangible things which relate directly or indirectly to the incident set forth in the plaintiff's
Complaint or to the answer to a Complaint or to any defenses asserted in this lawsuit. List and
describe any items which can not be photocopied.

SAppx0886

**Response**:

ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG objects to this Request as overly broad, unduly burdensome, and/or not proportional to the needs of the case because it seeks the production of "all" documents and tangible evidence "which relate directly or indirectly to the incident set forth in the plaintiff's Complaint," to the answer, or to any defenses asserted in this lawsuit, without regard for whether such materials are in any way related to the sole remaining due process claim in the Action. ECFMG further objects to this Request in that Plaintiff does not identify with any specificity the materials he seeks. As worded, the Request is so vague and ambiguous that ECFMG cannot reasonably formulate a response. ECFMG further objects to this Request to the extent it seeks information that is in the possession, custody, or control of Plaintiff. ECFMG further objects to this Request to the extent that it seeks information or documents that are protected from disclosure by the attorney-client privilege and/or the work-product doctrine.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows: ECFMG has already produced (1) the materials ECFMG provided to the Medical Education Credentials Committee in connection with Plaintiff's irregular behavior hearing, (2) the materials ECFMG provided to the Medical Education Credentials Committee in connection with its review of USAT, (3) other documents relating to Plaintiff's irregular behavior hearing, and (4) certain documents pertaining to USAT's sponsor note in the World Directory of Medical Schools. ECFMG specifically reserves the right to use any materials that are in the public domain or that are in the possession, custody, or control of Plaintiff, have been used at any hearing or in connection with any briefing in this Action, or that have otherwise been produced in connection with the Action.

21

PA 0637

7.    EVIDENCE IN POSSESSION OF DEFENDANT: Produce any item, (or identify any item which can not be produced) material or tangible evidence in the possession of defendant or defendant's agents, which is not privileged, which may lead to discoverable evidence in this lawsuit, or which is relevant to a claim, defense or the subject matter of this lawsuit, including but not limited to, any photographs, statements, contracts, accident reports, letters, diagrams, manuals, memos, rules or regulations, investigation reports, agreements, models, tapes, personnel files, or computer-generated material.

**Response**:

ECFMG reasserts and incorporates the General Objections as set forth above.  ECFMG objects to this Request as overly broad, unduly burdensome, and/or not proportional to the needs of the case because it seeks the production of any evidence in possession of Defendant, without regard for whether such materials are in any way related to the sole remaining due process claim in the Action.  ECFMG objects to this Request to the extent it seeks information that is in the possession, custody, or control of Plaintiff.  ECFMG further objects to this Request to the extent that it seeks information or documents that are protected from disclosure by the attorney-client privilege and/or the work-product doctrine.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows: To the extent that this Request calls for properly discoverable documents, such documents would be subsumed within Plaintiff's other, more specific discovery requests.

8.    SUBPOENAS AND DOCUMENT REQUESTS: Copies of all subpoenas and request for production issued by defendant or its agents in relation to this case, including witness or deposition subpoenas, and subpoenas requesting records or documents.

**Response**:

ECFMG reasserts and incorporates the General Objections as set forth above.  ECFMG objects to this Request to the extent it seeks information that is in the possession, custody, or control of Plaintiff.  ECFMG further objects to this Request to the extent that it seeks information or documents that are protected from disclosure by the attorney-client privilege and/or the work-product doctrine.

22

PA 0638

Subject to and without waiver of the foregoing objections, ECFMG responds as follows:

ECFMG has already served Plaintiff with (1) Defendants' First Set of Interrogatories and First Set

of Requests for Production of Documents to Dr. Orien L. Tulp, (2) a Notice of Deposition of

Plaintiff Dr. Orien L. Tulp, and (3) a Subpoena to Testify at a Deposition to Carla Konyk Tulp

(which was later withdrawn).

## SPECIFIC RESPONSES AND OBJECTIONS TO REQUESTS FOR ADMISSIONS WITH SUPPLEMENTAL INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

1. **Admission**: Defendants have in their possession or in the possession of their employees, the complete file of Tony Brown.

1(a). If the answer to the proceeding request for admissions is anything other than an unqualified "admitted," state all facts upon which the answer is based. Produce and attach copies of any documents, evidence or items reviewed, or relied upon, in your answer.

**Response**:

ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG

further objects to this Request on the grounds that it is vague, ambiguous, and lacking particularity

as it does not define the term "complete file" or specifically identify the individual referred to as

"Tony Brown." ECFMG further objects to this Request as overly broad, unduly burdensome,

and/or not proportional to the needs of the case because it seeks information on an individual who

has never been mentioned in this Action before, without regard for whether such individual is

related to the sole remaining due process claim in the Action. ECFMG further objects to this

Request to the extent it purports to be more than a Request for Admission. ECFMG further objects

to this Request to the extent that it seeks information or documents that are protected from

disclosure by the attorney-client privilege and/or the work-product doctrine.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows:

Following a reasonable inquiry, ECFMG lacks sufficient information to admit or deny this Request

PA 0639

because (1) the Request is unclear insofar as the term "complete file" is undefined and capable of multiple, inconsistent meanings, (2) the Request does not identify "Tony Brown" with specificity, and (3) the Request appears to be irrelevant to the sole remaining due process claim in the Action.

2.      **Admission**: List all schools that the ECFMG have brought charges against, from 1903 to the present time and the allegations against them

2(a).    If the answer to the proceeding request for admissions is anything other than an unqualified "admitted," state all facts upon which the answer is based. Produce and attach copies of any documents, evidence or items reviewed, or relied upon, in your answer.

**Response**:

ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG further objects to this Request as overly broad, unduly burdensome, and/or not proportional to the needs of the case because it seeks information extending over more than a one-hundred-year time period, without regard for whether such information is related to the sole remaining due process claim in the Action. ECFMG further objects to this Request as stated because it is an interrogatory, and not a proper request for admission, and therefore the Request is nonsensical. ECFMG further objects to this Request to the extent it purports to be more than a Request for Admission. ECFMG further objects to this Request to the extent that it seeks information or documents that are protected from disclosure by the attorney-client privilege and/or the work-product doctrine.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows: ECFMG applies the "irregular behavior" standard to individuals, not institutions. This is evident from the definition of "Irregular behavior" in ECFMG's Policies and Procedures Regarding Irregular Behavior. *See* Dkt. No. 12-3 at 27.

SAppx0890

3. **Admission**: Kara Corrado is not an attorney.

3(a). If the answer to the proceeding request for admissions is anything other than an unqualified "admitted," state all facts upon which the answer is based. Produce and attach copies of any documents, evidence or items reviewed, or relied upon, in your answer.

**Response**:

ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG

objects to this Request to the extent it seeks information that is in the possession, custody, or

control of Plaintiff. ECFMG further objects to this Request to the extent it purports to be more

than a Request for Admission. ECFMG further objects to this Request to the extent that it seeks

information or documents that are protected from disclosure by the attorney-client privilege and/or

the work-product doctrine.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows:

Admitted. Kara Corrado has a Juris Doctor degree and is not a practicing attorney. *See* Jan. 24,

2019 Hr'g Tr. 36:12-15.

4. **Admission**: The term "campus" is not defined by the ECFMG.

4(a). If the answer to the proceeding request for admissions is anything other than an unqualified "admitted," state all facts upon which the answer is based. Produce and attach copies of any documents, evidence or items reviewed, or relied upon, in your answer.

**Response**:

ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG

further objects to this Request as overly broad, unduly burdensome, and/or not proportional to the

needs of the case because it seeks information, without regard for whether such information is

related to the sole remaining due process claim in the Action. ECFMG further objects to this

Request to the extent it purports to be more than a Request for Admission. ECFMG further objects

to this Request to the extent that it seeks information or documents that are protected from

disclosure by the attorney-client privilege and/or the work-product doctrine.

25

Subject to and without waiver of the foregoing objections, ECFMG responds as follows: Denied. ECFMG uses the word campus in its common parlance. ECFMG directs Plaintiff to the Merriam-Webster Dictionary for the definition of campus: "(1) the grounds and buildings of a university, college, or school"; "(2) a university, college, or school viewed as an academic, social, or spiritual entity"; "(3) grounds that resemble a campus." This is the same common meaning with which Dr. Tulp has used the word "campus" prior to this litigation. *See* Dkt. No. 12 at 8 nn.4-5; Dkt. No. 12-6; Jan. 24, 2019 Hr'g Tr. 79:21-24, 87:1-8.

5.    **Admission**: "Irregular behavior" is a term that is used for actions that are not in accordance with the policies of the ECFMG.

5(a).    If the answer to the proceeding request for admissions is anything other than an unqualified "admitted," state all facts upon which the answer is based. Produce and attach copies of any documents, evidence or items reviewed, or relied upon, in your answer.

**Response**:

ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG further objects to this Request as overly broad, unduly burdensome, and/or not proportional to the needs of the case because it seeks information, without regard for whether such information is related to the sole remaining due process claim in the Action. ECFMG further objects to this Request to the extent it purports to be more than a Request for Admission. ECFMG further objects to this Request to the extent that it seeks information or documents that are protected from disclosure by the attorney-client privilege and/or the work-product doctrine.

Subject to and without waiver of these objections, ECFMG responds as follows: ECFMG admits in part this Request, as actions that are not in accordance with the policies of ECFMG can constitute "Irregular behavior," although this is not a complete definition. By way of further response, ECFMG directs Plaintiff to the definition of "Irregular behavior" in its Policies and Procedures Regarding Irregular Behavior, which ECFMG has previously provided to Plaintiff:

26

PA 0642

"*Irregular behavior* includes all actions or attempted actions on the part of applicants, examinees, potential applicants, others when solicited by an applicant and/or examinee, or any other person that would or could subvert the examination, certification or other processes, programs or services of ECFMG, including, but not limited to, the ECFMG Exchange Visitor Sponsorship Program, ECFMG International Credentials Services (EICS), the Electronic Portfolio of International Credentials (EPIC), and Electronic Residency Application Service (ERAS) Support Services at ECFMG. Such actions or attempted actions are considered irregular behavior, regardless of when the irregular behavior occurs, and regardless of whether the individual is certified by ECFMG. Examples of irregular behavior include, but are not limited to, submission of any falsified or altered document to ECFMG, whether submitted by the individual or by a third party, such as a medical school, on behalf of the individual; failing to comply with United States Medical Licensing Examination or ECFMG policies, procedures, and/or rules; falsification of information on applications, submissions, or other materials to ECFMG; taking an examination when not eligible to do so, or submission of any falsified or altered ECFMG document to other entities or individuals."

*See* Dkt. No. 12-3 at 27.

6.    **Admission**: "Irregular behavior" is directed to individuals who are involved in the process of application for ECFMG certification.

6(a).    If the answer to the proceeding request for admissions is anything other than an unqualified "admitted," state all facts upon which the answer is based. Produce and attach copies of any documents, evidence or items reviewed, or relied upon, in your answer.

**Response**:

ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG further objects to this Request as overly broad, unduly burdensome, and/or not proportional to the needs of the case because it seeks information, without regard for whether such information is related to the sole remaining due process claim in the Action. ECFMG further objects to this Request to the extent it purports to be more than a Request for Admission. ECFMG further objects to this Request to the extent that it seeks information or documents that are protected from disclosure by the attorney-client privilege and/or the work-product doctrine.

Subject to and without waiver of these objections, ECFMG responds as follows: ECFMG admits in part this Request, as "Irregular behavior" can be "directed to individuals who are

SAppx0893

involved in the process of application for ECFMG certification," although this is not a complete

list of those who ECFMG may find to have engaged in irregular behavior. By way of further

response, ECFMG directs Plaintiff to the definition of "Irregular behavior" in its Policies and

Procedures Regarding Irregular Behavior, which ECFMG has previously provided to Plaintiff:

> "*Irregular behavior* includes all actions or attempted actions on the part of
> applicants, examinees, potential applicants, others when solicited by an applicant
> and/or examinee, or **any other person** that would or could subvert the examination,
> certification or other processes, programs or services of ECFMG, . . ."

*See* Dkt. No. 12-3 at 27 (emphasis added).

7. **Admission**: If a foreign medical student or graduate does not obtain certification by
ECFMG, it would be difficult for that person to practice medicine in the United States.

7(a). If the answer to the proceeding request for admissions is anything other than an unqualified
"admitted," state all facts upon which the answer is based. Produce and attach copies of any
documents, evidence or items reviewed, or relied upon, in your answer.

**Response**:

ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG

further objects to this Request as overly broad, unduly burdensome, and/or not proportional to the

needs of the case because it seeks information, without regard for whether such information is

related to the sole remaining due process claim in the Action. ECFMG further objects to this

Request because it requires knowledge and information outside of ECFMG's present possession,

custody, or control. ECFMG further objcets to this Request as vague and ambiguous to the extent

it uses the undefined term "difficult," which may have multiple conflicting meanings. ECFMG

further objects to this Request as vague and ambiguous to the extent it asks ECFMG to opine on

the difficulty a hypothetical foreign medical student or graduate with unstated credentials or

abilities may have in practicing medicine in the United States. ECFMG further objects to this

Request to the extent it purports to be more than a Request for Admission. ECFMG further objects

28

to this Request to the extent that it seeks information or documents that are protected from disclosure by the attorney-client privilege and/or the work-product doctrine.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows: ECFMG is not able to admit or deny the Request as phrased because it seeks an admission regarding the difficulties that may be faced by a hypothetical foreign medical student or graduate with unstated credentials or abilities. By way of further response, ECFMG does not control the various third parties (*e.g.*, ACGME, state medical licensing boards) who exercise their discretion in choosing what weight (if any) to afford ECFMG certification.

8.     **Admission**: The effort of the committee who heard the allegations against Dr. Tulp was not a committee where things were submitted as evidence, but basically a proceeding where Dr. Tulp has an opportunity to make a statement on his behalf.

8(a).     If the answer to the proceeding request for admissions is anything other than an unqualified "admitted," state all facts upon which the answer is based. Produce and attach copies of any documents, evidence or items reviewed, or relied upon, in your answer.

