In The

# United States Court of Appeals
# For the Third Circuit

## 19-2706

ORIEN TULP

*Plaintiff-Appellant*

v.

EDUCATIONAL COMMISSION FOREIGN, ET AL

*Defendants-Appellees*

*On Appeal from Order and Judgment entered in the United States District Court for the Eastern District of Pennsylvania at No. 2-18-cv-05540*

## APPENDIX FOR PLAINTIFF-APPELLANT
## Volume III of III (pgs. 449a-end)

WILLIAM C. REIL, Esq.
LAW OFFICES OF WILLIAM C. REIL
1515 Market St, Suite 1200
Philadelphia, PA 19102
(215) 564-1635
*Attorney for Plaintiff-Appellant*

i

# TABLE OF CONTENTS

**Page**

Notice of Appeal, filed July 23, 2019 ............ 1a

Memorandum Opinion, filed June 25, 2019.. 5a

Opinion, filed March 26,2019 ....................... 20a-1

District Court Docket Entries ........................ 21a

Complaint, filed December 24, 2018............. 25a

Defendant's Motion to Dismiss Plaintiff's
  Complaint, filed January 22, 2019 .............. 60a

Scheduling Order, filed January 25, 2019 ..... 90a

Plaintiff's Answer to Defendant's Motion to
  Dismiss the Complaint, filed February 4,
  2019............................................................ 93a

Reply in Support of Defendant's Motion to
  Dismiss Plaintiff's Complaint, filed
  February 21, 2019 ....................................... 112a

Defendant Educational Commission for
  Foreign Medical Graduates Answer to
  Complaint and Affirmative Defenses, filed
  April 9, 2019 .............................................. 128a

Memorandum of Law in Support of
  Defendant Educational Commission for
  Foreign Medical Graduates Motion for
  Summary Judgment, filed May 3, 2019...... 148a

Plaintiff's Memorandum of Law in
  Opposition to Defendant's Motion for
  Summary Judgment, filed June 3, 2019...... 217a

Reply in Support of Defendant's Motion for
  Summary Judgment, filed June 20, 2019.... 390a

Transcript, dated November 28, 2018 ........... 418a

ii

**Page**

Hearing, dated November 28, 2018 ............... 418a-1

Transcript, dated January 24, 2019 ................ 449a

Transcript, Deposition of William W.
  Pinsky, M.D., dated February 6, 2019 ......... 584a

Transcript of Video Deposition, of Orien L.
  Tulip, PH.D., M.D., dated April 17, 2019 ... 729a

1

1        UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF PENNSYLVANIA

3    ORIEN L. TULP,
                                    Case No.  2:18-cv-05540-WB
4         Plaintiff,

5    v.                             Philadelphia, Pennsylvania
                                    January 24, 2019
6    EDUCATIONAL COMMISSION FOR     2:03 p.m.
     FOREIGN MEDICAL GRADUATES, et
7    al,

8         Defendants.

9

10              TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
                 BEFORE THE HONORABLE WENDY BEETLESTONE
11               UNITED STATES DISTRICT COURT JUDGE

12   APPEARANCES:
     For the Plaintiff:           Tommy Swate, Esquire
13                                 403 Wild Plum
                                   Houston, TX  77013
14
                                   William C. Reil, Esquire
15                                 1515 Market Street, Suite 1200
                                   Philadelphia, PA  19102
16
     For the Defendants:          Elisa P. McEnroe, Esquire
17                                 Matthew D. Klayman, Esquire
                                   Caitlyn Barrett, Esquire
18                                 Morgan Lewis Bockius, LLP
                                   1701 Market Street
19                                 Philadelphia, PA 19103-2921

20
     Court Recorder:              Michael Mani
21
     Transcription Service:       Chris Hwang
22                                 PO Box 223282
                                   Chantilly, Virginia 20153
23

24   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.
25

2

1                                **INDEX**

2
                                              Page
3
   Motion, denied                             134
4

5  WITNESSES FOR PLAINTIFF

6                         Direct    Cross    Redirect   Recross

7  Kara Corrado          8         36        59

8  Orien Tulp            63        102

9
   WITNESSES FOR DEFENDANTS
10
   Kara Corrado          52        74        (102)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

# INDEX OF EXHIBITS

EXHIBITS                                      Marked

PLAINTIFF'S

    C        Agreement                        14

    E        November 28, 2018 letter         109

    G        Letters                          110


DEFENDANT'S

    E        Sponsor Note                     46

    D-1      Video                            80

    D-2      Letter                           81

    D-3      USAT lecture schedule            83

    D-4      Letter                           84

    D-5      Email                            86

    D-6      Affidavit                        90

    D-7      Determination                    93

    1        Printout ECFMG website           111

    2        ECFMG school policy              112

    3        ECFMG information booklet        113

    8        Letter                           114

    13       Message                          116

4

```
1              (Call to order at 2:03 p.m.)

2              THE COURT RECORDER:  All rise.  Court is now in

3    session, the Honorable Wendy Beetlestone presiding.

4              THE COURT:  Good afternoon, have a seat.

5              MR. REIL:  Good day, Your Honor.

6              THE COURT:  This is the matter of Tulp v.

7    Educational Commission for Foreign Medical Graduates.  It's a

8    hearing on the preliminary injunction.  Can I have some

9    introductions, please?

10             MR. REIL:  I'm William C. Reil for the Plaintiff.

11             You introduce yourself.

12             MR. SWATE:  Tommy Swate for the Plaintiff.

13             THE COURT:  Okay.  This is the Plaintiff Mr. Tulp,

14   Dr. Tulp?

15             MR. TULP:  I'm Orien Tulp, the Plaintiff.

16             THE COURT:  Okay.  Defense?

17             MS. MCENROE:  Good afternoon, Your Honor, Elisa

18   McEnroe for Morgan Lewis on behalf of the Educational

19   Commission for Foreign Medical Graduates and Dr. Pinsky, both

20   of the Defendants.

21             Today with me, I have my colleagues Matt Klayman and

22   Caitlyn Barrett.  I also have the General Counsel for ECFMG

23   Francine Katz here at the table with us.

24             THE COURT:  Okay.

25             MS. MCENROE:  And we have two fact witnesses, who
```

1   requested to attend as well, Ms. Kara Corrado and Lisa Cover,

2   two executives from ECFMG.

3       THE COURT:  Okay.  So before we begin, I just want to

4   clarify exactly what we're doing here today.  So in looking at

5   the complaint, it is a little unclear to me as exactly what

6   causes of action are being asserted.  And what I glean from it,

7   and Mr. Reil or Mr. Swate, you should tell me if I'm incorrect.

8       The first cause of action is tortiously interfering

9   with the contract between the students of USAT and against

10  ECFMG.  And that is a common law tortious interference with

11  contract claim; is that correct?

12      MR. REIL:  Yes, Your Honor.

13      THE COURT:  Okay.  Next one as I understand it is

14  it's a violation of due process claim against -- do I refer to

15  you as ECFMG or ECF?  Or what's the best way of --

16      MS. MCENROE:  ECFMG would be our preferred acronym,

17  but whatever works for Your Honor.

18      THE COURT:  That's fine.  Okay, violation of due

19  process against ECFMG, which appears to be a $1983 claim

20  alleging that ECFMG violated Tulp's procedural due process

21  rights as protected by the 14th Amendment; is that correct?

22      MR. REIL:  Yes, Your Honor.

23      THE COURT:  And then the third cause of action,

24  fraudulent misrepresentation, abuse of process, and negligent

25  representation against ECFMG appears to be three separate

6

1   common law claims -- common law fraud, common law abuse of

2   process, and common law negligent misrepresentation.  Is that

3   correct?

4          MR. REIL:  Yes, Your Honor.

5          THE COURT:  And then finally, the fourth cause of

6   action, a violation of procedural and substantive due process

7   against all Defendants appears to be a §1983 claim alleging

8   that Defendants violated Tulp's procedural and substantive due

9   process rights as protected by the 14th Amendment.  Is that

10  correct?

11         MR. REIL:  Yes, Your Honor.

12         THE COURT:  Okay, and in terms of this hearing today,

13  are you proceeding under each of the causes of action or any

14  particular one?

15         MR. REIL:  I think we're -- I think the emphasis

16  today will be on the lack of due process.  I won't say we're

17  not proceeding on the others, but I think that would be

18  featured as --

19         THE COURT:  So procedural and substantive due

20  process.  So that is the second and the fourth cause of action?

21         MR. REIL:  I think there are -- they'll be our main

22  arguments, yes.

23         THE COURT:  Okay, and if I look at your motion, I

24  believe it is for a preliminary and a permanent injunction.

25         MR. REIL:  Yeah, and/or a permanent.

7

1      THE COURT:  And/or a permanent.  Now obviously, at

2  this stage, I'm not going to -- it's way too early in the game

3  for a permanent injunction.  So we are going to proceed under

4  the preliminary injunction rubric.

5      MR. REIL:  That's fine.

6      THE COURT:  Okay, so your first witness, or if you

7  want to make an argument, up to you.

8      MR. REIL:  I think, given the time constraints we

9  have here, maybe we would just call the first witness.  I'd

10  like to -- there's two witnesses here from ECFMG.

11      I'd like to make the motion for sequestration.  I'm

12  going to call Ms. Corrado.  The other witness I believe is Ms.

13  Cover.  I request that she be submit --

14      THE COURT:  Any objection to sequestering Ms. Cover?

15      MS. MCENROE:  No objection.

16      THE COURT:  Ms. Cover, could you please leave the

17  courtroom and wait outside?

18      Ms. Corrado, could you please approach the bench?

19  The witness chair is there.

20      And Mr. Mani, please swear the witness.

21      THE COURT RECORDER:  Please raise your right hand.

22  State and spell your name for the record?

23      THE WITNESS:  Kara Corrado, K-A-R-A C-O-R-R-A-D-O.

24                    KARA CORRADO

25  called as a witness for the Plaintiff, having been duly sworn

8

```
1    testified as follows:
2              THE COURT:  Have a seat.
3              THE WITNESS:  Thank you.
4              THE COURT:  Mr. Reil, your witness.
5                         DIRECT EXAMINATION
6    BY MR. REIL:
7         Q    Ms. Corrado, I understand you're employed by ECFMG
8    and I know I'm going to get the initials wrong a couple times.
9    Sometimes even though I realize I'll refer them as the board,
10   although I know the board is only part of them.
11        All right, can you tell the Court what you do for ECFMG?
12        A    Yes.  I am the vice president for operations at
13   ECFMG.
14        Q    Okay, and what are those -- what are you duties?
15        A    I am primarily responsible for oversight of our ECFMG
16   certificate program, as well as a primary source verification
17   for some of our international clients, and oversight of our
18   special investigations team and medical education resources
19   team.
20        Q    I understand you're an attorney, is that --
21             MR. REIL:  Your Honor, I'd ask -- I didn't -- I'd ask
22   that I be able to use leading questions with this witness.
23   She's a managerial employee of the Defendant and she's sent
24   several letters to the -- involving this case to the Plaintiff?
25             MS. MCENROE:  Your Honor, if I may?  If the request
```

456a

9

1   is to cross-examine the witness, I have no objection being that

2   it's our witness.  If the request is to be hostile to the

3   witness, I have an objection.

4           MR. REIL:  I'm not going to --

5           THE COURT:  Well --

6           MR. REIL:  -- use the term hostile.

7           THE COURT:  Well, I think we should be clear that in

8   my courtroom, hostility towards a witness is completely

9   forbidden.  Cross -- vigorous cross-examination is allowed.

10          MS. MCENROE:  No objection to that.

11          THE COURT:  And given that there's no objection, you

12  should cross-examine.  And the aim of the allowing you to

13  cross-examine a witness is simply to get things done as quickly

14  as possible.

15          MR. REIL:  I understand.

16  BY MR. REIL:

17      Q    I don't know if I asked you, you're an attorney?

18      A    I have a J.D. from Temple University.

19      Q    Okay, now can you describe for the record briefly

20  what is ECFMG?  I'll call them the board.

21      A    ECFMG is the Educational Commission for Foreign

22  Medical Graduates.  We are a nonprofit, private organization

23  that was established initially to screen international medical

24  graduates, who were coming to the United States seeking

25  residency programs, you know, and turns into graduate medical

1    education.

2        Q    Is ECFMG an accrediting agency?

3        A    No, sir.

4             THE COURT:  Did you say no?

5             THE WITNESS:  No.

6             THE COURT:  No.

7    BY MR. REIL:

8        Q    Okay, am I correct that a foreign medical student

9    cannot practice as a physician in the United States without

10   certification by ECFMG?  Is that substantially correct?

11       A    Generally, the licensing boards in the United States

12   will require ECFMG certification for international medical

13   graduates, but it's the discretion of each state board who they

14   license.  But generally, yes, they require ECFMG certification.

15       Q    And I -- and we'll probably be using this term a lot,

16   what does that mean ECFMG certification?  What exactly is it

17   that they certify?

18       A    So in order to obtain ECFMG certification, an

19   international medical graduate must meet the requirements for

20   certification.

21           And roughly, there are two such requirements.  There are

22   examination requirements and there are medical education

23   requirements.

24       Q    And ECFMG certifies these things to state medical

25   boards?

1    A    So we certify the individuals.  So if the individual

2  meets those requirements, they will issued a certificate.  That

3  certificate is what they can use then as part of the

4  requirements to get into a graduate medical education program

5  and to be able to take Step 3 of the USMLE and then to --

6  ultimately to be licensed.

7    Q    So undergraduates, foreign undergraduate students and

8  even graduates register with the -- ECFMG; is that correct?

9    A    If they are seeking entrance to graduate medical

10  education in the United States, then yes, they would have to

11  come through ECFMG.

12    Q    Now Dr. Tulp had a hearing here in Philadelphia where

13  ECFMG is located at 36th and Market on November 28th of this

14  year, correct?

15    A    The meeting was actually at the Rittenhouse Hotel.

16    Q    Oh, right, it was your -- I stand corrected.

17    A    That's okay.

18    Q    It was the Rittenhouse Hotel that day.  Well, you

19  were present at that immediate meeting?

20    A    Yes, sir.

21    Q    Okay, and Ms. Cover was present at that meeting?

22    A    She was.

23    Q    And Dr. Pinsky --

24    A    Yes.

25    Q    -- was present at that meeting?

1      A    Yes.

2      Q    Okay, now Dr. Tulp, that was a hearing for what's

3  called irregular behavior, correct?

4      A    Yes.

5      Q    Before we talk about that, is Dr. Tulp -- is he a

6  foreign medical student that's registered with the ECFMG?

7      A    No.

8      Q    Well, does he have some sort of a contract with

9  ECFMG?

10     A    Not that I'm aware of.

11     Q    All right.  Did he ever agree to submit himself in

12  any way to ECFMG?

13     A    I don't know if I understand, I'm sorry.  The --

14     Q    Well, did Dr. Tulp ever say I agree that ECFMG has

15  power over me to determine whether I have met irregular

16  behavior?  Is there any documents or verbal agreements like

17  that?

18     A    Not that I'm aware of.

19     Q    I see.  All right.  Is -- to your knowledge, well, I

20  don't want you to speak for your -- to your knowledge, has

21  anyone from ECFMG ever visited the school, which Dr. Tulp is

22  the president of, the USAT?  Has anybody ever visited the

23  school do you know, inspection?

24     A    Not that I'm aware of.

25     Q    Okay, now the school in USAT, am I correct that it's

13

1    been in existence since about 2003, roughly about 15 years?

2    Were you aware of that?

3        A    I'm aware that we received a copy of a charter for

4    USAT, which shows that it was incorporated in 2003, I believe,

5    yes.

6        Q    A charter from the government of Montserrat?

7        A    Yes, sir.

8            MR. REIL:  Okay, well, maybe with the Court's

9    permission, can I give the witness proposed exhibits that I

10   made, one of the notes?

11           THE COURT:  You may.

12           MR. REIL:  May approach?

13           THE COURT:  You may.

14   BY MR. REIL:

15       Q    Will you take a moment to look at those and I'll have

16   further questions.  And you were talking about, well, why don't

17   you take a look at Exhibit 3 -- Exhibit C --

18       A    Uh-huh.

19       Q    -- on page 5 of the packet that I submitted to you?

20   Tell me when you have it.

21       A    I have it, sir.

22       Q    Okay, now that's several pages and I'm not going to

23   ask you to read through that before.  Do you know whether that

24   is a -- an agreement between -- with the government of

25   Montserrat basically authorizing USAT?

14

1      A     My understanding is that this --

2          THE COURT:  Wait, wait, hold on a second.  Before you

3   ask substantive questions about a particular document, you must

4   seek to have it admitted.

5          MR. REIL:  Yes, Your Honor, okay.  Let me lay a

6   foundation here.  Are you --

7          THE COURT:  Well, let's see if we can -- would you

8   stipulate to the admissibility of this document?

9          MS. MCENROE:  I would stipulate that this is a

10  document that Dr. Tulp submitted to ECFMG.  I don't know that

11  we have the ability to stipulate to authenticity beyond that.

12         THE COURT:  Would you oppose its admissibility?

13         MS. MCENROE:  For these purposes today, no.

14         THE COURT:  Just for the -- okay, so for the purposes

15  only of this preliminary injunction hearing, it is admitted.

16  You can ask substantive questions.

17      (Plaintiff's Exhibit C admitted into evidence)

18         MR. REIL:  Okay.

19  BY MR. REIL:

20      Q     All right, to your knowledge, is this document

21  essentially a document from the government of Montserrat, where

22  ECFMG has its main presence authorizing ECFMG to operate as a

23  medical college?

24         MS. MCENROE:  Objection, Your Honor.  We would only

25  ask for clarification that in the last question both instances

15

1    of use of ECFMG, I don't mean to be presumptuous, but that

2    counsel intended to USAT as opposed to --

3              MR. REIL:  Yes, I did, Your Honor.

4              THE COURT:  Sustained, sustained.  Why don't you

5    repeat the question?

6              MR. REIL:  Okay.

7    BY MR. REIL:

8         Q    All right, have you seen this document before?

9         A    Yes, sir.

10        Q    What is it?

11        A    It is a copy of what appears to be the charter for

12   USAT with the government of Montserrat.

13        Q    Thank you.  All right, I would move that into

14   evidence at this time.

15             THE COURT:  That had been admitted.  You can go

16   ahead.

17   BY MR. REIL:

18        Q    Okay, all right.  Now why don't you take a look, if

19   you would, at what's Exhibit D in the packet and to the

20   complaint at page 10.  Okay, it appears to be an affidavit.  Do

21   you recognize it?

22        A    Yes, sir.

23        Q    Who issued it?

24        A    ECFMG.

25        Q    Okay, and for what purpose?

1      A    ECFMG requested the students and graduates of USAT to

2    complete the affidavit attesting to their medical school

3    attendance.

4      Q    I see.

5      A    So we could determine in what location they took

6    their basic sciences.

7      Q    And I see on this affidavit, if you go about

8    two-thirds of the way down, you see where it says I'm attaching

9    the following documentation.  Do you see that?

10     A    Yes.

11     Q    So this is an affidavit that also requests passports,

12   airline tickets, various documents, correct?

13     A    Yes.

14     Q    Okay.  Now at the hearing, when we arrived at the

15   hearing at the Rittenhouse Square in November 28th, we were

16   given a big black book of exhibits.  Are you familiar with the,

17   you know, that that happened?

18     A    Yes.

19     Q    Okay, and we hadn't seen that black book before the

20   hearing, correct?

21     A    No.

22     Q    No.

23     A    That's not correct.

24     Q    All right now, were affidavits in the hearing?  Were

25   affidavits in the black book at the hearing?

1       A    Yes.

2       Q    Okay, a couple hundred of them, correct?

3       A    Yes.

4       Q    Okay, and many of them were redacted, were they not?

5       A    They were.

6       Q    Okay.  So our -- we were given affidavits purportedly

7    from our students with the names redacted, correct?

8       A    That's correct.

9       Q    Okay.  How are we supposed to investigate what those

10   students said in the affidavit?

11      A    We redacted the names of the students --

12      Q    Uh-huh.

13      A    -- but not the attendance dates information --

14      Q    Okay.

15      A    -- to demonstrate that there was a significant number

16   of students.

17      Q    Well, on a particular affidavit that was redacted,

18   was there any way for Dr. Tulp to contact that student to see

19   if the information was accurate?

20           MS. MCENROE:  Objection, Your Honor.  I just want to

21   -- I wasn't sure if the witness was finished with her last

22   answer before the question began.  I just want to --

23           THE COURT:  Were you finished with your answer?

24           THE WITNESS:  With respect to the affidavits?

25           THE COURT:  Correct.

18

1          THE WITNESS:  Yes.  Sorry.  Yeah, it's okay.

2          MS. MCENROE:  I'm sorry about that.

3   BY MR. REIL:

4     Q    Okay, so these affidavits were used by is it fair to

5   say the board or ECFMG to investigate irregular behavior

6   against Dr. Tulp?

7     A    So the affidavits were presented to the board of

8   trustee -- the redacted affidavits were presented to the board

9   of trustees to demonstrate that a significant number of the

10  students that had returned the affidavits to us indicated that

11  they did not do their basic sciences in Montserrat.

12         There were a number of affidavits that were also included

13  that were not redacted and those were specifically to show the

14  instances where Dr. Tulp has provided information that

15  conflicted with the affidavit information that we got from the

16  students.

17    Q    Did the -- I think there was a board of several

18  doctors if I remember.  Did they receive the affidavits prior

19  to the hearing?

20    A    Yes, they received the same materials that you

21  received.

22    Q    So the affidavits were used as an investigative

23  material by ECFMG to give to the board?

24    A    I mean, they were used as support --

25    Q    Okay.

466a

1         A     -- to the allegation that we made, yes.

2         Q     All right.  Okay, so ECFMG did the investigation in

3    this case and then they submitted it to the board of ECFMG,

4    correct?

5         A     Yes, ECFMG staff, that's our normal procedure in

6    these types of cases.

7         Q     So that there was no distinction in the way this

8    proceeding went, the proceeding for irregular behavior.  There

9    was distinct between the investigatory and the adjudicatory.

10   It was all ECFMG?  Do you understand my question?

11             MS. MCENROE:  Objection.  Objection, Your Honor, to

12   the extent it calls for a legal conclusion.  I'm not quite sure

13   counsel's getting at with that question.

14             THE COURT:  Sustained.

15   BY MR. REIL:

16        Q     Did ECFMG employ outside investigators?

17        A     I'm sorry?

18        Q     In the -- with reference to the irregular charges

19   against Dr. Tulp, did ECFMG employ outside investigators?

20        A     In our review of the school, yes.

21        Q     Okay, did they visit the school?

22        A     That's my understanding.

23        Q     They did?

24        A     Yes.

25        Q     Okay.  Did we receive at the hearing the identity of

1   those investigators and any report from them?

2       A   No.

3       Q   Okay.  Now let me ask you this.  Okay, why don't you

4   take a look at page 4, if you will, that's Exhibit B.

5       A   Yes.

6       Q   Would you tell the Court what that is?

7       A   This, sir, is a -- appears to be a screenshot of the

8   listing in the World Directory of Medical Schools for USAT.

9       Q   Okay, and do you see there where it says, oh, about a

10   little more than a halfway down, note as of January 1st?

11       A   Yes, sir.

12       Q   Would you read that into the record?

13       MR. REIL:  It's short, Your Honor.

14   BY MR. REIL:

15       Q   Just that sentence and I'll have a follow up

16   question.

17       A   Yes.  "Note, as of January 1st, 2019, students and

18   graduates of this medical school with a graduation year of 2019

19   and later are not eligible to apply to ECFMG for ECFMG

20   certification, which also renders them ineligible to apply to

21   ECFMG for the United States medical licensing examinations as a

22   step towards ECFMG certification."

23       Q   Okay, and this went on this World Directory of

24   Medical Schools website?

25       A   I'm -- did you just ask me -- I'm sorry, did you ask

1    me if it was present there?

2        Q    Yes?

3        A    Yes.

4        Q    This is where --

5        A    Yes, it is.

6        Q    So students could see this, anybody could see it,

7    right?

8        A    Yes, correct.

9        Q    Okay.  Now the hearing involving irregular behavior

10   was on November 28th of 2018.  This was published, this meaning

11   the document that we just referred to here about the World

12   Directory of Medical Schools, this was put on the website well

13   before the hearing, wasn't it?

14       A    Yes.

15            THE COURT:  Let me clarify that.  When you say this

16   was put on the website, do you mean that the note was included

17   in the website entry or that the entry was included in the

18   website?

19            THE WITNESS:  The note, Your Honor, was published on

20   the entry.

21            THE COURT:  Prior to the hearing?

22            THE WITNESS:  Prior to the hearing, yes.

23   BY MR. REIL:

24       Q    All right.  All right, now let's talk about the

25   hearing on November 28th.  The hearing was supposed to take

```
 1    place over a time span of 20 minutes, correct?

 2         A    Yes, that's our usual procedure for --

 3         Q    Right, right.

 4         A    -- those types of hearings.

 5         Q    Did the ECFMG Board of Physicians present any

 6    witnesses at the hearing?

 7         A    No, that -- we don't normally present witnesses at

 8    our hearings.

 9         Q    I see, did the ECFMG board present any documents at

10    the hearing?

11         A    No, the documents are always produced before the

12    hearing.

13         Q    Okay, what documents were produced at the hearing?

14         A    So we -- so ECFMG staff, whenever we have allegations

15    irregular behavior and individuals who are coming to make a

16    personal appearance as Dr. Tulp did, as a courtesy to them, we

17    always provide a copy of the materials that we have previously

18    sent to them at the meeting, so that if they are questioned

19    about a document, they can reference it there if they haven't

20    brought it themselves.

21         Q    At this particular point hearing on November 28th,

22    isn't it a fact, Ms. Corrado, that no documents were entered

23    into evidence at the hearing by ECFMG?

24              MS. MCENROE:   Objection, Your Honor.   To the extent

25    it calls for a legal conclusion, the concept of evidence sounds
```

1  poor and legalish when this was more of an administrative

2  proceeding by a private not-for-profit entity.

3          MR. REIL:  If I may, Your Honor, this person's an

4  attorney.  They've been involved in the situation.  I'm simply

5  asking, and she was at the hearing, did she observe or did she

6  acknowledge of any documents being entered into evidence at the

7  hearing.

8          THE COURT:  Is there any process whereby documents

9  get introduced into evidence at such a hearing?

10         THE WITNESS:  No, we don't have a process like that.

11         THE COURT:  So in this case, there was no evidence

12  that was introduced into --

13         THE WITNESS:  No.

14         THE COURT:  -- there were no documents that were

15  introduced into evidence, because there was no process to do

16  that?

17         THE WITNESS:  Correct.

18         THE COURT:  Okay, go ahead.

19  BY MR. REIL:

20     Q    Testimony, Ms. Corrado, you were at the hearing.  Was

21  there any testimony entered -- was there any testimony

22  presented at the hearing?

23     A    No, because my recollection was that counsel would

24  not let Dr. Tulp give any testimony.

25     Q    All right.

24

1          THE COURT:  As in his counsel?

2          THE WITNESS:  As in his counsel.

3          THE COURT:  As in his counsel.

4    BY MR. REIL:

5      Q    Now in any of the materials that were sent to us from

6    ECFMG, did any of them address Dr. Tulp was being "tried" for

7    irregular behavior, did any -- do any materials from ECFMG

8    indicate which side Dr. Tulp or the board has the burden of

9    proof?

10     A    So our irregular behave -- we have a set of irregular

11   behavior procedures that were sent with the letter that details

12   the allegation.

13         We provided -- we list in the letter all of the

14   information that we have to support the allegation, evidence,

15   if you will and we provide that to the individual.  And then

16   the individual has to provide an explanation and can come to

17   the hearing to provide an explanation if they wish.

18     Q    ECFMG brought charges of irregular behavior against

19   Dr. Tulp.  Did they ever send out any sort of a letter, notice,

20   document to Dr. Tulp or his attorneys indicating who had the

21   burden of proof at the hearing?

22     A    We sent a letter that outlined the allegation and

23   asked for Dr. Tulp's response to that allegation.  We did not

24   use the phrase "you have the burden of proof", but we outlined

25   what the allegation is and asked for a response.

1      Q      Okay.

2      A      And then presented him with an opportunity to appear

3  personally at the hearing to respond to the allegations of

4  irregular behavior and to answer any questions that our board

5  of trustees may have had.

6      Q      But nowhere in its description of the hearing did

7  ECFMG ever indicate that the burden of proof was on ECFMG or on

8  Dr. Tulp?  Do I have that right?

9      A      Yes.

10      Q      All right, now ECFMG sent us a -- sent us the -- Dr.

11  Tulp and his attorneys, they sent us a transcript of the

12  November 28th hearing.  Were you aware of that?

13      A      Yes.

14      Q      Okay, does it indicate anywhere in those 32 pages

15  that any evidence was introduced by ECFMG at the November 28th

16  hearing?

17          MS. MCENROE:  Your Honor, if I may object?  There is

18  a transcript of the proceeding that I would request be entered

19  into evidence to serve as the record of what actually happened

20  in that proceeding as the best evidence.

21          THE COURT:  Oh, you can do that in -- when you take

22  over the witness if you like.

23          MS. MCENROE:  Sure.

24          THE COURT:  You can continue to ask your questions.

25          MR. REIL:  Okay.  I happen to have a copy of the

26

1    transcript here, which I'd like to mark as Exhibit H, with the

2    Court's permission and show it to the witness?

3         THE COURT:  Go ahead.

4    BY MR. REIL:

5         Q    Ms. Corrado -- .

6         MR. REIL:  Oh, may the record reflect that I've

7    handed the witness the exhibit, that I've handed -- I think it

8    goes the other way around, I've handed the exhibit to the

9    witness, okay.

10   BY MR. REIL:

11        Q    All right, you have the transcript of the hearing

12   there, 32 pages.  Can you point to somewhere in the transcript

13   where ECFMG is offering any evidence against Dr. Tulp?

14        THE COURT:  I need you to ask a more focused

15   question.  You can't ask her to look through 32 pages of

16   transcript at this point.

17        MR. REIL:  Okay, all right.

18   BY MR. REIL:

19        Q    You were at the hearing, correct?

20        A    Yes.

21        Q    Okay, do you have any recollection of ECFMG through

22   its -- ECFMG entering any evidence into the record at the

23   November 28th hearing?

24        A    No, because we don't -- that's not part of our

25   process.  We provide the evidence in advance to both the board

1   and the individual.

2       Q    All right, and the hearing was terminated by Ms.

3   McEnroe, correct?

4       A    That's correct.

5       Q    And is it fair to say, based on a administrative

6   record that contains no evidence, that Dr. Tulp was found

7   guilty of irregular behavior?

8       A    I -- there was evidence presented at the meeting.  So

9   I can't agree to that statement, because we did have evidence

10  presented to the parties before the meeting.

11      Q    At -- I'm talking about evidence in the record at the

12  hearing?  Was --

13      A    We --

14      Q    -- we established there wasn't.

15      A    We don't have a process to enter evidence on a record

16  at our administration meetings.

17      Q    But there's a transcript?

18      A    There's a transcript when an individual makes a

19  personal appearance, we have a court reporter and we will --

20      Q    All right.

21      A    -- transcribe the appearance, yes.

22      Q    All right.  Was Dr. Tulp found guilty, and I'll use

23  the word guilty because it's not a criminal case in quotes, was

24  Dr. Tulp found guilty of irregular behavior on November 28th

25  based on any evidence in the record?  And I'm talking about the

1    transcript.

2              THE COURT:  Let me clarify that, because I don't

3    think it's good to use the term guilty.  What is the term used

4    by --

5              MR. REIL:  Culpable, Your Honor.

6              THE COURT:  -- ECFMG in these contexts?

7              THE WITNESS:  We determined that he engaged in

8    irregular behavior.

9              THE COURT:  Okay.

10             THE WITNESS:  So we made a determination of irregular

11   behavior.

12   BY MR. REIL:

13        Q    My question is, is there anything in the -- from the

14   hearing or in the transcript that you recall that supports

15   that, any evidence in the record in the transcript?

16        A    We don't --

17        Q    I'm sorry.

18        A    In the transcript, no, but the transcript is not the

19   evidence -- it's not all of the evidence that we present.  When

20   someone makes a -- an appearance at the meeting, we take the

21   information that we have already collected.

22        And if they make a personal appearance, the committee can

23   consider the personal appearance that they make and any

24   statements that they make together to make a determination

25   about irregular behavior.

1      So the determination was made on the basis of the

2  appearance and the evidence that we provided to the individual

3  and to the board members to review.

4      Q    Did Dr. Tulp say anything at the hearing?

5      A    I don't recall him saying anything at the hearing.

6      Q    We've used the phrase "irregular behavior" several

7  times here.  Can you explain to the Court what irregular

8  behavior is?

9      A    Yes, ECFMG generally defines irregular behavior as

10  any action or attempted action by an individual or on behalf of

11  an individual that could or would subvert the processes of

12  ECFMG.

13      So an example of an irregular behavior is providing false

14  information to ECFMG or providing false documents to ECFMG.

15          MR. REIL:  So if I may have a moment, Your Honor.

16  BY MR. REIL:

17      Q    If you would look at page 12, Exhibit 5.  Do you have

18  that?

19      A    Yes, yes, sir.

20      Q    That's a letter of November 21st from you, Ms.

21  Corrado --

22      A    Yes.

23      Q    -- to my co-counsel Mr. Swate?

24      A    Yes, sir.

25      Q    Okay.  And down I think in the last paragraph, it

1    says in support of its mission.  I'd like to read that and ask

2    you a follow up question.

3         A    Okay.

4         Q    All right.  "In support of its mission to protect the

5    public, individuals that have or have attempted to subvert

6    ECFMG's policies and procedures are subject to ECFMG's policies

7    and procedures on irregular behavior."  Are you defining

8    irregular behavior there?

9         A    In that particular sentence?

10        Q    Yes, generally.

11        A    I mean, we're saying individuals who have attempted

12   to subvert our policies and procedures are subject to the

13   irregular behavior policies and procedures.

14        Q    Okay.

15        A    And then we follow that with a link to the irregular

16   behavior policies and procedures, which has the definition of

17   irregular behavior contained within it.

18        Q    Well, is there something more to the definition of

19   irregular behavior than what I've just read?

20        A    There is a definition of irregular behavior included

21   in the irregular behavior policies and procedures, which is

22   mentioned in the next sentence in the link.

23        Q    Okay.

24        A    That had all the -- had already been provided to

25   counsel prior this November 21st letter.

1        Q    Other than -- what does the link, if you know --

2        A    Uh-huh.

3        Q    -- what does it add to what's in that sentence, what

4    I just read you?

5        A    I don't know it from the top of my head, but it

6    provides all of the definition of irregular behavior and all of

7    our policies and procedures about irregular behavior, what we

8    do when we allege irregular behavior, what the process is, et

9    cetera.

10       Q    Uh-huh.  Now how is an individual supposed to know

11   whether or not they've attempted to subvert ECFMG's policies

12   and procedures?  How is a person supposed to know that?

13            MS. MCENROE:  Objection, Your Honor.  Calls for

14   speculation or a hypothetical.

15            THE COURT:  Sustained.

16   BY MR. REIL:

17       Q    Is that the definition of irregular procedure I just

18   read, give fair notice to an individual of what they're being

19   accused of?

20            MS. MCENROE:  Objection, Your Honor.  Misstates

21   testimony.  I believe the witness just said that he had not

22   provided the whole definition of irregular behavior and she

23   could not recite it off the top of her head.

24            THE COURT:  Sustained.

25   BY MR. REIL:

```
1         Q    All right.  And you can't tell us -- is there any

2    place where you can tell us if that -- let's strike that.

3         Is that is that definition of irregular behavior in your

4    letter to Dr. Swate, is that inaccurate?

5         A    Is my statement in the letter inaccurate?

6         Q    Yeah, what I just read in support of its mission?

7         A    No, no.

8         Q    Is that inaccurate?

9         A    No.

10        Q    Okay.  Okay, now the -- we went over I think it's

11   Exhibit B, the placement in the World Directory of Medical

12   Schools I'll call it.

13        A    Uh-huh.

14        Q    Was there any indication as to whether or not Dr.

15   Tulp would be allowed to bring that up at his hearing?

16        A    I don't know what Dr. Tulp would have brought up at

17   the hearing if he was --

18        Q    Well, let's put it this way.

19             THE COURT:  Let the witness finish.

20   BY MR. REIL:

21        Q    Yes.

22        A    If he testified, I don't know what he would have

23   brought up.

24        Q    Okay, did you ever indicate that the placement

25   involving the World Directory of Medical Schools was not a
```

1    subject for the hearing?

2        A    What I indicated was that the note that we placed in

3    the World Directory was not related to the allegation of

4    irregular behavior.

5        That is, it was related to our request for information

6    from USAT.  USAT did not provide that information and we placed

7    that note into the World Directory at that time.  It was not

8    related to the allegations of irregular behavior.

9        Q    I see.

10       A    So we did in the letter tell, I think, Mr. Swate.

11       Q    Well, let's look at that letter that you wrote to Mr.

12   Swate.  Would you go to page 23 of my exhibit pack.

13       A    Uh-huh.

14       Q    And I think that's the letter of 11/14/18 --

15       A    Uh-huh.

16       Q    -- to Dr. --

17            MR. REIL:  Yeah, and a lawyer, Your Honor --

18   BY MR. REIL:

19       Q    -- to Dr. Tommy Swate?  It's under Exhibit G.

20       A    Uh-huh.

21       Q    Do you have that?

22       A    I do.

23       Q    Okay, by the way, at this hearing, were any witnesses

24   from the USAT besides Dr. Tulp allowed to be present?

25       A    You mean on behalf of Dr. Tulp or?

1    Q    Yes, on the 28th.

2    A    So no.

3    Q    No, okay, all right.  How about students from the

4    USAT?  Were they allowed to be present and testify?

5    A    No, but that's part of our normal process when --

6    Q    I see.

7    A    -- we have an allegation of irregular behavior, we

8    don't let -- we don't typically permit anyone to bring

9    witnesses.

10    Q    Okay, if you take a look at page 23 --

11    A    Uh-huh.

12    Q    -- in the letter of November 14th, 2018 to Mr. Swate?

13    A    Uh-huh.

14    Q    All right, down one, two, three, four paragraphs.

15    A    Uh-huh.

16    Q    Fourth paragraph, the second sentence, all right.

17    Let me read it to you and I'll have a follow up question.

18    A    Okay.

19    Q    It says, you write, "Nor is there any right to a

20    hearing with ECFMG for USAT for any matter."  It's the next

21    sentence I'm interested in.

22    "ECFMG will not entertain any request to review the

23    actions that is taken with respect to USAT's sponsor note at

24    Dr. Tulp's irregular behavior here."  And that's sponsor note,

25    we're talking about the Exhibit B we've already discussed,

1    right?

2        A    That's correct.

3        Q    Okay, now that decision to exclude that evidence from

4    the hearing, did Dr. Tulp have any input in that?

5        A    Well, I sent it to his attorneys, so.

6        Q    Okay.  Well, was there a procedure whereby he could

7    object to that?

8        A    There's no such procedure.

9        Q    I see.

10            MR. REIL:  Could I have one moment, Your Honor?

11            THE COURT:  Mike, can you put that computer down on

12   the thing, on the podium?  Put it down, I can't see.

13            MR. REIL:  That's all the questions I have of this

14   witness at this time, Your Honor.

15            THE COURT:  Cross?

16            Not that one.  This one.  This one here.  Thank you.

17   And maybe put the microphone down.

18            MS. MCENROE:  Your Honor, I was actually going to ask

19   if I could approach and approach the witness from the lectern

20   if that's okay with you?

21            THE COURT:  That's fine, that's fine.  I just

22   couldn't see above the computer monitor.

23            MS. MCENROE:  Neither can I.  So thank you.

24        (Counsel confer)

25            MS. MCENROE:  May I approach the lectern, Your Honor?

1              THE COURT:  You may.

2                          CROSS-EXAMINATION

3    BY MS. MCENROE:

4         Q    Good afternoon, Ms. Corrado.

5         A    Hi.

6         Q    You understand I'm counsel for the Educational

7    Commission for Foreign Medical Graduates and Dr. Pinsky today?

8         A    Yes.

9         Q    I'd like to ask you a couple questions about the

10   areas of testimony you were just asked about.

11        A    Yes.

12        Q    First, I'd like to give you a chance to clarify, if

13   you'd like to, about whether or not you are an attorney?

14        A    I am not an attorney.  I have a law degree, so I'm

15   not a practicing attorney.

16        Q    Early on in the questioning from counsel for Dr.

17   Tulp, you were asked to question about the relationship, if

18   any, between ECFMG and Dr. Tulp, do you remember that

19   testimony?

20        A    Yes.

21        Q    In particular, you were asked if there was a contract

22   or any other kind of agreement.  Do you understand that

23   testimony?

24        A    Yes.

25        Q    How is it that ECFMG has interfaced, if at all, with

37

1   Dr. Tulp?

2        A    Dr. Tulp is one of the -- what we refer to as our

3   authorized signatory for USAT.  So he -- I believe, and I'm

4   sorry if I get your title wrong, is the president and the dean

5   of USAT.

6        As such, he can certify documents or he was able to

7   certify documents and information to ECFMG on behalf of the

8   medical school.

9        For international medical schools that we interact with,

10  we will, once the school has established that it meets the

11  requirements for its students and graduates to be eligible for

12  ECFMG certification, we typically communicate with the school

13  officials, collect the information that we need from them in

14  order to be able to process the applications and the

15  certifications of their students.  So in that way, we have

16  communicated with Dr. Tulp since I believe around 2003.

17       Q    So speaking nuts and bolts in terms of Dr. Tulp doing

18  anything --

19       A    Uh-huh.

20       Q    -- that comes to ECFMG --

21       A    Uh-huh.

22       Q    -- can you explain that a little bit more just from a

23  practical standpoint?

24       A    Yes, so the individuals who are students and

25  graduates of international medical schools would apply to ECFMG

1    to take the United States medical licensing examinations and

2    also need to submit their credentials, which includes their

3    final medical diploma and their final medical school

4    transcript.

5        ECFMG has to authenticate that information.  We need to

6    authenticate whether you're actually a student at a school or

7    not.

8        And so Dr. Tulp would sign off on applications, saying to

9    ECFMG essentially this -- yes, this person is a student or is a

10   graduate at USAT and they've completed their basic sciences.

11       In the same way, he would complete forms for diplomas.

12   Yes, this diploma is authentic and fill out the information

13   that we require to verify the credentials of students and

14   graduates.

15       Q    You testified in response to questions from counsel

16   about a finding of irregular behavior as against Dr. Tulp; is

17   that correct?

18       A    That's correct.

19       Q    Could you explain what action, if any, ECFMG took as

20   a result of that finding of irregular behavior against Dr.

21   Tulp?

22       A    Yes, so ECFMG put a sanction on Dr. Tulp for a

23   minimum of five years that we will not accept any documents

24   from -- signed or certified by Dr. Tulp on behalf of USAT or

25   any other medical school for that period of time.

1    After that period of time expires, we will consider

2    accepting Dr. Tulp as a signatory again for medical school if

3    he meets certain requirements.  And I'm sorry I don't have

4    them.  I can't remember them off the top of my head, but

5    basically, that he satisfies the requirements that we have,

6    conditions that we have, to be able to accept him again.

7        Q    Is it fair to say that the action taken by ECFMG in

8    light of the finding of irregular behavior with respect to Dr.

9    Tulp was limited to his role as an authorized signatory on

10    behalf of USAT to ECFMG?

11        A    Yes, that's correct, I mean, if he still signs

12    transcripts for students, we wouldn't reject a transcript

13    because that's an official document of USAT, but we would need

14    another official from USAT to authenticate it.

15        Q    And really just briefly, what is the process or how

16    hard is it to get somebody else to be, sorry, an authorized

17    official from USAT?

18        A    We -- I mean, it's not that hard.  We would just

19    reach out to the medical school to ask who would be able to

20    sign off for the school --

21        Q    For --

22        A    -- for just our, you know, vice dean, things like

23    that.

24        Q    So USAT would not be disqualified then from having an

25    authorized signatory?

1    A    Correct, that's correct.

2    Q    You were asked some questions about a black binder --

3    A    Yes.

4    Q    -- being given to counsel for Dr. Tulp at a November

5    28th hearing.  Do you remember that?

6    A    Yes.

7    Q    And I couldn't catch it in the testimony about your

8    explanation about whether those materials had been provided to

9    Dr. Tulp prior to the proceeding.  Could you explain that?

10    A    Yes, so we provide the materials to individuals prior

11    to the hearing.  Those materials were sent via email to Dr.

12    Tulp's counsel.

13    And I got an acknowledgement that they were received by

14    email, but I also sent them by a hard copy by Federal Express,

15    too.

16    Q    There was some discussion, sorry, there was some

17    discussion about certain materials being redacted in the

18    materials provided to Dr. Tulp.

19    A    Uh-huh.

20    Q    Can you explain why, please?

21    A    So we put about over 300, I think, affidavits in the

22    materials.  And we redacted their names, the individuals' names

23    on that bundle and their identification numbers, because we

24    wanted to -- we just wanted to make sure that we're protecting

25    the privacy of those students and that there would be no

1   adverse action taken against them for providing the information

2   to ECFMG.

3        Q    And what was the purpose of sending the students

4   those affidavits?

5        A    We sent the affidavits to the students, because we

6   wanted to determine where they had done their basic sciences.

7   We had had information that USAT was operating a campus in the

8   United States in Florida.  And Dr. Tulp had indicated that that

9   was not correct.

10       So we still were getting information contrary to that.  So

11  we decided to send the affidavit to the students to get

12  information from the students about where they actually did

13  their basic sciences.

14       Q    Why, if at all, was it a concern for ECFMG about

15  where the USAT students took their basic sciences?

16       A    So ECFMG has requirements about the medical schools

17  that we will accept and --

18            MR. REIL:  Objection.  Beyond the scope of my

19  examination.

20            THE COURT:  Overruled.

21  BY MS. MCENROE:

22       Q    You may answer.

23       A    Okay, sorry.  So we have requirements around, you

24  know, what international medical school is.

25       In fact, an international medical -- we define an

42

```
 1   international medical graduate as an individual who has
 2   received their education outside of the -- their medical
 3   education outside of the United States and Canada.
 4           And so we have requirements from the government
 5   officials where the school is located that the school has to
 6   meet.
 7           So the school has -- the government has to say, yes,
 8   essentially, I'm sort of oversimplifying, but the government
 9   has to say, yes, this is a medical school.  You recognize it as
10   such.  And its graduates are eligible for licensure in our
11   country.  And then ECFMG will recognize that.
12           But if the school has a branch campus outside of that
13   country, we also require the branch campus country to provide
14   that same type of information.  Do you recognize it as a
15   medical school?  And are its graduates eligible to practice in
16   your country?
17           So if you were having only classes in the United
18   States, we would need that documentation from the United
19   States, but also, you might be a United States school.
20       Q   So you were asked some questions about the role and
21   purpose of ECFMG?  At the beginning of your testimony, you
22   remember being asked that?
23       A   Yes.
24       Q   And can you explain a little bit more about why it's
25   concern to ECFMG, for example, if there were to be
```

1    predominantly education in the United States that you were just

2    talking about?

3        A    So, you know, if the person is educated only in the

4    United States, then they may not be considered an international

5    medical graduate.  So they might not even be eligible or

6    subject to ECFMG certification if they're not an international

7    medical graduate.

8        If they went to medical school in the United States, and

9    my understanding is they would have to go to a school that was

10   accredited by the LCME, which is the Liaison Committee on

11   Medical Education.

12       So we have to make sure that we're not, you know, we are

13   dealing with international medical graduates only because that

14   is our scope.  That is what we are authorized to deal with.

15       Q    Does ECFMG certify U.S.-based medical school

16   graduates?

17       A    No.

18       Q    So you -- ECFMG wouldn't grant a certificate to a

19   Penn Med grad?

20       A    No, correct, we would not.  We could not.

21       Q    There was some discussion, jumping to back to the

22   hearing that you were asked some questions about, you remember

23   the November 28th hearing?

24       A    Yes.

25       Q    There was some discussion about a sponsor note in the

1    World Directory.  And I believe you read some -- a note from

2    that language out into the record.  Do you remember that?

3         A    Yes, uh-huh.

4         Q    And there was a question about the sequence of

5    events.  Could you explain a little bit more in terms of the

6    note and the sponsor note, I'm sorry, in the World Directory

7    with regards to USAT vis a vis the irregular behavior

8    proceeding against Dr. Tulp?

9         A    Right.  So when we became aware that there was a

10   possibility that there was a campus in the United States for

11   USAT, we reached out by letter officially to USAT to ask.  We

12   said we understand there's campus in the United States.  Can

13   you please provide us with the documentation from the

14   Department of Education that authorizes you to have a medical

15   school and to conduct your activities in the United States?

16        And we got a response that that was not accurate.  We

17   talked about the affidavit process.  We asked the information

18   from the students.

19        And around, I think it was October 18th, when we had asked

20   for the documentation from USAT about the -- its U.S. branch

21   campuses I had not receive it, then we made a determination

22   that we could not accept students and graduates from that

23   medical school.  That would be effective Jan. 1, 2019.

24        We notified the students.  We put the note in the

25   directory, but that action was related only to not receiving

45

1   the documentation from the United States officials that the

2   school was recognized in the United States.

3       And we offered in a letter, so if you get the

4   documentation, give us the documentation so we can consider, we

5   can reconsider the sponsor note.

6       Q    To date, has ECFMG gotten such documentation

7   regarding authorization for USAT to conduct education in the

8   United States?

9       A    No.

10      Q    Do you have an estimate of how many times ECFMG has

11  asked for such documentation?

12      A    Um --

13      Q    Would it be fair to say multiple times?

14      A    Multiple, yeah, I mean, more than once.

15      Q    What is the purpose of a sponsor note in the World

16  Directory just briefly?

17      A    So the sponsor note, the World Directory of Medical

18  Schools is a listing of the world's medical schools.  And there

19  are over 3,000 medical schools in the world.  We do not accept

20  grad -- you know, we do not accept graduates from all 3,000.

21      There are a subset of those medical schools whose

22  graduates are eligible to apply to ECFMG for certification,

23  which means ultimately, they're allowed to continue to try and

24  practice medicine in the United States.

25      We used a sponsor note in the World Directory on a medical

1    school to indicate to the public and to the students and

2    graduates of that school whether or not those students and

3    graduates are eligible to apply to ECFMG for certification.

4         So it's the way in which we communicate publicly the

5    eligibility, if you will, of the school's graduates to start

6    the process of ECFMG certification.

7         Q    And I'd like to direct your attention in the packet

8    of exhibits that were given to you by counsel?

9         A    Uh-huh.

10        Q    Back to Exhibit E, which is the sponsor note.

11        A    Uh-huh.

12        Q    Let me know when you have it?

13        A    Okay, I have it.

14        Q    And it's fair to say earlier, you testified this is a

15   copy of the sponsor note for USAT?

16        A    Yes, uh-huh.

17             MS. MCENROE:  Your Honor, I'm not sure that this got

18   admitted into evidence.

19             THE COURT:  It did not.

20             MS. MCENROE:  So I'd like to move for its admission?

21             THE COURT:  Any objection?

22             MR. REIL:  No, Your Honor.

23             THE COURT:  It's admitted.

24        (Defendant's Exhibit E admitted into evidence)

25   BY MS. MCENROE:

1      Q    Ms. Corrado, if you could just very briefly, I know

2  you were directed to one portion of this document.  I'd like to

3  direct your attention up a little bit higher.

4      A    Uh-huh.

5      Q    There's a list of graduation -- there's a range from

6  2003 to 2018.

7      A    Uh-huh.

8      Q    What is that indicative of?

9      A    That is the listing of the graduate -- the graduation

10 years for which ECFMG will accept graduates of this school.  So

11 in other words, it's not just that your school is listed in the

12 World Directory with our sponsor note.  Your school has to be

13 listed and your graduation year has to be listed.

14      So if you graduated in 2005, we will still accept the 2005

15 graduate from USAT.  But if you graduated in 2020, currently,

16 we will not accept your application for certification.

17      Q    So I just want to make sure it's clear.  So is it

18 true that today, ECFMG would still accept, for example, 2018

19 USAT grads --

20      A    Yes.

21      Q    -- for certification if they meet all the other

22 requirements?

23      A    Yes.

24      Q    And are there enhanced procedures on USAT applicants?

25      A    There are.

1    Q    Can you explain what that means?

2    A    Yes, so the affidavit process that we touched on

3  earlier is a requirement for USAT students and graduates

4  currently.

5    Essentially, in order to receive ECFMG services, they need

6  to complete that affidavit and submit to ECFMG.  And once ECFMG

7  has reviewed it and accepted it, then we will continue to

8  provide services to those graduates and students.

9    Q    So looking back to the November 28th hearing and I'll

10  try to be quick.

11    THE COURT:  Hang on, wait.  So the note talks about

12  students and graduates of this medical school with a graduation

13  year of 2019.  You see that?

14    THE WITNESS:  Yes.

15    THE COURT:  When is -- when would students of USAT

16  normally graduate?  What month in 2019?

17    THE WITNESS:  I don't know, Your Honor, when they

18  would normally graduate.  This note is meant to indicate that

19  as of the first of this year, 2019, we will not accept any

20  graduates.

21    THE COURT:  Do you know whether there have been any

22  graduates of USAT in 2019?

23    THE WITNESS:  I do not know that, Your Honor.

24    THE COURT:  Go ahead.

25    MS. MCENROE:  Thank you, Your Honor.

1   BY MS. MCENROE:

2        Q    So moving back to the November 28th hearing, you were

3   asked a number of questions about submission into evidence and

4   other procedural events at the November 28th hearing.

5        Just very briefly, can you estimate or how many years have

6   you been attending or participating in this kind of irregular

7   behavior proceeding with personal appearances on behalf of

8   ECFMG?

9        A    Sure, 10.

10       Q    And so you say 10 years?

11       A    10 years, yes, sorry.

12       Q    And an estimate of, if you can ballpark, how many of

13  these kind of proceedings you participated in?

14       A    So 30.

15       Q    And so, just very briefly, in terms of the process at

16  the hearing, I know that there was some testimony that it's a

17  20-minute hearing.  Can you please explain the expected

18  process --

19       A    Sure.

20       Q    -- of that type of hearing?

21       A    Sure, so when an individual makes a personal

22  appearance before the board of trustees, we give a very

23  brief -- staff will give a very brief outline of the allegation

24  as -- of the irregular behavior.

25       The individual will be given approximately 20 minutes to

50

1    provide a statement, if they will.  Usually, they have an

2    opening statement.  They can have counsel there with them if

3    they want.

4        Once they've concluded their opening statement, then the

5    board is able to ask questions.  They'll generally ask

6    questions of the individual.

7        Once the questioning is finished, the individual's invited

8    to give a closing statement and then they're excused from the

9    hearing.

10       Q    In your experience, based just from your view, what

11   is the purpose of that hearing?

12       A    The --

13            MR. REIL:  I'm going to object, Your Honor, to the

14   extent that we're talking about hearings other than Dr. Tulp's

15   hearing, I don't think it's relevant.

16            MS. MCENROE:  That's fair, Your Honor.  I can

17   withdraw the question and ask it a different way.

18            THE COURT:  Go ahead.

19   BY MS. MCENROE:

20       Q    Ms. Corrado, what was the purpose of Dr. Tulp's

21   hearing on November 28th?

22       A    He was -- has a right to a personal appearance, which

23   he elected to take.  And the purpose would be for him to

24   provide his explanation about the allegation and to answer any

25   questions that the committee would have for him.

51

1     Q    We already discussed briefly the materials provided

2   to him in advance of the hearing.  In your view, did you expect

3   that additional evidence would be submitted by ECFMG at that

4   hearing?

5     A    No.

6          MR. REIL:  Objection.

7          THE COURT:  Basis?

8          MR. REIL:  I think, Your Honor, in her personal view

9   here, I'm not sure how that relate -- I don't think it's

10  relevant.

11         THE COURT:  Re-ask the question.

12  BY MS. MCENROE:

13    Q    Sure.

14         THE COURT:  Different way.

15  BY MS. MCENROE:

16    Q    Did it surprise you, based on your experience of

17  having gone to over 30 of these hearings in the past 10 years,

18  that ECFMG did not present any additional materials beyond the

19  black binder --

20    A    No.

21    Q    -- at the hearing of Dr. Tulp?

22    A    No.

23         MR. REIL:  Objection to whether the witness was

24  surprised.  Ask that it be rephrased.

25         THE COURT:  Overruled.

1          Go ahead.

2          THE WITNESS:  No, I was not surprised.

3          MS. MCENROE:  Your Honor, I have nothing else on

4    cross at this time.  I will have additional questions for the

5    witness.  So it's at your prerogative if you'd rather me have

6    the witness on the stand once.

7          THE COURT:  Let's just get, yeah, let's get this --

8    you now got the witness on direct in your case.

9          MS. MCENROE:  Great.

10          THE COURT:  Go ahead.

11          MS. MCENROE:  Thank you, Your Honor and I'll be as

12    brief as I can.

13                    DIRECT EXAMINATION

14    BY MS. MCENROE:

15    Q    Ms. Corrado, why did ECFMG change the sponsor note

16    for USAT in the World Directory?

17    A    We changed the sponsor note in the World Directory,

18    so that we could let students know what the status of the

19    school was.

20          And the note was changed because we did not have the

21    documentation from USAT from the Department of Education in

22    Florida or the other states where they were operating that

23    authorized their school in those states.

24    Q    And why did ECFMG allege irregular behavior against

25    Dr. Tulp?

1     A   When we asked Dr. Tulp if he had a -- that we -- I'm

2    sorry, we asked -- we advised Dr. Tulp that we understood that

3    he had a -- that USAT had a campus in Miami and we asked for

4    the documentation in a letter on August 21st.

5     And the response that we got from Dr. Tulp was that it is

6    not a campus.  There was not -- education was not occurring

7    there.  It was an administrative site only.

8     So when we got the affidavits from the students that

9    essentially said they all took their classes in Miami or some

10   other location in the United States, and had not gone to

11   Montserrat, that conflicted with the information that Dr. Tulp

12   had given us.  And then in our view, that was providing false

13   information to ECFMG.  So we alleged irregular behavior.

14    Q   Just briefly, could you explain how this concern came

15   to the attention of ECFMG regarding the location of the

16   education for USAT?

17    A   Sure.  In roughly the summer of 2017, ECFMG, we were

18   conducting a project to re-verify a number of medical schools

19   located in the Caribbean.  And we were doing research on them.

20   And we had not gotten any information back from Montserrat

21   regarding USAT.

22    And our team was looking into it and found a number of

23   videos online that seem to indicate that --

24        MR. REIL:  Objection to what the team found.  It's

25   hearsay.

1          THE COURT:  Sustained.

2          MR. REIL:  And --

3          THE COURT:  Sustained.

4          MR. REIL:  -- I don't think it's -- it's not based on

5    the witness' personal knowledge.

6          THE COURT:  Sustained.

7          MR. REIL:  I'm sorry, Your Honor.  I didn't hear.

8          THE WITNESS:  So we got an inkling that was some

9    activity happening in the United States.  We did some research.

10   We -- but ultimately, we got an email on August 8th of 2018

11   from a prospective parent of a USAT student, who said my son is

12   going to --

13         MR. REIL:  Objection to what a prospective parent

14   said.

15         THE COURT:  Sustained.  Sustained.

16         THE WITNESS:  So then, we requested USAT to provide

17   us with documentation about their Miami campus.

18   BY MS. MCENROE:

19     Q     And you mentioned doing some re-verification of

20   schools in the Caribbean?

21     A     Uh-huh.

22     Q     Very briefly, why was ECFMG doing that?

23     A     So ECFMG had done another investigation on another

24   medical school.  And we wanted to reach out to make sure that

25   that medical school still had its -- met the eligibility

1    requirements.  And at the same time, we decided to do an

2    eligibility requirement for all of the schools in that area.

3         And we are targeting actually different areas of the world

4    moving forward to re-verify information that we previously

5    received for schools.

6         Q    There's been some discussion of the change of the

7    sponsor note and the finding for irregular behavior against Dr.

8    Tulp.

9         We're just wondering what, if any impact, you know of

10   those actions having been on students of USAT, how that's

11   impacted them in any way?

12        A    My -- the students -- if the students did not

13   graduate by December of 2018, then the students would have to

14   transfer to other medical schools if they wanted to continue to

15   take USMLE examinations and to pursue ECFMG certification, but

16   those who had graduated prior are moving through the pipeline.

17        Q    And those students, you said if they wanted to

18   proceed through USAT USMLE examinations, if they had

19   transferred, what if any impact on their prior credits taken on

20   USAT being eligible for ECFMG certification, what impact if any

21   would that have been?

22        A    Well, so they -- their -- they would be able to

23   transfer their prior credits from USAT to whatever their new

24   medical school is.

25        Q    Do you have any understanding of what impact ECFMG's

1   actions vis a vis the sponsor note and the World Directory were

2   -- as to Dr. Tulp would have on the ability for USAT to provide

3   medical education generally to students in Montserrat, who have

4   no inclination of coming to ECFMG?

5        A    Yeah, they --

6             MR. REIL:  Objection to the question.  It's compound

7   and I think there has to be a foundation that the witness has

8   some personal knowledge here.  She's not in as an expert.

9             MS. MCENROE:  I'll withdraw the question then.

10            THE COURT:  Okay.

11  BY MS. MCENROE:

12       Q    Ms. Corrado, we were talking briefly about

13  recertification in the Caribbean.  Do you remember that?

14       A    Uh-huh.

15       Q    And you mentioned another school that had gone

16  through a process of investigation.  What school was that?

17       A    Atlantic University School of Medicine in St. Lucia.

18       Q    And was --

19            THE COURT:  And I'm sorry, in where?

20            THE WITNESS:  In St. Lucia.

21  BY MS. MCENROE:

22       Q    And was there any finding of irregular behavior as to

23  any medical school official in that --

24       A    Yes.

25       Q    -- investigation?

1       A    Yes.

2       Q    And what was the action or what was the finding, if

3    any, of the -- ECFMG with respect to that medical school

4    official?

5       A    The --

6             MR. REIL:  Objection to another investigation.

7    Relevance.

8             THE COURT:  Relevance?

9             MS. MCENROE:  Your Honor, I'm just trying to

10    establish there's a precedent here for how ECFMG conducted

11    itself.

12            THE COURT:  Overruled.  Go ahead.

13            THE WITNESS:  So ECFMG found that officials and

14    employees of the university had engaged in irregular behavior.

15    And they were similarly sanctioned in that.

16            They are -- they have been -- we will not accept

17    documents certified by those officials for a minimum of five

18    years after which they have to meet certain requirements if we

19    will consider them again for that school or for any other

20    medical school.

21       Q    We also talked briefly a little earlier when looking

22    at the sponsor note about enhanced procedures on students at

23    USAT.  Do you remember that?

24       A    Yes.

25       Q    And you mentioned that pertained to the affidavit

1    process; is that correct?

2         A    That's correct.

3         Q    Was -- has ECFMG ever used a similar enhanced

4    procedure on any other medical school?

5         A    Yes, in the case of the Atlantic University School of

6    Medicine for one, but others as well.

7         Q    And in any of those other circumstances when ECFMG

8    has imposed enhanced procedures involving these affidavits, has

9    it ever been that there were then no findings of irregular

10   behavior or no changes to a sponsor note as a result?

11        A    Yes.

12        Q    Has ECFMG ever investigated other medical schools

13   where there was communication with the medical school about a

14   change to a sponsor note and then the medical school was able

15   to provide ECFMG with the information sought?

16        A    Yes, there has.

17        Q    And then in that circumstance, was there any change

18   to the medical school listing the sponsor note?

19        A    Yes, we updated the sponsor note.

20        Q    To reflect?

21        A    To reflect that the graduates were eligible once

22   again for certification.

23        Q    Was it your intention if that information had been

24   provided that was requested from Dr. Tulp with regards to the

25   eligibility -- sorry, authorization to have medical school

59

1   education in the United States been provided to ECFMG that

2   ECFMG would do the same thing in this circumstance?

3       A    Yes.

4       MS. MCENROE:  I have no further questions at this

5   time.

6       THE COURT:  Mr. Reil, you have redirect on your own

7   witness and cross on Ms. McEnroe's witness.

8       MR. REIL:  Brief redirect, Your Honor.

9       THE COURT:  Go ahead.

10                  REDIRECT EXAMINATION

11  BY MR. REIL:

12      Q    You just gave some testimony, Ms. Corrado, concerning

13  the affidavits, Exhibit D, the affidavits of these students

14  filled out that ECFMG sent to them.  Would you take a look at

15  that affidavit on page 10?  I have a question on it.

16      A    I have it, sir.

17      Q    Okay, did ECFMG in that affidavit threaten the

18  students with irregular behavior if they didn't fill out the

19  affidavit?

20      A    No, sir.

21      Q    If you go to page 11 there.  Okay, if you go down on

22  page 11 to I guess the second to the last paragraph, where it

23  says ECFMG reserves the right.  Do you see that?

24      A    Uh-huh.

25      Q    Please read it into the record, that sentence.

1       A    "ECFMG reserves the right to bring allegations of

2  irregular behavior against you in accordance with its policies

3  and procedures showing ECFMG obtained information that

4  indicates that you have engaged in irregular behavior with

5  respect to any documentation submitted as part of this

6  process."

7       Q    All right, now what was the purpose of ECFMG putting

8  the -- that language with the affidavit?

9       A    This is to serve as a reminder to those students that

10 they need to provide correct and accurate information to ECFMG.

11 And that if they don't, they could be subject to our irregular

12 behavior procedures.

13      Q    What if they didn't fill out the affidavit?

14      A    There were a number of students that didn't fill out

15 the affidavit.  They -- we just don't -- we won't provide

16 services to them until they fill it out.

17      Q    I see.  All right, when you say you won't provide

18 services to them, if you don't provide services to them, that

19 means they'll never be able to become a practicing physician in

20 the United States, am I correct?

21      A    It means they won't be able to proceed to get ECFMG

22 certification.

23      Q    ECFMG certification is necessary for a foreign

24 medical student to practice as a physician in the United

25 States?

1           MS. MCENROE:  Objection, Your Honor.  Asked and

2    answered and also to the extent it purports to seek a legal

3    conclusion.

4           MR. REIL:  I'll withdraw the question, Your Honor.

5    BY MR. REIL:

6       Q    Okay, there was some testimony that was elicited

7    before my examination where you were asked about a campus.  Do

8    you remember that?

9       A    Yes.

10      Q    Does ECFMG define anywhere in its policies or

11   procedures what a campus is?

12      A    Not to my knowledge.

13          MR. REIL:  That's all I have, Your Honor.

14          THE COURT:  Okay, thank you very much.  You can leave

15   the stand.

16          THE WITNESS:  Thank you, Your Honor.

17       (Witness excused)

18          THE COURT:  We're going to take a five-minute break

19   and get back and have Ms. Cover on the stand ready to go when

20   we get back in.

21          THE COURT RECORDER:  All rise.

22          THE COURT:  Thank you.

23       (Recess at 3:21 p.m., until 3:32 p.m.)

24          THE COURT RECORDER:  All rise.

25          THE COURT:  Okay, Mr. Reil, the witness please?

62

1          THE COURT RECORDER:  Please raise your right hand.

2    State and spell your name for the record?

3          THE WITNESS:  Lisa Brenda Cover, L-I-S-A C-O-V-E-R.

4                        LISA COVER

5    called as a witness for the Plaintiff, having been duly sworn

6    testified as follows:

7          THE COURT:  Have a seat.  Your witness?

8          MR. REIL:  Your Honor, at this point, we have decided

9    not to examine Ms. Cover.

10          THE COURT:  Oh, okay.

11          MR. REIL:  With no objection if the Court allows.

12          THE COURT:  Would you -- Ms. McEnroe, would have

13    brought in Ms. Cover in your case in chief?

14          MS. MCENROE:  No questions.

15          THE COURT:  Okay, you can leave the stand.

16          THE WITNESS:  Thank you.

17     (Witness excused)

18          THE COURT:  Okay, let's have -- would you want -- do

19    you want to put Mr. Tulp on -- Dr. Tulp on the stand?

20          MR. REIL:  Yes.  And with the Court's permission,

21    Attorney Swate will examine Dr. Tulp.

22          THE COURT:  Go ahead.

23          THE COURT RECORDER:  Raise your right hand.  State

24    your name for the record?

25          THE WITNESS:  Dr. Orien Lee Tulp.

63

1                              ORIEN TULP

2    Plaintiff, having been duly sworn testified as follows:

3              THE COURT:  Have a seat.

4              Your witness.

5              MR. SWATE:  If it please the Court.

6                        DIRECT EXAMINATION

7    BY MR. SWATE:

8         Q    Dr. Tulp, what is your professional position

9    currently?

10        A    I'm president of the University of Science, Art, and

11   Technology.

12        Q    And that's USAT?

13        A    That's USAT.

14        Q    And how long has USAT been in operation?

15        A    15 years, 4 months.

16        Q    All right, are you a part owner of USAT?

17        A    Yes.

18        Q    What credentials that you have, just briefly, to

19   support your position at present?

20        A    There -- I have a Ph.D., two PhDs, an M.D.  And I've

21   been active as a professor for over 40 years.

22        Q    Now for most of your professional life, 43 years, do

23   you -- what, a military officer?

24        A    Yes, I was.  I served in the United States Army,

25   active in Reserve components 43 years, 5 months, and 26 days.

64

1        Q     Did you receive any awards?

2        A     Yes, I have many.

3        Q     Well, just a couple?

4        A     Including the Congressional Award of Regional Merit,

5    including three meritorious service awards, two from the

6    Commonwealth of Pennsylvania, and commendation metals, the

7    Citizenship Medal from the Sons of American Resolution --

8    Revolution.

9        We have many, many awards that I've received over the

10   course of my military career, including the eighth award of the

11   Garde Nationale, the eighth one in history was awarded to me

12   for having a significant academic and professional career and

13   simultaneous to my military career.

14       Q     Have you received any public awards?

15       A     Yes, I've received several presidential voluntary

16   service awards from several presidents of the United States.

17   And I received an exultation from President William Jefferson

18   Clinton in 1986.

19       Q     In the years that you operated in medical school,

20   what has been the experience of your students as far as the

21   results of the testing done by ECFMG and USMLE?

22       A     They've done very well.  We, you know, provide high

23   quality instruction.  The vast majority of our courses, the --

24   the entire, the full first year they can take from Montserrat

25   or they can take from virtually anywhere, because there's --

1   we've developed beginning 10 years ago, because of the volcano,

2   we developed something called SPOC, Small Platform Online

3   courses where you have high quality, the best we can find, all

4   U.S. certified instructors all have taught in U.S. medical

5   schools and are all -- were board certified in their fields.

6        They present these courses.  So they can take them pretty

7   from Montserrat, and many, many have over the years, from

8   anywhere in the world.

9        Q    What has been your --

10       THE COURT:  Mr. -- sorry, can you just get to the

11  chase?  I accept that Dr. Tulp has these qualifications and I

12  am for the purposes of this preliminary injunction hearing,

13  that is not what we're talking about.

14       MR. SWATE:  Yes, Your Honor.

15       THE COURT:  Just cut to the chase.

16  BY MR. SWATE:

17       Q    All right, what is required by every state in the

18  union for an international medical graduate to apply for a

19  medical license, whether either restricted or permanent?

20       A    They must have ECFMG certification.  There's the only

21  access that's available to them.

22       Q    Can a medical student United -- international medical

23  student be licensed without that certificate or license?

24       A    Not in the United States of America

25       MS. MCENROE:  Objection, Your Honor.  Foundation.

1           THE COURT:  Basis?  I mean, granted.  Sustained.

2           MS. MCENROE:  It's been a long afternoon, Your Honor.

3           THE COURT:  Sustained.

4           MS. MCENROE:  Thank you.

5           THE COURT:  You can lay some foundation and perhaps

6    get there.

7    BY MR. SWATE:

8       Q    Well, what -- getting to the chase, what evidence was

9    presented by ECFMG owned on the 28th that you had committed any

10   kind of bad act?

11      A    None.

12      Q    When did you find out about the notebook with the

13   various evidence that was -- that had been given to the members

14   of the committee that was supposed to hear your case?

15      A    On the 28th of November, it was placed on the table.

16   It had no label.  We didn't know what it was.  It was just a

17   black book that was sitting there.  We had no opportunity to

18   review it in advance.

19      Q    What evidence was produced by the ECFMG at that

20   meeting that support any allegations?

21      A    None.

22      Q    What effect does ECFMG placing that notation on that

23   world list of medical schools have on you personally, and then

24   I'll get to the medical school?

25      A    Well, it certainly blemishes my reputation

1    tremendously.  In over 50 years, I've never had a single

2    complaint from a student, a patient, a board, nothing.  I never

3    expected this.

4         Q    When was that notation first placed?

5         A    Prior to September 11th, 2018.  That was the last

6    date entered on the sponsor note when it was -- when it

7    appeared.

8         Q    Was that note placed prior to any hearing or any

9    allegations?

10        A    Yes.

11        Q    Now the ECFMG agreed that up until January the 1st,

12   2019, they would accept documentations from the USAT students,

13   correct?

14        A    That is correct.

15             MS. MCENROE:  Your Honor, foundation about what ECFMG

16   was sent.

17             THE COURT:  Sustained.

18             MR. SWATE:  Ma'am?

19             THE COURT:  Sustained, go ahead.  Lay some

20   foundation.

21   BY MR. SWATE:

22        Q    You were given a letter from the ECFMG that stated

23   that up until January the 1st, 2019, documentation would be

24   accepted?

25        A    That is correct.

68

1      Q     What harm resulted from allowing the USAT to operate

2   until January the 1st, 2019?

3      A     I am unaware of any harm whatsoever.

4      Q     Well, what magically happened at midnight on January

5   the 1st, 2019 or December the 31st, 2018?

6      A     ECFMG would no longer accept --

7            MS. MCENROE:  Objection, Your Honor --

8            THE COURT:  What?  You finish your question.

9            You hold.

10           Finish your question.

11  BY MR. SWATE:

12     Q     What occurred that would cause the ECFMG on December

13  the 31st, 2018 to accept documentation and then after that date

14  not accept documentation, if you know?

15     A     Nothing.

16           THE COURT:  Hold on.  Any objection?

17           MS. MCENROE:  Objection, Your Honor.  Foundation.

18           THE COURT:  Sustained.  Also, compound.

19  BY MR. SWATE:

20     Q     What damages, if any, is occurring while allowing

21  ECFMG to post those notes on that world internet site listing

22  medical schools?

23           MS. MCENROE:  Objection, Your Honor.  Foundation.

24           THE COURT:  Sustained.  Foundation?

25  BY MR. SWATE:

1       Q    Are you --

2       A    Yes.

3       Q    Are you aware that the notice has been posted,

4    correct?

5       A    Yes, I'm aware the notice was posted.

6       Q    Do you have any personal knowledge of the effect of

7    posting that notice?

8       A    Yes.

9       Q    What's your knowledge?

10      A    It really eliminates all new applications and it

11   prevents the university from collecting any uncollected

12   tuition.

13      Q    What harm would result from allowing USA -- by

14   allowing ECFMG to continue accepting documents from USAT

15   students until this matter's resolved?

16      A    There is no harm.

17           MS. MCENROE:  Objection, Your Honor.

18           THE COURT:  Basis?

19           MS. MCENROE:  Foundation and also vague.  I'm not

20   sure exactly what he means by harm.

21           THE COURT:  Sustained, sustained.

22           THE WITNESS:  I'm unaware of any harm.

23           THE COURT:  Oh, no, don't.  If I sustain, you don't

24   answer.

25           THE WITNESS:  Okay.

70

1           THE COURT:  Go ahead.

2           THE WITNESS:  I'm sorry, Your Honor.

3   BY MR. SWATE:

4       Q   Are you aware of the results of them posting the

5   information?

6       A   Yes.

7       Q   And what's been the result?

8       A   The result has been that all tuition payments stopped

9   on or before October 1st.  And that has made a major impact on

10  the economy at the university.  We were admitting about 50

11  students per month prior to that.  Since then, not one.

12      Q   And this was prior to any hearing or finding of

13  irregular behavior, correct?

14      A   That is correct.

15      Q   Do you have an opinion of whether it would be a

16  positive event to allow USAT to continue by ECFMG accepting

17  documents until this matter's resolved?

18          MS. MCENROE:  Objection, Your Honor.  Calls for

19  opinion testimony.

20          THE COURT:  Sustained unless you think that this can

21  be fact witness testimony, opinion testimony.  Make that

22  argument.

23          MR. SWATE:  He has specialized knowledge.  He's been

24  an administrator for 15 years.

25          THE COURT:  So you're trying to get him qualified as

1    an expert, is that what --

2              MR. SWATE:  Well, he is an expert.

3              THE COURT:  Well, he's not until I say he's an

4    expert.

5              MR. SWATE:  Well, I understand it, Judge.

6              THE COURT:  So are you trying to get him qualified as

7    an expert?

8              MR. SWATE:  Okay, I understand.  I will attempt to do

9    that.

10             THE WITNESS:  Okay.

11             THE COURT:  Okay, I'm not suggesting -- I mean, if

12   you want to do it, you can try and do it, but we've got go

13   through the process.  So why don't you do it?

14             MR. SWATE:  Yes, Your Honor.  I understand.

15             THE WITNESS:  Okay, would you repeat that question

16   now that we've had --

17   BY MR. SWATE:

18        Q    You've been a president and professor for USAT for 15

19   years?

20        A    That is correct.

21        Q    Are you familiar with the standards for your students

22   being licensed in the United States?

23        A    Yes.

24        Q    And what's this familiarity based on?

25        A    It's based on experience and study.

1          MR. SWATE:  Your Honor, I would have Dr. Tulp

2     admitted as an expert in medical administration.

3          MS. MCENROE:  Your Honor, we oppose.  I don't really

4     understand what an expert in medical administration is.  I

5     think that was factual testimony that was just being elicited

6     about why -- the basis for a line of questioning, which I don't

7     have an objection to that, but I don't understand him being put

8     forward as an expert at this time.

9          THE COURT:  Sustained.

10    BY MR. SWATE:

11         Q    You -- the -- you have familiarity with the history

12    of your students?

13         A    Yes, I do.

14         Q    Do you have familiarity with the history of your

15    students in going into residency programs?

16         A    Yes, we do.

17         Q    And what has been that history?

18         A    That history has been highly successful.  Most

19    successful -- most are successful in obtaining not only

20    residencies, but some medical positions, faculty positions at

21    U.S. medical schools following their board certification.

22         Q    Your student, if you can do this, how would you

23    describe your typical student?

24         A    Our typical students are exceptional.  They're way

25    above -- there is a mix of other international medical schools

73

1    from the region that we've interacted with.

2        All -- the minimum requirement for most questions coming

3    in is a Master's degree or higher.  And that accounts for about

4    90 percent of the total.

5        Q    What about the age of your students?  Do you have any

6    information about that?

7        A    We have no age restriction.  Our oldest graduate was

8    73.

9        Q    What kind of experience on the average do these

10   students have?

11       A    10 to 20 years of clinical experience prior to coming

12   into the program.  So.

13       Q    Are you making a claim today that you were denied due

14   process by the ECFMG?

15       A    Absolutely.

16            MS. MCENROE:  Objection, Your Honor.  Calls for a

17   legal conclusion.

18            THE COURT:  Sustained.

19            THE WITNESS:  Absolutely.

20            THE COURT:  If I say sustained, you don't answer the

21   question.

22            THE WITNESS:  Oh, I'm so sorry.

23            THE COURT:  Go ahead.

24   BY MR. SWATE:

25       Q    Well, what notice were you given of the charges?

74

1          A     None.

2          Q     What evidence was presented at the hearing?

3          A     None.

4          Q     Who terminated the hearing?

5          A     Attorney McEnroe.

6          Q     Were you allowed to -- were your attorneys allowed to

7     put on any evidence?

8          A     No.

9                MR. SWATE:  Pass the witness.

10               THE COURT:  All right.

11               MS. MCENROE:  May I approach the lectern, Your Honor?

12               THE COURT:  You may.

13               MS. MCENROE:  And per efficiencies, I would ask if

14    it's all right if I go do my cross and my --

15               THE COURT:  Yes.

16               MS. MCENROE:  It's yes?

17               THE COURT:  Yes, that's fine.

18               MS. MCENROE:  Thank you, Your Honor.

19                             CROSS-EXAMINATION

20    BY MS. MCENROE:

21         Q     Hi, Dr. Tulp.

22         A     Good afternoon.

23         Q     Good afternoon.  You were just asked about a hearing

24    on November 28th; is that correct?

25         A     Yes.

1    Q    And you heard testimony a little bit earlier today

2    about a transcript of the hearing?

3    A    I heard it, but I haven't read it.

4    Q    Have you received a copy of it?

5    A    No.

6    Q    Do you know if your lawyers have gotten a copy of it?

7    A    I believe our attorneys have received a copy very

8    recently.

9    Q    Does USAT have a campus in the United States?

10    A    No.

11    Q    Have you ever said that you USAT had a campus in the

12    United States?

13    A    No.

14    MS. MCENROE:  Your Honor, if I may, we need a minute

15    for a technical hookup so that we can --

16    THE COURT:  Go --

17    MS. MCENROE:  -- submit some evidence to refresh the

18    witness' recollection.

19    THE COURT:  Go ahead.  How -- when you say a minute,

20    do you mean one minute?

21    MS. MCENROE:  Literally a minute.  I think we have

22    it --

23    THE COURT:  Got it.

24    MS. MCENROE:  And Your Honor, while that's getting

25    queued up, I would like to submit it initially to refresh the

76

1   witness' recollection.

2           And once the Court gets to see it, I plan to move for

3   its admission on the basis of a statement of a party opponent?

4           THE COURT:  Any objection to submission of the

5   transcript?

6           MS. MCENROE:  I'm sorry, not the transcript, the

7   video that we're about to watch.

8           THE COURT:  The video, okay.  Do you know what video

9   she's talking about?

10          MR. SWATE:  No.  Have we --

11          THE COURT:  Okay, well, we'll take a look and then

12  I'll ask you that question again.

13          MS. MCENROE:  Thank you, Your Honor.

14          Your Honor, I think we're having a volume problem.

15          THE COURT:  Mr. Mani, can you solve that?

16          MR. SWATE:  Judge, we would object to this evidence.

17  It hasn't been authenticated.

18          THE COURT:  Well, we're just about -- we're doing

19  that right now.  That's what we're doing right now.

20          While we're waiting, Dr. Tulp, have there been any

21  2019 graduates of USAT as of yet this year?

22          THE WITNESS:  No, there have not been.

23          THE COURT:  When would be the first graduation or

24  when would have been the first graduation?

25          THE WITNESS:  In June.

1          THE COURT:  Okay.

2          MS. MCENROE:  Your Honor, while they're working on

3    that, in the interest of efficiency, I'd be happy to move on

4    and then circle back if that's all right?

5          THE COURT:  Go ahead.

6    BY MS. MCENROE:

7          Q    Dr. Tulp, you testified a minute ago that you had not

8    gotten any notice from ECFMG about the allegations against you;

9    is that correct?

10         A    That is correct.

11         MS. MCENROE:  All right, before I move on, it seems

12   like we got volume, so we'll circle back if we could?

13         THE COURT:  Go ahead.  The -- you'll be showing the

14   video solely for the purposes of determining whether -- its

15   admissibility?

16         MS. MCENROE:  Correct.  Yes, Your Honor.

17         THE COURT:  Okay, go ahead.

18         MS. MCENROE:  And Your Honor, we're only going to put

19   in the first couple minutes.  We're not going to --

20         (Video played at 3:53 p.m.)

21         (Music)

22         UNIDENTIFIED SPEAKER:  Thank you for joining us.  Our

23   guests today are Professor George Einstein of USAT and Dr.

24   Orien Tulp, the president of USAT, the British West Indies-

25   based University of Science, Arts, and Technology.

1          It is this institution in which dozens of physicians

2    graduate successfully, many from humble beginnings from nations

3    including the United States regardless of race or gender or

4    culture.

5          USAT has created a program of superior excellence and

6    in training physicians and other professionals to meet the

7    demand of scientific and medical needs in this global

8    technological environment.

9          Professor Einstein and Dr. Tulp will tell us more

10   about these achievements following these messages.

11      (Music)

12         With us now is Dr. Orien Tulp, president of USAT, the

13   University of Science, Arts, and Technology, Montserrat.

14   Pleasure and honor to have you back.

15         MR. TULP:  Thank you, sir.  Pleasure to be back.

16         UNIDENTIFIED SPEAKER:  So many things are happening

17   in education worldwide and of course in your part of the world.

18   And you do classes in Miami, Denver, and Montserrat.  What's

19   new with USAT?

20         MR. TULP:  USAT is now fully accredited in the United

21   Kingdom.  We're now preparing for our 2014 commencement, which

22   would be held right here in Miami.

23         We expect to graduate more than 100 students, which

24   is more than any other Caribbean school just by the way.  And

25   we'll have this -- we want family to come.  It's a great

1  opportunity, a great experience.  And it enables those who

2  graduate to experience closure, because now it's another

3  chapter of their career.

4         UNIDENTIFIED SPEAKER:  And USAT is contributing so

5  effectively in the lives and careers of many people in this

6  part of the world.

7         MR. TULP:  Yes, it is.  Yes, it is.  We have a lot of

8  physicians now in the state of Florida.  We have some who are

9  practicing and many more are in residency in their specialty

10  training.

11         It's moving ahead very quickly and very rapidly.

12  We're now the fastest, near as I can see, we are the fastest

13  growing medical school in the Caribbean.

14         UNIDENTIFIED SPEAKER:  So the University of Science,

15  Arts, and Technology also is expanding into other programs, I

16  understand.  Tell us of these?

17         MR. TULP:  Yes, yes we are.  We have a new program we

18  intend to start by September.  This would be medical

19  acupuncture designed for physicians, licensed physicians that

20  wish to add that.

21         We're going to create a unique new program, which

22  will lead to a Master of Science in Medical Acupuncture.

23  That'll be conducted in our Miami campus to start with and

24  probably extend that into some of the other campuses.

25         (Video ended at 3:56 p.m.)

1          MS. MCENROE:  Your Honor, I would make the argument

2    that Dr. Tulp is appearing here on this video himself, saying

3    referring to a Miami campus, which goes directly contradictory

4    to testimony he said that he never uses the word campus to

5    describe USAT's conduct in the United States.  So I would

6    submit that it's admissible as an admission of a party

7    opponent.

8          THE COURT:  Any objection?

9          MR. SWATE:  It's not -- part of the controversy is

10   the definition of campus.

11         THE COURT:  We're not talking about the -- that

12   particular issue.  We're only talking about the admissibility

13   of this tape.  So tell me why you oppose its admission?

14         MR. SWATE:  I don't.

15         THE COURT:  Okay, it's admitted.

16    (Defendant's Exhibit D-1 admitted into evidence)

17         MS. MCENROE:  Thank you, Your Honor.

18   BY MS. MCENROE:

19    Q    Dr. Tulp, you were testifying just a minute ago about

20   not having notice from ECFMG with respect to the issues on

21   going with USAT; is that correct?

22    A    That is correct.

23         MS. MCENROE:  Your Honor, may I approach the witness?

24         THE COURT:  You may.

25         MS. MCENROE:  And Your Honor, I have a copy for you

1     as well if you'd like me to hand that up if that's all right.

2          THE COURT:  Yes, please.

3     BY MS. MCENROE:

4          Q     Dr. Tulp, do you recognize this document?

5          A     I do.

6          Q     What is it?

7          A     I recognize it, yes.

8          Q     Okay, and this is a letter directed to you, correct?

9          A     That is correct.

10         Q     Did you get this letter?

11         A     I received it by email.

12         MS. MCENROE:  Your Honor, I would move for the

13    admission of this letter?

14         THE COURT:  Any objection?

15         MR. SWATE:  No objection.

16         THE COURT:  It's admitted.  What would you like to

17    label this as?  We'll label the video as D-1.

18       (Defendant's Exhibit D-2 admitted into evidence)

19         MS. MCENROE:  Great.  And how about we make this D-2?

20         THE COURT:  Got it.

21         MS. MCENROE:  Thank you, Your Honor.

22    BY MS. MCENROE:

23         Q     So starting from the top, and it's a brief letter, so

24    I'm going to try not to go too long on it, but it's from August

25    21st, 2018.  And it starts out saying, "It has recently come to

1    the attention of the Educational Commission for Foreign Medical

2    Graduates that USAT in Montserrat is operating a satellite or

3    branch campus in Miami, Florida."  Do you see that?

4         A    I see that.

5         Q    Then it was explained that, "In order for students

6    and graduates of an international medical school such as USAT

7    to have eligibility to apply for ECFMG certification, ECFMG

8    policy requires confirmation from the appropriate government

9    authority in the branch campus country that the branch campus

10   is authorized to operate as a medical school in such branch

11   campus country."  Do you see that?

12        A    Yeah, I see that, uh-huh.

13        Q    Have you ever provided such information to ECFMG

14   about the operation of education in the United States from

15   USAT?

16        A    No, because when I contacted the Florida Department

17   of Education, they said it was unnecessary based on what our

18   activities actually were.  The bulk of our program was online,

19   about 80 percent of it.  And we have previously told you that.

20             MS. MCENROE:  Your Honor, may I approach the witness?

21             THE COURT:  You may.

22             MS. MCENROE:  And the bench, Your Honor.

23   BY MS. MCENROE:

24        Q    Dr. Tulp, do you know what this document is?

25        A    Yes.

1      Q      What is it?

2      A      It's a site support and schedule.

3      Q      And it says -- you see it says lecture conference

4   schedule at the top?

5      A      It does that.

6      Q      And this is from University of Science, Arts, and

7   Technology; is that correct?

8      A      Yes, it is.

9            MS. MCENROE:  Your Honor, I would move for this

10   admission of D-3, please?

11            THE COURT:  Any objection?

12            MR. SWATE:  No, Your Honor.

13            THE COURT:  It's admitted.

14      (Defendant's Exhibit D-3 admitted into evidence)

15            THE WITNESS:  I have one question if I'm allowed to

16   ask?

17            THE COURT:  You're not.

18            MS. MCENROE:  At this juncture, you are --

19            THE COURT:  You are not.

20            THE WITNESS:  Okay.

21   BY MS. MCENROE:

22      Q      So you mentioned when you were questioned by counsel

23   about the notice of the allegations of irregular behavior

24   against you; is that correct?

25      A      That's correct.

84

1        Q    And you indicated you didn't have any notice of the

2    claims of irregular behavior against you?

3        A    I did not have notice.

4             MS. MCENROE:  May I approach, Your Honor?

5             THE COURT:  You may.

6             MS. MCENROE:  And the bench, Your Honor?

7             THE COURT:  You may.

8    BY MS. MCENROE:

9        Q    Dr. Tulp, have you seen this letter before?

10       A    I've seen this letter before, yes, I have.

11            MS. MCENROE:  Your Honor, I would move for admission

12   as D-4.

13            THE COURT:  Any objection?  Any objection?

14            MR. SWATE:  No.

15            THE COURT:  It's admitted.

16        (Defendant's Exhibit D-4 admitted into evidence)

17   BY MS. MCENROE:

18       Q    So Dr. Tulp, I'm going to direct you to a couple

19   parts of this letter in particular, but I don't want to belabor

20   the point or take too much time, but I'm just going to start

21   from the beginning.

22        That it's addressed to you and it says, "I'm writing to

23   advise you of the allegation that you individually and your

24   capacity as an official of the USAT faculty of medicine

25   Montserrat engaged in irregular behavior in connection with

85

1    providing false information to ECFMG." Do you see that?

2        A    I see that.

3        Q    And it goes on to say, "Specifically, you provided

4    false information to ECFMG when you notified ECFMG that USAT

5    does not operate a branch campus in Miami, Florida, and two,

6    certified to the attendance dates of several USAT students and

7    graduates when ECFMG has information that these students were

8    not attending USAT during some the of time periods which you

9    certified." Do you see that?

10       A    Yes, I see that.

11           MS. MCENROE:  May I approach, Your Honor?

12           THE COURT:  You may.

13           MS. MCENROE:  And the bench, Your Honor?

14           THE COURT:  You may.

15   BY MS. MCENROE:

16       Q    Dr. Tulp, this on its face is an email from you at

17   the top. Do you see that from Orien Tulp? Is that your email

18   address, o.tulp@usat.edu?

19       A    It is.

20       Q    Do you recognize this email?

21       A    I do.

22           MS. MCENROE:  Your Honor, I'd like to move for its

23   admission as D-5?

24           THE COURT:  Any objection?

25           MR. SWATE:  No.

1                    THE COURT:  It's admitted.

2         (Defendant's Exhibit D-5 admitted into evidence)

3    BY MS. MCENROE:

4         Q    This is an email from you to Scott Mealey.  Do you

5    know who Scott Mealey is?

6         A    No.

7         Q    Do you know whether or not he works at the ECFMG?

8         A    I -- according to a signature block, he does.

9         Q    Okay, do you have any reason to believe otherwise?

10        A    I have no reason to believe otherwise.

11        Q    And this email down below from Scott Mealey to you

12   says, "Please see the attached letter regarding USAT U.S.

13   satellite campus."  Do you see that?

14        A    I see that.

15        Q    And then up above, you wrote, "Dear Mr. Mealey."  Do

16   you see where I am?

17        A    I see that.

18        Q    And is this an email you wrote?

19        A    This is incorrect information.

20        Q    Correct, you're reading the beginning of the email,

21   right?

22        A    Right.

23        Q    This is correct information?  Did you write this

24   email?

25        A    I did.

1    Q    And it says, like you were reading, "This is

2    incorrect information.  The Miami location is an information

3    and testing site only where a pre USMLE examination and MDME

4    may administered and an orientation for new students is

5    conducted prior to the travelling to the Caribbean.  It is NOT

6    a campus.  Our only campus is located in Olveston, Montserrat,

7    British West Indies."  Is that what you wrote?

8    A    That is exactly correct.

9    Q    Is it your position that USAT has done no educational

10   services for students in the United States?

11   A    We have an online program.  They can take that

12   program from anywhere in the world.  Our most distant graduate

13   was from Thailand.

14        MS. MCENROE:  Your Honor, I'd move to strike as

15   nonresponsive.

16        THE COURT:  Overruled.

17   BY MS. MCENROE:

18   Q    Do you have any students who have gotten medical

19   education in the United States?

20   A    They received a review lecture, which is part of the

21   orientation.  We like to showcase our faculty because our

22   faculty are pretty strong and I like to showcase them.

23   Q    If you --

24   A    So we'll -- yes, we fly a couple of faculty in to

25   give a demonstration before you join our schools, here's what

1   you're going to get.  The lectures are delivered online.

2       Q    Do USAT students dissect cadavers in connection with

3   their medical education?

4       A    Yes, we have an agreement with the Miami Anatomic

5   Research Center, who provides that service for us.

6       Q    So USAT students dissect dead human bodies in the

7   United States, correct?

8       A    Cadavers.

9       Q    Yeah, the same thing, right? I just want to make

10  sure.

11      A    Cadavers.

12      Q    I'm sorry, I'm not a medical doctor, I'm just making

13  sure.

14      A    Yeah.

15      Q    But there is dissection of human remains, cadavers --

16      A    That is --

17      Q    -- in the United States by USAT students?

18      A    There is.  There we also have an anatomage machine,

19  which they do a computerized dissection prior to that.

20      Q    In your view, is the dissection of human cadavers not

21  education?

22      A    That is education that is provided by the Miami

23  Anatomic Research Center at their location on their campus.

24      Q    To USAT students in the United States?

25      A    The USAT students are in the United States attending

1   that, as do students from around the world attending that same,

2   very same anatomic research center for educational purposes.

3       Q    Dr. Tulp, did you instruct the students at USAT about

4   how to fill out the affidavits requested by the Educational

5   Commission for Medical Graduates?

6       A    Not specifically.  But if they asked me for guidance,

7   I would provide to guide it, -- but haven't seen the affidavits

8   until recently.

9            MS. MCENROE:  Your Honor, may I approach?

10           THE COURT:  You may.

11           MS. MCENROE:  And the bench, Your Honor?

12           THE COURT:  you may.

13  BY MS. MCENROE:

14      Q    Dr. Tulp, I'd like to direct your attention

15  specifically to the bolded text in the middle.

16      A    Uh-huh, uh-huh.

17      Q    That's followed by your signature block.  Do you see

18  that?

19      A    Right, I see that.

20      Q    Is this a message that you wrote?

21      A    It -- apparently I did.

22      Q    And who is Carla (phonetic) and I'm going to say this

23  wrong I'm sorry, Cognier (phonetic)?

24      A    Carpanich (phonetic) is the vice president of the

25  university.

1          MS. MCENROE:  Your Honor, I would move for this

2    admission -- admission of this document as D-6?

3          THE COURT:  Any objection to admit it?

4          MR. SWATE:  No, Your Honor.

5          THE COURT:  Admitted.

6    (Defendant's Exhibit D-6 admitted into evidence)

7    BY MS. MCENROE:

8      Q    And Dr. Tulp, this message says, "Please do NOT use

9    the phrase 'campus' when referring to the U.S. sites as that

10   implies approval from the U.S. Department of Education or the

11   State Department of Education, which isn't possible or likely

12   as an international medical school.

13        Someone reported to the ECFMG that we have a Miami campus.

14   It is an administrative site where we do interviews,

15   orientations, and pre USMLE proctored examinations."  Did I

16   read that correctly?

17     A    You did.

18     Q    Do you know if this message was disseminated to USAT

19   students to not use the phrase campus?

20     A    I do not know if it was or not.

21     Q    Is USAT accredited by CAAM-HP?

22     A    No, it is not required to be.

23     Q    Can you explain --

24     A    It is accredited in the United Kingdom.  We're a

25   British school.

1       Q    Where is the headquarters of USAT?

2       A    Montserrat, Olveston, Montserrat.

3       Q    And I had to get my crib sheet for all the acronyms

4   in this case.  Is it correct that CAAM-HP is the Caribbean

5   accreditation authority for education in medicine and other

6   health professionals?

7       A    It's an emerging accrediting body.  It is accredited

8   --

9       Q    You understand --

10      A    It has accredited --

11      Q    Go ahead, I'm sorry.

12      A    It's accredited maybe four schools so far.

13           MS. MCENROE:  Your Honor, may I approach?

14           THE COURT:  You may.

15           MR. SWATE:  Your Honor, I'll object to this evidence.

16   We don't know where it came from.  We don't know how it was

17   generated.  We don't know whether it's changed or not.

18           MS. MCENROE:  Your Honor, I'm going to ask some

19   questions to try and establish that.

20           THE COURT:  Okay, ask him foundational questions.

21           MS. MCENROE:  Thank you, Your Honor.

22   BY MS. MCENROE:

23      Q    Dr. Tulp, has USAT tried to become accredited by

24   CAAM-HP?

25      A    We have tried, but the government of Montserrat do

92

1   not accept CAAM as an accrediting body until September 13th,

2   2018.

3       Q    I'm sorry, I didn't quite hear you.  Did you say we

4   have tried or we haven't tried?

5       A    I have attempted, but the government in Montserrat

6   would not accept CAAM as an accrediting body until September

7   13th of 2018.

8       Q    Do you --

9       A    Therefore, they would not endorse any accreditation

10  by CAAM.  We were inspected by CAAM.  We passed it with flying

11  colors.

12      They interviewed between 15 and 20 students on campus each

13  time that they were there, but only one surveyor showed up.  He

14  had always Alzheimer's.  He took no notes.  He took no

15  pictures.  He even forgot to pay his hotel bill.  I had to.

16      Q    Had you seen this letter before or this

17  determination?

18      A    I've seen it before.

19      Q    You have?

20      A    And I would like to remark that there were more than

21  100 violations of the LCME protocol, which they said that they

22  applied when they conducted the site visit.

23      They're required to have three surveyors.  They have only

24  one, a retired physician from Canada.  And the other two

25  surveyors allegedly indicated here have never been to

1    Montserrat.

2             MS. MCENROE:  Your Honor, I'd like to try strike as

3    nonresponsive everything after the witness said he's seen his

4    document before?

5             THE COURT:  It's stricken.

6             MS. MCENROE:  Thank you, Your Honor.  I'd like to

7    move for admission of this document as Exhibit D-7?

8             THE COURT:  Any objection?

9             MR. SWATE:  No objection.

10            THE COURT:  It's admitted.

11    (Defendant's Exhibit D-7 admitted into evidence)

12    BY MS. MCENROE:

13        Q    I'd like the record direct your attention to the red

14    paragraphs in the middle.

15        A    Uh-huh.

16        Q    See the second paragraph there?

17        A    Yeah.

18        Q    It says, "Following discussions of the reviewers

19    report, CAAM-HP determined that this whole had not provided

20    sufficient evidence to indicate that teaching activities were

21    actually taking place in Montserrat."  Do you see that?

22        A    I see that.  That is an incorrect statement.  They

23    interviewed 15 students.  They observed classes in session.

24    They were there for three days.

25            MS. MCENROE:  Your Honor, permission to approach?

94

1               THE COURT:  You may.

2      BY MS. MCENROE:

3          Q    Dr. Tulp, what I just handed you is an email chain

4      that includes a message that starts with "dear students" and

5      then has your signature block at the bottom of the first page.

6          A    Uh-huh.

7          Q    Do you see this?

8          A    I see that.

9          Q    Is this a message that you've seen before?

10         A    I don't know if I've seen this or not.

11         Q    I'm going to read a little bit to you --

12         A    Yeah.

13         Q    -- to see if it refreshes your recollection?

14         A    Yeah.

15         Q    If that's all right?

16         A    I did not write this.

17         Q    Okay, but do you see your signature block there?

18         A    My signature block appears on everything, whether

19     I've signed or seen it or not.

20         Q    Okay, well, I want to see if I can refresh your

21     recollection.

22         A    That includes the documents from the ECFMG that I

23     receive.  They already have my signature attached.  I have not

24     signed it.  I never gave authorization for them to sign my

25     documents.

1     MS. MCENROE:  Your Honor, I would move to strike as

2  nonresponsive.  I don't know what question the witness was

3  responding to.

4     THE COURT:  Stricken.

5  BY MS. MCENROE:

6     Q    So I'd like to see if I can refresh your recollection

7  about whether you've seen this before.  So where it says "dear

8  students" on the first page, then there's a paragraph that

9  starts ECFMG.  Do you see where I am?

10    A    Uh-huh.

11    Q    Okay, and it says, "ECFMG is questioning our delivery

12 of the basic sciences because some students didn't attend on

13 Montserrat due to past volcanic activity on Montserrat."  Do

14 you see that?

15    A    I see that.

16    Q    Okay, and then I'd like to go to the second paragraph

17 there.  It starts with, "We will now begin."  Do you see that?

18    A    I see that.

19    Q    It says, "We will now begin offering the basic

20 science portion of our program at our campus on Montserrat as

21 early as October 1st, 2018 and at our new British Virgin

22 Islands campus as soon as January 2019."  Do you see that?

23    A    I see that.

24    Q    Does that refresh your recollection whether you've

25 seen this message before, whether or not you've authored it?

1    Q    I didn't author it.  And I don't believe that I've

2    actually seen this before.

3    Q    Okay, so stepping away from that --

4    A    But we've have basic sciences in Montserrat for many,

5    many years.  We've just graduated the first two students who

6    completed their entire four years in Montserrat, the first two

7    that did the entire four years basic sciences and clinical

8    sciences on the island of Montserrat.

9    The volcano was quieting down until about four years ago,

10   it would erupt every -- about once a month.  That is not a safe

11   environment.

12       MS. MCENROE:  Your Honor, I'd move to strike.

13       THE COURT:  Stricken.

14   BY MS. MCENROE:

15   Q    Stepping away from the document, because I understand

16   that you say may not have seen it before, is it true that USAT

17   opened a new campus on the British Virgin Islands in 2019?

18   A    We have been licensed in the British Virgin Islands

19   for some time now.

20   Q    And is that going to be the same USAT or is that

21   going to be a new medical school?

22   A    We haven't released that information yet.

23       THE COURT:  Well, can you respond to the question,

24   please?

25       THE WITNESS:  It will not be USAT.

1    BY MS. MCENROE:

2        Q    So you're opening a new medical school on another

3    island in the Caribbean; is that correct?

4        A    Not a volcanic island.

5        Q    Is USAT still in operation?

6        A    Yes.

7        Q    Does USAT have graduates that ever practiced medicine

8    in Montserrat?

9        A    Yes.

10        Q    Does USAT have graduates that ever practiced medicine

11    outside of Montserrat or the United States?

12        A    Yes.

13        Q    Does USAT have graduates that have ever practiced

14    medicine in the United Kingdom?

15        A    I'm not aware of any.  We don't recruit from the

16    United Kingdom that much.  My recollection is the United

17    Kingdom has about 20 or 30 medical schools of its own and

18    they're excellent medical schools.

19        Q    Are you aware of any USAT students having been

20    charged with irregular behavior?

21        A    Yes.

22        Q    In connection with this circumstance that we're

23    discussing today?

24        A    Yes.

25        Q    Who was that?

98

1      A    I'm not at liberty to say.

2           THE COURT:  Respond to the question.

3           THE WITNESS:  The one student that told me he'd made

4   one call, a single call to the ECFMG.  And on the basis of that

5   single call, he was assigned irregular behavior.

6           When he applied to take the Puerto Rico Medical Board

7   Exam, they denied him because of irregular behavior on the

8   basis of a single phone call to the ECFMG, when all he was

9   asking for is guidance on how to apply for step one.

10     Q    When did that happen?

11     A    A couple years ago.

12     Q    Do you have any understanding whether that -- was it

13  all in connection with the circumstances with regard to where

14  USAT has conducted its medical education?

15     A    I am not aware that it was connected or not connected

16  to that.

17     Q    Do -- what is that student's name?

18     A    I don't know whether it was connected or not, but

19  that's -- but --

20     Q    I'm sorry, doctor, I was asking about the student's

21  name?

22     A    I mean, I can't give you the student's name.

23          THE COURT:  Respond to the question.

24  BY MS. MCENROE:

25     Q    If you know?

546a

1    A    Yeah, it'll come to me.  I know his name, but it's a

2    very long Spanish name.

3    Q    Do you have an understanding of whether the action

4    ECFMG took against you with respect to the allegation of

5    irregular behavior prevents you from opening a new medical

6    school in the British Virgin Islands?

7    A    Anyone can open a medical school if they have the

8    resources to do so.

9    Q    Is it fair to say that it is not preventing you from

10   opening a new medical school in the British Virgin Islands?

11   A    It doesn't prevent us from opening it, but it would

12   prevent us from attracting students.

13   Q    So you said --

14   A    There's no chance that we could attract students with

15   that note on the World Directory.  That's only two-thirds of

16   the note.  The other third was removed after the subpoenas were

17   delivered.

18        MS. MCENROE:  Your Honor, I strike as nonresponsive

19   to any question that was pending.

20        THE COURT:  It's -- I'm not going to strike it, but

21   would you please just answer the question?

22        THE WITNESS:  Would you rephrase the question, so I

23   can understand it?

24        MS. MCENROE:  So I'm just trying to understand --

25        THE COURT:  Let me just ask a series of questions.

1              MS. MCENROE:  Yeah, thank you, Your Honor.

2              THE COURT:  Are you opening a new school in the

3    British Virgin Islands?

4              THE WITNESS:  None in our plan.

5              THE COURT:  And when you say our, who is our?

6              THE WITNESS:  The university.

7              THE COURT:  So USAT?

8              THE WITNESS:  USAT would sponsor it.

9              THE COURT:  USAT will sponsor the university in the

10   British Virgin Islands?

11             THE WITNESS:  Yes, we were invited about two years

12   ago to begin claiming for this.  But I mean, by British Virgin

13   Islands.

14             THE COURT:  And will the new university be called

15   USAT?

16             THE WITNESS:  No.

17             THE COURT:  What will it be called?

18             THE WITNESS:  As far as I know, it will be called the

19   University of Health and Humanities, British Virgin Islands or

20   the Virgin Islands.  You can leave out the British.

21             THE COURT:  You indicated that it would have

22   difficulty recruiting students?

23             THE WITNESS:  Yes.

24             THE COURT:  Well, when you said that, were you

25   referring to USAT in Montserrat?  Or were you suggesting that

101

1    the new British Virgin Island school would have difficulty

2    recruiting students?

3         THE WITNESS:  It would have difficulty recruiting

4    students because of the activities with the sponsored note on

5    the -- for USAT Montserrat.

6         THE COURT:  Well, the sponsor note is associated with

7    USAT, correct?

8         THE WITNESS:  That's correct.

9         THE COURT:  So what is your understanding about how

10   that note can connect with the British Virgin Islands?

11        THE WITNESS:  Because the ownership of the new

12   university began with USAT.

13   BY MS. MCENROE:

14        Q    Dr. Tulp, do you have an understanding -- you

15   testified a little earlier about some graduates from USAT being

16   able to practice medicine in Montserrat and other places

17   outside the United States; is that correct?

18        A    Yes, uh-huh.

19        Q    Do you have any understanding of whether ECFMG is at

20   all involved in the licensure or certification of those

21   graduates?

22        A    In 2005, there were not.  The body there is the CAAM

23   C exam, the Caribbean Medical Board Exam.  If they were to

24   apply today, they would not be able to.

25        Q    And that's a decision of the Montserratian

1    government?

2    A    No, that's a decision of the ECFMG, because the ECFMG

3    sponsor note applies to the United States of America, but the

4    ECFMG cooperates with virtually every medical board in the

5    world.

6    They all refer to your services.  I've seen documents that

7    you have sent to me to certify from Australia, from Denmark,

8    from other countries, from any other -- and Canada.  Canada has

9    already suspended access for USAT graduates based on the ECFMG

10    sponsoring note.

11    Q    Dr. Tulp, has USAT sought accreditation to be a U.S.

12    medical school?

13    A    No, it has not.

14    MS. MCENROE:  I have nothing further, Your Honor.

15    THE COURT:  Redirect and cross of Ms. McEnroe's

16    direct?

17                    CROSS-EXAMINATION

18    BY MR. SWATE:

19    Q    Doctor?

20    A    Yeah.

21    Q    As we sit here in this room today, is USAT a licensed

22    medical school by Montserrat?

23    A    Yes, it is.

24    Q    And also, is there another entity other than

25    Montserrat that licensed -- that accredits USAT?

1      A    Yes, the ASIC in the U.K., the accrediting system for

2  international schools, colleges, and universities except -- and

3  that's an institutional accreditation as opposed to a

4  programmatic accreditation.

5      Q    And --

6      A    But we're also accredited by the AICP, which is in

7  the United States.  That's the American Institute for Clinical

8  Psychotherapy.  And also by the American Association for Higher

9  Education and Accreditation.  And that latter one is also

10  institutional.

11      Q    Is the ECFMG an accrediting agent of a medical

12  school?

13      MS. MCENROE:  Objection, Your Honor.  Foundation.

14      THE COURT:  You can answer the question.

15      THE WITNESS:  I may answer?

16      THE COURT:  Go ahead.

17      THE WITNESS:  No, the ECFMG is not an accrediting

18  body.

19  BY MR. SWATE:

20      Q    But they acted as an accrediting body, correct?

21      A    Yes, they do.

22      Q    Essentially what -- let's go through the process of

23  what was happening to students who were sending in requests for

24  information from the ECFMG, based on your knowledge of what was

25  happening?

1          A     They were told they should transfer it to another

2     medical school immediately.  They were told that they had to

3     complete those affidavits or they could be assigned irregular

4     behavior or be fined -- alleged for perjury.

5                There are various penalties for someone who may have

6     graduated 10 years ago and may or may or not remember the exact

7     dates that they started school.

8          Q     If you know, what was being -- what was happening to

9     the students who didn't send in the affidavit, their records?

10    What was happening to their records, if you know?

11         A     Those records are frozen and they cannot proceed any

12    farther until they complete the affidavits.

13         Q     What's the effect of having frozen records from the

14    ECFMG?

15         A     You cannot proceed to the residency or licensure.

16         Q     These letters that they presented here today, did

17    they present those letters to you?

18         A     No, they do not.

19         Q     Let me finish my question.

20         A     Oh.

21         Q     It -- by someone from the USFMG in the hearing?

22         A     No, they do not.

23         Q     They didn't give you an opportunity to respond to

24    those letters, did they?

25         A     No, they do not.

1      Q    And one of the letters is obviously written by

2  someone other than you?

3      A    Yes.

4           MS. MCENROE:  Objection, Your Honor.  Foundation.

5  And is that a question?

6           THE COURT:  Sustained.

7  BY MR. SWATE:

8      Q    Appendix H, do you have that in front of you?

9      A    What page would that be?

10     Q    I don't know, I just have exhibit that -- it would be

11  one of the last letters she showed you.

12          MR. SWATE:  Your Honor, can I approach the witness?

13          THE COURT:  You may.

14          THE WITNESS:  Yeah.

15          MR. SWATE:  I'm going to show you what's the what I

16  have is it's right here, Appendix H.  And on the back of that,

17  there's a letter supposedly from you.  Would you read the last

18  sentence of that letter?

19          MS. MCENROE:  Your Honor, this was a letter was not

20  authenticated --

21          THE COURT:  Yeah.

22          MS. MCENROE:  -- and not admitted into evidence.

23          THE COURT:  Yeah, this document was not admitted.  So

24  therefore, any questioning about it is not appropriate.

25          MR. SWATE:  I'm not questioning the letter or

1    anything it stands for.  I'm requesting other than redirect, as

2    a cross of her redirect?  Because obviously, the letter is not

3    from him.

4           THE COURT:  Right on direct, there was the talk about

5    authentication and admissibility.  And it was determined during

6    that examination that it was not from him.  So therefore, it

7    was not admitted.

8           MR. SWATE:  Okay, thank you.

9    BY MR. SWATE:

10         Q    Now they talked a little bit about this CAAM

11   accreditation.

12         A    Right.

13         Q    When does that have to be in place?

14         A    2023.

15         Q    It doesn't have to be in place now, does it?

16         A    No.

17         Q    Have you got a valid license from Montserrat?

18         A    That is correct.

19         Q    At this time?

20         A    That is correct.

21         Q    In 2023, it's going to be like Cinderella?

22         A    Yeah.

23         MS. MCENROE:  Objection.

24         THE COURT:  Sustained.

25   BY MR. SWATE:

1        Q     Okay.

2        A     In 2023, we'll have it done.

3              THE COURT:  So if I sustain an objection, you do not

4    answer the question.

5              THE WITNESS:  So.

6    BY MR. SWATE:

7        Q     Just one last question and I'll pass the witness.

8    And I believe I've asked you, but just to -- they presented

9    none of this evidence to the committee at the hearing, did

10   they?

11       A     No, they did not.

12             MR. SWATE:  Pass.

13             THE COURT:  Now Ms. McEnroe, I believe at this point,

14   it would be your redirect of their cross?

15             MS. MCENROE:  Your Honor, I have no further

16   questions.  Thank you.

17             THE COURT:  You can leave the stand.

18             Anyone else any other witnesses?  No.

19        (Witness excused)

20             MS. MCENROE:  Not from --

21             THE COURT:  Okay, from Plaintiff, any other

22   witnesses?

23             MR. SWATE:  Your Honor, before we rest, we have some

24   documents we'd like to put into evidence.

25             THE COURT:  Well, do you have a witness who can --

1        MR. SWATE:  Ask Dr. to --

2        THE COURT:  To Dr. Tulp?

3        MR. SWATE:  To Dr. Tulp.

4        THE COURT:  Okay.  Go ahead.

5        MR. SWATE:  Yeah.  Since --

6        THE COURT:  No, Dr. Tulp, you have to go back on the

7   stand because he wants to introduce some documents through you.

8        MR. REIL:  Your Honor, before I understand the --

9   maybe I'm at the wrong point of juncture, I just wanted to

10  before we rest indicate what documents we wanted to introduce

11  into evidence.

12       THE COURT:  Well, I can tell you the ones that you

13  have had had admitted.  You've had Exhibit B, which is the

14  World Directory note.

15       MR. REIL:  That's one of them, yes.

16       THE COURT:  You've had Exhibit C, which is the

17  Montserrat Agreement.

18       MR. REIL:  Okay.

19       THE COURT:  You have Exhibit D, which is the

20  affidavit.

21       MR. REIL:  Yes.  I thought there was also --

22       THE COURT:  Wait a minute, we can -- you can say you

23  thought that once live gone through everything.  Let me see.  I

24  do not have records on Exhibit E, which is the November 21st,

25  2018 letter.  Is that something that you wanted to have

1   admitted?

2           MR. REIL:  Yes, there was testimony by Ms. Corrado on

3   that.  I would move to admit it.

4           THE COURT:  Any objection?

5           MS. MCENROE:  No, Your Honor.

6           THE COURT:  That's admitted, too.

7       (Plaintiff's Exhibit E admitted into evidence)

8           MR. REIL:  And I have one more.

9           THE COURT:  Hold on.  Which is the other one?

10          MR. REIL:  The other one, I believe, that there was

11  testimony on was --

12          THE COURT:  Identify it, yeah.

13          MR. REIL:  Yes, Exhibit G.  It was the fifth letter

14  down, the letter of 11/14/18 to Dr. -- Attorney Swate at page

15  22.  I asked Ms. Corrado about that is my recollection about

16  the faculty.

17          THE COURT:  Exhibit G, did you say?

18          MR. REIL:  Exhibit G.  And I have six letters listed.

19  It would be at page 23.

20          THE COURT:  I have no indication that that was -- oh.

21          MR. REIL:  If I might.

22          THE COURT:  Okay, I don't an indication that that was

23  admitted.  That was the page 23, correct?

24          MR. REIL:  Yes, Your Honor.

25          THE COURT:  Any objection to page 23 being admitted?

110

1          MS. MCENROE:  No objection.

2          THE COURT:  That's admitted.

3      (Plaintiff's Exhibit G admitted into evidence)

4          MR. REIL:  That's all I have, Your Honor.

5          THE COURT:  Okay.

6          MS. MCENROE:  And Your Honor, while we're admitting

7  exhibits, if you wouldn't mind, we have a number of exhibits

8  attached to our opposition to our motion -- sorry, our

9  opposition to the motion for preliminary injunction.

10          If you -- with the Court's permission, I'd like to

11  recall Ms. Corrado, if I could, to authenticate and can I just

12  have the exhibits admitted?

13          THE COURT:  I have no -- you can leave the stand now.

14          THE WITNESS:  Okay.

15      (Witness excused)

16          THE COURT:  I have no problem with that, but it will

17  be better if you could just stipulate.  Which documents are

18  they?

19          MS. MCENROE:  I don't know if you have the --

20          THE COURT:  I do.

21          MS. MCENROE:  -- exhibits in question.  So I would

22  like to -- Exhibit 1 is a printout of the ECFMG website about

23  ECFMG.

24          THE COURT:  Any objection to Exhibit 1 being

25  admitted?

558a

1          MR. REIL:  Your Honor, we weren't given any notice

2     that these exhibits were going to be put into --

3          THE COURT:  Well, you're getting notice now, okay,

4     that's what we're talking about.

5          MR. REIL:  Oh.

6          THE COURT:  So let's talk about it.

7          MR. REIL:  Okay.

8          THE COURT:  Let's talk turkey.  Exhibit 1 to the

9     Defendant's motion, you have any objection to that being

10    admitted?

11         MS. MCENROE:  Sure, I don't think the note's in here.

12         MR. REIL:  I have to --

13         Yeah, fine.

14         Yeah, no objection.

15         THE COURT:  Admitted.

16    (Defendant's Exhibit 1 admitted into evidence)

17         MS. MCENROE:  Exhibit 2, please, Your Honor?

18         THE COURT:  The ECFMG Medical School policy --

19    international medical school definition.  Any objection to

20    that?

21         MR. REIL:  I have to know what purpose it's being

22    admitted for here?

23         MS. MCENROE:  Your Honor, it's for the purposes as

24    used in our opposition for the motion for preliminary

25    injunction to help provide the factual background for the

1    Court, what we think is necessary to rebut the Plaintiff's

2    motion for preliminary injunction.

3         In particular, this helps to lay out the fact that

4    ECFMG defines international medical schools as an international

5    medical school as an educational facility located in a country

6    outside of the United States and Canada with its primary campus

7    and main operations located in that country.  And there's

8    additional information in here, too.

9         THE COURT:  Well, I'm going to tell you that I'm

10   going to allow either Ms. Corrado or Ms. Cover to come up and

11   talk about this document.

12        And I'm pretty sure it's admissible, given that it's

13   an ECFMG school policy.  So we can do the hard way or we can do

14   it the easy way.

15        MR. REIL:  Well, let's do it the easy way.

16        THE COURT:  Excellent, that's admitted.

17   (Defendant's Exhibit 2 admitted into evidence)

18        MS. MCENROE:  Thank you, Your Honor.  Exhibit 3 is

19   the 2009 information booklet for ECMG (sic).  This -- each

20   year, ECMG publishes an information booklet laying out a full

21   range of information for the applicants coming through its

22   processes.

23        This includes a copy of the irregular behavior

24   policy.  And I'd be prepared to introduce and have it

25   authenticated by either Ms. Corrado or Ms. Clover.

113

1          THE COURT:  Any objection?

2          MR. REIL:  No, Your Honor -- yes, Your Honor.  That

3   applies to 2019.  All right, that's what it says on there,

4   ECFMG certification.  I don't know how, if any, it is changed

5   from what we were concerned of primarily, the hearing note in

6   November of 2000.

7          THE COURT:  What's your response to that?

8          MS. MCENROE:  Understood, Your Honor.  At the bottom,

9   it has the September 13th, 2018.  I believe this is sort of a

10  school year 2019 document, but I'd be happy to get one of the

11  witnesses up and they could testify as to any changes if

12  necessary.

13         THE COURT:  Okay.

14         MR. REIL:  Would you be willing to stipulate -- oh,

15  is your witness going to say that there are no changes?

16         MS. MCENROE:  I think no relevant changes to the

17  irregular behavior policy for certain.

18         MR. REIL:  Yes, Your Honor.

19         THE COURT:  Okay, that's admitted.

20     (Defendant's Exhibit 3 admitted into evidence)

21         MS. MCENROE:  Thank you, Your Honor.  Exhibit 4, I

22  believe had already been admitted in the form of one of the D

23  exhibits.  So we can skip that one unless my co-counsel

24  corrects me.

25         MR. REIL:  That's correct.

1    MS. MCENROE:  Same with Exhibit 5 and Exhibit 6.

2    MR. REIL:  Just --

3    MS. MCENROE:  Sorry, I'm going fast.

4    MR. REIL:  My fingers don't work.  Okay, all right,

5  all right.  4, we have to --

6    MS. MCENROE:  So --

7    THE COURT:  4 and 5 previously admitted?

8    MS. MCENROE:  Correct, Your Honor.  I believe 6 and 7

9  have also previously been admitted.

10    MR. REIL:  Counsel's representation, I agree.

11    THE COURT:  Okay.

12    MS. MCENROE:  Yeah, so I think we're up to Exhibit 8,

13  Your Honor, which is another letter from Ms. Corrado to Dr.

14  Tulp that we would submit for admission into evidence.

15    THE COURT:  Any objection?

16    MR. REIL:  No, Your Honor.

17    I have that anyway, I think.

18    (Defendant's Exhibit 8 admitted into evidence)

19    MS. MCENROE:  Your Honor, Exhibit 9 is a declaration

20  from Ms. Corrado.  I submit for its admission into evidence

21  today.

22    THE COURT:  That will not be admitted.

23  That's -- I'll just deal with that as a declaration.

24    MS. MCENROE:  Sure.

25    THE COURT:  All right.

1              MS. MCENROE:  I'd like to move for admission of

2     Exhibit Number 10.  This is a letter from Mr. Swate counsel to

3     Ms. Corrado

4              THE COURT:  Any objection?

5              MR. REIL:  One moment, Your Honor.  I'd like to know

6     for what purpose this is being offered?

7              MS. MCENROE:  Again, this is another exhibit that's

8     been submitted in conjunction with our opposition to

9     preliminary injunction.  So I think it's on the face of our

10    opposition about the facts that we've relied on before.

11             THE COURT:  Yeah, but it's a statement by an attorney

12    containing his views on the litigation.  So I'm not going to

13    allow that to be admitted.

14             MS. MCENROE:  Understood, Your Honor.

15             THE COURT:  Go ahead.

16             MS. MCENROE:  Exhibit 11's already been admitted.

17    Sorry, Your Honor.  Just (indiscernible).  Again, Exhibit 12.

18    Exhibit 13, I would move for admission of ECFMG meeting --

19    message that I'd be prepared to bring either Ms. Cover or Ms.

20    Corrado up to authenticate.

21             MR. REIL:  One second, Your Honor or one moment, Your

22    Honor.

23             THE COURT:  Uh-huh.  What is MECC Support?

24             MS. MCENROE:  The Medical Education Credentials

25    Committee support.  So that committee that had the hearing in

116

1    November, it's called internally at ECFMG the MECC.

2            MR. REIL:  Yes, Your Honor.

3            THE COURT:  Okay.

4        (Defendant's Exhibit 13 admitted into evidence)

5            MS. MCENROE:  Your Honor, I'd move for admission of

6    Exhibit 14.  This is an email from Ms. Corrado to Dr. Swate

7    from November 2000 -- oh, you know what?  Has this one already

8    been admitted?  I'm sorry.  I think in a different form,

9    Plaintiffs have this email admitted.

10           THE COURT:  Okay, what else?

11           MS. MCENROE:  Exhibit 1 -- Exhibit 15 is a hearing

12   transcript and I'd move for its admission.

13           THE COURT:  That I would just deal with as a

14   transcript rather than an admitted document.

15           MS. MCENROE:  Thank you, Your Honor.  That's it from

16   us, Your Honor.  Thank you.

17           THE COURT:  Okay, and argument?  Opportunity for

18   argument if you wish.

19           MR. REIL:  Sure.

20           THE COURT:  Would you like to take a brief break

21   before we started argument?

22           MS. MCENROE:  That would be appreciated.

23           MR. REIL:  Yes, Your Honor.

24           THE COURT:  Five minutes.

25           MS. MCENROE:  Thank you.

1          THE COURT RECORDER:  All rise.

2     (Recess at 4:38 p.m., until 4:47 p.m.)

3          THE COURT RECORDER:  All rise.

4          THE COURT:  Okay, let's hear argument.

5          MS. MCENROE:  Your Honor, it's my position that it's

6     their burden of proof, so --

7          THE COURT:  Yes, we already -- well, they would have

8     to go first.

9          MS. MCENROE:  Thank you, Your Honor.

10         MR. SWATE:  If it pleases the Court, ECFMG had agreed

11    on their own that all documents and applications from students

12    of USAT would be honored until January the 1st, 2019.

13         Nothing has -- nothing changed on that date.  This is

14    not an allegation that you're running a rogue school.  The

15    result of the students have been exemplary students who

16    normally wouldn't have the opportunity to go to medical school,

17    they would go to medical school.  They achieved great results

18    on the test.

19         If the ECFMG tests are valid indications of education

20    of the students, the students are getting a great education at

21    USAT.

22         The harm that would result to USAT and Dr. Tulp would

23    be it essentially closes the school down.  That's the practical

24    effect of not allowing the status quo to be maintained.

25         With its notations on the website, the student that

1   reads that is certainly not going to enroll in a school or not

2   going to continue.

3           Now the damage to the students is the students are in

4   various stages of education.  Some are in their second year.

5   Some are in their third year.  Some are in their fourth year.

6           So by just wiping that out immediately, it would do a

7   great harm to them, but also, it'd be great harm to the docket,

8   too, because he has a property interest in the medical school.

9           Public policy, the students who have graduated in

10  USAT have been a benefit to the medical system in the United

11  States.  You're not unleashing incompetent students.  They go

12  forward, and they do a good job, and they take care of American

13  citizens that need medical care.

14          The damage to ECFMG by allowing the status quo to be

15  maintained till this issue is resolved is minimal, because the

16  issues we're going to be presenting is our position is that

17  ECFMG is a quasi-government agency.  They've been delegated by

18  every state and agency -- every state and medical board in this

19  country to qualify international medical students.

20          So if they can enter the system without opening a

21  schedule, then the students are blocked from entering the

22  system.

23          So there's no damage.  They can't claim well, you're

24  producing these horrible students, a locus on the United States

25  and harming people.  There's no harm to be done by allowing the

1    status quo to exist.

2              It also benefits the general public, because 25

3    percent of health care in the United States is rendered by

4    international medical graduates that go through this ECFMG

5    process.

6              And that -- our position is Dr. Tulp was obviously

7    denied due process.  Now whether he is entitled to it or not

8    entitled to it is a question to be resolved.  Whether ECFMG has

9    to give him some degree of due process is a question to be

10   answered later on.

11             And I think it will be answered in this case.  But

12   the question today is what harm or result of maintaining the

13   status quo?  And that's what we're asking to do, maintain the

14   status quo until this case is decided.

15             And I don't think they can demonstrate any great harm

16   to the students if they're allowed the next six months or eight

17   months, however long it takes to resolve the case, because they

18   will probably resolve very quick to continue with their

19   education.

20             And then at the end, if they need to transfer, like

21   they were -- they suggesting January the 1st, 2019, they can

22   and the damage has been done.

23             That's the -- the fact issue in this case is what I

24   believe is not the issue today.  The issue today is not the

25   facts, because they didn't -- they would not give us the facts

1   at the hearing.  Just refused to do so.

2          And again, there's all kinds of questions about the

3   process.  But with respect to that, I ask the Court to issue a

4   temporary injunction to allow the -- that would require that

5   ECFMG to process the students' paperwork.

6          It doesn't mean that they have to agree to every

7   piece of paper that comes along.  They do their normal

8   procedure, but they just process the paperwork in a normal

9   fashion instead of just totally blocking it.

10         And if they have problems with the paperwork, of

11  course, they could do whatever is reasonable to do.  And I

12  think that's our approach and we believe it's reasonable.

13  Thank you.

14         THE COURT:  Thank you.  Ms. McEnroe?

15         MS. MCENROE:  May I approach, Your Honor?

16         THE COURT:  You may.

17         MS. MCENROE:  Your Honor, I'm going to try to keep

18  this brief, because we briefed it extensively in our papers.

19  So I'm not going to hit every point, but there are a number of

20  things I want to just make sure I clarify.

21         Mr. Swate said a number of times that he was seeking

22  to maintain the status quo.  This motion for preliminary

23  injunction that's being cited today was filed on January 2nd,

24  2019.

25         The status quo as of that time is that the finding of

1    irregular behavior had already gone into effect and the sponsor

2    note had already gone into effect.

3        What changed January 1st, 2019 is the issue that

4    counsel brought up a number of times.  That date had been

5    noticed to the public and to USAT from October 2018.

6        Their public policy and student interest definitely

7    keeps raising, notably, USAT is not a party here.  The students

8    are not a party here.  ECFMG takes its role in trying to

9    protect the public and interfacing with the students and

10   graduates that it works with very seriously.

11       And what happened on January 1st, 2019 is that the

12   notice ECFMG had provided in advance about the change in status

13   of this school went into effect.

14       And why did it go into effect?  Because ECFMG was not

15   sure and hadn't been provided evidence that USAT is truly

16   international medical school.

17       ECFMG only tries to reach as far as its grasp.  It's

18   not trying to issue sponsor notes to the University of

19   Pennsylvania Medical School.

20       It's not trying to issue certificates to graduates of

21   medical schools that it does not deem to be within its -- and

22   within its definition of an international medical school.

23       University of Sciences, Arts, and Technology does not

24   fall within that definition as far as ECFMG is concerned.  And

25   that's become abundantly clear.

1      There's a -- you know, we can talk semantics on

2   campus, not campus, whatever.  We heard today, and it's been

3   admitted into evidence, Dr. Tulp has called it a Miami campus.

4   There were cadavers dissected in Miami.  There was education

5   happening in the United States.  But yet, he hasn't gotten his

6   school to be accredited as a medical school in the United

7   States.

8      At the same time, ECFMG has failed to declare that it

9   doesn't feel capable of certifying its graduates going forward,

10   because it's concerned that it's not an international medical

11   school to meet ECFMG's definition.

12      That puts it as sort of a loophole school, that's not

13   going to be getting its authorization from anybody, which is a

14   concern to ECFMG, which tries and its mission is to protect the

15   health of the public.

16      ECFMG is (indiscernible) to hear -- it's wonderful to

17   hear that the USAT students are great doctors in serving the

18   public in the United States because there are 13 years, or 15

19   years, sorry, 15 years of graduates from that school that are

20   eligible to become medical professionals in the United States

21   through residency programs and certification from the ECFMG.

22      We have not taken -- ECFMG has not taken action to

23   file allegations of irregular behavior or take other sort of

24   actions against students from USAT on this basis

25   retrospectively.

123

1          Prospectively, ECFMG provided notice.  But it may be

2    I'm getting too much in the weeds, because the truth of it is

3    we're here for a preliminary injunction.

4          And one day, I may be here arguing the full merits of

5    the case.  And Plaintiff just has not met the very high

6    standard for a preliminary injunction.

7          The status quo issue, I think, is a big one.  I think

8    we're sitting here now where the status quo they're seeking to

9    have overturned is that ECFMG would have to start recognizing

10   USAT, when it already has stopped recognizing USAT, basically

11   putting us in a position that if we were to be ordered to

12   change the sponsor note now, ECFMG would be getting forced by

13   this Court to tell the public that ECFMG deems graduates from

14   USAT to be eligible to be certified by ECFMG when ECFMG does

15   not deem that to be true.

16         If this Court were to go one step further, it would

17   be on this Court's discretion to tell us that we must certify

18   those graduates if they meet our other requirements

19   substituting this Court's opinion for ECFMG's.

20         So that I'm just trying to make sure, practically

21   speaking, it's clear what it is that an injunction here would

22   be seeking to do.

23         We think that just proves too much and goes too far,

24   especially on the very thin record that Plaintiffs have

25   provided you.

1          Plaintiff notably has not provided any evidence that

2     the underlying basis for ECFMG to take the action that it has

3     is incorrect, other than semantics.

4          Trying to say an administrative location versus a

5     campus, even though they admit that students were dissecting

6     cadavers in the United States and taking other extensive

7     lecture courses, which is in that lecture document we had

8     admitted into evidence.

9          This is troubling to us.  And they've had a lot of

10    opportunities to fix it.  They could have even handed us

11    something today, said hey, Florida or Colorado, and somewhere

12    in the United States where we're doing these things, authorizes

13    us to do so and they haven't done that.

14          And we posit it's because they can't.  And until they

15    can satisfy that they are truly an authorized school, operating

16    the way that they would need to, to qualify as an international

17    medical school for our purposes, we just don't think we have

18    the authority.  We're trying to be limited here in what we can

19    possibly do.

20          Now we communicated that publicly through our sponsor

21    note, saying the truth of it is, hey, student -- potential

22    students, hey, others in the medical world, so you know, if

23    someone comes to us who's a 2019 grad, a 2020 grad, they're not

24    going to be eligible for certification.

25          We're trying to -- we're not trying to besmirch

1  anyone.  We're trying to just be accurate, so that there's fair

2  warning out in the public, so that people know.

3          In terms of due process, I would encourage Your Honor

4  to look at the extensive jurisprudence we've provided to you on

5  ECFMG being a state actor or not.

6          The 3rd Circuit has held that ECFMG is not a state

7  actor.  Other courts in this district have similarly so held.

8  We would posit that there hasn't been evidence taken or

9  submitted to indicate otherwise.

10          Counsel argued that 25 percent of health care in the

11  United States comes through the ECFMG.  We take our obligation

12  very seriously.

13          And we are very concerned that if we were to

14  misrepresent USAT's role, if we were to abdicate on our

15  obligation to try and say, hey, we think this is a legitimate

16  school or we don't think this is a legitimate school, we worry

17  that we would lose the credibility of doing that in the market

18  place, which we find to be our goal.

19          That's what we do.  We're good at it.  We try and go

20  around and certify that students have done what they need to do

21  to enter residency programs in the United States.

22          We encourage Your Honor not to undermine that

23  authority that we have reasonably exercised.  Dr. Tulp got

24  extensive notice.  Dr. Tulp got extensive opportunities to

25  present his facts to us.

1    I submit to Your Honor, when you read the transcript

2    from the hearing on November 28th, it's correct.  I shut down

3    the hearing, because counsel was completely and utterly

4    preventing the committee from asking any questions of Dr. Tulp,

5    to get any sort of clarification on the facts and to

6    understand.

7        We weren't trying to deny anyone due process.  We

8    were trying to provide an extra layer of due process above what

9    we, a nonstate actor, even would need to provide.

10        So at the risk of not going on and on, Your Honor, if

11   there's a particular thing you'd like to hear about, I'd be

12   happy to argue further, but otherwise, I can let us bring this

13   to a close.

14        THE COURT:  Okay, thank you.

15        MS. MCENROE:  Thank you.

16        THE COURT:  Present and before the Court is

17   Plaintiff's motion for a preliminary injunction against

18   Defendant's Education Commission for Foreign Medical Graduates,

19   known as ECFMG and Dr. William Pinsky, collectively Defendants.

20        Plaintiff is president of the University of Science,

21   Arts, and Technology, USAT, a medical school located on the

22   British overseas territory of Montserrat.

23        ECFMG is a private nonprofit organization based in

24   Philadelphia, but certifies foreign medical school graduates,

25   so that those students can pursue postgraduate medical training

1    in the United States.

2                With a certification from ECFMG, graduates of foreign

3    medical schools like USAT begin the process of practicing

4    medicine in the United States.  Pinsky is the president and CEO

5    of ECFMG.

6                Plaintiff's suit is in effect, a response to

7    disciplinary action taken by ECFMG against USAT and Tulp

8    specifically.

9                According to documents attached to the complaint and

10   admitted here at the hearing today, ECFMG investigated and

11   subsequently sanctioned USAT and Tulp for providing false

12   information to ECFMG regarding the school's activities.

13               Specifically, ECFMG found that, one, USAT was

14   operating unauthorized branch campuses within the United

15   States; and two, Tulp personally provided false information to

16   ECFMG regarding USAT's student attendance.

17               Following a hearing before ECFMG's board, at which

18   Pinsky presided, ECFMG concluded that Tulp had -- that Tulp and

19   -- Tulp had engaged in behavior that violated ECFMG's policies

20   and procedures.

21               As a result, ECFMG took the following action.  It

22   determined that it will not accept any documents signed and/or

23   certified by Tulp for a period of five years; two, it undertook

24   steps to verify that USAT graduates had in fact attended USAT's

25   Montserrat campus; and three, held that USAT graduates with a

1   graduation year of 2019 and beyond are no longer eligible to

2   apply for ECFMG certification.

3          Plaintiff's suit alleges that Defendants violated his

4   constitutional rights and committed various common law torts.

5   He moved for a preliminary injunction, asking this Court to

6   enjoin Defendants from taking any further adverse action

7   against Plaintiff, resume processing the medical examinations

8   of the students of USAT, and release their examination scores,

9   and remove the negative advisory from the sponsor notes on the

10  World Directory of Medical Schools listing for the USAT College

11  of Medicine.

12         A Plaintiff seeking a preliminary injunction must

13  establish that he is likely to succeed on the merits, that he

14  is likely to suffer irreparable harm in the absence of

15  preliminary relief, that the balance of equities tip in his

16  favor, and that an injunction is in the public interest, that

17  is Winter v. Natural Resources Defense Council, Inc., 555 U.S.

18  7, page 20, 2008.

19         The failure to establish any element renders a

20  preliminary injunction inappropriate.  That is Nutrasweet

21  Company v. Vit-Mar Enterprises, Inc., 176 F.3d 151, page 153,

22  3rd Circuit, 1999.

23         The movant bears the burden of showing that these

24  four factors weigh in favor of granting the injunction.  See

25  Opticians Association of America v. Independent Opticians of

1   _America_, 920 F.2d 187, page 192, 3rd Circuit, 1990.

2           Plaintiff's complaint includes four causes of action

3   or four claims labeled as causes of actions.  At the beginning

4   of this hearing, I clarified with Plaintiff what those claims

5   were and also clarified which claims the Plaintiff was

6   proceeding on in this preliminary injunction hearing.

7   Plaintiff's lawyer informed me that he was proceeding on the

8   constitutional claims, the §1983 claims.

9           Turning to the likelihood of success on the merits,

10  and that is Counts II and IV, §1983 claims, I find that

11  Plaintiff is unlikely to prevail on his §1983 claims because

12  they require a showing of state action, which is not present

13  here.

14          To prevail on a §1983 claim, Plaintiff must allegedly

15  violation of a right secured by the constitutional laws of the

16  United States committed by a person acting undercover of state

17  law.  That's _West v. Atkins_, 487 U.S. 42, page 48, 1988.

18          The 3rd Circuit has held that as a private not-for-

19  profit organization, ECFMG is a private party and not a state

20  actor.

21          That's _Opoku v. Education Commission for Foreign_

22  _Medical Graduates_, 574 F.Appx. 197, page 201, 3rd Circuit of

23  2014.

24          As has the Southern District of New York in _Stoninger_

25  (phonetic) v. Educational Commission for Foreign Medical

1   Graduates, 1993 Westlaw 138954 at page 2, SDNY, April 28th,

2   1993, concluding ECFMG is not a state actor.

3           To the extent that Opoku is a nonprecedential

4   decision in that it is a nonpublished decision, I look to

5   possible exceptions to the state or instances where a private

6   actor can be found to engage in state action.

7           Those instances are limited and as set forth in

8   McKeesport Hospital v. Accreditation Counsel for Graduate

9   Medical Education, 24 F.3d 519, 524, 3rd Circuit, those

10  instances are if the private party acted with the help of or in

11  concert with state officials.  In this case, there is no

12  indication that that happened.

13          Two, when the private party has been delegated their

14  power, traditionally exclusively reserved to the state.  In

15  this case, there is no evidence that that is the case.

16          Or three, if there is a sufficiently close nexus

17  between the State and the challenge action of the private

18  entity, so that the action of the latter may be fairly treated

19  as the state itself.

20          In this case, the testimony was that ECFMG is a

21  nonprofit organization.  And although there was testimony that

22  licensing boards in the United States generally require

23  certification through -- of students through ECFMG, the

24  testimony was that that requirement is a discretionary

25  requirement.  Accordingly, I find that ECFMG has not shown at

1   this juncture of the litigation that it is a state actor.

2          While the lack of state action ultimately dooms

3   Plaintiff's constitutional claims, it is far from the only

4   problem with the §1983 claiMs.

5          ECFMG's disciplinary hearing seemingly meet the --

6   meets the requirements of due process in that an essential

7   principle of due process is that a deprivation of life,

8   liberty, or property be preceded by notice and opportunity for

9   hearing appropriate to the nature of the case.  Cleveland Board

10  of Education v. Loudermill, 470 U.S. 532, 542, 1985.  In this

11  case, there was notice and an opportunity to be heard.

12         As for Plaintiff's substantive due process claims,

13  the complaint does not identify a protected property interest

14  that falls within the ambit of substantive of due process.

15  Nicholas v. Pennsylvania State University, 227 F.3d, 133, page

16  141, 3rd Circuit, 2000.

17         Thus, Plaintiff's constitutional claims are likely to

18  fail, such that a preliminary injunction should not issue on

19  those claims.

20         Turning, however, in an excess of caution to the

21  irreparable harm prong on the preliminary injunction standard,

22  in addition to establishing a likelihood of success on the

23  merit, Plaintiff must also establish that he stands to suffer

24  irreparable harm if no injunction is issued.

25         Establishing a risk of irreparable harm is not

1    enough.  A Plaintiff has the burden of proving a clear showing

2    of immediate irreparable harm.

3              The requisite feared injury or harm must be

4    irreparable, not merely serious or substantial and it must be

5    of a peculiar nature, so that compensation in money cannot

6    atone for it.  That is Campbell Soup Company v. Conagra, Inc.,

7    977 F.2d, 86, page 92, 93, 3rd Circuit, 1992.

8              Plaintiff has made several arguments with respect to

9    the alleged harm that will befall USAT and its students.  With

10   respect to USAT, the testimony was that there has been a fall-

11   off in applications and that tuition payments have ceased.

12             Nevertheless, the testimony was also that USAT may

13   continue as an institution, so long as Dr. Tulp is not a

14   signatory.  Someone else from USAT could become an authorized

15   signatory.  And USAT is not disqualified from substituting a

16   different person as the authorized signatory.

17             Similarly with students, the testimony is that as

18   yet, there is -- no harm has befallen any students in that

19   students who graduated in 2018, up and through 2018, can still

20   go through the ECFMG process.

21             While students are -- who graduate in 2019 cannot,

22   they can transfer for their credits and also the first

23   graduation will be this summer.  So is -- there is no immediate

24   harm.

25             I go through the alleged harm to the students and to

1   USAT merely to illustrate that if the students or USAT were to

2   bring this preliminary injunction at present on the evidence on

3   the record, they would not have been able to meet the

4   irreparable harm standard.

5           Turning now to the harm that Plaintiff, as in Dr.

6   Tulp, says that he has or will suffer, he says in effect that

7   his business will stand to suffer because of Defendant's

8   actions.

9           Generally monetary harm in the form of lost business

10  does not constitute irreparable harm, because damages would be

11  an immediate remedy.  And that is Franks GMC Truck Center v. --

12  Inc. v. General Motors, Corp., 847 F.2d 100, 102, 3rd Circuit,

13  1988.

14          However, some courts have recognized that the

15  recoverable monetary loss may constitute irreparable harm where

16  the loss threatens the very existence of the movant's business.

17  See Washington Metropolitan Area Transit Commission v. Holiday

18  Tours, Inc., 559 F.2d 849, 843, note 2, D.C. Circuit, 1977.

19          Here, Plaintiff has the burden of proving through a

20  clear showing of immediate irreparable injury that he will

21  suffer such harm absent an injunction.  That's ECRI, 809 F.2d

22  at 226.

23          But as already discussed, there is no reason to

24  believe that with a change of signatory, and that USAT will not

25  be able to continue and therefore, in fact, the business need

134

1    not fail.

2          Thus, Plaintiff has not shown immediate irreparable

3    injury resulting from ECFMG's action and thus I will deny the

4    motion for preliminary injunction.

5          Turning now to one other issue, there was Defendant's

6    motion to quash.  And I think that was wanting Mr. Pinsky at

7    the PI hearing.  I understand that that is now moot?

8          MS. MCENROE:  Correct.

9          THE COURT:  Okay, so I will moot that out.

10         MR. REIL:  Yes, Your Honor.

11         Now I'm going to turn to the Rule 16 conference.

12         MS. MCENROE:  Your Honor, if I may with permission,

13   some of my witnesses have child care obligations

14   (indiscernible) if that's okay?

15         THE COURT:  Go ahead.  Yeah.

16         MS. MCENROE:  Thank you.

17         THE COURT:  I don't need those on the record.  Okay,

18   so --

19      (Proceedings concluded at 5:14 p.m.)

20

21

22

23

24

25

1                                **CERTIFICATE**

2

3

4          I, Chris Hwang, court approved transcriber, certify

5    that the foregoing is a correct transcript from the official

6    electronic sound recording of the proceedings in the above-

7    entitled matter.

8

9

10

11

12

13    _____          February 14, 2019

14    Chris Hwang                       Date

15    Transcriber

16

17

18

19

20

21

22

23

24

25



```
 1              UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
                   NO. 2:18-cv-05540-WB
 3

 4    DR. ORIEN L. TULP     )   DEPOSITION UPON
                            )
 5          Plaintiff,      )   ORAL EXAMINATION
                            )
 6        - vs -            )          OF
                            )
 7    EDUCATIONAL           )   WILLIAM W.
      COMMISSION FOR        )   PINSKY, M.D.
 8    FOREIGN MEDICAL       )
      GRADUATES and DR.     )
 9    WILLIAM W. PINSKY     )
                            )
10          Defendants.     )
11    _ _ _ _ _ _ _ _ _ _

12

13

14         TRANSCRIPT OF DEPOSITION, taken

15    by and before DANA M. JONES, Professional

16    Reporter and Notary Public, at the

17    offices of MORGAN LEWIS, 1701 Market

18    Street, 18th Floor, Philadelphia,

19    Pennsylvania, on Wednesday, February 6,

20    2019, commencing at 10:00 a.m.

21

22

23         GOLKOW LITIGATION SERVICES
        877.370.3377 ph/917.591.5672 fax
24            Deps@golkow.com
```

WILLIAM W. PINSKY, M.D.

```
 1    A P P E A R A N C E S :

 2

 3         LAW OFFICES OF WILLIAM C.
           REIL
 4         BY:  WILLIAM C. REIL,
           ESQUIRE
 5           1515 Market Street
             Suite 1200
 6           Philadelphia, PA  19102
               Attorney for the
 7         Plaintiff

 8

           MORGAN LEWIS & BOCKIUS LLP
 9         BY:  ELISA P. MCENROE,
           ESQUIRE
10           1701 Market Street
             18th Floor
11           Philadelphia, PA  19103
               Attorney for the
12         Defendants

13

14         ECFMG/FAIMER
           BY:  FRANCINE HALUSHKA KATZ,
15         ESQUIRE
             3624 Market Street
16           Philadelphia, PA  19104
               Senior Vice President
17         and General Counsel

18

19

20

21    A L S O   P R E S E N T :

22    Dr. Orien Tulp
      Christina Beatrice - Paralegal to William
23    Reid, Esquire.

24
```

WILLIAM W. PINSKY, M.D.

```
 1              I N D E X

 2
    WITNESS                          PAGE
 3
    WILLIAM W. PINSKY, M.D.
 4

 5      By:  Mr. Reil                 6

 6      By:  Ms. McEnroe              X

 7

 8                   - - -
 9

10           E X H I B I T S
11

12
    NUMBER        DESCRIPTION      PAGE
13

14  Pinsky-1    Compilation of
                Documents          6
15

16

17

18

19

20

21

22

23

24
```

Page 3

WILLIAM W. PINSKY, M.D.

```
 1                  LITIGATION SUPPORT PAGE

 2
                 INSTRUCTION NOT TO ANSWER
 3

 4    PAGE     LINE

 5    (None)

 6

 7        REQUEST FOR PRODUCTION OF DOCUMENTS

 8
      PAGE   LINE
 9
      (None)
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

WILLIAM W. PINSKY, M.D.

1        (By agreement of counsel,

2    the sealing, filing, and

3    certification of the transcript

4    has been waived; and all

5    objections, except as to the form

6    of the question, have been

7    reserved until the time of trial.)

8        DR. WILLIAM PINSKY, after

9    having been duly sworn, was

10   examined and testified as follows:

11       (At this time, Compilation

12   of documents was marked for

13   identification as Exhibit

14   Pinsky-1.)

15       COURT REPORTER:  Usual

16   stipulations?

17       MS. MCENROE:  We'll reserve

18   all objections --

19       MR. REIL:  Okay.

20       MS. MCENROE:  -- other than

21   as to form until the time of

22   trial.

23       I don't know if there are

24   other stipulations you were

WILLIAM W. PINSKY, M.D.

```
 1          looking for.

 2               MR. REIL:  The -- let's go

 3          off the record.

 4               (At this time, a discussion

 5          was held off the record.)

 6               MS. MCENROE:  And we will

 7          read and sign.

 8               MR. REIL:  Before we begin,

 9          I have this as Pinsky-1.  It's

10          identical to what I used at the

11          hearing.  I just put the moniker

12          Pinsky-1 on there.

13               I have one for the witness

14          and does the court reporter need

15          one?

16               COURT REPORTER:  Sure.

17               (At this time, a packet of

18          exhibits was marked for

19          identification as Exhibit

20          Pinsky-1.)

21                    - - -

22               EXAMINATION

23                    - - -

24     BY MR. REIL:
```

WILLIAM W. PINSKY, M.D.

1          Q.      Dr. Pinsky, I'm Bill Reil.

2     I'm the attorney, one of the attorneys,

3     along with Tommy Swate for Dr. Tulp.  I'm

4     not going to go through a lot of

5     instructions for depositions because I'm

6     sure your attorney has done that with

7     you.  I guess there's a couple that, you

8     know, that I should mention, that I'm

9     sure you've already heard.

10               Your answers have to be

11    verbal.  So shakes of the head and things

12    like that are hard to get down on the

13    record.  We don't want you to guess or I

14    don't want you to guess but, you know,

15    you can estimate things if you want to.

16               If you don't understand the

17    question, you're allowed to say you don't

18    understand, you know, the question.  And

19    then there's another litany of things,

20    which I'm sure you've heard that I'm not

21    going to -- that I'm not going to bother

22    to go over.

23               Oh, yeah, one I guess I

24    should, right -- is there any reason that

WILLIAM W. PINSKY, M.D.

1    you can't give a deposition today:  Don't

2    feel well, medical problems, anything

3    like that?

4          A.    No.

5          Q.    All right.  I think I'm

6    going to begin by finding out a little

7    bit of your background if I might.

8                Let's see.  How long have

9    you been a medical doctor?

10         A.    I graduated from medical

11   school in 1973.

12         Q.    And where was that?

13         A.    Saint Louis University.

14         Q.    And can you give me a

15   thumbnail sketch of what your medical

16   practice has consisted of from 1973 to

17   the present?

18                MS. MCENROE:  Objection to

19         form.  You can answer.

20                THE WITNESS:  Yes.  So my

21         goals after graduating from

22         medical school was to be a

23         pediatric cardiologist and to be

24         an academic pediatric

WILLIAM W. PINSKY, M.D.

1          cardiologist.  And I, after doing

2          my residency and fellowship, was

3          on the faculty full time at

4          several different universities.

5    BY MR. REIL:

6          Q.    And how did you come to be

7    associated with the ECFMG?

8          A.    The prior CEO was retiring

9    and a search firm was engaged to find a

10   successor and they contacted me to see if

11   I had interest.

12         Q.    Okay.  And I am going to,

13   even though I know the board is not the

14   ECFMG, it's just part of it, right, maybe

15   sometime I'll say the board, it's a

16   little shorter than all the initials.

17              When did you first join the

18   ECFMG?

19         A.    I came in this position in

20   July of 2016.

21         Q.    When you say you came in

22   this position, what position is that?

23         A.    As President and CEO.

24         Q.    Okay.  Were you a member of

WILLIAM W. PINSKY, M.D.

1    the, if I'm phrasing it right, were you a

2    member of the ECFMG before that?

3                MS. MCENROE:  Objection to

4         form.

5                THE WITNESS:  I don't know

6         what member means.

7    BY MR. REIL:

8         Q.    Well, let's talk about -- I

9    don't know if we -- when was your first

10   association with the ECFMG?

11        A.    As an employee?

12        Q.    Yes.  In any capacity.

13        A.    Well, I became aware of

14   ECFMG when I was in medical school --

15        Q.    Okay.

16        A.    -- because I knew that there

17   were certain physicians that had to come

18   through the ECFMG to be able to practice.

19        Q.    Go ahead.  I'm sorry, I'm

20   interrupting.

21        A.    No.  That's when I first

22   heard of ECFMG.

23        Q.    Right.  And does one do --

24   did you -- how does it work?  Did you

WILLIAM W. PINSKY, M.D.

1   join the ECFMG as a member, as an

2   employee?  Did you -- did your

3   association become more formal at some

4   time?

5           MS. MCENROE:  Objection to

6       form.

7           THE WITNESS:  So July 1st I

8       was hired -- I began my employment

9       as President and CEO.

10  BY MR. REIL:

11      Q.    President and CEO.  Okay.

12          And before that, were you

13  employed at all by the ECFMG?

14      A.    No.

15      Q.    Can you give me a summary of

16  what your job duties are as President and

17  CEO?  I'll call it the board but I mean

18  ECFMG because I can say it easy.

19          MS. MCENROE:  Objection to

20      form.

21          THE WITNESS:  So I am

22      responsible and accountable to the

23      board.  I'm the single employee

24      that's accountable to them.  And I

WILLIAM W. PINSKY, M.D.

```
 1          have the responsibility and

 2          accountability for meeting the

 3          expectations of the board in terms

 4          of overall performance of the

 5          organization.

 6   BY MR. REIL:

 7          Q.    When you say you're

 8   accountable to the board, can you

 9   elaborate on that?

10          A.    They do an annual review of

11   my performance.

12          Q.    And how many people are on

13   the board?

14          A.    I think that there are 17 at

15   the moment. I could be off by one or two

16   because we've gone through some

17   transition of right sizing --

18          Q.    -- well, that's good enough.

19   And you're also the CEO of the board?

20          A.    No.

21          Q.    No.  Who is?

22          A.    There's a Chairman of the

23   board.

24          Q.    There's a Chairman of the
```

WILLIAM W. PINSKY, M.D.

1    board.  And who would that person be?

2         A.    Currently the Chair of the

3    board is Dr. Andy Filak.

4         Q.    Could you spell that for me?

5         A.    F, like in Frank, I-L-A-K.

6         Q.    Okay.  And does Dr. Filak

7    work out of the building where you work

8    at, 36th and Market?

9         A.    No.

10        Q.    Where does he work out of?

11        A.    In Cincinnati.

12        Q.    36th and Market is the

13   headquarters of the ECFMG; right?

14        A.    Yes.

15        Q.    What is in Cincinnati?

16        A.    That's where Dr. Filak is

17   employed.  Our board members are

18   voluntary board members so they have all

19   have other positions.

20        Q.    Now, I believe, and correct

21   me if I'm wrong, that you said you're the

22   President and CEO.

23        A.    Yes.

24        Q.    Okay.  What do you do in

WILLIAM W. PINSKY, M.D.

1    your capacity as CEO?

2              MS. MCENROE:  Objection to

3         form.

4    BY MR. REIL:

5         Q.    You can answer.

6         A.    I oversee the operations of

7    the organization.

8         Q.    Is one of your functions to

9    carry out the policies of the

10   organization?

11             MS. MCENROE:  Objection to

12        form.

13             THE WITNESS:  It's my

14        responsibility to assure that the

15        leadership and employees follow

16        the policies of the organization.

17   BY MR. REIL:

18        Q.    I see.  And how do you

19   generally -- how do you do that?

20        A.    By trust and verify.

21        Q.    So is it fair to say that a

22   part of your job is to be familiar with

23   the policies of -- I like your word, the

24   organization?

WILLIAM W. PINSKY, M.D.

1          A.     Yes.

2          Q.     Now, when did you become

3    aware of my client, Dr. Tulp?

4          A.     Probably somewhere partway

5    through 2018.

6          Q.     And how did Dr. Tulp come to

7    your attention?

8          A.     Conversation was initiated

9    to inform me of a possible policy

10   violation.

11         Q.     And with whom did you have

12   that conversation?

13         A.     I have to assume it was with

14   the leadership of the Operations Group

15   and I think probably with counsel as

16   well.

17         Q.     Well, we don't want anything

18   you told counsel.

19                But you said you had that

20   conversation, do you remember the name of

21   the person you had the conversation with?

22         A.     I would assume it was with

23   Ms. Corrado and Cover.

24         Q.     And what were you told?

WILLIAM W. PINSKY, M.D.

1           MS. MCENROE:  So I'll object

2       to the extent it calls for

3       privileged information.  I don't

4       know if that's why you're

5       hesitating.

6           THE WITNESS:  That's why I'm

7       hesitating, yes.

8           MS. MCENROE:  So

9       substantively not to divulge

10      anything that was communicated to

11      counsel for the purpose of getting

12      legal advice.  But facts

13      communicated to you unrelated to

14      seeking legal advice you can

15      testify about.

16          MR. REIL:  I agree with

17      that.

18          THE WITNESS:  So as I

19      recall, I was told that there was

20      an issue that a medical school was

21      operating in the United States and

22      not as an international school.

23  BY MR. REIL:

24      Q.   And you we're talking about

WILLIAM W. PINSKY, M.D.

Page 17

1    USAT?

2         A.    Yes.

3         Q.    And did Ms. Corrado or Ms.

4    Cover give any sort of written report or

5    memo about this illegal operation to you?

6              MS. MCENROE:  Objection to

7         form.

8              THE WITNESS:  I don't recall

9         receiving it.

10   BY MR. REIL:

11        Q.    Well, if you didn't receive

12   one, where would it be?

13             MS. MCENROE:  Objection to

14        form.

15             THE WITNESS:  I'm not sure

16        what you're asking me.

17   BY MR. REIL:

18        Q.    Well, I think you said you

19   didn't recall receiving one.  Okay?

20        A.    I recall this as a

21   conversation not as a written report.

22        Q.    Did you ask either -- have

23   you received any memos from or -- from

24   Ms. Corrado about either Dr. Tulp or the

WILLIAM W. PINSKY, M.D.

```
 1    USAT?

 2              MS. MCENROE:  Objection to

 3         form.

 4              THE WITNESS:  Yeah, I don't

 5         recall receiving it.

 6    BY MR. REIL:

 7         Q.    Okay.  You don't recall.

 8              If you did receive them,

 9    where would they be?

10         A.    If they were electronic they

11    would be in an e-mail I assume.

12         Q.    I didn't hear you.

13         A.    I said if it was electronic

14    I assume it would be in an e-mail

15    somewhere, but I don't recall receiving

16    anything.

17         Q.    By the way, I have a

18    question, I don't want to go too far

19    afield.  I have a question about Ms.

20    Corrado.  We have several documents from

21    her where she has JD, Juris Doctor after

22    her name, is she an attorney?

23              MS. MCENROE:  Objection to

24         form.
```

WILLIAM W. PINSKY, M.D.

```
 1              THE WITNESS:  Yes.  I
 2         believe she graduated from law
 3         school.
 4  BY MR. REIL:
 5         Q.    Do you know what law school
 6  it was?
 7         A.    No.
 8         Q.    Now, I take it, did you in
 9  your conversation with Ms. Corrado and
10  Ms. Cover, do you recall how they got the
11  information, alleged information, about
12  the illegal activities of USAT?
13              MS. MCENROE:  Objection to
14         form.
15              THE WITNESS:  So I recall in
16         the conversation that there was a
17         parent of a, I believe, a
18         prospective student, who had been
19         told that they -- if they enrolled
20         into school they would be going to
21         a campus in the United States.
22  BY MR. REIL:
23         Q.    Prior to that time, had USAT
24  come to your attention with regard to any
```

WILLIAM W. PINSKY, M.D.

```
 1   alleged infractions?
 2              MS. MCENROE:  Objection to
 3        form.
 4              THE WITNESS:  I don't
 5        believe so.
 6   BY MR. REIL:
 7        Q.    Was there any prior
 8   initiation of irregular behavior prior to
 9   this particular, shall we say incident --
10              MS. MCENROE:  Objection --
11              MR. REIL:  -- against Dr.
12        Tulp.
13              MS. MCENROE:  Objection to
14        form.
15              THE WITNESS:  Not that I'm
16        aware of.
17   BY MR. REIL:
18        Q.    You say it came to your --
19   you mentioned a question or two ago about
20   a letter from a parent.  Okay?
21        A.    Well, I'm not sure if it was
22   a letter.  It was some sort of
23   communication, not to me, but to the
24   Operations Department.
```

WILLIAM W. PINSKY, M.D.

Page 21

```
1           Q.     To the Operations
2    Department?
3           A.     To Ms. Corrado's department.
4           Q.     Ms. Corrado is the head of
5    the Operations Department?
6           A.     Ms. Cover is.
7           Q.     Ms. Corrado works in the
8    Operations Department?
9           A.     Yes.
10          Q.     Do you know if that
11   conversation was memorialized anywhere by
12   e-mail or writing?
13          A.     I don't know.
14          Q.     If it was, who would -- who
15   would have it, would it be Ms. Cover?
16                 MS. MCENROE:  Objection to
17          form.
18                 THE WITNESS:  I would assume
19          so.
20   BY MR. REIL:
21          Q.     Did the -- is there -- oh, I
22   should have asked you, I've been a little
23   remiss.  Let me back up.
24                 Before you came to the
```

WILLIAM W. PINSKY, M.D.

```
 1   deposition today, did you review any
 2   documents?
 3        A.    Just a couple.
 4        Q.    Can you remember what they
 5   were?
 6        A.    So one was the letter that
 7   we sent to Dr. Tulp following the
 8   appearance before the committee and the
 9   other was the order for the deposition
10   today.
11        Q.    And you were actually
12   present at Dr. Tulp's hearing before the
13   committee on, I think it was 11/24?
14             MS. MCENROE:   Objection to
15        form.
16             THE WITNESS:  Yes.
17             DR. TULP:  11/28.
18   BY MR. REIL:
19        Q.    11/28.
20             MR. REIL:  Thank you,
21        Doctor.
22             THE WITNESS:  Whatever the
23        day was, yes.
24   BY MR. REIL:
```

WILLIAM W. PINSKY, M.D.

```
 1          Q.    And were you present for the
 2   whole hearing?
 3          A.    Yes.
 4          Q.    Now, at some point did you
 5   become aware that ECM launched a formal
 6   investigation of Dr. Tulp and USAT?
 7                I'm talking other than what
 8   the parent communicated to you.
 9                MS. MCENROE:   Objection to
10          form.
11                THE WITNESS:   So I'm not
12          sure exactly what you mean by
13          formal investigation.
14   BY MR. REIL:
15          Q.    Well, at some point did the
16   organization hire people or use employees
17   to investigate these allegations of
18   campuses in the United States?
19                MS. MCENROE:   Objection to
20          form.
21                THE WITNESS:   So I'm aware
22          that we requested affidavits from
23          students to determine where they
24          were attending school.  And staff
```

WILLIAM W. PINSKY, M.D.

```
1            reviewed, I believe, other

2            information that was available.

3   BY MR. REIL:

4        Q.    In this investigation of

5   USAT and its alleged United States

6   campuses, were any outside people hired?

7   And by outside people, I mean, private

8   investigators or people who were not

9   working for the organization.

10           MS. MCENROE:  Objection to

11       form.

12           THE WITNESS:  So people not

13       working for the organization, you

14       mean, that are not full time

15       employees; is that what you're

16       asking?

17   BY MR. REIL:

18       Q.    Yes, like private

19   investigators.

20       A.    I believe I'm aware at some

21   point somebody was hired to visit the

22   campus.

23       Q.    And when you say somebody

24   was hired, was that somebody who worked
```

WILLIAM W. PINSKY, M.D.

1    for the organization or was that an

2    outside person?

3              MS. MCENROE:  Objection to

4         form.

5              THE WITNESS:  Outside person

6         that was hired to do that.

7    BY MR. REIL:

8         Q.    Okay.  Was it just one

9    person or do you know if it was more than

10   one person?

11        A.    I have no idea.

12        Q.    Who hired them?

13        A.    I don't know.

14        Q.    Who would know that?

15             MS. MCENROE:  Objection to

16        form.

17             THE WITNESS:  The person

18        that hired them.

19             Somebody in the Operations

20        Department would know.

21   BY MR. REIL:

22        Q.    Is it likely that Ms. Cover

23   would know that?

24             MS. MCENROE:  Objection to

WILLIAM W. PINSKY, M.D.

1          form.

2                    THE WITNESS:  Possibly.

3     BY MR. REIL:

4          Q.    And when this -- was --

5     strike that.

6                    When this person reviewed

7     the alleged campuses, did they make a

8     report back to the organization, if you

9     know?

10         A.    I don't know.

11                   MS. MCENROE:  Objection to

12         form.

13                   THE WITNESS:  I never saw a

14         report.

15    BY MR. REIL:

16         Q.    Well, did you ever speak

17    with Ms. Cover or any other employee of

18    your organization and say, well, what's

19    happening with the investigation of Dr.

20    Tulp?

21         A.    I don't remember having a

22    direct conversation about that.

23         Q.    Well, how about what you

24    know?

WILLIAM W. PINSKY, M.D.

```
 1              MS. MCENROE:  Objection to
 2         form.
 3              THE WITNESS:  I believe that
 4         somebody visited the campus and
 5         saw that there was -- there was --
 6         they were building a building or
 7         buildings.  But I don't know
 8         anything more than that.
 9    BY MR. REIL:
10         Q.    And did you see any -- did
11    you see any pictures?
12         A.    No.
13         Q.    Did you see any deeds for
14    property?
15         A.    No.
16              MS. MCENROE:  Objection to
17         form.
18              THE WITNESS:  No.
19    BY MR. REIL:
20         Q.    By the way, in any of its
21    documents or bulletins, does the
22    organization define the term campus?
23              MS. MCENROE:  Objection to
24         form.
```

WILLIAM W. PINSKY, M.D.

```
 1   BY MR. REIL:

 2          Q.    As far as you know?

 3          A.    I'm not sure.

 4          Q.    Does the organization have a

 5   file on Dr. Tulp?

 6          A.    I'm not sure what you mean

 7   by a file.

 8          Q.    Repository where

 9   investigative reports, things pertinent

10   to the investigation would be kept?

11          A.    I assume that records are

12   collated in reference to USAT.

13          Q.    And where would that

14   information be?

15          A.    It would be within the

16   Operations Group.

17          Q.    Within the Operations Group.

18                And Ms. Cover is the head of

19   the Operations Group?

20          A.    Yes.

21          Q.    And is it fair to say she's

22   also your second in command?

23                MS. MCENROE:   Objection to

24          form.
```

WILLIAM W. PINSKY, M.D.

```
 1                THE WITNESS:  No.

 2                MR. REIL:  No.  Okay.

 3   BY MR. REIL:

 4        Q.    Who is the second in command

 5   underneath you?

 6        A.    Mr. Donohue.  Dennis

 7   Donohue.

 8        Q.    Perhaps we can save some

 9   time, if you could enlighten me, starting

10   with yourself at the top of the pyramid

11   and give me a little idea of how the

12   chain of command works at the

13   organization?

14                MS. MCENROE:  Objection to

15          form.

16                THE WITNESS:  So my direct

17          reports are Mr. Donohue.  Mr.

18          Donohue has his direct reports

19          that include Ms. Cover, the Head

20          of HR, CFO, project management

21          person.  I believe that's his

22          direct reports.

23                My other direct reports are

24          general counsel, the Director and
```

WILLIAM W. PINSKY, M.D.

```
 1              Secretary of the Board and the
 2              President of FAIMER.  Capital F,
 3              A-I-M-E-R.  All capitalized.
 4   BY MR. REIL:
 5              Q.    Would you explain to me what
 6   FAIMER is?
 7              A.    It's the Foundation For the
 8   Advancement of International Medical
 9   Education and Research.  It's a separate
10   501 (c3) but basically a subsidiary 501
11   (c3) and they're involved in
12   international medical education.
13   Basically, to improve medical education
14   by mentoring and training medical
15   educators around the world.
16              Q.    To your knowledge, did
17   anyone from the organization ever visit
18   USAT in Montserrat?
19                    MS. MCENROE:  Objection to
20         form.
21                    THE WITNESS:  Not that I
22         know.
23   BY MR. REIL:
24              Q.    Why not?
```

WILLIAM W. PINSKY, M.D.

```
 1          A.    I don't know how to answer
 2   that question.
 3          Q.    Well, as president of USAT,
 4   what was the relationship -- and we're
 5   talking about 15 years, I believe the
 6   university started around 2003.
 7                Let me rephrase that
 8   question.
 9                What was the relationship
10   between the organization and Dr. Tulp?
11                MS. MCENROE:  Objection to
12          form.
13                THE WITNESS:  Well, I can't
14          speak prior to two-and-a-half
15          years ago.  I'm not sure there was
16          any relationship at all.
17   BY MR. REIL:
18          Q.    And two years ago you
19   received the -- you heard of a
20   conversation -- the organization heard of
21   a conversation or communication from a
22   parent that there were campuses in the
23   United States.  Do I have that right?
24                MS. MCENROE:  Objection to
```

WILLIAM W. PINSKY, M.D.

Page 32

```
 1          form.
 2                  THE WITNESS:  Yes.
 3     BY MR. REIL:
 4          Q.   Are you aware if anyone from
 5     the organization was able to attend a
 6     lecture at any one of these campuses?
 7                  MS. MCENROE:  Objection to
 8          form.
 9                  THE WITNESS:  No.
10     BY MR. REIL:
11          Q.   And where were these
12     campuses allegedly located?
13          A.   I'm not sure of all the
14     locations.  Florida, Texas, Colorado were
15     mentioned.
16          Q.   Was anyone from the
17     organization able to go down to Florida
18     and see a building that said USAT on it?
19                  MS. MCENROE:  Objection to
20          form.
21                  THE WITNESS:  What I am
22          aware of is that individuals from
23          the organization saw a YouTube
24          presentation by Dr. Tulp
```

WILLIAM W. PINSKY, M.D.

```
 1          describing the opportunity to

 2          attend a campus in Florida.  And I

 3          have an understanding that many of

 4          these activities occurred at

 5          hotels.

 6   BY MR. REIL:

 7          Q.    Did anyone actually see a

 8   building in Florida or anywhere else in

 9   the United States that said USAT on it?

10               MS. MCENROE:  Objection to

11          form.

12               THE WITNESS:  No.  I don't

13          know.

14   BY MR. REIL:

15          Q.    So there was more than --

16   was more than one person assigned to go

17   down to Florida to check out if there

18   were campuses?

19               MS. MCENROE:  Objection to

20          form.

21               THE WITNESS:  I never said

22          anybody was assigned to go to

23          Florida.

24   BY MR. REIL:
```

WILLIAM W. PINSKY, M.D.

```
 1          Q.     Okay.  Fair qualification.

 2                 Did anyone ever go to

 3   Florida to physically check out if there

 4   was --

 5                 MS. MCENROE:  -- objection

 6          to form.  Asked and answered

 7          repeatedly.

 8                 MR. REIL:  Okay.

 9   BY MR. REIL:

10          Q.     You may answer.

11          A.     I'm not aware.

12          Q.     And why don't you tell me,

13   to your knowledge, what efforts were made

14   by the organization to determine if USAT

15   had a campus, had any campuses in the

16   United States?

17                 MS. MCENROE:  Objection to

18          form.

19                 THE WITNESS:  So I don't

20          know all the details, but what I'm

21          aware of, are that efforts were

22          made through, as I mentioned

23          before, looking through YouTube

24          and finding video presentations
```

WILLIAM W. PINSKY, M.D.

```
 1              that talked about the campuses.
 2              There may have been other social
 3              media, you know, inspections as
 4              well.  And affidavits were
 5              requested from students asking
 6              them where they attended classes.
 7   BY MR. REIL:
 8              Q.    Okay.  Did you authorize
 9   those affidavits that we're talking
10   about?
11              A.    It wouldn't be my job --
12                    MS. MCENROE:   --
13   objection to form.
14                    THE WITNESS:  It wouldn't be
15   my job to do that.
16   BY MR. REIL:
17              Q.    Well, since we're talking
18   about -- since we're talking about
19   affidavits, maybe I want to look at what
20   I've designated as Pinsky-1 for the
21   purposes of this deposition.
22                    And I'll represent on the
23   record, that this is the same material
24   which I presented at the Injunction
```

WILLIAM W. PINSKY, M.D.

Page 36

1    Hearing before Judge Beetlestone, I think

2    was a couple Thursdays ago.

3                MS. MCENROE:  And for the

4          record, it's a compilation of

5          documents with an index appended

6          to the front.

7                MR. REIL:  Correct.

8    BY MR. REIL:

9          Q.    Okay.  I'm looking for the

10   affidavit.  Do you see the first page

11   where it has sort of like an index?

12   Maybe we should go to page 10.  Take a

13   look at page 10.

14         A.    (Witness complies.)

15         Q.    Page 10 says at the top,

16   it's a blank affidavit.  It says, ECFMG

17   at the top.  And it says, Affidavit

18   Attesting to Medical School Attendance.

19                Have you seen that before?

20         A.    No.

21         Q.    Haven't seen it before.

22   Okay.

23                Well, you spoke about an

24   affidavit in your testimony.  Is it that

WILLIAM W. PINSKY, M.D.

1    you were aware that there were affidavits

2    being used but you didn't actually see

3    them or am I missing what you're saying?

4          A.    Yes, that's what I said.

5          Q.    So you don't have any

6    personal knowledge as to how this

7    affidavit was used by the organization?

8                MS. MCENROE:  Objection to

9          form.

10               THE WITNESS:  I just know

11         that they were sent to the

12         students.

13   BY MR. REIL:

14         Q.    Who sent them?

15         A.    The Operations Group.

16         Q.    And that would be the one

17   that Mr. Cover heads?

18         A.    Yes.

19         Q.    Did you see any of the

20   affidavits that came back?

21         A.    No.

22         Q.    I want to direct your

23   attention to page 11 -- oh, before I do

24   that, let's stay with page 10.

WILLIAM W. PINSKY, M.D.

Page 38

```
 1                 This affidavit would be

 2   directed, I think we said to students of

 3   USAT?

 4                 MS. MCENROE:  Objection to

 5        form.

 6                 THE WITNESS:  That's what I

 7        understand.

 8   BY MR. REIL:

 9        Q.   I see.  If you go about

10   two-thirds of the way down the document

11   on page 10, there's a part there

12   requesting documentation possibly

13   passport, airline tickets, so forth and

14   so on.

15                 Do you see that?

16        A.   Yes.

17        Q.   So this is an affidavit

18   which also requests documents?

19                 MS. MCENROE:  Objection to

20        form.

21                 THE WITNESS:  Is that a

22        question?

23   BY MR. REIL:

24        Q.   Yes.
```

WILLIAM W. PINSKY, M.D.

1         A.    I believe that's what it

2    says.

3         Q.    At the hearing of Dr. Tulp

4    back on November 28th, right, do you

5    recall that Dr. Tulp, through his

6    attorneys, were furnished with some of

7    these affidavits?

8              MS. MCENROE:   Objection to

9         form.

10   BY MR. REIL:

11        Q.    If you know?

12        A.    I don't remember.

13        Q.    Why don't we take a look at

14   page 11.  On page 11, let me read this

15   into the record.

16             Almost the next to the last

17   paragraph before the bottom it says:

18   ECFMG reserves the right.

19             Do you see that?

20        A.    Yes.

21        Q.    ECFMG reserves the right to

22   bring allegations of irregular behavior

23   against you, in accordance with its

24   policies and procedures, should ECFMG

WILLIAM W. PINSKY, M.D.

Page 40

```
 1    obtain information that indicates that

 2    you have engaged in irregular behavior

 3    with respect to any documentation

 4    submitted as part of the process.

 5              Well, the you would refer to

 6    the students of USAT; right?

 7              MS. MCENROE:  Objection to

 8         form.

 9              THE WITNESS:  I believe so.

10    BY MR. REIL:

11         Q.    Is this -- is what I just

12    read, telling the students that they can

13    be charged with irregular behavior if

14    they haven't filled out this document

15    correctly?

16              MS. MCENROE:  Objection to

17         form.  The document speaks for

18         itself.  You may answer.

19              THE WITNESS:  I believe the

20         document speaks for itself.

21    BY MR. REIL:

22         Q.    Okay.  And does the document

23    say that students can be charged with

24    irregular behavior?
```

WILLIAM W. PINSKY, M.D.

```
 1              MS. MCENROE:  Objection to
 2        form.
 3              THE WITNESS:  Same answer.
 4        I believe the document speaks for
 5        itself.
 6              It states that ECFMG
 7        reserves -- I'm quoting.  "ECFMG
 8        reserves the right to bring
 9        allegations of irregular
10        behavior."
11   BY MR. REIL:
12        Q.    What's irregular behavior?
13        A.    It's a term that is used for
14   actions that are not in accordance with
15   the policy of ECFMG.
16        Q.    And who would it apply to
17   generally?  I mean, I couldn't be -- I'm
18   not a medical person, I couldn't be found
19   guilty of irregular behavior, maybe I
20   could.  Could you give me an idea who
21   it's directed to?
22              MS. MCENROE:  Objection to
23        form.
24              THE WITNESS:  It's directed
```

WILLIAM W. PINSKY, M.D.

```
 1              to individuals who are involved in

 2              the process of applications for

 3              ECFMG certification.

 4    BY MR. REIL:

 5         Q.    I see.  Is that -- I

 6    wouldn't want -- I didn't expect you to

 7    have an exact quote.  But is what you

 8    say, is that stated in some sort of

 9    document the ECFMG has?

10         A.    Probably.  It's probably on

11    a policy statement somewhere.

12         Q.    Where are the policy

13    statements kept?

14              MS. MCENROE:  Objection to

15         form.

16              THE WITNESS:  In the offices

17         at 36th and Market.

18    BY MR. REIL:

19         Q.    Is there a book or something

20    like that that has a -- that has the

21    various policy statements from ECFMG?

22         A.    I'm sure there's a

23    depository, maybe electronic, but I'm

24    sure there's a depository.
```

WILLIAM W. PINSKY, M.D.

1          Q.     I'm curious, does the

2     organization, I like your word, does the

3     organization have a charter?

4          A.     What do you mean by charter?

5          Q.     Well, some document when it

6     came into being that explains its form

7     and function and where it gets its power

8     I guess?

9          A.     I think, I'm assuming

10    there's a document from 60 plus years ago

11    when ECFMG was formed at the request of

12    several organizations, and we have our

13    mission statement that's available.

14         Q.     The mission statement was

15    composed by the organization; correct?

16         A.     Yes.

17         Q.     Are there any outside

18    documents that -- by outside, I mean

19    outside the organization, that deal with

20    the powers of the organization?

21              MS. MCENROE:   Objection to

22         form.

23              THE WITNESS:   I don't know.

24    BY MR. REIL:

WILLIAM W. PINSKY, M.D.

```
 1          Q.     Now, if ECFMG, and I'm

 2    asking you hypothetically because you're

 3    the head of the organization, if ECFMG

 4    finds a person culpable of irregular

 5    behavior, what does that mean in terms of

 6    what does that sanction mean if you're

 7    found culpable of irregular behavior?

 8               MS. MCENROE:  Objection to

 9          form.

10               THE WITNESS:  So there's not

11          a single answer to that because

12          there's different types of

13          irregular behavior.

14    BY MR. REIL:

15          Q.     Okay.

16          A.     So an individual who is

17    found of irregular behavior has a

18    notation of that put into their file.

19    And then there are different sanctions

20    that could occur depending on the type of

21    irregular behavior.

22          Q.     Well, are there, somewhere

23    specified in writing, the different types

24    of irregular behavior?
```

WILLIAM W. PINSKY, M.D.

Page 45

```
1              MS. MCENROE:  Objection to
2         form.
3              THE WITNESS:  No.  Irregular
4         behavior is just irregular
5         behavior.  Then it's what -- what
6         the individual did to be found to
7         have irregular behavior and the
8         sanctions are determined; if there
9         are any sanctions, there's not
10        always sanctions.  If there are
11        any sanctions to be found.
12   BY MR. REIL:
13        Q.   Is it a fair statement that
14   irregular behavior could be applied to an
15   individual who runs afoul of the policies
16   of the organization?
17              MS. MCENROE:  Objection to
18        form.
19              THE WITNESS:  I believe
20        that's what I said before.
21   BY MR. REIL:
22        Q.   Can persons, other than
23   foreign medical students, be found
24   culpable of irregular behavior?
```

WILLIAM W. PINSKY, M.D.

```
 1                MS. MCENROE:  Objection to
 2          form.
 3                THE WITNESS:  Medical school
 4          officials can be.
 5    BY MR. REIL:
 6          Q.   Medical school officials can
 7    be.
 8                And where does the
 9    organization get that authority to find
10    medical school officials potentially
11    guilty of irregular behavior?
12                MS. MCENROE:  Objection to
13          form.
14    BY MR. REIL:
15          Q.   Is it -- where does that
16    come from?
17                MS. MCENROE:  Objection to
18          form.
19                THE WITNESS:  Again, it has
20          to do with accuracy and legitimacy
21          of documents that are provided to
22          ECFMG.
23    BY MR. REIL:
24          Q.   Can you comment for me on
```

WILLIAM W. PINSKY, M.D.

1    the relationship between the organization

2    and the State Medical Boards, how does

3    that work?  I'm a lay person.

4                    MS. MCENROE:  Objection to

5              form.

6                    THE WITNESS:  We have no

7              direct relationship with any of

8              the State Medical Boards.  The

9              State Medical Boards develop

10             policy and regulations that

11             usually are through legislation;

12             and ECFMG is recognized by the

13             State Boards to be the agency that

14             verifies documents, primary source

15             verification.

16   BY MR. REIL:

17        Q.    Is it fair to say that if

18   ECFMG does not certify a foreign medical

19   student or foreign medical graduate, that

20   they can't practice medicine in the

21   United States?

22                    MS. MCENROE:  Objection to

23             form.

24                    THE WITNESS:  No, that's not

WILLIAM W. PINSKY, M.D.

```
 1          true.
 2   BY MR. REIL:
 3          Q.     What is true?
 4          A.     State board can make an
 5   independent decision on their own.
 6          Q.     So there's an appeal process
 7   to the State board?
 8                 MS. MCENROE:  Objection to
 9          form.
10                 THE WITNESS:  I don't
11          understand the question.
12   BY MR. REIL:
13          Q.     Well, you -- I asked you
14   about ECFMG and a foreign medical student
15   and I think you said the State board,
16   right --
17                 MR. REIL:  Could you read
18          that response back?  The question
19          and the answer.
20                 (At this time, the court
21          reporter read back from the record
22          as requested.)
23   BY MR. REIL:
24          Q.     And I'm asking you to expand
```

WILLIAM W. PINSKY, M.D.

```
 1    on that answer.  What is the mechanism by
 2    which that occurs?
 3              MS. MCENROE:  Objection to
 4         form.
 5              THE WITNESS:  So those are
 6         State board policies that I can't
 7         give you details on.  I do know
 8         that a State board can make an
 9         exception when they wish to.
10    BY MR. REIL:
11         Q.   So the -- so I think what
12    you're saying is, the State board could
13    somehow examine a decision by ECFMG and
14    decide if they are going to override it
15    or not?
16              MS. MCENROE:  Objection to
17         form.
18              THE WITNESS:  I believe so.
19    BY MR. REIL:
20         Q.   Does that happen very often,
21    if you know?
22              MS. MCENROE:  Objection to
23         form.
24              THE WITNESS:  I would guess
```

WILLIAM W. PINSKY, M.D.

Page 50

```
 1         not.
 2    BY MR. REIL:
 3         Q.    When is the last time you
 4    remember that happening?
 5         A.    I can't remember.
 6         Q.    Well, let's put it this way:
 7    If a foreign medical student or graduate
 8    does not obtain, I think certification by
 9    ECFMG, it would be as a practical matter,
10    it would be difficult for that person to
11    practice medicine in the United States?
12         A.    Yes.
13              MS. MCENROE:   Objection to
14         form.
15              THE WITNESS:  Yes.
16    BY MR. REIL:
17         Q.    You were at the hearing of
18    Dr. Tulp on November 28, 2018.  I think
19    we already established that; right?
20         A.    Correct.
21         Q.    Did any witnesses testify at
22    that hearing?
23              MS. MCENROE:   Objection to
24         form.
```

WILLIAM W. PINSKY, M.D.

1              THE WITNESS:  Dr. Tulp was

2        invited to be a witness.

3   BY MR. REIL:

4        Q.    But I'm talking actually at

5   the hearing, did any witnesses testify at

6   the hearing?

7        A.    Dr. Tulp was invited to be a

8   witness and testify at the hearing.

9        Q.    Did he testify?

10       A.    No.

11       Q.    Did any witnesses testify?

12       A.    His attorney did.

13       Q.    Well, his attorney wasn't a

14   witness; right?

15             MS. MCENROE:  Objection to

16        form.

17             MR. REIL:  I won't quibble

18        over that.

19   BY MR. REIL:

20       Q.    Were any -- were any

21   documents introduced at that hearing?

22             MS. MCENROE:  Objection to

23        form.

24             THE WITNESS:  Documents were

WILLIAM W. PINSKY, M.D.

Page 52

```
 1            sent to Dr. Tulp and his

 2            representation prior to the

 3            hearing.

 4   BY MR. REIL:

 5            Q.    Were any of those documents

 6   introduced at the hearing?

 7                 MS. MCENROE:  Objection to

 8            form.

 9   BY MR. REIL:

10            Q.    That you recall.

11            A.    What does introduce mean?

12            Q.    Put into evidence, you know,

13   this paper was put into evidence like

14   we're doing here.

15                 MS. MCENROE:  Objection to

16            form.

17                 THE WITNESS:  That's not the

18            format for that committee.

19   BY MR. REIL:

20            Q.    What is the format?

21            A.    The documents are

22   distributed prior to the hearing and then

23   the hearing is to answer any questions

24   relative to them.
```

WILLIAM W. PINSKY, M.D.

Page 53

```
 1           Q.    I see.  So the -- how
 2   many -- was the full board, maybe 16 or
 3   17, doctors there at the hearing?
 4              MS. MCENROE:  Objection to
 5        form.
 6              THE WITNESS:  No.
 7   BY MR. REIL:
 8           Q.    How many were there roughly?
 9           A.    It was the Medical Education
10   Credentials Committee Membership, which
11   is made up of people from the board.
12           Q.    All doctors?
13           A.    I don't think so.  I'm just
14   trying to remember.  I think we -- I
15   think -- I don't have a list of the
16   committee in front of me.
17           Q.    Mostly doctors?
18           A.    Mostly doctors.
19           Q.    Let's leave it at that.
20           A.    We have nonphysicians on the
21   board, I just can't remember.
22           Q.    Are there any attorneys on
23   the board?
24           A.    Yes.
```

WILLIAM W. PINSKY, M.D.

Page 54

```
 1          Q.    There are?

 2          A.    Yes.

 3          Q.    Okay.  Now, was Dr. Tulp

 4   allowed to bring witnesses to present at

 5   that hearing?

 6               MS. MCENROE:  Objection to

 7          form.

 8               THE WITNESS:  I don't

 9          recall.

10   BY MR. REIL:

11          Q.    Well, would there be

12   somewhere in the rules and regulation of

13   the organization that would describe what

14   you're allowed to do at the hearing?

15               MS. MCENROE:  Objection to

16          form.

17               THE WITNESS:  I don't know.

18          I think there probably was in the

19          communications to Dr. Tulp about

20          the opportunity to appear at the

21          hearing.

22   BY MR. REIL:

23          Q.    Do you know if there's

24   anything about the opportunity to bring
```

WILLIAM W. PINSKY, M.D.

Page 55

```
 1   witnesses?
 2              MS. MCENROE:  Objection to
 3         form.
 4              THE WITNESS:  I don't
 5         remember.
 6   BY MR. REIL:
 7         Q.    Did the board present any
 8   witnesses at Dr. Tulp's hearing?
 9              MS. MCENROE:  Objection to
10         form.
11              THE WITNESS:  No.
12   BY MR. REIL:
13         Q.    What did the board present
14   at Dr. Tulp's hearing?
15              MS. MCENROE:  Objection to
16         form.
17              THE WITNESS:  The board
18         received the same documents that
19         had been sent to Dr. Tulp and his
20         attorneys.  The board had that
21         material and they reviewed that
22         prior to coming to the committee
23         meeting.
24   BY MR. REIL:
```

WILLIAM W. PINSKY, M.D.

```
 1          Q.    So that -- I think black
 2    binder that we got.
 3          A.    Yes.
 4          Q.    The board received that
 5    prior to the meeting?
 6          A.    Yes.
 7          Q.    Hearing?
 8          A.    Yes.  The committee did.
 9          Q.    Okay.  And for what purpose?
10                MS. MCENROE:  Objection to
11          form.
12                THE WITNESS:  To be informed
13          about the work that was going to
14          go on during the committee meeting
15          that day.
16    BY MR. REIL:
17          Q.    Was that black binder ever
18    submitted into evidence, if you know?
19                MS. MCENROE:  Objection to
20          form.
21    BY MR. REIL:
22          Q.    Do you know what that means?
23                MS. MCENROE:  Objection to
24          form.
```

WILLIAM W. PINSKY, M.D.

```
 1                    THE WITNESS:  That's not the
 2          format of the committee.
 3   BY MR. REIL:
 4          Q.    What is the format?
 5          A.    It's not a committee where
 6   things are submitted as evidence.
 7          Q.    So it's basically a
 8   proceeding where Dr. Tulp has an
 9   opportunity to make a statement on his
10   behalf; is that a fair statement?
11                    MS. MCENROE:  Objection to
12          form.
13                    THE WITNESS:  Yes.
14   BY MR. REIL:
15          Q.    Now, is there any
16   procedure -- I'm sure you've been to a
17   lot of the these hearings; is that a fair
18   statement?
19                    MS. MCENROE:  Objection to
20          form.
21                    THE WITNESS:  Well, in the
22          two-and-a-half years I've been to
23          several.
24   BY MR. REIL:
```

WILLIAM W. PINSKY, M.D.

Page 58

```
 1          Q.     Okay.  That's good enough
 2     for me.
 3                 Is there -- and there's --
 4     there was a black binder that I remember
 5     that had a lot of material in it; right?
 6          A.     Yes.
 7          Q.     Who gathered that material?
 8          A.     The operations people.
 9          Q.     Was Dr. Tulp, through his
10     attorneys, given any ability to object to
11     any of that material in the binder?
12                 MS. MCENROE:  Objection to
13          form.
14                 THE WITNESS:  The purpose of
15          the hearing was for them to be
16          able to raise questions -- or
17          answer questions or raise
18          questions in terms of anything
19          that they wanted to talk about.
20     BY MR. REIL:
21          Q.     Well, let's put it this way:
22     Did Dr. Tulp have any input as to what
23     material went into that binder?
24                 MS. MCENROE:  Objection to
```

WILLIAM W. PINSKY, M.D.

Page 59

```
 1         form.
 2              THE WITNESS:  This was the
 3         material that had been accrued,
 4         you know, through working through
 5         this by ECFMG.
 6  BY MR. REIL:
 7         Q.    Working through -- I didn't
 8  hear that part.
 9         A.    Working through this --
10  working through the issues.
11         Q.    It was accrued by the
12  organization?
13         A.    Yes.
14         Q.    Was there a section of the
15  binder that contained material that was
16  submitted by Dr. Tulp or his attorneys?
17              MS. MCENROE:  Objection to
18         form.
19  BY MR. REIL:
20         Q.    You can answer.
21         A.    I'm guessing there might
22  have been some correspondence that was in
23  there, that had been submitted to Dr.
24  Tulp or his attorneys.
```

WILLIAM W. PINSKY, M.D.

Page 60

```
 1          Q.    Well, we don't want you to

 2    guess.  Let's take a look at -- I may

 3    have covered this already.

 4               Did we establish that part

 5    of your job as the President and the CEO,

 6    is to carry out the policies of the

 7    organization?

 8               MS. MCENROE:  Objection to

 9         form.

10               THE WITNESS:  Yes, it is.

11    BY MR. REIL:

12          Q.    Let's take a look at the

13    letter that you sent out to Dr. Tulp

14    after the hearing.  I believe in

15    Pinsky-1, that's page 2 actually.  Let me

16    know when you have that.

17          A.    Yes.

18          Q.    Why don't you just take a

19    moment to look it over and then I have

20    some questions.

21          A.    (Witness complies.)  Okay.

22          Q.    Would you describe for the

23    record, if this is a letter from you to

24    Dr. Tulp, dated December 14, 2018, would
```

WILLIAM W. PINSKY, M.D.

1    you identify this for the record?   In

2    other words, explain what it is.

3              MS. MCENROE:  Objection to

4         form.

5              THE WITNESS:  This is a

6         letter that summarizes the

7         Credential Committee review of the

8         allegations.  And in some brief

9         way, a listing of what the process

10        was in terms of providing

11        documents to Dr. Tulp and his

12        attorneys.  And then the

13        consideration of the committee

14        following the review of the

15        documentation and the appearance

16        at the committee.

17   BY MR. REIL:

18        Q.    A few questions about that

19   letter.

20              By the way, were you a

21   member of the Credentials Committee?

22        A.    Yes.

23        Q.    Were you the head of the

24   Credentials Committee?

WILLIAM W. PINSKY, M.D.

1        A.    No.

2        Q.    Who was?

3        A.    Dr. Gusic.

4              COURT REPORTER:  Gusic?

5              THE WITNESS:  I'm sorry.

6        G-U-S-I-C.

7              COURT REPORTER:  Thank you.

8    BY MR. REIL:

9        Q.    And does Dr. Gusic work at

10   36th and Market?

11       A.    No.

12       Q.    Let's take a look at that

13   letter on page 2 from December 14, 2018.

14              In the first sentence there

15   you say that the Credentials Committee

16   has completed its review.

17              Do you see that?

18       A.    Yes.

19       Q.    What did it review?

20              MS. MCENROE:  Objection to

21       form.

22              THE WITNESS:  It reviewed

23       the documentation.  It

24       participated in -- the committee

WILLIAM W. PINSKY, M.D.

```
 1            participated in the appearance
 2            before the committee and then
 3            discussion afterwards.
 4   BY MR. REIL:
 5       Q.   Is it fair to say that since
 6   no witnesses testified at the hearing and
 7   Dr. Tulp didn't make a statement, the
 8   review that we're talking about
 9   essentially were the documents that were
10   in that black book?
11            MS. MCENROE:  Objection to
12       form.
13            THE WITNESS:  Because Dr.
14       Tulp did not make a statement,
15       even though he was asked to, it
16       was primarily the documentation
17       that were in the book.
18   BY MR. REIL:
19       Q.   Was it ever explained as far
20   as you're aware, whether Dr. Tulp --
21   whether the organization had to prove its
22   case against Dr. Tulp or Dr. Tulp had to
23   prove his case?  Did you ever get into
24   that?
```

WILLIAM W. PINSKY, M.D.

1              MS. MCENROE:  Objection to

2        form.

3              THE WITNESS:  You know it's

4        not a trial situation.

5    BY MR. REIL:

6        Q.    I see.

7        A.    It's a situation of

8    reviewing all information.

9        Q.    Well, the ECFMG brought

10   charges, if you will, against Dr. Tulp

11   and you were on the Credentials

12   Committee, was there any discussion of

13   what's called the burden of proof?

14             MS. MCENROE:  Objection to

15        form.  Asked and answered.

16             THE WITNESS:  Again, it's

17        not a trial so that terminology is

18        not used.

19   BY MR. REIL:

20       Q.    Is that defined anywhere in

21   the ECFMG bulletins or documents as to

22   who has the burden of proof in one of

23   these hearings?

24             MS. MCENROE:  Objection to

WILLIAM W. PINSKY, M.D.

```
 1        form.
 2              THE WITNESS:  I don't think
 3        the terminology burden of proof is
 4        used.
 5              MS. MCENROE:  Counsel, we've
 6        been going for about an hour.  If
 7        there's a good time to take a
 8        break, let us know.
 9              MR. REIL:  I would say --
10        let's go off the record.
11              (At this time, a discussion
12        was held off the record.)
13   BY MR. REIL:
14        Q.   Now, if you go down to line
15   three or four of the letter.  It says --
16   the letter that we're talking about on
17   December 14th.
18              It says:  Specifically, you
19   provided -- you I think referring to Dr.
20   Tulp -- false information to ECFMG when
21   you (1) notified ECFMG that USAT does not
22   operate a branch campus in Miami,
23   Florida; right?
24              Are you aware of what that
```

WILLIAM W. PINSKY, M.D.

1    alleged false information was?

2          A.    I believe the false

3    information is that USAT holds itself to

4    be a medical school located in

5    Montserrat.

6          Q.    And then if you go down

7    further it says:

8                In the first paragraph, it

9    talks about, it says:  ECFMG has

10   information that these students were not

11   attending USAT during the time periods to

12   which you certified.

13               What's that in reference to,

14   No. 2 there?

15         A.    I believe that is in

16   reference to the dates of students

17   matriculation at USAT.

18         Q.    How was that information

19   obtained?

20         A.    I believe that's from the

21   affidavits.

22         Q.    To your knowledge, was any

23   other source for the information other

24   than the affidavits used?

WILLIAM W. PINSKY, M.D.

Page 67

```
 1              MS. MCENROE:  Objection to
 2       form.
 3              THE WITNESS:  I don't know.
 4  BY MR. REIL:
 5       Q.    Did Dr. Tulp have an
 6  opportunity to challenge the accuracy of
 7  any of these affidavits which were in the
 8  black book at the hearing?
 9              MS. MCENROE:  Objection to
10       form.
11              THE WITNESS:  Yes.
12  BY MR. REIL:
13       Q.    Yes.  Okay.
14              Well, was he supplied those
15  affidavits prior to the hearing?
16       A.    I don't know.
17       Q.    Isn't it true that many of
18  the affidavits, the information about the
19  individuals was redacted?
20       A.    I don't know that.
21       Q.    Under your procedures was
22  Dr. Tulp allowed to bring any of these
23  individuals who filled out affidavits to
24  the hearing on November 28th?
```

WILLIAM W. PINSKY, M.D.

Page 68

```
 1              MS. MCENROE:  Objection to
 2        form.
 3              THE WITNESS:  I'm not sure
 4        about that.
 5   BY MR. REIL:
 6        Q.    Now, if you look, I think
 7   it's the next to the last paragraph, the
 8   one that starts, ECFMG Committee.
 9              Do you see that one?
10        A.    The next to last paragraph
11   on the first page?
12        Q.    On the first page, on page
13   2.
14        A.    Yes.
15        Q.    The last sentence there I
16   have a question about that.
17              It says:  Your ECFMG Medical
18   School Web Portal, and then in
19   parenthesis it has, EMSWP, account will
20   remain deactivated.
21              Can you explain what that
22   means, Doctor?
23        A.    Yes.  I believe that's the
24   electronic interface between the school
```

WILLIAM W. PINSKY, M.D.

```
 1    and ECFMG.

 2           Q.    And it says, remains

 3    deactivated, so -- well, strike that.

 4                 What's the purpose of this,

 5    of deactivating this portal?

 6                 MS. MCENROE:  Objection to

 7         form.

 8                 THE WITNESS:  The purpose of

 9         deactivating it?

10    BY MR. REIL:

11           Q.    Yes.  I think it was, will

12    remain deactivated.

13                 What's the idea behind

14    deactivating it?

15           A.    Because of the finding of

16    irregular behavior.

17           Q.    And it says:  Will remain

18    deactivated.

19                 It was deactivated before

20    the hearing, wasn't it?

21                 MS. MCENROE:  Objection to

22         form.

23                 THE WITNESS:  I believe so

24         but I don't remember that exactly,
```

WILLIAM W. PINSKY, M.D.

1          but I believe so.

2    BY MR. REIL:

3          Q.    **And who made the decision to**

4    **deactivate the web portal prior to the**

5    **hearing?**

6          A.    If it was, it would have

7    been from Operations.

8          Q.    **And who in Operations, if**

9    **you know, would have made that decision?**

10         A.    I think it could have been,

11   you know, one of a couple different

12   senior people within Operations.

13         Q.    **For instance?**

14              MS. MCENROE:    Objection to

15         form.

16              THE WITNESS:    Ms. Corrado,

17         Ms. Cover.

18   BY MR. REIL:

19         Q.    **To your knowledge, was there**

20   **a particular person who was leading the**

21   **investigation into Dr. Tulp and USAT?**

22         A.    Not to my knowledge.

23         Q.    **Well, besides Ms. Corrado**

24   **and Ms. Cover, who else was prominent in**

WILLIAM W. PINSKY, M.D.

Page 71

1    the investigation?

2                MS. MCENROE:  Objection to

3           form.

4                THE WITNESS:  I really don't

5           know at that level.  There are

6           other people, you know, at a

7           variety of different levels in

8           that department.

9    BY MR. REIL:

10          Q.    Would you receive reports at

11   regular intervals about the investigation

12   into Dr. Tulp and USAT?

13          A.    I didn't receive reports.

14   We had conversations with counsel prior

15   to the hearing.

16          Q.    And I don't want anything

17   you told counsel.

18                Let's take a look at page 3

19   if we might.

20                At the top of page 3 it

21   says:  In 2018, and there's one sentence

22   there, I'd ask that you read that into

23   the record?

24          A.    The one that starts, in

WILLIAM W. PINSKY, M.D.

1    2018?

2         Q.    Yes.  In 2018, just that one

3    sentence.

4         A.    In 2018, ECFMG determined

5    that a certain official of the University

6    of Science Arts & Technology engaged in

7    irregular behavior in connection with

8    providing false information to ECFMG.

9         Q.    That certain official, was

10   Dr. Orien Tulp; correct?

11        A.    Yes.

12        Q.    And was this -- was what you

13   just read, was that placed on the WDOMS?

14             MS. MCENROE:  Objection to

15        form.

16             THE WITNESS:  Yes.  It's

17        what the prior sentence says at

18        the bottom of page 2.

19   BY MR. REIL:

20        Q.    Can you explain for the

21   record what the WDOMS is?

22        A.    So it's WDMS, the World

23   Directory of Medical Schools, is a

24   directory that we co-sponsor that, to the

WILLIAM W. PINSKY, M.D.

```
 1   best of our knowledge, lists all
 2   operating medical schools in the world.
 3        Q.   And what's the, you know, in
 4   general, I know your organization doesn't
 5   own the WDMS.  In general, can you, as an
 6   insider in the field, describe the
 7   audience for the WDMS?
 8               MS. MCENROE:  Objection to
 9          form.
10               THE WITNESS:  So the
11          audience is varied.  It can be
12          anywhere from individuals who are
13          interested in going to medical
14          school, individuals who are in
15          medical school.  It can be
16          individuals that have
17          responsibility for post-graduate
18          training.  It can be individuals
19          who were being recruited to a job
20          that might look at that.
21   BY MR. REIL:
22        Q.   Now, that sentence that you
23   just read, I think you said it was posted
24   on the WDMS, the web, the internet,
```

WILLIAM W. PINSKY, M.D.

1    right; am I right about that?

2           A.    In the World Directory.

3           Q.    Was it placed there before

4    the November 28th hearing?

5           A.    I don't know.  But I believe

6    probably not.

7           Q.    Who would know?

8           A.    Operations people.

9           Q.    And why do you say probably

10   not?

11          A.    I assume it was waiting for

12   the outcome of the hearing.

13          Q.    Because it discusses

14   irregular behavior.  So you would assume

15   it would -- strike that.

16                Well, let me ask you this

17   question:  That last sentence that you

18   read, should it have been placed by the

19   organization on the WDMS prior to the

20   hearing?

21                MS. MCENROE:  Objection to

22        form.

23                THE WITNESS:  I assume so.

24   BY MR. REIL:

WILLIAM W. PINSKY, M.D.

1          Q.     Can you explain what you

2    mean when you say I assume so?

3          A.     I assume that could be the

4    way we would do it.

5          Q.     That it should not be placed

6    on the WDMS prior to the hearing?  I want

7    to make sure I understand what you're

8    saying.

9          A.     That that would be placed

10   after the committee has reviewed and made

11   a determination of irregular behavior.

12         Q.     Why not before?

13                MS. MCENROE:  Objection to

14         form.

15   BY MR. REIL:

16         Q.     You can answer.

17         A.     I think the hearing is a

18   step that gives Dr. Tulp the opportunity

19   to comment on the findings.

20         Q.     Within your organization,

21   who would be the person who would likely

22   know when that was placed, that sentence

23   we just talked about, when that was

24   placed on the WDMS?

WILLIAM W. PINSKY, M.D.

```
1            MS. MCENROE:  Objection to
2       form.
3            THE WITNESS:  I think you
4       asked that before, but that's the
5       Operations Group.
6  BY MR. REIL:
7       Q.    In your opinion, is it
8  likely that Ms. Cover would know or could
9  find out when that was placed?
10           MS. MCENROE:  Objection to
11      form.
12           THE WITNESS:  Yes.
13 BY MR. REIL:
14      Q.    Now, at the end, the last
15 paragraph, it says:  As noted in the
16 enclosed ECFMG Rules of Appellate
17 Procedure.
18           Do you see that?
19      A.    Yes.
20      Q.    ECFMG has written Rules of
21 Appellate Procedure; right?
22      A.    Yes.
23      Q.    Does the ECFMG have written
24 rules about procedure at a hearing?
```

WILLIAM W. PINSKY, M.D.

Page 77

```
 1              MS. MCENROE:  Objection to
 2        form.
 3              THE WITNESS:  I assume so.
 4   BY MR. REIL:
 5        Q.    And where would they be?
 6        A.    They would be at the 36th
 7   and Market office.
 8        Q.    And who would have access to
 9   it?  Would you be able to get them or
10   would it be somebody else?
11        A.    It would be more efficient
12   to have the Operations Group.
13        Q.    And again, that would be Ms.
14   Cover?
15        A.    Yes.
16              MR. REIL:  Can we -- I just
17        want to talk to my client briefly.
18              MS. MCENROE:  Sure.  Let's
19        take a break and go off the
20        record.
21              (At this time, a short break
22        was taken.)
23   BY MR. REIL:
24        Q.    Dr. Pinsky, that letter of
```

WILLIAM W. PINSKY, M.D.

1    December 14th of this year, a two-page

2    letter beginning on page 2 and ended on

3    page 3.

4          A.    Of 2018?

5          Q.    2018, not this year.  Thank

6    you.  I stand corrected.

7                It's signed by you?

8          A.    Yes.

9          Q.    Did you draft it?

10         A.    No.

11         Q.    Who did draft it?

12         A.    The Operations Group.

13         Q.    When you say the Operations

14    Group, who presented it to you?  Did you

15    have some sort of discussion with

16    somebody about the particulars before you

17    signed it?

18         A.    The discussion on the

19    particulars occurred at the committee and

20    so this is the outcome of the committee

21    discussion.

22         Q.    Did Ms. Cover ever present

23    this letter to you for your review?

24         A.    In draft form, is that what

WILLIAM W. PINSKY, M.D.

```
 1   you're asking?
 2          Q.    Yes.  In draft form.
 3          A.    I don't recall.
 4          Q.    But if I understand
 5   correctly, you didn't actually draft the
 6   letter?
 7          A.    Correct.
 8          Q.    Before you signed it, what
 9   efforts did you make to ensure that the
10   letter was accurate?
11                MS. MCENROE:  Objection to
12          form.
13                THE WITNESS:  I read the
14          letter, and to assure myself that
15          it accurately reflected the
16          discussion and the outcome of the
17          committee meeting.
18   BY MR. REIL:
19          Q.    Of the committee meeting?
20          A.    (Witness nods head.)
21                MS. MCENROE:  That was a yes
22          for the record.
23                THE WITNESS:  That was a
24          yes.  I'm sorry.
```

WILLIAM W. PINSKY, M.D.

1    BY MR. REIL:

2        Q.    And did you ever give an

3    address or a presentation regarding

4    Caribbean medical schools?

5            MS. MCENROE:   Objection to

6        form.

7            THE WITNESS:  No.

8    BY MR. REIL:

9        Q.    Did you ever draft a

10   document or a memo concerning Caribbean

11   medical schools?

12           MS. MCENROE:  Objection to

13       form.

14           THE WITNESS:  Not that I can

15       recall.

16   BY MR. REIL:

17       Q.    Now, let me just finish up

18   again by going on page 3 that sentence,

19   in 2018 ECFMG, down to ECFMG.  The one

20   sentence you read in italics in your

21   letter.

22            Isn't it a fact that that

23   was placed on the WDMS on or before

24   September 11, 2018?

WILLIAM W. PINSKY, M.D.

1              MS. MCENROE:  Objection to

2        form.

3              THE WITNESS:  I'm very

4        confident it was not.

5    BY MR. REIL:

6        Q.    **When do you believe that it**

7    **was placed on the WDMS?**

8        A.    I believe that the intention

9    is to place this after a determination

10   has been made.  I'm not even sure that

11   this particular statement has been placed

12   on it yet.

13       Q.    **So the -- do you know as a**

14   **fact when or if this sentence that we're**

15   **talking about, when it was placed or if**

16   **it was placed on the WDMS?**

17             MS. MCENROE:  Objection to

18       form.

19             THE WITNESS:  I don't know

20       if it's been placed yet.

21   BY MR. REIL:

22       Q.    **And you don't know if it was**

23   **placed before the hearing or you are**

24   **certain that it was not placed before --**

WILLIAM W. PINSKY, M.D.

```
 1    well --

 2         A.    I'm certain it was not

 3    placed before.  And I'm not certain

 4    whether it's been placed yet.

 5         Q.    Okay.  Where is the -- when

 6    you communicate with the WDMS, if you

 7    know that, where are they located?

 8              MS. MCENROE:  Objection to

 9         form.

10    BY MR. REIL:

11         Q.    If you know?

12         A.    So I don't communicate

13    directly with them.  WDMS is, you know, a

14    partnership, you know, it's among

15    organizations.

16         Q.    Do you know where they're

17    located?  And I'm interested in terms of

18    contacting them to verify when this was

19    placed.

20              MS. MCENROE:  Objection to

21         form.

22              THE WITNESS:  I think

23         there's individuals that work on

24         the WDMS that are situated in
```

WILLIAM W. PINSKY, M.D.

```
 1          various cities, including France

 2          and Philadelphia.

 3   BY MR. REIL:

 4          Q.    And Philadelphia?

 5          A.    Right.

 6          Q.    Do you know where they are

 7   in Philadelphia?

 8          A.    It would be in our building.

 9          Q.    They are in your building.

10   Okay.

11                And are they under WDMS or

12   are they under another name?

13          A.    They are under FAIMER, it's

14   the FAIMER Partnership.

15                THE WITNESS:  You have that

16          from before; right?

17                COURT REPORTER:  Yes.  Thank

18          you.

19   BY MR. REIL:

20          Q.    F-A-I-M-E-R?

21          A.    Yes.

22          Q.    It's one of the few things I

23   do well, spell.

24                And that's in your building?
```

WILLIAM W. PINSKY, M.D.

Page 84

```
 1          A.    Yes.

 2          Q.    And who is the head person,

 3    if you know, at FAIMER Partnership?

 4          A.    So the President is John

 5    Norcini, N-O-R-C-I-N-I.

 6          Q.    And does he work out of your

 7    building?

 8          A.    Yes.

 9          Q.    Now, to your knowledge, has

10    any other university president ever been

11    charged with irregular behavior by the

12    ECFMG?

13                MS. MCENROE:  Objection to

14          form.

15                THE WITNESS:  I know of

16          another senior official, I'm not

17          sure what his title was.

18    BY MR. REIL:

19          Q.    How about a university

20    president are you sure, as you sit there,

21    other than Dr. Tulp, does it come to mind

22    that another university president has

23    been charged with irregular behavior?

24                MS. MCENROE:  Objection to
```

WILLIAM W. PINSKY, M.D.

```
 1        form.
 2              THE WITNESS:  I'll say yes
 3        but I'm not exactly sure of the
 4        individual's title.
 5  BY MR. REIL:
 6        Q.    Who would that individual
 7  be?
 8        A.    The official that was in
 9  charge of Atlantic University School of
10  Medicine.
11        Q.    And his name is?
12        A.    I'm blanking on his name
13  right now.
14        Q.    He was in charge?
15        A.    Yes.
16        Q.    Now -- so there's Dr. Tulp
17  and there's one other official from
18  Atlantic?
19        A.    Yes.
20        Q.    And they are the only two
21  you can recall in the history of the
22  ECFMG?
23              MS. MCENROE:  Objection to
24        form.
```

WILLIAM W. PINSKY, M.D.

```
 1                THE WITNESS:  I believe

 2          there were two officials at

 3          Atlantic University that were

 4          charged.

 5   BY MR. REIL:

 6          Q.    Anybody else you can recall?

 7          A.    No.

 8          Q.    The ECFMG is not an

 9   accrediting agency; correct?

10                MS. MCENROE:  Objection to

11          form.

12                THE WITNESS:  Correct.

13   BY MR. REIL:

14          Q.    And one of the things Dr.

15   Tulp was charged with in connection with

16   the irregular behavior, dealt with having

17   campuses in the United States; right?

18                MS. MCENROE:  Objection to

19          form.

20                THE WITNESS:  Giving us

21          false information --

22                MR. REIL:  False

23          information.

24                THE WITNESS:  -- about the
```

WILLIAM W. PINSKY, M.D.

1          campuses.

2    BY MR. REIL:

3          Q.    To your recollection, was

4    any other university president ever

5    charged with the same thing?

6                MS. MCENROE:  Objection to

7          form.

8                THE WITNESS:  Not to my

9          knowledge.

10   BY MR. REIL:

11         Q.    Did you ever ask, by you,

12   the ECFMG, did they ever ask for a

13   curriculum from the USAT?

14               MS. MCENROE:  Objection to

15         form.

16               THE WITNESS:  I don't know.

17   BY MR. REIL:

18         Q.    Did you or any of your

19   senior people ever visit the USAT?

20               MS. MCENROE:  Objection to

21         form.  Asked and answered.

22               THE WITNESS:  As I said

23         before, not that I know.

24   BY MR. REIL:

WILLIAM W. PINSKY, M.D.

Page 88

1          Q.    And why not?

2          A.    As I said before, I'm not

3    sure how to answer that question.

4          Q.    Okay.  You did say that.

5    I'll withdraw that question.

6                MR. REIL:  I think that's

7          all I have.  Let me just confer

8          with my superiors here and I think

9          that will be it.

10               (At this time, a discussion

11         was held off the record.)

12   BY MR. REIL:

13         Q.    To your knowledge, are there

14   other international schools of medicine,

15   of course, that have campuses in the

16   United States besides the USAT, which is

17   something that you allege?

18               MS. MCENROE:  Objection to

19         form.

20               THE WITNESS:  Not that I'm

21         aware of yet.

22   BY MR. REIL:

23         Q.    So presently, the only one

24   that you're aware of that has campuses in

WILLIAM W. PINSKY, M.D.

1    the United States is the USAT?

2            MS. MCENROE:  Objection to

3        form.

4            THE WITNESS:  From our

5        current knowledge, yes.

6            MR. REIL:  That's all I

7        have.

8            MS. MCENROE:  No questions

9        from us.  Thank you very much.

10           Thank you, Dr. Pinsky.

11           (Deposition concluded at

12       11:50 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

WILLIAM W. PINSKY, M.D.

Page 90

1             C E R T I F I C A T I O N

2

3         I, DANA M. JONES, Professional

4    Court Reporter and Notary Public, certify

5    that the foregoing is a true and accurate

6    transcript of the deposition held before

7    me at the time, place and on the date

8    hereinbefore set forth.

9         I further certify that I am

10   neither attorney nor counsel for, not

11   related to or employed by, any of the

12   parties to the action in which this

13   deposition was taken; further, that I am

14   not a relative or employee of any

15   attorney or counsel employed in this

16   case, nor am I financially interested in

17   this action.

18

19

20

21

22   _____

               DANA M. JONES

23

24

WILLIAM W. PINSKY, M.D.

Page 91

```
 1          INSTRUCTION TO WITNESS

 2

 3

 4       Please read your deposition over

 5   carefully and make any necessary

 6   corrections.  You should state the reason

 7   in the appropriate space on the errata

 8   sheet for any corrections that are made.

 9       After doing so, please sign the

10   errata sheet and date it.

11       You are signing same subject to the

12   changes you have noted on the errata

13   sheet, which will be attached to your

14   deposition.

15       It is imperative that you return

16   the original errata sheet to the deposing

17   attorney within thirty (30) days of

18   receipt of the deposition transcript by

19   you.  If you fail to do so, the

20   deposition transcript may be deemed to be

21   accurate and may be used in court.

22

23

24
```

WILLIAM W. PINSKY, M.D.

Page 92

1                ACKNOWLEDGEMENT OF DEPONENT

2

3

4            I, WILLIAM W. PINSKY, M.D., do hereby

5     certify that I have read the foregoing pages,

6     and that the same is a correct transcription of

7     the answers given by me to the questions

8     therein propounded, except for the

9     corrections or changes in form or

10    substance, if any, noted in the attached

11    errata sheet.

12

13

14

15    Date                _____

16

17

18

19

20    Subscribed and sworn to before me.

21    My commission expires _____.

22

23

24

WILLIAM W. PINSKY, M.D.

Page 93

```
 1              - - - - - - - -
 2              ERRATA SHEET
 3              - - - - - - - -
 4
 5       PAGE     LINE        CHANGE/ REASON
 6       _ _ _    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
 7       _
 8       _ _ _    _ _ _     _ _ _ _ _ _ _ _ _ _ _
 9       _ _ _
10       _ _ _    _ _ _     _ _ _ _ _ _ _ _ _ _ _
11       _ _ _
12       _ _ _    _ _ _     _ _ _ _ _ _ _ _ _ _ _
13       _ _ _
14       _ _ _    _ _ _     _ _ _ _ _ _ _ _ _ _ _
15       _ _ _
16       _ _ _    _ _ _     _ _ _ _ _ _ _ _ _ _ _
17       _ _ _
18       _ _ _    _ _ _     _ _ _ _ _ _ _ _ _ _ _
19       _ _ _
20       _ _ _    _ _ _     _ _ _ _ _ _ _ _ _ _ _
21       _ _ _
22       _ _ _    _ _ _     _ _ _ _ _ _ _ _ _ _ _
23       _ _ _
24       _ _ _    _ _ _     _ _ _ _ _ _ _ _ _ _ _
```

WILLIAM W. PINSKY, M.D.

**Exhibits**

**Pinsky 1**

**(**

**(1)** 65:21

**1**

**10** 36:12,13,15 37:24 38:11

**11** 37:23 39:14 80:24

**11/24** 22:13

**11/28** 22:17,19

**11:50** 89:12

**14** 60:24 62:13

**14th** 65:17 78:1

**15** 31:5

**16** 53:2

**17** 12:14 53:3

**1973** 8:11,16

**1st** 11:7

**2**

**2** 60:15 62:13 66:14 68:13 72:18 78:2

**2003** 31:6

**2016** 9:20

**2018** 15:5 50:18 60:24 62:13 71:21

72:1,2,4 78:4,5 80:19,24

**28** 50:18

**28th** 39:4 67:24 74:4

**3**

**3** 71:18,20 78:3 80:18

**36th** 13:8,12 42:17 62:10 77:6

**5**

**501** 30:10

**6**

**60** 43:10

**A**

**A-I-M-E-R** 30:3

**a.m.** 89:12

**ability** 58:10

**able** 10:18 32:5,17 58:16 77:9

**academic** 8:24

**access** 77:8

**accordance** 39:23 41:14

**account** 68:19

**accountability** 12:2

**accountable** 11:22,24 12:8

**accrediting** 86:9

**accrued** 59:3, 11

**accuracy** 46:20 67:6

**accurate** 79:10

**accurately** 79:15

**actions** 41:14

**activities** 19:12 33:4

**actually** 22:11 33:7 37:2 51:4 60:15 79:5

**address** 80:3

**Advancement** 30:8

**advice** 16:12, 14

**affidavit** 36:10, 16,17,24 37:7 38:1,17

**affidavits** 23:22 35:4,9, 19 37:1,20 39:7 66:21,24 67:7,15,18,23

**afield** 18:19

**afoul** 45:15

**after** 5:8 8:21 9:1 18:21 60:14 75:10 81:9

**afterwards** 63:3

**again** 46:19 64:16 77:13 80:18

**against** 20:11 39:23 63:22 64:10

**agency** 47:13 86:9

**ago** 20:19 31:15,18 36:2 43:10

**agree** 16:16

**agreement** 5:1

**ahead** 10:19

**airline** 38:13

**all** 5:4,18 8:5 9:16 11:13 13:18 30:3 31:16 32:13 34:20 53:12 64:8 73:1 88:7 89:6

**allegations** 23:17 39:22 41:9 61:8

**allege** 88:17

**alleged** 19:11 20:1 24:5 26:7 66:1

**allegedly** 32:12

**allowed** 7:17 54:4,14 67:22

**Almost** 39:16

**along** 7:3

**already** 7:9 50:19 60:3

**also** 12:19 28:22 38:18

**always** 45:10

**among** 82:14

**Andy** 13:3

**annual** 12:10

**another** 7:19 83:12 84:16,22

**answers** 7:10

**anybody** 33:22 86:6

**anyone** 30:17 32:4,16 33:7 34:2

**anything** 8:2 15:17 16:10 18:16 27:8 54:24 58:18 71:16

**anywhere** 21:11 33:8 64:20 73:12

**appeal** 48:6

**appear** 54:20

**appearance** 22:8 61:15 63:1

**Appellate** 76:16,21

**appended** 36:5

**applications** 42:2

**applied** 45:14

**apply** 41:16

**around** 30:15 31:6

**Arts** 72:6

**assigned**

33:16,22

associated 9:7

association
10:10 11:3

assume 15:13,
22 18:11,14
21:18 28:11
74:11,14,23
75:2,3 77:3

assuming 43:9

assure 14:14
79:14

Atlantic 85:9,
18 86:3

attend 32:5
33:2

Attendance
36:18

attended 35:6

attending
23:24 66:11

attention 15:7
19:24 37:23

Attesting
36:18

attorney 7:2,6
18:22 51:12,13

attorneys 7:2
39:6 53:22
55:20 58:10
59:16,24 61:12

audience 73:7,
11

authority 46:9

authorize 35:8

available 24:2
43:13

aware 10:13
15:3 20:16
23:5,21 24:20
32:4,22 34:11,
21 37:1 63:20
65:24 88:21,24

**B**

back 21:23
26:8 37:20
39:4 48:18,21

background
8:7

basically
30:10,13 57:7

became 10:13

become 11:3
15:2 23:5

Beetlestone
36:1

before 6:8 10:2
11:12 21:24
22:8,12 34:23
36:1,19,21
37:23 39:17
45:20 63:2
69:19 74:3
75:12 76:4
78:16 79:8
80:23 81:23,24
82:3 83:16
87:23 88:2

began 11:8

begin 6:8 8:6

beginning 78:2

behalf 57:10

behavior 20:8
39:22 40:2,13,
24 41:10,12,19

44:5,7,13,17,
21,24 45:4,5,7,
14,24 46:11
69:16 72:7
74:14 75:11
84:11,23 86:16

behind 69:13

being 37:2
43:6 73:19

believe 13:20
19:2,17 20:5
24:1,20 27:3
29:21 31:5
39:1 40:9,19
41:4 45:19
49:18 60:14
66:2,15,20
68:23 69:23
70:1 74:5 81:6,
8 86:1

besides 70:23
88:16

best 73:1

between 31:10
47:1 68:24

Bill 7:1

binder 56:2,17
58:4,11,23
59:15

bit 8:7

black 56:1,17
58:4 63:10
67:8

blank 36:16

blanking 85:12

board 9:13,15
11:17,23 12:3,
8,13,19,23
13:1,3,17,18
30:1 48:4,7,15

49:6,8,12 53:2,
11,21,23 55:7,
13,17,20 56:4

Boards 47:2,8,
9,13

book 42:19
63:10,17 67:8

bother 7:21

bottom 39:17
72:18

branch 65:22

break 65:8
77:19,21

brief 61:8

briefly 77:17

bring 39:22
41:8 54:4,24
67:22

brought 64:9

building 13:7
27:6 32:18
33:8 83:8,9,24
84:7

buildings 27:7

bulletins 27:21
64:21

burden 64:13,
22 65:3

**C**

c3 30:10,11

call 11:17

called 64:13

calls 16:2

came 9:19,21

20:18 21:24
37:20 43:6

campus 19:21
24:22 27:4,22
33:2 34:15
65:22

campuses
23:18 24:6
26:7 31:22
32:6,12 33:18
34:15 35:1
86:17 87:1
88:15,24

can't 8:1 31:13
47:20 49:6
50:5 53:21

capacity 10:12
14:1

Capital 30:2

capitalized
30:3

cardiologist
8:23 9:1

Caribbean
80:4,10

carry 14:9 60:6

case 63:22,23

CEO 9:8,23
11:9,11,17
12:19 13:22
14:1 60:5

certain 10:17
72:5,9 81:24
82:2,3

certification
5:3 42:3 50:8

certified 66:12

certify 47:18

WILLIAM W. PINSKY, M.D.

Index: CFO..direct

**CFO** 29:20

**chain** 29:12

**Chair** 13:2

**Chairman** 12:22,24

**challenge** 67:6

**charge** 85:9,14

**charged** 40:13, 23 84:11,23 86:4,15 87:5

**charges** 64:10

**charter** 43:3,4

**check** 33:17 34:3

**Cincinnati** 13:11,15

**cities** 83:1

**classes** 35:6

**client** 15:3 77:17

**co-sponsor** 72:24

**collated** 28:12

**Colorado** 32:14

**come** 9:6 10:17 15:6 19:24 46:16 84:21

**coming** 55:22

**command** 28:22 29:4,12

**comment** 46:24 75:19

**committee** 22:8,13 52:18

53:10,16 55:22 56:8,14 57:2,5 61:7,13,16,21, 24 62:15,24 63:2 64:12 68:8 75:10 78:19,20 79:17,19

**communicate** 82:6,12

**communicated** 16:10,13 23:8

**communication** 20:23 31:21

**communications** 54:19

**compilation** 5:11 36:4

**completed** 62:16

**complies** 36:14 60:21

**composed** 43:15

**concerning** 80:10

**concluded** 89:11

**confer** 88:7

**confident** 81:4

**connection** 72:7 86:15

**consideration** 61:13

**consisted** 8:16

**contacted** 9:10

**contacting** 82:18

**contained** 59:15

**conversation** 15:8,12,20,21 17:21 19:9,16 21:11 26:22 31:20,21

**conversations** 71:14

**Corrado** 15:23 17:3,24 18:20 19:9 21:4,7 70:16,23

**Corrado's** 21:3

**correct** 13:20 36:7 43:15 50:20 72:10 79:7 86:9,12

**corrected** 78:6

**correctly** 40:15 79:5

**correspondence** 59:22

**counsel** 5:1 15:15,18 16:11 29:24 65:5 71:14,17

**couple** 7:7 22:3 36:2 70:11

**course** 88:15

**court** 5:15 6:14,16 48:20 62:4,7 83:17

**Cover** 15:23 17:4 19:10 21:6,15 25:22 26:17 28:18 29:19 37:17 70:17,24 76:8

77:14 78:22

**covered** 60:3

**Credential** 61:7

**Credentials** 53:10 61:21,24 62:15 64:11

**culpable** 44:4, 7 45:24

**curious** 43:1

**current** 89:5

**Currently** 13:2

**curriculum** 87:13

---

**D**

**dated** 60:24

**dates** 66:16

**day** 22:23 56:15

**deactivate** 70:4

**deactivated** 68:20 69:3,12, 18,19

**deactivating** 69:5,9,14

**deal** 43:19

**dealt** 86:16

**December** 60:24 62:13 65:17 78:1

**decide** 49:14

**decision** 48:5 49:13 70:3,9

**deeds** 27:13

**define** 27:22

**defined** 64:20

**Dennis** 29:6

**department** 20:24 21:2,3,5, 8 25:20 71:8

**depending** 44:20

**deposition** 8:1 22:1,9 35:21 89:11

**depositions** 7:5

**depository** 42:23,24

**describe** 54:13 60:22 73:6

**describing** 33:1

**designated** 35:20

**details** 34:20 49:7

**determination** 75:11 81:9

**determine** 23:23 34:14

**determined** 45:8 72:4

**develop** 47:9

**different** 9:4 44:12,19,23 70:11 71:7

**difficult** 50:10

**direct** 26:22

29:16,18,22,23
37:22 47:7

**directed** 38:2
41:21,24

**directly** 82:13

**Director** 29:24

**directory**
72:23,24 74:2

**discusses**
74:13

**discussion** 6:4
63:3 64:12
65:11 78:15,
18,21 79:16
88:10

**distributed**
52:22

**divulge** 16:9

**doctor** 8:9
18:21 22:21
68:22

**doctors** 53:3,
12,17,18

**document**
38:10 40:14,
17,20,22 41:4
42:9 43:5,10
80:10

**documentation**
38:12 40:3
61:15 62:23
63:16

**documents**
5:12 18:20
22:2 27:21
36:5 38:18
43:18 46:21
47:14 51:21,24
52:5,21 55:18
61:11 63:9

64:21

**done** 7:6

**Donohue** 29:6,
7,17,18

**down** 7:12
32:17 33:17
38:10 65:14
66:6 80:19

**draft** 78:9,11,
24 79:2,5 80:9

**duly** 5:9

**during** 56:14
66:11

**duties** 11:16

---

**E**

---

**e-mail** 18:11,14
21:12

**easy** 11:18

**ECFMG** 9:7,14,
18 10:2,10,14,
18,22 11:1,13,
18 13:13 36:16
39:18,21,24
41:6,7,15 42:3,
9,21 43:11
44:1,3 46:22
47:12,18 48:14
49:13 50:9
59:5 64:9,21
65:20,21 66:9
68:8,17 69:1
72:4,8 76:16,
20,23 80:19
84:12 85:22
86:8 87:12

**ECM** 23:5

**education**
30:9,12,13

53:9

**educators**
30:15

**efficient** 77:11

**efforts** 34:13,
21 79:9

**either** 17:22,24

**elaborate** 12:9

**electronic**
18:10,13 42:23
68:24

**employed**
11:13 13:17

**employee**
10:11 11:2,23
26:17

**employees**
14:15 23:16
24:15

**employment**
11:8

**EMSWP** 68:19

**enclosed**
76:16

**end** 76:14

**ended** 78:2

**engaged** 9:9
40:2 72:6

**enlighten** 29:9

**enough** 12:18
58:1

**enrolled** 19:19

**ensure** 79:9

**essentially**
63:9

**establish** 60:4

**established**
50:19

**estimate** 7:15

**even** 9:13
63:15 81:10

**evidence**
52:12,13 56:18
57:6

**exact** 42:7

**exactly** 23:12
69:24 85:3

**EXAMINATION**
6:22

**examine** 49:13

**examined** 5:10

**except** 5:5

**exception** 49:9

**Exhibit** 5:13
6:19

**exhibits** 6:18

**expand** 48:24

**expect** 42:6

**expectations**
12:3

**explain** 30:5
61:2 68:21
72:20 75:1

**explained**
63:19

**explains** 43:6

**extent** 16:2

---

**F**

---

**F-A-I-M-E-R**

83:20

**fact** 80:22
81:14

**facts** 16:12

**faculty** 9:3

**FAIMER** 30:2,6
83:13,14 84:3

**fair** 14:21
28:21 34:1
45:13 47:17
57:10,17 63:5

**false** 65:20
66:1,2 72:8
86:21,22

**familiar** 14:22

**far** 18:18 28:2
63:19

**feel** 8:2

**fellowship** 9:2

**few** 61:18
83:22

**field** 73:6

**Filak** 13:3,6,16

**file** 28:5,7
44:18

**filing** 5:2

**filled** 40:14
67:23

**find** 9:9 46:9
76:9

**finding** 8:6
34:24 69:15

**findings** 75:19

**finds** 44:4

**finish** 80:17

WILLIAM W. PINSKY, M.D.

firm 9:9

first 9:17 10:9, 21 36:10 62:14 66:8 68:11,12

Florida 32:14, 17 33:2,8,17, 23 34:3 65:23

follow 14:15

following 22:7 61:14

follows 5:10

foreign 45:23 47:18,19 48:14 50:7

form 5:5,21 8:19 10:4 11:6, 20 14:3,12 17:7,14 18:3, 24 19:14 20:3, 14 21:17 22:15 23:10,20 24:11 25:4,16 26:1, 12 27:2,17,24 28:24 29:15 30:20 31:12 32:1,8,20 33:11,20 34:6, 18 35:13 37:9 38:5,20 39:9 40:8,17 41:2, 23 42:15 43:6, 22 44:9 45:2, 18 46:2,13,18 47:5,23 48:9 49:4,17,23 50:14,24 51:16,23 52:8, 16 53:5 54:7, 16 55:3,10,16 56:11,20,24 57:12,20 58:13 59:1,18 60:9 61:4 62:21

63:12 64:2,15 65:1 67:2,10 68:2 69:7,22 70:15 71:3 72:15 73:9 74:22 75:14 76:2,11 77:2 78:24 79:2,12 80:6,13 81:2, 18 82:9,21 84:14 85:1,24 86:11,19 87:7, 15,21 88:19 89:3

formal 11:3 23:5,13

format 52:18, 20 57:2,4

formed 43:11

found 41:18 44:7,17 45:6, 11,23

Foundation 30:7

four 65:15

France 83:1

Frank 13:5

front 36:6 53:16

full 9:3 24:14 53:2

function 43:7

functions 14:8

furnished 39:6

further 66:7

G

G-U-S-I-C 62:6

gathered 58:7

general 29:24 73:4,5

generally 14:19 41:17

getting 16:11

give 8:1,14 11:15 17:4 29:11 41:20 49:7 80:2

given 58:10

gives 75:18

Giving 86:20

goals 8:21

gone 12:16

good 12:18 58:1 65:7

graduate 47:19 50:7

graduated 8:10 19:2

graduating 8:21

Group 15:14 28:16,17,19 37:15 76:5 77:12 78:12,14

guess 7:7,13, 14,23 43:8 49:24 60:2

guessing 59:21

guilty 41:19 46:11

Gusic 62:3,4,9

H

happen 49:20

happening 26:19 50:4

hard 7:12

having 5:9 26:21 86:16

head 7:11 21:4 28:18 29:19 44:3 61:23 79:20 84:2

headquarters 13:13

heads 37:17

hear 18:12 59:8

heard 7:9,20 10:22 31:19,20

hearing 6:11 22:12 23:2 36:1 39:3 50:17,22 51:5, 6,8,21 52:3,6, 22,23 53:3 54:5,14,21 55:8,14 56:7 58:15 60:14 63:6 67:8,15, 24 69:20 70:5 71:15 74:4,12, 20 75:6,17 76:24 81:23

hearings 57:17 64:23

held 6:5 65:12 88:11

here 52:14 88:8

hesitating 16:5,7

hire 23:16

hired 11:8 24:6,21,24 25:6,12,18

history 85:21

holds 66:3

hotels 33:5

hour 65:6

HR 29:20

hypothetically 44:2

I

I-L-A-K 13:5

idea 25:11 29:11 41:20 69:13

identical 6:10

identification 5:13 6:19

identify 61:1

illegal 17:5 19:12

improve 30:13

incident 20:9

include 29:19

including 83:1

independent 48:5

index 36:5,11

indicates 40:1

WILLIAM W. PINSKY, M.D.

Index: individual..may

**individual** 44:16 45:6,15 85:6

**individual's** 85:4

**individuals** 32:22 42:1 67:19,23 73:12,14,16,18 82:23

**inform** 15:9

**information** 16:3 19:11 24:2 28:14 40:1 64:8 65:20 66:1,3, 10,18,23 67:18 72:8 86:21,23

**informed** 56:12

**infractions** 20:1

**initials** 9:16

**initiated** 15:8

**initiation** 20:8

**Injunction** 35:24

**input** 58:22

**insider** 73:6

**inspections** 35:3

**instance** 70:13

**instructions** 7:5

**intention** 81:8

**interest** 9:11

**interested** 73:13 82:17

**interface** 68:24

**international** 16:22 30:8,12 88:14

**internet** 73:24

**interrupting** 10:20

**intervals** 71:11

**into** 19:20 39:15 43:6 44:18 52:12,13 56:18 58:23 63:23 70:21 71:12,22

**introduce** 52:11

**introduced** 51:21 52:6

**investigate** 23:17

**investigation** 23:6,13 24:4 26:19 28:10 70:21 71:1,11

**investigative** 28:9

**investigators** 24:8,19

**invited** 51:2,7

**involved** 30:11 42:1

**irregular** 20:8 39:22 40:2,13, 24 41:9,12,19 44:4,7,13,17, 21,24 45:3,4,7, 14,24 46:11 69:16 72:7 74:14 75:11

84:11,23 86:16

**issue** 16:20

**issues** 59:10

**italics** 80:20

**J**

**JD** 18:21

**job** 11:16 14:22 35:11,15 60:5 73:19

**John** 84:4

**join** 9:17 11:1

**Judge** 36:1

**July** 9:20 11:7

**Juris** 18:21

**K**

**kept** 28:10 42:13

**knew** 10:16

**knowledge** 30:16 34:13 37:6 66:22 70:19,22 73:1 84:9 87:9 88:13 89:5

**L**

**last** 39:16 50:3 68:7,10,15 74:17 76:14

**launched** 23:5

**law** 19:2,5

**lay** 47:3

**leadership** 14:15 15:14

**leading** 70:20

**leave** 53:19

**lecture** 32:6

**legal** 16:12,14

**legislation** 47:11

**legitimacy** 46:20

**let** 21:23 31:7 39:14 60:15 65:8 74:16 80:17 88:7

**letter** 20:20,22 22:6 60:13,23 61:6,19 62:13 65:15,16 77:24 78:2,23 79:6, 10,14 80:21

**level** 71:5

**levels** 71:7

**like** 7:12 8:3 13:5 14:23 24:18 36:11 42:20 43:2 52:13

**likely** 25:22 75:21 76:8

**line** 65:14

**list** 53:15

**listing** 61:9

**lists** 73:1

**litany** 7:19

**little** 8:6 9:16

21:22 29:11

**located** 32:12 66:4 82:7,17

**locations** 32:14

**long** 8:8

**looking** 6:1 34:23 36:9

**lot** 7:4 57:17 58:5

**Louis** 8:13

**M**

**made** 34:13,22 53:11 70:3,9 75:10 81:10

**make** 26:7 48:4 49:8 57:9 63:7, 14 75:7 79:9

**management** 29:20

**many** 12:12 33:3 53:2,8 67:17

**marked** 5:12 6:18

**Market** 13:8,12 42:17 62:10 77:7

**material** 35:23 55:21 58:5,7, 11,23 59:3,15

**matriculation** 66:17

**matter** 50:9

**may** 34:10 35:2 40:18 60:2

| | | | | |
|---|---|---|---|---|
| **maybe** 9:14 35:19 36:12 41:19 42:23 53:2 | 84:13,24 85:23 86:10,18 87:6, 14,20 88:18 89:2,8 | **memorialized** 21:11 | **need** 6:14 | 49:3,16,22 50:13,23 51:15,22 52:7, 15 53:4 54:6, 15 55:2,9,15 56:10,19,23 57:11,19 58:12,24 59:17 60:8 61:3 62:20 63:11 64:1,14,24 67:1,9 68:1 69:6,21 70:14 71:2 72:14 73:8 74:21 75:13 76:1,10 77:1 79:11 80:5,12 81:1, 17 82:8,20 84:13,24 85:23 86:10,18 87:6, 14,20 88:18 89:2 |
| **MCENROE** 5:17,20 6:6 8:18 10:3 11:5, 19 14:2,11 16:1,8 17:6,13 18:2,23 19:13 20:2,10,13 21:16 22:14 23:9,19 24:10 25:3,15,24 26:11 27:1,16, 23 28:23 29:14 30:19 31:11,24 32:7,19 33:10, 19 34:5,17 35:12 36:3 37:8 38:4,19 39:8 40:7,16 41:1,22 42:14 43:21 44:8 45:1,17 46:1, 12,17 47:4,22 48:8 49:3,16, 22 50:13,23 51:15,22 52:7, 15 53:4 54:6, 15 55:2,9,15 56:10,19,23 57:11,19 58:12,24 59:17 60:8 61:3 62:20 63:11 64:1,14,24 65:5 67:1,9 68:1 69:6,21 70:14 71:2 72:14 73:8 74:21 75:13 76:1,10 77:1, 18 79:11,21 80:5,12 81:1, 17 82:8,20 | **mean** 11:17 23:12 24:7,14 28:6 41:17 43:4,18 44:5,6 52:11 75:2 **means** 10:6 56:22 68:22 **mechanism** 49:1 **media** 35:3 **medical** 8:2,9, 10,15,22 10:14 16:20 30:8,12, 13,14 36:18 41:18 45:23 46:3,6,10 47:2, 8,9,18,19 48:14 50:7 53:9 66:4 68:17 72:23 73:2,13,15 80:4,11 **medicine** 47:20 50:11 85:10 88:14 **meeting** 12:2 55:23 56:5,14 79:17,19 **member** 9:24 10:2,6 11:1 61:21 **members** 13:17,18 **Membership** 53:10 **memo** 17:5 80:10 | **memos** 17:23 **mention** 7:8 **mentioned** 20:19 32:15 34:22 **mentoring** 30:14 **Miami** 65:22 **might** 8:7 59:21 71:19 73:20 **mind** 84:21 **missing** 37:3 **mission** 43:13, 14 **moment** 12:15 60:19 **moniker** 6:11 **Montserrat** 30:18 66:5 **more** 11:3 25:9 27:8 33:15,16 77:11 **Mostly** 53:17, 18 **much** 89:9 **N** **N-O-R-C-I-N-I** 84:5 **name** 15:20 18:22 83:12 85:11,12 | **never** 26:13 33:21 **next** 39:16 68:7,10 **nods** 79:20 **nonphysicians** 53:20 **Norcini** 84:5 **notation** 44:18 **noted** 76:15 **notified** 65:21 **November** 39:4 50:18 67:24 74:4 **O** **object** 16:1 58:10 **objection** 8:18 10:3 11:5,19 14:2,11 17:6, 13 18:2,23 19:13 20:2,10, 13 21:16 22:14 23:9,19 24:10 25:3,15,24 26:11 27:1,16, 23 28:23 29:14 30:19 31:11,24 32:7,19 33:10, 19 34:5,17 35:13 37:8 38:4,19 39:8 40:7,16 41:1, 22 42:14 43:21 44:8 45:1,17 46:1,12,17 47:4,22 48:8 | **objections** 5:5, 18 **obtain** 40:1 50:8 **obtained** 66:19 **occur** 44:20 **occurred** 33:4 78:19 **occurs** 49:2 **off** 6:3,5 12:15 65:10,12 77:19 88:11 **office** 77:7 **offices** 42:16 **official** 72:5,9 84:16 85:8,17 **officials** 46:4, 6,10 86:2 |

WILLIAM W. PINSKY, M.D.

**often** 49:20

**one** 6:13,15 7:2,23 10:23 12:15 14:8 17:12,19 22:6 25:8,10 32:6 33:16 37:16 64:22 68:8,9 70:11 71:21,24 72:2 80:19 83:22 85:17 86:14 88:23

**only** 85:20 88:23

**operate** 65:22

**operating** 16:21 73:2

**operation** 17:5

**operations** 14:6 15:14 20:24 21:1,5,8 25:19 28:16, 17,19 37:15 58:8 70:7,8,12 74:8 76:5 77:12 78:12,13

**opinion** 76:7

**opportunity** 33:1 54:20,24 57:9 67:6 75:18

**order** 22:9

**organization** 12:5 14:7,10, 16,24 23:16 24:9,13 25:1 26:8,18 27:22 28:4 29:13 30:17 31:10,20 32:5,17,23 34:14 37:7

43:2,3,15,19, 20 44:3 45:16 46:9 47:1 54:13 59:12 60:7 63:21 73:4 74:19 75:20

**organizations** 43:12 82:15

**Orien** 72:10

**outcome** 74:12 78:20 79:16

**outside** 24:6,7 25:2,5 43:17, 18,19

**over** 7:22 51:18 60:19

**overall** 12:4

**override** 49:14

**oversee** 14:6

**own** 48:5 73:5

**P**

**packet** 6:17

**paper** 52:13

**paragraph** 39:17 66:8 68:7,10 76:15

**parent** 19:17 20:20 23:8 31:22

**parenthesis** 68:19

**part** 9:14 14:22 38:11 40:4 59:8 60:4

**participated** 62:24 63:1

**particular** 20:9 70:20 81:11

**particulars** 78:16,19

**partnership** 82:14 83:14 84:3

**partway** 15:4

**passport** 38:13

**pediatric** 8:23, 24

**people** 12:12 23:16 24:6,7,8, 12 53:11 58:8 70:12 71:6 74:8 87:19

**performance** 12:4,11

**Perhaps** 29:8

**periods** 66:11

**person** 13:1 15:21 25:2,5,9, 10,17 26:6 29:21 33:16 41:18 44:4 47:3 50:10 70:20 75:21 84:2

**personal** 37:6

**persons** 45:22

**pertinent** 28:9

**Philadelphia** 83:2,4,7

**phrasing** 10:1

**physically** 34:3

**physicians** 10:17

**pictures** 27:11

**Pinsky** 5:8 7:1 77:24 89:10

**Pinsky-1** 5:14 6:9,12,20 35:20 60:15

**place** 81:9

**placed** 72:13 74:3,18 75:5,9, 22,24 76:9 80:23 81:7,11, 15,16,20,23,24 82:3,4,19

**plus** 43:10

**point** 23:4,15 24:21

**policies** 14:9, 16,23 39:24 45:15 49:6 60:6

**policy** 15:9 41:15 42:11, 12,21 47:10

**portal** 68:18 69:5 70:4

**position** 9:19, 22

**positions** 13:19

**possible** 15:9

**possibly** 26:2 38:12

**post-graduate** 73:17

**posted** 73:23

**potentially** 46:10

**power** 43:7

**powers** 43:20

**practical** 50:9

**practice** 8:16 10:18 47:20 50:11

**present** 8:17 22:12 23:1 54:4 55:7,13 78:22

**presentation** 32:24 80:3

**presentations** 34:24

**presented** 35:24 78:14

**presently** 88:23

**president** 9:23 11:9,11,16 13:22 30:2 31:3 60:5 84:4, 10,20,22 87:4

**primarily** 63:16

**primary** 47:14

**prior** 9:8 19:23 20:7,8 31:14 52:2,22 55:22 56:5 67:15 70:4 71:14 72:17 74:19 75:6

**private** 24:7,18

**privileged** 16:3

**probably** 15:4, 15 42:10 54:18

WILLIAM W. PINSKY, M.D.
Index: problems..residency

74:6,9

problems 8:2

procedure 57:16 76:17, 21,24

procedures 39:24 67:21

proceeding 57:8

process 40:4 42:2 48:6 61:9

project 29:20

prominent 70:24

proof 64:13,22 65:3

property 27:14

prospective 19:18

prove 63:21,23

provided 46:21 65:19

providing 61:10 72:8

purpose 16:11 56:9 58:14 69:4,8

purposes 35:21

put 6:11 44:18 50:6 52:12,13 58:21

pyramid 29:10

Q

qualification

34:1

question 5:6 7:17,18 18:18, 19 20:19 31:2, 8 38:22 48:11, 18 68:16 74:17 88:3,5

questions 52:23 58:16, 17,18 60:20 61:18 89:8

quibble 51:17

quote 42:7

quoting 41:7

R

raise 58:16,17

read 6:7 39:14 40:12 48:17,21 71:22 72:13 73:23 74:18 79:13 80:20

really 71:4

reason 7:24

recall 16:19 17:8,19,20 18:5,7,15 19:10,15 39:5 52:10 54:9 79:3 80:15 85:21 86:6

receive 17:11 18:8 71:10,13

received 17:23 31:19 55:18 56:4

receiving 17:9, 19 18:5,15

recognized 47:12

recollection 87:3

record 6:3,5 7:13 35:23 36:4 39:15 48:21 60:23 61:1 65:10,12 71:23 72:21 77:20 79:22 88:11

records 28:11

recruited 73:19

redacted 67:19

refer 40:5

reference 28:12 66:13,16

referring 65:19

reflected 79:15

regard 19:24

regarding 80:3

regular 71:11

regulation 54:12

regulations 47:10

Reil 5:19 6:2,8, 24 7:1 9:5 10:7 11:10 12:6 14:4,17 16:16, 23 17:10,17 18:6 19:4,22 20:6,11,17 21:20 22:18, 20,24 23:14 24:3,17 25:7, 21 26:3,15 27:9,19 28:1

29:2,3 30:4,23 31:17 32:3,10 33:6,14,24 34:8,9 35:7,16 36:7,8 37:13 38:8,23 39:10 40:10,21 41:11 42:4,18 43:24 44:14 45:12,21 46:5,14,23 47:16 48:2,12, 17,23 49:10,19 50:2,16 51:3, 17,19 52:4,9, 19 53:7 54:10, 22 55:6,12,24 56:16,21 57:3, 14,24 58:20 59:6,19 60:11 61:17 62:8 63:4,18 64:5, 19 65:9,13 67:4,12 68:5 69:10 70:2,18 71:9 72:19 73:21 74:24 75:15 76:6,13 77:4,16,23 79:18 80:1,8, 16 81:5,21 82:10 83:3,19 84:18 85:5 86:5,13,22 87:2,10,17,24 88:6,12,22 89:6

relationship 31:4,9,16 47:1, 7

relative 52:24

remain 68:20 69:12,17

remains 69:2

remember

15:20 22:4 26:21 39:12 50:4,5 53:14, 21 55:5 58:4 69:24

remiss 21:23

repeatedly 34:7

rephrase 31:7

report 17:4,21 26:8,14

reporter 5:15 6:14,16 48:21 62:4,7 83:17

reports 28:9 29:17,18,22,23 71:10,13

Repository 28:8

represent 35:22

representation 52:2

request 43:11

requested 23:22 35:5 48:22

requesting 38:12

requests 38:18

Research 30:9

reserve 5:17

reserved 5:7

reserves 39:18,21 41:7, 8

residency 9:2

WILLIAM W. PINSKY, M.D.

respect 40:3

response 48:18

responsibility 12:1 14:14 73:17

responsible 11:22

retiring 9:8

review 12:10 22:1 61:7,14 62:16,19 63:8 78:23

reviewed 24:1 26:6 55:21 62:22 75:10

reviewing 64:8

roughly 53:8

rules 54:12 76:16,20,24

runs 45:15

**S**

said 13:21 15:19 17:18 18:13 32:18 33:9,21 37:4 38:2 45:20 48:15 73:23 87:22 88:2

Saint 8:13

same 35:23 41:3 55:18 87:5

sanction 44:6

sanctions 44:19 45:8,9, 10,11

save 29:8

saw 26:13 27:5 32:23

say 7:17 9:15, 21 11:18 12:7 14:21 20:9,18 24:23 26:18 28:21 40:23 42:8 47:17 62:15 63:5 65:9 74:9 75:2 78:13 85:2 88:4

saying 37:3 49:12 75:8

says 36:15,16, 17 39:2,17 65:15,18 66:7, 9 68:17 69:2, 17 71:21 72:17 76:15

school 8:11,22 10:14 16:20,22 19:3,5,20 23:24 36:18 46:3,6,10 66:4 68:18,24 73:14,15 85:9

schools 72:23 73:2 80:4,11 88:14

Science 72:6

sealing 5:2

search 9:9

second 28:22 29:4

Secretary 30:1

section 59:14

seeking 16:14

seen 36:19,21

senior 70:12 84:16 87:19

sent 22:7 37:11,14 52:1 55:19 60:13

sentence 62:14 68:15 71:21 72:3,17 73:22 74:17 75:22 80:18,20 81:14

separate 30:9

September 80:24

several 9:4 18:20 43:12 57:23

shakes 7:11

short 77:21

shorter 9:16

should 7:8,24 21:22 36:12 39:24 74:18 75:5

sign 6:7

signed 78:7,17 79:8

since 35:17,18 63:5

single 11:23 44:11

sit 84:20

situated 82:24

situation 64:4, 7

sizing 12:17

sketch 8:15

social 35:2

somebody 24:21,23,24 25:19 27:4 77:10 78:16

somehow 49:13

something 42:19 88:17

sometime 9:15

somewhere 15:4 18:15 42:11 44:22 54:12

sorry 10:19 62:5 79:24

sort 17:4 20:22 36:11 42:8 78:15

source 47:14 66:23

speak 26:16 31:14

speaks 40:17, 20 41:4

Specifically 65:18

specified 44:23

spell 13:4 83:23

spoke 36:23

staff 23:24

stand 78:6

started 31:6

starting 29:9

starts 68:8 71:24

State 47:2,8,9, 13 48:4,7,15 49:6,8,12

stated 42:8

statement 42:11 43:13,14 45:13 57:9,10, 18 63:7,14 81:11

statements 42:13,21

states 16:21 19:21 23:18 24:5 31:23 33:9 34:16 41:6 47:21 50:11 86:17 88:16 89:1

stay 37:24

step 75:18

stipulations 5:16,24

strike 26:5 69:3 74:15

student 19:18 47:19 48:14 50:7

students 23:23 35:5 37:12 38:2 40:6,12, 23 45:23 66:10,16

submitted 40:4 56:18 57:6 59:16,23

WILLIAM W. PINSKY, M.D.

Index: subsidiary..visit

subsidiary 30:10

substantively 16:9

successor 9:10

summarizes 61:6

summary 11:15

superiors 88:8

supplied 67:14

Swate 7:3

sworn 5:9


**T**

take 19:8 36:12 39:13 60:2,12, 18 62:12 65:7 71:18 77:19

taken 77:22

talk 10:8 58:19 77:17

talked 35:1 75:23

talking 16:24 23:7 31:5 35:9, 17,18 51:4 63:8 65:16 81:15

talks 66:9

Technology 72:6

telling 40:12

term 27:22 41:13

terminology 64:17 65:3

terms 12:3 44:5 58:18 61:10 82:17

testified 5:10 63:6

testify 16:15 50:21 51:5,8,9, 11

testimony 36:24

Texas 32:14

than 5:20 9:16 23:7 25:9 27:8 33:15,16 45:22 66:24 84:21

their 44:18 48:5

thing 87:5

things 7:11,15, 19 28:9 57:6 83:22 86:14

three 65:15

through 7:4 10:18 12:16 15:5 34:22,23 39:5 47:11 58:9 59:4,7,9, 10

thumbnail 8:15

Thursdays 36:2

tickets 38:13

time 5:7,11,21 6:4,17 9:3 11:4 19:23 24:14 29:9 48:20 50:3 65:7,11

66:11 77:21 88:10

title 84:17 85:4

today 8:1 22:1, 10

told 15:18,24 16:19 19:19 71:17

Tommy 7:3

top 29:10 36:15,17 71:20

training 30:14 73:18

transcript 5:3

transition 12:17

trial 5:7,22 64:4,17

true 48:1,3 67:17

trust 14:20

trying 53:14

Tulp 7:3 15:3,6 17:24 20:12 22:7,17 23:6 26:20 28:5 31:10 32:24 39:3,5 50:18 51:1,7 52:1 54:3,19 55:19 57:8 58:9,22 59:16,24 60:13,24 61:11 63:7,14,20,22 64:10 65:20 67:5,22 70:21 71:12 72:10 75:18 84:21 85:16 86:15

Tulp's 22:12 55:8,14

two 12:15 20:19 31:18 85:20 86:2

two-and-a-half 31:14 57:22

two-page 78:1

two-thirds 38:10

type 44:20

types 44:12,23


**U**

under 67:21 83:11,12,13

underneath 29:5

understand 7:16,18 38:7 48:11 75:7 79:4

understanding 33:3

United 16:21 19:21 23:18 24:5 31:23 33:9 34:16 47:21 50:11 86:17 88:16 89:1

universities 9:4

university 8:13 31:6 72:5 84:10,19,22 85:9 86:3 87:4

unrelated 16:13

until 5:7,21

USAT 17:1 18:1 19:12,23 23:6 24:5 28:12 30:18 31:3 32:18 33:9 34:14 38:3 40:6 65:21 66:3,11, 17 70:21 71:12 87:13,19 88:16 89:1

use 23:16

used 6:10 37:2, 7 41:13 64:18 65:4 66:24

Usual 5:15

usually 47:11


**V**

varied 73:11

variety 71:7

various 42:21 83:1

verbal 7:11

verification 47:15

verifies 47:14

verify 14:20 82:18

video 34:24

violation 15:10

visit 24:21 30:17 87:19

WILLIAM W. PINSKY, M.D.

visited 27:4

voluntary 13:18

**W**

waiting 74:11

waived 5:4

want 7:13,14, 15 15:17 18:18 35:19 37:22 42:6 60:1 71:16 75:6 77:17

wanted 58:19

way 18:17 27:20 38:10 50:6 58:21 61:9,20 75:4

WDMS 72:22 73:5,7,24 74:19 75:6,24 80:23 81:7,16 82:6,13,24 83:11

WDOMS 72:13, 21

web 68:18 70:4 73:24

went 58:23

Whatever 22:22

whether 63:20, 21 82:4

whole 23:2

whom 15:11

will 6:6 64:10 68:19 69:11,17

88:9

WILLIAM 5:8

wish 49:9

withdraw 88:5

within 28:15,17 70:12 75:20

witness 6:13 8:20 10:5 11:7, 21 14:13 16:6, 18 17:8,15 18:4 19:1,15 20:4,15 21:18 22:16,22 23:11,21 24:12 25:5,17 26:2, 13 27:3,18 29:1,16 30:21 31:13 32:2,9, 21 33:12,21 34:19 35:14 36:14 37:10 38:6,21 40:9, 19 41:3,24 42:16 43:23 44:10 45:3,19 46:3,19 47:6, 24 48:10 49:5, 18,24 50:15 51:1,2,8,14,24 52:17 53:6 54:8,17 55:4, 11,17 56:12 57:1,13,21 58:14 59:2 60:10,21 61:5 62:5,22 63:13 64:3,16 65:2 67:3,11 68:3 69:8,23 70:16 71:4 72:16 73:10 74:23 76:3,12 77:3 79:13,20,23 80:7,14 81:3,

19 82:22 83:15 84:15 85:2 86:1,12,20,24 87:8,16,22 88:20 89:4

witnesses 50:21 51:5,11 54:4 55:1,8 63:6

word 14:23 43:2

words 61:2

work 10:24 13:7,10 47:3 56:13 62:9 82:23 84:6

worked 24:24

working 24:9, 13 59:4,7,9,10

works 21:7 29:12

world 30:15 72:22 73:2 74:2

writing 21:12 44:23

written 17:4,21 76:20,23

wrong 13:21

**Y**

year 78:1,5

years 31:5,15, 18 43:10 57:22

yet 81:12,20 82:4 88:21

yourself 29:10

Youtube 32:23 34:23

# DEPOSITION
# PINSKY-1



Dr. Tulp v. ECFMG and Dr. Pinsky
Docket No: 2:18-cv-05540-WB

## PLAINTIFF'S PROPOSED EXHIBITS

|                                                                              | PAGE |
|------------------------------------------------------------------------------|------|
| Acronym Sheet                                                                | 1    |
| (Exhibits A-F from Complaint)                                                |      |
| Exhibit A: Letter of 12/14/18 from Dr. Pinsky To Dr. Orien L. Tulp           | 2    |
| Exhibit B: World Directory of Medical Schools Printout on USAT               | 4    |
| Exhibit C: Agreement between USAT and the Government of Montserrat           | 5    |
| Exhibit D: ECFMG Affidavit Attesting to Medical School Attendance            | 10   |
| Exhibit E: Letter of 11/21/18 from Ms. Kara Corrado to Dr. Tommy Swate       | 12   |
| Exhibit F: Letter of 10/18/18 from Lisa L. Cover to Dr. Orien L. Tulp        | 14   |
| Exhibit G: (Letters from Kara Corrado, Esq.)                                 |      |
| Letter of 11/27/18 to Dr. Tommy Swate                                        | 18   |
| Letter of 11/25/18 to Dr. Tommy Swate                                        | 19   |
| Letter of 10/18/18 to Dr. Orien L. Tulp                                      | 21   |
| Letter of 11/14/18 to Dr. Tommy Swate                                        | 23   |
| Letter of 10/26/18 to Dr. Tommy Swate                                        | 28   |
| Letter of 9/14/18 to Dr. Orien L. Tulp                                       | 31   |

# EXHIBIT A

Dr. Tulp v. ECFMG and Dr. Pinsky
Docket No: 2:18-cv-05540-WB
**Acronym Sheet**

- USAT is University of Science, Art, and Technology

- ECFMG is Education Commission for Foreign Medical Graduates

- USMLE is United States Medical Licensing Examination

- WDOMS is World Directory of Medical Schools



**ECFMG®**

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

3624 Market Street
Philadelphia PA 19104-2685 USA
215-386-5900 | 215-386-9767 Fax
www.ecfmg.org

PERSONAL AND CONFIDENTIAL
VIA EMAIL: o.tulp@usat.edu

December 14, 2018

Dr. Orien L. Tulp
Professor and President
University of Science, Arts & Technology (USAT) Faculty of Medicine
Main Campus
S. Mayfield Estate Drive
Olveston
MONTSERRAT

Dear Dr. Tulp:

I am writing to inform you that the ECFMG Medical Education Credentials Committee ("ECFMG Committee") has completed its review of the allegation that you, individually and in your capacity as an official of University of Science, Arts & Technology (USAT) Faculty of Medicine, Montserrat, engaged in irregular behavior in connection with providing false information to ECFMG. Specifically, you provided false information to ECFMG when you (1) notified ECFMG that USAT does not operate a branch campus in Miami, FL and (2) certified to the attendance dates of several USAT students and graduates when ECFMG has information that these students were not attending USAT during some of the time periods to which you certified.

In advance of the review, the members of the ECFMG Committee were provided with the documents listed in ECFMG's October 18, 2018 letter and ECFMG's November 14, 2018 emails. A hardcopy of the complete file was also sent to your attorney, Mr. Tommy Swate, on November 16, 2018 via Federal Express. On November 16, 2018, Mr. Swate acknowledged receipt of this complete file. You made a personal appearance before the ECFMG Committee accompanied by your legal counsel, Mr. Swate. A copy of the transcript of the proceedings will be sent to you as soon as it is available.

The ECFMG Committee considered the documentation presented to it and Mr. Swate's statements. Following careful review, the ECFMG Committee determined that you engaged in irregular behavior in connection with providing false information to ECFMG.

The ECFMG Committee has determined that ECFMG will not accept any documents signed / certified by you for ECFMG on behalf of USAT, or any other medical school, for a minimum of five years from today; thereafter, the prohibition shall end only upon a petition to ECFMG conclusively demonstrating to the satisfaction of the ECFMG Committee a familiarity with, and willingness to adhere to, ECFMG polices. Your ECFMG Medical School Web Portal (EMSWP) account will remain deactivated.

In light of the ECFMG Committee's findings, the ECFMG Sponsor Note for USAT in the *World Directory of Medical Schools (World Directory)* will be updated as follows:

2

ECFMG® is an organization committed to promoting excellence in international medical education.

Dr. Orien L. Tulp
December 14, 2018
Page 2 of 2

> *In 2018, ECFMG determined that a certain official of the University of Science Arts & Technology engaged in irregular behavior in connection with providing false information to ECFMG.*

This note will remain in USAT's ECFMG Sponsor Note in the *World Directory* for five years, regardless of whether USAT changes its name, ownership, and/or location.

Additionally, in accordance with the ECFMG *Policies and Procedures Regarding Irregular Behavior*, a permanent annotation that you engaged in irregular behavior will be included in your ECFMG record. ECFMG may report the ECFMG Committee's determination of irregular behavior to the Federation of State Medical Boards of the United States, U.S. state and international medical licensing authorities, directors of graduate medical education programs, and to any other organization or individual who, in the judgment of ECFMG, has a legitimate interest in such information.

As noted in the enclosed ECFMG *Rules of Appellate Procedure*, decisions of the ECFMG Medical Education Credentials Committee may be appealed within the 30-day time period specified.

Sincerely,

William W. Pinsky, MD FAAP FACC
President and CEO

CC: Tommy Swate, Esq. swatemd@aol.com
    William Reil, Esq. billreillaw@gmail.com

Encl: As noted.

# EXHIBIT B

# University of Science, Arts & Technology (USAT) Faculty of Medicine

Montserrat

School Details    Contact Information    Program Details    Sponsor Notes

The information below has been provided by the World Directory's sponsoring organizations.

- Students and graduates of this medical school are eligible to apply to ECFMG for ECFMG Certification and for examination, provided that:
  - For medical school students officially enrolled in this school, the graduation years are listed below as "current".
  - For graduates of this medical school, their graduation year is included in the graduation years listed below.
    - Graduation Years:
      - 2003 - 2018
  - All other eligibility requirements are met. Refer to the ECFMG Information Booklet for detailed information.
- **Note: As of January 1, 2019, students and graduates of this medical school with a graduation year of 2019 and later are not eligible to apply to ECFMG for ECFMG Certification, which also renders them ineligible to apply to ECFMG for the United States Medical Licensing Examinations (USMLE) as a step toward ECFMG Certification.**
- **Currently, students and graduates of USAT are subject to enhanced procedures that must be met in order to be eligible to apply for ECFMG Certification related services, including but not limited to: ECFMG Certification, USMLE examinations that lead to ECFMG Certification, and Electronic Residency Application Service (ERAS®) Support Services. ECFMG will provide information and instructions to applicants upon receipt of application.**

# EXHIBIT C



AN AGREEMENT

BETWEEN

THE GOVERNMENT OF MONTSERRAT

AND

MEDICAL COLLEGE OF

LONDON (MCL),

UNIVERSITY OF SCIENCE, ARTS

AND

TECHNOLOGY

(MONTSERRAT) LTD. (USAT)

MONTSERRAT

A.D. 2003

A G R E E M E N T

THIS AGREEMENT made the ...24th.. day of .....September...,2003 between:

THE GOVERNMENT OF MONTSERRAT (hereinafter referred to as "the Government" which expression shall where the context so admits include its assigns and successors) whose address for service is THE CHIEF MINISTER'S OFFICE, BRADES, MONTSERRAT and MEDICAL COLLEGE OF LONDON (MCL), UNIVERSITY OF SCIENCE, ARTS AND TECHNOLOGY (Montserrat) LTD (USAT), a duly incorporated company (hereinafter referred to as "the MCL-USAT" which expression shall where the context so admits include its assigns and successors) whose address is BRADES, Montserrat.

WITNESSETH AS FOLLOWS: -

1. DEFINITIONS

In this agreement the following expressions shall have the meaning herein ascribed to them.

"Agreement Period" means a period of 20 years commencing with the date on which this agreement is executed. The MCL-USAT will have the option to review and renew the Agreement.

"Contributions" means a contribution payable to the Social Security Fund.

"Expatriate Staff" means staff recruited from overseas who are not citizens of Montserrat or are not ordinarily resident in Montserrat for tax purposes.

"USAT" means UNIVERSITY OF SCIENCE, ART AND TECHNOLOGY (MONTSERRAT) LTD.

2. TAX EXEMPTIONS

(1)

6. WORK PERMIT FOR EXPATRIATE EMPLOYEES

6.1     MCL-USAT will at the beginning of each year of the agreement period provide a list of names of its academic and administrative staff requiring work permits and in addition shall supply all relevant information needed for the processing of the work permits.

6.2     Government of Montserrat shall issue the necessary work permits and visas to enable MCL-USAT staff, students and families to remain on island for the period of their employment or study subject to the significance of any information provided on Police Records.

3

7.2　MCL-USAT will ensure that income tax is paid in respect of each of its employees.

8.　**GENERAL**

8.1　The Government undertakes to establish a registry to record certification obtained by medical graduates of MCL-USAT.

8.2　The Government of Montserrat will at the request of MCL-USAT request the listing of MCL-USAT with the World Directory of Medical Schools published by WHO, Geneva, Switzerland.

4

8.13　MCL-USAT agrees to maintain operations in Montserrat with regard to its Medical and other Programmes for the duration of the agreement unless unforeseen circumstances and/or natural disaster arise that the MCL-USAT may choose to relocate to an area of convenience for the MCL-USAT for a time period to be determined by MCL-USAT. This would not affect any permission granted to the MCL-USAT by the Government of Montserrat.

8.14　The MCL-USAT may grant academic and professional degrees to duly qualified students of the institution and commensurate with an institution of higher education who have completed the academic and professional requirements of the degree for which they have been considered, and who have been recommended for such by the faculty and directors of MCL-USAT. The specific degrees authorized shall include Doctor of Philosophy (PH.D.), the Doctor of Medicine (M.D.) or Bachelor of Surgery (M.B.B.S), Bachelor of Dental Surgery (B.D.S.), the Master of Public Health (M.P.H.), the Master of Science (M.Sc.), the Master of Arts (M.A.), the Bachelor of Science (B.Sc.) and the Bachelor of Arts (B.A.).

IN WITNESS whereof the parties or the duly authorised representative of the parties have signed this Deed on the day first above written.

Signed by Mr. John A. Osborne
Minister for Finance and
Economic Development on behalf
of the Government of Montserrat

Dr. Orien L. Tulp
President, USAT, and Director
Medical College of London

Before and in the presence of:

Esco Henry-Greer
Attorney General

Before and in the presence of:

Esco Henry-Greer
Attorney General

7

7

9.5    At the end of the agreement period MCL-USAT shall have the option to extend the agreement for a further period to be determined by MCL-USAT and GOM.

9.6    Notwithstanding the above, the offer included in this agreement shall be valid for a period of one (1) year from the date of this agreement after which the terms and conditions may be subject to re-negotiation however, if MCL-USAT makes any substantial property investment or undertakes any major contractual obligation referable to and in reliance on this Agreement, then the terms set out shall become final and binding on the Government.

IN WITNESS whereof the parties or the duly authorised representative of the parties have signed this Deed on the day first above written.

Signed by Mr. John A. Osborne
Minister for Finance and
Economic Development on behalf
of the Government of Montserrat

Dr. Orien L. Tulp
President, USAT, and Director
Medical College of London

Before and in the presence of:

Esco Henry-Greer
Attorney General

Before and in the presence of:

Esco Henry-Greer
Attorney General

7

8
701a

17/003
COMPANY NO.

# COMPANIES ACT OF MONTSERRAT

## CERTIFICATE OF INCORPORATION

UNIVERSITY OF SCIENCE, ARTS
AND TECHNOLOGY (MONTSERRAT) LTD.
NAME OF COMPANY

I hereby certify that the above-mentioned Company, the Articles of Incorporation of
which are attached, was incorporated under the Montserrat Companies Act 1998.



Registrar of Companies

18th September, 2003
Date of Incorporation

9

# EXHIBIT D



**EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES**

3624 Market Street
Philadelphia, PA 19104-2685 USA
215-386-5900 | 215-386-9767 Fax
www.ecfmg.org

# AFFIDAVIT ATTESTING TO MEDICAL SCHOOL ATTENDANCE

I, _____

*ECFMG Applicant Name*                                              *ECFMG ID Number*

hereby declare, under penalty of perjury under the laws of all applicable jurisdictions, including the United States of America, and under penalty of a finding of irregular behavior under applicable ECFMG rules and regulations, that:

## Section 1: Attendance Dates at University of Science, Arts & Technology (USAT) Faculty of Medicine
I attended University of Science, Arts & Technology (USAT) Faculty of Medicine located in Montserrat during the following dates:

| From (Month/Year) | To (Month/Year) |
|---|---|
| | |

## Section 2: Dates and Location of Basic Sciences Courses Taken in Montserrat
I was physically present and took basic sciences courses in Montserrat, during the following dates and at the following location *(if you did not complete your basic sciences course work at a facility located in Montserrat, complete Section 3)*:

| Dates of Basic Sciences Courses Taken while Physically Located in Montserrat | | |
|---|---|---|
| (Do not include dates if you were not physically present in Montserrat. Do not include breaks in time where you were not physically located in Montserrat. Only list the beginning and end date for when you were physically present in Montserrat attending basic sciences courses.) | | |
| From (Month/Year) | To (Month/Year) | Address of Facility Where Basic Sciences Classes Were Held |
| | | |
| | | |
| | | |
| | | |

While I took my basic sciences classes in Montserrat, I resided at the following location(s):

| Residence Address in Montserrat | Residence Dates in Montserrat | |
|---|---|---|
| | From (Month/Year) | To (Month/Year) |
| | | |
| | | |

I am attaching the following documentation to demonstrate my physical presence in Montserrat during the time I was taking basic sciences classes at University of Science, Arts & Technology (USAT) Faculty of Medicine. *(check all that apply)*:

☐ My passport, showing travel to Montserrat and visas for Montserrat          ☐ My lease, utility bills, etc. for my housing

☐ My airline tickets/boarding passes documenting travel to Montserrat          ☐ Other (please specify)

## Section 3: TO BE COMPLETED ONLY IF YOU CANNOT COMPLETE SECTION 2
I did *not* take basic sciences courses at a facility located in Montserrat because:

I also declare that this information is comprehensive, complete and accurate as of the date of my signature.

_____          _____  _____  _____

*Signature of Applicant*                                                      *(day)*      *(month)*      *(year)*

### Certification by Official
I certify that on the date set forth below the individual named above did appear personally before me and that the statements in this document are subscribed and sworn to before me by the individual on this _____ day, of the month of _____ in the year _____ .

_____

*Signature of Notary Public*                                                     Official Seal

_____

*Printed Name of Offical*

704a

WHAT YOU NEED TO DO
Effective immediately, as a USAT student or graduate seeking a service or services related to ECFMG Certification, including registration for the United States Medical Licensing Examination (USMLE), release of USMLE scores, issuance of an ECFMG Certificate, or issuance of ECFMG Certification Status Reports to residency programs, you must complete the attached affidavit, attesting to the accuracy of your medical school attendance information to ECFMG's satisfaction. Completion of the affidavit is required and will facilitate ECFMG's review.

The affidavit must also be notarized by NotaryCam, which provides secure on-line notarization of documents. To use NotaryCam, go to https://www.notarycam.com/ecfmg-affidavit/ and follow NotaryCam's instructions. NotaryCam will e-mail your affidavit to ECFMG directly.

YOU MUST COMPLETE AND SUBMIT THIS AFFIDAVIT NO LATER THAN NOVEMBER 1, 2018.

Please allow two to four weeks processing time after the above-described affidavit has been submitted to ECFMG. ECFMG will notify you in writing after your affidavit has been processed.

ECFMG reserves the right to bring allegations of irregular behavior against you, in accordance with its policies and procedures, should ECFMG obtain information that indicates that you have engaged in irregular behavior with respect to any documentation submitted as part of this process.

If you have any questions, please contact MECCsupport@ecfmg.org and you will be assigned a Case Manager. If you prefer, you may call 215-386-5900 and ask to be transferred to a Case Manager for USAT.

Sincerely,

ECFMG

# EXHIBIT E



EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

3624 Market Street
Philadelphia PA 19104-2685 USA
215-386-5900 | 215-386-9767 Fax
www.ecfmg.org

VIA EMAIL: swatemd@aol.com

November 21, 2018

Mr. Tommy Swate
Attorney at Law
403 Wild Plum
Houston, Texas 77013

Dear Mr. Swate:

Thank you for the email confirmation on November 16, 2018 that you received the complete file that will be reviewed by the ECFMG Medical Education Credentials Committee ("ECFMG Committee") in the matter related to Dr. Orien Tulp. As previously communicated, Dr. Tulp is scheduled to make a personal appearance (accompanied by you and Mr. Reil, his attorneys) before the ECFMG Committee on Wednesday, November 28, 2018 at 9:00 AM at the Rittenhouse Hotel, 210 West Rittenhouse Square, Philadelphia, PA 19103. Please arrive with Dr. Tulp at 8:45 AM.

I am writing in response to your letter dated November 13, 2018, which is rife with misstatements. There are two important issues of concern which require clarification at this time: (1) ECFMG's authority to conduct its activities, including the ECFMG Certification program and making allegations of irregular behavior pertaining to Dr. Tulp; and (2) the "activity of the ECFMG in regards to the USAT" related to ECFMG's update of USAT's *World Directory of Medical Schools* ECFMG Sponsor Note.

### Concern (1): ECFMG's Authority to Conduct the ECFMG Certification Program & Irregular Behavior

In your letter, you request ECFMG to "identify by what legal authority [ECFMG] has to claim and report that Dr. Tulp - engaged in 'irregular behavior'." For some additional context regarding ECFMG's responsibility and its mission to protect the public, ECFMG (formally the Evaluation Service for Foreign Medical Graduates) was established as a private, non-profit organization in 1956 by the Federation of State Medical Boards (FSMB), the American Hospital Association (AHA), the Association of American Medical Colleges (AAMC), and the American Medical Association (AMA). It was established to validate medical credentials, assess basic medical knowledge and determine English language proficiency for graduates of international medical schools. As you may already know, medical licensing authorities in the United States require that international medical graduates (IMGs) be certified by ECFMG, among other requirements, to obtain an unrestricted license to practice medicine.

In support of its mission to protect the public, individuals that have or have attempted to subvert ECFMG's policies and procedures are subject to ECFMG's Policies and Procedures on Irregular Behavior. These were previously shared with you and are also available on ECFMG's web-site at https://www.ecfmg.org/programs/irregular-behavior.html. As communicated in our prior correspondence, it is under these policies that Dr. Tulp is charged with irregular behavior for providing false information to ECFMG. I trust that the files you received on November 16 help clarify the charges and evidence of irregular behavior.

12

ECFMG® is an organization committed to promoting excellence in international medical education.

Mr. Tommy Swate
November 21, 2018
Page 2 of 2

**Concern (2): *ECFMG's Update to USAT's World Directory ECFMG Sponsor Note***

As previously communicated to you, ECFMG's update to USAT's World Directory Sponsor note is *not* related to a charge of irregular behavior for Dr. Tulp.

ECFMG updated its sponsor note on October 18, 2018 because ECFMG learned that USAT was operating a medical school campus located in the United States. Before taking this action, ECFMG had requested USAT to provide documentation from the appropriate United States authorities that USAT is authorized to operate its medical school campuses and educational programs in the United States. To date, USAT has failed to deliver such documentation.

It appears from the information gathered from you (e.g. your statement that USAT has conducted classes "in locations other than Montserrat *for 15 years* without incident...") and corroborated by USAT students that USAT has primarily operated and conducted its educational activities in the United States. Based on this information, USAT may not even be an international medical school. However, as previously communicated, if you are able to provide documentation from the appropriate United States authorities that USAT is authorized to operate its medical school branch campuses in the United States, ECFMG will consider this information.

Also, in your letter dated November 13, 2018 you state "ECFMG has taken the position that ECFMG has the right to accredit a medical school." We must clarify for you that ECFMG is not an accrediting agency and does not purport to accredit international medical schools.

Please contact me if you have any additional questions regarding our ECFMG Committee meeting scheduled next week.

Sincerely,

*Kcorrado*

Ms. Kara Corrado, JD
Vice President for Operations

# EXHIBIT F



EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

3624 Market Street
Philadelphia PA 19104-2685 USA
215-386-5900
www.ecfmg.org

PERSONAL AND CONFIDENTIAL
VIA EMAIL: o.tulp@usat.edu

October 18, 2018

Dr. Orien L. Tulp
Professor and President
University of Science, Arts & Technology (USAT) Faculty of Medicine
Main Campus
S. Mayfield Estate Drive
Olveston
MONTSERRAT

Dear Dr. Tulp:

I am writing to advise you of the allegation that you, individually and in your capacity as an official of the University of Science, Arts & Technology (USAT) Faculty of Medicine, Montserrat, engaged in irregular behavior in connection with providing false information to ECFMG. Specifically, you provided false information to ECFMG when you (1) notified ECFMG that USAT does not operate a branch campus in Miami, Florida and (2) certified to the attendance dates of several USAT students and graduates when ECFMG has information that these students were not attending USAT during some of the time periods to which you certified. The details of ECFMG's allegation are set forth below.

<u>Details of Allegation</u>
*False Information Regarding U.S. Branch Campuses*
On August 21, 2018, ECFMG advised you that we had become aware that USAT was operating a "branch" campus in Miami, Florida. We advised you that in order for students and graduates of an international medical school, such as USAT, to have eligibility to apply for ECFMG Certification, ECFMG policy requires confirmation from the appropriate government authority in the branch campus country that the branch campus is authorized to operate as a medical school in such branch campus country. Therefore, we requested that USAT provide documentation from the United States Department of Education and/or the Florida Department of Education confirming that USAT's Miami branch campus is authorized to operate as a medical school in the United States. We indicated that this documentation should cover the whole time period that the USAT Miami branch campus has been in operation.

In response to ECFMG's August 21, 2018 letter, you replied:

"This is incorrect information. The Miami location is an information and testing site only, where a pre-usmle examination [an NBME] may administered, and an Orientation for new students is conducted prior to their traveling to the

1 4

ECFMG® is an organization committed to promoting excellence in medical education.

Dr. Orien L. Tulp
October 18, 2018
Page 2 of 4

> Caribbean.. It is NOT a campus.  Our ONLY Campus is located in Olveston,
> Montserrat, British West Indies.
>
> Actually, recall that Montserrat is a volcanic Island, and the license issued to
> USAT in September, 2003 DOES actually permit the establishment of off-campus
> lecture and administrative sites as needed.  USAT has students on island on a
> year round basis since its origination." [emphasis in original]

After receiving your reply, ECFMG received information that USAT was also
providing medical education lectures not only at its Miami site, but also at sites in
Tampa, Florida, Dallas, Texas, and Puerto Rico. As a result and to ensure that
information regarding international medical schools and their students provided to
ECFMG complies with ECFMG policies and requirements, ECFMG notified you that
ECFMG would require USAT students and graduates to complete an affidavit, attesting
to the accuracy of the medical school information provided to ECFMG.

In response to ECFMG's affidavit request, many USAT students and graduates
have certified that they have not completed any courses on Montserrat, but instead
completed courses on site in the United States at the direction of USAT officials due to
volcanic and hurricane activity on Montserrat. ECFMG also received a copy of the "2018
University of Science, Arts and Technology Lecture Conference Schedule" which shows
lectures occurring in Florida and Texas.  We note that there are no lectures scheduled
for Montserrat.  We also note that graduation occurs in Miami, Florida.

This directly conflicts with the information that you provided, i.e. that "the Miami
location is an information and testing site only, where a pre-usmle examination [an
NBME] may administered, and an Orientation for new students is conducted prior to
their traveling to the Caribbean.. It is NOT a campus.  Our ONLY Campus is located in
Olveston, Montserrat, British West Indies." [emphasis in original].  Further, though
USAT's agreement with the Montserrat government indicates that USAT "agrees to
maintain operations in Monserrat with regard to its Medical and other programmes for
the duration of the agreement unless unforeseen circumstances and/or natural disaster
arise that the MCL-USAT may choose to relocate to an area of convenience for the
MCL-USAT for a time period to be determined by MCL-USAT.  This would not effect
any permission granted to MCL-USAT by the government of Montserrat," ECFMG has
no record of receipt of any official communication from you or any other USAT official
indicating that USAT relocated due to volcanic activity, from 2003 until present.

In ECFMG's September 15, 2017 announcement "Relocation of Caribbean
Medical Schools Impacted by Hurricane Irma" ECFMG advised: "Schools that have
relocated or plan to relocate their operations to the United States or elsewhere as a
result of Hurricane Irma should provide ECFMG with: a) a formal notice to ECFMG that
includes the address of where the school is temporarily located and the expected date
of when the school will return to its home country, b) copies of approvals from the home
country governmental authorities, and c) copies of approvals from the accrediting

15

Dr. Orien L. Tulp
October 18, 2018
Page 3 of 4

agency, if any. This information should be e-mailed to Medical Education Resources at medschoolreview@ecfmg.org, along with any questions or comments." ECFMG has no record of receipt of any correspondence from you or any other USAT official that USAT was relocating to the United States due to Hurricane Irma, or any other hurricane.

### *Certification of False Information Regarding Students Attendance Dates*

During the course of the investigation into USAT's branch campuses, ECFMG has discovered information that indicates that you provided false information to ECFMG regarding the attendance dates of some of your students on some of their applications for United States Medical Licensing Examinations (USMLE). Specifically, you certified that students were attending USAT during time periods which they were not actually attending USAT.

It is ECFMG's usual practice to consider any action or attempted actions by any person that would or could subvert the processes, programs or services of ECFMG to be *irregular behavior*. See Section A.1. of the enclosed *ECFMG Medical Education Credentials Committee Policies and Procedures*. Examples of irregular behavior include the provision of false information or falsified credentials to ECFMG. ECFMG investigates and considers allegations of irregular behavior in order to protect the integrity of its processes, programs, and services. The ECFMG Committee can impose serious sanctions if it finds irregular behavior has been committed.

The review into the matters described in this letter are ongoing. ECFMG reserves the right to amend or make additional allegations of irregular behavior, in accordance with its policies and procedures, should ECFMG obtain information that supports such amendment or additional allegations.

### ECFMG Medical Education Credentials Committee Review of this Allegation

This matter will be referred to the ECFMG Committee for review at its next scheduled meeting on November 28, 2018 in Philadelphia. The ECFMG Committee will consider the information presented and take action in accordance with the enclosed *ECFMG Medical Education Credentials Committee Policies and Procedures*.

You will have the opportunity to appear personally before the ECFMG Committee, accompanied by legal counsel, if you so wish. Please indicate in your response if you wish to appear personally before the ECFMG Committee in your individual and/or official capacities. If you do wish to make a personal appearance, I will notify you of the particular time and location of the meeting.

The following documents will be included in the Agenda for the ECFMG Committee's review:

- ECFMG's August 21, 2018 letter to you and your August 21, 2018 e-mail reply;

Dr. Orien L. Tulp
October 18, 2018
Page 4 of 4

- ECFMG's September 14, 2018 letter to you, including a copy of the affidavit sent to USAT students on September 14, 2018;
- Copy of "2018 University of Science, Arts and Technology Lecture Conference Schedule"
- September 15, 2017 ECFMG Announcement "Relocation of Caribbean Medical Schools Impacted by Hurricane Irma";
- Copy of "An Agreement Between the Government of Montserrat and Medical College of London (MCL) University of Science, Arts, and Technology (Montserrat) LTD. (USAT)"
- Affidavits completed by USAT students; and
- This letter.

Copies of these documents, with the exception of the completed affidavits by students, are enclosed.

**Please provide a response to ECFMG by November 1, 2018.**   In your response, please note whether you wish to make a personal appearance before the ECFMG Committee.   All documents should be submitted to Ms. Kara Corrado, Vice President for Operations, at the address above or via e-mail at kcorrado@ecfmg.org.   If you have any questions, please do not hesitate to call me at (215) 883-7318.

Sincerely,

*Lisa L. Cover*

Lisa L. Cover
Senior Vice President for Business
Development and Operations

Encl: As noted.

17

# EXHIBIT G

 Gmail

Bill Reil <billreillaw@gmail.co

---

## RE: Reply to your November 13, 2018 Letter

1 message

**Corrado, Kara** <KCorrado@ecfmg.org>                                                        Tue, Nov 27, 2018 at 7:35
To: "swatemd@aol.com" <swatemd@aol.com>, "o.tulp@usat.edu" <o.tulp@usat.edu>, "c.konyk@usat.edu"
<c.konyk@usat.edu>, "billreillaw@gmail.com" <billreillaw@gmail.com>

Dear Mr. Swate,

My letter of October 18, 2018 to Dr. Tulp (which you indicated you have) outlines the allegations against Dr. Tulp.
Provided with that letter was a copy of ECFMG's Policies and Procedures on Irregular Behavior. In my November 21,
2018 letter to you, I again responded to your inquiries regarding this topic, including providing you the link to said
policies and procedures. Now, I once again provide the link to such policies and procedures, which can also be found
on our website at:  https://www.ecfmg.org/programs/irregular-behavior.html  All materials the ECFMG Committee will
review were sent to you by email (5 separate emails with attachments) on November 14, 2018. You acknowledged
receipt of these materials by email on November 16, 2018. Notwithstanding, an identical hardcopy of the materials
was sent by Federal Express to you on November 16, 2018. The Federal Express tracking number is:
467844693418. Federal Express' website shows that the package is pending pick up by you. Our communications
with you (including this correspondence) are also shared with the ECFMG Committee.

We are uncertain why you continue to request information that you acknowledge has previously been provided to you

ECFMG is a private, non-profit organization. ECFMG has not made any concessions regarding its position on any
legal status, rights or immunities to which it might be entitled.

Sincerely,

Kara Corrado

---

Ms. Kara Corrado, J.D.

Vice President for Operations

Educational Commission for Foreign Medical Graduates (ECFMG)

3624 Market Street

Philadelphia, PA 19104

TEL: +1.215.823.2273

kcorrado@ecfmg.org I www.ecfmg.org

715a


G
18

**From:** swatemd@aol.com [mailto:swatemd@aol.com]
**Sent:** Sunday, November 25, 2018 9:28 PM
**To:** Corrado, Kara; o.tulp@usat.edu; c.konyk@usat.edu; billreillaw@gmail.com
**Subject:** Re: Reply to your November 13, 2018 Letter


**External Email. Please Proceed with Caution.**

---

I am requesting on behalf of Dr. Toup written procedure for November 28th hearing, agenda, and packet of information sent to the committee members regarding Dr. Toup. I have not received any procedure information other than Dr. Toup without hearing the ECFMG accusations will be required to respond to information that committee members have not disclosed. From your correspondence with me is it fair to assume you claim that ECFMG is a private entity with no claims of qualified immunity? Tommy Swate


-----Original Message-----
From: Corrado, Kara <KCorrado@ecfmg.org>
To: swatemd <swatemd@aol.com>
Sent: Wed, Nov 21, 2018 5:01 pm
Subject: Reply to your November 13, 2018 Letter

Dear Mr. Swate,


Please see attached our reply to your November 13, 2018 letter.


Sincerely,


Kara Corrado

---

Ms. Kara Corrado, J.D.

Vice President for Operations

Educational Commission for Foreign Medical Graduates (ECFMG)

3624 Market Street

Philadelphia, PA 19104


TEL: +1.215.823.2273

kcorrado@ecfmg.org I www.ecfmg.org



**Disclaimer**

The information contained in this communication from **ECFMG® / Educational Commission for Foreign Medical Graduates** is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you

are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd.**

**Disclaimer**

The information contained in this communication from **ECFMG® / Educational Commission for Foreign Medical Graduates** is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd.**

 **ECFMG**®

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

3624 Market Street
Philadelphia, PA 19104-2685 USA
215-386-5900 | 215-386-9767 Fax
www.ecfmg.org

October 18, 2018

VIA EMAIL: usat.edu@gmail.com

Orien Tulp, President
University of Science, Arts & Technology (USAT) Faculty of Medicine
Main Campus
S. Mayfield Estate Drive
Olveston, MONTSERRAT

Dear Dr. Tulp,

This is a follow-up to my August 21 and September 14, 2018 letters to you. As you know, it has recently come to the attention of the Educational Commission for Foreign Medical Graduates (ECFMG) that USAT in Montserrat is operating a satellite (or branch) campus in Miami, Florida. ECFMG also understands that USAT is operating satellite campuses in Texas and Puerto Rico.

As I previously advised you, in order for students and graduates of an international medical school, such as USAT, to have eligibility to apply for ECFMG Certification, ECFMG policy requires confirmation from the appropriate government authority in the branch campus country that the branch campus is authorized to operate as a medical school in such branch campus country, among other requirements.

In light of this policy, ECFMG requested that USAT provide documentation from the United States Department of Education and/or the Florida Department of Education confirming that USAT's Miami branch campus is authorized to operate as a medical school in the United States. This documentation should cover the entire time period during which the USAT Miami branch campus has been in operation. To date, ECFMG has no record of receipt of such documentation from you or USAT.

**Therefore, effective today, ECFMG's Sponsor Note in the *World Directory of Medical Schools* (*World Directory*) for USAT has been updated to reflect that 2019 and later graduates of USAT are no longer eligible to apply for ECFMG Certification or USMLE examinations as a step toward ECFMG Certification.**

ECFMG is also writing to your current students to advise them that, if they graduate from USAT in 2019 or later, they will be ineligible for ECFMG Certification and ineligible to register for USMLE examinations as a step toward ECFMG Certification after December 31, 2018. We are also letting them know that in order to become eligible for ECFMG Certification (or to register for USMLE examinations as a step toward ECFMG Certification) on or after January 1, 2019, the United States Department of Education and/or the Departments of Education for Florida, Texas, and Puerto Rico

ECFMG® is an organization committed to promoting excellence in international medical education.

Dr. Orien L. Tulp
October 18, 2018
Page 2 of 2

must provide ECFMG with documentation that USAT is authorized to operate as a medical school in the United States. Otherwise, the students must transfer to and/or be officially enrolled in a medical school that is listed in the *World Directory* as meeting eligibility requirements for ECFMG Certification. In addition, the "Graduation Years" in the ECFMG note on the Sponsor Notes tab of the *World Directory* listing for the student's medical school must be listed as "Current" at the time he/she applies and on his/her test day.

USAT's 2018 and earlier graduates will continue to remain eligible to apply to ECFMG for ECFMG Certification.

Should the United States Department of Education and/or the Departments of Education for Florida, Texas, and Puerto Rico provide ECFMG with documentation that USAT is authorized to operate as a medical school in the United States, ECFMG will be happy to review USAT's eligibility for an ECFMG Sponsor Note in the *World Directory*.

Sincerely,

Ms. Kara Corrado, JD
Vice President for Operations

 Gmail

Bill Reil <billreillaw@gmail.com>

## RE: Hearing for Dr. Tulp -- Response Required

1 message

**Corrado, Kara** <KCorrado@ecfmg.org>                                              Wed, Nov 14, 2018 at 3:19 PM
To: swatemd <swatemd@aol.com>
Cc: "carla.konyk@gmail.com" <carla.konyk@gmail.com>, "billreillaw@gmail.com" <billreillaw@gmail.com>, "Katz, Francine"
<fkatz@ecfmg.org>

Dear Mr. Swate,

Thank you for your email. As we understand that you and Mr. Reil are representing Dr. Tulp in the matter related to the
allegations of irregular behavior, I am sending the materials that the ECFMG Committee will review when considering
these allegations. I will send the attachments in 5 separate emails, as they are quite large. Please let me know if you
have not received them. Please note that this email will also be provided to the Committee.

ECFMG's Medical Education Credentials Committee is comprised of members of ECFMG's Board of Trustees and
ECFMG's President and CEO. ECFMG staff and legal counsel will also be present at the meeting. These individuals
will introduce themselves to you and Dr. Tulp at the meeting; thus it is not necessary for ECFMG to give you the
names of these individuals in advance of the meeting. Further, it is not appropriate for ECFMG to give you the
addresses of these individuals, either now or at the meeting.

Again, and as stated in my October 26, 2018 letter, we clarify for you that ECFMG's update to its *World Directory of
Medical Schools* Sponsor Note for USAT is unrelated to the allegations of irregular behavior for Dr. Tulp. ECFMG's
update to USAT's Sponsor Note is related to its branch campus activities in the United States. ECFMG requested
USAT to provide ECFMG with the documentation from the United States Department of Education and/or the Florida
Department of Education confirming that USAT's Miami branch campus is authorized to operate as a medical school in
the United States. To date, ECFMG has no record of receipt of such documentation from USAT. Should the United
States Department of Education and/or the Departments of Education for Florida, Texas, Puerto Rico, and Maryland
(where ECFMG understand USAT has branch campuses) provide ECFMG with documentation that USAT is
authorized to operate its medical school branch campuses in the United States, ECFMG will be happy to review
USAT's eligibility for an ECFMG Sponsor Note in the *World Directory*. Until that time, USAT's ECFMG Sponsor Note
for USAT will remain as is.

Since ECFMG has not alleged irregular behavior against USAT (the institution) there is no need for a hearing for
USAT. Nor is there any right to a hearing with ECFMG for USAT for any matter. ECFMG will not entertain any request
to review the actions it has taken with respect to USAT's Sponsor Note at Dr. Tulp's irregular behavior hearing.

**Dr. Tulp is scheduled to appear before the ECFMG Committee with you and Mr. Reil (Dr. Tulp's attorneys) on
Wednesday November 28, 2018 at 9:00 AM at the Rittenhouse Hotel, 210 West Rittenhouse
Square , Philadelphia , PA 19103. Please arrive at 8:45 AM.** In accordance with ECFMG's standard practice, Dr.
Tulp will be scheduled for 20 minutes, during which time he will have the opportunity to present his response to these
allegations (either personally or through his counsel) and the ECFMG Committee members, ECFMG counsel, and staff
will have the opportunity to ask questions. After that, Dr. Tulp may provide a brief, closing statement.

Sincerely,

Kara Corrado

Ms. Kara Corrado, J.D.

Vice President for Operations

Educational Commission for Foreign Medical Graduates (ECFMG)

3624 Market Street

Philadelphia, PA 19104

TEL: +1.215.823.2273

kcorrado@ecfmg.org I www.ecfmg.org

**From:** swatemd@aol.com [mailto:swatemd@aol.com]
**Sent:** Friday, November 09, 2018 6:28 PM
**To:** Corrado, Kara; carla.konyk@gmail.com
**Subject:** Re: Hearing for Dr. Tulp -- Response Required

**External Email. Please Proceed with Caution.**

Mr. Riel and I will represent Dr. Tulp at the hearing on October 28th.  Please send a copy of the October 28 agenda and written policy and procedure to my attention at swatemd@aol.com. Please forward copies of all documents submitted to the committee members prior to the hearing.

I did not receive your letter of October 26 until this afternoon by e mail. I am requesting the names and addresses of the committee members plus the individuals other than the committee members that will be at the hearing. Also, please send me ALL the evidence that will be presented at the hearing so that Dr. Tulp  can prepare for the hearing.

I represent both Dr. Tulp and USAT. I will send a formal demand by certified mail for ECFMG to stop the tortious inference with the operation of USAT immediately. The ECFMG has taken action against USAT without giving USAT the opportunity to respond in a formal setting. To save time and expense, I am request a hearing on behalf of USAT on October 28, 2018.  Please inform me of the person or persons who authorized the letters to USATs' students? What person or entity made a decision to arbitrarily without a hearing block certain USATs' students scores from being disclosed?  Tommy Swate

-----Original Message-----
From: Corrado, Kara <KCorrado@ecfmg.org>
To: swatemd <swatemd@aol.com>
Sent: Fri, Nov 9, 2018 2:19 pm
Subject: RE: Hearing for Dr. Tulp -- Response Required

Dear Mr. Swate,

I just resent the letter to you. I had emailed it to you on October 26, 2018.  Please let me know if you have received it.

Please advise if you are representing Dr. Tulp and if Dr. Tulp will be appearing at the meeting.


Sincerely,


Kara Corrado

---

Ms. Kara Corrado, J.D.

Vice President for Operations

Educational Commission for Foreign Medical Graduates (ECFMG)

3624 Market Street

Philadelphia, PA 19104


TEL: +1.215.823.2273

kcorrado@ecfmg.org I www.ecfmg.org

---

**From:** swatemd [mailto:swatemd@aol.com]
**Sent:** Friday, November 09, 2018 3:03 PM
**To:** Corrado, Kara
**Subject:** Re: Hearing for Dr. Tulp -- Response Required


**External Email. Please Proceed with Caution.**

I have not received a letter dated October 26th from you. Please e mail the LETTER to me . Both attorneys will appear on the 28th. I can not respond until I receive your letter. Tommy Swate



Sent from my T-Mobile 4G LTE Device


-------- Original message --------

From: "Corrado, Kara" <KCorrado@ecfmg.org>

Date: 11/9/18 1:01 PM (GMT-06:00)

To: swatemd@aol.com, billreillaw@gmail.com

Cc: "Katz, Francine" <fkatz@ECFMG.org>

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd.**

**Disclaimer**

The information contained in this communication from **ECFMG® / Educational Commission for Foreign Medical Graduates** is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd.**

**Disclaimer**

The information contained in this communication from **ECFMG® / Educational Commission for Foreign Medical Graduates** is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd.**

Subject: Hearing for Dr. Tulp -- Response Required

Gentleman:

I am following up on ECFMG's October 26, 2018 letter to you regarding USAT. We understand that you both are counsel for USAT.

As you know, ECFMG will review the allegations of irregular behavior for Dr. Tulp on November 28, 2018.   Dr. Tulp has a right to a personal appearance at that meeting with his legal counsel.

Please reply to this email by November 14, 2018 and indicate:

1)   If you are representing Dr. Tulp in this matter; and

2)   If Dr. Tulp plans to attend the meeting in person (and if so, which of his attorneys will be present).

If we do not receive a reply from you on or before November 14, 2018, we will assume that Dr. Tulp is not making a personal appearance.  Dr. Tulp's case is scheduled to be reviewed on November 28, 2018 whether or not he makes a personal appearance.

Sincerely,

Kara Corrado

Ms. Kara Corrado, J.D.

Vice President for Operations

Educational Commission for Foreign Medical Graduates (ECFMG)

3624 Market Street

Philadelphia, PA 19104

TEL: +1.215.823.2273

kcorrado@ecfmg.org I www.ecfmg.org

**Disclaimer**

The information contained in this communication from **ECFMG® / Educational Commission for Foreign Medical Graduates** is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.



ECFMG®

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

3624 Market Street
Philadelphia PA 19104-2685 USA
215-386-5900 | 215-386-9767 Fax
www.ecfmg.org

VIA EMAIL: swatemd@aol.com

October 26, 2018

Mr. Tommy Swate
Attorney at Law
403 Wild Plum
Houston, Texas 77013

Dear Mr. Swate:

I am writing in response to your letters dated September 15, 2018 and September 23, 2018. These letters were received at ECFMG on October 16, 2018 and October 23, 2018 respectively. We understand from your letters that you have been retained as counsel for University of Science, Arts & Technology (USAT) Faculty of Medicine, Montserrat. Your letters appear to conflate the issue that USAT is operating branch campuses in the United States without appropriate documentation with the allegations of irregular behavior for Dr. Tulp. We take this opportunity to clarify these issues for you.

**Allegations of Irregular Behavior for Dr. Orien Tulp**

ECFMG has *not* alleged irregular behavior on the part of USAT (the institution). The allegations of irregular behavior are specific to Dr. Tulp, both individually and in his capacity as an official of USAT. Therefore, before providing you with any materials relating to allegations of irregular behavior concerning Dr. Tulp, we ask that you advise ECFMG whether you also represent Dr. Tulp individually, in addition to USAT. We will be happy to share the entire case file that will be reviewed by the ECFMG Medical Education Credentials Committee ("ECFMG Committee") with you once you have officially advised that you are Dr. Tulp's legal counsel.

Please note that only Dr. Tulp is entitled to request a personal appearance at the ECFMG Committee hearing, with his legal counsel, as outlined in ECFMG's Policies and Procedures for Irregular Behavior. ECFMG will not permit any other person or official, from USAT or otherwise, to appear instead of Dr. Tulp at his hearing. If you are Dr. Tulp's legal counsel, Dr. Tulp has the right for you to appear with him at the hearing. There is no right or need for "local counsel" or "paralegals" to attend; therefore, they will not be permitted to attend Dr. Tulp's hearing.

Further, in your September 23, 2018 letter, you indicate that "a decision has already been made regarding October 18, 2018 allegations because the ECFMG has posted on various websites warning to USAT students that after January 1, 2018 USAT students will no longer be eligible to apply for the various Step tests." This is incorrect. No decision regarding the allegations against Dr. Tulp has been made as the ECFMG Committee has not yet reviewed these allegations. ECFMG carefully follows its policies and procedures, maintaining fairness and integrity throughout its processes. We trust this information disabuses you of the notion that ECFMG's "proceedings are not neutral."

**USAT's Operation of Branch Campuses in the United States**

ECFMG's update to USAT's ECFMG Sponsor Note in the *World Directory of Medical Schools* is a wholly separate matter from the allegations against Dr. Tulp. Our letters of August

ECFMG® is an organization committed to promoting excellence in international medical education.

725a

Mr. Tommy Swate
October 26, 2018
Page 2 of 3

21, 2018, September 14, 2018, and October 18, 2018 (enclosed for your reference) are related to the issue surrounding USAT's operation of branch campuses in the United States. Through these correspondences, ECFMG advised USAT of ECFMG's policy regarding branch campuses operating in countries outside the main campus country. To reiterate: in order for students and graduates of an international medical school to have eligibility to apply for ECFMG Certification, ECFMG policy requires (among other things) confirmation from the appropriate government authority in the branch campus country that the branch campus is authorized to operate as a medical school in the branch campus country.

When ECFMG became aware that USAT was operating a campus in Miami, FL, United States, ECFMG requested USAT to provide ECFMG with the documentation from the United States Department of Education and/or the Florida Department of Education confirming that USAT's Miami branch campus is authorized to operate as a medical school in the United States. This documentation should cover the entire time period during which the USAT Miami branch campus has been in operation. To date, ECFMG has no record of receipt of such documentation from USAT.

As a result, ECFMG updated its ECFMG's Sponsor Note in the *World Directory of Medical Schools* (*World Directory*) for USAT to reflect that 2019 and later graduates of USAT are no longer eligible to apply for ECFMG certification. ECFMG also provided USAT students with this information and guidance on how this information impacted them. If USAT students still have questions about this, they should contact ECFMG directly as outlined in ECFMG's message to them.

ECFMG does not dispute that USAT's charter has a provision in which the government of Montserrat permits USAT to "relocate to an area of convenience" if faced with "natural disaster or unforeseen circumstances." The charter indicates "This would not affect any permission granted to the MCL-USAT by the Government of Montserrat." However, the government of Montserrat is not in a position to authorize the establishment of a medical school campus or conduction of other educational activity in another country. Thus, this section of USAT's charter is irrelevant to the matter of the United States' recognition of USAT's activities within its sovereign borders.

In reference to your question regarding ECFMG's temporary relocation of some medical schools impacted by natural disasters, it is not appropriate for ECFMG to disclose its communication with other medical school officials. However, we can assure you that the safety of students and school officials is of the highest priority to ECFMG and ECFMG has and will continue to be supportive of and flexible with students and medical schools during periods of temporary relocation and operational recovery. ECFMG is not aware of any recent natural disasters impacting the island of Montserrat that would require a temporary relocation of USAT.

ECFMG now understands that in addition to Florida, USAT operates campuses in Texas, Puerto Rico, and Maryland. Should the United States Department of Education and/or the Departments of Education for Florida, Texas, Puerto Rico, and Maryland provide ECFMG with documentation that USAT is authorized to operate its medical school branch campuses in the United States, ECFMG will be happy to review USAT's eligibility for an ECFMG Sponsor Note in the *World Directory*. Until that time, USAT's ECFMG Sponsor Note for USAT will remain as is.

Mr. Tommy Swate
October 26, 2018
Page 3 of 3

Finally, we note that your letter indicates that USAT has conducted classes "in locations other than Montserrat *for 15 years* without incident..." [emphasis in original]. This is troubling to ECFMG, as ECFMG defines an international medical graduate as a physician who received his/her basic medical degree or qualification from a medical school located ***outside*** the United States and Canada. If USAT has not conducted any medical education in Montserrat for the entirety of its existence, but instead has done so at facilities in the United States, then its graduates, by definition, are not international medical graduates and therefore are not eligible for ECFMG Certification. As a US medical school, we understand that USAT would be subject to accreditation by the Liaison Committee on Medical Education (LCME) which is the U.S. Department of Education-recognized accrediting body for programs leading to the M.D. degree in the United States. ECFMG is not aware that USAT has been so accredited by LCME.

Sincerely,

*Kcorrado*

Ms. Kara Corrado, JD
Vice President for Operations

Encl: As noted.

Appendix G

 **ECFMG**®    EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

3624 Market Street
Philadelphia PA 19104-2685 USA
215-386-5900 | 215-386-9767 Fax
www.ecfmg.org

VIA E-MAIL: usat.edu@gmail.com

September 14, 2018

Orien Lee Tulp, PhD, CNS
President and Dean of Academic Affairs
University of Science, Arts & Technology (USAT) Faculty of Medicine
Main Campus
S. Mayfield Estate Drive
Olveston
MONTSERRAT

Dear Dr. Tulp:

This is a follow-up to our August 21, 2018 letter in which ECFMG requested information from you about the University of Science, Arts & Technology (USAT) Faculty of Medicine's satellite (or branch) campus in Miami, FL. In response, you indicated, "The Miami location is an information and testing site only, where a pre-usmle examination [an NBME] may administered, and an Orientation for new students is conducted prior to their traveling to the Caribbean. It is NOT a campus. Our ONLY Campus is located in Olveston, Montserrat, British West Indies." We thank you for your quick reply.

ECFMG has since received information that USAT is providing medical education lectures not only at its Miami site, but also at sites in Tampa, FL, and Dallas, TX.

It is critical that ECFMG ensure that information regarding international medical schools and their students provided to ECFMG complies with ECFMG policies and requirements. Therefore, ECFMG continues its review of this matter. This letter is to advise you that, as part of its review, ECFMG has reached out to students and graduates of USAT in order to collect information from them regarding their attendance at USAT.

Effective today, USAT students and graduates seeking services related to ECFMG Certification, including registration for USMLE examinations, release of USMLE scores, issuance of an ECFMG Certificate, or issuance of ECFMG Certification Status Reports to residency programs, must complete and submit an affidavit attesting to the accuracy of the medical school information provided to ECFMG. Services will not be provided to individuals who do not complete the affidavit. ECFMG has provided instructions about this process directly to the students and graduates.

Should your students and graduates approach you with questions about this process, please advise them to contact ECFMG directly.

Sincerely,

*kcorrado*

Ms. Kara Corrado, J.D.
Vice President for Operations

ECFMG® is an organization committed to promoting excellence in international medical education.

728a

1                UNITED STATES DISTRICT COURT
   FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2
                     NO. 2:18-cv-05540-WB
3

4   DR. ORIEN L. TULP        )  VIDEO DEPOSITION
                             )
5        Plaintiff,          )  OF
                             )
6      - vs -                )  ORIEN L. TULP,
                             )  Ph.D., M.D.
7   EDUCATIONAL              )
    COMMISSION FOR           )
8   FOREIGN MEDICAL          )
    GRADUATES and DR.        )
9   WILLIAM W. PINSKY        )
                             )
10        Defendants.        )

    _ _ _ _ _ _ _ _ _ _
11

12

13

14        TRANSCRIPT OF VIDEO DEPOSITION,
15   taken by and before DANA M. JONES,
16   Professional Reporter and Notary Public,
17   at the offices of MORGAN LEWIS, 1701
18   Market Street, 18th Floor, Philadelphia,
19   Pennsylvania, on Wednesday, April 17,
20   2019, commencing at 9:20 a.m.
21

22

23        GOLKOW LITIGATION SERVICES
        877.370.3377 ph/917.591.5672 fax
24             Deps@golkow.com

Orien L. Tulp, Ph.D., M.D.

```
 1    A P P E A R A N C E S:
 2
 3
          LAW OFFICES OF WILLIAM C. REIL
 4        BY:  WILLIAM C. REIL, ESQUIRE
            1515 Market Street
 5          Suite 1200
            Philadelphia, PA  19102
 6             Attorney for the
          Plaintiff
 7
 8        T. E. SWATE, LAW OFFICE
          BY:  TOMMY SWATE, ESQUIRE
 9          403 Wild Plum Street
            Houston, Texas 77013
10             Attorney for Plaintiff
11
12
          MORGAN LEWIS
13          BY:  ELISA P. MCENROE, ESQUIRE
            MATTHEW KLAYMAN,ESQUIRE
14          1701 Market Street
            18th Floor
15          Philadelphia, PA  19103
               Attorneys for the
16        Defendants
17
18        ECFMG/FAIMER
          BY:  FRANCINE HALUSHKA KATZ,ESQUIRE
19          3624 Market Street
            Philadelphia, PA  19104
20             Senior Vice President
          and General Counsel
21
      A L S O   P R E S E N T:
22
      Devyn Mulholland - Videographer
23    Christina Beatrice - Paralegal to William
      Reid, Esquire.
24    Christopher Blinn
```

Orien L. Tulp, Ph.D., M.D.

```
 1                 I N D E X
 2

     WITNESS                              PAGE
 3

-------ORIEN L. TULP, Ph.D., M.D.-------
 4

 5      By:  Ms. McEnroe              5, 114
 6      By:  Mr. Swate                  96
 7

                        -  -  -
 8

 9


                E X H I B I T S
10

11

     NUMBER          DESCRIPTION        PAGE
12

13   Exhibit-1    Resume                 32
14

15

16

17

18

19

20

21

22

23

24
```

Orien L. Tulp, Ph.D., M.D.

```
 1                    LITIGATION SUPPORT PAGE
 2
                   INSTRUCTION NOT TO ANSWER
 3
 4      PAGE      LINE
 5      (None)
 6
 7         REQUEST FOR PRODUCTION OF DOCUMENTS
 8
        PAGE    LINE
 9
        77         7
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Orien L. Tulp, Ph.D., M.D.

```
1              P R O C E E D I N G,
2          VIDEOGRAPHER:  We are now on
3     the record.  My name is Devyn
4     Mulholland.  I'm a videographer
5     with Golkow Litigation Services.
6          Today's date is April 17,
7     2019.  The time is 9:20 a.m. This
8     video deposition is being held in
9     Philadelphia, Pennsylvania in the
10    matter of Tulp, Ph.D. versus
11    ECFMG, et al. The defendant is
12    Orien L.  Tulp, Ph.D., M.D.
13          Counsel will be noted on the
14    stenographic record.  The court
15    reporter is Dana Jones and will
16    now swear in the witness.
17          ORIEN L. TULP, Ph.D.,
18    M.D., after having been duly
19    sworn, was examined and testified
20    as follows:
21              -  -  -
22          EXAMINATION
23              -  -  -
24  BY MS. MCENROE:
```

1        Q.    Good morning, Dr. Tulp.  My

2   is Elisa McEnroe, counsel for the

3   Educational Commission for Foreign

4   Medical Graduates, which we'll call it

5   ECFMG today.

6        A.    Okay.

7        Q.    Is that okay?

8        A.    All right.

9        Q.    Have you been deposed

10  before?

11       A.    Not very often.

12       Q.    Not very often but ever

13  before?

14       A.    Only once.

15       Q.    Only once.  Okay.  So you

16  understand that you're under oath today?

17       A.    I understand.

18       Q.    Just as if you were in a

19  court room before Judge Beetlestone?

20       A.    Yes.

21       Q.    And we will expect that

22  you'll tell the true?

23       A.    I don't know any other way.

24       Q.    Great.  And if you could

Orien L. Tulp, Ph.D., M.D.

1    speak up a little bit louder that will be

2    helpful for all of us.

3         A.    I will try.

4         Q.    Thank you so much.

5               Do you know where you were

6    on January 18, 2019?

7         A.    January 18, 2019?

8         Q.    Correct.

9         A.    Wasn't I here?

10        Q.    I don't know.  That's the

11   date of the alleged break in for the --

12        A.    -- oh, that break in.

13        Q.    Yeah.  Do you know where you

14   were the day of the break in?

15        A.    I was not in Colorado that

16   day.

17        Q.    And was the break in in

18   Colorado?

19        A.    It was in Colorado, yes.

20        Q.    What kind of facility was it

21   a break in into?

22        A.    It was an office complex.

23        Q.    And what office is in that

24   complex?

Orien L. Tulp, Ph.D., M.D.

```
1          A.     USAT had their

2   administrative admission's office there

3   and an office for the registrar.

4   Administrative offices.

5          Q.     Does it still have offices

6   there?

7          A.     No.

8          Q.     When did it cease having

9   offices there?

10          A.     March 1st.

11          Q.     And where did the documents

12   or other possessions from USAT move to?

13          A.     5400 Ward Road, Aspen

14   Business Complex.

15          Q.     Also in Colorado?

16          A.     Aspen Park Business.

17          Q.     Also in Colorado?

18          A.     Also in Colorado, yes.

19          Q.     What's the reason for the

20   move?

21          A.     The lease was up and they

22   put the building up for sale.

23          Q.     Do you know what was stolen

24   during the theft on January 18, 2019?
```

Orien L. Tulp, Ph.D., M.D.

```
1          A.      What was missing?  They
2   appeared to have targeted the former
3   registrar's desk.  They took the two
4   computers that she had been using during
5   her employ.  And some files that had been
6   in her desk and little else.
7                  COURT REPORTER:  I'm sorry?
8                  THE WITNESS:  A few minor
9          other items but they only targeted
10         her desk and that was about it.
11  BY MS. MCENROE:
12         Q.      And who was that former
13  registrar?
14         A.      That was Nadine Cruz.
15         Q.      When did she cease being a
16  registrar for USAT?
17         A.      About one month before that.
18  I don't recall the exact date.
19         Q.      When you say two computers,
20  were they desktop computers or laptops?
21         A.      They were laptops, desktops,
22  yes.
23         Q.      Desktops or laptops?
24         A.      You know, laptops.
```

Orien L. Tulp, Ph.D., M.D.

1        Q.    And when you say some files
2   in her desk were stolen, were those hard
3   copy or electronic files?
4        A.    They were paper files.  It
5   was actually the application for her
6   replacement.
7        Q.    And who was her replacement?
8        A.    A trainee, Nicole Perez.
9        Q.    You said a couple of other
10  small things were taken as well.
11       A.    Speakers.
12       Q.    Speakers, computer speakers?
13       A.    Laptop speakers.
14       Q.    Anything else?
15       A.    A couple of flash drives.
16       Q.    Do you remember the contents
17  of those flash drives?
18       A.    I do not know the content of
19  the flash drives, no.
20       Q.    Anything else?
21       A.    I think they took a water
22  bottle that belonged to Ms. Cruz, I
23  believe.
24       Q.    Anything else?

Orien L. Tulp, Ph.D., M.D.

```
1           A.      I don't know of any other
2      items.
3           Q.      Do you if a police report
4      was made?
5           A.      Yes.
6           Q.      Have you ever seen that?
7           A.      No.
8           Q.      Who made the police report?
9           A.      The building owner made the
10     report -- or the building manager made
11     the report.
12          Q.      Who was that?
13          A.      The building manager, I
14     don't know her name.
15          Q.      A lady?
16          A.      A lady.  I don't know her
17     name.
18          Q.      Has anything been recovered?
19          A.      No.
20          Q.      Do you know if it's an open
21     investigation?
22          A.      I believe it's still open.
23          Q.      Do you have a suspicion or
24     understanding about why those things may
```

Orien L. Tulp, Ph.D., M.D.

1   have been stolen from the USAT building?

2          A.    A very strong suspension.

3          Q.    And what is your suspension?

4          A.    The suspension would be that

5   it would have been linked to Ms. Cruz

6   because it specifically targeted her desk

7   and her previous -- her former computers.

8   And because the nature of the break in

9   where it occurred, how it occurred, one

10  would have to be very familiar with the

11  building to know how to gain entrance.

12         Q.    Was there any, as far as you

13  know, evidence of a break in, broken

14  locks, broken windows?

15         A.    Broken window.

16         Q.    A broken window?

17         A.    A broken window in the

18  conference room.

19         Q.    Glass broken or broken like

20  the lock --

21         A.    -- glass broken.

22         Q.    So if you could just let me

23  finish my questions --

24         A.    Okay.

Orien L. Tulp, Ph.D., M.D.

```
1        Q.     -- and I'll let you finish
2   your answer, so we don't talk on top of
3   each other.   But we're doing great so
4   far.
5        A.     That's fine.
6        Q.     Okay.   Thank you.
7               So there was broken glass
8   you said?
9        A.     Yes.
10        Q.     And what are the
11   circumstances of Ms. Cruz leaving USAT?
12        A.     There were work performance
13   issues.
14        Q.     What do you mean by that?
15        A.     Repeated errors on
16   transcripts.
17        Q.     What do you mean by repeated
18   errors on transcripts?
19        A.     Misspelling of names,
20   misspelling of course selections,
21   miscalculation of grade point averages,
22   things that a registrar has to be very
23   accurate about.
24        Q.     Who communicated to Ms. Cruz
```

Orien L. Tulp, Ph.D., M.D.

1    that she was no longer going to be

2    employed by USAT?

3         A.    The vice president.

4         Q.    And who is that?

5         A.    Carla Konyk, Director Konyk.

6         Q.    And could you spell Carla's

7    last name for us?

8         A.    K-O-N-Y-K.

9         Q.    And you say that Konyk?

10        A.    Konyk.

11        Q.    Great.  Thank you.

12              Was that communication in

13    writing or oral, do you know?

14        A.    Both.  And it was a

15    longstanding communication over a number

16    of months.

17        Q.    Prior to January 2019?

18        A.    Prior to her dismissal.

19        Q.    And which was in December

20    2018, does that sound right?

21        A.    I don't remember the exact

22    date.  I don't know.

23        Q.    But towards the end of 2018

24    would you say?

Orien L. Tulp, Ph.D., M.D.

1    A.    Probably, yes.

2    Q.    Do you know if any valuables

3   were taken in the theft?

4    A.    Any?

5    Q.    Valuables.

6    A.    Valuables.  Well, laptops in

7   this case would be considered valuables.

8    Q.    Aside from the laptops.

9    A.    I don't -- I'm not aware of

10  any other significant valuables.  There's

11  no money stored on campus, for example,

12  in the office.

13    Q.    Have you been in touch with

14  the police to tell them your suspicion

15  about the cause of the theft?

16    A.    I have requested through the

17  vice president who communicates with the

18  former manager who has been unresponsive.

19    Q.    The former building manager?

20    A.    Building manager is

21  unresponsive.

22    Q.    But you have not gone

23  directly to the police yourself?

24    A.    No, I haven't gone directly

Orien L. Tulp, Ph.D., M.D.

1    to the police myself.

2         Q.    I'd like to talk about USAT

3    a little bit.

4              Do you understand what I'm

5    talking about by saying USAT?

6         A.    Uh-huh.  I'm familiar with

7    the term.

8              MR. REIL:  Counsel, before

9         we get into your next issue, could

10        we go off the record?

11             MS. MCENROE:  Sure.

12             MR. REIL:  Okay.

13             VIDEOGRAPHER:  Off the

14        record at 9:29 a.m.

15             (At this time, a discussion

16        was held off the video and

17        stenographic record.)

18             VIDEOGRAPHER:  Back on the

19        record at 9:30 a.m.

20             MS. MCENROE:  Counsel can

21        correct me if I'm wrong but we've

22        agreed that for the purposes of

23        this deposition, that all

24        objection -- all objections aside

Orien L. Tulp, Ph.D., M.D.

1              to those to form are reserved

2              until the time of trail.

3                      MR. SWATE:  Yes, that's the

4              agreement.

5                      MR. REIL:  So agreed.

6                      MS. MCENROE:  Thank you.

7       BY MS. MCENROE:

8                      Q.    So what does USAT stand for?

9                      A.    University of Science, Arts

10      and Technology.

11                     Q.    Do you know when USAT came

12      into existence?

13                     A.    I didn't hear that.

14                     Q.    Do you know when USAT came

15      into existence?

16                     A.    September 26, 2003.

17                     Q.    And how do you know that

18      date?

19                     A.    Because I was there.

20                     Q.    Tell me a little bit about

21      your involvement in the starting of USAT?

22                     A.    We -- while I was residing

23      in the UK I'm often, as a professor,

24      often asked to write letters of

Orien L. Tulp, Ph.D., M.D.

1   recommendation for students to go to

2   other schools, and I became aware while I

3   was on a leave in Cambridge that there

4   were a number of offshore schools based,

5   you know, satellite programs running in

6   the UK, and while I was there one of them

7   invited me to be a dean of his school.  I

8   went down and looked at it and I began to

9   investigate and discovered that, number

10  one, his school was never licensed.  And

11  I used the credential for the Pentagon

12  for medical professionals, so I did a

13  little background research to find out

14  that this whole school was bogus at the

15  time.

16       Q.    And what school was that?

17       A.    Saint Christopher's School

18  of Medicine -- or St. Christopher's

19  College of Medicine it became, and I'm

20  not when that transition occurred.

21            I declined the invitation on

22  the grounds that I've -- I was attending

23  professor at Drexel and it would have

24  been a conflict of my contract and I

Orien L. Tulp, Ph.D., M.D.

1  didn't want to do it anyway.  And so --
2  but it gave me a reason to look into the
3  business of offshore schools, being many
4  of them.  I think they're right now 78
5  offshore schools in the Caribbean region
6  alone, in the Caricom.
7           COURT REPORTER:  In where?
8           THE WITNESS:  In the
9      Caricom.
10          And so I looked into that
11      and I realized that they're all
12      entrepreneurial, all of them.  And
13      we got the idea that if one were
14      to form a university based on an
15      academic platform, it should go
16      far because there's a real need
17      and that's when we created USAT.
18  BY MS. MCENROE:
19      Q.    You say when we created
20  USAT, who else worked with you to help
21  create USAT?
22      A.    Several other individuals.
23  We got together in a pub in Cambridge,
24  the Eagle Pub.  Very famous.  I'm sure

Orien L. Tulp, Ph.D., M.D.

1    you know about it.

2         Q.    I studied at Oxford not at

3    Cambridge so I apologize, I don't know

4    that one.

5         A.    I see.  That's where they

6    first outlined DNA on a napkin.  Anyway.

7    So we decided that we would form this

8    school, form a university based on an

9    academic platform because we're all

10   academics.

11        Q.    And who is the we?

12        A.    We -- my other primary

13   contributor at that time was Dr. Jeffrey

14   Mvenge.

15        Q.    How do you spell the last

16   name?

17        A.    M-V-E-N-G-E.

18        Q.    And anybody else?

19        A.    And he and I were the two

20   principles.

21        Q.    You said offshore schools a

22   number of times, what do you mean by that

23   in this setting?

24        A.    Offshore schools that are

Orien L. Tulp, Ph.D., M.D.

1    schools that are located off the shores

2    of the US or major continents.  They're

3    offshore schools I believe where

4    virtually every major land to me.

5          Q.     So are you and Jeffrey

6    Mvenge the two founders of USAT?

7          A.     He went back to Zimbabwe.

8          Q.     Did he found USAT with you?

9          A.     He was on the organizing

10    committee.

11          Q.     Did he found USAT with you?

12          A.     He was a contributor, I will

13    say that.

14          Q.     Does he have any ownership

15    interest in USAT today?

16          A.     No.

17          Q.     Do you?

18          A.     Yes.

19          Q.     What's your ownership

20    interest in USAT?

21          A.     50 percent.

22          Q.     Who owns the other 50

23    percent?

24          A.     Carla Konyk.

Orien L. Tulp, Ph.D., M.D.

```
1              Why is that relevant?
2              MR. REIL:  Let counsel ask
3       her questions.
4              THE WITNESS:  All right.
5              MR. REIL:  We'll object if
6       we think it's necessary.
7              THE WITNESS:  Okay.
8              MS. MCENROE:  Thank you.
9    BY MS. MCENROE:
10             Q.   And what's your relationship
11      to Ms. Konyk?
12             A.   She's the vice president.
13             Q.   Do you have a personal
14      relationship?
15             A.   I've known her for many
16      years.
17             Q.   Is she your wife?
18             MR. REIL:  You can answer.
19             THE WITNESS:  She is.
20   BY MS. MCENROE:
21             Q.   Is she a medical doctor?
22             A.   Yes.
23             Q.   Where did she get her
24      medical degree?
```

Orien L. Tulp, Ph.D., M.D.

1    A.    In the UK.

2    Q.    At what school?

3    A.    I think it was called London
4    Medical College or something like that.

5    Q.    Is that before or after you
6    guys had met?

7    A.    Probably after.  I met her
8    many years ago on a humanitarian medical
9    mission.

10   Q.    And pardon me for not
11   nothing but does she have an M.D. or is
12   there a different medical degree from the
13   UK?

14   A.    They're MBBS.

15   Q.    MBBS.  And is that what she
16   has?

17   A.    Yes.

18   Q.    Since the founding of USAT
19   has the ownership split been 50 percent
20   you and 50 percent Ms. Konyk?

21   A.    Yes.

22   Q.    From the beginning?

23   A.    From the beginning.

24   Q.    Still today?

Orien L. Tulp, Ph.D., M.D.

```
1          A.      Until today.

2          Q.      And what is your title aside

3  from owner at USAT?

4          A.      Professor.

5          Q.      Are you also the president?

6          A.      Yes.

7          Q.      Do you have any other titles

8  at USAT?

9          A.      No.

10         Q.      Have you had any other

11  titles at USAT?

12         A.      No.

13         Q.      Speaking first about your

14  role as president, what specifically do

15  you do at USAT as president?

16         A.      I provide overall direction

17  of the University, administrative

18  professor -- I tend to spend more of my

19  time working on the professional side, on

20  the academic side, curriculum,

21  corporation, guiding the curriculum

22  development, that sort of thing.

23         Q.      Anything else?

24         A.      That's about it.
```

Orien L. Tulp, Ph.D., M.D.

1          Q.    For professor, what do you

2    teach or have you taught at USAT?

3          A.    Nutritional medicine mostly.

4    And that would include things like

5    pharmacology.

6               COURT REPORTER:  I'm sorry?

7               THE WITNESS:  That would

8          include pharmacology.

9               MR. REIL:  Wait until

10         there's a question.

11              MS. MCENROE:  I think he was

12         just clarifying for the court

13         reporter.

14              MR. REIL:  Oh, okay.  Fine.

15   BY MS. MCENROE:

16         Q.    And have you been both the

17   professor and the president of USAT since

18   its founding?

19         A.    Yes.

20         Q.    And you mentioned that Ms.

21   Konyk is the vice president?

22         A.    Yes.

23         Q.    Is she a professor as well?

24         A.    No, she's administrator.

753a

Orien L. Tulp, Ph.D., M.D.

1          Q.     Just very briefly, what her

2    role is at USAT?

3          A.     She's vice president and --

4    administration.

5          Q.     So what does that mean?

6          A.     Well, she takes care of all

7    the administrative details, makes sure

8    the bills get paid and that sort of

9    thing.  Faculty get paid, making sure the

10   administrative policies, managing the

11   office and that sort of thing.

12         Q.     Where is she based?

13         A.     Colorado.

14         Q.     And where are you based?

15         A.     Colorado and Montserrat.  I

16   split my time.

17         Q.     How would you estimate your

18   split of time percentage-wise?

19         A.     Recently, probably if I go

20   back, in the average over the last 15

21   years about 50/50.

22         Q.     About 50/50.

23                You have a home there in

24   Montserrat?

Orien L. Tulp, Ph.D., M.D.

1        A.    Yes.

2        Q.    Is there any other USAT

3   faculty or employees who are located in

4   Montserrat?

5        A.    Yes.

6        Q.    And who is that?

7        A.    Dr. Lewis.   Consultant

8   surgeon.

9        Q.    What's Dr. Lewis' first

10  name?

11       A.    Lowell.

12       Q.    And is he a professor?

13       A.    He's a professor.   He's a

14  very senior surgeon.

15       Q.    Anybody else?

16       A.    Tracy Scipio, who is the

17  office manager.

18       Q.    Yup.

19       A.    Roy Abrams who is the

20  building engineer of the campus.

21       Q.    Yup.

22       A.    Another fellow who is --

23  Charles Rooney, who is the grounds

24  keeper.

Orien L. Tulp, Ph.D., M.D.

1      Q.    Yup.

2      A.    We have a housekeeper whose

3   name I don't recall, it just changed.

4      Q.    Yup.

5      A.    We have some other staff

6   that worked there on a regular basis to

7   make sure that, you know, the buildings

8   are maintained in good condition and the

9   administrative stuff gets managed.

10     Q.    Any other professors located

11  in Montserrat?

12     A.    They travel in as are

13  needed.

14     Q.    Are you currently employed

15  at the University of Health and

16  Humanities in the British Virgin Islands?

17     A.    No.

18     Q.    Has that school been

19  founded?

20     A.    I believe so.

21     Q.    Were you involved in it

22  getting founded?

23     A.    Yes and no.  I provided some

24  guidance.

1        Q.    Is Ms. Konyk involved in its

2   founding?

3        A.    I believe so.

4        Q.    Is she an owner, in part or

5   in whole, of the University of Health and

6   Humanities BVI?

7        A.    I believe so.

8        Q.    What percentage owner is

9   she?

10       A.    I'm not sure.

11       Q.    Do you know any of the other

12  owners at the University of Health and

13  Humanities BVI?

14       A.    Not really.

15       Q.    So is that a no?

16       A.    That's a no.

17       Q.    Do you know what the status

18  is of that school, is it open and

19  operating?

20       A.    It's been operating, yes.

21       Q.    Since when?

22       A.    Since January.

23       Q.    Does it have students

24  enrolled?

Orien L. Tulp, Ph.D., M.D.

1          A.    I believe so.  I believe

2    they do have.

3          Q.    Are you a professor at the

4    University of Health and Humanities BVI?

5          A.    No.

6          Q.    Do you plan to be?

7          A.    Not sure.

8          Q.    Is there any relationship

9    between USAT and the University of Health

10   and Humanities in BVI?

11         A.    No direct relationship that

12   I'm aware of.

13         Q.    Is there an indirect

14   relationship?

15              MR. REIL:  Objection to the

16         form of the question.  Can we go

17         off the record?

18              VIDEOGRAPHER:  Off the

19         record at 9:43 a.m.

20              (At this time, a discussion

21         was held off the video and

22         stenographic record.)

23              MR. REIL:  I object to that

24         question because -- the form of

Orien L. Tulp, Ph.D., M.D.

1        the question because I think the
2        term indirect relationship is very
3        vague.  I'd appreciate it if you
4        can clarify that.
5              MS. MCENROE:  Are you
6        directing him not to answer?
7              MR. REIL:  Absolutely not.
8              MS. MCENROE:  Then let's go
9        back on the record.
10             VIDEOGRAPHER:  Back on the
11       video record at 9:44 a.m.
12   BY MS. MCENROE:
13       Q.    Is there an indirect
14   relationship between USAT and the
15   University of Health and Humanities BVI?
16       A.    I would say probably yes.  I
17   don't -- I can't clarify that.  I'm not
18   privy to that information.
19       Q.    So Dr. Tulp, I am not going
20   to try to go through your whole
21   employment history and education history
22   because it's quite impressive and long.
23   I'm not going to belabor the point here
24   today but I do want to talk through a

Orien L. Tulp, Ph.D., M.D.

1   couple of things in particular.  And we

2   have what we believe is a copy of your

3   resume.

4                 MS. MCENROE:  I'd like to

5         mark Exhibit-1.

6                 (At this time, a Resume was

7         marked for identification as

8         Exhibit-1.)

9   BY MS. MCENROE:

10        Q.    So Dr. Tulp, I'm handing you

11   what's been marked as Exhibit-1.  Is that

12   your name at the top?

13        A.    It is indeed, yes.

14        Q.    And are those your titles

15   listed out, Ph.D., M.D., F.A.C.N.,

16   C.N.S.?

17        A.    Yes.

18        Q.    Is this your resume?

19        A.    It does appear to be, yes.

20        Q.    Is this a familiar document

21   to you?

22        A.    It is familiar, yes.

23        Q.    Did you prepare it?

24        A.    I most likely did some time

760a

Orien L. Tulp, Ph.D., M.D.

1    ago.

2         Q.    Do you have any reason to

3    believe you did not prepare it?

4         A.    No.

5         Q.    So I know what a Ph.D. and

6    an M.D. is.   What is an F.A.C.N.?

7         A.    Fellow of the American

8    College of Nutrition.

9         Q.    And what is C.N.S.?

10        A.    Certified Nutritional

11   Specialist.

12        Q.    I'd like to take a look at

13   the second page of that document and I'd

14   like to go through a couple things in

15   your education briefly.

16             So as I see it you have a

17   number of different degrees listed here

18   but I want to start from the top and work

19   my way down for the M.D. related degrees.

20   So the first that I see is a Ph.D., M.D.,

21   from the University of Vermont in 1968 to

22   1974; is that correct?

23        A.    Correct, uh-huh.

24        Q.    So am I understanding that

Orien L. Tulp, Ph.D., M.D.

1   correct to say that you did both a

2   Medical Doctor degree and a Doctor of

3   philosophy at the University of Vermont?

4           A.      Yes, I did the Ph.D.

5           Q.      The M.D., Ph.D. program?

6           A.      That's right.

7           Q.      And so if I called the

8   University of Vermont would they tell me

9   that you graduated with an M.D.?

10              MR. REIL:  Objection as to

11          what the University of Vermont

12          would say.  You can answer.

13              THE WITNESS:  I have no

14          idea.

15  BY MS. MCENROE:

16          Q.      Do you have an diploma from

17  the University of Vermont with an M.D.

18  degree on it?

19          A.      I have a diploma.  I had

20  one.

21          Q.      Have you ever seen one for

22  yourself?

23          A.      Yes, I have.  I've had one.

24  When I went to Montserrat they wanted my

Orien L. Tulp, Ph.D., M.D.

1    original diploma so I took it out of the

2    frame and it has yet to be returned.

3         Q.    And when I asked you if I

4    called the University of Vermont if they

5    would tell me that you had an M.D. degree

6    or not, you didn't say emphatically yes.

7    Why not?

8         A.    Because I don't have a copy

9    of that certificate anymore, it's gone.

10        Q.    Do you have a transcript

11   from when you attended the University of

12   Vermont and got your medical doctorate

13   degree?

14        A.    I'm sure I do.  It's been

15   many years.

16        Q.    Moving a little bit further

17   down there's listed as a medical degree

18   from St. Petersburg Medical Academy/IUFS

19   in St. Petersburg, Russia in 2005.  What

20   is IUFS?

21        A.    I think that's the

22   International University for Fundamental

23   Studies.  And I'm not sure what the

24   relationship of that is with St.

Orien L. Tulp, Ph.D., M.D.

1   Petersburg Medical Academy.  Medical

2   Academy is the medical school.

3          Q.    Was that education in

4   Russian or in English?

5          A.    It was in English.

6          Q.    Have you ever tried to come

7   through the Educational Commission for

8   Foreign Medical Graduates with your

9   foreign medical diploma to enter graduate

10   medical education in the United States?

11          A.    No.

12          Q.    That diploma is listed as

13   2005?

14          A.    Correct.

15          Q.    Why did you attend St.

16   Petersburg Medical Academy for a medical

17   doctor degree in 2005?

18          A.    They wanted me to be -- they

19   offered me a seated faculty position and

20   that was an enticement to get me to

21   accept it.

22          Q.    Did you do course work for

23   that M.D. degree?

24          A.    It was transfer credit.

Orien L. Tulp, Ph.D., M.D.

1          Q.    From where?

2          A.    From University of Vermont.

3          Q.    Did you do any course work

4    at St. Petersburg Medical Academy?

5          A.    No.  It was all transfer

6    credit.

7          Q.    And I'd like to look at your

8    M.D. degree next, it's from California

9    University, Los Angeles?

10         A.    That's a foreign degree

11   equivalence.

12         Q.    So can you explain what that

13   means?

14         A.    They reviewed everything,

15   they did a -- just like when similar to I

16   assume with the ECFMG does when you

17   submit your credentials, they do an

18   evaluation of that credential through

19   some agency and then they issue the

20   certificate accordingly.

21         Q.    And was that a degree

22   awarded for course work done there?

23         A.    No, that's an equivalency.

24         Q.    Is that school, the

Orien L. Tulp, Ph.D., M.D.

```
1    California University, Los Angeles
2    located in the United States?
3         A.    Yes.
4         Q.    In California?
5         A.    In California.
6         Q.    In Los Angeles?
7         A.    In Los Angeles.
8         Q.    Did you go to Los Angeles in
9    connection with receiving this degree?
10        A.    I've been to Los Angeles
11   many times.
12        Q.    In connection with receiving
13   this degree?
14        A.    I didn't -- no, I didn't
15   have to go in connection with that
16   because it's an equivalency certificate,
17   not, you know, not in a classroom base.
18        Q.    And what served as the basis
19   for that equivalency?
20        A.    They evaluate your course
21   work and compare it to the US standard.
22        Q.    And what course work was
23   that for you?
24        A.    That was course work taken
```

Orien L. Tulp, Ph.D., M.D.

1   at the University of Vermont and I

2   presume -- it's a collection of

3   everything.

4           Q.    And why did you pursue

5   getting the M.D. degree at California

6   University, Los Angeles?

7           A.    I guess for the same reason

8   we had to do it for NARIC in the UK.

9   When I was residing there, they evaluate

10  your credentials to see if they're

11  equivalent to their credentials.  Even

12  though I never actually took a position

13  in the UK.  We did do -- I did to the

14  NARIC evaluation and they considered

15  everything equivalent up to and including

16  the Ph.D., which is pretty good because

17  I'm aware that they don't accept a lot of

18  US credentials.

19          Q.    So I want to make sure I

20  understand.  So the Doctor of Medicine,

21  California University, Los Angeles, were

22  they evaluating to see if you had the

23  equivalent of a US degree?

24          A.    US and UK.

767a

Orien L. Tulp, Ph.D., M.D.

1        Q.    US and UK.

2        A.    Yes.

3        Q.    Okay.  And so -- but you

4    already had a US degree from the

5    University of Vermont; correct?

6        A.    Right.

7        Q.    So you were doing that for

8    the purposes of having the equivalency of

9    a UK degree?

10       A.    Yes, because I was

11   considering an appointment at Cambridge.

12       Q.    So did you take an

13   appointment at Cambridge?

14       A.    No, I did not.

15       Q.    But you mentioned having

16   been at Cambridge when you had the idea

17   for USAT?

18       A.    Yes, right.

19       Q.    So were you a ever

20   affiliated with a college in Cambridge?

21       A.    I was invited to give a few

22   lectures at different colleges while I

23   was there.

24       Q.    What colleges?

Orien L. Tulp, Ph.D., M.D.

1          A.     I don't remember the names

2     of the colleges.  It's many years ago.

3          Q.     Would that have been in the

4     2004 timeframe?

5          A.     It would have been 2001,

6     '02, '03, '04 because I resided in the UK

7     for about six years.

8          Q.     And what were you doing

9     professionally when you lived in

10    Cambridge for six years?

11         A.     I was on leave from Drexel

12    University.

13         Q.     Doing what?

14         A.     I was on a medical leave.

15         Q.     Why did you take your

16    medical leave from Drexel University in

17    the United Kingdom?

18         A.     I had a serious back injury

19    from a car accident and I needed to have

20    a year away when Drexel would stop

21    ringing up my phone every day.

22         Q.     So did you work while you

23    were there?

24         A.     I gave guest lectures,

Orien L. Tulp, Ph.D., M.D.

1  occasional guest lectures there and on

2  the continent.

3          Q.    The next degree is an M.D.

4  (AM.) What does that mean?

5          A.    Yes.

6          Q.    What does that mean, the AM?

7          A.    Alternative medicine.

8          Q.    So is that different than a

9  Doctor of Medicine degree?

10         A.    Yes.  That's natural

11  medicine.

12         Q.    And you received that degree

13  in 2004 from Open International

14  University, Columbo, Sri Lanka India?

15         A.    Correct.

16         Q.    Did you actually physically

17  go to India to receive that degree?

18         A.    No, I did not.

19         Q.    Did you take any course work

20  to receive that degree?

21         A.    They used my course work

22  from the University of Vermont and other

23  institutions because I have a strong

24  interest in complementary medicine.

Orien L. Tulp, Ph.D., M.D.

1    Q.    You also have another M.D.

2    (AM) received in 2004, this time labeled

3    as Doctor of Medicine in Alternative,

4    slash, Integrated Medicine, Medicina

5    Alternativa?

6    A.    Yes.

7    Q.    If I didn't butcher that.

8    Okay.

9    From the Indian Board of

10   Alternative Medicine Calcutta?

11   A.    That's correct.

12   Q.    And did you go to Calcutta

13   in connection with that degree?

14   A.    No, I did not have to.  I

15   didn't go to.

16   Q.    What did they accept in

17   order to award you that degree?

18   A.    They reviewed my transcripts

19   and my entire profile to do that.

20   Q.    So was that again the

21   University of Vermont course work?

22   A.    It included University of

23   Vermont, yes.

24   Q.    Did it return -- sorry.

771a

Orien L. Tulp, Ph.D., M.D.

1   Strike that.

2           Did it include anything

3   else?

4       A.     They probably did but I

5   don't recall.

6       Q.     Do you have any other M.D.

7   or medical degree or equivalent?  Or did

8   we review all of them?

9       A.     No, I think you've got it

10  covered.

11      Q.     Are you a practicing doctor

12  in the United States?

13      A.     No.

14      Q.     Are you licensed to practice

15  medicine in United States?

16      A.     I was at one time.

17      Q.     In what state?

18      A.     West Virginia.

19      Q.     When was that?

20      A.     A long time ago.

21      Q.     If it refreshes your

22  recollection at all, take a look at page

23  4, if it would be helpful.  And of

24  course, I want your current answer.  But

Orien L. Tulp, Ph.D., M.D.

1    just there's a section at the top, it
2    says, Medical Licensure, West Virginia,
3    USA.
4          A.    Right.
5          Q.    And it says that it expired
6    in July of 2010.  Do you see that?
7          A.    Right.
8          Q.    Does that sound right to
9    you?
10          A.    That seems right.  I just
11    didn't bother renewing it.
12          Q.    Have you ever treated
13    patients in the United States as a
14    medical doctor?
15          A.    No.  I've been an academic
16    and a researcher.
17          Q.    Do you know when you
18    received your medical degree in West
19    Virginia?  I'm sorry, strike that.
20                Do you know when you
21    received your medical license from West
22    Virginia?
23          A.    I don't recall the year.
24          Q.    It also says here that you

Orien L. Tulp, Ph.D., M.D.

1    are an Allied Health Professional in

2    California.  Is that a medical doctor?

3         A.    That was Allied Health.  It

4    was when I first -- I did a sabbatical in

5    California at a pharmaceutical firm.

6         Q.    But is that the same as a

7    medical license in California?

8         A.    No, that's more pathology.

9         Q.    In the District of Columbia

10   you have listed Naturopathic Medicine?

11        A.    Yes.  I was registered their

12   Naturopathic Medicine.

13        Q.    Is that the same as a

14   license to practice medicine?

15        A.    It was in that domain, yes.

16        Q.    So you are able to practice

17   medicine in the District of Columbia?

18        A.    Natural medicine.

19        Q.    Just natural medicine?

20        A.    Natural medicine.  Yes.

21        Q.    But it was an

22   unrestricted -- it was not an

23   unrestricted license to practice

24   medicine?

1        A.    No.   No.

2              THE WITNESS:  I don't think

3        they issue those anymore, I don't

4        know.   I haven't kept up with it.

5              MS. MCENROE:  Well, it's

6        almost 10 o'clock and we're about

7        to have a fire alarm so we're

8        going to take a quick break.

9              VIDEOGRAPHER:  Off the

10       record at 9:57 a.m.

11             (At this time, a short break

12       was taken.)

13             VIDEOGRAPHER:  We're back on

14       the record at 10:08 a.m.

15  BY MS. MCENROE:

16       Q.    Dr. Tulp, I'd like to talk a

17  little bit about your work at USAT.  And

18  in particular, your role as an authorized

19  signatory on behalf of USAT for purposes

20  of the Educational Commission for Foreign

21  Medical Graduates?

22       A.    Sure.

23       Q.    When I say an authorized

24  signatory, do you know what I'm talking

Orien L. Tulp, Ph.D., M.D.

1    about?

2          A.    I think I do.

3          Q.    What does that mean to you?

4          A.    It means I get to sign

5    things.

6          Q.    You get to sign things for

7    what purpose?

8          A.    Diplomas and I suppose also

9    it would include anything that requires

10   an official signature.

11         Q.    In order to communicate to

12   the Educational Commission for Foreign

13   Medical Graduates, that the information

14   is correct?

15         A.    Presuming it's correct as

16   presented to me.

17         Q.    To the best of your

18   knowledge?

19         A.    To the best of my knowledge.

20         Q.    Do you understand that you

21   are not presently permitted by the ECFMG

22   to be an authorized signatory?

23         A.    I understand that.

24         Q.    Do you know if USAT has

Orien L. Tulp, Ph.D., M.D.

1    different authorized signatories at

2    present aside from yourself?

3         A.    Yes, it does.

4         Q.    And who is that?

5         A.    Carla Konyk is the

6    authorized signature now.

7         Q.    Anybody else?

8         A.    The registrar which would

9    be --

10        Q.    Mary Hickling?

11        A.    Mary Hickling, yes.

12        Q.    And they are both presently

13   employees of USAT?

14        A.    Yes.

15        Q.    Do you know whether they

16   were both authorized signatories

17   previously when you were also an

18   authorized signatory?

19        A.    I was not aware that they

20   were.

21        Q.    Do you know one way or the

22   other?

23        A.    I did not know that they

24   were authorized signatories at that time.

777a

Orien L. Tulp, Ph.D., M.D.

1    I only knew that the registrar, because
2    her signature has to be recorded with an
3    official ECFMG form of some sort.  And I
4    knew that she was but I didn't know any
5    of the others were.
6          Q.    And when you say the
7    registrar, you're talking about Ms.
8    Hinkling?
9          A.    Ms. Hinkling, yes.
10         Q.    And how long has she been
11   the registrar at USAT?
12         A.    About five years I think.
13   I'm guessing.
14         Q.    Previously when you were an
15   authorized signatory to ECFMG, when
16   documents were signed with your name,
17   were you the actually the one signing
18   them?
19         A.    I hope I was but I can't
20   attest that I always was.
21         Q.    And why do you say that?
22         A.    Well, some of the forms are
23   already signed when I get them.
24         Q.    By you?

Orien L. Tulp, Ph.D., M.D.

```
1           A.      Some by the ECFMG.

2           Q.      Right.  But if you sign a

3     document as the authorized signatory on

4     behalf of USAT previously and submitted

5     it to ECFMG, did it have your signature

6     on it before you received it?  Is that

7     what you're saying?

8           A.      I can't say yes or no.  That

9     it was always that way.

10          Q.      So you said you hoped that

11    you were the person who actually signed

12    the documents, was anybody else at USAT

13    authorized to sign on your behalf?

14          A.      No.

15          Q.      Was anybody authorized to

16    send e-mails on your behalf?

17          A.      I believe that the -- they

18    sent everything out over my signature

19    block.  When they send correspondence to

20    students, for example, they send it over

21    my signature block, and I never really

22    thought very much about that one way or

23    the other.

24          Q.      But you may not have
```

Orien L. Tulp, Ph.D., M.D.

1    necessarily been the author of the

2    e-mails, is that what you're saying?

3          A.    I would not have been the

4    author.

5          Q.    Sometimes you were and

6    sometimes you weren't?

7          A.    More often than not on the

8    usual correspondence then I'm not author.

9          Q.    I just want to confirm the

10   e-mail addresses that you use.

11         A.    I (indicating.)

12         Q.    I just want to confirm the

13   e-mail addresses that you use.  One I

14   have is O.tulp, which is T-U-L-P,

15   @USAT.edu?

16         A.    That is correct.

17         Q.    And another I've seen is

18   USAT.edu@gmail.com.

19         A.    Yes.  That preceded the edu,

20   the Educause domain.

21         Q.    And those are both e-mails

22   addresses you have used?

23         A.    Yes.

24         Q.    And you receive e-mails at

Orien L. Tulp, Ph.D., M.D.

1    those e-mail addresses?

2        A.    Yes.

3        Q.    Since it sounds like you

4    have some uncertainty about whether

5    documents that went to ECFMG with your

6    signature on them weren't necessarily

7    signed by, did you ever raise that

8    concern to ECFMG?

9        A.    I haven't because as a

10   result of this I became aware of it.

11       Q.    What do you mean by that?

12       A.    I was not aware that there

13   were questions before.  15 years we had

14   no glitches.  Not a single glitch.

15       Q.    I just want to make sure I

16   break that down and understand what

17   you're talking about.

18            So when you say before this

19   are you talking about before the

20   circumstances that bring us to this

21   deposition today?

22       A.    Yes.

23       Q.    And when you say you weren't

24   aware of there being glitches, what do

1  you mean by a glitch?

2      A.    The ECFMG is claiming that

3  documents were inaccurate.  I'm unaware

4  of any that were inaccurate when they

5  were sent by me.

6      Q.    Are you now aware that they

7  were inaccurate at the time?

8      A.    No.  Because I have not seen

9  proof.

10      Q.    What steps, if any, is USAT

11  currently taking to make sure that

12  documents that are signed by an

13  authorized signatory sent to ECFMG are

14  accurate?

15      A.    When Dr. Konyk reviews them

16  she has access to administrative files

17  that I do not.  So she's able to go back

18  and verify names, dates and places that I

19  could not.

20      Q.    And is that a process that's

21  in place now?

22      A.    It is.  Yes, it's in place

23  now.

24      Q.    Was it in place previously

Orien L. Tulp, Ph.D., M.D.

1    when you were the authorized signatory or

2    a authorized signatory I should say?

3        A.    We follow FERPA.  And

4    therefore, if you have no need, there's

5    no requirement to see if this particular

6    document, you cannot access that.  So

7    during the process of leading up to this,

8    I can't go in and look at a person's

9    transcript and make a comment on it or

10   edit it or verify things.  Occasionally,

11   I can get them but I'm not authorized to

12   be in that system because I have no need

13   to enter data.  If you can't enter data

14   there's no need to be in there.

15       Q.    So when you were the

16   authorized signatory, you were also

17   President of USAT signing documents to

18   attest to the veracity of transcripts and

19   diplomas to the ECFMG, but you say that

20   you had no reason to check that they were

21   actually accurate?

22       A.    I had to reason to doubt

23   that they were correct.  I had no reason

24   to doubt that they were correct or

1   incorrect because as they were presented

2   to me they've already been through the

3   registrar for verification.

4          Q.     What was the process there?

5   Because my understanding is is that ECFMG

6   would send documents to USAT asking if

7   these are correct, and then they would

8   come back with your signature saying they

9   were.

10          So at what point was the

11   registrar verifying that they were

12   correct and how do we know that that's

13   true based on the document?

14          A.     At that point I would take

15   the data from the transcript.

16          Q.     Which transcript?

17          A.     The USAT transcript.

18          Q.     Provided from ECFMG?

19          A.     Provided by the registrar.

20          Q.     So you would get a

21   comparison?

22          A.     I'd get it and if they

23   matched they matched. They almost all

24   exclusively did.  I don't recall any

Orien L. Tulp, Ph.D., M.D.

1    times when they did not match.

2        Q.    So how does that play in

3    with FERPA, if you were verifying that

4    the transcripts matched or that the

5    diplomas matched, what is it that you're

6    talking about that you were not

7    accessing?

8        A.    I can't access -- if you

9    come to me as a student and you want me

10   to do a grade, review your file, I can

11   only review what the student brings to me

12   to look at and what their study plan is.

13   I can't review their -- I can't -- I

14   can't calculate on whether they got an A,

15   B, C or a D on a grade because I can't

16   read that part of the -- I can't read

17   that part of the file.

18       Q.    So you as president were not

19   authorized to read those files to make

20   sure that they were accurate?

21       A.    I never asked to be

22   authorized to read that because that's --

23   I delegate that to the registrars.  Those

24   that have a need to be in those files.

Orien L. Tulp, Ph.D., M.D.

1      Q.     So in fulfilling your role
2   when you were an authorized signatory for
3   ECFMG, when a transcript or a diploma was
4   sent to USAT for primary source of
5   verification you did not access the
6   underlining information --
7      A.     -- then I would get --
8      Q.     Hold on.  Let me finish my
9   question.
10         -- you did not access the
11  underlining information in USAT's system
12  to verify that it was accurate?
13     A.     I would access it through
14  the registrar.
15     Q.     What do you mean by that?
16  Physically, how did it work?
17     A.     I would ask her now to send
18  me a copy of that transcript so that I
19  could verify the accuracy.
20     Q.     Okay.  So you would.  You
21  would just have a middle person, who
22  would go into the system and get it for
23  you and then you can hold the two next to
24  each other and say, yes, that matches?

Orien L. Tulp, Ph.D., M.D.

1     A.    Right.  I can look at it
2  side-by-side and say, yes, they match
3  that's correct.
4     Q.    And do you believe you did
5  that each time that your signature was on
6  a document, to ECFMG as the authorized
7  signatory for either a diploma or a
8  transcript?
9     A.    I believe I did, yes.
10     Q.    If you were permitted by
11  ECFMG now would you continue to serve as
12  an authorized signatory for USAT to
13  ECFMG?
14     A.    I would.
15     Q.    And would you change the
16  process involved to make sure that there
17  were no "glitches?"
18     A.    I would tighten it up.
19     Q.    And how would you tighten it
20  up?
21     A.    I would tighten it up by,
22  you know, request the access to the files
23  at that time so that I can look not just
24  at the transcript but the entire academic

1    record.

2              THE WITNESS:  There's one

3         point that you didn't finish with.

4              MR. REIL:  Wait for a

5         question.

6              THE WITNESS:  Okay.  All

7         right.

8    BY MS. MCENROE:

9         Q.    You testified earlier that

10   Ms. Cruz was dismissed from USAT because

11   of some issues with her performance; is

12   that correct?

13        A.    She wasn't dismissed she

14   walked off the job.

15        Q.    Ah, so she quit?

16        A.    She quit.

17        Q.    But in any event, you

18   mentioned that she had had some

19   performance issues; is that correct?

20        A.    Yes.  She had been counseled

21   repeatedly.

22        Q.    Do you know if any of those

23   errors coming from Ms. Cruz made their

24   way to ECFMG?

Orien L. Tulp, Ph.D., M.D.

1      A.     I believe they probably did.

2      Q.     And what role was she

3  playing?

4      A.     She was the registrar.

5      Q.     So you would have been

6  relying on --

7      A.     -- she was the registrar

8  before Mary Hickling.

9      Q.     So you would have been

10  relying on information from Ms. Cruz --

11      A.     Yes.

12      Q.     -- in serving as the

13  authorized --

14      A.     Right.

15      Q.     -- signatory to ECFMG?

16      A.     Right.  We became aware of

17  the errors maybe a year prior to her

18  departure.

19      Q.     What steps, if any, did you

20  take to rectify those errors with ECFMG?

21      A.     She was counseled, she was

22  put on probation.

23      Q.     Did the actual errors that

24  made their way to ECFMG get corrected?

Orien L. Tulp, Ph.D., M.D.

1      A.    When we found them we would
2  correct them, yes.
3      Q.    You corrected them with
4  ECFMG directly?
5      A.    Some, yes.  Some, yes.  I
6  think some probably did get corrected,
7  you know, that way.
8      Q.    But potential that some of
9  them did not?
10      A.    But until I became aware of
11  these because -- I became aware of it
12  when I was reviewing some of the
13  transcripts to certify individuals, that
14  there were errors on those transcripts
15  that had slipped through.  Typos,
16  misspellings.  I looked mostly at the
17  signature, the heading of the transcript.
18  The name, make sure the name is correct.
19  And that it matched the application, that
20  it matched all the other parts of the
21  file.  And that's when we discovered that
22  not only was the -- were names being
23  misspelled, careless typing.  Failing to
24  check her work.

790a

Orien L. Tulp, Ph.D., M.D.

1          Q.    Could there have been

2     substantive errors as well?

3          A.    There could have been.

4     There could have been.

5          Q.    And they would have gone to

6     ECFMG under your signature?

7          A.    They could have before I

8     detected it.

9          Q.    Is USAT currently operating

10    as a medical school?

11         A.    It's currently operating,

12    yes, because we have files that we have

13    to attend to and maintain for a number of

14    years.

15         Q.    Does USAT currently have

16    students enrolled?

17         A.    I don't believe so.

18         Q.    When was the last student

19    enrolled attending USAT?

20         A.    Probably December 31st.

21         Q.    2018?

22         A.    Yes.

23         Q.    Do you know if any students

24    were set to graduate after January 1,

Orien L. Tulp, Ph.D., M.D.

1    2019?

2         A.    There were some that would

3    have been eligible in the coming year,

4    yes.

5         Q.    Do you know what happened to

6    those students?

7         A.    I believe they've all

8    transferred to other schools.

9         Q.    Did anyone, in fact,

10   graduate after January 1, 2019?

11        A.    No.

12        Q.    Going back to the previous

13   years, 2014, '15, '16.  Prior to the

14   circumstances that bring us here today,

15   when would you USAT hold graduation?

16        A.    Twice a year.

17        Q.    When is that?

18        A.    Mid June and mid December.

19        Q.    Mid June and mid December.

20             And typically, how many

21   students would graduate at each of those

22   graduation ceremonies, ballpark?

23        A.    It would vary depending on

24   how many were -- had completed the

792a

Orien L. Tulp, Ph.D., M.D.

1    requirements at that point.

2         Q.    And was one was graduation

3    ceremony more common than the other?  So

4    would most people graduate in the summer

5    and a couple in December or would

6    it be in --

7         A.    About half and half.

8         Q.    About half and half.

9         A.    It changed over time.

10        Q.    And what do you mean by

11   that?

12        A.    The December graduation

13   became more popular.

14        Q.    Why do you think that?

15        A.    Because that would graduate

16   them in time to go to residency without

17   skipping a year.

18        Q.    And explain to me how that

19   timeframe works, that sort of life cycle?

20        A.    During their fourth, you

21   know, their last year, their fourth year,

22   they would be taking all of the remainder

23   of the USMLE, you know, requirements, and

24   we would like to have them complete those

Orien L. Tulp, Ph.D., M.D.

1    before they graduate.

2         Q.    Do they have to complete

3    those before they graduate?

4         A.    No.

5         Q.    And what do you mean by

6    that?  So they can still have course work

7    ongoing even if they graduated?

8         A.    If they're an international

9    student there's no need to take the

10   USMLE.

11        Q.    Ah, I see.  So you're saying

12   because they may not come to the United

13   States to practice medicine; correct?

14        A.    They do not all want to come

15   here to practice.

16        Q.    When USAT had students

17   enrolled, was it possible for a student

18   to graduate before they finished their

19   course work for USAT?

20        A.    No.

21        Q.    Typically, how many years

22   would it take a student at USAT to get

23   through the medical curriculum at USAT?

24        A.    Typically about

Orien L. Tulp, Ph.D., M.D.

1    three-and-a-half years.

2         Q.    And you say typically, is

3    that the most common or do you view there

4    as being some other general range?

5         A.    Some take longer than

6    others.

7         Q.    And when you say that, would

8    3.5 years generally be the minimum that

9    it would take for someone to get

10   through --

11        A.    -- probably the average.

12        Q.    The average?

13        A.    Yeah.

14        Q.    And how quickly could

15   someone get through it if they were doing

16   the course work?

17        A.    Probably as little as three

18   years because there are no breaks.

19        Q.    When you say that, you mean

20   that they have accelerated their course

21   work so it would be a little bit more

22   condensed?

23        A.    There no -- there's no term

24   off.  There's no, you know, in my day we

Orien L. Tulp, Ph.D., M.D.

1    had the summers off.  Our students don't

2    have the summers off.  Once they start

3    the program it is nonstop until they

4    finish.  So they can complete that four

5    years of, you know, academic work in

6    about three academic -- three calender

7    years.

8         Q.    Would it be possible for

9    them to do it faster than three calender

10   years?

11        A.    It would be possible but not

12   very -- not very often.  We don't like to

13   graduate them too soon.

14        Q.    When you say it would be

15   possible, I'm just trying to understand

16   that -- in my experience, tell me if I'm

17   wrong, there's a certain number of course

18   hours one would need to complete --

19        A.    Right.

20        Q.    -- usually to get through a

21   curriculum, is that how it was at USAT?

22        A.    Yeah, they can.

23        Q.    So if you took no terms off

24   would it be possible to condense the

Orien L. Tulp, Ph.D., M.D.

1  education faster than three calender

2  years?

3      A.    It would be a challenge.

4      Q.    Do you know of students

5  having done that?

6      A.    I believe a few may have but

7  we usually would not encourage them to

8  graduate until after they take that

9  remaining time to finish the USMLE

10  requirements.  If they put those off

11  until the end they might be able to

12  finish the academic part a little bit

13  quicker but we want them to do those all

14  before they graduate whenever possible.

15      Q.    And when you say the USMLE

16  requirements, are you talking about

17  examinations?

18      A.    Step one, step two CS at

19  2CK.

20      Q.    Did USAT have a requirement,

21  a graduation requirement, for its

22  students who were intending to go to the

23  United States to pass any of the steps?

24      A.    They do not have to pass the

1    USMLE to graduate because the USMLE is

2    not an academic requirement.

3           Q.    Does USAT require it or no?

4           A.    We do not require them to,

5    no.

6           Q.    Do you know how many

7    students graduated from USAT in 2015?

8           A.    I don't recall exactly.

9    Probably about a hundred.

10          Q.    And in 2016?

11          A.    Probably about a hundred.

12          Q.    And 2017?

13          A.    Probably about a hundred.

14          Q.    And 2018?

15          A.    Two hundred and eight --

16    2018 was a banner year because of the

17    ECFMG actions.

18          Q.    So how many in 2018?

19          A.    400.

20          Q.    400?

21          A.    Yes.  Approximately.  I

22    don't know the exact number.

23          Q.    And when you say it was a

24    banner year because of the ECFMG actions,

Orien L. Tulp, Ph.D., M.D.

1    what do you mean?

2         A.    Students who were in that

3    final transitional year, the pressure on

4    them then was to graduate, in some cases,

5    before they had taken the USMLE.

6    Normally, they would have delayed until

7    2019.

8         Q.    So were all 400 who

9    graduated in 2018 in their final year at

10   USAT?

11        A.    Obviously.

12             (Brief interpretation.)

13             THE WITNESS:  Sorry.  Sorry.

14             MS. MCENROE:  No problem.

15   You can --

16             THE WITNESS:  I thought I

17        put the power off before.

18   BY MS. MCENROE:

19        Q.    And when -- in 2018, do you

20   know what happened to the non-final year

21   students at USAT, the lower-graded

22   students?

23        A.    They transferred to other

24   schools.

1          Q.    And how many students
2    transferred?
3          A.    About a thousand.
4          Q.    Do you know if any of them
5    transferred to the University of Health
6    and Humanities BVI?
7          A.    No.  I do not know.
8          Q.    You don't know one way or
9    the other?
10         A.    I don't know one way or the
11   other.
12         Q.    Do you know where the
13   majority of them transferred to?
14         A.    No, I do not.  I know some
15   of the schools they transferred to but I
16   don't know all of them.
17         Q.    Was there a primary school
18   or two that they transferred to or was it
19   a mix?
20         A.    It was a mix.
21         Q.    Just trying to get an
22   understanding for USAT's operations in
23   terms of tuition from its students.
24               Did USAT get paid tuition

Orien L. Tulp, Ph.D., M.D.

1    annually, semiannually, quarterly, how

2    did that work from students?

3         A.    They had a payment plan.

4    Every student has to sign a payment plan.

5         Q.    So explain what that means.

6         A.    They make an agreement when

7    they matriculate of how they're going to

8    pay their tuition.

9         Q.    Is there a standardized

10   payment plan?

11        A.    It's tailored to the

12   individual.

13        Q.    I understand it may be

14   tailored to the individual.  But is there

15   a standard form --

16        A.    Yes.

17        Q.    -- of agreement?

18        A.    Yes.

19        Q.    And so on the standard form

20   was there a schedule for payment?

21        A.    Yes.

22        Q.    Can you explain that

23   schedule, please?

24        A.    The schedule would be how

801a

1    much they plan to pay each month and how

2    they plan to pay it.

3        Q.    So they paid monthly?

4        A.    Some paid monthly.

5        Q.    And some paid otherwise?

6        A.    Some paid on whatever

7    schedule they could agree on.

8        Q.    How many, percentage-wise,

9    paid monthly?

10        A.    I do not know.

11        Q.    Who would know that?

12        A.    The administrative office in

13    Colorado would know that.

14        Q.    So is that Ms. Konyk?

15        A.    That would be Dr. Konyk.

16    Dr. Konyk, yes.

17        Q.    Oh, it's Dr. Konyk, I'm

18    sorry.

19            So it sounds to me, and

20    correct me if I'm wrong, that the -- in

21    the usual course for a USAT student

22    before 2018 a student would attend course

23    work?

24        A.    Right.

802a

Orien L. Tulp, Ph.D., M.D.

1    Q.    Between three-and-a-half,

2  four years kind of timing?

3    A.    Typically.

4    Q.    And they'd remain a USAT

5  student until they got through certain of

6  the USMLE exams?  Certain of the steps?

7    A.    That was -- that was the

8  plan.

9    Q.    Did those students continue

10  to pay tuition between when they finished

11  course work and when they finished their

12  USMLE exams?

13    A.    Some did.

14    Q.    But some did not?

15    A.    It was an individual basis.

16    Q.    But they yet remained

17  enrolled at USAT?

18    A.    It's an individual basis

19  that they would work out with the vice

20  president.

21    Q.    Do students pay any

22  additional amount of money upon

23  graduation for the termination of their

24  time at USAT?

803a

1       A.     No, no.  A graduation fee

2  and that's all they would pay.

3       Q.     Would USAT graduate students

4  who still had amounts due and owing of

5  USAT?

6       A.     They could walk for

7  graduation.

8       Q.     Would you issue a diploma?

9       A.     No.

10       Q.     Do you know in 2018 if USAT

11  issued diplomas before students finished

12  paying their tuition?

13       A.     USAT did not issue diplomas

14  until tuition is paid.  They have to

15  clear all the academic and administrative

16  elements before they receive their

17  certificates.

18       Q.     Is it fair to say that USAT

19  got paid on a time basis, so monthly or

20  quarterly, whenever the student could, as

21  opposed to an X amount for a medical

22  degree?  So if took a student five years

23  it would cost more than someone who took

24  three years?

1          A.      No.

2          Q.      So explain that to me.

3          A.      The fees are explained in

4    their admission document exactly how much

5    they're going to be and they're locked in

6    at the time of matriculation.

7               MS. MCENROE:  For purposes

8          of the record, and we can follow

9          up after the deposition, we're

10         going to put in a request for

11         production of at least the

12         standard form tuition agreement

13         with the students.  It's

14         responsive to a number of our

15         document requests in particular,

16         for example, number 12 documents

17         sufficient to show USAT's revenue

18         for calendar years 2003 through

19         2018.  Copies of and all documents

20         relating to contracts between USAT

21         and USAT students, etcetera.

22              MR. SWATE:  Send us a formal

23         request.

24              MS. MCENROE:  Yeah, we'll

Orien L. Tulp, Ph.D., M.D.

1    send you a letter in writing but I

2    just wanted to put you on notice

3    now.

4         MR. SWATE:  Send us a formal

5    request.

6         MS. MCENROE:  Oh, we did

7    already.

8         MR. SWATE:  Oh, you have?

9         MS. MCENROE:  Yes, we

10   already sent you a formal request,

11   that's what I'm looking at from

12   February 19, 2019.

13        MR. SWATE:  Okay.

14        MR. REIL:  Is that different

15   than what we've answered so far?

16   That's a request that has not been

17   answered?

18        MS. MCENROE:  It's a request

19   that's been answered like all the

20   rest of your answers that you're

21   not providing us with documents.

22   And I'm specifically telling you,

23   we found out now that there are

24   documents responsive that we

806a

Orien L. Tulp, Ph.D., M.D.

```
 1          should be able to at least see a
 2          copy of the form tuition
 3          agreement.
 4               MR. REIL:  I'm certainly not
 5          going to agree to that.  But as my
 6          cocounsel said, send us the
 7          request.
 8               MS. MCENROE:  Well, we
 9          already made the request.  But
10          we'll send you a letter clarifying
11          the request.
12               MR. REIL:  Thank you.
13     BY MS. MCENROE:
14          Q.   Do you know when USAT last
15     admitted a student, most recently?
16          A.   Mid September.
17          Q.   2018?
18          A.   2018.
19          Q.   Do you know what happened to
20     that last admitted student, did they
21     graduate?
22          A.   Not if they applied in
23     September they wouldn't have graduated,
24     no.
```

Orien L. Tulp, Ph.D., M.D.

1      Q.    So I had asked you a

2  question before, if a student took five

3  years to graduate did they pay more than

4  a student who graduated in three years.

5      A.    No.

6      Q.    So can you explain that to

7  me?

8      A.    There are fees, expected

9  fees, that are set when they are

10  admitted.  Those fees are locked in, as

11  University policy, and they will not

12  change for that student.  If the tuition

13  rate changes they got locked in at the

14  original rate quoted to them originally.

15  They need to plan their budgets just like

16  we need to plan ours.

17      Q.    Right.  But it sounded like

18  the students got charged on a monthly

19  basis.  And so I'm just trying to

20  understand when you say that they're

21  charged a fee or quoted a fee, is that a

22  lump sum price, it will cost you X amount

23  of dollars to get your medical degree

24  here?

808a

Orien L. Tulp, Ph.D., M.D.

1        A.     It depends on the student

2   and how many semesters they must complete

3   and what the total cost is predicted to

4   be.  If it goes over that we don't charge

5   them extra.

6        Q.     If they take longer you

7   don't charge them extra?

8        A.     Well, some people have to

9   take a leave for a month or a week or a

10  semester for family reasons, for personal

11  reasons, and we don't charge them more

12  money because they had to take a leave,

13  that would be silly.

14       Q.     So if a student graduated in

15  fewer years, so let's say in four years,

16  did that student pay less tuition than

17  somebody who took longer?

18       A.     They pay what would be

19  quoted in their admission letter.

20       Q.     Right.  But I'm still trying

21  to understand.  You had said they would

22  pay on some periodic basis, be it monthly

23  or whatnot.  And I was trying to

24  understand if they were quoted overall

Orien L. Tulp, Ph.D., M.D.

1    amounts that they're charged?

2        A.    It's based on a predicted

3    enrollment of four years.

4        Q.    Okay.  And if they finish in

5    three-and-a-half years would they be

6    charged less?

7        A.    No.  Because that would mean

8    they've completed their work faster than

9    prediction.  We always try to predict an

10   extra six months or so for each student

11   to be on the safe side.  But their

12   tuition is set as the number of semesters

13   they must complete and the amount of

14   course work they must complete, whether

15   it takes them three years or ten years.

16   It's the same.

17            No one has ever taken ten

18   years thankfully.  We'd have a talk

19   before that happens.

20       Q.    I'm sure you would.

21       A.    That's where I come in.

22       Q.    Yes.  Okay.  So we've been

23   talking a little bit about the money

24   inflowing, so coming into USAT.  I just

Orien L. Tulp, Ph.D., M.D.

1  want to understand, obviously, we're here

2  today because you filed a lawsuit against

3  ECFMG.  What is it that you're hoping to

4  get out of this lawsuit?

5       A.    Good resolution.

6       Q.    What do you mean by that?

7       A.    A good resolution.  Number

8  one, you've attached me personally.

9  ECFMG has attached me personally without

10  justifying that.

11       Q.    So I'm sorry --

12       A.    -- without proof.

13       Q.    I'm not trying to get at

14  what your allegations are.  I think I

15  have a pretty good understanding of your

16  allegations.  I'm trying to understand

17  the damages, the outcome, what you're

18  trying to get from ECFMG.

19            MR. REIL:  I'm going to

20            object, that the witness should be

21            allowed to finish his answer.

22            It's a wide-ranging question.  But

23            you can answer.

24            MS. MCENROE:  You can

811a

Orien L. Tulp, Ph.D., M.D.

```
1        answer.
2             THE WITNESS:  It's a
3        wide-ranging question.  When the
4        ECFMG posted that warning on the
5        World Directory of Medical Schools
6        on or before September 11, 2018,
7        when it was first reported to me,
8        not by ECFMG but by a student.  At
9        that point, all payments to the
10       University stopped and there was a
11       mass exitus.  You cost us over a
12       thousand students and you cost
13       over a thousand students their
14       medical careers.
15  BY MS. MCENROE:
16       Q.    All right.  So I'm just
17  trying to make sure I understand what
18  you're seeking to get out of this
19  lawsuit.  So you said you're not thousand
20  students, right, so you're not here on
21  behalf of their medical careers.  You're
22  here on behalf of yourself; right?
23       A.    The losses to the
24  University --
```

812a

Orien L. Tulp, Ph.D., M.D.

```
1        Q.    Wait.  Wait.

2        A.    -- are extraordinary.

3        Q.    So I'm trying to understand

4    through your lawsuit, Dr. Tulp, what is

5    it you're trying to get from ECFMG?

6              MR. REIL:  I would request

7         that the witness be allowed to

8         finish his answer without

9         interruption.

10             MS. MCENROE:  I'm trying to

11        make sure he actually answers my

12        question.

13             THE WITNESS:  We want a

14        resolution.  I'm not an

15        argumentative person.  We want a

16        resolution.  You gave the

17        University no opportunity to

18        correct whatever deficiencies you

19        found after 15 years of having

20        found none.

21             MS. MCENROE:  I'm going to

22        move --

23             THE WITNESS:  That makes no

24        sense to me.
```

Orien L. Tulp, Ph.D., M.D.

```
 1                 MS. MCENROE:  I'm going to
 2         move strike as nonresponsive.
 3  BY MS. MCENROE:
 4         Q.    So what dollar figure are
 5  you looking to get from ECFMG?
 6         A.    The uncollectible --
 7         Q.    -- specific dollar --
 8         A.    -- do you want to have a
 9  dollar figure?
10         Q.    Yes, I would like a dollar
11  figure.
12         A.    The uncollectible tuitions
13  as of October 1st up to, you know, from
14  at that point over $41.2 million.  These
15  are students that are paying a little bit
16  each month as they could, waiting to get
17  their documents.
18         Q.    Anything else?
19         A.    Personal damages.
20         Q.    How much?
21         A.    It's up to the judge.
22         Q.    How much would you be
23  seeking?
24         A.    You destroyed my career.
```

Orien L. Tulp, Ph.D., M.D.

1        Q.    I'm not --

2        A.    -- I had spotless career for

3   50 years.

4        Q.    Sir, I appreciate that.  I'm

5   asking for a dollar figure.  How much

6   would you be seeking from the court?

7             MR. REIL:  Objection.  There

8        are intangible damages in the

9        Complaint, that's for the

10       factfinder.  You may answer.

11  BY MS. MCENROE:

12       Q.    How much would you be

13  seeking from the court?

14       A.    We haven't decided.

15       Q.    Anything else?

16       A.    We want a resolution.

17       Q.    What do you mean by

18  resolution?  You've used that multiple

19  times.

20       A.    We have tried to work with

21  the ECFMG from the first e-mail and they

22  were very dishonest with me.  They said I

23  lied and I did not.  I don't lie.  If

24  there was an error in a form somewhere

815a

1   along the line that they discovered

2   retrospectively, let's fix the error,

3   let's not destroy the school.  We had the

4   strongest academic record of any school

5   in the Caribbean, that we built.  Because

6   we built it on an academic platform.  You

7   destroyed that.

8                MS. MCENROE:  Move to strike

9        as nonresponsive.

10  BY MS. MCENROE:

11       Q.    So what do you mean by

12  resolution?  You've used that word a

13  couple times.

14       A.    We want to restore USAT

15  preferentially.

16       Q.    What do you mean by

17  preferentially?

18       A.    That would be our first

19  choice to restore USAT.

20       Q.    Okay.

21       A.    So they continue to function

22  and continue to provide the diversity of

23  medical education that other schools are

24  not doing.

Orien L. Tulp, Ph.D., M.D.

1          Q.    So that means through a

2     modification of ECFMG sponsor note?

3          A.    Through removing the sponsor

4     note that's there that was placed well

5     before we knew, and well before any

6     correspondence from ECFMG.

7          Q.    Anything else?

8          A.    I think that's what's called

9     due process.

10          MS. MCENROE:  Move to strike

11          as nonresponsive.

12     BY MS. MCENROE:

13          Q.    Anything else?

14          A.    What else do you need to

15     know?

16          Q.    I'm just trying to get a

17     sense of what it is you're seeking

18     through this lawsuit.  I've asked that

19     question a number of times.  We've talked

20     through a number of things.  I'm asking

21     if there's anything else?

22          A.    We haven't decided the

23     damages.

24          Q.    You haven't yet decided the

817a

Orien L. Tulp, Ph.D., M.D.

1   damages?

2        A.    We have not decided the

3   damages.

4        Q.    Okay. Well, we're in

5   discovery --

6        A.    -- but we must collect the

7   uncollectible tuitions that became

8   uncollectible when that sponsor note went

9   on the World Directory of Medical Schools

10   without warning.

11        Q.    As of October 1st?

12        A.    It was there on September

13   11th.

14        Q.    And when did you -- no, no,

15   I understand. But you said that there

16   was a mass exitus but you graduated a

17   whole lot of students in 2018; right?

18        A.    Those were the ones that

19   completed the requirements or where in

20   their final semester.

21        Q.    So you graduated a whole lot

22   of students at the end of 2018. Do you

23   have a sense of how much money USAT took

24   in from the finishing of the medical

818a

Orien L. Tulp, Ph.D., M.D.

1    education for all those 400 students at

2    the end of 2018?

3          A.    No, I do not.

4          Q.    How would we figure that

5    out?  Does USAT keep financial

6    statements?

7          A.    Yes, but I don't -- I don't

8    keep them.

9          Q.    Does USAT get audited

10   financial statements?

11         A.    I believe so.

12         Q.    Do you know where USAT pays

13   taxes?

14         A.    Yes, we do pay taxes.

15         Q.    In which jurisdiction?

16         A.    The United States.

17         Q.    USAT pays taxes in the

18   United States --

19         A.    -- in the United States and

20   in Montserrat.

21         Q.    Where do you personally pay

22   taxes?

23         A.    I personally pay taxes?

24         Q.    Yes, where?

819a

Orien L. Tulp, Ph.D., M.D.

```
 1          A.    In the US.

 2          Q.    In which state?

 3          A.    Colorado.

 4          Q.    And do you file in any

 5   foreign jurisdictions?

 6          A.    I earn no foreign income.

 7          Q.    And do you get paid a salary

 8   from USAT?

 9          A.    No.

10          Q.    How do you get paid from

11   USAT?

12          A.    I don't get paid by USAT.

13          Q.    Previously, did you get paid

14   by USAT?

15          A.    No.

16          Q.    So how do you earn a living?

17          A.    I'm retired.  I have a

18   pension.

19          Q.    When did you retire?

20          A.    20 years ago.

21          Q.    Have you ever earned money

22   from USAT?

23          A.    No.

24          Q.    So you said you get a
```

820a

Orien L. Tulp, Ph.D., M.D.

1    pension, is that from the US Army?

2         A.    I get a military pension and

3    Social Security and a teacher's

4    retirement pension.

5         Q.    And from teaching where?

6         A.    From Drexel.  And other

7    institutions.

8         Q.    How long did you teach at

9    Drexel?

10        A.    Over 20 years.

11        Q.    And at what school at

12   Drexel?  If I'm saying that the right

13   way.  At the medical school,

14   undergraduate?

15        A.    They did not have the

16   medical school then.

17        Q.    Oh, I didn't realize that.

18   Okay.  So where were you teaching within

19   Drexel?

20        A.    I was Professor of

21   Nutrition.

22        Q.    From when to when?

23        A.    1983 until 2004.

24        Q.    And you get a pension from

Orien L. Tulp, Ph.D., M.D.

```
1    them as well?

2           A.    I have teacher's -- from the

3    TIAA.

4           Q.    Anything else?

5           A.    No.

6           Q.    Any other sources of income?

7           A.    No.

8           Q.    And you said Social Security

9    as well?

10          A.    Yes.

11          Q.    I little bit of housekeeping

12   and then we can take a quick break.  I

13   just want to make sure I have this right.

14                You have two counsel here

15   representing you today?

16          A.    Yes, I do.

17          Q.    You have Tommy Swate --

18          A.    Yes.

19          Q.    -- and Bill Reil?

20          A.    Yes.

21          Q.    And they're both your

22   lawyers?

23          A.    Yes.

24          Q.    And they're lawyers in this
```

Orien L. Tulp, Ph.D., M.D.

1    case for you?

2         A.    Yes.

3         Q.    And they were lawyers for

4    you before the ECFMG hearing on November

5    28, 2018?

6         A.    No.

7         Q.    They were not?

8         A.    Oh, yeah.  They were here

9    then.  Yes, yes, yes.

10        Q.    Okay.  So just to make sure

11   that the record is clear.  For the

12   hearing you attended at ECFMG in November

13   2018 --

14        A.    November 28th.

15        Q.    -- both Tommy Swate and Bill

16   Reil came with you as your counsel?

17        A.    That is correct.

18        Q.    And you had engaged them

19   prior to that time; correct?

20        A.    Yes.

21             MS. MCENROE:  I'd like to

22        take a quick break.

23             THE WITNESS:  Sure.

24             VIDEOGRAPHER:  Off the

Orien L. Tulp, Ph.D., M.D.

```
1        record at 10:48 a.m.
2             (At this time, a short break
3        was taken.)
4             VIDEOGRAPHER:  We're back on
5        the record at 11:08 a.m.
6             MS. MCENROE:  Subject to
7        question from counsel, I have
8        nothing further at this time.
9        Thank you very much.
10            THE WITNESS:  Okay.
11                 - - -
12               EXAMINATION
13                 - - -
14   BY MR. SWATE:
15       Q.    Coronal, I just have a few
16   questions.  I'm calling you Coronal, is
17   that insulting to you?
18       A.    Not at all.
19       Q.    Why?
20       A.    Because I earned the rank of
21   Coronal, professionally approved.
22       Q.    In the --
23       A.    -- in the United States
24   Army.
```

1    Q.    It wasn't Iraqui Army, it

2    was the United States Army?

3    A.    United States Army.

4    Q.    And you didn't get that by

5    filing a few papers?

6    A.    No, I did not.

7    Q.    How long did you serve in

8    the United States Army?

9    A.    Over 40 years.

10   Q.    40 years.  Now, did you have

11   lawyers hired when you found out about

12   the posting by the ECFMG on this internet

13   site for medical schools?

14   A.    No.

15   Q.    Did you have notice it was

16   going to be posted?

17   A.    No.

18         MS. MCENROE:  Objection to

19         form.

20   BY MR. SWATE:

21   Q.    How did you -- how did you

22   find out it was posted?

23   A.    A student called me and -- I

24   believe on the 13th of September and

Orien L. Tulp, Ph.D., M.D.

1    alerted me that it was there.

2         Q.    You didn't get a certified

3    letter from the ECFMG?

4         A.    No.

5              MS. MCENROE:  Objection to

6         form.

7              THE WITNESS:  No, I did not.

8              MR. SWATE:  Just to make

9         sure I answer your objection.

10   BY MR. SWATE:

11        Q.    Did you get any notice from

12   any party that they were posting this

13   information on the internet?

14        A.    No.

15             MS. MCENROE:  Objection to

16        form.

17   BY MR. SWATE:

18        Q.    Who posted this information?

19             MS. MCENROE:  Objection to

20        form.

21             THE WITNESS:  As I

22        understand it, the posting was

23        from the ECFMG to the World

24        Directory of Medical Schools.

Orien L. Tulp, Ph.D., M.D.

1              They take their instructions from

2              their sponsors, of which the ECFMG

3              is one.

4    BY MR. SWATE:

5              Q.    Did you have a hearing prior

6    to this post?

7              A.    No.

8              Q.    So what -- what was the

9    affect of this posting on the USAT?

10             A.    It was dramatic.

11             Q.    Well, dramatic, what do you

12   mean by --

13             A.    -- Dramatic in the sense

14   that up until mid September, I think

15   September 11th was the date that it was

16   actually posted, on or before, up until

17   mid December.  Mid September we were

18   getting between 2- and 300 applications

19   per month and admitting maybe 50 of

20   those.  They stopped.  We haven't had an

21   admission since mid September.  And since

22   that posting was on the World Directory

23   of Medical Schools our admissions group

24   tells us that there had only been 12

Orien L. Tulp, Ph.D., M.D.

```
1   applicants in all that time, that's eight
2   months.
3          Q.    Did it -- did any, have any
4   affect on your current students?
5          A.    Yes.
6          Q.    What affect did it have?
7          A.    It was devastating because
8   they saw their medical degree going out
9   the window.
10         Q.    Did any students leave the
11  school?
12         A.    About a thousand.  At least
13  a thousand.  I don't have an exact count.
14         Q.    Now, tell us a little bit
15  about your student population, is it
16  basically 22-year-olds from prominent
17  schools that get admitted or --
18         A.    -- no.
19         MS. MCENROE:  Objection to
20         form.
21  BY MR. SWATE:
22         Q.    What's your student
23  population?
24         A.    Student population are --
```

828a

Orien L. Tulp, Ph.D., M.D.

| | |
|---|---|
| 1 | MS. MCENROE:  Objection to |
| 2 | form. |
| 3 | THE WITNESS:  -- adult |
| 4 | learners.  The average age coming |
| 5 | in is mid 30s.  They range in age |
| 6 | from early 20s to over 60.  We do |
| 7 | not use any age criteria.  They |
| 8 | represent a very diverse group of |
| 9 | students culturally and -- as they |
| 10 | come from all -- all walks of life |
| 11 | literally and all cultures. |
| 12 | About 50 percent or more are |
| 13 | minorities that do not have access |
| 14 | to medical school in the United |
| 15 | States' system for the most part. |
| 16 | And that gives them an opportunity |
| 17 | to earn a medical degree and |
| 18 | become a physician, which for many |
| 19 | of them it's their life dream. |
| 20 | BY MR. SWATE: |
| 21 | Q.  How -- now, one of the |
| 22 | criteria of a successful medical schools |
| 23 | is how their students perform the test |
| 24 | that are administered by the USMLE, which |

Orien L. Tulp, Ph.D., M.D.

1    you can't take the test unless the ECFMG

2    gives you a certificate.  How do your --

3    how do your students do on this test,

4    these tests, these series of tests?

5            MS. MCENROE:  Objection to

6        form.

7            THE WITNESS:  Generally they

8        do quite well.

9    BY MR. SWATE:

10        Q.    Well, specifically, can you

11    tell me specifically how they do?

12            MS. MCENROE:  Objection to

13        form.

14            THE WITNESS:  About 90

15        percent pass, which is a very high

16        percentage for an international

17        school.  The highest score that I

18        have seen several years ago was

19        290 on an exam out of 292 and 288.

20        They do very well.

21    BY MR. SWATE:

22        Q.    Well, how does it compare

23    with the past rate of American medical

24    schools?

Orien L. Tulp, Ph.D., M.D.

```
 1              MS. MCENROE:  Objection to
 2        form.
 3              THE WITNESS:  Comparable.
 4        Very comparable.
 5   BY MR. SWATE:
 6        Q.    Now, once the students pass
 7   the exams, arduous exams, how do they do
 8   on their residency programs?
 9        A.    Very well.
10              MS. MCENROE:  Objection to
11        form.
12   BY MR. SWATE:
13        Q.    What's the acceptance rate
14   for residency?
15        A.    This year --
16              MS. MCENROE:  Objection to
17        form.
18              THE WITNESS:  This year our
19        selection rate was 90 percent for
20        residency in spite of that
21        warning.  It would have been
22        higher but many of them could not
23        get their results released in time
24        to be placed into residency.
```

Orien L. Tulp, Ph.D., M.D.

1    BY MR. SWATE:

2         Q.    Well, this lack of notice

3    and lack of hearing that ECFMG

4    participated in, what affect did it have

5    on your students?

6              MS. MCENROE:  Objection to

7         form.

8              THE WITNESS:  It was

9         devastating.

10   BY MR. SWATE:

11        Q.    By devastating, what do you

12   mean?

13        A.    Devastating because they

14   want information and they have not been

15   able to get accurate information from the

16   case workers.

17        Q.    Well, what affect did it

18   have on applying for residency?

19             MS. MCENROE:  Objection to

20        form.

21             THE WITNESS:  We have --

22   BY MR. SWATE:

23        Q.    -- if you know?

24        A.    We have 51 signed up for

Orien L. Tulp, Ph.D., M.D.

1    ERAS only about 20 were approved in time

2    by ECFMG.  And of those 20 I believe 18

3    have now been placed.

4         Q.    We talked about the ECFMG.

5    What is the role of the ECFMG in foreign

6    medical graduate education?  Can you tell

7    the jury --

8              MS. MCENROE:  Objection to

9         form.

10   BY MR. SWATE:

11        Q.    -- what the role is?

12        A.    They have exclusive control

13   over access to the US Medical Licensing

14   Examination.  There's no other way to

15   take that exam except going through the

16   ECFMG.  They're delegated that authority,

17   as I understand it, from various states.

18   And that would seem to make them, cause

19   they're governmental, because the states

20   are governmental.

21        Q.    Well, Coronal, if I

22   understand what you're telling me, if

23   they don't get a certificate from the

24   ECFMG you cannot enter the United States

833a

Orien L. Tulp, Ph.D., M.D.

1    medical training?

2            A.     They cannot.

3                   MS. MCENROE:   Objection to

4            form.

5                   THE WITNESS:   They cannot.

6            Because they also control the

7            residency ERAS, Electronic

8            Residency Application Service,

9            which gates them into applying for

10           specific programs for residency.

11   BY MR. SWATE:

12           Q.     The -- what action did the

13   ECFMG take, understand it was a hearing

14   on the 28th, of November the 28th.   Prior

15   to that hearing, what action did the

16   ECFMG take regarding documents they would

17   accept from your medical school, USAT?

18                  MS. MCENROE:   Objection to

19           form.

20                  THE WITNESS:   They, in their

21           statement, they said they would

22           not accept any documents that were

23           after December 31st.   They

24           canceled the exam permits for many

```
 1              students even though they had been
 2              previously approved to take the
 3              exam.  When they go report in to
 4              take the exam they would discover
 5              that their exams had been canceled
 6              by the ECFMG.
 7    BY MR. SWATE:
 8         Q.    This December 31st date,
 9    that's December 31, 2018?
10         A.    No, this is in October --
11    November.
12         Q.    No, I'm talking about the
13    date they wouldn't accept any documents
14    from USAT?
15         A.    No, they would --
16         Q.    -- at what date?
17              MS. MCENROE:  Objection to
18              form.
19              THE WITNESS:  The last date
20              they would accept documents they
21              had to have everything completed
22              by December 31st.
23    BY MR. SWATE:
24         Q.    Of what year?
```

Orien L. Tulp, Ph.D., M.D.

1          A.    Of 2018.

2          Q.    So on January 1, 2019, after

3    New Year's, it's like Cinderella that

4    turned into a pumpkin.

5          MS. MCENROE:  Objection to

6          form.

7          THE WITNESS:  Yeah, it turns

8          into now they can no longer --

9          after that they can't become

10         certified unless they have

11         completed all the requirements and

12         have the diploma in hand by the

13         end of 2018.

14   BY MR. SWATE:

15         Q.    When was this December the

16   31st deadline imposed?

17         MS. MCENROE:  Objection to

18         form.

19         THE WITNESS:  I believe it

20         was in October.

21   BY MR. SWATE:

22         Q.    Prior to the November 28th

23   hearing?

24         A.    Yes.

Orien L. Tulp, Ph.D., M.D.

```
1              Q.    So the committee that heard
2    your case didn't make that decision?
3              MS. MCENROE:   Objection to
4         form.
5              THE WITNESS:   No, it was
6         already made.
7              MR. SWATE:   And --
8              THE WITNESS:   -- the actual
9         date was September 11th as far as
10        I can figure out from looking at
11        the date stamped on the World
12        Directory site.
13   BY MR. SWATE:
14             Q.    So you weren't given an
15   opportunity for a hearing and notice of
16   the December 31st --
17             A.    -- no.
18             MS. MCENROE:   Objection to
19        form.
20             THE WITNESS:   Not at all.
21   BY MR. SWATE:
22             Q.    Now, you had a hearing on
23   December -- November the 28th; correct?
24             A.    Correct.
```

Orien L. Tulp, Ph.D., M.D.

```
1              Q.    And who conducted that
2     hearing?
3                    MS. MCENROE:   Objection to
4            form.
5                    THE WITNESS:   Ms. McEnroe.
6     BY MR. SWATE:
7              Q.    Ms. McEnroe.  Did any
8     committee member speak?
9              A.    No, not that I recall.
10             Q.    Did any committee members
11    talk about any evidence that was being
12    presented against you?
13             A.    No, not that I recall.
14                   MS. MCENROE:   Objection to
15           form.
16    BY MR. SWATE:
17             Q.    Was evidence presented at
18    the hearing that you've never seen
19    before?
20                   MS. MCENROE:   Objection to
21           form.
22                   THE WITNESS:   There was a
23           book placed on the table that I've
24           never seen before.  It was a black
```

Orien L. Tulp, Ph.D., M.D.

1           book on a black table, almost

2           didn't see it when I walked by.

3   BY MR. SWATE:

4           Q.    Was the committee -- was the

5   hearing adjourned?

6           A.    Yes.

7           Q.    Prior to you giving any

8   testimony?

9           A.    Yes.

10           Q.    Was your lawyer in the

11   process of going through the book when

12   the hearing was adjourned?

13           A.    Yes, he was.

14           Q.    Who was your lawyer?

15           A.    Tommy Swate.

16           Q.    Was Tommy Swate being

17   hostile or aggressive or frightening in

18   his representation of you during that --

19           A.    -- no.

20           MS. MCENROE:  Objection to

21           form.

22           Wait for him to finish the

23           question.

24           THE WITNESS:  Not at all.

Orien L. Tulp, Ph.D., M.D.

1   BY MR. SWATE:

2        Q.    Now, Ms. McEnroe is a

3   witness; correct?

4            MS. MCENROE:  Objection to

5        form.

6            THE WITNESS:  She is a

7        witness, yes.

8            MR. SWATE:  Can I just

9        consult with my counsel a minute?

10       We may be close.

11           MS. MCENROE:  Sure.  Do you

12       want to take a quick?

13           MR. SWATE:  Yeah.

14           VIDEOGRAPHER:  Off the

15       record at 11:20 a.m.

16           (At this time, a short break

17       was taken.)

18           VIDEOGRAPHER:  Back on the

19       record at 11:26 a.m.

20  BY MR. SWATE:

21       Q.    Just a couple quick

22  questions, Coronal.

23            In this hearing of the 28th

24  I just want to make it clear that the

Orien L. Tulp, Ph.D., M.D.

1  committee presented no evidence against

2  you?

3        A.    No, they did not.

4             MS. MCENROE:   Objection to

5        form.

6  BY MR. SWATE:

7        Q.    And you understand by their

8  agreement that they are required to make

9  a decision based on the preponderance of

10 the evidence?

11            MS. MCENROE:   Objection to

12       form.

13            THE WITNESS:   That's what I

14       understand.

15 BY MR. SWATE:

16       Q.    Did -- by preponderance of

17 the evidence, could they have made some

18 kind of decision based on the evidence

19 heard in the committee meeting?

20       A.    No.

21            MS. MCENROE:   Objection to

22       form.  Calls for a legal

23       conclusion.

24 BY MR. SWATE:

Orien L. Tulp, Ph.D., M.D.

```
1          Q.    Was there any evidence

2    presented in the committee meeting?

3               MS. MCENROE:  Objection to

4          form.

5               THE WITNESS:  In the

6          committee meeting that followed

7          the hearing?

8    BY MR. SWATE:

9          Q.    No.  The hearing, your --

10         A.    -- no, there was no evidence

11   presented.

12              MR. SWATE:  Okay.  I'll pass

13         the witness.

14              MS. MCENROE:  Thank you.

15                   - - -

16                 EXAMINATION

17                   - - -

18   BY MS. MCENROE:

19         Q.    I just have a couple of

20   quick questions.

21         A.    Okay.

22         Q.    You were just being

23   questioned by your counsel, Tommy Swate;

24   correct?
```

1        A.    Right.  Correct.

2        Q.    You testified earlier that

3  I'm a witness, meaning Elisa McEnroe, is

4  a witness to the November 28th hearing --

5        A.    Right.

6        Q.    -- is that correct?

7        A.    That's correct.

8        Q.    So the same would be true

9  for your counsel, Tommy Swate; correct?

10       A.    No --

11       Q.    -- he was present?

12       A.    Yeah, he was present.

13       Q.    Yup.  And he would be a

14  witness as well?

15       A.    He would be the witness of

16  the events, yes.

17       Q.    And Mr. Bill Reil as well

18  was a present at the hearing?

19       A.    Yes.

20       Q.    And he would be a witness as

21  well?

22       A.    That's correct.

23       Q.    When did you hire your

24  counsel Tommy Swate and Bill Reil?

Orien L. Tulp, Ph.D., M.D.

1     A.    October.  I don't know

2   when -- it was after this, you know,

3   after this happened because we weren't --

4     Q.    After what happened?

5     A.    After we received the

6   September 14th, I think was -- the close

7   of business of September 14th, when I

8   received the e-mail from the ECFMG

9   notifying us.  So that's at least three

10  days after it was posted.

11    Q.    So you hired counsel in mid

12  September 2018?

13    A.    Sometime around October 1st

14  or thereabouts.  It took us a little

15  while to find an attorney who understood

16  the merits of the case.

17          But I have one question for

18  you.

19          MR. SWATE:  No.

20          MR. REIL:  No.

21          THE WITNESS:  Because you

22      haven't introduced your friends

23      here.  And I don't know who they

24      are.

Orien L. Tulp, Ph.D., M.D.

```
1              MR. REIL:  Don't worry about
2         that now.  Just answer her
3         questions.
4              THE WITNESS:  Okay.
5    BY MS. MCENROE:
6         Q.    And when you say you hired
7    counsel that was Mr. Tommy Swate and Bill
8    Reil?
9         A.    Correct.
10        Q.    So that was sometime maybe
11   early October?
12        A.    Something like that.  I
13   don't recall the exact date.
14        Q.    Got it.  And have you
15   personally been sued by any USAT student
16   in connection with the ECFMG sponsor
17   note?
18        A.    Not yet.
19        Q.    Have you personally been
20   sued by any USAT student in connection
21   with the finding of irregular behavior
22   against you by ECFMG?
23        A.    No, not yet.
24        Q.    And when you say not yet, do
```

Orien L. Tulp, Ph.D., M.D.

1    you know of any impending lawsuits at

2    present?

3            A.    I've heard rumors.

4            Q.    You've heard rumors.  Do you

5    know about who was going to sue you?

6            A.    I wouldn't care to disclose

7    that.

8            Q.    Do you know if USAT has been

9    sued by any student in connection with

10   the sponsor note change for USAT from

11   ECFMG?

12           A.    I'm not aware of it yet.

13           Q.    You say you're not aware of

14   it yet, are you aware that USAT has been

15   sued or you don't, or no?

16           A.    I'm not aware.  I think I

17   would have known if they had been served

18   a suit.  I have not been served a suit.

19           Q.    Do you know if a suit

20   against USAT has been filed?

21           A.    I do not know.

22           MS. MCENROE:  I have no

23        further questions.  Pending

24        counsel's questions.

846a

Orien L. Tulp, Ph.D., M.D.

```
1              MR. SWATE:  No, we have --
2              MR. REIL:  Nor do I.
3              MS. MCENROE:  Great.  Well,
4     thank you everybody.  Thank your
5     for your time, Doctor.
6              VIDEOGRAPHER:  This
7     concludes this deposition.  The
8     time is 11:30 a.m., we're off the
9     record.
10              (Video deposition concluded
11     at 11:30 a.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Orien L. Tulp, Ph.D., M.D.

1          C E R T I F I C A T I O N

2

3          I, DANA M. JONES, Professional

4    Court Reporter and Notary Public, certify

5    that the foregoing is a true and accurate

6    transcript of the deposition held before

7    me at the time, place and on the date

8    hereinbefore set forth.

9          I further certify that I am

10   neither attorney nor counsel for, not

11   related to or employed by, any of the

12   parties to the action in which this

13   deposition was taken; further, that I am

14   not a relative or employee of any

15   attorney or counsel employed in this

16   case, nor am I financially interested in

17   this action.

18

19

20

21

22   _____

               DANA M. JONES

23

24

848a