**Response**:

ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG further objects to this Request to the extent it is vague, compound, ambiguous, and lacking particularity because of the undefined terms "the effort of the committee," and "submitted as evidence." ECFMG further objects to this Request to the extent it purports to be more than a Request for Admission. ECFMG further objects to this Request to the extent that it seeks information or documents that are protected from disclosure by the attorney-client privilege and/or the work-product doctrine.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows: ECFMG denies the Request as stated. ECFMG directs Plaintiff to ECFMG's Policies and Procedures Regarding Irregular Behavior, which provides that an individual charged with alleged irregular behavior is given "an opportunity to provide written explanation and to present other

29

PA 0645

relevant information" to the Medical Education Credentials Committee and "may also request the opportunity to appear personally" before the Committee, "and may be represented by legal counsel." ECFMG also directs Plaintiff to the transcript of the hearing on Plaintiff's Motion for a Preliminary and/or Permanent Injunction, during which Kara Corrado testified that although there is not a process during which documents are introduced as evidence at the hearing, the Committee considers evidence that is provided to it and the individual before the hearing. Jan. 24, 2019 Hr'g Tr. 23:8–17, 26: 24–27:10, 28:18–29:3.

9.     **Admission**: In 2018, ECFMG determined that Dr. Tulp engaged in "irregular behavior" in connection with providing false information to the ECFMG.

9(a).    If the answer to the proceeding request for admissions is anything other than an unqualified "admitted," state all facts upon which the answer is based. Produce and attach copies of any documents, evidence or items reviewed, or relied upon, in your answer.

**Response**:

ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG objects to this Request to the extent it seeks information that is in the possession, custody, or control of Plaintiff. ECFMG further objects to this Request to the extent it purports to be more than a Request for Admission. ECFMG further objects to this Request to the extent that it seeks information or documents that are protected from disclosure by the attorney-client privilege and/or the work-product doctrine.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows: Admitted.

10.    **Admission**: The WDMS, the World Directory of Medical Schools, is a Directory that ECFMG co-sponsors and has an office in the same building as ECFMG.

10(a).   If the answer to the proceeding request for admissions is anything other than an unqualified "admitted," state all facts upon which the answer is based. Produce and attach copies of any documents, evidence or items reviewed, or relied upon, in your answer.

**Response**:

SAppx0896

ECFMG reasserts and incorporates the General Objections as set forth above. ECFMG further objects to this Request to the extent it is vague, compound, ambiguous, and lacking particularity because of the undefined term "co-sponsors," and ECFMG objects to Plaintiff's characterization of the term "co-sponsors." For purposes of responding to this Request, ECFMG interprets the term "co-sponsor" to mean "sponsor" as that term is used in the ECFMG Information Booklet. *See* Dkt. No. 12-4 at 5. ECFMG further objects to this Request to the extent it purports to be more than a Request for Admission. ECFMG further objects to this Request because it requires knowledge and information outside of ECFMG's present possession, custody, or control.

Subject to and without waiver of the foregoing objections, ECFMG responds as follows: ECFMG admits that it is one of several organizations that "sponsor" the WDOMS. ECFMG denies that the WDOMS has an office in the same building as ECFMG.

DATED:  April 24, 2019

/s/ Elisa P. McEnroe
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:     +1.215.963.5917
Facsimile:     +1.215.963.5001
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorney for the Educational Commission for Foreign Medical Graduates*

31

Case 2:18-cv-05540-WB    Document 33-5    Filed 06/03/19    Page 97 of 151

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2019, a copy of the foregoing was served via electronic and/or regular mail on all counsel of record.

/s/ Elisa P. McEnroe
Elisa P. McEnroe

SAppx0898

PA 0648

LAW OFFICES OF WILLIAM C. REIL
BY: William C. Reil, Esquire
Identification No. 26833
1515 Market Street, Suite 1200
Philadelphia, PA 19102
215-564-1635                ATTORNEY FOR PLAINTIFF

| | |
|---|---|
| DR. ORIEN L. TULP | : UNITED STATES DISTRICT |
| President of the | : COURT FOR THE EASTERN |
| University of Science, Arts, and Technology | : DISTRICT OF PENNSYLVANIA |
| 4288 Youngfield Street | : |
| Wheat Ridge, CO 80033 | : CIVIL ACTION NO. |
| vs. | : |
| EDUCATIONAL COMMISSION FOR | : |
| FOREIGN MEDICAL GRADUATES | : |
| 3624 Market Street | : |
| Philadelphia, PA 19104 | : |
| and | : |
| DR. WILLIAM W. PINSKY, PRESIDENT | : |
| AND CEO | : |
| Educational Commission for | : |
| Foreign Medical Graduates | : |
| 3624 Market Street | : |
| Philadelphia, PA 19104 | : JURY TRIAL DEMANDED |

## PLAINTIFFS' REQUEST FOR ADMISSIONS WITH SUPPLEMENTAL INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS DIRECTED TO ALL DEFENDANTS

Plaintiffs, by their undersigned attorney, hereby serves upon all defendants, this Request for Admissions with Interrogatories and Request for Production of Documents, pursuant to the Pennsylvania of Civil Procedure. Each matter set forth herein in the Request for Admissions shall be deemed admitted, unless you serve an answer or objection upon counsel within thirty (30) days of service hereof, or within forty-five (45) days from the date of service of original process.

    1.     **Admission:** Defendants have in their possession or in the possession of their employees, the complete file of Tony Brown.

    1(a).    If the answer to the proceeding request for admissions is anything other than an unqualified "admitted," state all facts upon which the answer is based. Produce and attach copies of any documents, evidence or items reviewed, or relied upon, in your answer.

2. **Admission:** List all schools that the ECFMG have brought charges against, from 1903 to the present time and the allegations against them

2(a). If the answer to the proceeding request for admissions is anything other than an unqualified "admitted," state all facts upon which the answer is based. Produce and attach copies of any documents, evidence or items reviewed, or relied upon, in your answer.

3. **Admission:** Kara Corrado is not an attorney.

3(a). If the answer to the proceeding request for admissions is anything other than an unqualified "admitted," state all facts upon which the answer is based. Produce and attach copies of any documents, evidence or items reviewed, or relied upon, in your answer.

4. **Admission:** The term "campus" is not defined by the ECFMG.

4(a). If the answer to the proceeding request for admissions is anything other than an unqualified "admitted," state all facts upon which the answer is based. Produce and attach copies of any documents, evidence or items reviewed, or relied upon, in your answer.

5. **Admission:** "Irregular behavior" is a term that is used for actions that are not in accordance with the policies of the ECFMG.

5(a). If the answer to the proceeding request for admissions is anything other than an unqualified "admitted," state all facts upon which the answer is based. Produce and attach copies of any documents, evidence or items reviewed, or relied upon, in your answer.

6. **Admission:** "Irregular behavior" is directed to individuals who are involved in the process of application for ECFMG certification.

6(a). If the answer to the proceeding request for admissions is anything other than an unqualified "admitted," state all facts upon which the answer is based. Produce and attach copies of any documents, evidence or items reviewed, or relied upon, in your answer.

7. **Admission:** If a foreign medical student or graduate does not obtain certification by ECFMG, it would be difficult for that person to practice medicine in the United States.

7(a). If the answer to the proceeding request for admissions is anything other than an unqualified "admitted," state all facts upon which the answer is based. Produce and attach copies of any documents, evidence or items reviewed, or relied upon, in your answer.

8.     **Admission:** The effort of the committee who heard the allegations against Dr. Tulp was not a committee where things were submitted as evidence, but basically a proceeding where Dr. Tulp has an opportunity to make a statement on his behalf.

8(a).  If the answer to the proceeding request for admissions is anything other than an unqualified "admitted," state all facts upon which the answer is based. Produce and attach copies of any documents, evidence or items reviewed, or relied upon, in your answer.

9.     **Admission:** In 2018, ECFMG determined that Dr. Tulp engaged in "irregular behavior" in connection with providing false information to the ECFMG.

9(a).  If the answer to the proceeding request for admissions is anything other than an unqualified "admitted," state all facts upon which the answer is based. Produce and attach copies of any documents, evidence or items reviewed, or relied upon, in your answer.

10.    **Admission:** The WDMS, the World Directory of Medical Schools, is a Directory that ECFMG co-sponsors and has an office in the same building as ECFMG.

10(a). If the answer to the proceeding request for admissions is anything other than an unqualified "admitted," state all facts upon which the answer is based. Produce and attach copies of any documents, evidence or items reviewed, or relied upon, in your answer.

Respectfully submitted,

William C. Reil

William C. Reil
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the attached document (s) was served upon all

other parties or their counsel of record by:

| | |
|---|---|
| _____ | Regular First Class Mail |
| _____X_____ | Electronic Mail |
| _____ | Certified Mail |
| _____ | Hand-Delivered |
| _____ | Electronic Filing |
| _____ | Federal Express |

William C. Reil, Esquire
Attorney for Plaintiff
1515 Market Street, Suite 1200
Philadelphia, PA 19102
215-564-1635
ID: 26833
03/22/19

LAW OFFICES OF WILLIAM C. REIL
BY: William C. Reil, Esquire
Identification No. 26833
1515 Market Street, Suite 1200
Philadelphia, PA 19102
215-564-1635                                    ATTORNEY FOR PLAINTIFF

| | | |
|---|---|---|
| Dr. Orien L. Tulp | : | UNITED STATES DISTRICT |
| President of the | : | COURT FOR THE EASTERN |
| University of Science, Arts, | : | DISTRICT OF PENNSYLVANIA |
| and Technology | : | |
| 4288 Youngfield Street | : | |
| Wheat Ridge, CO 80033 | : | CIVIL ACTION NO. |
| vs. | : | |
| Educational Commission for | : | |
| Foreign Medical Graduates | : | |
| 3624 Market Street | : | |
| Philadelphia, PA 19104 | : | |
| and | : | |
| Dr. William W. Pinsky | : | |
| President and CEO | : | |
| Educational Commission for | : | |
| Foreign Medical Graduates | : | |
| 3624 Market Street | : | |
| Philadelphia, PA 19104 | : | JURY TRIAL DEMANDED |

## PLAINTIFFS' INTERROGATORIES ADDRESSED TO ALL DEFENDANTS

Plaintiffs, by the undersigned attorney, hereby serve upon all defendants these

Interrogatories, pursuant to the Federal Rules of Civil Procedure. You are hereby

notified to Answer the following Interrogatories within thirty (30) days from the date

hereof. These Interrogatories are continuing. You are, therefore, also notified to

supplement or amend your answers promptly upon discovery of information that any

answers are inaccurate or incomplete. The term "Defendant," for the purposes of these

Interrogatories, includes the agents, servants and employees of all defendants in this

lawsuit.

Case 2:18-cv-05540-WB    Document 33-5    Filed 06/03/19    Page 103 of 151

## PLAINTIFFS' INTERROGATORIES ADDRESSED TO ALL DEFENDANTS

1. <u>WITNESSES</u>:   State the name and address of any person whom defendant believes may have any knowledge concerning the allegations made in the Complaint of the plaintiff or the defenses made by defendant.

2. <u>EVIDENCE</u>:   Identify any document, report, writing, statement, item, physical or tangible evidence which is in the possession of defendant or known to defendant, which may be relevant to the allegations made in the Complaint of plaintiff or the defenses made by defendant.

3. <u>PHOTOGRAPHS AND DIAGRAMS</u>:   Identify any photographs, videotapes, audiotapes, slides, movies, charts or diagrams, which are in the possession of defendants or which are known to defendants.

4. <u>STATEMENTS</u>: Have you or any person acting on your behalf obtained from any person any statement (as defined by the Rules of Civil Procedure) or had any conversation with anyone concerning this action or its subject matter? If so, identify:

    (a) each such person;

    (b) when, where, by whom, and to whom each statement was made and whether it was reduced to writing or recorded;

    (c) any person who has custody of any such statements which was reduced to writing or recorded;

    (d) attach a copy of the statement.

5. <u>EXPERTS</u>: State the name, address and field of expertise of each expert whose testimony you intend to present at the trial of this case. State the subject matter about which the expert is expected to testify, the facts and opinions to which he or she is expected to testify, and a summary of the grounds for each opinion. Identify the expert's publications and previous cases in which the expert has appeared. Attach a copy of any report by the expert and a curriculum vitae.

6.    <u>INSURANCE</u>:   State the policy numbers, insurance company, and amount of coverage of any insurance policy naming a defendant as an insured, or in which a defendant has an insurable interest, or the existence of any insurance policy, which could apply to the claims of the plaintiff, including umbrella, excess, automobile, commercial and homeowner's policies. Attach a "Face Sheet" or equivalent documentation indicating the policy limits of each such insurance coverage. Indicate whether there has been a disclaimer or a reservation of rights by an insurance carrier of defendant.

7.    <u>TRIAL WITNESSES</u>:   Identify each witness by name and address that defendant intends to call or subpoena at the trial or arbitration of this case.

8.    <u>TRIAL EVIDENCE</u>:   Identify each document, item or exhibit, which defendant intends to use, refer to, mark or introduce into evidence at deposition, trial or arbitration of this case. Attach copies of any documents, photographs or other items which will be used, referred to, or introduced.

9. <u>SOURCES</u>: Identify all persons, documents, and sources of information that were used or consulted in answering this document, other than defendant's counsel.

10. <u>DEFENSES</u>: State the factual basis of any defense which defendant has asserted in a pleading, or which defendant intends to assert at trial.

11. <u>CONTRIBUTORY NEGLIGENCE</u>: If defendant alleges contributory negligence by the plaintiff, then state the factual basis for this contention.

12. <u>DEFENDANT'S VERSION</u>: State briefly defendant's version of the incident described in plaintiff's Complaint, it it materially differs from what plaintiff has alleged.

13. <u>DEFENDANT'S FILE</u>:   Identify any document, writing or evidence, that is not privileged, which has been obtained by defendant in connection with this lawsuit and has not been previously supplied to plaintiff or by plaintiff, including any document which mentions or refers to the parties, witnesses or the subject matter of this lawsuit, or a defense asserted thereto.

14. <u>LIABILITY BY ANOTHER</u>:   If defendant maintains that someone or some entity, who is not a party to this lawsuit, may be liable to plaintiff, then fully identify that person or entity, and state the factual basis for the alleged liability.

15. <u>DESIGNATION OF DEFENDANT</u>:   If it is maintained that defendant has been improperly named or designated in this lawsuit, state the correct name of defendant and indicate whether defendant will stipulate to amend the Complaint to reflect the correct name. Has defendant's insurance carrier indicated that insurance coverage is not applicable based on an improper designation of defendant in this lawsuit?

16. <u>PRIVILEGED MATERIAL</u>:   Identify any terms or material relevant to this lawsuit which defendant has not supplied, because defendant believes that such material is privileged, confidential or not subject to discovery, except material generated by counsel, and the legal basis for withholding the material.

Date: 03/15/19

William C. Reil
William C. Reil
Attorney for Plaintiffs

LAW OFFICES OF WILLIAM C. REIL
BY: William C. Reil, Esquire
Identification No. 26833
1515 Market Street, Suite 1200
Philadelphia, PA 19102
215-564-1636                                      ATTORNEY FOR PLAINTIFF

| | | |
|---|---|---|
| Dr. Orien L. Tulp | : | UNITED STATES DISTRICT |
| President of the | : | COURT FOR THE EASTERN |
| University of Science, Arts, | : | DISTRICT OF PENNSYLVANIA |
| and Technology | : | |
| 4288 Youngfield Street | : | |
| Wheat Ridge, CO 80033 | : | CIVIL ACTION NO. |
| vs. | : | |
| Educational Commission for | : | |
| Foreign Medical Graduates | : | |
| 3624 Market Street | : | |
| Philadelphia, PA 19104 | : | |
| and | : | |
| Dr. William W. Pinsky | : | |
| President and CEO | : | |
| Educational Commission for | : | |
| Foreign Medical Graduates | : | |
| 3624 Market Street | : | |
| Philadelphia, PA 19104 | : | JURY TRIAL DEMANDED |

## PLAINTIFFS' REQUEST FOR PRODUCTION OF DOCUMENTS
## ADDRESSED TO ALL DEFENDANTS

Plaintiffs, by the undersigned attorney, hereby serve upon all defendants this

Request for Production of Documents, pursuant to the Federal Rules of Civil

Procedure. These documents and/or items are to be produced at the Offices of

plaintiffs' counsel at 1515 Market St., Suite 1200, Philadelphia, PA 19102, and this

request for production answered within thirty (30) days of the date of service hereof.

Such requests are continuing up to and at the time of trial. The term "Defendant," for

the purposes of these documents, includes the agents, servants and employees of all

defendants in this lawsuit.

## PLAINTIFFS' REQUEST FOR PRODUCTION OF DOCUMENTS ADDRESSED TO ALL DEFENDANTS

1.  <u>TRIAL, DEPOSITION OR ARBITRATION EVIDENCE</u>.   All documents, exhibits, items or evidence of any type which defendant intends to use, refer to, mark or introduce at deposition, arbitration, or trial of this case. Please list any evidentiary material which defendant has or is supplying to plaintiffs. **Plaintiffs will object to any evidence, which defense counsel has not sent directly to plaintiffs' counsel in discovery in a timely manner, including documents obtained from third parties by subpoena or request to produce. This request for production is a continuing request, which requires defendant through defense counsel, to supplement their answers and produce directly to plaintiffs' counsel in a timely manner, any evidence received after defendant's response herein.**

2.  <u>PHOTOGRAPHS</u>:   All photographs and diagrams of any person, place or thing which is directly or indirectly related to the incident set forth in the plaintiff's Complaint, or in defendant's response.

3.  <u>STATEMENTS</u>:   All written statements (signed or unsigned), descriptions of statements, records and written accounts of investigations relating to this lawsuit.

4.  <u>WITNESS DOCUMENTS</u>:   Any documents or writings, which mention or refer to the parties in this lawsuit or any witness in this lawsuit, including **all medical records obtained by the defendant,** which refer to plaintiffs or the incident involving plaintiffs, or to defendant or the incident involving defendant.

5.  <u>INSURANCE</u>:   The "face-sheet" of any insurance policies, including excess or umbrella policies, under which the defendant was an insured or had an insurable interest on or about the time of the incident described in the Complaint by the plaintiffs, including the policy limits of all insurance policies, and any supporting documentation if there is a reservation of rights or disclaimer by an insurance carrier.

6.  <u>DOCUMENTS AND TANGIBLE EVIDENCE</u>:   All writings, items, memoranda, data and tangible things which relate directly or indirectly to the incident set forth in the plaintiff's Complaint or to the answer to a Complaint or to any defenses asserted in this lawsuit. List and describe any items which can not be photocopied.

7.  <u>EVIDENCE IN POSSESSION OF DEFENDANT</u>:   Produce any item, (or identify any item which can not be produced) material or tangible evidence in the possession of defendant or defendant's agents, which is not privileged, which may lead to discoverable evidence in this lawsuit, or which is relevant to a claim, defense or the subject matter of this lawsuit, including but not limited to, any photographs, statements, contracts, accident reports, letters, diagrams, manuals, memos, rules or regulations, investigation reports, agreements, models, tapes, personnel files, or computer-generated material.

8.    <u>SUBPOENAS AND DOCUMENT REQUESTS</u>: Copies of all subpoenas and request for production issued by defendant or its agents in relation to this case, including witness or deposition subpoenas, and subpoenas requesting records or documents.

Date: 03/15/19

*William C. Reil*

William C. Reil, Esquire
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I certify that I will serve in accordance with P.A.R.C.P. 440 all parties not served electronically. I further certify that a true and correct copy of the attached document (s) was served upon all other parties or their counsel of record by:

| | |
|---|---|
| _____X_____ | Regular First Class Mail |
| _____ | Facsimile |
| _____ | Certified Mail |
| _____ | Hand-Delivered |
| _____X_____ | Email |
| _____ | Electronic Filing |

Date: 03/15/19

*William C. Reil*

William C. Reil, Esquire
Attorney for Plaintiffs



# UNIVERSITY OF SCIENCE, ARTS
# &
# TECHNOLOGY, MONTSERRAT

Main Campus
Camelot Estate, P.O. Box 506, South Mayfield Estate Drive, Olveston, Montserrrat
US Information Office
5400 Ward Road, Building 3-150, Arvada, CO 80002

Please be advised that the following chart summarizes the negative change in USAT basic science enrollments **before and after** September 14, 2018. That is the date that the first red paragraph was added to USAT's Sponsor Notes Page on the World Directory of Medical Schools list by the ECFMG.

| USAT Total Number of Students Enrolled in Basic Science Courses Prior to September 14, 2018 | USAT Total Number of Students Enrolled in Basic Science Courses from September 15, 2018 up to Dec. 15, 2018. (Fall Semester 2018) | Percentage Change |
|---|---|---|
| 419 | 372 | -11.21% |

This is Lifelong Learning. This is U.S.A.T.

USA (FL Cert Nr. L12000078671), Montserrat (Cert Nr. 17-2003).
Member Institution of Med Ed Central, WHO Global Alliance on Healthcare, WDOMS World Medical Schools, ASIC (UK) & IPSP (ITALY), AAHEA. USAT is IMED/FAIMER listed.
USAT is an Equal Opportunity Employer. © USAT 2019
*Excellence and Professionalism in Research and Education.*          01/2019



# USAT
## *MONTSERRAT*

### UNIVERSITY OF SCIENCE, ARTS
### &
### TECHNOLOGY, MONTSERRAT
Main Campus
Camelot Estate, P.O. Box 506, South Mayfield Estate Drive, Olveston, Montserrrat
US Information Office
5400 Ward Road, Building 3-150, Arvada, CO 80002

Please be advised that the following chart summarizes the negative change in USAT basic science course enrollments **before and after December 31, 2018**. That is the date that the ECFMG removed their sponsorship of USAT, as declared on USAT's Sponsor Notes Page on the World Directory of Medical Schools, that USAT courses would no longer be valid; disallowing USAT students from taking the USMLE Examinations after that date.

| USAT Total Number of Students Enrolled in Basic Science Courses up until December 31, 2018. | USAT Total Number of Students Enrolled in Basic Science Courses from January 1, 2019 to April 30, 2019. (Spring Semester 2019) | Percentage Change |
|---|---|---|
| 372 | 181 | -51.34% |

Please be advised that the following chart summarizes the negative change in USAT clinical enrollments **before and after December 31, 2018**. That is the date that the ECFMG removed their sponsorship of USAT, as declared on USAT's Sponsor Notes Page on the World Directory of Medical Schools, that USAT courses would no longer be valid; disallowing USAT students from taking the USMLE Examinations after that date.

| USAT Total Number of Students Enrolled in Clinical Science Courses up until December 31, 2018. | USAT Total Number of Students Enrolled in Clinical Science Courses from January 1, 2019 to April 30, 2019. (Spring Semester 2019) | Percentage Change |
|---|---|---|
| TBD | | |

This is Lifelong Learning. This is U.S.A.T.

USA (FL Cert Nr. L12000078671), Montserrat (Cert Nr. 17-2003).
Member Institution of Med Ed Central, WHO Global Alliance on Healthcare, WDOMS World Medical Schools, ASIC (UK) & IPSP (ITALY), AAHEA. USAT is IMED/FAIMER listed.
USAT is an Equal Opportunity Employer. © USAT 2019
*Excellence and Professionalism in Research and Education.*                01/2019



# USAT
## *MONTSERRAT*

# UNIVERSITY OF SCIENCE, ARTS
# &
# TECHNOLOGY, MONTSERRAT
Main Campus
Camelot Estate, P.O. Box 506, South Mayfield Estate Drive, Olveston, Montserrrat
US Information Office
5400 Ward Road, Building 3-150, Arvada, CO 80002

Please be advised that the following chart summarizes the negative change in new
USAT applications received **from January 01, 2018 up to February 28, 2019.**

| USAT Monthly Enrollments from January 2018 to January 2019 | Number of Applications Received | Percentage Change |
|---|---|---|
| January 1- 31, 2018 | 75 | |
| February 1-28, 2018 | 47 | |
| March 1-31, 2018 | 58 | |
| April 1-30, 2018 | 62 | |
| May 1-31, 2018 | 84 | |
| June 1-30, 2018 | 67 | |
| July 1-31, 2018 | 75 | |
| August 1-31, 2018 | 65 | |
| September 1-13, 2018 | 26 | |
| September 14-30, 2018 | 29 | -1.81% |
| October 1-31, 2018 | 43 | -21.81% |
| November 1-30, 2018 | 28 | -34.88% |
| December 1-31, 2018 | 17 | -39.29% |
| January 1-31, 2019 | 09 | -47.05% |
| February 1-27, 2019 | 07 | -2.22% |

This is Lifelong Learning. This is U.S.A.T.

USA (FL Cert Nr. L12000078671), Montserrat (Cert Nr. 17-2003).
Member Institution of Med Ed Central, WHO Global Alliance on Healthcare, WDOMS World Medical Schools, ASIC (UK) & IPSP (ITALY), AAHEA. USAT is iMED/FAIMER listed.
USAT is an Equal Opportunity Employer. © USAT 2019
*Excellence and Professionalism in Research and Education.*          01/2019

Affidavit of Dr. Orien L. Tulp
State Of Colorado, Jefferson, County

Before me, the undersigned notary, on this day personally appeared, Dr. Orien L. Tulp, the affiant, whose identity is known to me. After I administered an oath, affiant testified as follows:

1. My name is Orien L. Tulp. I am over 18 years of age, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. I am Professor and President of USAT Montserrat. USAT was established on September 26, 2003. Exhibit 1. I own a 50% interest in USAT. USAT has a University based medical school duly licensed by the Government of Montserrat authorities. Exhibit 2.  As part of my duties as USAT president, I was to be aware and review the number of students enrolled as well as oversee the general administration and operations of the school. USAT admits a significant proportion of non-traditional students including minorities. The school is culturally diverse as evidenced by over 50% percent minority students including Caribbean Nationals, approximately 10% students over 50 years of age, and over 75% percent licensed allied medical and Healthcare Professionals at the time of their admission.

3. My formal education includes a PH.D. and other degrees.  My experience that makes me qualified to be President of USAT is a military and Civilian career of over forty years duration retiring with the rank of Colonel, and my Civilian Career as a Full Professor at a top tier University. My military career consisted of administrative supervision, command, and training of Physicians and other military medical personnel, and my Civilian career as a Professor included research and teaching of Physicians and other health care professionals and including extensive publishing in the scientific literature.  Exhibit 3 (copies of military rank and awards) I have personal knowledge of the USAT records and procedures due to my position as president of the school.

4. The Educational Commission for Foreign Medical Graduates (ECFMG) is a Pennsylvania registered non-profit 501(3) entity. The ECFMG has been granted, by all the state medical boards, the exclusive authority to decide which international medical graduates are permitted to take the various tests administered by the USMLE and NBME. Exhibit 4, (ECFMG Fact Sheet) An international medical graduate cannot access graduate medical training in the United States without successfully passing a series of three examinations. The ECFMG is the gatekeeper for entry to take the various examinations. Without successfully passing the USMLE examinations, the international medical graduate cannot enter the United States medical training programs to commence post graduate specialty training. Without entry into the training system, the International medical students cannot be licensed to practice medicine in the United States.

1

PA 0666

5. The ECFMG defines irregular behavior to include all actions or attempted actions on the part of applicants, examinees, potential applicants, others when solicited by an applicant and/or other programs, or services of the ECFMG. This definition also includes falsification of information on applications, completed by the applicants for the examinations. Exhibit 5 (Policies and Procedures Regarding Irregular Behavior).

6. The ECFMG's policies and procedures regarding irregular behavior include the following:

a. The ECFMG staff will investigate any allegations of irregular behavior.

b. If the ECFMG staff finds that there exists a reasonable basis to conclude that an individual has engaged in irregular behavior, the matter will be referred by the staff to the Medical Education Credentials Committee of the ECFMG.

c. The Credentials Committee is the body delegated by the ECFMG to make a fact determination.

d. The ECFMG staff is required to give the person charged with irregular behavior notice of the charge and evidence.

e. The person charged with allegations of irregular behavior has the right to appear personally before the Medical Education Credentials Committee.

f. The Medical Education Credential Committee is required to base its decision on a preponderance of the evidence. Exhibit 5.

7. The ECFMG staff, prior to any notice or hearing, placed on the World Directory of Medical Schools (WDOMS) website page for USAT, beginning on or before September 14, 2018, a notice that USAT students were being subjected to special investigation and enhanced screening. Exhibit 6 (copy of website notice).

8. Prior to placing the notice on the website, the ECFMG staff did not notify USAT or myself that the ECFMG had a concern, despite the observation that for the preceding 15 years not a single error or concern had ever been reported to USAT by the ECFMG. The ECFMG's staff took disciplinary action, prior to any notice or a hearing before the ECFMG Credential's committee, by placing damaging information on the Sponsor Note section for USAT on the WDOMS website.

9. As a result of the ECFMG's staff posting the warning on the WDOMS website my interest in USAT was severely devalued and may be depleted.

10. My sworn deposition testimony established how and why the decrease in value occurred after the publication on the WDOMS website of on or before Sept. 14, 2018. Dr. Tulp's Deposition transcript Page 84, lines 2-14. The majority of Students disenrolled, stop paying tuition and left for other schools as a result of the September 14, 2018 notice. Dr. Tulp's Deposition page 71, lines 19-24, page 72 lines 1-3.

11. Prior to the November 28, 2018 hearing, I was not supplied with any affidavits from any students. The ECFMG admits in its Summary Judgment Motion that the ECFMG had received 300 student affidavits. ECFMG's Summary Judgment Motion, Page 11, issues 28.

2

PA 0667

12. The claim by the ECFMG that it provided me with all material to be considered prior to the November 28, 2018 hearing is disputed. At no time was I supplied with a definition of "campus," let alone "branch campus." My lawyer requested the ECFMG define campus prior to the November 28, 2018 hearing. The ECFMG staff refused to supply a definition. Instead the attorney conducting the hearing was attempting to have me define "campus". USAT does conduct "on-line" classes with it's private, Montserrat based Satellite Communications network including the Basic Medical Sciences of the medical curriculum, thereby negating a requirement for a fixed campus.

13. The November 28, 2018 hearing was conducted by an ECFMG lawyer that was demanding to cross examine me, but the ECFMG supplied no witnesses for my lawyers to cross examine.

14. The lawyer who conducted the hearing for the ECFMG Credential's committee presented no evidence for the committee to consider.

15. The November 28, 2018 hearing was abruptly terminated by the ECFMG's attorney when my lawyer started going through the evidence that in part was only produced after 10 AM that morning. When the first two pages were identified as a letter from a person with whom I had no contact or knowledge of, the lawyer abruptly terminated the hearing over my lawyer's protest, and before my 20 minutes of allotted time had elapsed.

16. There are no written rules by the ECFMG on who has the burden of proof. The hearing was conducted by ECFMG counsel as if I had the obligation to prove my innocence alone, without any evidence, witnesses, or cross-examination allowed.

Dr. Orien L. Tulp

Sworn to and subscribed before me by Dr. Orien L. Tulp on June 3rd, 2019

Notary Public in and for The State of Colorado My Commission Expires: 04/19/2023

TYLER DEAN SANDER
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20194015168
MY COMMISSION EXPIRES 04/19/2023

3

PA 0668

 **Gmail**

Bill Reil <billreillaw@gmail.com>

---

## sponsor note as of Oct 15, 2018
1 message

---

**Orien Tulp** <o.tulp@usat.edu>                                    Sun, May 26, 2019 at 2:26 PM
To: Bill Reil <billreillaw@gmail.com>, swatemd <swatemd@aol.com>

This is the text that should be included in the exhibits, it appeared from mid Oct 2018 until Jan 3, 2019, after Dr Pinsky received his subpoena.

- **Note: As of January 1, 2019, students and graduates of this medical school with a graduation year of 2019 and later are not eligible to apply to ECFMG for ECFMG Certification, which also renders them ineligible to apply to ECFMG for the United States Medical Licensing Examinations (USMLE) as a step toward ECFMG Certification.**

- **Currently, students and graduates of USAT are subject to enhanced procedures that must be met in order to be eligible to apply for ECFMG Certification related services, including but not limited to: ECFMG Certification, USMLE examinations that lead to ECFMG Certification, and Electronic Residency Application Service (ERAS®) Support Services. ECFMG will provide information and instructions to applicants upon receipt of application.**

- **Note: In 2018, ECFMG determined that certain staff / officials of the University of Science, Arts and Technology (USAT) engaged in irregular behavior in connection with providing false information and documents to ECFMG.**

Orien L Tulp, PhD, MD, FACN, CNS
Professor and President
USAT Montserrat
*www.usat.edu*
Cell: 727-252-6210

PA 0669

November 28, 2018

1          MEETING OF THE ECFMG MEDICAL
         EDUCATION CREDENTIALS COMMITTEE

2

                    -   -   -

3

4    RE:  ORIEN L. TULP, USAT

5                   -   -   -

6              NOVEMBER 28, 2018

7                   -   -   -

8          Hearing taken pursuant to notice,

9    was held at RITTENHOUSE HOTEL, 210 West

10   Rittenhouse Square, Philadelphia,

11   Pennsylvania, commencing at 10:00 a.m.,

12   on the above date, before LISA MARIE

13   CAPALDO, RPR, a Registered Professional

14   Reporter and Notary Public in and for the

15   Commonwealth of Pennsylvania.

16

17

18

19

20

           GOLKOW LITIGATION SERVICES

21     877.370.3377 ph | 917.591.5672 fax
              Deps@golkow.com

22

23

24

November 28, 2018

```
 1    APPEARANCES:
 2    ECFMG STAFF
 3    Mr. William W. Pinsky
      Mr. Dennis M. Donohue
 4    Ms. Kara Corrado
      Ms. Lisa L. Cover
 5    Ms. Svetlana Gridneva
      Mr. Scott Mealey
 6    Ms. Rosemary Carlin
 7
      ECFMG Board Members
 8
      Dr. Maryellen Gusic
 9    Dr. Ronald R. Blanck
      Dr. Barbara Barzansky
10    Dr. Peter Buckley
      Dr. Andrew Filak
11    Dr. Ram Krishna
      Dr. Dotun Ogunyemi
12    Dr. James Pelegano
13
14
15
16
17
18
19
20
21
22
23
24
```

CONFIDENTIAL                    SAppx0921                    ECFMG00000512

PA 0671

November 28, 2018

```
 1                    -   -   -

 2                   I N D E X

 3                    -   -   -

 4                 _____

 5        Statement of:

 6               ORIEN L. TULP, USAT

 7

 8         By Mr. Swate

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

CONFIDENTIAL

ECFMG00000513

SAppx0922

PA 0672

November 28, 2018

```
 1                    -   -   -

 2                 PROCEEDING

 3                    -   -   -

 4     O R I E N   T U L P, Sworn.

 5                    -   -   -

 6              DR. GUSIC:  We will begin by

 7         asking the committee members and

 8         the staff to introduce themselves.

 9         We will swear in Dr. Tulp and then

10         if there are any opening

11         statements.

12              MS. McENROE:  Elisa McEnroe,

13         outside counsel for ECFMG.

14              MS. KATZ:  I'm Francis Katz.

15         I'm the general counsel at ECFMG.

16              DR. CRAIG:  Steve Craig,

17         board member.

18              DR. OGUNYEMI:  Dr. Ogunyemi,

19         ECFMG board member.

20              DR. BUCKLEY: Peter Buckley,

21         I'm also an ECFMG board member.

22              DR. PELEGANO:  Jim Pelegano,

23         ECFMG board member.

24              DR. KRISHNA:  Dr. Krishna,
```

CONFIDENTIAL                                   ECFMG00000514
SAppx0923

PA 0673

November 28, 2018

1            board member.

2                    DR. FILIK:  Andy Filik,

3        ECFMG board member.

4                    DR. PINSKY:  Bill Pinsky,

5        President and CEO of ECFMG.

6                    DR. GUSIC:  Maryellen Gusic,

7        board member and chair of this

8        committee.

9                    DR. BLANCK:  Ronald Blanck,

10       chair and board member of this

11       committee.

12                   DR. BARZANSKY:  Barbara

13       Barzansky, ECFMG board member.

14                   MS. CORRADO:  Kara Corrado,

15       ECFMG staff.

16                   MS. COVER:  Lisa Cover,

17       ECFMG staff.

18                   MR. DONOHUE:  Dennis

19       Donohue, ECFMG staff.

20                   MS. GRIDNEVA:  Svetlana

21       Gridneva, ECFMG staff.

22                   MS. CARLIN:  Rosemary

23       Carlin, ECFMG staff.

24                   MS. CORRADO:  Just briefly,

CONFIDENTIAL                    SAppx0924                    ECFMG00000515

PA 0674

November 28, 2018

```
 1         I'm just going to iterate the
 2         allegations for the committee.
 3         The allegation is that Dr. Orien
 4         Tulp, professor and president of
 5         USAT engaged in irregular behavior
 6         in connection with providing false
 7         information to ECFMG, specifically
 8         that Dr. Tulp provided false
 9         information to ECFMG regarding
10         USTAT's United States branch
11         campuses and certifying to the
12         attendance dates of several USTAT
13         students and graduates when ECFMG
14         has information that these
15         students were not attending USTAT
16         during some of the time periods to
17         which Dr. Tulp certified.
18         Dr. Tulp is here today along
19         with his attorneys to address
20         these allegations and to answer
21         any questions that the committee
22         may have.
23         DR. GUSIC:  Opening
24         statements.
```

CONFIDENTIAL          SAppx0925          ECFMG00000516
PA 0675

1          MR. SWATE:  Thank you.  I

2      asked the name of the officer

3      outside the door, and he refused

4      to give me his name.  Could you

5      tell me who the officer outside

6      the door is?

7          MS. McENROE:  It's a

8      security officer we've brought in

9      for our own protection in case we

10     need it throughout our day's

11     proceedings.  He's an off-duty

12     Philadelphia police officer.

13         MR. SWATE:  First, I would

14     like to ask for the -- I've asked

15     and I've asked and I've asked for

16     the packet that was presented to

17     the committee members.  I would

18     like a copy of the packet, the

19     information that was submitted to

20     the committee members so that I

21     will know what was considered by

22     the committee before we came here

23     today because you're considering

24     information that I may or may not

November 28, 2018

1      know about.  And that's

2      fundamentally unfair to my client,

3      for my client to have to defend

4      against potential information that

5      we don't have.

6           First, I would ask for a

7      copy of that.

8           MS. McENROE:  There's

9      actually a black binder right in

10     front of you.  We also have

11     provided that on more than one

12     occasion prior to this proceeding,

13     which is our usual practice even

14     without you asking.  That's what

15     we do.

16          MR. SWATE:  Where is the

17     letter that you sent to the

18     committee members addressing this?

19          MS. McENROE:  The materials

20     presented to the committee

21     regarding this circumstance with

22     Dr. Tulp's charges of irregular

23     behavior are presented in that

24     binder to you.

CONFIDENTIAL              SAppx0927              ECFMG00000518

PA 0677

November 28, 2018

```
 1              MR. SWATE:  I'm asking you

 2         for the letter you sent to the

 3         committee members.

 4              MS. McENROE:  I don't know

 5         what you're talking about.

 6              MR. SWATE:  You didn't send

 7         them a letter explaining what this

 8         was?

 9              MS. McENROE:  We sent those

10         materials.

11              MR. SWATE:  What about the

12         letter that went with the

13         materials?

14              MS. McENROE:  Those are the

15         materials including any

16         correspondence with it.

17              MR. SWATE:  All the

18         correspondence would be included

19         with this material?

20              MS. McENROE:  Correct.

21              MR. SWATE:  I'm sorry.

22         Where is the correspondence that

23         you sent to the committee?

24              MS. McENROE:  This is the
```

CONFIDENTIAL                    SAppx0928                    ECFMG00000519

PA 0678

November 28, 2018

| | |
|---|---|
| 1 | same material that you were |
| 2 | provided.  November 14th you got |
| 3 | it by e-mail, and November 15th |
| 4 | you got it by Federal Express. |
| 5 | MR. SWATE:  I'm asking for |
| 6 | the letters that you sent to these |
| 7 | committee members.  You just |
| 8 | didn't send this out to the |
| 9 | committee members just blindly. |
| 10 | MS. McENROE:  Unfortunate |
| 11 | for them, potentially there's a |
| 12 | lot of materials they have to |
| 13 | review, and they carefully review |
| 14 | the materials presented to them as |
| 15 | presented to you.  We get an |
| 16 | electronic copy, myself included |
| 17 | which you were provided by e-mail |
| 18 | on November 14th. |
| 19 | MR. SWATE:  So you're |
| 20 | telling me that you did not send |
| 21 | them a letter explaining this |
| 22 | material and explaining the |
| 23 | allegation to the committee |
| 24 | members. |

November 28, 2018

1          MS. McENROE:  That material

2     is as presented to the committee.

3          MR. SWATE:  You're not

4     answering my question.

5          MS. McENROE:  I'm not here

6     to answer your questions, sir.

7     We're here for your client to

8     explain to us the charges of

9     irregular behavior against him.

10         If you have an opening

11    statement you would like to make,

12    we're interested in hearing it.

13    Our committee has questions for

14    your client, and then we will

15    consider the charges of irregular

16    behavior.

17         MR. SWATE:  This committee

18    has no jurisdiction over Dr. Tulp.

19    We showed up today as it stands

20    for negotiation.  You all have no

21    legal jurisdiction to determine

22    anything.

23         So accordingly, please be

24    advised that we're not waiving

CONFIDENTIAL

November 28, 2018

1  because we're here any

2  jurisdictional issues that may be

3  addressed at another forum at

4  another day.

5      Since the ECFMG has made the

6  allegation, it should have the

7  sole and exclusive burden of

8  proof.  So who is presenting the

9  evidence against Dr. Tulp?

10     This is not the U.S.

11  Congress where you can make blind

12  allegations and attempt to have

13  the person prove they are not

14  guilty.  And that's what's

15  occurring here today, just blatant

16  accusations and then assuming he's

17  guilty.  And you have him come

18  here for 20 minutes to explain why

19  he's not guilty.

20     You have a duty of

21  presenting your evidence, credible

22  evidence before Dr. Tulp has to

23  answer anything.  It's your

24  burden.

1         Now, you claim you are

2    basing this on the preponderance

3    of evidence.  What evidence are

4    you presenting here today that Dr.

5    Tulp violated anything?  None.

6         Also, there appears to be a

7    co-mingling of the prosecutorial

8    and jury functions.  You are both

9    making the claims and acting as

10   judge and jury.

11        We have asked for discovery

12   of documents, especially any

13   letters or correspondence that

14   have been sent to the committee

15   members.  The claim that you just

16   sent the committee members this

17   without any explanation doesn't

18   meet any kind of test of

19   credibility.

20        The ECFMG is either acting

21   as quasi government entity or

22   acting under a contract basis.

23   Now, you claim that you are a

24   private nonprofit entity.  So the

CONFIDENTIAL                               ECFMG00000523

SAppx0932

PA 0682

November 28, 2018

1    only reason that you could be

2    interacting with Dr. Tulp is on

3    the basis of contract.  Where is

4    the contract?

5        Dr. Tulp's doesn't have a

6    contract with you all.  So you

7    have no right to tortuously

8    interfere with his business

9    practices or tortuously interfere

10   with his students.

11       ECFMG has printed and

12   published derogatory information

13   about USAT.  Whether it's true or

14   not true, at least the target of

15   those accusations should have had

16   the opportunity to address those

17   accusations before you go out and

18   attempt to ruin the school, which

19   is what you have done causing

20   probably millions of dollars worth

21   of damages.

22       If you're not a quasi

23   government entity, everybody in

24   this room is going to be liable

November 28, 2018

1    for whatever damages we can prove.

2    You've already prejudged the case

3    by taking action against USAT by

4    refusing to release documents of

5    their students.  Totally have

6    refused to release documents of

7    students the students are entitled

8    to have released.

9         Again, repeating myself,

10   you're either a quasi government

11   agency or you are a private

12   agency.  A private agency you got

13   to have a contract.  Quasi

14   government agency you got to have

15   at least an assemblance of due

16   process which there's none here.

17        I asked for the rules and

18   regulations and the protocols for

19   these meetings.  Apparently, there

20   is none other than what's in the

21   eyes of the beholders of the

22   people who run the ECFMG.

23        What's the protocol?  I

24   asked for the agenda.  I got a

November 28, 2018

```
 1    brief statement to show up at
 2    8:45.  And here we are at
 3    ten o'clock, total disrespectful
 4    to my client and myself to have us
 5    show up at 8:45 and then be
 6    ten o'clock before you have us
 7    come in and address you.
 8          So we have not received the
 9    rules and regulations for the
10    hearing nor have we seen any right
11    that you have other than
12    essentially blackmailing the
13    students and telling the students,
14    well, if you don't send in these
15    forms, we're going to hold your
16    records hostage, which has
17    resulted in students either being
18    accepted for residency and not
19    being able to continue with the
20    residency or not being able to be
21    interviewed for the residency.
22          That is our opening
23    statement.  If you have any
24    questions, you can address them to
```

Golkow Litigation Services
CONFIDENTIAL
SAppx0935
Page 16
ECFMG00000526
PA 0685

November 28, 2018

1      me.  Dr. Tulp will not be

2      answering any questions.

3          MS. McENROE:  Mr. Swate, do

4      you have any substantive response

5      or statement with respect to the

6      charges of irregular behavior

7      against your client?

8          We've heard your procedural

9      concerns.  And just for the

10     purposes of the record, we

11     disagree across the board with

12     your allegations and your

13     statements about the state of

14     affairs.  I think for everybody's

15     time I'm not going to go through

16     them and enumerate each and every

17     single one of them.

18         If and when we ever ended up

19     dealing with these issues in the

20     court of law, we would deal with

21     them then and we feel very

22     confident --

23         MR. SWATE:  I can assure you

24     we're going to end up in federal

November 28, 2018

1     court.

2         MS. McENROE:  I let you

3     speak.  Can you let me speak?

4         MR. SWATE:  I'm sorry.

5         MS. McENROE:  Do you have

6     any statement with regard to the

7     actual substantive allegations of

8     irregular behavior?

9         MR. SWATE:  We can go

10    through this page by page.

11        MS. McENROE:  I don't mean

12    to go through it page by page.

13    Are you here today saying that --

14    is it Dr. Tulp?  I would say Tulp

15    with an L.

16        DR. TULP:  It's Tulp.

17        MS. McENROE:  Are you saying

18    that Dr. Tulp did not provide

19    incorrect information to ECFMG

20    with regard to branch campuses in

21    the United States?

22        MR. SWATE:  Show me your

23    evidence that he did.

24        MS. McENROE:  We have e-mail

CONFIDENTIAL
SAppx0937
ECFMG00000528
PA 0687

November 28, 2018

```
 1        correspondence from him in all
 2        caps saying that there were not
 3        campuses in the United States.
 4        And we have significant evidence
 5        to the contrary.  We were
 6        wondering if --
 7             MR. SWATE:  What's your
 8        definition of campus?
 9             MS. McENROE:  Maybe that's
10        something you can illuminate for
11        us about what your client's view
12        is of a campus, whether there was
13        education taking place in the
14        United States for USTAT.
15             MR. SWATE:  The burden of
16        proof is not on Dr. Tulp.  The
17        burden of proof is on the ECFMG.
18             Now, Dr. Tulp is not going
19        to address a nebulous definition
20        of campuses.  You show me your
21        written definition of campuses and
22        we'll address that.
23             MS. McENROE:  Did USTAT
24        provide any student with any
```

November 28, 2018

1     medical school basic science

2     education in the United States?

3          MR. SWATE:  Well, yes, it

4     did.

5          MS. McENROE:  He's shaking

6     his head, no, and you just said,

7     yes.  So maybe you should let your

8     client speak to respond.

9          MR. SWATE:  Dr. Tulp is not

10    going to be talking today.  The

11    next time you hear him talk is

12    going to be in federal court.

13         MS. McENROE:  So, yes, there

14    was education in the United

15    States?

16         MR. SWATE:  There was no

17    campus in the United States.

18         MS. McENROE:  So my question

19    was, was there any education for

20    basic medical sciences provided in

21    the United States?

22         MR. SWATE:  What do you mean

23    by education?

24         MS. McENROE:  Were there any

CONFIDENTIAL                    SAppx0939                    ECFMG00000530

```
 1              live lectures provided in the
 2              United States for USAT?
 3                   MR. SWATE:  My
 4              understanding is the lectures were
 5              for some extent was prepared by
 6              the Internet, that type of thing.
 7                   MS. McENROE:  That was not
 8              responsive to my question.  My
 9              question was --
10                   MR. SWATE:  You're not
11              cross-examining me, Counsel.
12                   MS. McENROE:  Well, I'm
13              asking you questions and trying to
14              be more specific --
15                   MR. SWATE:  We can't answer
16              the questions because you haven't
17              defined what campus is.  You
18              haven't defined what the
19              regulations for having an off-site
20              campus where you allowed other
21              schools to have off-site campuses,
22              but you attacked USTAT for some
23              reason.
24                   Now, you cannot disagree
```

November 28, 2018

1          that you have allowed other

2          schools to have off-site campuses

3          due to natural problems.  You've

4          been told what the natural

5          problems were.

6                    MS. McENROE:  That was not

7          my question.  My question was,

8          were there any live lectures

9          provided to students of USTAT or

10         basic medical sciences in the

11         United States?

12                   MR. SWATE:  I'm not a

13         witness.  So you don't get to

14         cross-examine me.

15                   MS. McENROE:  I may not be

16         able to ask you questions as a

17         witness.  I would normally ask

18         your client.

19                   MR. SWATE:  You're not going

20         to be able to do that because you

21         haven't given me enough

22         information to prepare my client.

23         This star chamber proceedings,

24         he's not going to participate in.

November 28, 2018

```
1              MS. McENROE:  Despite the
2        four inches of paper --
3              MR. SWATE:  Let's go through
4        each of the --
5              MS. McENROE:  You had some
6        concerns that by not taking you
7        exactly at 8:45 when we asked that
8        you be here for a 9:00 hearing
9        until 10:00 was a waste of time.
10       We apologize if you feel that way.
11       That was not at all the intention.
12       This is a busy committee.  We
13       don't have the time or the man
14       with to sit here and go through
15       every single page that we provided
16       you weeks ago.
17             MR. SWATE:  I'm prepared to
18       go through every page of this.
19             MS. McENROE:  Tell me where
20       in there it proves that your
21       client did not provide any medical
22       school education in the United
23       States.
24             MR. SWATE:  He doesn't have
```

1    the burden of proof.

2            MS. McENROE:  We're just

3    going around in circles.  I don't

4    know that it's going to be much

5    more helpful to try and proceed.

6            MR. SWATE:  I'm willing to

7    go through every page of this.

8            MS. McENROE:  To what end?

9    You're not answering my questions.

10    What are you hoping to get out of

11    every single page of that?

12            If you want to sit here and

13    look for something specific, tell

14    me.  We've all read the materials.

15    We can help direct you.

16            Take a look at Appendix E at

17    the e-mail from your client

18    saying, it is not a campus.  Our

19    only campus is located in

20    Olveston, Montserrat, British West

21    Indies.

22            My questions are trying to

23    understand whether there was

24    medical school education in the

Case: 19-2706 Document: 45-3 Page: 436 Date Filed: 01/16/2020
Case 2:18-cv-05540-WB Document 33-9 Filed 06/03/19 Page 149 of 191

November 28, 2018

| | |
|---|---|
| 1 | United States. |
| 2 | MR. SWATE: That's not what |
| 3 | -- what you're trying to do is ask |
| 4 | that question and then leap frog |
| 5 | to make like that's the campus. |
| 6 | Give me your definition of |
| 7 | what a campus is and then give me |
| 8 | the cases in which you've allowed |
| 9 | campuses to operate outside of |
| 10 | their original address. |
| 11 | MS. McENROE: Perhaps your |
| 12 | client, if we would be allowed, |
| 13 | could provide us an explanation of |
| 14 | what he meant by campus in this |
| 15 | e-mail because the committee is |
| 16 | interested in hearing that. |
| 17 | MR. SWATE: I would like to |
| 18 | know what your definition of |
| 19 | campus is. |
| 20 | MS. McENROE: He's the one |
| 21 | who used the word here. I'm |
| 22 | interested to know what he means |
| 23 | by it. |
| 24 | MR. SWATE: I'm asking you, |

```
 1        what's your definition of campus?
 2        Secondly, what's the exceptions to
 3        having an off-site campus?
 4            MS. McENROE:  We appreciate
 5        you being here today.  We're
 6        working on trying to understand
 7        the facts and circumstances in
 8        this case.  Apparently, we're
 9        going to be left with a cold
10        record because your client is
11        refusing to answer any questions.
12            I think at this time it
13        makes sense, unless there's any
14        closing statement you want to
15        make, that we adjourn.
16            MR. SWATE:  ECFMG is
17        adjourning this without us having
18        the ability to go through their
19        efforts.
20            MS. McENROE:  Is there
21        anything in particular you want to
22        go through?  We provided this to
23        you --
24            MR. SWATE:  I want to go
```

1    through the whole thing.

2         MS. McENROE:  Start on page

3    one.  What is it you want to talk

4    to us about it?

5         MR. SWATE:  The matter has

6    been brought to the CIE's

7    attention.  Where is the letter or

8    whatever information was brought

9    to the attention?

10        MS. McENROE:  We're not here

11   to answer questions, sir.  If you

12   have a closing statement or

13   something specific you want to

14   point out to us so we understand

15   the allegations better that are

16   lodged against your client, that

17   would be helpful.

18        That's why we're here today,

19   the due process you're saying that

20   you wanted.  We're here to try to

21   understand what it is that you're

22   trying to do here.

23        And candidly, I appreciate

24   you advocating on behalf of your

PA 0696

November 28, 2018

1    client.  It's not productive here

2    if we can't understand the

3    underlying facts as your client

4    means them and wants ECFMG to

5    understand them.

6        So if this is your position

7    that you're just going to come

8    here and obstruct, then that's

9    just how it's going to be and

10    we're not wasting this committee's

11    time.  They have a busy agenda,

12    and we've got to keep going.

13        MR. SWATE:  It's a waste of

14    the committee's time when you're

15    going to destroy somebody's good

16    name and good reputation without

17    telling them what you're claiming.

18    At least in Texas, before we

19    execute somebody, we at least tell

20    them what the claim is for

21    executing them.

22        You've refused.  You've

23    stone walled me on the procedures.

24    I've asked for written procedures

CONFIDENTIAL                   SAppx0947         ECFMG00000538

PA 0697

November 28, 2018

1    for this committee.  Apparently,

2    there's none.  It's whatever you

3    want to make them.

4         MS. McENROE:  Sir, you've

5    gotten the policy and procedures

6    on irregular behavior multiple

7    times.  You'd like to say that the

8    record says what you say it says.

9    It just doesn't.

10        We're trying to follow the

11   best procedure we possibly can,

12   and you and your client are

13   obstructing us in being able to

14   collect the information.  At this

15   point, I don't think that it's

16   productive to continue the

17   proceeding.

18        MR. SWATE:  We're entitled

19   to know what procedure this

20   committee is operating under.  You

21   just can't operate under whatever

22   you want to make it.

23        MS. McENROE:  You've gotten

24   the policies and procedures.

Case 19-2706 Document 45-3 Page 441 Date Filed 01/16/2020
Case 2:18-cv-05540-WB Document 33-9 Filed 06/03/19 Page 116 of 191

November 28, 2018

```
 1              MR. SWATE:  No, I haven't.
 2         I've gotten --
 3              MS. McENROE:  They're
 4         available on the Internet.
 5              MR. SWATE:  I have received
 6         broad statements, you can do
 7         whatever you want.
 8              MS. McENROE:  The record
 9         will reflect --
10              MR. SWATE:  And that's not a
11         written policy and procedure.  And
12         that will not stand up under any
13         theory.
14              MS. McENROE:  We've provided
15         them to you in writing and the
16         link to the URL where they are
17         available publically on the
18         Internet.  I don't think at this
19         point there's anything else that's
20         worth us discussing at this
21         moment.  Thank you.
22              MR. SWATE:  You're
23         terminating --
24              MS. McENROE:  Yes, I'm
```

CONFIDENTIAL                SAppx0949                ECFMG00000540

PA 0699



November 28, 2018

1    terminating the proceeding.

2         MR. SWATE:  ECFMG is

3    terminating this prior to us

4    presenting our evidence.

5         MS. McENROE:  We asked you

6    to present evidence, and all you

7    did was present legal argument.

8         What's your offer of proof?

9    What would you like to provide?

10        MR. SWATE:  We'll go through

11   every page of this.

12        MS. McENROE:  In particular,

13   what would you like to provide?

14        MR. SWATE:  First, I'd like

15   to know who Ms. Sara Colins is?

16        MS. McENROE:  From the

17   Florida Department of Education?

18        MR. SWATE:  I don't know who

19   this is.

20        MS. McENROE:  So what

21   evidence is that that you are

22   presenting to us?

23        MR. SWATE:  I'm asking your

24   evidence.  You're the one

CONFIDENTIAL       SAppx0950       ECFMG00000541

PA 0700



November 28, 2018

1    presenting the evidence and I'm

2    asking what it is?

3         MS. McENROE:  You're not

4    providing any evidence.  So thank

5    you for coming today, Dr. Tulp.

6    We appreciate it.

7         MR. SWATE:  So you're

8    adjourning the --

9         MS. McENROE:  Yes, I'm

10   adjourning the proceeding.

11              -   -   -

12        (Whereupon, the hearing

13   concluded at approximately 10:39

14   a.m.)

15              -   -   -

16

17

18

19

20

21

22

23

24

November 28, 2018

```
 1              C E R T I F I C A T E

 2

 3                   I hereby certify that

 4   the witness was duly sworn by me and that

 5   the deposition is a true record of the

 6   testimony given by the witness.

 7

 8

 9        _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

         LISA CAPALDO

10        Dated:

11

12   (The foregoing certification of this

13   transcript does not apply to any

14   reproduction of the same by any means,

15   unless under the direct control and/or

16   supervision of the certifying shorthand

17   reporter.)

18

19

20

21

22

23

24
```

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the attached document (s) was served

upon all other parties or their counsel of record by:

                Regular First Class Mail

                Facsimile

                Certified Mail

                Hand-Delivered

X      Electronic Filing

X      Email

*William C. Reil*

William C. Reil, Esquire
Attorney for Plaintiff
Attorney I.D. No. 26833
1515 Market Street, Suite 1200
Philadelphia, PA 19102
215-564-1635
06/03/19
For: Tommy Swate, Esquire

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DR. ORIEN L. TULP, | ) |
| | ) |
| Plaintiff, | ) Case No. 2:18-cv-05540-WB |
| | ) |
| v. | ) Hon. Wendy Beetlestone |
| | ) |
| EDUCATIONAL COMMISSION FOR | ) |
| FOREIGN MEDICAL GRADUATES and | ) |
| DR. WILLIAM W. PINSKY, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## REPLY IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Dated:  June 20, 2019

Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA  19103-2921
Telephone:    +1.215.963.5917
Facsimile:    +1.215.963.5001
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for
Foreign Medical Graduates*

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................ 1

II.    ARGUMENT ............................................................................................................... 1

    A.    There Is No Genuine Dispute Dr. Tulp Had Notice and Opportunity to be Heard. ................................................................................................................ 1

    B.    Neither the Court's Motion to Dismiss Ruling, Nor Unverified Allegations in the Complaint Create Genuine Disputes of Material Fact ................................ 5

    C.    Dr. Tulp is Not Entitled to Any Form of Relief ...................................................... 6

    D.    ECFMG Followed This Court's Policies and Procedures ..................................... 7

III.   CONCLUSION ........................................................................................................... 9

SAppx0955

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bricklayers & Allied Craftworkers Local 1 of PA/DE v. Penn Valley Tile, Inc.*,
  175 F. Supp. 3d 487 (E.D. Pa. 2016) ...........................................................................8

*Chung v. Park*,
  514 F. 2d 382 (3d Cir. 1975)................................................................................3, 4

*Heller v. Doe*,
  509 U.S. 312 (1993)...............................................................................................4

*Power Restoration Int'l Inc. v. PepsiCo, Inc.*,
  No. 12-1922, 2015 WL 1208128 (E.D. Pa. March 17, 2015)...................................7

*Psi Upsilon of Philadelphia v. University of Pennsylvania*,
  591 A.2d 755 (Pa. Super. 1991)..............................................................................4

*Shah v. Bank of America*,
  346 F. App'x 831 (3d Cir. 2009) ............................................................................6

*Thomas M. Cooley Law v. American Bar Ass'n*,
  459 F.3d 705 (6th Cir. 2006) .................................................................................4

**Other Authorities**

Fed. R. Civ. P. 12....................................................................................................5

Fed. R. Civ. P. 26....................................................................................................6

Fed. R. Civ. P. 37....................................................................................................6

Fed. R. Civ. P. 56................................................................................................8, 9

-ii-

# I.    INTRODUCTION

Summary judgment is warranted and nothing in Dr. Tulp's Opposition changes that.  There is no genuine dispute that ECFMG gave Dr. Tulp (a) repeated notice of the allegations and evidence against him, and (b) multiple opportunities to present a substantive response—in writing and in person—to the allegations and evidence against him.  Dr. Tulp's allegations of a supposedly inadequate "record" on irregular behavior ring hollow when he comes forward with no evidence to dispute that the substantial evidence supporting the irregular behavior finding was shared with Dr. Tulp's counsel prior to and during the irregular behavior proceeding.

In denying Dr. Tulp's request for injunctive relief, this Court concluded specifically that based on the evidence presented at the injunction hearing, "*[i]n this case, there was notice and an opportunity to be heard*."    SOF 78 (emphasis added).    Dr. Tulp concedes that the evidence presented during the injunction hearing "may have been, at the time, sufficient notice and opportunity to be heard …."  Opp. at 5.  Dr. Tulp further concedes that the discovery that has taken place since the injunction hearing has shed "[v]ery little, if any, new light . . . on the hearing of Dr. Tulp before the ECFMG."  Opp. at 6.  Because Dr. Tulp cannot genuinely dispute that the record before the Court on summary judgment is in all material respects the same as (if not more favorable to ECFMG than) the record that led the Court to find that "there was notice and an opportunity to be heard," summary judgment should be granted.

# II.    ARGUMENT

## A.    There Is No Genuine Dispute Dr. Tulp Had Notice and Opportunity to be Heard.

There is no genuine dispute that ECFMG gave Dr. Tulp repeated notice of the allegations and evidence against him.    Dr. Tulp cites **no evidence** suggesting that he lacked notice of the irregular behavior allegations.    Rather, as described in detail in ECFMG's summary judgment

submission, ECFMG sent multiple letters to Dr. Tulp before the irregular behavior proceeding to summarize and describe in detail the irregular behavior allegations against him.  Def.'s Stmt. of Undisputed Material Facts ("SOF"), ECF No. 31-3, ¶¶ 31-36, 37, 39.  ECFMG also sent Dr. Tulp's counsel copies of the materials that the Medical Education Credentials Committee would consider regarding the irregular behavior allegations and several explanations of ECFMG's process for investigating and evaluating irregular behavior allegations.  SOF ¶¶ 31-39, 42-46.

There is no genuine dispute that ECFMG gave Dr. Tulp multiple opportunities to be heard. Dr. Tulp does not dispute that he was invited to present a written response to the irregular behavior allegations and that he had an opportunity to appear personally before the Medical Education Credentials Committee with two attorneys to address those allegations.  SOF ¶¶ 35, 37, 39-43.  Dr. Tulp's unsupported assertion that "no witnesses or evidence [were] allowed to be presented at the hearing" is false and insufficient to create a genuine dispute of material fact.  Rather, the undisputed evidence is that **Dr. Tulp** was invited to testify and present evidence before and during the irregular behavior proceeding.  SOF ¶¶ 54-56.  Indeed, it is the height of *chutzpah* for Dr. Tulp to fault ECFMG for terminating his irregular behavior hearing "without plaintiff making any statement" when Dr. Tulp's counsel repeatedly and emphatically stated that Dr. Tulp was **refusing to testify** and that the next time he would speak would be in federal court.  *Id.*; *see also* Opp. at 14. Dr. Tulp cites no evidence to create a genuine dispute as to what happened at the injunction hearing, which is set forth in the hearing transcript, SOF ¶¶ 47–62, and demonstrates that Dr. Tulp was afforded common law due process.[1]  ECFMG respectfully encourages the Court to read that short transcript in its entirety.  JA0139-JA0175.

---

[1] Dr. Tulp suggests that notice of the irregular behavior finding was posted to the World Directory prior to the hearing.  ECF. No. 33-3 at ¶ 2.  The evidence is insufficient to create a genuine dispute because it consists of a single email purportedly sent by Plaintiff after the close of discovery to his

SAppx0958

Dr. Tulp makes various other arguments in an attempt to create a genuine dispute regarding the due process afforded to him. As detailed below, each fails.

**First**, Dr. Tulp argues that there was no evidence "in the administrative record" before the Medical Education Credentials Committee to support a finding of irregular behavior. Opp. at 14. That argument is misleading (and immaterial) because it is undisputed that there is no process for admitting evidence "in the record" during irregular behavior proceedings. SOF ¶¶ 48, 52; JA0198 (testimony of Kara Corrado). Dr. Tulp cannot genuinely dispute that there was substantial evidence considered by the Medical Education Credentials Committee supporting its finding that Dr. Tulp engaged in irregular behavior. SOF ¶¶ 45, 48, 59, 63. The fact is Dr. Tulp had notice of that evidence and multiple opportunities to be heard regarding the allegations of irregular behavior against him. SOF ¶¶ 35, 37, 39-46, 48, 54-56, 62.

**Second**, Dr. Tulp claims that the "burden of proof" was placed on him improperly. Opp. at 12. As a threshold matter, Dr. Tulp did not bear the "burden of proof" in connection with the irregular behavior proceeding. ECFMG presented to Dr. Tulp and the Medical Education Credentials Committee substantial evidence supporting the irregular behavior allegations against Dr. Tulp. SOF ¶¶ 35, 37, 39-46, 48, 54-56, 62. Dr. Tulp was then asked to respond to that evidence. But even if Dr. Tulp was assigned the burden of proof, that would not be improper or contrary to due process. *See Chung v. Park*, 514 F. 2d 382, 386-87 (3d Cir. 1975) (rejecting argument that university's practice of placing burden of proof on terminated professor at hearing violated due process because "[d]ue process is protean in nature" and burden of proof comported

---

lawyer alleging that such information had been posted. PA0558. The genuine record evidence shows that it had not yet been posted, and still has not been posted. SOF ¶¶ 74-75. Moreover, the timing of changes to the World Directory are immaterial to the question of whether Dr. Tulp had notice and an opportunity to be heard with respect to the irregular behavior allegations against him.

SAppx0959

with function of hearing "to inform professor of the grounds for his non-retention and to allow him to challenge their sufficiency"). As explained above, Dr. Tulp had notice and an opportunity to be heard—the touchstones of due process—and assigning him the burden of proof would not demonstrate a denial of due process.

*Third*, Dr. Tulp's reliance (at Opp. 9-10) on certain procedures used in other due process cases to argue that ECFMG violated Dr. Tulp's due process rights in this case is unavailing. Due process is a flexible concept that may differ from circumstance to circumstance. *See Heller v. Doe*, 509 U.S. 312, 332 (1993) ("[F]lexibility is necessary to gear the process to the particular need; the quantum and quality of the process due in a particular situation depend upon the need to serve the purpose of minimizing the risk of error." (quoting *Greenholtz v. Inmates of Neb. Penal & Correctional Complex*, 442 U.S. 1, 13 (1979)). "The difference in the nature of the interests implicated affects the procedural requisites for the hearing." *Chung*, 514 F.2d at 387 n. 8 (citing *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971)). ECFMG's decision to not accept paperwork with Dr. Tulp's signature given his numerous misrepresentations was an action reflecting ECFMG's determination that it could not trust information provided by Dr. Tulp. Such a decision is based on ECFMG's discretion, dissimilar from the accrediting decisions at play in *Thomas M. Cooley Law School. v. American Bar Ass'n*, which were based on violations of specific rules and regulations, or the university sanctions imposed on a student fraternity in *Psi Upsilon of Philadelphia v. University of Pennsylvania*, which were based on violations of specific obligations under the fraternity's charter. Accordingly, the irregular behavior proceeding reflected many of the processes afforded in those two circumstances, but it need not reflect all the process afforded in those circumstances, given the discretionary nature of ECFMG's action. *See Chung*, 514 F.2d at 387 n. 8 (recognizing that process required is more lenient in circumstances where the decision

-4-

is based on the discretion of the sanctioning entity, rather than whether a sanctioned party met a set of statutory or administrative conditions that would entitle it to a particular property or liberty interest).

**B.    Neither the Court's Motion to Dismiss Ruling, Nor Unverified Allegations in the Complaint Create Genuine Disputes of Material Fact.**

Dr. Tulp argues that summary judgment is not warranted because "[n]othing has changed, in terms of the summary judgment record" on the issue of common law due process, "since the Court concluded in its [motion-to-dismiss] Opinion that there was a plausible claim for deprivation of common law due process." Opp. at 14. But Dr. Tulp cannot rely on the Court's motion-to-dismiss opinion in order to create a genuine dispute of material fact. The Court's motion-to-dismiss ruling was based on its limited review under Federal Rule of Civil Procedure 12(b)(6) of the mere allegations of the Complaint and its attachments. ECF. No. 28 at 1 n. 1. To the extent the Court declined to consider evidence from the injunction hearing when ruling on ECFMG's Motion to Dismiss, the Court was obligated to accept as true all of the well-pleaded allegations in Dr. Tulp's Complaint and to construe those allegations in the light most favorable to Dr. Tulp. ECF No. 28 at 1 n. 1. The Court could not consider or review any other evidence, including the transcript of the irregular behavior proceeding. JA0139-JA0175. To the contrary, when the Court considered a more complete record with evidence at the injunction hearing earlier in this case, it concluded that Dr. Tulp's due process claims lacked merit because "[i]n this case, there was notice and an opportunity to be heard." SOF ¶ 78.[2]

---

[2]    Dr. Tulp argues that the Court could not have found after the injunction hearing that there was notice and an opportunity to be heard because "[i]f the Court had already found that there was notice and opportunity to be heard, which is tantamount to common law due process, there would not be a motion for summary judgment." Opp. at 5. This confuses the nature of injunction hearings and motions to dismiss. At the motion to dismiss stage, the Court limited its analysis to the allegations in the Complaint and its exhibits. ECF. No. 28 at 1 n. 1. It was based on that limited analysis that the case was permitted to proceed to discovery and summary judgment. The fact is

SAppx0961

Similarly, to the extent that Dr. Tulp quotes from the allegations in his unverified Complaint to argue that summary judgment is unwarranted, *see* Opp. at 2-4, such allegations are not evidence and cannot create genuine disputes of material fact. *Shah v. Bank of America*, 346 F. App'x 831, 833 (3d Cir. 2009) ("To survive a motion for summary judgment, the plaintiff cannot rely on unsupported allegations in the complaint, and must present more than 'the mere existence of a scintilla of evidence.'") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). It is Dr. Tulp's burden to present ***record evidence*** in support of his claims to defeat summary judgment. As evidenced by the unsubstantiated assertions and sparse record citations in Dr. Tulp's Opposition, Dr. Tulp has failed to meet that burden.

### C.    Dr. Tulp is Not Entitled to Any Form of Relief.

The record confirms that Dr. Tulp is not entitled to any form of relief. During discovery, Dr. Tulp failed to produce any evidence to substantiate his claim for damages. ECF No. 31-1 at 20. ECFMG served several discovery requests seeking such evidence and even served a letter before the close of discovery demanding the production of any evidence of Dr. Tulp's damages. SOF ¶ 79. Dr. Tulp produced no such documents. *Id.* Now, Dr. Tulp has included in his supplemental appendix documents that had never before been produced purporting to support Dr. Tulp's damages claim. Decl. of Elisa McEnroe ("McEnroe Decl.") ¶7, JA0703–JA0704. This attempted sandbagging is improper, and the evidence not produced in discovery should not be considered. Fed. R. Civ. P. 37(c) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e) the party is not allowed to use that information or witness to supply

---

that discovery has confirmed that the record before the Court at the injunction hearing—when the Court considered all of the evidence presented and concluded there was notice and opportunity to be heard—was complete and accurate.

SAppx0962

evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").[3]

Even if the Court were to consider materials that had not been produced in discovery, those materials do not preclude summary judgment. Dr. Tulp has presented no evidence from which a reasonable jury could determine the value of Dr. Tulp's interest in USAT or any alleged damages suffered by Dr. Tulp as a result of ECFMG's alleged conduct. Sufficient evidence of damages is required to survive summary judgment for more than a nominal award. *See Power Restoration Int'l Inc. v. PepsiCo, Inc.*, No. 12-1922, 2015 WL 1208128, at *4-9 (E.D. Pa. March 17, 2015) (lost profits requires non-speculative evidence of sufficient to establish anticipated net profit). Rather, the evidence in the record demonstrates that Dr. Tulp was never paid by USAT. SOF ¶ 19. Moreover, Dr. Tulp attributes damages to ECFMG's update to the World Directory of Medical Schools, which was a factual update to students about the status of USAT. The plaintiff in this case is Dr. Tulp, not USAT.

### D.    ECFMG Followed This Court's Policies and Procedures.

Dr. Tulp spends much energy in the Opposition arguing that ECFMG did not follow proper procedures in the filings attendant to its Motion for Summary Judgment. Dr. Tulp is wrong. ECFMG followed the Court's Policies and Procedures in submitting its Statement of Undisputed Material Facts (ECF No. 31-3) and the Joint Appendix (ECF No. 31-4).

With respect to the Statement of Undisputed Facts, in accordance with the Court's Policies and Procedures, ECFMG filed "a separate Statement of Undisputed Material Facts containing a numbered, paragraph-by-paragraph recitation of facts with specific citations to the joint appendix

---

[3]     Dr. Tulp argues that certain unidentified "letters from ECFMG" are "not in the record or exhibits" and should not be considered. Examination of the record shows that all of the letters relied upon by ECFMG were produced in discovery and are properly before the Court on summary judgment.

SAppx0963

in support of all of those facts as to which [ECFMG] contends no genuine issue exists." Judge

Beetlestone Policies & Procedures, Civil Cases, Section V.C.1. In response, Dr. Tulp failed to

comply with the Court's Policies and Procedures because he did not submit "a separate Statement

of Disputed Material Facts, stating in similar paragraph form whether [Dr. Tulp] accepts or rejects

that each fact as stated by the moving party is undisputed." Judge Beetlestone Policies &

Procedures, Civil Cases, Section V.C.2. Dr. Tulp claims that it was "difficult to respond" to

ECFMG's Statement of Undisputed Material Facts because the facts "were never agreed to" by

Dr. Tulp and Dr. Tulp's counsel first saw ECFMG's Statement of Undisputed Material Facts when

ECFMG filed its Motion for Summary Judgment. Opp. at 1-2. That does not excuse Dr. Tulp's

failure to comply with this Court's Policies and Procedures. ECFMG was under no obligation to

share its Statement of Undisputed Material Facts with Dr. Tulp prior to filing, and Dr. Tulp had

ample time—including an extra 10 days by stipulation of the parties—to respond as required by

this Court's Policies and Procedures.[4]

Similarly, Dr. Tulp's complaints about the procedure used by ECFMG to assemble the

Joint Appendix (ECF No. 31-4) are unfounded. ECFMG followed this Court's Policies and

Procedures to the letter. Pursuant to this Court's Policies and Procedures, ECFMG conferred with

Dr. Tulp's counsel regarding the contents of the Joint Appendix. McEnroe Decl. ¶¶5–6. Initially,

ECFMG provided Dr. Tulp's counsel with a table of contents summarizing the contents of the

proposed Joint Appendix, along with an electronic version of the proposed Joint Appendix.

---

[4]      Because Dr. Tulp failed to respond as required by the Court's Policies and Procedures, the facts set forth in ECFMG's Statement of Undisputed Material Facts should be deemed admitted. *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."); *see, e.g.*, *Bricklayers & Allied Craftworkers Local 1 of PA/DE v. Penn Valley Tile, Inc.*, 175 F. Supp. 3d 487 (E.D. Pa. 2016).

SAppx0964

McEnroe Decl. ¶3; JA0705–JA0706.  When Dr. Tulp's counsel sent a letter to ECFMG's counsel reflecting confusion about whether ECFMG was asking him to stipulate to anything about the documents, ECFMG's counsel called Dr. Tulp's counsel on the phone.  McEnroe Decl. ¶¶4–5; JA0707–JA0708.  During the call, counsel for ECFMG explained the Court's Policies and Procedures regarding the Joint Appendix, including the fact that Dr. Tulp could add materials to the Joint Appendix before filing or supplement the Joint Appendix with additional materials after it was filed (if necessary).  McEnroe Decl. McEnroe Decl. ¶6.  Dr. Tulp's counsel responded that he had nothing to add to the Joint Appendix at that time and that ECFMG counsel had conferred with him pursuant to the Court's Policies and Procedures.  McEnroe Decl. ¶6.

In sum, ECFMG followed this Court's summary judgment procedures and Dr. Tulp did not.  Dr. Tulp's dissatisfaction with those procedures is not a basis to deny ECFMG the relief it seeks, nor is it grounds to deny summary judgment.

## III.    CONCLUSION

For the foregoing reasons, ECFMG respectfully requests that the Court grant its Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.

Dated: June 20, 2019

Respectfully submitted,

/s/ Elisa P. McEnroe
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA  19103-2921
Telephone:      +1.215.963.5917
Facsimile:      +1.215.963.5001
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for*
*Foreign Medical Graduates*

SAppx0966

## CERTIFICATE OF SERVICE

I do hereby certify that on this date, I caused true and correct copies of the foregoing

document to be served via electronic filing upon the following counsel of record via the ECF

system and/or mail:

TOMMY SWATE
403 WILD PLUM
HOUSTON, TX 77013
Email: swatemd@aol.com

WILLIAM C. REIL
1515 MARKET ST SUITE 1200
PHILADELPHIA, PA 19102
215-564-1635
Fax: 215-564-4292
Email: billreillaw@gmail.com

*Attorneys for Plaintiff*

DATED:  June 20, 2019                    */s/ Elisa P. McEnroe*
                                         Elisa P. McEnroe

SAppx0967

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DR. ORIEN L. TULP, <br><br> Plaintiff, <br><br> v. <br><br> EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES and DR. WILLIAM W. PINSKY, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) Case No. 2:18-cv-05540-WB <br><br> Hon. Wendy Beetlestone |

## DEFENDANT EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES' REPLY STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Section V.C.3 of the Court's Policies and Procedures for Civil Cases, Defendant Educational Commission for Foreign Medical Graduates ("ECFMG") submits the following Reply Statement of Undisputed Material Facts in response to Plaintiff Dr. Orien L. Tulp's Statement of Disputed Material Facts.

1.      The administrative hearing by the ECFMG on 11/28/18 for Dr. Tulp was fundamentally unfair and violated common law due process. (Number 14 on Plaintiff's Appendix, Transcript of ECFMG Hearing for Dr. Tulp (11-28-18), PA0670-PA0702).

**RESPONSE:** This paragraph contains improper legal conclusions. To the extent that a response is required, this paragraph is disputed but not material. ECFMG admits that an irregular behavior proceeding for Dr. Tulp took place on November 28, 2018. SOF ¶¶ 47. ECFMG denies that the irregular behavior proceeding was "fundamentally unfair and violated common law due process" for the reasons set forth in its summary judgment briefing. ECF No. 31-1, 31-3.

2.      Defendants' [sic] violated Dr. Tulp's right to common law due process by publishing on the WDOMS before his hearing. This impacted the hearing because it implied that Dr. Tulp was guilty of irregular behavior or misconduct before he had his hearing.

1

**RESPONSE:** This paragraph contains improper legal conclusions. To the extent that a response is required, this paragraph is disputed but not material. ECFMG denies that ECFMG violated Dr. Tulp's right to common law due process. ECF No. 31-1, 31-3. Moreover, ECFMG denies that it published information on the World Directory of Medical Schools that "implied that Dr. Tulp was guilty of irregular behavior or misconduct." The evidence shows that ECFMG posted truthful factual information on the World Directory regarding how it would proceed with applications from USAT students (so that the impacted students could be aware and proceed accordingly), not information about Dr. Tulp's irregular behavior proceedings or finding. SOF ¶¶ 69–75. Any dispute regarding the timing of postings to the World Directory is not genuine and is not material to the question of whether Dr. Tulp had notice and an opportunity to be heard in connection with his irregular behavior finding.

3.       There is no evidence, in the record of the administrative hearing of Dr. Tulp, from which the ECFMG could have found him guilty of irregular behavior. (Number 14 on Plaintiff's Appendix, Transcript of ECFMG Hearing for Dr. Tulp (11-28-18), PA0670-PA0702).

**RESPONSE:** This paragraph contains improper legal conclusions. To the extent that a response is required, this paragraph is disputed but not material. Substantial evidence supporting Dr. Tulp's irregular behavior finding was presented to the Medical Education Credentials Committee and disclosed to Dr. Tulp and his counsel before and during the irregular behavior proceeding. SOF ¶¶ 21-46. Dr. Tulp's reference to evidence "in the record" is disputed as misleading because ECFMG does not have a process whereby materials presented to the Medical Education Credentials Committee can be entered into evidence in connection with irregular behavior proceedings. SOF ¶¶ 48, 52; JA0198. Any dispute regarding the evidence presented at Dr. Tulp's irregular behavior hearing is immaterial to the question of whether Dr. Tulp had notice and an opportunity to be heard in connection with his irregular behavior finding.

2

4.      ECFMG limited Dr. Tulp to 20 minutes for presentation and the hearing was unilaterally terminated by Elisa P. McEnroe, Esquire, without any evidence put in to the record. (PA0701, ECFMG Hearing; Complaint paragraph 15, PA0562).

**RESPONSE:**  This paragraph is disputed but not material.  Dr. Tulp's opportunity to

present his response was scheduled for 20 minutes.  SOF ¶ 43.  The hearing was terminated by

counsel for ECFMG because Dr. Tulp refused to testify and his counsel became hostile and refused

to present any evidence explaining or clarifying Dr. Tulp's position that an irregular behavior

finding was not warranted.  SOF ¶¶ 56–59, 62.  Dr. Tulp's reference to evidence "put in to the

record" is disputed as misleading because ECFMG does not have a process whereby materials

presented to the Medical Education Credentials Committee can be entered into evidence in

connection with irregular behavior proceedings.  SOF ¶¶ 48, 52; JA0198.  The disputed facts are

immaterial to the question of whether Dr. Tulp had notice and an opportunity to be heard in

connection with his irregular behavior finding.

5.      Dr. Tulp never received any indication from ECFMG, nor did their rules indicate, who had the burden of proof at the administrative hearing. Accordingly, Dr. Tulp did not know whether ECFMG intended to present witness and evidence that he could cross-examine. At the hearing, Dr. Tulp was informed that he had the burden of proof. (PA0672). See also spreadsheet of student losses at USAT. (PA0663-PA-0665).

**RESPONSE:**  This paragraph is disputed in part but not material.  Dr. Tulp did not have

the burden of proof and was never told that he had the burden of proof.  SOF ¶¶ 35, 37, 40, 42, 43,

45, 48, 51–55, 59–62.  ECFMG's policies indicate the processes through which ECFMG presents

the evidentiary basis underlying irregular behavior allegations and the process through which those

alleged to have committed irregular behavior may respond to those allegations.  SOF ¶ 3.  ECFMG

objects to Dr. Tulp's inclusion of a spreadsheet of student losses at USAT in his supplemental

appendix because it was never produced in discovery despite being responsive to numerous

3

discovery requests. SOF ¶ 79. The disputed facts are immaterial to the question of whether Dr. Tulp had notice and an opportunity to be heard in connection with his irregular behavior finding.

6. ECFMG serves a public function by certifying International Medical Graduates. Not reasonably disputed.

**RESPONSE:** Disputed but immaterial. ECFMG disputes that it "serves a public function" because it is not clear what is meant by "public function." In dismissing Dr. Tulp's constitutional due process claims, this Court already held that ECFMG is not a state actor nor does its alleged conduct constitute state action. ECF No. 28 at 5. The disputed fact is immaterial to the question of whether Dr. Tulp had notice and an opportunity to be heard in connection with his irregular behavior finding.

7. The policy of the ECFMG is not to present witnesses or documents at hearing. (Injunction Hearing, testimony of Corrado, lines 5-12, JA0197).

**RESPONSE:** Disputed in part but immaterial. ECFMG's standard practice is to present copies of all written materials to be considered by the Medical Education Credentials Committee and to give the subject of the irregular behavior proceedings the opportunity to be heard and make a personal appearance before the Committee. SOF ¶ 35, 39; JA0197, JA0209. ECFMG does not normally allow for live witnesses other than the subject of the proceedings, though it does take written statements into account. *Id.* The disputed fact is immaterial to the question of whether Dr. Tulp had notice and an opportunity to be heard in connection with his irregular behavior finding.

8. In terms of damages, paragraphs 29 and 30, together with the prayer of the complaint, set forth not only injunctive and equitable relief, but also the tangible and intangible effects of the ECFMG on Dr. Tulp. Plaintiff requests that the finding of "irregular behavior" be reversed. It is too late now to have another hearing., since USAT has basically been destroyed by the actions of the ECFMG. Dr. Tulp indicated in his deposition with regards to damages the following: when the ECFMG posted a warning on the WDOMS before the hearing with ECFMG. At that time, virtually all payments to USAT stopped and there was a mass exodus of students. Dr. Tulp indicated that ECFMG cost USAT over a thousand students and their medical careers. (Tulp deposition at JA0511). Dr. Tulp also indicated "The uncollectible tuitions as of October 1st up to,

4

you now, from at that point over $41.2 million. These are students that are paying a little bit each month as they could, waiting to get their documents." (Tulp deposition at JA0513).

**RESPONSE:** This statement consists of improper legal conclusions and there are no facts for ECFMG to recognize as disputed or undisputed. To the extent that a response is required, this paragraph is disputed in part but immaterial. Dr. Tulp points to no facts in the record supporting his contention that it is too late to have another hearing. Although ECFMG does not dispute that Dr. Tulp made allegations regarding his damages in his Complaint and at his deposition, ECFMG disputes Dr. Tulp's characterization of those alleged damages. The evidence shows that ECFMG posted truthful factual information on the World Directory regarding how it would proceed with applications from USAT students (so that the impacted students could be aware and proceed accordingly), not information about Dr. Tulp's irregular behavior proceedings or finding. SOF ¶¶ 69–75. Dr. Tulp has presented no evidence to support his contentions regarding a mass exodus of students from USAT and uncollected tuition payments. Even if he had, the disputed facts are immaterial to the question of whether Dr. Tulp had notice and an opportunity to be heard in connection with his irregular behavior finding.

9. According to ECFMG procedure, no witnesses or evidence were presented at the administrative hearing of Dr. Tulp. (Number 14 on Plaintiff's Appendix, Transcript of ECFMG Hearing for Dr. Tulp (11-28-18), PA0670-PA0702).

**RESPONSE:** Disputed in part but immaterial. ECFMG's standard practice is to present copies of all written materials to be considered by the Medical Education Credentials Committee and to give the subject of the irregular behavior proceedings the opportunity to be heard and make a personal appearance before the Committee. SOF ¶ 35, 39; JA0197, JA0209. Consistent with this practice, ECFMG provided the written materials considered by the Medical Education Credentials Committee and Dr. Tulp was provided with an opportunity to serve as a witness and testify, although he refused to do so. SOF ¶¶ 44–46, 48, 55–56, 62. The disputed facts are

5

immaterial to the question of whether Dr. Tulp had notice and an opportunity to be heard in connection with his irregular behavior finding.

10.     The ECFMG refused to define "campus" when asked prior to the 11/28/19 hearing, but insisted that Dr. Tulp define it for the ECFMG. (PA0668).

**RESPONSE:**  Disputed but immaterial.  As ECFMG uses the word campus in its common parlance, ECFMG asked Dr. Tulp what *he* meant by "campus" when he said that USAT did not have a campus in the United States, especially since Dr. Tulp's answer conflicted with information that USAT had been offering classes in the United States.  SOF ¶¶ 22-33, 57.  Dr. Tulp himself used the same common meaning of the word "campus" prior to this litigation.  JA0254.  The disputed facts are immaterial to the question of whether Dr. Tulp had notice and an opportunity to be heard in connection with his irregular behavior finding.

11.     Nowhere in the rules or regulations of the ECFMG, is it stated who has the burden of proof at the hearing. Not reasonably disputed.

**RESPONSE:**  Disputed but immaterial.  ECFMG incorporates by reference its response to Paragraph 5.  ECFMG's policies indicate the processes through which ECFMG presents the evidentiary basis underlying irregular behavior allegations and the process through which those alleged to have committed irregular behavior may respond to those allegations.  SOF ¶3.  This disputed fact is immaterial to the question of whether Dr. Tulp had notice and an opportunity to be heard in connection with his irregular behavior finding.

12.     The ECFMG conducted the administrative hearing as if Dr. Tulp had the burden to prove his innocence without any evidence introduced against him. (Number 14 on Plaintiff's Appendix, Transcript of ECFMG Hearing for Dr. Tulp (11-28-18), PA0670-PA0702).

**RESPONSE:**  This paragraph is disputed but not material.  ECFMG incorporates by reference its responses to Paragraphs 5 and 11.  Dr. Tulp did not have the burden of proof and was never told that he had the burden of proof.  SOF ¶¶ 35, 37, 40, 42, 43, 45, 48, 51–55, 59–62.

6

ECFMG's policies indicate the processes through which ECFMG presents the evidentiary basis underlying irregular behavior allegations and the process through which those alleged to have committed irregular behavior may respond to those allegations.  SOF ¶3.  Substantial evidence supporting Dr. Tulp's irregular behavior finding was presented to the Medical Education Credentials Committee and disclosed to Dr. Tulp and his counsel before and during the irregular behavior proceeding.  SOF ¶¶ 21–46.  Dr. Tulp's reference to "evidence introduced" is disputed as misleading because ECFMG does not have a process whereby materials presented to the Medical Education Credentials Committee can be "introduced" at the irregular behavior proceedings.  SOF ¶¶ 48, 52; JA0198.  The disputed facts are immaterial to the question of whether Dr. Tulp had notice and an opportunity to be heard in connection with his irregular behavior finding.

Dated: June 20, 2019

Respectfully submitted,

*/s/ Elisa P. McEnroe*
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA  19103-2921
Telephone:     +1.215.963.5917
Facsimile:     +1.215.963.5001
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for Foreign Medical Graduates*

7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DR. ORIEN L. TULP,<br><br>        Plaintiff,<br><br>v.<br><br>EDUCATIONAL COMMISSION FOR<br>FOREIGN MEDICAL GRADUATES and<br>DR. WILLIAM W. PINSKY,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

)  Case No. 2:18-cv-05540-WB

)  Hon. Wendy Beetlestone

## SUPPLEMENT TO JOINT APPENDIX – TABLE OF CONTENTS

| Document | Page(s) |
|---|---|
| June 20, 2019 Declaration of Elisa McEnroe | JA0703-JA0704 |
| Exhibit A: Email from C. Barrett to W. Reil, T. Swate, E. McEnroe, and M. Klayman (May 1, 2019) | JA0705-JA0706 |
| Exhibit B: Letter from W. Reil to E. McEnroe (May 2, 2019) | JA0707-JA0708 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DR. ORIEN L. TULP, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:18-cv-05540-WB |
| | ) | |
| v. | ) | Hon. Wendy Beetlestone |
| | ) | |
| EDUCATIONAL COMMISSION FOR | ) | |
| FOREIGN MEDICAL GRADUATES and DR. | ) | |
| WILLIAM W. PINSKY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DECLARATION OF ELISA P. MCENROE IN SUPPORT OF DEFENDANT'S REPLY**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

I, Elisa P. McEnroe, declare as follows:

1.      I am an attorney in the law firm Morgan, Lewis & Bockius LLP and counsel for Defendant Educational Commission for Foreign Medical Graduates ("ECFMG").

2.      I make this Declaration in connection with the above-captioned action. I have personal knowledge of the facts stated herein and if called as a witness could and would testify to those facts.

3.      On May 1, 2019, my colleague Caitlin Barrett sent counsel for Dr. Tulp (Bill Reil and Tommy Swate) an email entitled "Tulp v. ECFMG – Joint Appendix" concerning the Joint Appendix that would be filed in connection with ECFMG's summary judgment motion. Attached to the email were (1) a table of contents summarizing the contents of the proposed Joint Appendix, and (2) an electronic version of the proposed Joint Appendix. I was copied on that email and received it myself. A true and correct copy of that email (without its voluminous attachments) is attached here as **Exhibit A** (JA0705-JA0706).

JA0704

4.      In response, Bill Reil, counsel for Dr. Tulp, sent a letter to counsel for ECFMG reflecting confusion about whether ECFMG was asking him to stipulate to anything about the documents.   A true and correct copy of that letter is attached here as **Exhibit B** (JA0707-JA0708).

5.      Together with my colleague Matthew D. Klayman, I called Bill Reil on the phone on the afternoon of May 2.

6.      During the call, I explained the Court's Policies and Procedures regarding the preparation of a Joint Appendix, including the fact that Dr. Tulp could add materials to the Joint Appendix before filing or supplement the Joint Appendix with additional materials after it was filed (if necessary).   Mr. Reil responded that he had nothing to add to the Joint Appendix at that time and that we had conferred with him pursuant to the Court's Policies and Procedures.

7.      The first time Dr. Tulp disclosed the "Spreadsheet of Student Loss at USAT" and the accompanying documents (PA 0663–PA 0665) was in its opposition to Defendant's Motion for Summary Judgment.   These documents were responsive to numerous requests for production but not produced in discovery.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge.

EXECUTED:  June 20, 2019

Elisa P. McEnroe

2

# EXHIBIT A

# Barrett, Caitlin

| | |
|---|---|
| **From:** | Barrett, Caitlin |
| **Sent:** | Wednesday, May 1, 2019 11:19 AM |
| **To:** | 'billreillaw@gmail.com'; 'swatemd@aol.com' |
| **Cc:** | McEnroe, Elisa P.; Klayman, Matthew D. |
| **Subject:** | Tulp v. ECFMG - Joint Appendix |
| **Attachments:** | Joint Appendix.pdf; 052766__103809714v1_5.1.2019 DRAFT Table of Contents for Joint Appendix (2).DOCX |

Counsel,

I am sending the following correspondence on behalf of Elisa McEnroe.  Defendant ECFMG intends to move for summary judgment this week in accordance with Judge Beetlestone's scheduling order.  As Judge Beetlestone's Order lays out, the Parties must develop a joint appendix which the movant for summary judgment will then file at the time it files the motion for summary judgment.  Please find attached our proposed joint appendix and a list of the contents of the proposed appendix.  Once the appendix is agreed upon, we will bates-number it and have it prepared for filing.  Please let us know whether you have any objections or additions you would like to make **by the close of business day, tomorrow, May 2, 2019.**

Best,

**Caitlin Barrett**
**Morgan, Lewis & Bockius LLP**
1701 Market Street | Philadelphia, PA 19103-2921
Direct: +1.215.963.5930 | Main: +1.215.963.5000 | Fax: +1.215.963.5001
caitlin.barrett@morganlewis.com | www.morganlewis.com
Assistant: Marlene E. Mackason | +1.215.963.4930 | marlene.mackason@morganlewis.com

SAppx0979

# EXHIBIT B

**William C. Reil, Esquire**
**1515 Market Street, Suite 1200, Philadelphia, PA 19102**
**Tel: 215-564-1635 Fax: 215-564-4292**
**BillReilLaw@gmail.com**

May 2, 2019

**BY EMAIL ONLY**
elisa.mcenroe@morganlewis.com

Elisa P. McEnroe, Esquire
Morgan, Lewis, and Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921

     Re:  Dr. Tulp v. ECFMG and Dr. Pinsky
          Docket No: 2:18-cv-05540-WB
          **Joint Appendix and Stipulations**

Dear Ms. McEnroe:

I received your email captioned "Joint Appendix." There has been insufficient time to look over 500 pages of documents which you sent to us. It would be useful if you could send a list of proposed stipulations, which you wish Mr. Swate and myself to consider.

Generally, I will stipulate to the authenticity of any reasonable exhibit, but not necessarily to the truth of the entire document. Accordingly, it would be preferable to see the document to which the appendix refers. I would recommend to my client that we reserve the right to object to a stipulation, contingent upon how it is used.

Sincerely yours,

*William C. Reil*

William C. Reil

cc:  Tommy Swate, Esquire
      Dr. Orien L. Tulp



# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DR. ORIEN L. TULP,  :  **CIVIL ACTION**
         **Plaintiff,**  :

     v.  :

EDUCATIONAL COMMISSION FOR  :  **NO. 18-5540**
FOREIGN MEDICAL GRADUATES AND  :
DR. WILLIAM W. PINSKY,  :
         **Defendants.**  :

**FILED**

**JAN 25 2019**

KATE BARKMAN, Clerk
By_____Dep. Clerk

## SCHEDULING ORDER

**AND NOW**, this 24th day of January, 2019, following a Preliminary Pretrial Conference,

**IT IS ORDERED** as follows:

1.    All fact discovery shall be completed by April 19, 2019.

2.    Any motions for summary judgment motions shall be filed and served on or

before May 3, 2019. If the parties do not plan on filing summary judgment motions, they shall

so report to the Court (Chambers, Room 3809) on or before May 3, 2019. In all summary

judgment filings, the parties shall comply with the provisions of this Court's Policies and

Procedures regarding the submission of a joint appendix and of statements of undisputed and

disputed material facts.

    A.    When one party intends to move for summary judgment, that party
shall initiate a process whereby the parties shall meet, confer and
develop a single, joint appendix of all exhibits, including any and all
exhibits that may be referenced in their respective briefs.

    B.    The joint appendix shall be filed by the movant no later than the date
the initial motion for summary judgment is docketed. All pages of
the joint appendix shall be consecutively "Bates stamped" and
referenced in the motions and briefs by the Bates number assigned
each page. The joint appendix shall include a table of contents. The
parties shall make every effort to include all necessary exhibits in the
initial joint appendix. Should it become necessary for the non-moving
party to submit additional exhibits, however, it may do so at the time
it files its opposition brief. Any addendum to the joint appendix shall

be consecutively Bates stamped, beginning at the page number where the joint appendix left off, and shall include a table of contents. Judge Beetlestone will not consider material not included in the appendix.

C.    Statements of Facts

    1.    Upon motion for summary judgment, counsel shall also submit a separate Statement of Undisputed Material Facts containing a numbered, paragraph-by-paragraph recitation of facts with specific citations to the joint appendix in support of all of those facts as to which the moving party contends no genuine issue exists.

    2.    Counsel opposing a motion for summary judgment shall also submit a separate Statement of Disputed Material Facts, stating in similar paragraph form whether that party accepts or rejects that each fact as stated by the moving party is undisputed. If a party contends that a fact is in dispute, citation must be made to the joint appendix that supports the party's view that that particular fact is in dispute. The party should then list its own additional disputed facts in the same format with specific citations to the joint appendix.

    3.    Counsel for the moving party shall then submit—even if not filing a reply brief—a separate Reply Statement of Undisputed Material Facts stating in similar paragraph form whether that party accepts or rejects that each additional fact as stated by the opposing party is disputed. If a party contends that a fact is undisputed, citation must be made to the joint appendix that supports that party's view that the particular fact is undisputed.

3.    For all filings submitted and conferences held pursuant to this scheduling order, and for all pretrial and trial proceedings referred to herein, counsel shall follow Judge Beetlestone's Policies and Procedures, a copy of which can be found online at www.paed.uscourts.gov.

BY THE COURT:

_____

**WENDY BEETLESTONE, J.**

ENT'D JAN 2 5 2019

2

**CERTIFICATE OF SERVICE**

I, Elisa P. McEnroe, counsel for Appellees Educational Commission for Foreign Medical Graduates and Dr. William W. Pinsky, certify that, on January 16, 2020, a copy of the foregoing Supplemental Appendix was filed electronically through the appellate CM/ECF system with the Clerk of the Court. All counsel of record in this case are registered CM/ECF users. Pursuant to Local Appellate Rule 30.1, four copies of this brief were sent to the Clerk of the Court for delivery.

Dated: January 16, 2020                 */s/ Elisa P. McEnroe*
                                        Elisa P. McEnroe

                                        *Attorney for Appellees Educational*
                                        *Commission for Foreign Medical*
                                        *Graduates and Dr. William Pinsky*